**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| QUEST DIAGNOSTICS INVESTMENTS LLC, | |
| Plaintiff, | |
| v. | C.A. No. 1:18-cv-01436-MN |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, ESOTERIX, INC., and ENDOCRINE SCIENCES, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE PLEADINGS UNDER 35 U.S.C. § 101**

## TABLE OF CONTENTS

I.      STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ..........................1

II.     SUMMARY OF ARGUMENT ................................................................................1

III.    STATEMENT OF FACTS ......................................................................................2

      A.      The Testosterone Patent ..........................................................................2

      B.      The Vitamin D Patents .............................................................................4

           1.      The '867 and '427 Patents (Vitamin D Metabolites)...................4

           2.      The '868 Patent (Dihydroxyvitamin D Metabolites)...................8

IV.     LEGAL STANDARDS .........................................................................................10

      A.      Rule 12(c).................................................................................................10

      B.      Section 101...............................................................................................11

V.      ARGUMENT .......................................................................................................12

      A.      The Testosterone Patent is Not Patent-Eligible .........................................12

           1.      *Alice/Mayo* Step 1 ...................................................................12

           2.      *Alice/Mayo* Step 2 ...................................................................14

      B.      The Vitamin D Patents Are Not Patent-Eligible.....................................16

           1.      *Alice/Mayo* Step 1 ...................................................................17

           2.      *Alice/Mayo* Step 2 ...................................................................18

VI.     CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE(S)**

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)................................................................................11, 12

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015)............................................................... passim

*Athena Diagnostics, Inc. v. Mayo Collaborative Services, LLC*,
   No. 2017-2508, 2019 U.S. App. LEXIS 3645 (Fed. Cir. Feb. 6, 2019) ................... passim

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014)........................................................................11

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
   859 F.3d 1352 (Fed. Cir. 2017)............................................................... passim

*In-Depth Test, LLC v. Maxim Integrated, Prods., Inc.*,
   Civ. No. 14-877-CFC, 2018 WL 6617142 (D. Del. Dec. 18, 2018)................................11

*Intellectual Ventures I LLC v. AT & T Mobility LLC*,
   235 F. Supp. 3d 577 (D. Del. 2016).................................................................11

*Mayo Collaborative Servs. v. Pometheus Labs., Inc.*,
   566 U.S. 66 (2012)............................................................................... passim

*OIP Techs., Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 (Fed. Cir. 2015)........................................................................11

*Roche Molecular Sys. v. Cepheid*,
   905 F.3d 1363 (Fed. Cir. 2018)............................................................... passim

*Rosenau v. Unifund Corp.*,
   539 F.3d 218 (3rd Cir. 2008) ...........................................................................11

*Zimmerman v. Corbett*,
   873 F.3d 414 (3rd Cir. 2017) ...........................................................................10

## STATUTES

35 U.S.C. § 101 ..........................................................................................1, 2, 11, 19

## RULES

Fed. R. Civ. P. 12(b)(6) ...................................................................................10

Fed. R. Civ. P. 12(c) .................................................................................10, 11

Defendants Laboratory Corporation of America Holdings; Esoterix, Inc.; and Endocrine Sciences, Inc. (collectively, "LabCorp") respectfully move for judgment on the pleadings that the four patents-in-suit are patent-ineligible under 35 U.S.C. § 101.

## I.   STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Quest Diagnostics Investments LLC ("Quest") filed a Complaint against LabCorp on September 17, 2018 asserting infringement of four patents.  D.I. 1.  The Court issued a Scheduling Order on January 15, 2019 with a jury trial scheduled for March 29, 2021. D.I. 18.

## II.   SUMMARY OF ARGUMENT

All four patents asserted by Quest in the Complaint are directed to natural phenomena, an ineligible patent subject matter.   One of the patents—U.S. Patent No. 8,409,862 ("the Testosterone Patent")—is directed to determining the amount of testosterone in a sample from female human by mass spectrometry.  The other three patents—U.S. Patent Nos. 7,972,867; 8,101,427; and 7,972,868 ("the Vitamin D Patents")—are directed to determining the presence or amount of vitamin D or dihydroxyvitamin D metabolites in a sample by mass spectrometry.  The patents disclose that testosterone and vitamin D or dihydroxyvitamin D metabolites are naturally occurring compounds in animals.  The patents also describe mass spectrometry as a well-known technique at the time of the alleged inventions.  Consequently, the four patents-in-suit are merely directed to methods of determining the presence or amount of naturally occurring compound (testosterone, or vitamin D or dihydroxyvitamin D metabolites) in a sample by using a well-known, conventional, and routine technique—mass spectrometry.  Because the patents-in-suit are directed to nothing more than observing natural phenomena, they are directed to patent-ineligible subject matter.

1

Further, none of the elements in the asserted claims of the patents-in-suit contain an inventive step sufficient to transform the claimed naturally occurring phenomenon into a patent-eligible application. All the steps and limitations found in the asserted claims are described in the patents as well-known to the skilled artisan, thus merely routine and conventional. None of the asserted claims provide any new laboratory technique or any new innovation. Thus, the elements found in the asserted claims do not and cannot transform the nature of the claims into a patent-eligible concept.

Accordingly, all four patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and therefore, the case should be dismissed with prejudice.

## III. STATEMENT OF FACTS

### A. The Testosterone Patent

The Testosterone Patent (the '862 patent) is entitled "Determination of Testosterone by Mass Spectrometry" and was issued on April 2, 2013. D.I. 1-1, Ex. A (hereinafter, "'862"). Quest asserts claim 1 of the Testosterone Patent in the Complaint (D.I. 1 at ¶ 49), which is directed to "[a] method for determining the amount of testosterone in a sample when taken from a female human." '862 at 19:50-51. Claim 1 reads:

> The invention claimed is:
> 1. A method for determining the amount of testosterone in a sample when taken from a female human, comprising:
> (a) purifying testosterone from a sample from a female human, wherein said purifying comprises extracting testosterone from said sample;
> (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and
> (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;
> wherein said testosterone is not derivatized prior to mass spectrometry, and
> wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample.

*Id.* at 19:50-65 (highlights added).  The specification explains that testosterone is a naturally occurring hormone.  *Id.* at 1:32-48 ("Testosterone . . . is a C19 steroid hormone . . . Testosterone stimulates adult maturation of external genitalia and secondary sex organs, and the growth of beards, axillary and pubic hair. . . ."); *see also id.* at 1:49-59 ("Testosterone levels are much lower in females compared to males. . . .").

The three claimed steps of claim 1—(a) "purifying"; (b) "ionizing"; and (c) "detecting"—all go to using the mass spectrometry technique and are all described in the specification as well-known in the art, i.e., conventional and routine.  Indeed, mass spectrometry was already a common technique in the art at the time of the alleged invention.  *Id.* at 6:28-7:18 (citing to prior art patents when describing mass spectrometry).  As to the first "purifying" testosterone step, the specification states:  "In certain embodiments, the testosterone present in a test sample can be purified prior to ionization.  **Numerous methods are known in the art to purify testosterone**, including [listing of different methods]."  *Id.* at 3:6-15 (emphasis added).  The second step of "ionizing" is also described as well-known in the art.  *Id.* at 3:59-4:2 ("In various embodiments, the testosterone present in a test sample can be **ionized by any method known to the skilled artisan**. . . .   The skilled artisan will understand that the choice of ionization method can be determined based on the analyte to be measured, type of sample, the type of detector, the choice of positive versus negative mode, etc.") (emphasis added).   The last step of "detecting" testosterone ion by a mass spectrometer and relating the amount of the ion to the amount of the original molecule (i.e., testosterone) is similarly described in the patent as well-known in the art:  "The mass spectrometer typically provides the user with an ion scan; that is, the relative abundance of each m/z over a given range . . . **Numerous other methods for relating the**

*presence of amount of an ion to the presence or amount of the original molecule are well
known to those of ordinary skill in the art.*" *Id.* at 4:19-35 (emphasis added).

Claim 1 also contains two "wherein" clauses.  The first "wherein" clause simply states
that "testosterone is *not derivatized* prior to mass spectrometry."  *Id.* at 19:62-63 (emphasis
added).  In other words, it simply instructs not to derivatize testosterone—reacting two
molecules to form a new molecule—prior to mass spectrometry.[1]  The second "wherein" clause
claims that the method is "*capable of detecting* testosterone at concentrations of less than 10
ng/dL in the sample."  *Id.* at 19:64-65 (emphasis added).  In other words, the second "wherein"
clause merely states a result—the specific range of concentration of testosterone that the method
can detect.

### B.  The Vitamin D Patents

Quest asserts three Vitamin D Patents ('867, '427, and '868 patents).  The first two ('867
and '427 patents) are entitled "Methods for Detecting Vitamin D Metabolites by Mass
Spectrometry" and share the same specification.  D.I. 1-1, Ex. C (hereinafter "'867") and Ex. B
(hereinafter "'427").  The '867 patent was issued on July 5, 2011 and the '427 patent was issued
on January 24, 2012.  *Id.*  The third Vitamin D Patent ('868 patent) is entitled "Method for
Detecting Dihydroxyvitamin D Metabolites by Mass Spectrometry" and was issued on July 5,
2011.  D.I. 1-1, Ex. D (hereinafter "'868").

### 1.  The '867 and '427 Patents (Vitamin D Metabolites)

Quest asserts claim 21 of the '867 patent in the Complaint (D.I. 1 at ¶ 68), which is
directed to "[a] method for determining the presence or amount of 25-hydroxyvitamin $D_2$ in a
sample by tandem mass spectrometry."  '867 at 22:21-23.  Claim 21 of the '868 patent reads:

---

[1] The '867 patent explains that "derivatizing" means "reacting two molecules to form a new
molecule."  D.I. 1-1, Ex. C at 3:58-59.

> **21**. A method for determining the presence or amount of 25-hydroxyvitamin $D_2$ in a sample by tandem mass spectrometry, comprising:
> (a) generating a protonated and dehydrated precursor ion of said 25-hydroxyvitamin $D_2$ with a mass to charge ratio (m/z) of 395.30±0.5;
> (b) generating one or more fragment ions of said precursor ion; and
> (c) detecting the presence or amount of one or more of said ions generated in step (a) or (b) or both and relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ in said sample.

*Id.* at 22:20-32 (highlights added).

Quest asserts claim 1 of the '427 patent in the Complaint (D.I. 1 at ¶ 56), which is directed to "[a] method for determining the amount of vitamin D metabolite in a sample by tandem mass spectrometry." '427 at 20:44-46. Claim 1 of the '427 patent reads:

> **1**. A method for determining the amount of a vitamin D metabolite in a sample by tandem mass spectrometry, comprising:
> (a) generating a protonated and dehydrated precursor ion of said vitamin D metabolite;
> (b) generating one or more fragment ions of said precursor ion; and
> (c) detecting the amount of one or more of said ions generated in step (a) or (b) or both and relating the detected ions to the amount of said vitamin D metabolite in said sample.

*Id.* at 20:44-54.

The patents explain that 25-hydroxyvitamin $D_2$ is a vitamin D metabolite. '867[2] at 3:39-42 ("the vitamin D metabolite is one or more compounds selected from the group consisting of 25-hydroxyvitamin $D_3$, 25-hydroxyvitamin $D_2$, 1,25-dihydroxyvitamin $D_3$ and 1,25-dihydroxyvitamin $D_2$."). The patents also explain that vitamin D metabolites are naturally occurring compounds in animals. *Id.* at 3:29-32 ("As used herein, the term 'vitamin D metabolite' refers to any chemical species that may be ***found in the circulation of an animal***

---

[2] Because the '867 and '427 patents share the same specification, only the '867 patent is cited to reference both.

which is formed by a biosynthetic or metabolic pathway for vitamin D or a synthetic vitamin D analog.") (emphasis added).  Further, the patents describe that using mass spectrometry to detect specific vitamin D metabolites was already well-known in the art.  *Id.* at 2:21-33 ("reports have been published that disclose methods for detecting specific vitamin D metabolites using mass spectrometry. . . .").  Additionally, the specification describes tandem mass spectrometry as well-known in the art.  *See, e.g.*, *id.* at 9:13-15 ("Mass spectrometers that combine time-of-flight analyzers with ***tandem MS*** are also ***well known to the artisan***.") (emphasis added).

Indeed, the three claimed steps in claim 21 of the '867 patent and claim 1 of the '427 patent—(a) "generating . . . precursor ion"; (b) "generating . . . fragment ions"; and (c) "detecting"—all go to using the mass spectrometry technique and are all described in the specification as well-known in the art, i.e., conventional and routine.  For the first two steps, the patents explain that "generating . . . precursor ion" and "generating . . . fragment ions" are well-known to the artisan.  *Id.* at 8:59-67 ("One can often enhance the resolution of the MS technique by employing '***tandem mass spectrometry***,' or 'MS/MS,'   In this technique, a ***precursor ion (also called a parent ion) generated*** from a molecule of interest can be filtered in an MS instrument, and the precursor ion is subsequently ***fragmented*** to ***yield*** one or more ***fragment ions*** (also called daughter ion or product ions) that are then analyzed in a second MS procedure.") (emphasis added); *see also id.* at 9:13-15 ("Mass spectrometers that combine time-of-flight analyzers with ***tandem MS*** are also ***well known to the artisan***.") (emphasis added); 10:13-17 ("***Using standard methods well known in the art***, one of ordinary skill is capable of identifying one or more ***fragment ions*** of a particular ***precursor ion*** of a vitamin D metabolite that can be used for selection in quadrupole 3 (Q3).") (emphasis added); *see also id.* at 8:56-58 (explaining

that in mass spectrometry, "quadrupole instruments can act as both a 'mass filter' and as a 'mass detector' for the ions injected into the instrument.").

For the first step in the '867 patent, claim 27(a) additionally claims "generating a **protonated** and **dehydrated** precursor ion of said 25-hydroxyvitamin $D_2$ with a **mass to charge ratio (m/z)** of 395.30±0.5." *Id.* at 22:24-26 (emphasis added). Claim 1 of the '427 patent does not claim any specific mass to charge ratio (m/z). Claim 27(a) of the '867 patent makes clear that generating a precursor ion with the recited mass to charge ratio (m/z) is dictated by a well-known chemical reaction. 25-hydroxyvitamin $D_2$ has a molecular weight of about 412 g/mol. Claim 27(a) claims both protonating and dehydrating the 25-hydroxyvitamin $D_2$. The protonation—i.e., adding hydrogen ($H^+$)—is adding 1 g/mol to the compound, which adds up to 413 g/mol. Dehydration—i.e., subtracting water ($H_2O$)—is subtracting 18 g/mol to the compound, which comes out to 395 g/mol, which is claimed in claim 27(a) of the '867 patent. Indeed, the patents explain that calculating mass to charge ratio (m/z) is well-known in the art. *Id.* at 4:25-29 ("MS [mass spectrometry] technology generally includes . . . (2) *detecting the molecular weight of the charged compound and calculating a mass-to-charge ratio (m/z).*").

The last step of claim 27 of the '867 patent and claim 1 of the '427 patent is "detecting" the presence or amount of the ions and relating that to the amount of the vitamin D metabolite. The patents describe that such technique was well-known in the art: "The results of an analyte assay, that is, a mass spectrum, can be related to the amount of the analyte in the original sample by **numerous methods known in the art**. . . . Numerous other methods for relating the presence or amount of an ion to the presence or amount of the original molecule will be **well known to those of ordinary skill in the art**." *Id.* at 9:22-45 (emphasis added).

-7-

### 2.    The '868 Patent (Dihydroxyvitamin D Metabolites)

Quest asserts claims 1 and/or 9 of the '868 patent in the Complaint (D.I. 1 at ¶ 81), which are directed to "determining the amount of one or more dihydroxyvitamin D metabolites in a [] sample . . . by tandem mass spectrometry." '868 at 19:51-54 and 20:23-26.  Claims 1 and 9 read as follows:

**1.** A method for determining the amount of one or more dihydroxyvitamin D metabolites in a biological sample, when taken from a human, by tandem mass spectrometry, comprising:

(i) generating a precursor ion of said one or more dihydroxyvitamin D metabolites by ionizing said one or more dihydroxyvitamin D metabolites with atmospheric pressure chemical ionization (APCI);

(ii) generating one or more fragment ions of said precursor ion; and

(iii) detecting the amount of one or more of said ions generated in step (i) or (ii) or both and relating the amount of detected ions to the amount of said one or more dihydroxyvitamin D metabolites in said sample; wherein said one or more dihydroxyvitamin D metabolites are not subject to derivatization.

**9.** A method for determining the amount of one or more dihydroxyvitamin D metabolites in a sample by tandem mass spectrometry, comprising:

(a) derivatizing the dihydroxyvitamin D metabolites from said sample with 4'-carboxyphenyl-TAD; and

(b) determining the amount of the derivatized vitamin D metabolites obtained from step (a) by tandem mass spectrometry comprising:

(i) generating a precursor ion of said one or more dihydroxyvitamin D metabolites;

(ii) generating one or more fragment ions of said precursor ion; and

(iii) detecting the amount of one or more of said ions generated in step (i) or (ii) or both and relating the amount of detected ions to the amount of said one or more dihydroxyvitamin D metabolites in said sample.

*Id.* at 19:51-65 and 20:23-38 (highlights added).  Claims 1 and 9 are substantially the same, except claim 1 requires no derivatization and claim 9 requires derivatization.

The specification explains that dihydroxyvitamin D metabolite is a naturally occurring compound in animals.  *Id.* at 3:50-61 ("As used herein, the term 'dihydroxyvitamin D metabolite' refers to any dihydroxylated vitamin D species that may be ***found in the circulation of an animal*** which is formed by a biosynthetic or metabolic pathway for vitamin D or a synthetic vitamin D analog . . . . In certain preferred embodiments the dihydroxyvitamin D metabolites are naturally present in a body fluid of a mammal, more preferably a human.") (emphasis added).  The specification further explains that using mass spectrometry to detect specific vitamin D metabolites was well-known in the art.  *Id.* 2:8-9 ("reports have been published that disclose methods for detecting specific vitamin D metabolites using mass spectrometry.").  Additionally, the specification describes tandem mass spectrometry as well-

known in the art.  *See, e.g.*, *id.* at 14:36-38 ("Mass spectrometers that combine time-of-flight analyzers with **tandem MS** are also **well known to the artisan**.") (emphasis added).

Both claims 1 and 9 claim three steps—(i) "generating a precursor ion"; (ii) generating . . . fragment ions"; and (iii) "detecting."  They all go to using the mass spectrometry technique and all of which are described in the specification as well-known in the art, i.e., conventional and routine.  For the first two steps, the specification describes "generating a precursor ion" and "generating . . . fragment ions" as well-known to the artisan.  *Id.* at 14:15-22 ("One may enhance the resolution of the MS technique by employing '**tandem mass spectrometry**' or 'MS/MS.'  In this technique, a **precursor ion** (also called a parent ion) **generated** from a molecule of interest can be filtered in an MS instrument, and the precursor ion is subsequently **fragmented** to yield one or more **fragment ions** (also called daughter ions or product ions) that are then analyzed in a second MS procedure.") (emphasis added); *see also id.* at 14:36-38 ("Mass spectrometers that combine time-of-flight analyzers with **tandem MS** are also **well known to the artisan**.") (emphasis added).

The first step of claim 1 also claims using "atmospheric pressure chemical ionization (APCI)."  *Id.* at 19:56-57.  But APCI is described in the specification as well-known in the art. *Id.* at 13:48-61 ("Mass spectrometry is performed using a mass spectrometer which includes an ion source for ionizing the fractionated sample and creating charged molecules for further analysis.  For example **ionization of the sample may be performed by** electrospray ionization (ESI), **atmospheric pressure chemical ionization (APCI)**, photoionization, . . . The **skilled artisan will understand** that the choice of ionization method can be determined based on the analyte to be measured, type of sample, the type of detector, the choice of positive versus negative mode, etc.") (emphasis added).

The last step of "detecting" the amount of the ions and relating that to the amount of the dihydroxyvitamin D metabolites is also described by the specification as well-known in the art: "Numerous other methods for relating the presence or amount of an ion to the presence or amount of the original molecule will be ***well known to those of ordinary skill in the art***."  *Id.* at 14:67-15:3 (emphasis added).

In addition to the three steps, claim 1 requires that "dihydroxyvitamin D metabolites are not subject to derivatization" (*id.* at 19:65) and claim 9 requires "derivatizing the dihydroxyvitamin D metabolites" (*id.* at 20:26-27).   As disclosed in the specification, derivatizing or not derivatizing a compound before using mass spectrometry was well-known in the art at the time of the alleged invention.  *Id.* at 4:66-67 ("As used herein, 'derivatizing' means reacting two molecules to form a new molecule."); 2:10-20 ("[Prior art references] disclose methods for detecting various vitamin D metabolites using liquid chromatography and mass spectrometry.  These methods require that the metabolites be ***derivatized*** prior to detection by mass-spectrometry.    Methods   to   detect   ***underivatized***   1,25   $(OH)_2D3$   by   liquid chromatography/mass-spectrometry are disclosed in Kissmeyer and Sonne, J Chromatogr A. 2001 . . .") (emphasis added).

## IV.    LEGAL STANDARDS

### A.    Rule 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  A Rule 12(c) motion is analyzed under the same standards that apply to a Rule 12(b)(6) motion to dismiss.  *Zimmerman v. Corbett,* 873 F.3d 414, 417 (3rd Cir. 2017).  When considering a motion for judgment on the pleadings, courts accept all of the non-moving party's well-pled allegations as true and draw all reasonable inferences in the non-movant's favor.  *Id.* at 417-18.  Judgment on the pleadings is only granted

when the "movant clearly establishes that no material issue of fact remains to be resolved and [the movant] is entitled to judgment as a matter of law." *In-Depth Test, LLC v. Maxim Integrated, Prods., Inc.,* Civ. No. 14-877-CFC, 2018 WL 6617142, at *3 (D. Del. Dec. 18, 2018) (quoting *Rosenau v. Unifund Corp.,* 539 F.3d 218, 221 (3rd Cir. 2008)). "The ultimate question of patent eligibility is an issue of law, making it an appropriate basis for a Rule 12(c) motion." *Intellectual Ventures I LLC v. AT & T Mobility LLC*, 235 F. Supp. 3d 577, 585 (D. Del. 2016) ("The Federal Circuit has affirmed district courts that have granted motions for judgment on the pleadings based on § 101 challenges.") (*citing OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015) and *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014)).

## B.      Section 101

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. But there is an exception: Laws of nature, natural phenomena, and abstract ideas are not patentable—these concepts are ineligible for patent protection. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014).

The Supreme Court has established a two-step framework for distinguishing between patents that claim patent-ineligible concepts "from those that claim patent-eligible applications of those concepts." *Id.* at 2355 (citing *Mayo Collaborative Servs. v. Pometheus Labs., Inc.*, 566 U.S. 66, 77-79 (2012)). The first step of *Alice/Mayo* asks whether the claims are ***directed to*** an ineligible concept. *Id.* at 2355; *Mayo* at 75-77. "While method claims are generally eligible subject matter, method claims that are directed only to natural phenomena [or laws of nature] are directed to ineligible subject matter." *Cleveland Clinic Found. v. True Health Diagnostics LLC*,

859 F.3d 1352, 1360 (Fed. Cir. 2017).  "If the claims are directed to eligible subject matter, the inquiry ends."  *Id.*  If not, the second step of *Alice/Mayo* examines "whether the limitations of the claim apart from the law of nature [or naturally occurring phenomena], considered individually and as an ordered combination, 'transform the nature of the claim into a patent-eligible application.'"  *Athena Diagnostics, Inc. v. Mayo Collaborative Services, LLC*, No. 2017-2508, 2019 U.S. App. LEXIS 3645, at *11 (Fed. Cir. Feb. 6, 2019) (citing *Alice*, 134 S. Ct. at 2355); *see also Mayo*, 566 U.S. at 71-72.  "For claims that encompass natural phenomena, the method steps are the 'additional features that must be new and useful.'"  *Roche Molecular Sys. v. Cepheid*, 905 F.3d 1363, 1368 (Fed. Cir. 2018) (citing *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377 (Fed. Cir. 2015)).  "To save a patent at step two, an inventive concept must be evident in the claims."  *Cleveland Clinic*, 859 F.3d at 1362 (citation omitted).

## V.    ARGUMENT

### A.    The Testosterone Patent is Not Patent-Eligible

The Testosterone Patent is directed to a method of observing a natural phenomenon: determining an amount of naturally occurring testosterone in a sample of a female human.  It does so by using mass spectrometry, a well-known, conventional, and routine technique.  Nothing in the claims transform them into anything more than observing this natural phenomenon.  Accordingly, the Testosterone Patent is patent ineligible.

#### 1.    *Alice/Mayo* Step 1

Claim 1 of Testosterone Patent is directed to a method of determining an amount of testosterone in a sample of a female human by using mass spectrometry.  *See* '862 at 19:50-51; *see also* title of '862 patent ("Determination of Testosterone by Mass Spectrometry").  The specification makes clear that (1) testosterone is a naturally occurring hormone (*id.* at 1:32-48, 1:49-59); and (2) mass spectrometry was a well-known technique in the art at the time of the

alleged invention (*id.* at 6:28-7:18).  Accordingly, claim 1 is nothing more than observing a natural phenomenon (determining amount of naturally occurring testosterone) using a well-known, conventional and routine technique (mass spectrometry).  This is patent-ineligible subject matter.

Notably, claim 1 is akin to the claims found to be patent-ineligible by the Federal Circuit in *Ariosa, Cleveland Clinic*, *Roche*, and *Athena*.  In *Ariosa*, the method in question started with "cffDNA taken from a sample of maternal plasma or serum—a naturally occurring non-cellular fetal DNA that circulates freely in the blood stream of a pregnant woman" and ended with "paternally inherited cffDNA, which is also a natural phenomenon."  *Ariosa*, 788 F.3d at 1376.  In *Cleveland Clinic*, the multistep methods in question were merely for "observing the law of nature that MPO [myeloperoxidase] correlates to cardiovascular disease."  *Cleveland Clinic*, 859 F.3d at 1360.  In concluding that the patents were directed to a natural law under the *Alice/Mayo* step 1, the Federal Circuit found that "Cleveland Clinic has not created a new laboratory technique; rather, it uses well-known techniques to execute the claimed method."  *Id.* at 1361.  Similarly, in *Roche*, the method claims in question merely "disclose[d] a diagnostic test based on the observation that the presence of the eleven position-specific signature nucleotides of the naturally occurring MTB [Mycobacterium tuberculosis] *rpoB* gene indicates the presence of MTB in a biological sample."  *Roche*, 905 F.3d at 1371.  Lastly, in *Athena*, the claims at issue were directed to "methods for diagnosing neurological disorders by detecting antibodies to a protein called musclespecific tyrosine kinase ('MuSK')."  *Athena*, 2019 U.S. App. LEXIS 3645 at *3.  The specification of the patent at issue in *Athena* "describe[d] the claimed concrete steps for observing the natural law as conventional."  *Id.* at *16.  Accordingly, the Federal Circuit found that the claims were "directed to a natural law because the claimed advance was only in

the discovery of a natural law, and that the additional recited steps only apply conventional techniques to detect the natural law." *Id.* at *15-16.

Here, like the claims in *Ariosa*, *Cleveland Clinic*, *Roche*, and *Athena*, claim 1 of the Testosterone Patent is directed to merely observing the amount of testosterone, which is a naturally occurring hormone in a female human. Indeed, claim 1 does not claim any new laboratory technique; rather, it uses a well-known method—mass spectrometry. Further, that the man-made compounds, such as "testosterone ions," are used in claim 1 employing a well-known technique (i.e., mass spectrometry) does not change the nature of the claim—the claim is still directed to a natural phenomenon. *See Athena*, 2019 U.S. App. LEXIS 3645 at *19 ("reaffirm[ing] that use of a man-made molecule in a method claim employing standard techniques to detect or observe a natural law may still leave the claim directed to a natural law.").

Accordingly, because claim 1 of the Testosterone Patent is directed to a natural phenomenon, the second step of the *Alice/Mayo* framework needs to be analyzed.

### 2. *Alice/Mayo* Step 2

None of the elements of claim 1 contain an inventive concept sufficient to transform the claimed naturally occurring phenomenon into a patent-eligible application. *See, e.g.*, *Mayo*, 566 U.S. at 71-72. Instead, all of the three steps in claim 1—(1) "purifying"; (2) "ionizing"; and (3) "detecting"—go to using mass spectrometry, a common technique, and are described in the patent as well-known to the skilled artisan. *See, e.g.*, '862 at 6:28-7:18 (mass spectrometry well-known); 3:6-15 (the "purifying" step well-known); 3:59-4:2 (the "ionizing" step well-known); and 4:19-35 (the "detecting" step well-known); *see also* § III.A. *supra*. In other words, the three steps are nothing more than routine and conventional techniques, and thus, no additional innovation is added. *See, e.g.*, *Mayo*, 566 U.S. at 82 ("simply appending conventional steps,

-14-

specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."); *Ariosa*, 788 F.3d at 1377 ("The specification of the '540 patent confirms that the preparation and amplification of DNA sequences in plasma or serum were well-understood, routine, conventional activities performed by doctors in 1997."); *Cleveland Clinic*, 859 F.3d at 1362 ("Cleveland Clinic does not purport to have invented color-imetric-based assay, flow cytometry, or ELISA, or any of the claimed methods to 'see' MPO and its derivative in bodily samples.  Rather, the claims here instruct that MPO levels be detected or determined using any of these known techniques."); *id.* ("[The patents] require only conventional MPO detection methods and compare those values to predetermined or control values derived from conventional statistical methods."); *Roche*, 905 F.3d at 1372 ("*Alice/Mayo* step two's requirement of 'additional features that must be new and useful' is simply not met in this case because the asserted method claims recite standard PCR methods applied to a naturally occurring phenomenon; there is no additional innovation."); *Athena*, 2019 U.S. App. LEXIS 3645 at *23 ("Because the specification defines the individual immunoprecipitation and iodination steps and the overall radioimmunoassay as conventional techniques, the claims fail to provide an inventive concept."); *id.* at *25 ("For the same reasons that we have concluded that attaching a label to MuSK did not make the claims directed to an eligible concept at step one, we conclude that appending labeling techniques to a natural law does not provide an inventive concept where, as here, the specification describes 125I labeling as a standard practice in a well-known assay.").

The two "wherein" clauses found in claim 1 also do not provide any innovation.  The first "wherein" clause simply states not to derivatize testosterone (i.e., not to change the testosterone). '862 at 19:62-63.  This is akin to simply saying "don't do it" and does not add any inventive

concept.  *See, e.g.*, *Cleveland Clinic*, 859 F.3d at 1362 ("*Mayo* and *Ariosa* make clear that transforming claims that are directed to a law of nature requires more than simply stating the law of nature while adding the words 'apply it.'") (citations omitted).  Indeed, the other patents-in-suit disclose that not derivatizing a compound before using mass spectrometry was well-known in the art.  '868 at 2:17-19 ("Methods to detect **underivatized** 1,25 $(OH)_2D3$ by liquid chromatography/**mass-spectrometry** are disclosed in Kissmeyer and Sonne, J Chromatogr A. 2001, 935(1-2):93-103.") (emphasis added); '867 at 2:30-33 (same).  Therefore, the first "wherein" clause does not add any inventive concept.

The second "wherein" clause states that the method is "**capable of detecting** testosterone" at a certain concentration range.  '862 at 19:64-65 (emphasis added).  The second "wherein" clause does not introduce any new laboratory technique, but simply states a result—capable of detecting certain concentration range—of using a well-known technique, mass spectrometry. Therefore, the second "wherein" clause also does not add any inventive concept.

In sum, under *Alice/Mayo* step 2, the elements in claim 1 of the Testosterone Patent do not transform the nature of the claim into a patent-eligible concept.  Accordingly, the Testosterone Patent is directed to patent-ineligible subject matter.

### B.  The Vitamin D Patents Are Not Patent-Eligible

For similar reasons as the Testosterone Patent, the Vitamin D Patents are also not patent-eligible.  The Vitamin D Patents are directed to methods for determining the presence or amount of naturally occurring vitamin D or dihydroxyvitamin D metabolites in a sample using mass spectrometry, which is a well-known, conventional, and routine technique.  Nothing in the claims transform them into anything more than observing this natural phenomenon. Accordingly, because the Vitamin D Patents are directed to nothing more than observing a natural phenomenon, they are directed to patent-ineligible subject matter.

-16-

1.     *Alice/Mayo* **Step 1**

Claim 21 of the '867 patent and claim 1 of the '427 patent are directed to methods for determining the presence or amount of vitamin D metabolites in a sample by mass spectrometry. *See* '867 at 22:20-32, 3:39-42 (25-hydroxyvitamin $D_2$ is a vitamin D metabolite); '427 at 20:44-54.   Similarly, claims 1 and 9 of the '868 patent are directed to methods for determining the amount of dihydroxyvitamin D metabolites in a sample by mass spectrometry.   *See* '868 at 19:51-65, 20:23:38.   These Vitamin D Patents make clear that (1) vitamin D or dihydroxyvitamin D metabolites are naturally occurring compounds in animals ('867 at 3:29-32; '868 at 3:50-61); and (2) mass spectrometry, including the tandem mass spectrometry, was a well-known technique in the art at the time of the alleged inventions ('867 at 2:21-33, 8:56-67, 9:13-15, 10:13-17; '868 at 2:8-9, 14:36-38).   Accordingly, the asserted claims of the Vitamin D Patents are nothing more than observing a natural phenomenon (determining the presence or amount of naturally occurring vitamin D or dihydroxyvitamin D metabolites) using a well-known, conventional and routine technique (mass spectrometry).   This is patent-ineligible subject matter.

As discussed above in relating to the Testosterone Patent, the asserted claims of the Vitamin D Patents are akin to the claims found to be patent-ineligible by the Federal Circuit in *Ariosa, Cleveland Clinic*, *Roche*, and *Athena*.   Like the claims in *Ariosa*, *Cleveland Clinic*, *Roche*, and *Athena*, the asserted claims of the Vitamin D Patents are directed to merely observing the presence or amount of vitamin D or dihydroxyvitamin D metabolites, which are naturally occurring compounds in animals.   *See Ariosa*, 788 F.3d at 1376; *Cleveland Clinic*, 859 F.3d at 1360-61; *Roche*, 905 F.3d at 1371; *Athena*, 2019 U.S. App. LEXIS 3645 at *15-16; *see also* § V.A.1. *supra*.   Indeed, the asserted claims of the Vitamin D Patents do not claim any new laboratory technique; rather, they use a well-known method—mass spectrometry.   Further, that the man-made compounds, such as "precursor ion" and "fragment ions," are used in the claims

-17-

employing a well-known technique (i.e., mass spectrometry) does not change the nature of the claim—the claim is still directed to a natural phenomenon.  *See Athena*, 2019 U.S. App. LEXIS 3645 at *19.

Accordingly, because the asserted claims of the Vitamin D Patents are directed to natural phenomena, the second step of the *Alice/Mayo* framework needs to be analyzed.

2.      ***Alice/Mayo* Step 2**

None of the elements in the asserted claims of the Vitamin D Patents contain an inventive concept sufficient to transform the claimed naturally occurring phenomenon into a patent-eligible application.  *See, e.g.*, *Mayo*, 566 U.S. at 71-72.  Instead, all of the three steps found in the asserted claims of the Vitamin D Patents—(1) "generating . . . precursor ion"; (2) "generating . . . fragment ions"; and (3) "detecting"—go to using mass spectrometry, a common technique, and are described in the patents as well-known to the skilled artisan.  *See, e.g.*, '867 at 2:21-33, 8:56-67, 9:13-15, 10:13-17 and '868 at 2:8-9, 14:36-38 (mass spectrometry well-known); '867 at 4:25-29, 8:59-67, 9:13-15, 10:13-17 and '868 at 14:15-22, 14:36-38, 19:56-57 (the first two "generating" steps well-known); '867 at 9:22-45 and '868 at 14:67-15:3 (the "detecting" steps well-known); *see also* § V.A.2. *supra*.

For the first step of claim 27 in the '867 patent, claim 27(a) additionally claims "generating a ***protonated*** and ***dehydrated*** precursor ion of said 25-hydroxyvitamin $D_2$ with a ***mass to charge ratio (m/z)*** of 395.30±0.5."  *Id.* at 22:24-26 (emphasis added).  But generating this precursor ion is simply the result of a law of nature—a well-known chemical reaction.  As discussed above in § III.B.1., simple chemistry and math give the precursor ion, as depicted below:

$$412 \text{ g/mol } [25\text{-hydroxyvitamin D}_2]$$

$$+ 1 \text{ g/ mol } [H^+ \text{ (protonation)}]$$

$$- 18 \text{ g/mol } [H_2O \text{ (dehydration)}]$$

$$= 395 \text{ g/mol}$$

And calculating a mass to charge ratio (m/z) was also well-known in the art.  '867 at 4:25-29. Accordingly, claiming the mass to charge ratio (m/x), a routine chemistry and mathematics, does not add any inventive concept.

For claims 1 and 9 of the '868 patent, they additionally claim either not derivatizing (claim 1) or derivatizing (claim 9) the dihydroxyvitamin D metabolite prior to mass spectrometry.  '868 at 19:65, 20:26-27.  But the specification discloses that derivatizing or not derivatizing a compound before using mass spectrometry was well-known in the art.  *Id.* at 4:66-67; *see also* § III.B.2. *supra*.  Therefore, such elements do not add any inventive concept.

Because all the elements in the asserted claims of the Vitamin D Patents were well-known in the art, routine, and conventional, they do not and cannot transform the claimed naturally occurring phenomenon into a patent-eligible application.  *See, e.g.*, *Mayo*, 566 U.S. at 82; *Ariosa*, 788 F.3d at 1377; *Cleveland Clinic*, 859 F.3d at 1362; *Roche*, 905 F.3d at 1372; *Athena*, 2019 U.S. App. LEXIS 3645 at *23-25; *see also* § V.A.2. *supra*.  Accordingly, the Vitamin D Patents are directed to patent-ineligible subject matter.

## VI.   CONCLUSION

For the foregoing reasons, LabCorp respectfully submits that all four patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and therefore, the case should be dismissed with prejudice.

Respectfully submitted,

WILSON SONSINI GOODRICH
  & ROSATI, P.C.


 /s/ Ian R. Liston

*Of Counsel*:                                    Ian R. Liston (#5507)
                                                 Johanna Peuscher-Funk (#6451)
Edward G. Poplawski                              222 Delaware Avenue, Suite 800
Olivia M. Kim                                    Wilmington, DE 19801
Erik Carlson                                     (302) 304-7600
WILSON SONSINI GOODRICH                          iliston@wsgr.com
  & ROSATI, P.C.                                 jpeuscherfunk@wsgr.com
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
(323) 210-2900                                   *Counsel for Defendants Laboratory*
epoplawski@wsgr.com                              *Corporation of America Holdings; Esoterix,*
okim@wsgr.com                                    *Inc.; and Endocrine Sciences, Inc.*
ecarlson@wsgr.com

Matias Ferrario
KILPATRICK TOWNSEND
  & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7300
mferrario@kilpatricktownsend.com

Dated:  February 12, 2019

## CERTIFICATE OF SERVICE

I, Ian R. Liston, hereby certify that on February 12, 2019, I caused the foregoing

*Defendants' Opening Brief in Support of Their Motion for Judgment on the Pleadings Under*

*35 U.S.C. § 101* to be served via electronic mail upon the following counsel of record:

Kenneth L. Dorsney
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
kdorsney@morrisjames.com

*Counsel for Plaintiff*
*Quest Diagnostic Investments LLC*

Adam R. Gahtan
Kevin X. McGann
Eric M. Majchrzak
FENWICK & WEST LLP
1211 Avenue of the Americas, 32nd Floor
New York, NY 10036
agahtan@fenwick.com
kmcgann@fenwick.com
emajchrzak@fenwick.com

Melanie L. Mayer
Elizabeth B. Hagan
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
mmayer@fenwick.com
ehagan@fenwick.com

*Counsel for Plaintiff*
*Quest Diagnostic Investments LLC*

/s/ Ian R. Liston
Ian R. Liston (#5507)