IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUEST DIAGNOSTICS INVESTMENTS LLC,

Plaintiff,

v.

LABORATORY CORPORATION OF
AMERICA HOLDINGS, ESOTERIX, INC., and
ENDOCRINE SCIENCES, INC.,

Defendants.

C.A. No. 18-1436 (MN)



**PUBLIC - REDACTED VERSION**

**PLAINTIFF'S RESPONSIVE BRIEF IN
OPPOSITION TO DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS UNDER 35 U.S.C. § 101**

*Of Counsel*:

Adam R. Gahtan
Kevin X. McGann
Eric M. Majchrzak
Fenwick & West LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: 212.430.8500
Email:     agahtan@fenwick.com
           kmcgann@fenwick.com
           emajchrzak@fenwick.com

Melanie L. Mayer
Elizabeth B. Hagan
Fenwick & West LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Email:     mmayer@fenwick.com
           ehagan@fenwick.com

Dated: March 19, 2019

Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: 302.888.6800
kdorsney@morrisjames.com

*Attorney for Plaintiff*
*Quest Diagnostics Investments LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.    Statement of the Nature and Stage of the Proceedings ..................................... 1

II.   Summary of Argument ....................................................................................... 1

III.   Statement of Facts .............................................................................................. 2

     A.   Vitamin D Metabolite and Testosterone Testing ........................................ 2

     B.   Mass Spectrometry ...................................................................................... 3

     C.   Vitamin D Patents ....................................................................................... 4

     D.   The '862 Patent ............................................................................................ 6

IV.   Argument ............................................................................................................ 7

     A.   Assignor Estoppel Bars LabCorp's Defenses to the Vitamin D Patents ...... 7

     B.   Quest's Patents are Patent Eligible Under 35 U.S.C. § 101 ........................ 7

        1.   Step one: the patents are "directed to" patent-eligible subject matter ............. 9

        2.   Step two: The patents contain inventive concepts .......................................... 17

        3.   LabCorp's motion is limited to the claims explicitly identified in its motion ................................................................. 20

V.    Conclusion ....................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
573 U.S. 208 (2014)..................................................................................................... passim

*Amgen Inc v. Coherus Biosciences Inc.,*
No. 17-cv-546-LPS, 2017 U.S. Dist. LEXIS 219791 (D. Del. Dec. 7, 2017) ................... 3

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
788 F.3d 1371 (Fed. Cir. 2015)................................................................................. 14-17

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC,*
915 F.3d 743 (Fed. Cir. 2019)..................................................................................... 14, 15

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
827 F.3d 1341 (Fed. Cir. 2016).......................................................................................... 18

*Berkheimer v. HP Inc.,*
881 F.3d 1360 (Fed. Cir. 2018)................................................................................... 17, 19

*Bilski v. Kappos,*
561 U.S. 593 (2010)............................................................................................................. 8

*Cleveland Clinic Found. v. True Health Diagnostics LLC,*
859 F.3d 1352 (Fed. Cir. 2017)................................................................................. 14-17

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.,*
776 F.3d 1343 (Fed. Cir. 2014)........................................................................................ 20

*Diamond v. Chakrabarty,*
447 U.S. 303 (1980)............................................................................................................. 8

*Diamond v. Diehr,*
450 U.S. 175 (1981).................................................................................................... passim

*Enfish, LLC v. Microsoft Corp.,*
822 F.3d 1327 (Fed. Cir. 2016).................................................................................... 9, 11

*Exergen Corp. v. Kaz USA, Inc.,*
725 Fed. App'x 959 (Fed. Cir. 2018) ............................................................................... 19

*Funk Bros. Seed Co. v. Kalo Inoculant Co.,*
333 U.S. 127 (1948)............................................................................................................. 8

*Gottschalk v. Benson,*
409 U.S. 63 (1972)............................................................................................................... 8

*Green v. Fund Asset Mgmt., L.P.,*
245 F.3d 214 (3d Cir. 2001).............................................................................................. 7

*Intellectual Ventures I LLC v. Ricoh Ams. Corp.,*
170 F. Supp. 3d 673 (D. Del. 2016)............................................................................. 7, 19

*Kroy IP Holdings, LLC v. Groupon Inc.,*
No. 17-cv-1405-MN, 2018 WL 6499675 (D. Del. Dec. 10, 2018) .............................. 8, 17

*MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*,
    816 F.3d 1374 (Fed. Cir. 2016)......................................................................... 7

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012).............................................................................. passim

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)....................................................................... 13

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011)......................................................................................... 19

*Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*,
    No. 2018-1295, 2019 U.S. App. LEXIS 7647 (Fed. Cir. Mar. 15, 2019) ........................ 15

*Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*,
    No. 17-cv-1353-LPS, 2018 WL 1419082 (D. Del. Mar. 22, 2018)................................. 14

*Parker v. Flook*,
    437 U.S. 584 (1978)........................................................................... 9, 10, 13

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016).............................................................. 9, 10, 12, 15

*Roche Molecular Sys., Inc. v. Cepheid*,
    905 F.3d 1363 (Fed. Cir. 2018)................................................................... 14-17

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017).................................................................... 9, 10

*Turbe v. Gov't of the Virgin Island*,
    938 F.2d 427 (3d Cir. 1991)............................................................................ 7

*Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018)....................................................................... 15

**Statutes**

35 U.S.C. § 100(b)....................................................................................... 8

35 U.S.C. § 101..................................................................................... 7, 15

iii

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Quest Diagnostics Investments LLC ("Quest") sued Defendants Laboratory Corporation of America Holdings, Esoterix, Inc., and Endocrine Sciences, Inc. (collectively, "LabCorp") on September 17, 2018.  (*See* D.I. 1.)  Fact discovery runs through April 3, 2020.

## II.   SUMMARY OF ARGUMENT

Each claim that LabCorp challenges is directed to patent-eligible subject matter: methods (processes) with concrete steps for a new and useful purpose, that improve on the prior art.  Such claims have always been eligible, as in *Diamond v. Diehr*, 450 U.S. 175, 184 (1981), which is mandatory, dispositive authority.

At step one, LabCorp argues that the challenged claims are "directed to" the mere observation of natural phenomena – possibly the presence of vitamin D and testosterone in humans, but LabCorp is not clear about that, finding natural laws wherever it can in the claims. LabCorp also fails to consider the claims *as a whole*.  Instead, it excises multiple elements from each because, in its view (with no factual record) those elements are "conventional," and then it evaluates only what remains.  That is not how the analysis works: decades of consistent Supreme Court authority require that a claim be assessed "as a whole," and, specifically, that courts *not* ignore "old" elements, because, especially in method claims, new combinations of conventional steps are most certainly eligible.  *Id.* at 188.  Although the Court need not reach it, the challenged claims are patent-eligible under step two as well, because their innovative combinations of steps transform them into something significantly more than natural phenomena.

As a threshold matter, LabCorp's motion is barred by assignor estoppel with respect to the Vitamin D patents.  A former Quest employee, an inventor on those patents, played a significant role in the development of the accused methods after moving to LabCorp.  Privity between the employee and LabCorp likely estops LabCorp from asserting invalidity.  At the very least, the

1

Court should defer action on this motion until it has resolved the assignor estoppel issues. (*See* D.I. 34 (ordering teleconference on the assignor estoppel issue).)

## III.  STATEMENT OF FACTS

Quest asserts four patents with claims directed to highly elaborated, innovative mass spectrometry ("MS") techniques.  Three claim patentable methods to detect and quantitate vitamin D metabolites: U.S. Patent Nos. 7,972,867 (the "'867 patent"), 7,972,868 (the "'868 patent"), and 8,101,427 (the "'427 patent") (collectively, the "Vitamin D Patents").  The fourth claims a patentable method that, among other things, includes innovative purification steps for detection of very low levels of testosterone in females: U.S. Patent No. 8,409,862 (the "'862 patent").

### A.  Vitamin D Metabolite and Testosterone Testing

There are two forms of vitamin D: vitamin $D_2$ and vitamin $D_3$. ('867, 1:23-26, 1:39-41.) Both convert to 25-hydroxyvitamins $D_2$ and $D_3$ (collectively, "25OHD") in the liver, and then to 1,25-dihydroxyvitamins $D_2$ and $D_3$ (collectively, "1,25(OH)$_2$D") in the kidney. (*Id.*, 1:31-33, 1:35-37, 1: 44-47.)  Vitamin $D_2$ and $D_3$ act differently in the body, *i.e.*, they have different bioactivity and bioavailability. (*Id.*, 1:49-52.)  Doctors measure 25OHD to help diagnose and manage calcium metabolism disorders (*id.*, 1:58-60), and 1,25(OH)$_2$D to help diagnose diseases like kidney failure and certain lymphomas. ('868, 1:62-67.)  Historically, vitamin D metabolite measurement was via radioimmunoassays with antibodies specific for 25OHD. ('867 patent, 2:13-15.)  Those assays could not distinguish between 25OHD$_2$ and 25OHD$_3$, and so could not determine the source of a patient's vitamin D deficiency. (*Id.*, 2:15-19.)

Testosterone is present in females at much lower levels than in males. ('862, 1:49-50.) Testosterone levels may correlate with diseases such as polycystic ovary syndrome and adrenal hyperplasia, and with clinical manifestations like infertility, hirsutism, amenorrhea, and obesity. (*Id.*, 1:54-59.)  Existing testosterone assays, including radioimmunoassays and ELISA (enzyme-

2

linked immunosorbent assay), quantify substances based on antibody binding.   (*Id.*, 1:66-2:1 (citing Marcus and Durnford, STEROIDS 46: 975-86 (1985) (ELISA and radioimmunoassay) (Ex. A).)[1]  Those assays cannot detect low levels of testosterone in biological samples without extensive pre-analysis preparation. (*Id.*)

### B.   Mass Spectrometry

MS is a method of "filtering, detecting, and measuring ions [of an analyte] based on their mass-to-charge ratio." ('862, 6:29-30; D.I. 1 ¶ 9.)[2]  "[M]olecules of interest are ionized" and sorted based on their "mass ('m') and charge ('z')." ('862, 6:30-35; D.I. 1, ¶ 9; Chyall ¶ 14.)  MS outputs an "ion scan," which shows the relative abundance of each m/z data point over a given range.  ('862, 4:19-21; D.I. 1, ¶ 10; Chyall ¶ 22.)  The results of the ion scan can be "related to the amount of the analyte in the original sample." ('862, 4:21-23; D.I. 1, ¶ 10; Chyall ¶ 21.)

Artisans must design and optimize MS tests for each analyte, always a complicated process ('867, 8:25-9:45; Chyall ¶ 32), but especially for biological samples which contain numerous unique proteins, small molecules, and other compounds.  (Chyall ¶ 33.)  There is no standard MS method.  (Chyall ¶ 32.)  A skilled artisan could select single or tandem MS (*i.e.*, MS/MS).  In tandem MS, "a precursor ion (also called a parent ion) generated from a molecule of interest can be filtered in an MS instrument, and the precursor ion is subsequently fragmented to yield one or more fragment ions (also called daughter ions or product ions) that are then analyzed in a second MS procedure." ('867, 8:61-66; D.I. 1, ¶ 9; Chyall ¶¶ 24-25.)  The choice of precursor ion is critical, as it can determine the tandem MS method's selectivity.  ('867, 10:37-11:6 (precursor

---

[1] Exhibits refer to those accompanying the Majchrzak Declaration.  Referenced publications (in this brief) are generally from the prosecution history or patent specification and thus properly considered in a Rule 12(c) setting.  *Amgen Inc v. Coherus Biosciences Inc.*, No. 17-cv-546-LPS, 2017 U.S. Dist. LEXIS 219791, at *6 n.6 (D. Del. Dec. 7, 2017).

[2] Quest submits the Declaration of Dr. Leonard J. Chyall ("Chyall ¶_.") solely for background and terminology related to mass spectrometry.

choice allowed distinguishing related metabolites); D.I. 1, ¶ 9; Chyall ¶ 31.)  MS methods must also account for the ionization source, which includes atmospheric pressure chemical ionization (APCI) and electrospray ionization (ESI), among others ('867, 8:28-34; Chyall ¶¶ 15-19.)  To enhance detection, many MS methods also involve sample preparations, purification methods (e.g., chromatography) to separate the analyte from other materials, and analyte derivatization (reaction with another molecule), which shifts the m/z of the analyte away from interfering signals and/or increases ionization efficiency.  ('867, 6:23-27, 3:58-59; Chyall ¶¶ 26-31.)

### C.  Vitamin D Patents

As noted above, radioimmunoassays could not distinguish between vitamin $D_2$ and $D_3$ metabolites.  Other assays, such as prior art MS methods, had difficulty detecting vitamin D metabolites in plasma due to their "structural and chemical similarities to one another, and the presence of large quantities of other lipids and sterols in [biological] samples."  (Yeung *et al.*, 645(1) J. CHROM. 115-23 at 116 (1993) (Ex. B).)  No one had developed an MS technique that could (i) distinguish multiple, structurally related vitamin D metabolites in a sample, or (ii) detect $1,25(OH)_2D$ metabolites at physiological levels. (*See, e.g., id.* at 122 (describing a detection limit sufficient for most metabolites "except for $1,25(OH)_2D_3$").)

Prior art methods taught detecting protonated (single hydrogen ion (H+) added) precursor ions (*i.e.*, 413 m/z) of $25OHD_2$.  ('867, 10:60-62.)[3]  The second MS step then fragmented those ions to form a dehydrated fragment (395 m/z) and water (18 m/z).  (*Id.*, 10:60-67.)  Because neither m/z value is specific for an individual vitamin D metabolite, skilled artisans could not readily distinguish them via prior art methods.  (*Id.*, 10:60-11:1.)  The inventors developed metabolite specific tandem MS tests by subjecting *protonated and dehydrated precursor* ions to

---

[3]   The related '867 and '427 patents have the same specification; thus, Quest only cites the '867.

fragmentation to detect "at least one fragment ion of a vitamin D metabolite . . .  that does not represent only a loss of one or more water molecules." ('867, 11:2-6.)  The resulting unique fragments, free of interference from dominating dehydrated ions, allow one to distinguish low levels of different vitamin D metabolites in the same human sample.  (*Id.*, Examples 1, 2, and 3.)

The claims of the '867 and '427 patents are directed to these new tandem MS methods, which improved earlier efforts to detect vitamin D metabolites by MS and include: (a) generating a protonated and dehydrated precursor ion; (b) generating one or more fragment ions of the precursor ion(s); (c) detecting the amount of one or more of the precursor or fragment ions or both; and (d) relating the detected ions to the amount of vitamin D metabolite in the sample.  ('867, 21:1-22:59; '427, 20:44-22:25.)  The '867's claims (*e.g.*, 1, 11, 17, 18, 21, 29, 30) further recite protonated and dehydrated precursor ions with specific mass-to-charge (or m/z) ratios.

The '868 patent also claims "unique methods of [MS]" directed at quantitating $1,25(OH)_2D$ metabolites.  ('868, 8:14-15, claims.)  "Plasma concentrations of $[1,25(OH)_2D]$ metabolites are significantly lower than those for the [25OHD] metabolites," making them much more difficult to quantitate.  ('868 Prosecution, Response at 18 (Oct. 22, 2010) (Ex. C).)  For example, one reference reported that "it has been ***impossible*** to get any precision data in human serum so far."  (Kissmeyer, 935 J. CHROM. 93-103 at 99 (2001) (emphasis added) (Ex. D).)  Another reference reported failed attempts to detect physiological amounts of $1,25(OH)_2D_3$ in simple ethanol, *i.e.* without "other" molecules and proteins normally present in patient samples.  (Yeung, at 122 (Ex. B).)

The methods claimed in the '868 patent achieve what the prior art methods could not – detecting $1,25(OH)_2D$ at physiological levels in a patient sample.  Claim 1 is directed to one such technique: a tandem MS method that includes: (i) generating a precursor ion of the one or more metabolites by ionizing with APCI; (ii) generating one or more fragment ions of the precursor

10831908/1

ion(s); and (iii) detecting the amount of the precursor ion(s), fragment ion(s), or both and relating the amount of detected ions to the amount of 1,25(OH)$_2$D metabolites in the sample; all without derivatizing the metabolites.  Claim 9 is similar, but it does not require ionizing with APCI, and does require derivatization with 4'-carboxyphenyl-TAD.

### D.   The '862 Patent

The '862 patent claims a method that solved the problem of detecting the very low levels of testosterone typically found in women, *i.e.*, less than 10 ng/dL.  (*See, e.g.*, '862, 1:49-50; D.I. 1, ¶ 12.)  Prior to the invention, it was difficult to detect testosterone even above 10 ng/dL, in part because "[t]estosterone strongly binds to plasma proteins such as sex hormone-binding globulin (SBHG) or testosterone-estradiol-binding globulin (TEBG)" and also binds "CBG (cortisol-binding globulins) and albumin." ('862, 1:60-63.)  Accordingly, "[l]ess than 2.5% of testosterone circulates unbound to plasma proteins" and is detectable.  (*Id.* at 1:64-65.)  Earlier methods, including ELISA, radioimmunoassays, and MS, each required time-consuming, labor-intensive steps, including derivatization of samples.  (*See, e.g.*, '862, "Other Publications" (citing Shackleton *et al.*, STEROIDS 62:523-29 at 526 (1997) (Ex. E)); *see also* Marcus & Durnford at 978 (Ex. A).)

The '862 invention solved both problems (s*ee, e.g.*, '862, 5:62-65, 14:41-54), claiming a novel method for detecting low levels of testosterone in human samples, without derivatization. (*See, e.g.*, *id.*, claim 1.)  The method combines specific purification steps, including extracting testosterone from the sample, via, for example, high-turbulence liquid chromatography ("HTLC"). (*See, e.g.*, *id.*, 12:7-15:10 (Examples 1-4), 18:1-19:48.)  HTLC "creates turbulence inside the extraction column" which "ensures optimized binding of testosterone to the large particles in the column and the passage of residual protein and debris to waste." (*Id.*, 13:20-34.)  Testosterone is then ionized into precursor and fragment ions "to produce one or more testosterone ions," and detected "at concentrations of less than 10 ng/dL." (*See, e.g.*, *id.*, 13:35-43, claim 1; D.I. 1, ¶ 13.)

6

## IV. ARGUMENT

In deciding a Rule 12(c) motion, "a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party." *Intellectual Ventures I LLC v. Ricoh Ams. Corp.*, 170 F. Supp. 3d 673, 675 (D. Del. 2016) (citing *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001)). "The motion can be granted only if no relief could be afforded under any set of facts that could be provided." *Id.* (citing *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). The Court should deny LabCorp's motion because LabCorp is estopped from asserting this defense and the claims are directed to eligible subject matter.

### A. Assignor Estoppel Bars LabCorp's Defenses to the Vitamin D Patents

Assignor estoppel "prohibits an assignor of a patent, or one in privity with an assignor, from attacking the validity of that patent when he is sued for infringement by the assignee." *MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1379-80 (Fed. Cir. 2016) (citations omitted). LabCorp's recent discovery responses indicate that Dr. Holmquist, inventor on all asserted Vitamin D Patents, was significantly involved in the development of the accused methods after he left Quest for LabCorp (e.*g.*, Ex. F at 8-10), supporting privity that would estop LabCorp. *See MAG Aerospace*, 816 F.3d at 1380 (assignor estoppel where defendant "availed itself of [the inventor's] knowledge and assistance to conduct the alleged infringement") (internal quotation omitted). At the very least, LabCorp's admissions support additional discovery into this threshold issue, and the Court has scheduled a teleconference for May 8, 2019 on this issue. (D.I. 34.) Quest requests that the present motion be denied or deferred until the assignor estoppel issue is resolved.

### B. Quest's Patents are Patent Eligible Under 35 U.S.C. § 101

A person may obtain a patent for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "The term

'process' means process, art or method, and includes a new use of a known process[.]" 35 U.S.C. § 100(b).  These broad categories reflect Congress' intent that "the patent laws would be given wide scope." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) ("anything under the sun that is made by man" is eligible)).  The judge-made exception – for "[p]henomena of nature, . . . mental processes, and abstract intellectual concepts," *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) – is severely limited, as illustrated by the Supreme Court's typical examples: minerals, plants, $E = mc^2$, gravity, the heat of the sun, and electricity.  *Chakrabarty*, 447 U.S. at 309; *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).  The exception exists solely to avoid "'tying up the future use of' . . . building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 85 (2012)).  "[T]oo broad an interpretation of this exclusionary principle could eviscerate patent law" as "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo*, 566 U.S. at 71.  Courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice*, 573 U.S. at 217.

*Alice* and *Mayo* established a two-part test for eligibility.  At step one, the court determines whether the claim is "directed to" a law of nature.  *Id.*  If it is not, then the claim is patent-eligible and the inquiry ends.  *Id*.  If it ***is***, then the Court determines whether it contains an "inventive concept" sufficient to "transform the ineligible concept into something 'significantly more.'" *Kroy IP Holdings, LLC v. Groupon Inc.*, No. 17-cv-1405-MN, 2018 WL 6499675, at *5 (D. Del. Dec. 10, 2018) (quoting *Alice*, 573 U.S. at 217-18).  Method claims that recite specific steps have always been patent eligible, even when the method involves or relies on a law of nature, *Diehr*, 450 U.S. 185-91, and they continue to be following *Mayo*.  *See Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,

8

827 F.3d 1042, 1048-49 (Fed. Cir. 2016). There is no *per se* rule against eligibility of methods for

detecting natural substances, nor could there be such a categorical exclusion under the statute.

      1.      **Step one: the patents are "directed to" patent-eligible subject matter**

      a.      <u>The claims recite new and useful laboratory techniques</u>

At step one, "it is not enough to merely identify a patent-ineligible concept underlying the

claim; we must determine whether the patent-ineligible concept is what the claim is 'directed to.'"

*CellzDirect*, 827 F.3d at 1050. Claims are "considered in light of the specification, based on

whether their character *as a whole* is directed to excluded subject matter." *Enfish, LLC v.

Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis added) (internal quotation

omitted).

Claims are not "directed to" a natural law simply because they involve one. *See Diehr*,

450 U.S. at 185-91; *Parker v. Flook*, 437 U.S. 584, 590 (1978); *Thales Visionix Inc. v. United

States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017); *CellzDirect*, 827 F.3d at 1050.  In *Diehr*,

methods related to rubber curing processes were eligible despite expressly depending on a

mathematical equation.  450 U.S. 185-91.  Included among the eligible claims were those to no

more than continuously measuring the temperature inside a mold, constantly recalculating the

cure time using the equation, and signaling the computer when to open the press. *Id*. at 179 n.5.

The Supreme Court endorsed *Diehr* in *Mayo,* 566 U.S. at 80-82, and in *CellzDirect*, the Federal

Circuit followed *Diehr's* guidance and heeded *Mayo's* cautions: the district court had held

claims to a method of preserving cells ineligible, as they amounted only to the observation that

the cells could survive multiple freeze-thaw cycles, but the Federal Circuit reversed because,

though that property might be natural, "the claims are simply not directed to [that property].

Rather, the claims . . . are directed to a new and useful *laboratory technique*[.]"  827 F.3d at

1046, 1048 (emphasis added).  The claims in *CellzDirect*, which required "concrete steps": cell

fractionation, recovery, and refreezing (*id.* at 1046-47), were "precisely the type of claim[s] that [are] eligible for patenting," as they "achieve 'a new and useful end.'" *Id.* at 1048 (citing *Alice*, 573 U.S. at 217).  The steps in *CellzDirect* were, moreover, conventional; the method's only innovation was repeating them a second time.  *Id.*

As in *Diehr* and *CellzDirect*, the claims here recite "concrete steps" in innovative methods to achieve new and useful purposes: detecting ions of testosterone and vitamin D (or metabolites), in some cases at levels previously impossible.  *See id.* at 1047.  The claims are not to vitamin D metabolites or testosterone themselves, nor do they preclude other methods for detecting them: indeed, the prior art describes many other methods, including MS methods.  That the methods involve naturally-occurring molecules – the *only* natural phenomena on which LabCorp relies (D.I. 27 at 14, 17) – is irrelevant.  *See Diehr*, 450 U.S. at 185-91; *Flook*, 437 U.S. at 590; *Thales*, 850 F.3d at 1348-49; *CellzDirect*, 827 F.3d at 1050.

### i.   The Vitamin D Patents

The Vitamin D Patents describe and claim detailed tandem MS methods, with innovative, non-conventional arrangements of elaborated steps, to detect vitamin D metabolites.  *See Diehr*, 450 U.S. at 187.  The '867 and '427 patents, for example, claim novel methods that can detect and distinguish vitamin D metabolites (*e.g.*, $25OHD_2$ and $25OHD_3$) in a single assay.  (*See supra* Section III.C.)  Prior art methods used protonated precursor ions which then fragmented into non-metabolite specific ions in the second MS step.  (*See supra id.*)  Quest's scientists were the first to recognize the benefit of creating, identifying, and fragmenting a *protonated and dehydrated precursor ion* (*e.g.*, 395 m/z) into specific, identifiable fragment ions in a second MS step (*e.g.*, 179.10, 251.30, and 209.20 m/z).  ('867, 11:2-6, 13:21-29 (Table 1).)  The '867 and '427 patents' claims do what prior art methods could not: differentiate vitamin D metabolites in patient samples.  ('867, claim 21 (requires generating the $395.30\pm0.5$ precursor ion in step (a)); '427, claim 1

(requires generating "a protonated and dehydrated precursor ion").)

The '868 method allows for identification of vitamin D metabolites at levels described as "impossible" in the prior art. (Kissmeyer, at 99 (Ex. D).) Overcoming the art, the inventors explained that there was no "reasonable expectation that [prior art] methods could determine the amount of dihydroxyvitamin D in such a sample at human physiological levels." (*See* '868 Prosecution, Response, at 11 (Oct. 22, 2010) (Ex. C) (distinguishing Yeung); Office Action, at 2-6 (Dec. 17, 2010) (not including rejections based on Yeung) (Ex. G).) The '868 inventors solved the prior art's inability to detect $1,25(OH)_2D$ in human samples via, for example, specific tandem MS techniques: ionization by [APCI]" (claim 1) or "derivatizing the dihydroxyvitamin D metabolites from said sample with 4'-carboxyphenyl-TAD" (claim 9). The methods claimed in the '868 patent, as a whole, represent a non-conventional arrangement of steps and an advance in the art. The '868 is "directed to" that method and is patent eligible at step one. *See CellzDirect*, 827 F.3d at 1046-50; *Enfish*, 822 F.3d at 1335.

### ii.    The '862 Patent

The '862 patent is directed to a method for detecting testosterone at low levels, <10 ng/dL. (*See* Section III.D.) The inventors overcame a prior art rejection on this basis. ('862 Prosecution, RCE, at 8-9 (Mar. 28, 2012) (Ex. H); Office Action (Aug. 15, 2012) (no prior art rejections) (Ex. I).) The claimed non-conventional arrangement of steps, in particular the inclusion of extraction (*e.g.*, by HTLC) as part of pre-MS purification, solved this problem and also allowed for high-throughput testing:

> The present invention describes methods and compositions for unambiguously detecting testosterone in a test sample. The methods utilize liquid chromatography (LC), most preferably HTLC . . . and combine this with unique methods of mass spectrometry (MS). . . . Testosterone assays are provided that have enhanced specificity and are accomplished in less time and with less sample preparation than required in presently available testosterone assays. In various embodiments the methods of the invention

11

accurately detect testosterone in samples where it is present in concentrations of . . . less than 10 ng/dL.

('862, 5:48-65.)   The '862 patent is directed to that non-conventional method, a patentable improvement over the art.   If the method in *CellzDirect* – merely repeating a known series of steps a second time – was eligible, 827 F.3d at 1046-50, then these methods, more innovating compared to the art, certainly are.

**b.      Claims are not "directed to"**
**a natural law just because they involve one**

LabCorp argues that the claims reduce to observing vitamin D metabolites or testosterone themselves, because the claims involve those molecules and because individual steps of the claimed methods, in isolation, were known in the art and so do not figure in the analysis.   (D.I. 27 at 12-14, 17-18.)   LabCorp is wrong for several reasons.   First, though it has the burden, LabCorp does not consistently identify the natural law to which the multi-step, multi-technology methods supposedly reduce.   Initially, they seem to suggest that it is the presence of the analytes in animals (D.I. 27 at 1), a massive oversimplification of the plain language, and, in fact, the methods detect or quantify non-naturally occurring *ions* created during the innovative method, not the naturally occurring analytes.   (*See, e.g.*, '867, claim 1 ("said ions generated in step (a) or (b) or both").)   Later, LabCorp describes the "natural phenomenon" as "determining an amount of naturally occurring testosterone in a sample of a female human" (D.I. 27 at 12), which sounds more like a *method* than a phenomenon; and then concede that: "[t]he Vitamin D patents are *directed to methods* for determining the presence or amount" of vitamin D analytes.   (*Id.* at 16 (emphasis added).)   In plain terms, the claims recite elaborated, multi-step, multi-technology methods.

Second, instead of assessing the claims *as a whole*, LabCorp separates them into individual elements, and treats any element that, in its view, was known, even if only generically, as if it were not part of the claim.   From claims in the '427 and '867 patents, for example, LabCorp excises

12

"tandem mass spectrometry" and "(a) generating . . . precursor ion; (b) generating . . . fragment ions; and (c) detecting" (D.I. 27 at 6 (internal quotation marks omitted)), and then assesses only its own abbreviated version of the claims, which, not surprisingly amount to one of its versions of a natural law.  (D.I. 27 at 17.)  From the '868 patent, LabCorp eliminates "generating a precursor ion," "generating . . . fragment ions," and "detecting," and with respect to the '862 patent, "mass spectrometry" and "(a) purifying; (b) ionizing; and (c) detecting" (*Id.* at 3-4), and then performs a similarly stripped-down analysis.  (*Id*. at 13, 17-18.)  Indeed, for testosterone, the analysis is: "(1) testosterone is . . . naturally occurring . . . (2) [MS] was a well-known technique in the art at the time of the alleged invention. . .. Accordingly, claim 1 is nothing more than observing a natural phenomenon."  (*Id*. at 12-13.)  There is no mention of purifying or ionizing steps, and the passage LabCorp cites in the patent for the conventionality of MS is pure generic background totally unrelated to testosterone.  (*Id.* at 12-14.)

LabCorp's analysis violates fundamental, absolute requirements for eligibility analyses. "Claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis." *Diehr*, 450 U.S. at 188; *see Flook*, 437 U.S. at 594 ("patent claim must be considered as a whole").  LabCorp somehow omits discussion, or, indeed, even acknowledgment of these cases, all of which the Supreme Court cited with approval in *Alice* and *Mayo*.  *See, e.g.,* 573 U.S. at 217-18; 566 U.S. at 70-72.  The whole-claim requirement "is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diehr*, 450 U.S. at 188.  Nothing in *Mayo/Alice* changed *Diehr* or its principles.  Thus, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016), a post-*Mayo* Federal Circuit decision, warns that

"courts must be careful to avoid over-simplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." (internal quotation omitted). LabCorp's analyses could not oversimplify more.

A recent decision from this court illustrates the proper analysis. In *Pacific Biosciences*, the Court considered whether claims related to a "nanopore DNA sequencing process that engages in redundant sequencing . . . to determine a nucleotide sequence of interest" were patent eligible on a motion to dismiss. *Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, No. 17-cv-1353-LPS, 2018 WL 1419082, at *1-2 (D. Del. Mar. 22, 2018). The challenger (Oxford) argued that the claims were directed to the abstract mental process of "comparing" two gene sequences and the naturally occurring correlation between complementary DNA strands. *Id.* at *6. The Court disagreed, finding "Oxford's contention that the claims are merely directed to the abstract idea of comparing and the natural phenomenon of complementarity of nucleotides ignores almost all of the content of the claim, including most of its limitations." *Id.* The Court held that "the claimed method takes advantage of a natural phenomenon to create a new and useful method, but, as a whole, it is not focused on or directed to that natural phenomenon," and denied the motion to dismiss. *Id.* at *7. The claims here are no different from those in *Pacific Biosciences*: as a whole, they describe non-conventional, specific arrangements of steps that represent advancements in the art. They are not directed to a natural phenomenon and LabCorp's argument to the contrary "ignores almost all of the content of the claim, including most of its limitations" and should be rejected. *See id.* at *6. If the Court read the claims as broadly as LabCorp urges, the judicial-exception to patent eligibility would "swallow all of patent law." *Alice*, 573 U.S. at 217.

### c.    The cases LabCorp cites are inapposite

With little discussion or analysis, LabCorp argues that *Ariosa*, *Cleveland Clinic*, *Roche*, and *Athena* stand for the proposition that claims to methods for detecting the presence and/or

amount of a "naturally occurring" compound are effectively *per se* ineligible, and, therefore, that the court must grant LabCorp's motion. (*See* D.I. 27 at 14, 17-18.) LabCorp is wrong.

Methods are processes, an expressly *eligible* category in 35 U.S.C. § 101, as are "improvements" to existing processes. There is no exception based on the type or goal of the method. Neither the Supreme Court nor the Federal Circuit has – or could have – written such an exception into the statute. To the contrary, the Supreme Court understands Congress to demand expansive eligibility, *Diehr*, 450 U.S. at 182, and in *Alice* and *Mayo*, the Court reiterated its consistent warning, in appropriately dire terms, that courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 573 U.S. at 217; *Mayo*, 566 U.S. at 71. LabCorp's argument that *Ariosa*, *Cleveland Clinic*, *Roche* and *Athena* might have created a *per se* rule that methods of detecting naturally occurring molecules are patent ineligible is statutorily impermissible, and ignores consistent, mandatory Supreme Court precedent. In any event, the facts here are closer to, for example, *CellzDirect*, 827 F.3d at 1047-52, *Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018), and *Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*, No. 2018-1295, 2019 U.S. App. LEXIS 7647 (Fed. Cir. Mar. 15, 2019).

LabCorp's cases are also distinguishable.[4] For example, the patents in those cases described the natural phenomenon itself as the invention. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376 (Fed. Cir. 2015) (invention was "discover[y] that foetal DNA is

---

[4] Quest and Athena Diagnostics are related entities. Quest acknowledges that *Athena* is part of recent section 101 jurisprudence, but considers it to have been wrongly decided, the majority having diverged significantly from Section 101, including as interpreted in *Mayo*. *See, e.g.*, *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 753 n.4 (Fed. Cir. 2019). In any event, the facts in *Athena* no more compel judgment against Quest, especially at this stage of proceedings, than do any of the other cases on which LabCorp relies.

detectable in maternal serum or plasma samples"); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360-61 (Fed. Cir. 2017) ("discovery that patients with cardiovascular disease have significantly greater levels of leukocyte and [MPO]") (modification in original); *Roche Molecular Sys., Inc. v. Cepheid*, 905 F.3d 1363, 1366 (Fed. Cir. 2018) ("inventors discovered that the *rpoB* gene in [Mycobacterium tuberculosis] contains eleven 'position-specific signature nucleotides'"). The patents here, in contrast, describe and claim novel MS *methods* as the invention (s*ee supra*, Sections IV.B.1.a.i and ii.); they do not claim to have discovered the presence of certain analytes in humans. The methods in those cases also described claim steps at high levels of abstraction, with no method details provided. *Ariosa*, 788 F.3d at 1376-77; *Cleveland Clinic*, 859 F.3d at 1356-57; *Roche*, 905 F.3d at 1366-67. Such abstraction was critical to the Supreme Court's decision in *Mayo*, too, in which the step recited simply "determin[e]" metabolite levels, without stating *how*; a doctor was free to choose any of the methods already known for those very metabolites. *Mayo*, 566 U.S. at 74, 82; *see also Cleveland Clinic*, 859 F.3d at 1362 (analogizing to claims in *Ariosa* as providing only general instruction because the patentee did not purport to invent a method). LabCorp likens the "detection" steps here to the steps from the cited cases, but the equivalence is obviously false: "detect" in the present claims is not only limited to ions in MS analysis, but it appears in a sub-step of a multi-step method that is further limited. The claims here are simply not: "detect testosterone" or "detect vitamin D," as in the cases LabCorp cites.

There is thus also no preemption here – of the presence of vitamin D or testosterone in humans, of their detection in humans, or even of their detection by MS – and preemption is the sole concern underlying the judicial exception in the first place. *Alice*, 573 U.S. at 216. The level of detail in the claims captures the novel methods invented. For example, claim 21 of the '867

16

patent requires "generating a protonated and dehydrated precursor ion" of 25-hydroxyvitamin $D_2$ (which was not taught in the prior art), fragmenting the precursor ion, and then determining the amount of the ions in the patient's sample, as does related claim 1 of the '427 patent. Claim 9 of the '868 patent requires "derivatizing the dihydroxyvitamin D metabolites . . . with 4'-carboxyphenyl-TAD," "generating a precursor ion," "generating one or more fragment ions," and then "detecting the amount" of the fragments. Claim 1 of the '862 patent requires "purifying [and extracting] testosterone from a sample," "ionizing" the purified testosterone, and then "detecting" testosterone in samples with very low levels of the analyte, *i.e.*, "less than 10 ng/dL." These claims are far removed from the generic, preemptory steps in *Ariosa*, *Cleveland Clinic*, and *Roche*.

## 2.     Step two: The patents contain inventive concepts

LabCorp bears the burden of proving, by clear and convincing evidence, that the claims are "directed to" ineligible subject matter. For the reasons given above, it has failed to meet its burden. Quest, with no burden to do so, has shown the *eligibility* of the claims at step one or, at the very least, raised sufficient issues of fact that prevent judgment against it at this stage. The Court need not address step two, but should it find that any of the challenged claims is directed to natural phenomena, that claim is still patent-eligible because it contains an "inventive concept" that "transform[s] the ineligible concept into something 'significantly more.'" *Kroy*, 2018 WL 6499675, at *5 (quoting *Alice*, 573 U.S. at 217-18). Claims satisfy this step when their elements, or a combination of them, "involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (citation and internal quotation marks omitted). The "inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827

10831908/1

F.3d 1341, 1350 (Fed. Cir. 2016).

### a.   The claims recite innovative combination of steps

The '427 and '867 patents claim methods capable of distinguishing between multiple vitamin D metabolites in a biological sample, something the prior art could not do.  (*See supra*, Sections III.C and IV.B.1.a.i.)  These methods achieve this innovation by the non-conventional step of generating a protonated and dehydrated precursor ion in the first MS step, which is then further fragmented into metabolite specific patterns in the second MS step.  (*See id.*)  The '868 patent solves the problem of detecting 1,25(OH)$_2$D metabolites in biological samples via specific steps, such as ionization via APCI or derivatizing with 4'-carboxyphenyl-TAD.  (*See supra* Sections III.C and IV.B.1.a.i.)  The '862 patent describes and claims a method for detecting low levels of testosterone and doing so without the need for extraneous preparation steps.  (*See supra* Sections III.D and IV.B.1.a.ii.)  The '862 patent achieves this via a non-conventional arrangement of steps: (1) a purifying by extraction, (2) ionizing extracted testosterone, and (3) detecting ions – without derivatization.  (*See id*.)  Thus, every challenged claim includes an "inventive concept" and is eligible at step two.  *See BASCOM*, 827 F.3d at 1349-50.

### b.   LabCorp's step two arguments
### fail to consider the claims as a whole

LabCorp argues that the challenged claims are ineligible at step two because "[n]one of the elements in the asserted claims . . . contain an inventive concept sufficient to transform the claimed naturally occurring phenomenon into a patent-eligible application."  (D.I. 27 at 14-15, 18-19.)  But LabCorp assesses only each claim element in *isolation* as "well-known."  (*Id*. at 18, 14.)  Thus, LabCorp's step two analysis is wrong in the same way as its step one analysis.

In *BASCOM*, the Federal Circuit held that, although the "limitations of the claims, taken individually, recite[d] generic computer, network and Internet components, none of which [was]

inventive by itself," the ordered combination of steps was patent eligible, because it described "installation of a filtering tool at a specific location," a previously unknown, eligible concept. 827 F.3d at 1349-50 (the claims' "particular arrangement of elements [was a] technical improvement over prior art ways of filtering such content"). Similarly, in *Exergen Corp. v. Kaz USA, Inc.*, 725 Fed. App'x 959, 964-66 (Fed. Cir. 2018), the court held eligible a method for determining body temperature, notwithstanding that the individual steps were known, including for temperature measurement, because the *combination*, inspired by discovery of a natural correlation between arterial and core temperatures, was unconventional.

LabCorp does not address the combination of steps in the claims; it focuses entirely on (its view of) the individual elements. Under step two, LabCorp cannot prove that "no relief could be afforded [to Quest] under any set of facts." *Intellectual Ventures*, 170 F. Supp. 3d at 675.

**c.**   **Questions of fact at step two require discovery**

At step two, whether the claim elements or their combination are well-understood, routine, or conventional to a person of ordinary skill is a question of fact. *Berkheimer*, 881 F.3d at 1368. Also, any fact "that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Id.* (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). LabCorp offers no evidence that the *ordered combination* of specific steps in the challenged claims are ineligible. The Court should therefore find the claims eligible at step two for the reasons given above, including that LabCorp has not addressed the combination of claim elements. If LabCorp disputes that the combination was not well-known or conventional, an issue of fact precludes granting LabCorp's motion. *See id.*

### 3. LabCorp's motion is limited to the claims explicitly identified in its motion

Quest has shown that the handful of claims LabCorp's motion identifies: claim 21 of the '867 patent, claim 1 of the '427 patent, claims 1 and 9 of the '868 patent, and claim 1 of the '862 patent (those mentioned as exemplary in the Complaint) are patent eligible. LabCorp does not address any other claims or show that the challenged claims are representative of all claims, which they are not. For example, LabCorp challenges claim 21 in the '867 patent, which does not recite a purification step, while other claims (*e.g.*, 22, 23, 25) require purification. The same is true for the claims LabCorp challenges in the '427, '868, and '862 patents. A court may invalidate claims without direct analysis only if it has fully considered other "representative claims," something the Court cannot do here because LabCorp has not even attempted to so argue. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Moreover, despite having only recently received LabCorp's (insufficient)[5] core technical document disclosures, Quest will likely assert additional claims.

## V. CONCLUSION

The Court should deny LabCorp's motion or, in the alternative, defer ruling until the issues of assignor estoppel and any factual disputes related to the present motion are resolved.

---

[5] Quest has identified deficiencies in that initial production and will request additional information regarding LabCorp's testing procedures.

10831908/1

Dated: March 19, 2019

Of Counsel:

Adam R. Gahtan
Kevin X. McGann
Eric M. Majchrzak
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: 212.430.8500
Email:    agahtan@fenwick.com
            kmcgann@fenwick.com
            emajchrzak@fenwick.com

Melanie L. Mayer
Elizabeth B. Hagan
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Email:    mmayer@fenwick.com
            ehagan@fenwick.com

Respectfully submitted,

MORRIS JAMES LLP


By: /s/ Kenneth L. Dorsney
    Kenneth L. Dorsney (#3726)
    500 Delaware Avenue, Suite 1500
    Wilmington, DE 19801
    Telephone: 302.888.6800
    kdorsney@morrisjames.com

*Attorney for Plaintiff*
*Quest Diagnostics Investments LLC*

21

10831908/1