# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUEST DIAGNOSTICS INVESTMENTS LLC, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) C.A. No. 18-01436-MN |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, ESOTERIX, INC., and ENDOCRINE SCIENCES, INC., | ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE PLEADINGS UNDER 35 U.S.C. § 101**

**TABLE OF CONTENTS**

I.   ASSIGNOR ESTOPPEL DOES NOT APPLY TO THE ISSUE OF PATENT ELIGIBILITY OF THE VITAMIN D PATENTS ................................................................1

II.  ALL FOUR PATENTS-IN-SUIT ARE NOT PATENT-ELIGIBLE..................................2

    A.   Step One: the Patents Are Directed to Patent-Ineligible Subject Matter.................2

        1.   The Patents do not Claim any New Laboratory Technique.........................2

        2.   The Patents are Directed to Merely Observing Natural Phenomena ...........5

        3.   The Federal Circuit Precedent Supports Patent-Ineligibility.......................6

    B.   Step Two: the Patents do not Claim any Inventive Concepts..................................6

        1.   There is no Innovative Combination of Steps..............................................6

        2.   The Claims were Considered as a Whole ....................................................8

        3.   There are no Questions of Fact to be Resolved ...........................................8

    C.   All of the Claims are Similar and Linked to the Same Subject Matter....................9

III. CONCLUSION..............................................................................................................10

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                          **PAGE(S)**

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) .................................................................................. 3, 6, 9

*Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*,
689 F.3d 1303 (Fed. Cir. 2012) .......................................................................................... 2

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
915 F.3d 743 (Fed. Cir. 2019) .......................................................................... 4, 5, 6, 8, 9

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......................................................................................... 8

*Bilski v. Kappos*,
561 U.S. 593 (2010) .......................................................................................................... 2

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
659 F.3d 1057 (Fed. Cir. 2011) .......................................................................................... 2

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) ...................................................................................... 3, 6

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) .......................................................................................... 9

*Diamond Scientific Co. v. Ambico, Inc.*,
848 F. 2d 1220 (Fed. Cir. 1988) .......................................................................................... 1

*Diamond v. Diehr*,
450 U.S. 175 (1981) .......................................................................................................... 2

*Exergen Corp. v. Kaz USA, Inc.*,
725 Fed. Appx. 959 (Fed. Cir. 2018) .................................................................................. 8

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
Civ. No. 13-1632-LPS, 2017 WL 3706495 (D. Del. Aug. 23, 2017) .................................. 9

*Pac. Biosciences of Cal., inc. v. Oxford Nanopore Techs., Inc.*,
No. 17-cv-1353-LPS, 2018 WL 141902 (D. Del. Mar. 22, 2018) .................................. 5, 6

*Rapid Litigation Management Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) .......................................................................................... 5

*Roche Molecular Sys. v. Cepheid*,
905 F.3d 1363 (Fed. Cir. 2018) ...................................................................................... 4, 6

*Scott Paper Co. v. Marcalus Co.*,
    326 U.S. 249 (1945)............................................................................................................1

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring).......................................................2

**STATUTES**

35 U.S.C. § 101................................................................................................................1, 6, 10

35 U.S.C. § 102............................................................................................................................1

35 U.S.C. § 103............................................................................................................................1

35 U.S.C. § 112............................................................................................................................1

Contrary to Quest's argument, LabCorp's motion is not barred by assignor estoppel with respect to the Vitamin D Patents. Unlike traditional invalidity defenses, patent eligibility is a threshold question to ensure that the claimed subject is even eligible for patent protection before addressing other questions of invalidity or infringement. Accordingly, assignor estoppel does not apply to the patent eligibility question. Here, both the Vitamin D Patents and the Testosterone Patent are not patent-eligible because they are merely directed to observing naturally-occurring vitamin D metabolites or testosterone using well-known, conventional, and routine mass spectrometry ("MS") technology.

## I. ASSIGNOR ESTOPPEL DOES NOT APPLY TO THE ISSUE OF PATENT ELIGIBILITY OF THE VITAMIN D PATENTS

Patent eligibility is a threshold test—different from the traditional invalidity defenses that the Court has previously applied assignor estoppel to. When the Federal Circuit adopted assignor estoppel, it applied assignor estoppel to the traditional invalidity defenses of 35 U.S.C. §§ 102 (lack of novelty), 103 (obviousness), and 112 (inadequate disclosure). *Diamond Scientific Co. v. Ambico, Inc.*, 848 F. 2d 1220, 1222 (Fed. Cir. 1988). In doing so, *Diamond Scientific* noted that assignor estoppel does not bar all defenses due to the Supreme Court's decision in *Scott Paper Co. v. Marcalus Co.*, 326 U.S. 249 (1945). *Id.* at 1222-23. In *Scott Paper*, the Supreme Court held that assignor estoppel does ***not*** prevent a defendant from showing that it practiced an expired patent. 326 U.S. at 256-57. Thus, assignor estoppel does not allow a patentee to claim subject matter that no one could claim because it had been dedicated to the public in an expired patent. *See id.*

Here, assignor estoppel similarly should not allow Quest to claim subject matter that is ineligible for patent protection. Patent eligibility under § 101 is traditionally understood as a "***threshold***" test: applying before other challenges to the sufficiency of a patented invention. *See,*

1

*e.g.*, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *Diamond v. Diehr*, 450 U.S. 175, 188 (1981); *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1324 (Fed. Cir. 2012); *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1064 (Fed. Cir. 2011) (noting the difference between "the threshold inquiry of patent-eligibility, and the substantive conditions of patentability"). The Court has the ultimate responsibility to ensure that "claimed subject matter is even ***eligible for patent protection*** before addressing questions of invalidity or infringement." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring).[1] Accordingly, assignor estoppel does not apply to the issue of patent eligibility of the Vitamin D Patents. Moreover, Quest does not assert that assignor estoppel applies to the Testosterone Patent.

## II. ALL FOUR PATENTS-IN-SUIT ARE NOT PATENT-ELIGIBLE

### A. Step One: the Patents Are Directed to Patent-Ineligible Subject Matter

#### 1. The Patents do not Claim any New Laboratory Technique

<u>**Vitamin D Patents.**</u> Quest admits that the Vitamin D Patents claim methods "to detect vitamin D metabolites" and does not contest that vitamin D metabolites are naturally-occurring compounds in animals. Response Brief, D.I. 35 ("Res.") at 10. Quest's only contention is whether the claimed methods are directed to "detailed tandem MS methods, with innovative, ***non-conventional*** arrangement of elaborated steps." *Id.* They are not. As discussed in LabCorp's Opening Brief (D.I. 27 at 17-19), all of the steps are described in the patent specification as well-known, conventional techniques performing MS. The steps were also not arranged in a way to create a new technique. *See* § II.B.1 *infra*. Ignoring its own patent specifications, Quest asserts that "Quest's scientists were the first to recognize the benefit of creating, identifying, and fragmenting a *protonated and dehydrated precursor ion* (*e.g.*, 395 m/z) into specific, identifiable

---

[1] Unless stated otherwise, all emphasis in quotes is added.

fragment ions in a second MS step . . ." Res. 10 (emphasis in original). But ionizing for the purpose of performing MS and using a second MS step (i.e., using tandem MS generating precursor and fragmented ions) are nothing new, as admitted by the patent specifications. *See, e.g.*, '867 at 8:34-41 ("The ***skilled artisan will understand*** that the choice of ionization method can be determined based on the analyte to be measured . . . After the sample has been ionized, the ***positively charged*** or negatively charged ***ions*** thereby created may be analyzed to determine a mass-to-charge ratio (i.e., m/z)."); 8:59-66 ("***One can often enhance the resolution*** of the MS technique by employing '***tandem mass spectrometry***,' or 'MS/MS.' In this technique, a ***precursor ion*** (also called a parent ion) generated from a molecule of interest can be filtered in an MS instrument, and the precursor ion is subsequently fragmented to yield one or more ***fragment ions*** (also called daughter ions or product ions) that are then analyzed in a ***second MS procedure***."); 9:13-15 ("Mass spectrometers that combine time-of-flight analyzers with ***tandem MS*** are also ***well known to the artisan***.").

Quest also argues that the Vitamin D Patents overcame prior art because they were able to detect vitamin D metabolites at levels not previously possible. Res. 11. Even if true—that Quest was the first to apply the well-known MS techniques to detect low levels of naturally-occurring vitamin D metabolites—the patents are still directed to merely observing natural phenomena without adding any improvement to the underlying technique. The Federal Circuit has consistently found such patents to be patent-ineligible. *See, e.g.*, *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015) ("Where claims of a method patent are directed to an application that starts and ends with a naturally occurring phenomenon, the patent fails to disclose patent eligible subject matter if the methods themselves are conventional, routine and well understood applications in the art."); *Cleveland Clinic Found. v. True Health*

*Diagnostics LLC*, 859 F.3d 1352, 1361 (Fed. Cir. 2017) ("the asserted claims of the testing patents are directed to the natural existence of MPO in a bodily sample and its correlation to cardiovascular risk rather than to 'a new and useful laboratory technique' for detecting this relationship. Indeed, Cleveland Clinic has not created a new laboratory technique; rather, it uses well-known techniques to execute the claimed method."); *Roche Molecular Sys. v. Cepheid*, 905 F.3d 1363, 1372 (Fed. Cir. 2018) ("While it may be true that Roche inventors were the first to use PCR to detect MTB in a biological sample, being the first to discover a previously unknown naturally occurring phenomenon or a law of nature alone is not enough to confer patent eligibility . . . the asserted method claims recite standard PCR methods applied to a naturally occurring phenomenon; there is no additional innovation."); *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019) (claims "directed to natural law because the claimed advance was only in the discovery of a natural law, and that the additional recited steps only apply conventional techniques to detect that natural law.").

<u>**Testosterone Patent.**</u> Quest admits that the Testosterone Patent claims a method for "detecting testosterone in low levels" and does not contest that testosterone is a naturally-occurring hormone. Res. 11. The only issue in contention is whether the Testosterone Patent claims "**non-conventional** arrangement of steps, in particular the inclusion of extraction (*e.g.*, by HTLC [high turbulence liquid chromatography]) as part of pre-MS purification." *Id.* Not so. The patent specification makes clear the extraction methods (i.e., purification) and the use of HTLC for purification prior to analysis by MS were well-known in the art, and the arrangement of those steps was conventional, i.e. found in the prior art and understood by persons of ordinary skill. '862 at 3:8-15 ("Numerous methods are **known in the art** to purify testosterone, including **chromatography** . . ."); 3:19-29 ("**HTLC** is a form of chromatography that utilizes **turbulent**

-4-

*flow . . . **HTLC has been applied*** in the preparation of samples containing two unnamed drugs *prior to analysis by mass spectrometry*. [Citing prior art]. ***Persons of ordinary skill in the art understand 'turbulent flow.'***"). Contrary to Quest's argument (Res. 12), the Testosterone Patent is different from the method at issue in *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016), which was "directed to a new and useful laboratory technique for preserving hepatocytes." Here, the Testosterone Patent does not introduce any new technique for extraction/purification (including HTLC) or MS. In short, both the steps found in the Testosterone Patent and their arrangement were conventional.

### 2.      The Patents are Directed to Merely Observing Natural Phenomena

Quest complains that LabCorp oversimplified the claims and ignored that the methods include detecting "non-naturally occurring *ions*." Res. 12 (emphasis in original). However, as discussed in LabCorp's Opening Brief (D.I. 27 at 3-4, 6-7, 9-10), the patent specifications describe these "non-naturally occurring ions" as a result of employing a well-known method in performing MS. Such man-made compounds used in employing a well-known technique do not change the nature of the claim—the claim is still directed to observing natural phenomena. *See, e.g.*, *Athena*, 915 F.3d at 752 ("reaffirm[ing] that use of a man-made molecule in a method claim employing standard techniques to detect or observe a natural law may still leave the claim directed to a natural law.").

Quest also complains that LabCorp failed to assess the claims as a whole. Res. 12-14. Not so. Just because LabCorp used shorthand to identify the claimed steps does not mean that LabCorp ignored the whole language of the steps. Indeed, LabCorp identified specific passages in the specification where **all** of the claimed steps were described as well-known in the art as techniques used in performing MS. *See, e.g.*, D.I. 27 at 3-4, 6-7, 9-10. Quest's cited *Pac. Biosciences of Cal., inc. v. Oxford Nanopore Techs., Inc.*, No. 17-cv-1353-LPS, 2018 WL

141902 (D. Del. Mar. 22, 2018) is inapposite. *Pac. Biosciences* involved "an ***improved*** method of nanopore sequencing." *Id.* at *6. The patents in this case, on the other hand, do not improve any laboratory technique. Rather, they merely apply a well-known, conventional MS technology to observe or detect naturally-occurring vitamin D metabolites or testosterone.

### 3. The Federal Circuit Precedent Supports Patent-Ineligibility

Quest mischaracterizes LabCorp's argument as proposing that "methods for detecting the presence and/or amount of a 'naturally occurring' compound are effectively *per se* ineligible." Res. 14-15. As discussed in LabCorp's Opening Brief (D.I. 27 at 13-14) and § II.A.1 *supra*, *Ariosa*, *Cleveland Clinic*, *Roche*, and *Athena* all found that merely observing the law of nature or natural phenomenon using a well-known, conventional, and routine technique is patent-ineligible. Just like these Federal Circuit cases, the patents in this case are directed to merely observing the amount of naturally-occurring vitamin D metabolites or testosterone using a well-known, conventional, and routine MS technology.[2]

### B. Step Two: the Patents do not Claim any Inventive Concepts

#### 1. There is no Innovative Combination of Steps

Quest asserts that the claims recite innovative combination of steps, but cannot show any.

**<u>Vitamin D Patents.</u>** For the '427 and '867 patents, Quest argues that they contain "non-conventional step of generating a protonated and dehydrated precursor ion in the first MS step, which is then further fragmented into metabolite specific patterns in the second MS step." Res. 18. But these steps are merely describing the conventional tandem-MS method, which is admitted in the patent specification as well-known in the art. *See, e.g.*, '867 at 8:34-41; 8:59-66;

---

[2] Quest also argues that there is "no preemption here." Res. 16. "Preemption is sufficient to render a claim ineligible under § 101, but it is not necessary." *Athena*, 915 F.3d at 752. Moreover, "[w]here a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, as they are in this case, preemption concerns are fully addressed and made moot." *Ariosa*, 788 F.3d at 1376.

9:13-15; *see also* § II.A.1 *supra*. For the '868 patent, Quest argues that the "patent solves the problem of detecting 1,25(OH)₂D metabolites in biological samples via specific steps, such as ionization via APCI or derivatizing with 4'-carboxyphenyl-TAD." Res. 18. But these so-called "specific steps" are all described in the patent specification as well-known in the art. *See, e.g.*, '868 at 13:48-61 ("Mass spectrometry is performed using a mass spectrometer which includes an ion source for ionizing the fractionated sample and creating charged molecules for further analysis. For example **ionization of the sample may be performed by** . . . **atmospheric pressure chemical ionization (APCI)**, . . . The **skilled artisan will understand** that the choice of ionization method can be determined based on the analyte . . ."); 2:10-20 ("[Prior art references] disclose methods for detecting various vitamin D metabolites using liquid chromatography and mass spectrometry. These methods require that the metabolites be *derivatized* prior to detection by mass-spectrometry. Methods to detect *underivatized* 1,25 (OH)₂D3 by liquid chromatography/mass-spectrometry are disclosed in [prior art]. . .").

**Testosterone Patent ('862 Patent).** Quest argues that it "describes and claims a method for detecting low levels of testosterone and doing so without the need for extraneous preparation steps." Res. 18. This presumably refers to the inclusion of the extraction/purification step pre-MS. But as discussed above in § II.A.1, using extraction/purification methods prior to analysis by MS was well-known in the art. '862 at 3:8-15; 3:19-29. Quest also argues that the Testosterone Patent contains "non-conventional arrangement of steps: (1) a purifying by extraction, (2) ionizing extracted testosterone, and (3) detecting ions – without derivatization." Res. 18. But Quest fails to point to any description of specification indicating that this is non-conventional arrangement. Indeed, as discussed in LabCorp's Opening Brief (D.I. 3-4, 14-16), all of these steps are conventional, routine steps of using MS. There is nothing new about the

arrangement of these well-known steps in performing MS. *See id.*

### 2.     The Claims were Considered as a Whole

Quest wrongly asserts that LabCorp failed to assess the claims as a whole. Res. 18-19. The second step of *Alice/Mayo* examines "whether the limitations of the claim apart from the law of nature [or naturally occurring phenomena], ***considered individually and as an ordered combination***, 'transform the nature of the claim into a patent-eligible application.'" *Athena*, 915 F.3d at 749 (citation omitted). Each and every step of the claims is directed to conventional and well-known steps. *See* D.I. 27 at 2-10, 14-16, 18-19. The ordered combination of these steps does not provide any inventive concept, as they merely follow the routine steps of performing MS. *Id.* And as discussed above in § II.B.1 *supra*, Quest cannot show any innovative concept.

Quest cites to *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), which is inapposite. Res. 18-19. *BASCOM* involved "specific method of filtering Internet content [which] cannot be said, as a matter of law, to have been conventional or generic." *BASCOM*, 827 F.3d at 1351. "Filtering content on the Internet was already a known concept, and the patent describes how its particular arrangement of elements is a ***technical improvement*** over prior art ways of filtering such patent." *Id.* Here, unlike *BASCOM*, the patents do not provide any technical improvement over performing MS as admitted by the patent specifications. Quest also cites to *Exergen Corp. v. Kaz USA, Inc.*, 725 Fed. Appx. 959 (Fed. Cir. 2018). In *Exergen*, "[a]fter considering all the trial testimony and evidence, the district court found that 'there is no evidence in the record' that [the] methods were well-understood, routine, and conventional. . ." *Id.* at 965. Unlike *Exergen*, the patents here themselves confirm that the claimed methods were well-understood, routine, and conventional.

### 3.     There are no Questions of Fact to be Resolved

There are no facts to be resolved for the purpose of this motion because the patent

specifications confirm that all of the steps found in the claims are well-known in the art, i.e., routine and conventional. *See* D.I. 27 at 2-10, 14-16, 18-19; *see also, e.g.*, *Ariosa*, 788 F.3d at 1377 ("The specification of the '540 patent confirms that the preparation and amplification of DNA sequences in plasma or serum were well-understood, routine, conventional activities performed by doctors in 1997."); *Athena*, 915 F.3d at 754 ("Because the specification defines the individual immunoprecipitation and iodination steps and the overall radioimmunoassay as conventional techniques, the claims fail to provide an inventive concept."); *id*. at 754-55 ("For the same reasons that we have concluded that attaching a label to MuSK did not make the claims directed to an eligible concept at step one, we conclude that appending labeling techniques to a natural law does not provide an inventive concept where, as here, the specification describes 125I labeling as a standard practice in a well-known assay."). Because there is no need to look outside of the patents, which are part of the Complaint, the motion can be granted without any further factual inquiry.[3]

    **C.**  **All of the Claims are Similar and Linked to the Same Subject Matter**

  Quest complains that LabCorp only identified certain claims. Res. 20. But those are very claims that Quest identified in its Complaint. D.I. 1 at ¶¶ 49, 56, 68, 81. Nevertheless, the rest of the claims in the patents are substantially similar and linked to the same patent-ineligible subject matter. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

  <u>**Vitamin D Patents.**</u> For the **'427 patent**, independent claim 13 has substantially the same steps as claim 1 (identified in Complaint), except claim 13 requires determining amounts of two

---

[3] On the other hand, Quest's expert declaration (D.I. 37, Chyall Decl.) is not part of the Complaint and therefore should be disregarded. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.,* Civ. No. 13-1632-LPS, 2017 WL 3706495, at *7 (D. Del. Aug. 23, 2017) ("[T]he Court correctly disregarded [Plaintiff's] expert declarations in deciding Defendants' motion for judgment on the pleadings.").

or more vitamin D metabolites. Dependent claims 2-9, 14-19 add purification steps, including using HPLC or HTLC, which were all well-known in the art. *See, e.g.*, '867 at 6:54-7:7; 7:29-32. The rest of the dependent claims (claims 10-12 and 20-23) merely identify a specific vitamin D metabolite. For the ***'867 patent***, independent claims 1 and 11 all share almost identical steps with claim 21 (identified in the Complaint), except claim 1 goes to a different vitamin D metabolite and claim 11 goes to detecting two or more vitamin D metabolites. The dependent claims also do not add any inventive concepts as they merely add purification step (claims 2-8, 12-16, 21-28) (*see* '867 at 6:54-7:7, 7:29-32) or identify different ions or different vitamin D metabolite (claims 8-10, 17-20, 29-31). For the ***'868 patent***, independent claims 1 and 9 are identified in the Complaint. D.I. 1 at ¶ 81. The dependent claims also do not add any inventive concepts as they merely add purification step (claims 10-13, 15-20) (*see* '868 at 10:29-36, 11:1-12:39), identify different ions or different vitamin D metabolite(s) (claims 2-8), or identify APCI like claim 1 (claim 14).

***Testosterone Patent.*** For the ***'863 patent***, claim 15 is substantially the same as claim 1 (identified in the Complaint), except it specifically identifies HTLC and HPLC—two conventional techniques—for the purification step. The dependent claims do not add any inventive concepts as they merely add purification/extraction step (claims 2-7, 17), identify different level of testosterone detected (claims 8-9, 23-24), identify different ions (claims 10-12, 18-20), identify different kinds of sample from a female human (claims 13-14, 21-22), or identify whether to derivatize (claim 16).

## III.    CONCLUSION

For the foregoing reasons and the reasons set forth in its Opening Brief (D.I. 27), LabCorp respectfully submits that all four patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and therefore, the case should be dismissed with prejudice.

-11-

                                         Respectfully submitted,

                                         WILSON SONSINI GOODRICH & ROSATI, P.C.

*Of Counsel*:                                      */s/ Ian R. Liston*
                                               Ian R. Liston (#5507)

Edward G. Poplawski                 Johanna Peuscher-Funk (#6451)
Olivia M. Kim                            222 Delaware Avenue, Suite 800
Erik Carlson                              Wilmington, DE 19801
WILSON SONSINI GOODRICH & ROSATI, P.C.   (302) 304-7600
633 West Fifth Street, Suite 1550        iliston@wsgr.com
Los Angeles, CA 90071                jpeuscherfunk@wsgr.com
(323) 210-2900
epoplawski@wsgr.com                *Counsel for Defendants Laboratory*
okim@wsgr.com                        *Corporation of America Holdings; Esoterix,*
ecarlson@wsgr.com                  *Inc.; and Endocrine Sciences, Inc.*

Matias Ferrario
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7300
mferrario@kilpatricktownsend.com

Dated:  April 5, 2019

## CERTIFICATE OF SERVICE

I, Ian R. Liston, hereby certify that on April 5, 2019, I caused the foregoing ***Defendants' Reply Brief in Support of Their Motion for Judgment on the Pleadings Under 35 U.S.C. § 101*** to be served via electronic mail upon the following counsel of record:

Kenneth L. Dorsney
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
kdorsney@morrisjames.com

*Counsel for Plaintiff*
*Quest Diagnostic Investments LLC*

Adam R. Gahtan
Kevin X. McGann
Eric M. Majchrzak
FENWICK & WEST LLP
1211 Avenue of the Americas, 32nd Floor
New York, NY 10036
agahtan@fenwick.com
kmcgann@fenwick.com
emajchrzak@fenwick.com

Melanie L. Mayer
Elizabeth B. Hagan
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
mmayer@fenwick.com
ehagan@fenwick.com

*Counsel for Plaintiff*
*Quest Diagnostic Investments LLC*


 */s/ Ian R. Liston*
Ian R. Liston (#5507)