# EXHIBIT E

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN NETWOK DEVICES,<br>RELATED SOFTWARE AND<br>COMPONENTS THEREOF (I)** | Investigation No. 337-TA-944 |

## INITIAL DETERMINATION
### Administrative Law Judge David P. Shaw

Pursuant to the notice of investigation, 80 Fed. Reg. 4314 (January 27, 2015), this is the

initial determination in *Certain Network Devices, Related Software and Components Thereof (I)*,

United States International Trade Commission Investigation No. 337-TA-944.

It is held that a violation of section 337 of the Tariff Act, as amended, has occurred in the

importation into the United States, the sale for importation, or the sale within the United States

after importation, of certain network devices, related software and components thereof with

respect to asserted claims 1, 2, 8-11, and 17-19 of U.S. Patent No. 7,162,537; asserted claims 6,

7, 20, and 21 of U.S. Patent No. 6,741,592; and asserted claims 5, 7, 45, and 46 of U.S. Patent

No. 7,200,145.

# TABLE OF CONTENTS

Page

I.  Background ..........................................................................................................1

    A.  Institution of the Investigation ...............................................................1

    B.  Procedural History ..................................................................................1

    C.  The Private Parties .................................................................................2

II.  Jurisdiction and Standing .................................................................................3

    A.  Subject Matter Jurisdiction ....................................................................3

    B.  Personal Jurisdiction ..............................................................................3

    C.  *In Rem* Jurisdiction and Importation ....................................................3

        1.  Importation of the Accused Products........................................3

        2.  Importation of Hardware Components ......................................4

    D.  Ownership of the Asserted Patents .........................................................6

III.  The Asserted Patents ......................................................................................6

    A.  U.S. Patent No. 7,162,537.......................................................................6

        1.  Overview of the Technology .....................................................6

        2.  Overview of the '537 Patent .....................................................8

        3.  The Asserted Claims ...............................................................11

        4.  The '537 Products at Issue ......................................................14

    B.  U.S. Patent No. 7,340,597.....................................................................15

        1.  Overview of the Technology ...................................................15

        2.  Overview of the '597 Patent ...................................................16

        3.  The Asserted Claims ...............................................................17

        4.  The '597 Products at Issue ......................................................19

## TABLE OF CONTENTS (CONT'D)

Page

C.  U.S. Patent Nos. Nos. 6,741,592 and 7,200,145 ................................................... 19

    1.  Overview of the Technology ......................................................................... 19

    2.  Overview of the '592 and '145 Patents ......................................................... 20

    3.  The Asserted Claims ..................................................................................... 23

    4.  The Private VLAN Products at Issue ............................................................ 27

D.  U.S. Patent No. 7,290,164 ...................................................................................... 27

    1.  Overview of the Technology ......................................................................... 27

    2.  Overview of the '164 Patent ......................................................................... 29

    3.  The Asserted Claims ..................................................................................... 31

    4.  The '164 Products at Issue ............................................................................ 33

IV.  General Principles of Law ................................................................................................ 33

A.  Claim Construction .................................................................................................. 33

B.  Infringement ............................................................................................................ 36

    1.  Direct Infringement ....................................................................................... 36

    2.  Induced Infringement .................................................................................... 37

    3.  Contributory Infringement ............................................................................ 38

C.  Validity .................................................................................................................... 39

    1.  Anticipation ................................................................................................... 39

    2.  Obviousness .................................................................................................. 40

    3.  Patentable Subject Matter ............................................................................. 42

    4.  Written Description ....................................................................................... 43

    5.  Enablement ................................................................................................... 43

    6.  Indefiniteness ................................................................................................ 44

Appx888.003

## TABLE OF CONTENTS (CONT'D)

Page

D.  Assignor Estoppel ...................................................................................45

E.  Equitable Defenses ..................................................................................46

    1.  Equitable Estoppel ......................................................................46

    2.  Laches ..........................................................................................47

    3.  Implied License ..........................................................................49

    4.  Patent Misuse .............................................................................49

    5.  Waiver .........................................................................................50

    6.  Unclean Hands ...........................................................................50

F.  Domestic Industry ...................................................................................50

    1.  Technical Prong .........................................................................51

    2.  Economic Prong .........................................................................52

V.  The '537 (SysDB) Patent ....................................................................................53

A.  Claim Construction .................................................................................53

    1.  Level of Ordinary Skill ..............................................................53

    2.  Disputed Claim Terms ...............................................................54

B.  Literal Infringement Analysis .................................................................64

    1.  Claim 19 .....................................................................................65

    2.  Claim 1 .......................................................................................74

    3.  Claim 2 .......................................................................................77

    4.  Claim 8 .......................................................................................77

    5.  Claim 9 .......................................................................................79

    6.  Claim 10 .....................................................................................80

    7.  Claim 11 .....................................................................................80

iii

## TABLE OF CONTENTS (CONT'D)

| | | | Page |
|---|---|---|---|
| | 8. | Claim 17 | 81 |
| | 9. | Claim 18 | 81 |
| C. | | Indirect Infringement | 82 |
| | 1. | Specific Intent and Knowledge of the Asserted Patents | 82 |
| | 2. | Direct Infringement of the '537 Patent in the United States | 86 |
| | 3. | Induced Infringement of the '537 Patent | 87 |
| | 4. | Contributory Infringement of the '537 Patent | 88 |
| D. | | Technical Prong of the Domestic Industry Requirement | 89 |
| | 1. | Claim 19 | 89 |
| | 2. | Claim 1 | 94 |
| | 3. | Claim 2 | 97 |
| | 4. | Claim 8 | 98 |
| | 5. | Claim 10 | 99 |
| | 6. | Claim 11 | 100 |
| | 7. | Claim 17 | 100 |
| E. | | Validity | 100 |
| | 1. | Anticipation | 101 |
| | 2. | Obviousness | 105 |
| | 3. | Arguments Relating to 35 U.S.C. § 112 | 108 |
| | 4. | Inventorship | 109 |
| VI. | | The '597 (ProcMgr) Patent | 110 |
| A. | | Claim Construction | 110 |
| | 1. | Level of Ordinary Skill | 110 |

iv

**TABLE OF CONTENTS (CONT'D)**

Page

2. Disputed Claim Terms .................................................................................. 112

B. Literal Infringement Analysis ....................................................................... 117

1. The Accused Products Do Not Detect a Change to a Configuration
of a Subsystem ............................................................................................. 118

2. The Accused Arista Products Do Not Determine a Configuration
(Claim 72) .................................................................................................... 121

C. Technical Prong of the Domestic Industry Requirement ............................ 122

1. Claim 1 ......................................................................................................... 122

2. Claim 14 ....................................................................................................... 128

3. Claim 15 ....................................................................................................... 128

4. Claim 39 ....................................................................................................... 129

5. Claim 71 ....................................................................................................... 130

6. Claim 72 ....................................................................................................... 131

D. Validity ............................................................................................................. 132

1. Assignor Estoppel ....................................................................................... 132

2. Patent Eligibility Under 35 U.S.C. § 101 ................................................. 139

3. Invalidity Over the Prior Art ..................................................................... 140

VII. The '592 and '145 (Private VLAN) Patents ........................................................ 147

A. Claim Construction ......................................................................................... 147

1. Level of Ordinary Skill .............................................................................. 147

2. Disputed Claim Terms ............................................................................... 148

B. Literal Infringement Analysis ....................................................................... 172

1. '592 Patent – Claim 6 ................................................................................. 173

2. '592 Patent – Claim 7 ................................................................................. 177

v

## TABLE OF CONTENTS (CONT'D)

| | | | Page |
|---|---|---|---|
| | 3. | '592 Patent – Claim 20 | 180 |
| | 4. | '592 Patent – Claim 21 | 185 |
| | 5. | '145 Patent – Claim 5 | 188 |
| | 6. | '145 Patent – Claim 7 | 189 |
| | 7. | '145 Patent – Claim 45 | 192 |
| | 8. | '145 Patent – Claim 46 | 194 |
| | 9. | Arista's Non-Infringement Arguments | 195 |
| C. | | Indirect Infringement | 200 |
| | 1. | Direct Infringement of the Private VLAN Patents in the United States | 200 |
| | 2. | Induced Infringement of the Private VLAN Patents | 201 |
| | 3. | Contributory Infringement of the Private VLAN Patents | 202 |
| D. | | Technical Prong of the Domestic Industry Requirement | 203 |
| | 1. | '592 Patent – Claim 6 | 203 |
| | 2. | '592 Patent – Claim 7 | 206 |
| | 3. | '592 Patent – Claim 20 | 208 |
| | 4. | '592 Patent – Claim 21 | 211 |
| | 5. | '145 Patent – Claim 5 | 213 |
| | 6. | '145 Patent – Claim 7 | 215 |
| | 7. | '145 Patent – Claim 45 | 218 |
| | 8. | '145 Patent – Claim 46 | 219 |
| | 9. | Arista's Domestic Industry Arguments | 221 |
| E. | | Validity | 224 |

vi

**TABLE OF CONTENTS (CONT'D)**

Page

|   |   |   |   |
|---|---|---|---|
| | 1. | Anticipation – The 802.1Q Standard | 224 |
| | 2. | Obviousness | 230 |
| | 3. | Patentable Subject Matter | 234 |
| | 4. | Arguments Relating to 35 U.S.C. § 112 | 236 |
| VIII. | The '164 (Zero Touch Provisioning) Patent | | 243 |
| | A. | Claim Construction | 243 |
| | | 1. Level of Ordinary Skill | 243 |
| | | 2. Disputed Claim Terms | 244 |
| | B. | Literal Infringement Analysis | 249 |
| | | 1. The Accused Products Are Not Fault Recovery Processes – All Asserted Claims | 250 |
| | | 2. The Accused Products Do Not Detect a Loss of Connectivity – All Claims | 252 |
| | | 3. The Accused Products Performing Initial Provisioning Do Not Infringe – All Asserted Claims | 253 |
| | C. | Technical Prong of the Domestic Industry Requirement | 254 |
| | | 1. The Domestic Industry Products Do Not Detect a Loss of Connectivity – All Claims | 254 |
| | | 2. The Domestic Industry Products Are Not Fault Recovery Processes – All Claims | 255 |
| | D. | Validity | 256 |
| | | 1. Anticipation – U.S. Patent No. 7,069,334 to Wysoczynski | 256 |
| | | 2. Anticipation – AutoInstall | 260 |
| | | 3. Anticipation – AutoConfig | 260 |
| | | 4. Obviousness – Wysoczynski in Combination with Johnson | 261 |

vii

**TABLE OF CONTENTS (CONT'D)**

Page

5. Secondary Considerations of Non-Obviousness.......................262

IX. Equitable Defenses...........................................................................263

A. Equitable Estoppel ............................................................263

1. There Was No Misleading Conduct by Cisco...........................263

2. There Was No Reasonable Reliance by Arista.....................265

3. There Was No Prejudice .......................................267

B. Implied License, Waiver, and Patent Misuse.........................267

1. Implied License....................................................268

2. Waiver.................................................................268

3. Patent Misuse.......................................................269

C. Laches .................................................................270

1. Laches As a Defense in Section 337 Investigations ..............270

2. Arista's Laches Defense .......................................271

D. Unclean Hands ...............................................................272

X. Domestic Industry – Economic Prong .........................................274

A. Cisco's Engineering and R&D Activities ............................275

B. Dr. Leonard's Analysis of Cisco's Domestic Industry .......................276

1. Cisco's Investments in Plant and Equipment........................276

2. Cisco's Investments in the Employment of Labor or Capital.................280

3. Cisco's Investments in Engineering and R&D .................286

XI. Conclusions of Law ......................................................................292

XII. Initial Determination on Violation..................................................293

XIII. Order .............................................................................................293

viii

The following abbreviations may be used in this Initial Determination:

| | |
|---|---|
| ALJ | Administrative Law Judge |
| Br. | Post-Hearing Brief |
| CDX | Complainant's Demonstrative Exhibit |
| Compl. | Complainant or Complainant's |
| CPX | Complainant's Physical Exhibit |
| CX | Complainant's Exhibit |
| Dep. | Deposition |
| DHCP | Dynamic Host Configuration Protocol |
| DWS | Direct Witness Statement |
| EDIS | Electronic Document Imaging System |
| JDX | Joint Demonstrative Exhibit |
| JPX | Joint Physical Exhibit |
| JX | Joint Exhibit |
| MPEP | Manual of Patent Examining Procedure |
| PTO | U.S. Patent and Trademark Office |
| Q/A | Question and Answer |
| RDX | Respondent's Demonstrative Exhibit |
| Resp. | Respondent or Respondent's |
| RPX | Respondent's Physical Exhibit |
| RWS | Rebuttal Witness Statement |
| RX | Respondent's Exhibit |

| SDX | Staff's Demonstrative Exhibit |
| SPX | Staff's Physical Exhibit |
| SRWS | Supplemental Rebuttal Witness Statement |
| SWS | Supplemental Witness Statement |
| SX | Staff's Exhibit |
| Tr. | Transcript |
| WS | Witness Statement |

## I.     Background

### A.     Institution of the Investigation

By publication of a notice in the *Federal Register* on January 27, 2015, pursuant to

subsection (b) of section 337 of the Tariff Act of 1930, as amended, the Commission instituted

this investigation to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the
> importation into the United States, the sale for importation, or the sale
> within the United States after importation of certain network devices,
> related software and components thereof by reason of infringement of one
> or more of claims 1, 2, 8-11, and 17-19 of the '537 patent [U.S. Patent No.
> 7,162,537]; claims 1, 6, and 12 of the '296 patent [U.S. Patent No.
> 8,356,296]; claims 1, 5, 6, 9, and 18 of the '164 patent [U.S. Patent No.
> 7,290,164]; claims 1, 14, 15, 29, 39-42, 63, 64, 71-73, and 84-86 of the
> '597 patent [U.S. Patent No. 7,340,597]; claims 6-10, 17, 18, 20, 21, 23,
> and 24 of the '592 patent [U.S. Patent No. 6,741,592]; claims 1, 3, 5, 7-11,
> 13, 15-29, 33-37, and 39-46 of the '145 patent [U.S. Patent No.
> 7,200,145], and whether an industry in the United States exists as required
> by subsection (a)(2) of section 337.

80 Fed. Reg. 4134 (Jan. 27, 2015).

The Commission named as complainant Cisco Systems, Inc. of San Jose, California. *Id.*

The Commission named as respondent Arista Networks, Inc. of Santa Clara, California.

*Id.*

The Office of Unfair Import Investigations ("Staff" or "OUII") was also named as a party

to the investigation. *Id.*

### B.     Procedural History

The target date for completion of this investigation was set at 16 months, *i.e.*, May 27,

2016. Order No. 3 (Jan. 28, 2015). The deadline for this initial determination was therefore set

for January 27, 2016. *Id.*

Cisco moved to terminate the investigation in part as to the following asserted claims:

- U.S. Patent No. 8,356,296: claims 1, 6, and 12 (all asserted claims);

- U.S. Patent No. 7,340,597: claims 40-42 and 84-86;

- U.S. Patent No. 6,741,592: claims 8-10, 17-18, and 23-24; and

- U.S. Patent No. 7,200,145: claims 1, 3, 8-10, 11, 13, 15-29, 33-37, and 39-44.

The administrative law judge granted the motion in an initial determination. Order No. 19 (Aug. 21, 2015), *aff'd*, Notice of the Commission's Determination Not to Review an Initial Determination Terminating the Investigation As to Certain Claims (Sept. 9, 2015).

A prehearing conference was held on September 9, 2015, with the evidentiary hearing in this investigation beginning immediately thereafter. The hearing concluded on September 16, 2015. *See* Order No. 6 (Mar. 9, 2015); Prehearing Tr. 1-24 (Sept. 10, 2015); Hearing Tr. 1-1494. The parties were requested to file post-hearing briefs not to exceed 450 pages, and to file reply briefs not to exceed 150 pages. Prehearing Tr. 10 (Sept. 10, 2015).

Following the submission of post-hearing briefs, Arista submitted a Notice of New Authority (EDIS Doc. No. 570796) (Dec. 15, 2015) addressing the economic prong of the domestic industry requirement. Cisco submitted a response to Arista's Notice (EDIS Doc. No. 572194) (Jan 11, 2016).

On January 27, 2016, the administrative law judge issued Order No. 27, an initial determination extending the target date of this investigation to June 2, 2016. The deadline for this initial determination is therefore February 2, 2016.

## C.    The Private Parties

Cisco Systems, Inc. is a corporation organized and existing under the laws of California, having its principal place of business at 170 West Tasman Drive, San Jose, California, 95134. Compl. ¶ 7.

Arista Networks, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 5453 Great America Parkway, Santa Clara, California, 95134. *See* Compl. ¶ 12; Resp. ¶ 12.

## II. Jurisdiction and Standing

### A. Subject Matter Jurisdiction

No party has contested the Commission's jurisdiction over the subject matter of this investigation. *See, e.g.*, Compl. Br. at 41-42; Resp. Br at 34; Staff Br. at 8. Indeed, as indicated in the Commission's notice of investigation, discussed above, this investigation involves the alleged importation of products that infringe United States patents in a manner that violates section 337 of the Tariff Act, as amended. Accordingly, it is found that the Commission has subject matter jurisdiction over this investigation.

### B. Personal Jurisdiction

No party has contested the Commission's personal jurisdiction over it. *See, e.g.*, Compl. Br. at 42; Resp. Br. at 34; Staff Br. at 8. Indeed, all parties appeared at the evidentiary hearing, and presented evidence. It is found that the Commission has personal jurisdiction over all parties.

### C. *In Rem* Jurisdiction and Importation

#### 1. Importation of the Accused Products

The Commission has *in rem* jurisdiction when infringing articles are imported, sold for importation, or sold within the United States after importation by the owner, importer, or consignee. 19 U.S.C. § 1337(a)(1)(B); *see also* 80 Fed. Reg. 4134 (Jan. 27, 2015) (Notice of Investigation). It has long been recognized that an importation of even one accused product can satisfy the importation requirement of section 337. *See Certain Trolley Wheel Assemblies*, Inv.

3

No. 337-TA-161, Comm'n Op. at 7-8, USITC Pub. No. 1605 (Nov. 1984) (deeming the importation requirement satisfied by the importation of a single product of no commercial value).

Arista has argued that a violation of section 337 cannot be found in this investigation because [




]. *See, e.g.*, CX-1009C (Arista's First Supplemental Response to Interrogatory No. 40); *see also* Metivier Tr. 1161.

The evidence demonstrates, however, that the accused products have been imported into the United States [                                                      ]. *See, e.g.*, CX-0597C; CX-1009C; JX-0029C; CX-1213C; Metivier Tr. 1160-1161, 1165; Duda Tr. 821-822 ("[


].").  For example, Mr. Metivier, Arista's Vice President of Manufacturing and Platform engineering, testified that [


].  Metivier Tr. 1168, 1172.  Arista's Chief Technology Officer, Mr. Kenneth Duda, also testified that [

].  Duda Tr. 823.

Therefore, it is determined that the Commission has *in rem* jurisdiction over the accused products pursuant to 19 U.S.C. § 1337(a).

### 2.  Importation of Hardware Components

The Commission has *in rem* jurisdiction over "articles that . . . infringe" a United States patent, a set that includes components used in, or are otherwise a part of, contributory and

4

induced infringement under 35 U.S.C. § 271(b), (c). *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1346 (Fed. Cir. 2015) (*en banc*) ("'[I]nfringement' is a term that encompasses both direct and indirect infringement, including infringement by importation that induces direct infringement of a method claim."); *see Certain Digital Media Devices Including Televisions, Blu-Ray Disc Players, Home Theater Sys., Tablets & Mobile Phones, Components Thereof & Associated Software*, Inv. No. 337-TA-882, Final Initial Determination (Aug. 7, 2014) ("*Certain Digital Media Devices*"). The Commission therefore has jurisdiction over articles that contribute to or induce direct infringement, even if direct infringement occurs after importation into the United States. *Suprema*, 796 F.3d at 1347, 1348; *Certain Digital Media Devices* at 22-23.

The record evidence establishes that, [

]. *See, e.g.*, CX-1009C; JX-0029C; CX-0597C. Cisco alleges that this [

]. *See, e.g.*, Compl. Br. at 375-405. It is argued that the [

]. *See, e.g.*, Compl. Br. at 45 (citing Duda Tr. 861; Metivier Tr. 1167, 1173; CX-0035C; CX-0038C; CX-0040C; JX-0026C (Duda Dep. Tr.) 204-205, 266, 267-268, 273-275; JX-0031C (Pech Dep. Tr.) 140-141).

Therefore, it is determined that the Commission has *in rem* jurisdiction over the switch hardware, inasmuch as they constitute "articles that . . . infringe" pursuant to section 337 and the Federal Circuit's *en banc* decision in *Suprema*.

5

### D.    Ownership of the Asserted Patents

The asserted patents have each been assigned to Cisco, and the assignments have been recorded with the U.S. Patent and Trademark Office. *See* JX-0013; JX-0015; JX-0016; JX-0017; JX-0018. It is therefore determined that Cisco has standing to bring this enforcement action against Arista.

## III.    The Asserted Patents

### A.    U.S. Patent No. 7,162,537

#### 1.    Overview of the Technology

The '537 patent is generally directed to a system and method for managing data in networking devices. JX-0001 ('537 patent) at Abstract. In particular, the '537 patent concerns the use of router subsystems to externally manage router configuration data stored in a centralized database, referred to as "sysDB." The '537 patent teaches that, although prior art systems used a centralized database (*i.e.*, sysDB) to store router configuration data, none allowed the subsystems to manage the data.

As the '537 patent explains, network devices, such as routers and switches, transfer network messages and packets within a network or between networks. JX-0001 at col. 1, lns. 19-22. These network devices typically use an operating system to control the functionality needed to operate. *Id.* at col. 1, lns. 14-18. Network devices also can use a number of specialized subsystems to perform specific functionality. *Id.* at col. 1, lns. 37-38. For example, the IP subsystem handles IP address information, and the AAA subsystem deals with user authentication information. *Id.* at col. 4, lns. 9-11. The '537 patent teaches that prior art operating systems generally used one of two approaches. In the first approach, devices relied on each subsystem to manage the specific functions for which it was responsible. *Id.* at col. 1, lns.

6

37-40. Although this technique allowed each subsystem to focus on a specific process, it suffered from several drawbacks. In particular, each of the subsystems often had "multiple dependencies with other client subsystem[s]." *Id.* at col. 1, lns. 37-47. These multiple dependencies hindered device performance, for example, by making "common transactions cumbersome and unnecessarily complicated." *Id.* at col. 1, lns. 48-67.

In the second approach, a centralized database system was used to manage network device transactions. JX-0001 ('537 patent) at col. 2, lns. 42-49. The inventor of the '537 patent, Mr. Pradeep Kathail, along with others at Cisco, was awarded U.S. 6,704,752 ("Kathail '752") regarding this centralized database approach. CX-0006C (Kathail WS) at Q/A 42-43; CX-1150. Prior art systems implementing this approach helped to reduce or avoid multiple dependencies among client subsystems by using a central point of coordination. JX-0001 ('537 patent) at col. 2, lns. 55-57. In the system of Kathail '752, for example, "[t]he centralized database system manages a storage structure . . . contain[ing] configuration data for the router. The centralized database then carries out the configuration change in the appropriate tuple[1] node using the configuration information provided in the configuration command issued by the user." CX-1150 at Abstract (emphasis added). Mr. Kathail received additional patents—U.S. Patent Nos. 6,952,703 ("Kathail '703") and 6,728,723 ("Kathail '723")—relating to how the centralized database in this approach would verify and notify others of transactions. CX-0006C (Kathail WS) at Q/A 42-43; CX-1150. As the '537 patent explains, this second approach also suffers from drawbacks. *See* CX-0006C (Kathail WS) at Q/A 42-43. For example, a centrally managed

---

[1] In this instance, a tuple is a node on a data storage tree structure. *See* CX-0007C (Almeroth WS) at Q/A 373.

system is inefficient because it requires one database to perform the transactions continuously on
stored data, taxing the central database:

> However, the centralized database scheme is somewhat inefficient when
> the information stored in the database contains a large amount of data or is
> changing very fast. For example, when the data in the database is
> constantly changing (such as statistic counters), the sysDB may have to
> continuously perform transaction routines, notification routines, and
> verification routines.

JX-0001 ('537 patent) at col. 2, ln. 58 – col. 3, ln. 38.

The central database is also needed to coordinate the activities of all of the individual

subsystems, which requires burdensome logic and processing. *See* CX-0006C (Kathail WS) at

Q/A 42-43, 57; CX-0007C (Almeroth WS) at Q/A 41.

### 2.     Overview of the '537 Patent

Asserted U.S. Patent No. 7,162,537 ("the '537 patent") is titled, "Method and System for

Externally Managing Router Configuration Data in Conjunction With a Centralized Database."

JX-0001 ('537 patent).  The '537 patent issued on January 9, 2007, and the named inventor is

Pradeep Kathail. *Id.*

To address the problems present in the prior art, the '537 patent provides "a method and

system for externally managing router configuration data in conjunction with a centralized

database [that] allows the various subsystems of the IOS to be modular and independent." *See*

JX-0001 ('537 patent) at col. 3, lns. 13-16.  As such, the system of the '537 patent maintains

modularity by using a centralized database while at the same time reducing some of the

computational burden of that centralized database by allowing external subsystems to manage

data. *Id.* at col. 3, lns. 13-19.  In this way, modularity and independence is achieved without the

8

drawback of multiple dependencies among client subsystems. *See id.*; CX-0007C (Almeroth WS) at Q/A 42.

The operating system contemplated in the '537 patent includes a database subsystem, sysDB, along with several other subsystems coupled to sysDB, such as an IP subsystem, an Ethernet subsystem, a dialer subsystem, an authentication subsystem, and a point-to-point protocol subsystem. JX-0001 ('537 patent) at col. 7, lns 46-55. As the '537 patent explains, subsystems can submit a registration request to sysDB to externally manage certain router configuration data:

> A managing subsystem registers for external data managing services with the sysDB by transmitting a "managing" registration request. The managing subsystem may register to externally manage router configuration data which would otherwise be maintained within the sysDB tree. Accordingly, the managing subsystem may register to externally manage an individual tuple of the sysDB tree or an entire sub-tree (or namespace) of the sysDB tree.

*Id.* at col. 5, lns. 18-25.

According to the '537 patent, its invention differs from prior art systems in a number of ways. For example, whereas in the prior art systems "the centralized database . . . carries out the configuration change," the system of the '537 patent transfers that role to the external managing subsystem. JX-0001 ('537 patent) at col. 14, ln. 65 – col. 15, ln. 2; *see* CX-1150 at col. 3, lns. 41-44. Compared to the prior art, external management also allows the central database to avoid certain processing required to coordinate modifications to data stored within. *See* CX-0007C (Almeroth WS) at Q/A 42, Q/A 47.

Some benefits of external management are seen by comparing the steps for updating data in the '537 patent using an external manager (Figure 8) with the steps for updating data in the prior art Kathail '752 patent using sysDB without external management (Figure 5). As shown

9

below in demonstrative CDX-0020C-0000, prior art systems required significant functionality

that was rendered unnecessary with external management. For example, Kathail '752 requires

that several tasks be performed by the centralized database system when a change is requested,

inasmuch as the centralized database system is the manager. These tasks include checking

whether the data is locked in step 200, refusing the change in step 230 if the data were locked,

and then communicating that refusal in step 240:



CDX-0020C-0000 (citing CX-1150 (Kathail '752) at Fig. 5; JX-0001 ('537 patent) at Fig. 8).

These steps were all required in the context of the '752 patent because sysDB managed

all the data, and therefore managed access to the data by the subsystems. CX-0007C (Almeroth

WS) at Q/A 169. By contrast, the '537 patent does not require that those tasks be carried out by

the centralized database. Rather, the subsystems responsible for the data manage them directly,

and it is therefore unnecessary for the centralized database to lock and unlock the data or

10

otherwise to manage access to the data by the subsystems. *Id.* The computational steps required for centralized management of data that are depicted in Figure 5 the '752 patent are absent when external management is available, as shown in Figure 8 of the '537 patent. CX-0007C (Almeroth WS) at Q/A 169; JX-0001 ('537 patent) at Figs. 5, 8. Moreover, if the data are not externally managed, the '537 patent indicates in box 500 of Figure 8 that data updates are handled according to the method disclosed in Kathail '752. JX-0001 ('537 patent) at Fig. 8; col. 14, lns. 44-54.

Thus, the claimed inventions of the '537 patent provide independence between the various subsystems of the IOS by eliminating dependencies between multiple individual subsystems through the use of a centralized database. JX-0001 ('537 patent) at col. 5, lns. 41-50. The '537 patent also teaches that the claimed inventions avoid and reduce the disadvantages associated with such a database by allowing individual subsystems to manage the data outside of the database. *Id.*

### 3.   The Asserted Claims

Cisco asserts independent claims 1, 10, and 19 from the '537 patent, as well as dependent claims 2, 8, 9, 11, 17, and 18.[2]  The relevant claims read as follows:

> 1. A method for reducing computational overhead in a centralized database system by externally managing router data in conjunction with a centralized database subsystem, said database subsystem operatively coupled for communication with a plurality of router subsystems one of which is a first managing subsystem, comprising:
>
> a) transmitting a management registration request by said first managing subsystem to said database subsystem, said registration request indicating router configuration data for which said first managing subsystem is requesting to provide external management

---

[2] Cisco relies on claims 1, 2, 8, 10, 11, 17, and 19 of the '537 patent to argue satisfaction of the technical prong of the domestic industry requirement. *See* Compl. Br. at 27.

11

services, said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database;

b) receiving said management registration request by said database subsystem; and

c) registering said first managing subsystem for external management by said database subsystem.

2. The method of claim 1 further comprising maintaining router configuration data using a tree structure having a plurality of tuples by said database system.

8. The method of claim 1 further comprising:

(a) transmitting a change request for router data by a requesting subsystem to said database subsystem;

(b) receiving said change request by said database subsystem;

(c) determining whether said router data is externally managed by a second managing subsystem; and

(d) requesting a data change for said router data to said second managing subsystem by said database subsystem when said database subsystem determines said router data is externally managed by a second managing subsystem.

9. The method of claim 8 further comprising:

a) determining whether said router data is locally cached; and

b) updating the cache value to said router data when said router data is locally cached.

10. A program storage device readable by a machine, tangibly embodying a program of instructions executable by the machine to perform a method for reducing computational overhead in a centralized database system by externally managing router data in conjunction with a centralized database subsystem, said database subsystem operatively coupled for communication with a plurality of router subsystems one of which is a first managing subsystem, said method comprising:

(a) transmitting a management registration request by said first managing subsystem to said database subsystem, said registration

12

request indicating router configuration data for which said first managing subsystem is requesting to provide external management services, said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database;

(b) receiving said management registration request by said database subsystem; and

(c) registering said first managing subsystem for external management by said managing subsystem.

11. The program storage device of claim 10, said method further comprising maintaining router configuration data using a tree structure having a plurality of tuples by said database system.

17. The program storage device of claim 10, said method further comprising:

(a) transmitting a change request for router data by a requesting subsystem to said database subsystem;

(b) receiving said change request by said database subsystem;

(c) determining whether said router data is externally managed by a second managing subsystem; and

(d) requesting a data change for said router data to said second managing subsystem by said database subsystem when said database subsystem determines said router data is externally managed by a second managing subsystem.

18. The program storage device of claim 17, said method further comprising:

(a) determining whether said router data is locally cached; and

(b) updating the cache value to said router data when said router data is locally cached.

19. In a router device having a processor and memory, a router operating system executing within said memory comprising:

(a) a database subsystem;

13

(b) a plurality of client subsystems, each operatively coupled for communication to said database subsystem, one of said client subsystems configured as a managing subsystem to externally manage router data upon issuing a management request to said database subsystem; and

(c) a database operatively coupled to said database subsystem, said database configured to store router configuration data and delegate management of router configuration data to a management subsystem that requests to manage router configuration data, said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database.

### 4.     The '537 Products at Issue

#### a.     Accused Arista Products

The Accused '537 Products are Arista's 7010, 7048, 7050, 7050X, 7150, 7250X, 7280E, 7300, 7300X, and 7500E series switches. *See* CX-0007C (Almeroth WS) at Q/A 24. Arista switches, including the switches named above, run Arista's "Extensible Operating System," or "EOS." CX-0007C (Almeroth WS) at Q/A 82; CX-0179. At the center of EOS is "Sysdb," a centralized database that Cisco contends contains the complete state of the system and interfaces with various subsystems called "agents." CX-0286 at 4-5; *see also* CX-0007C (Almeroth WS) at Q/A 85; JX-0026C (Duda Dep. Tr.) at 37-38.

#### b.     Cisco Domestic Industry Products

Cisco's '537 Domestic Industry Products are the CRS-1, XR 12000, and the ASR 9000 platforms, which use Cisco's IOS XR operating system. Mr. Kathail, the named inventor of the '537 patent, worked on IOS XR under its previous name of IOS ENA. CX-0006C (Kathail WS) at Q/A 10, Q/A 17-18, Q/A 99. IOS XR uses a centralized database called SysDB. *Id.* at Q/A 19; CX-0007C (Almeroth WS) at Q/A 284. In IOS XR, a subsystem process may register with

14

SysDB to be an "External Data Manager" (or "EDM") for a particular set of data that it identifies in a registration request. CX-0471C; CX-0007C (Almeroth WS) at Q/A 284-294.

## B. U.S. Patent No. 7,340,597

### 1. Overview of the Technology

The invention of the '597 patent is a computer networking communications device invented by Arista founder David Cheriton while he working as an engineer at Cisco. The '597 patent relates to communication networks, which allow for access to information and services provided by remote devices. JX-0004 ('597 patent) at col. 1, lns. 12-16. Convenient access to remote information and services makes it easier for an attacker to take over networked communications devices, however, to cripple the network or "to proceed with further compromise of the network's security." *Id.* at col. 1, lns. 35-36.

The '597 patent teaches that prior attempts to implement a secure, robust, and flexible logging and reporting mechanism to monitor system changes on communications devices as they occurred typically relied on network monitors external to the communications devices. JX-0004 at col. 2, lns. 7-20. These implementations suffered from multiple problems unique to monitoring security threats in networked environments. First, attacking a router or other devices between a given communications device and its associated network monitor could disable the monitor's access to data and ability to function properly. *Id.* at col. 1, lns. 30-38; col. 2, lns. 16-20. Second, configuration changes reported by a device to an external monitor may cause a network administrator to disable or isolate the device where the change is severe enough to warrant its quarantine. *Id.* at col. 5, lns. 5-16. Third, an external network monitor itself is a target for attacks. *Id.* at col. 1, lns. 30-38; col. 2, lns. 13-20.

15

## 2.      Overview of the '597 Patent

Asserted U.S. Patent No. 7,340,597 ("the '597 patent") is titled, "Method and Apparatus for Securing a Communications Device Using a Logging Module." JX-0004 ('597 patent).  The '597 patent issued on March 4, 2008, and the named inventor is David R. Cheriton. *Id.*

To address the problems in the prior art, David Cheriton developed the inventions claimed in the '597 patent while working at Cisco.  The device includes a "logging module" coupled to a subsystem in the device and uses the full hardware and software capabilities of the device to securely log and report configuration changes within the device itself, without the need for external systems.  JX-0004 at col. 2, lns. 21-30.  Cheriton's invention solved the three problems with the prior art discussed above.

The '597 patent describes a communication device that itself contains a logging module that is separate from but coupled to one or more of the operative subsystems of the communication device.  The device's logging module "determines a configuration of the subsystem 115, detects a change in the configuration of the subsystem 115, and indicates that the change has occurred." JX-0004 at col. 6, lns. 7-10.  Inasmuch as the logging module logs each of these changes to the subsystem, the logging module can provide an indication whenever an attacker attempts to circumvent the security of the subsystem. *Id.* at col. 2, lns. 40-42.  Unlike the prior art, the logging module of the '597 patent is contained within the device, coupled to its subsystems; it is not distributed across the device or other devices on the network.

Another aspect of the invention disclosed in the '597 patent secures the device's logging module by "substantially restricting" the ability to configure or disable the logging module remotely.  JX-0004 at col. 3, lns. 56-62; col. 13, lns. 14-53; Fig. 8.  This can be accomplished by structuring the device so that its logging module is not configurable over the device's network

16

interface. The invention of the '597 patent also solves the shortcomings of prior art approaches because the device is able to broadcast configuration changes on the network, rather than being restricted to (for example) sending configuration changes to a single remote device. *Id.* at col. 11, lns. 45-51; col. 13, lns. 47-49; Fig. 8. This aspect of the device allows multiple remote external monitors to subscribe and unsubscribe to reports of the device's configuration changes generated by the device's logging module, without reconfiguring the device. This aspect of the device makes it more difficult for an attacker to mask a compromised device by attacking an external monitor.

### 3.    The Asserted Claims

Cisco asserts independent claims 1, 39, and 71, and dependent claims 14, 15, 29, 63, 64,[3] 72, and 73 of the '597 patent.[4] The relevant claims read as follows:

> 1. An apparatus comprising:
>
>> a communications device comprising:
>>
>>> a subsystem; and
>>>
>>> a logging module, coupled to said subsystem, and configured to detect a change to a configuration of said subsystem of said communications device, and communicate information regarding said change to said configuration of said subsystem of said communications device.
>
> 14. The communications device of claim 1, wherein
>
>> the subsystem is a communications interface.
>
> 15. The communications device of claim 14, wherein

---

[3] Claims 63 and 64 depend from unasserted claim 40, which depends from asserted claim 39.

[4] Cisco relies on claims 1, 14, 15, 39, 71, and 72 of the '597 patent to argue satisfaction of the technical prong of the domestic industry requirement. *See* Compl. Br. at 31.

17

the logging module is further configured to restrict a change to a configuration of the logging module by the communications interface.

29. The communications device of claim 1, wherein

the logging module is configured to communicate the change to the configuration of the subsystem by broadcasting the change to the configuration of the subsystem.

39. A method comprising:

detecting a change in a configuration of a subsystem of a communications device wherein a logging module is coupled to said subsystem and said detecting is performed at the logging module; and

communicating information regarding the change comprises causing said logging module to communicate the change information.

40. The method of claim 39, further comprising:

determining the configuration.

63. The method of claim 40, wherein the communicating comprises:

broadcasting the information.

64. The method of claim 63, wherein the broadcasting is performed using the subsystem.

71. A communications device comprising:

a subsystem;

a processor, coupled to the subsystem;

computer readable medium coupled to the processor;

and computer code, encoded in the computer readable medium, configured to cause the processor to:

detect a change in a configuration of the subsystem; and

communicate information regarding the change.

72. The communications device of claim 71, wherein the computer code is further configured to cause the processor to:

determine the configuration.

18

73. The communications device of claim 72, wherein the computer code configured to cause the processor to communicate the information regarding the change is further configured to cause the processor to:

broadcast the information.

### 4. The '597 Products at Issue

#### a. Accused Arista Products

Cisco has accused Arista's 7010, 7048, 7050, 7050X, 7150, 7250X, 7280E, 7300, 7300X, and 7500E series network switches of infringing the '597 patent. CX-0001C (Wicker WS) at Q/A 83-261; *see* Compl. Br. at 31. It is argued that these communication devices comprise a subsystem and a logging module named Process Manager or "ProcMgr." CX-0001C (Wicker WS) at Q/A 83-261; *see* Compl. Br. at 31.

#### b. Cisco Domestic Industry Products

The Cisco '597 Domestic Industry Products ("the '597 DI Products") are the Catalyst 6500, Catalyst 6800, ASR 901, and Nexus 7000 product lines. CX-0001C (Wicker WS) at Q/A 262-316. It is argued that these devices comprise a subsystem and a logging module named On-Board Failure Logging or "OBFL." *Id.*

### C. U.S. Patent Nos. Nos. 6,741,592 and 7,200,145

#### 1. Overview of the Technology

A computer network is a system to enable communication among devices, typically computers that are connected to the network. A network is comprised of the hardware and software that allow devices to communicate with one another. CX-0003C (Jeffay WS) at Q/A 26. A common form of a computer network is a Local Area Network or "LAN." LANs typically span a small geographic area such as an office or a building, and are comprised of the hardware and software required to enable communication between devices attached to the

19

network. CX-0003C (Jeffay WS) at Q/A 29. Common interconnection devices used to build LANs are devices such as "switches," "hubs," and "bridges." Devices that connect LANs to one another are called "routers." In addition, many networking devices function as both a switch and a router. CX-0003C (Jeffay WS) at Q/A 30.

The acronym "VLAN" stands for "Virtual Local Area Network" and can be conceptualized as a LAN within a LAN. A VLAN is a segment or a subset of a LAN and, like a LAN, is implemented using hardware and software. Networking devices that are members of the same VLAN can communicate with each other as if they are on the same LAN, but devices that are members of separate VLANs are isolated from each other at layer 2.[5] In general, VLANs are used to partition devices on a LAN into sub-LANs to create smaller, private, or secure networks without having to add more networking devices. CX-0003C (Jeffay WS) at Q/A 32.

### 2. Overview of the '592 and '145 Patents

The '592 patent is entitled, "Private VLANs," and issued on May 25, 2004. JX-0005 ('592 patent). The named inventors are Thomas J. Edsall, Marco Foschiano, Michael Fine, and Thomas Nosella. *Id.* The '145 patent is a continuation of the '592 patent, and the two patents (the "Private VLAN Patents") share the same specification.[6] *See id.*; JX-0006 ('145 patent). Both the '592 and '145 patents expire on May 22, 2020. JX-0005; JX-0006.

The Private VLAN Patents are directed toward mechanisms for separating users' traffic on a networking device using port and VLAN technologies. CX-0003C (Jeffay WS) at Q/A 34. As taught in the Private VLAN Patents, it was common at the time of the invention to separate

---

[5] References to numbered layers are with respect to the seven-layer OSI model of computer networking.

[6] Citations will be made to the specification of the '592 patent during discussions of the disclosures of and inventions claimed in both patents.

20

different users' packet traffic by assigning each user to a different subnetwork or "subnet" identified by a unique layer 3 address. JX-0005 ('592 patent) at col. 1, lns. 12-18. Several disadvantages of this practice are described in the Private VLAN Patents. For instance, only a limited number of subnets may be addressed by a particular network device, thereby restricting the number of users who can be served while having their traffic maintained separately. JX-0005 ('592 patent) at col. 1, lns. 19-22; col. 1, lns. 56-67; CX-0003C (Jeffay WS) at Q/A 44-45. Additionally, managing a large number of subnets within a networking device is burdensome. JX-0005 ('592 patent) at col. 1, lns. 56-67; CX-0003C (Jeffay WS) at Q/A 45.

The Private VLAN Patents purport to overcome these problems by providing special types of ports and VLANs for separating users' traffic on a single LAN, while allowing for greater scalability than was available using subnets. Specifically, the Private VLAN Patents introduce three new types of VLANs (referred to in some claims as a "primary VLAN," an "isolated VLAN," and a "community VLAN") that interact with three new types of ports (referred to in some claims as "promiscuous ports," "isolated ports," and "community ports"). CX-0003C (Jeffay WS) at Q/A 48. The Private VLAN Patents teach that these new VLANs and the corresponding port types work together to separate user traffic on a LAN, while making it easy to add and manage users new to the network.

In one particular embodiment shown in Figure 1 of the Private VLAN Patents, promiscuous ports receive packets from the Internet, and transmit them to user devices, such as servers, through isolated and community ports. CX-0003C (Jeffay WS) at Q/A 49; JX-0005 ('592 patent) at Fig. 1; col. 2, lns. 12-25; col. 3, ln. 62 – col. 4, ln. 7; col. 4, lns. 46-50. By contrast, isolated and community ports receive packets from the user devices and transmit them out to the Internet through promiscuous ports. CX-0003C (Jeffay WS) at Q/A 49; JX-0005 ('592

21

patent) at Fig. 1; col. 2, lns. 12-25; col. 4, lns. 52-64; col. 5, lns. 9-19. An isolated port can transfer packets to a promiscuous port, but cannot transfer packets to another isolated port. JX-0005 ('592 patent) at col. 2, lns. 20-26. Such a port is useful to isolate a single device on the network, such as one of the servers, so that no one else on the network can access that device. CX-0003C (Jeffay WS) at Q/A 49; JX-0005 ('592 patent) at col. 2, lns. 12-19. By contrast, a community port is a port that is part of a "community" of ports and can send packets to any other of the community ports in its community, but cannot directly exchange packets with ports that are not part of the community using layer 2 protocol. CX-0003C (Jeffay WS) at Q/A 49, Q/A 53; JX-0005 ('592 patent) at col. 2, lns. 20-26. This allows some users within a "community" to access devices on the network, while isolating other users. CX-0003C (Jeffay WS) at Q/A 49, Q/A 53.

In embodiments shown in Figures 2 and 3 of the Private VLAN Patents, a primary VLAN connects some or all of the promiscuous ports with some or all of the isolated and community ports. As such, packets received from the Internet at a promiscuous port can be transferred to isolated and community ports via a primary VLAN. To ensure the isolation between ports as described above, a primary VLAN is a one-way connection from a promiscuous port to isolated or community ports. Thus, for example, a packet received from a server at an isolated or promiscuous port cannot be transferred to any other port using a primary VLAN. CX-0003C (Jeffay WS) at Q/A 51; JX-0005 ('592 patent) at col. 2, lns. 27-36.

In contrast to a primary VLAN, an isolated VLAN is a VLAN that connects the isolated ports to some or all of the promiscuous ports. Like a primary VLAN, an isolated VLAN is also a one-way connection, but in this instance is directed from the isolated ports to the promiscuous ports; an isolated VLAN cannot transfer packets to other isolated ports or community ports.

22

Accordingly, a packet arriving at an isolated port from a server, for example, could not be directly transferred to a different server that is connected to another isolated port. This arrangement ensures isolation between the user traffic received at different isolated ports. CX-0003C (Jeffay WS) at Q/A 52; JX-0005 ('592 patent) at col. 2, lns. 37-45.

Finally, a community VLAN is used to connect the community ports to each other and to the promiscuous ports. As such, a community VLAN can receive packets from a community port and transfer them to other "community" ports as well as the promiscuous port. It cannot, however, send packets to an isolated port, and it is also a one-way connection to the promiscuous port. CX-0003C (Jeffay WS) at Q/A 53; JX-0005 ('592 patent) at col. 2, lns. 46-62. Community VLANs thus help users within a community to access shared devices, while still isolating the members of that community from other users.

### 3. The Asserted Claims

#### a. The '592 Patent

From the '592 patent, Cisco asserts independent claims 6, 20, and 21, as well as dependent claim 7.[7] The relevant claims read as follows:

> 6. A switch, comprising:
>
> > a promiscuous port for receiving incoming packets from an external network, and for transmitting outgoing packets to said external network; and
> >
> > a plurality of isolated ports, a selected isolated port of said plurality of isolated ports connected to a selected private network, said selected isolated port receiving packets from said selected private network and transmitting packets onto said selected private network, said selected isolated port exchanging packets with said promiscuous port through a

---

[7] Cisco relies on these same claims to prove satisfaction of the technical prong of the domestic industry requirement. *See* Compl. Br. at 266-74.

path inside said switch, and said isolated port not exchanging packets with another isolated port.

7. The switch of claim 6 further comprising:

a plurality of community ports, each of said community ports of said plurality of community ports receiving packets from a selected external network and transmitting packets onto said selected external network, each port of said community of ports exchanging packets through a path internal to said switch with said promiscuous port, and said each port of said community of ports exchanging packets with all ports of said plurality of community ports through a path within said switch, and said each port of said community of ports not exchanging packets with any other port of said switch through a path within said switch.

20. A switch implementing virtual local area networks (VLANs) in a computer network, comprising:

a first isolated port assigned to a user to receive said user's packet from an external circuit connected to said first isolated port; and

a selected promiscuous port to receive said packet through an isolated VLAN, said packet to be transferred to an external circuit connected to said promiscuous port, said isolated VLAN configured as a one way connection from all isolated ports to all promiscuous ports and also configured to prevent any other isolated port from receiving said user's packets from said isolated VLAN, said all promiscuous ports also connected via a one way primary VLAN to said all isolated ports.

21. A switch implementing virtual local area networks (VLANs) in a computer network, comprising:

a plurality of community ports, including a first community port assigned to a user to receive said user's packet from an external circuit connected to said first community port; and

a plurality of promiscuous ports connected to external circuits to receive said packet through a community VLAN, all other community ports connected to said community VLAN also receiving said packet, but not any other ports of said switch, said community VLAN configured as a one way connection from all community ports in said community VLAN to all promiscuous ports, said all promiscuous ports also connected via a one way primary VLAN to all community ports.

24

b.    The '145 Patent

From the '145 patent, Cisco asserts independent claims 5, 7, 45, and 46.[8]  The relevant

claims read as follows:

> 5. A router, comprising:
>
> a port connected to a shared network;
>
> a plurality of user ports;
>
> a first VLAN from the port connected to the shared network to the plurality of user ports, the first VLAN to receive packets from the shared network and transferring them to a designated user port, the first VLAN to reject packets from the user ports;
>
> a second VLAN from the plurality of user ports, the second VLAN to receive packets from the user ports and transferring them to the port connected to the shared network, the second VLAN to prevent transfer of packets from one of the user ports to other user ports, and the second VLAN also to reject packets from the shared network, in order to separate packet traffic of different users.
>
> 7. A router, comprising:
>
> one or more promiscuous ports;
>
> one or more isolated ports;
>
> one or more community ports;
>
> a primary VLAN, the primary VLAN to receive packets from outside of the router through the one or more promiscuous ports and to transfer the packets to a selected one of the one or more isolated ports and to transfer the packets to the one or more community ports, the primary VLAN to reject packets from the one or more isolated ports and to reject packets from the one or more community ports;
>
> an isolated VLAN, the isolated VLAN to receive packets from outside of the router through an isolated port of the one or more isolated ports and to transfer the packets to the one or more promiscuous ports, the isolated VLAN to prevent transfer of the packets from the isolated port

---

[8] Cisco relies on these same claims to prove satisfaction of the technical prong of the domestic industry requirement.  *See* Compl. Br. at 274-80.

25

to another isolated port of the one or more isolated ports, and the isolated VLAN to prevent transfer of the packets from the isolated port to the one or more community ports, and the isolated VLAN to reject packets from the one or more promiscuous ports; and

a community VLAN, the community VLAN to receive packets from outside of the router at a community port of the one or more community ports and to transfer the packets to the one or more promiscuous ports and to transfer the packets to any other community ports, the community VLAN to prevent transfer of packets to the one or more isolated ports, the community VLAN to reject packets from the one or more promiscuous ports.

45. A computer readable medium containing executable program instructions for operating a router, the executable program instructions comprising program instructions configured to:

establish a first VLAN from a port connected to a shared network to a plurality of user ports, the first VLAN to receive packets from the shared network and to transfer them to one or more of the user ports, the first VLAN to reject any packets received from the user ports;

establish a second VLAN from the plurality of user ports, the second VLAN to receive packets from the user ports and to transfer them to the port connected to the shared network, the second VLAN to prevent transfer of packets from one of the user ports to other user ports, and the second VLAN also to reject packets from the shared network, to thereby separate packet traffic of different users.

46. A computer readable medium containing executable program instructions for operating a router, the executable program instructions comprising program instructions configured to:

establish a primary VLAN, the primary VLAN to receive packets from outside of the router through the one or more promiscuous ports and to transfer the packets to one or more community ports, the primary VLAN to reject packets received from the one or more community ports; and

establish a community VLAN, the community VLAN to receive packets from outside the router on a community port of the one or more community ports and to transfer the packets to the one or more promiscuous ports and to transfer the packets to any other community ports of the one or more community ports, the community VLAN rejecting packets received from the one or more promiscuous ports.

26

### 4.     The Private VLAN Products at Issue

#### a.     Accused Arista Products

Cisco contends that Arista's 7010, 7050, 7050X, 7150, 7250X, 7300, and 7300X series network switches that run Arista's EOS software, which in turn supports the private VLAN feature, infringe the asserted claims of the Private VLAN Patents (the "Accused Private VLAN Products"). CX-0003C (Jeffay WS) at Q/A 132-133.

#### b.     Cisco Domestic Industry Products

To show satisfaction of the technical prong of the domestic industry requirement with respect to the Private VLAN Patents, Cisco relies on Cisco's Catalyst 4500 and Catalyst 6500 series switches, the CBS 3110-40 series switches, the Industrial Ethernet 3000 series switches, the Connected Grid 2520 series switches, and the Nexus 3000, Nexus 5000, Nexus 6000, Nexus 7000, and Nexus 9000 series switches with the private VLAN feature (the "Cisco Private VLAN DI Products"). CX-0003C (Jeffay WS) at Q/A 441-442.

### D.     U.S. Patent No. 7,290,164

#### 1.     Overview of the Technology

The '164 patent relates to the configuration and re-configuration of intermediate network devices, such as routers and switches. A network device, which serves to interconnect end-user devices on a computer network, has one or more network interfaces, which is the hardware onto which links connect. *See, e.g.*, CX-0008C (Bhattacharjee WS) at Q/A 34. Configuring a network device requires providing instructions with operational parameters to each network interface on the device. *See, e.g., id.* at Q/A 36. A device may include configuration files referenced by the operating system. *Id.* Configuring a device would also include modifying

27

these files. *Id.* Network administrators can implement high-level network policy by specifying

such instructions. *Id.*

It is common for network devices to have what is known as a Command Line Interface

("CLI") for receiving configuration instructions. *See, e.g.*, CX-0008C (Bhattacharjee WS) at

Q/A 37. The device will accept configuration commands, which are strings of text, through the

CLI. *Id.* These CLI commands can be input directly, for example by a network administrator

using a terminal, or they may be stored in and executed from a file. *Id.*

For example, configuration commands can be used to configure an interface with a

network address, such as an IP address. *See, e.g.*, CX-0008C (Bhattacharjee WS) at Q/A 38.

Similarly, the device can be given instructions to select which protocols the device must run on a

network. *See, e.g.*, *id.* at Q/A 39. These configurations can enable the exchange of routing or

forwarding information to facilitate communication on the network. *Id.*

In the context of the '164 patent, provisioning a network device means providing it with

configurations for hardware and software to make the device operational. JX-0003 ('164 patent)

at col. 1, lns. 32-45; col. 2, lns. 6-12. Once a device has been deployed and its wired links

connected, it must be provided with a configuration for it to be operational. CX-0008C

(Bhattacharjee WS) at Q/A 43.

The '164 patent addresses the scenario in which a network device has a configuration, but

that configuration is lost or modified in a way that prevents the device and the network

management system from communicating. Prior to the patent, there was no way to recover that

connectivity in an automatic manner. JX-0003 ('164 patent) at col. 1, lns. 46–54. Typically, a

user would have to manually enter configuration commands or a technician would need to travel

to the customer's premises to manually reconfigure the device. *Id.*

The '164 patent specification discusses a prior art attempt to solve the problem described above called "rollback." Under the rollback mechanism, the current configuration of the device is periodically saved, and the user can roll back to a previous configuration if needed. JX-0003 ('164 patent) at col. 1, ln. 55 – col. 2, ln. 5. Nevertheless, the configuration of a network device embeds information about security, topology, and policy, all of which can change over time. Therefore, the '164 patent explains that "what worked yesterday may not work tomorrow." *Id.* at col. 1, ln. 58 – col. 2, ln. 5. The '164 patent also teaches that rolling back a network configuration may create security vulnerabilities or violate network privacy policies. Therefore, rollback is extremely dangerous, and automatic rollbacks are not advised. *See* CX-0008C (Bhattacharjee WS) at Q/A 47.

### 2.    Overview of the '164 Patent

Asserted U.S. Patent No. 7,290,164 ("the '164 patent") is titled, "Method of Reverting to a Recovery Configuration in Response to Device Faults." JX-0003 ('164 patent). The '164 patent issued on October 30, 2007, and the named inventors are Andrew G. Harvey, John Ng, and Gilbert R. Woodman, III. *Id.*

The inventors conceived a mechanism for the automatic re-provisioning, or reconfiguration, of a network device that has a lost, misconfigured, or corrupted configuration. *See, e.g.*, JX-0003 ('164 patent) at col. 2, lns. 6-9; col. 3, lns. 59-64. The '164 patent teaches a network device that automatically reverts to a recovery configuration stored on the device upon detecting a loss of connectivity resulting from a configuration change. The recovery configuration enables the device to connect to a configuration manager on the network to download a new configuration. *See, e.g.*, *id.* at col. 3, lns. 46-57. The configuration manager is

29

an entity coupled to the network and comprising configuration information which may be exchanged with a network device. *Id.* at col. 5, lns. 25-29; Fig. 1.

The scenario envisioned by exemplary claim 1 is one in which the configuration on the network device is changed based on configuration instructions such that the network device loses connectivity with the network. For example, and with reference to Figure 1 of the '164 patent reproduced below, a network administrator at a computer connected to a network (Network A [item 101]) issues configuration instructions to a network device (CPE A [item 110]) in order to change the device's current configuration (e.g., Running Config [item 110B]) to a new configuration:



*Fig. 1*

As recited in claim 1, the network device will detect a loss of connectivity between the device and a network (*e.g.*, Networks A [item 101], B [item 107], or C [item 107]) resulting from the configuration change and revert to a recovery configuration ("Recovery Config" [item 110C]).

The '164 patent requires that the recovery configuration be stored in persistent storage in association with manufacturing the device. JX-0003 ('164 patent) at claims 1, 18. Such storage

30

is persistent and can be used beyond just initial provisioning. *Id.* at col 1, lns. 46-54; col. 3, lns. 49-51; col. 7, ln.62 – col. 8, ln. 6; claim 1. Manufacturing the device in this way is one aspect that distinguishes the '164 invention from the rollback prior art, inasmuch as rollback configurations are created post-install. *Id.* at col. 1, ln. 55 – col. 2, ln. 5. Additionally, the '164 patent teaches that the recovery configuration may serve a dual-purpose as a boot configuration loaded during manufacture to enable automatic provisioning of a newly installed device. *Id.* at col. 3, lns. 59-61; col. 1, lns. 32-45.

### 3. The Asserted Claims

Cisco asserts independent claims 1 and 18, as well as dependent claims 5, 6, and 9 of the '164 patent.[9] The relevant claims read as follows:

> 1. A method of reverting to a recovery configuration in response to faults of a network device, the method comprising the computer-implemented steps of:
>
>> receiving configuration instructions;
>>
>> changing a current configuration to a new configuration based upon the configuration instructions;
>>
>> detecting a loss of connectivity between the device and a network resulting from the configuration change; and
>>
>> recovering from the loss of connectivity by reverting to a recovery configuration, wherein the recovery configuration is stored in a persistent storage of the device in association with manufacturing the device, wherein the recovering step further comprises:
>>
>>> retrieving a recovery configuration;
>>>
>>> making the recovery configuration the current configuration; and
>>>
>>> establishing connectivity to a configuration manager using the recovery configuration.

---

[9] Cisco refers to claims 1, 5, 9, and 18 of the '164 patent to argue satisfaction of the technical prong of the domestic industry requirement. *See* Compl. Br. at 41.

5. A method as recited in claim 1, wherein the step of recovering from the loss of connectivity by reverting to a recovery configuration further comprises the steps of:

    receiving from the configuration manager a network level configuration; and

    replacing the current configuration with the network level configuration.

6. A method as recited in claim 1, wherein the recovery configuration is a boot configuration and wherein establishing connectivity to a configuration manager using the recovery configuration comprises:

    establishing connectivity with the configuration manager as a new device.

9. A method as recited in claim 1, wherein retrieving the recovery configuration comprises:

    obtaining a configuration for a state enabling the device to establish connectivity to the configuration manager.

18. A computer-readable medium carrying one or more sequences of instructions for reverting to a recovery configuration in response to faults of a network device, which instructions, when executed by one or more processors, cause the one or more processors to carry out the steps of:

    receiving configuration instructions;

    changing the current configuration to a new configuration based upon the configuration instructions;

    detecting a loss of connectivity between the device and a network resulting from the configuration change;

    recovering from the loss of connectivity by reverting to a recovery configuration

    wherein the recovery configuration is stored in a persistent storage of the device in association with manufacturing the device, wherein the recovering step further comprises:

        retrieving the recovery configuration;

        making the recovery configuration the current configuration; and

32

establishing connectivity to a configuration manager using the recovery configuration.

### 4. The '164 Products at Issue

#### a. Accused Arista Products

Cisco contends that Arista's 7010, 7048, 7050, 7050X, 7150, 7250X, 7300, 7300X, and 7500E series network switches running Arista's EOS with the Zero Touch Provisioning feature infringe the asserted claims of the '164 patent. CX-0008C (Bhattacharjee WS) at Q/A 87-88.

#### b. Cisco Domestic Industry Products

Cisco contends that the Nexus 3000, Nexus 5000, Nexus 6000, Nexus 7000 and Nexus 9000 series switches with the Power-on Auto-Provisioning ("PoAP") feature are domestic industry products for the '164 patent. CX-0008C (Bhattacharjee WS) at Q/A 89.

## IV. General Principles of Law

### A. Claim Construction

Claim construction begins with the plain language of the claim.[10] Claims should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art, viewing the claim terms in the context of the entire patent.[11] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006).

---

[10] Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004); *Vivid Tech., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

[11] Factors that may be considered when determining the level of ordinary skill in the art include: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984).

33

In some instances, claim terms do not have particular meaning in a field of art, and claim construction involves little more than the application of the widely accepted meaning of commonly understood words. *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

In many cases, claim terms have a specialized meaning, and it is necessary to determine what a person of skill in the art would have understood the disputed claim language to mean. "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The public sources identified in *Phillips* include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

In cases in which the meaning of a claim term is uncertain, the specification usually is the best guide to the meaning of the term. *Id.* at 1315. As a general rule, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The specification is, however, always highly relevant to the claim construction analysis, and is usually dispositive. *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Moreover, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316.

34

Claims are not necessarily, and are not usually, limited in scope to the preferred

embodiment. *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir.

2003); *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir.

2008) ("[The] description of a preferred embodiment, in the absence of a clear intention to limit

claim scope, is an insufficient basis on which to narrow the claims."). Nevertheless, claim

constructions that exclude the preferred embodiment are "rarely, if ever, correct and require

highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583. Such a conclusion can be

mandated in rare instances by clear intrinsic evidence, such as unambiguous claim language or a

clear disclaimer by the patentees during patent prosecution. *Elekta Instrument S.A. v. O.U.R. Sci.*

*Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed.

Cir. 2002).

If the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence

may be considered. Extrinsic evidence consists of all evidence external to the patent and the

prosecution history, and includes inventor testimony, expert testimony, and learned treatises.

*Phillips*, 415 F.3d at 1317. Inventor testimony can be useful to shed light on the relevant art. In

evaluating expert testimony, a court should discount any expert testimony that is clearly at odds

with the claim construction mandated by the claims themselves, the written description, and the

prosecution history, in other words, with the written record of the patent. *Id.* at 1318. Extrinsic

evidence may be considered if a court deems it helpful in determining the true meaning of

language used in the patent claims. *Id.*

35

## B.    Infringement

### 1.    Direct Infringement

Under 35 U.S.C. §271(a), direct infringement consists of making, using, offering to sell, or selling a patented invention without consent of the patent owner.  The complainant in a section 337 investigation bears the burden of proving infringement of the asserted patent claims by a "preponderance of the evidence." *Certain Flooring Products*, Inv. No. 337-TA-443, Comm'n Notice of Final Determination of No Violation of Section 337, 2002 WL 448690, at *59, (Mar. 22, 2002); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376 (Fed. Cir. 1998).

Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, *i.e.*, when the properly construed claim reads on the accused device exactly.[12] *Amhil Enters., Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996); *Southwall Tech. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed Cir. 1995).

If the accused product does not literally infringe the patent claim, infringement might be found under the doctrine of equivalents.  "Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605,

---

[12] Each patent claim element or limitation is considered material and essential. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).  If an accused device lacks a limitation of an independent claim, the device cannot infringe a dependent claim. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

609 (1950)).  "The determination of equivalence should be applied as an objective inquiry on an element-by-element basis."[13]  *Id.* at 40.

"An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial.  The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (quoting *Graver Tank*, 339 U.S. at 608); *accord Absolute Software*, 659 F.3d at 1139-40.[14]

Prosecution history estoppel can prevent a patentee from relying on the doctrine of equivalents when the patentee relinquished subject matter during the prosecution of the patent, either by amendment or argument.  *AquaTex*, 419 F.3d at 1382.  In particular, "[t]he doctrine of prosecution history estoppel limits the doctrine of equivalents when an applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to an examiner."  *Id.* (quoting *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005)).

### 2.     Induced Infringement

With respect to induced infringement, section 271(b) of the Patent Act provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C.

---

[13] "Infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1130 (Fed. Cir. 2011).

[14] "The known interchangeability of substitutes for an element of a patent is one of the express objective factors noted by *Graver Tank* as bearing upon whether the accused device is substantially the same as the patented invention.  Independent experimentation by the alleged infringer would not always reflect upon the objective question whether a person skilled in the art would have known of the interchangeability between two elements, but in many cases it would likely be probative of such knowledge." *Warner-Jenkinson*, 520 U.S. at 36.

§ 271(b).  "To prevail on a claim of induced infringement, in addition to inducement by the

defendant, the patentee must also show that the asserted patent was directly infringed."  *Epcon*

*Gas Sys. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002).  Further, "[s]ection

271(b) covers active inducement of infringement, which typically includes acts that intentionally

cause, urge, encourage, or aid another to directly infringe a patent."  *Arris Group v. British*

*Telecomms. PLC*, 639 F.3d 1368, 1379 n.13 (Fed. Cir. 2011).  The Supreme Court has held that

"induced infringement under § 271(b) requires knowledge that the induced acts constitute patent

infringement."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2068

(2011).  The Court further held: "[g]iven the long history of willful blindness[ ] and its wide

acceptance in the Federal Judiciary, we can see no reason why the doctrine should not apply in

civil lawsuits for induced patent infringement under 35 U.S.C. § 271(b)."  131 S. Ct. at 2060

(footnote omitted).

### 3.    Contributory Infringement

As for contributory infringement, section 271(c) of the Patent Act provides: "Whoever

offers to sell or sells within the United States or imports into the United States a component of a

patented machine, manufacture, combination or composition, or a material or apparatus for use

in practicing a patented process, constituting a material part of the invention, knowing the same

to be especially made or especially adapted for use in an infringement of such patent, and not a

staple article or commodity of commerce suitable for substantial noninfringing use, shall be

liable as a contributory infringer." 35 U.S.C. § 271(c).

Section 271(c) "covers both contributory infringement of system claims and method

claims." *Arris*, 639 F.3d at 1376 (footnotes omitted).  To hold a component supplier liable for

contributory infringement, a patent holder must show, *inter alia*, that (a) the supplier's product

38

was used to commit acts of direct infringement; (b) the product's use constituted a material part

of the invention; (c) the supplier knew its product was especially made or especially adapted for

use in an infringement" of the patent; and (d) the product is not a staple article or commodity of

commerce suitable for substantial noninfringing use. *Id.*

### C.    Validity

#### 1.    Anticipation

Anticipation under 35 U.S.C. § 102 is a question of fact. *z4 Techs., Inc. v. Microsoft*

*Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). Section 102 provides that, depending on the

circumstances, a claimed invention may be anticipated by variety of prior art, including

publications, earlier-sold products, and patents. *See* 35 U.S.C. § 102 (*e.g.*, section 102(b)

provides that one is not entitled to a patent if the claimed invention "was patented or described in

a printed publication in this or a foreign country or in public use or on sale in this country, more

than one year prior to the date of the application for patent in the United States").

The general law of anticipation may be summarized, as follows:

> A reference is anticipatory under § 102(b) when it satisfies particular
> requirements. First, the reference must disclose each and every element of
> the claimed invention, whether it does so explicitly or inherently. *Eli Lilly
> & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375
> (Fed.Cir.2006). While those elements must be "arranged or combined in
> the same way as in the claim," *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545
> F.3d 1359, 1370 (Fed.Cir.2008), the reference need not satisfy an
> *ipsissimis verbis* test, *In re Bond*, 910 F.2d 831, 832-33 (Fed. Cir. 1990).
> Second, the reference must "enable one of ordinary skill in the art to make
> the invention without undue experimentation." *Impax Labs., Inc. v.
> Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed.Cir.2008); *see In re
> LeGrice*, 49 C.C.P.A. 1124, 301 F.2d 929, 940-44 (1962). As long as the
> reference discloses all of the claim limitations and enables the "subject
> matter that falls within the scope of the claims at issue," the reference
> anticipates -- no "actual creation or reduction to practice" is required.
> *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380-81
> (Fed.Cir.2003); *see In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).

39