> This is so despite the fact that the description provided in the anticipating reference might not otherwise entitle its author to a patent. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991) (discussing the "distinction between a written description adequate to support a claim under § 112 and a written description sufficient to anticipate its subject matter under § 102(b)").

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

### 2.    Obviousness

Under section 103 of the Patent Act, a patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[15]  35 U.S.C. § 103.  While the ultimate determination of whether an invention would have been obvious is a legal conclusion, it is based on "underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness."  *Eli Lilly and Co. v. Teva Pharmaceuticals USA, Inc.*, 619 F.3d 1329 (Fed. Cir. 2010).

The objective evidence, also known as "secondary considerations," includes commercial success, long felt need, and failure of others.  *Graham v. John Deere Co.*, 383 U.S. 1, 13-17 (1966); *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006). "[E]vidence arising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).  Secondary considerations, such as commercial success, will

---

[15] The standard for determining whether a patent or publication is prior art under section 103 is the same as under 35 U.S.C. § 102, which is a legal question.  *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987).

Appx888.051

not always dislodge a determination of obviousness based on analysis of the prior art. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007) (commercial success did not alter conclusion of obviousness).

"One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *KSR*, 550 U.S. at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

Specific teachings, suggestions, or motivations to combine prior art may provide helpful insights into the state of the art at the time of the alleged invention. *Id.* at 420. Nevertheless, "an obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way." *Id.* "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* A "person of ordinary skill is also a person of ordinary creativity." *Id.* at 421.

Nevertheless, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007); *see KSR*, 550 U.S. at 416 (a combination of elements must do more

41

than yield a predictable result; combining elements that work together in an unexpected and fruitful manner would not have been obvious).[16]

### 3.    Patentable Subject Matter

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  Section 101 nevertheless "contains an important implicit exception" for abstract ideas, which reflects "the longstanding rule that '[a]n idea of itself is not patentable.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).  Inasmuch as "all inventions" rest upon abstract ideas at some level, tribunals must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354 (quotation marks omitted); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (warning "too broad an interpretation of this exclusionary principle could eviscerate patent law").  It therefore is important to "distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1303) (modifications in original).

The Supreme Court has set forth a two-part framework for analyzing Section 101 eligibility. *See Alice*, 134 S. Ct. at 2355.  A court first determines whether the asserted claims involve an underlying abstract idea.  *Id.*  If so, then it then determines whether the claims "contain[] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).  This can be

---

[16] Further, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 52 (1966)).

42

shown by "solv[ing] a technological problem in 'conventional industry practice,'" "improv[ing] an existing technological process," or "improv[ing] the functioning of the computer itself." *Id.* at 2358-59 (quoting *Diamond v. Diehr*, 450 U.S. 175, 178 (1981)). Inasmuch as a patent is presumed valid, Arista must demonstrate that a patent fails both steps of the *Alice* framework by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2242 (2011); *StoneEagle Servs., Inc. v. Play-Plus Solutions, Inc.*, 2015 WL 4042097, *4 (M.D. Fla. July 1, 2015); *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 2015 WL 774655, *3 (N.D. Ill. Feb. 24, 2015); *see, e.g.*, *Certain Audiovisual Components*, Inv. No. 337-TA-837, 2013 WL 4406820, *45 (July 18, 2013).

### 4. Written Description

The issue of whether a patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112, ¶ 1 is a question of fact. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1188 (Fed. Cir. 2012). A patent's written description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed. The test for sufficiency of a written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*)).

### 5. Enablement

A patent's specification must "enable a person of ordinary skill in the art to make and use the invention." 35 U.S.C. § 112 ¶ 1 (2006). This requirement is met when, at the time of filing the application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation." *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365

43

(Fed. Cir. 1997) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)). Enablement is a

question of law. *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1576 (Fed.

Cir. 1984); *Streck, Inc. v. Research & Diagnostic Sys.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).

When determining whether or not the amount of experimentation required to make and

use the claimed invention is undue, courts consider the *Wands* factors: the quantity of

experimentation necessary, the amount of direction or guidance presented in the specification,

the presence of working samples, the nature of the invention, the state of the prior art, the relative

skill of those in the art, the predictability or unpredictability of the art, and the breadth of the

claims. *In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988).

### 6. Indefiniteness

The definiteness requirement of 35 U.S.C. § 112 ensures that the patent claims

particularly point out and distinctly claim the subject matter that the patentee regards to be the

invention. *See* 35 U.S.C. § 112, ¶ 2; *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370

F.3d 1354, 1366 (Fed. Cir. 2004). If a claim's legal scope is not clear enough so that a person of

ordinary skill in the art could determine whether or not a particular product infringes, the claim is

indefinite, and is, therefore, invalid. *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d

1373, 1384 (Fed. Cir. 2003).[17]

Thus, it has been found that:

> When a proposed construction requires that an artisan make a separate
> infringement determination for every set of circumstances in which the
> composition may be used, and when such determinations are likely to
> result in differing outcomes (sometimes infringing and sometimes not),
> that construction is likely to be indefinite.

---

[17] Indefiniteness is a question of law. *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109 (Fed. Cir. 2011).

Appx888.055

*Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008).

The Supreme Court recently addressed the issue of indefiniteness, and stated that a finding of indefiniteness should not be found if the claims, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

### D.   Assignor Estoppel

"Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent . . . from later contending that what was assigned is a nullity." *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). One who assigns patent rights is presumed to have made an "implicit representation" that the rights assigned "are not worthless." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998) (quoting *Diamond*). Thus, an assignor is estopped from raising defenses asserting, in effect, "what [it] has sold as a patent was not a patent." *Diamond*, 848 F.2d at 1224. "The estoppel historically has applied to invalidity challenges based on 'novelty, utility, patentable invention, anticipatory matter, and the state of the art.'" *Id.* (quoting *Babcock v. Clarkson*, 63 F. 607, 609 (1st Cir. 1894)). The bar can also extend to the inequitable conduct equitable defense. *See Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 794 (Fed. Cir. 1990).

Assignor estoppel applies to assignors, and to "other parties in privity with the assignor such as a corporation founded by the assignor." *Diamond*, 848 F.2d at 1224. Privity depends on a balancing of equities based on the strength of the relationship between the assignor and the other party. *Shamrock*, 903 F.2d at 793. Privity does not require that the assignor designed or worked on the infringing technology. *Mentor Graphics*, 150 F.3d at 1379 (finding privity between two companies, even though the assignor company did not develop the accused

45

product). If such facts are present they favor a finding of privity, but they are not required. "What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance.'" *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991).

### E. Equitable Defenses

#### 1. Equitable Estoppel

To establish the affirmative defense of estoppel, an alleged infringer must demonstrate: "(1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted." *Certain Bearings and Packaging Thereof*, Inv. No. 337-TA-487, Initial Determination at 28 (April 10, 2003) (internal citations omitted). Notably, "[r]eliance is not the same as prejudice or harm, although frequently confused . . . [t]o show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security." *Id.* (quoting *A.C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) (*en banc*)). Material prejudice may be established by a showing of "change of economic position or loss of evidence." *Aukerman*, 960 F.2d at 1033. Additionally, egregious conduct on the part of the alleged infringer must also be considered. *Bearings*, Initial Determination at 28.

It is well-established that all relief, including prospective relief, may be barred by equitable estoppel. *Aukerman*, 960 F.2d at 1041. Nevertheless, application of the doctrine is given to the sound discretion of the trial judge. *Id.* at 1028.

Appx888.057

## 2. Laches

Section 337(c) provides that "[a]ll legal and equitable defenses may be presented in all cases." 19 U.S.C. § 1337(c). Pursuant to this provision, legal and equitable defenses to infringement cognizable in federal district courts may generally be asserted before the Commission. *See Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572, 1576-79 (Fed. Cir. 1986).

In *Aukerman v. Chaides*, 960 F.2d 1020 (Fed. Cir. 1992) (*en banc*), the Federal Circuit held that the equitable defense of laches applied only to past damages, and could not bar prospective relief. *See Aukerman*, 960 F.2d at 1041 ("[L]aches bars relief on patentee's claim only with respect to damages accrued prior to suit."). Under this authority, the Commission had previously determined that laches is not available as a defense before the Commission. *See Certain Personal Watercraft and Components Thereof*, Inv. No. 337-TA-452, Initial Determination, Order No. 54 at 2 (September 19, 2001) (EDIS Doc. No. 61574) (unreviewed, EDIS Doc. No. 61619); *Certain EPROM, EEPROM, Flash Memory, and Flash Memory Microcontroller Semiconductor Devices*, Inv. 337-TA-395, Supplemental Views of Commission Bragg at n.65, 1998 WL 35428257, at *28 (Oct. 1998) ("The facts of this case suggest an attempt . . . to take what is essentially a laches defense and bootstrap it into prospective relief, which *Aukerman* holds to be impossible.").

The Federal Circuit recently issued an *en banc* decision rejecting *Aukerman*'s "bright line rule" regarding laches and prospective relief. *See SCA Hygiene Products Aktiebolag SCA Personal Care, Inc. v. First Quality Baby Products, LLC*, 807 F.3d 1311 (Fed. Cir. 2015) (*en banc*). The *SCA Hygiene* opinion explained that the court convened *en banc* to resolve whether, "in light of the Supreme Court's recent decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134

47

S. Ct. 1962 (2014), laches remains a defense to legal relief in a patent infringement suit." *Id.* at

1315. Although *Petrella* concerned a copyright infringement cause of action and one of the

issues concerned a delay in the assertion of that cause of action, the *SCA Hygiene* court stated:

"Still, Petrella clearly casts doubt on several aspects of *Aukerman*." *Id.* at 1321. The *SCA*

*Hygiene* court held that laches considerations can be applied in assessing prospective relief,

including with respect to injunctions and, in "extraordinary circumstances," to ongoing royalties.

*See id.* at 1315 ("We emphasize that equitable principles apply whenever an accused infringer

seeks to use laches to bar ongoing relief.").

While it appears to be a matter of first impression, the Federal Circuit's *SCA Hygiene*

decision may provide a basis under some circumstances to assert laches before the

Commission.[18]

In order to prevail in a laches defense in the event that such a defense is appropriate

under the circumstances of this investigation, Arista must prove that (1) Cisco delayed in

bringing an infringement lawsuit for an "unreasonable and inexcusable" length of time from

when it knew or reasonably should have known of its infringement claim against the accused

infringer, and (2) the delay caused "material prejudice" or injury (economic or evidentiary) to the

defendant. *See Aukerman*, 960 F.2d at 1028. A presumption of laches may apply only where the

delay in bringing suit is more than 6 years. *Id.* at 1035. This period begins with a patentee's

---

[18] The *SCA Hygiene* court reasoned that although *Aukerman* held that laches could not bar
prospective relief, "[r]eexamination of that rule is necessary in light of *Petrella* and the Supreme
Court's decision in *eBay v. MerchExchange, L.L.C.*, 547 U.S. 388 (2006)." *SCA Hygiene*, 807
F.3d at 1331. However, to the extent the *SCA Hygiene* court's rationale for overruling the
holding in *Aukerman* is based in part on *eBay*, the reasoning based on *eBay* should not apply to
the Commission. *See, e.g., Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1359 (Fed. Cir.
2010) ("Given the different statutory underpinnings for relief before the Commission in Section
337 actions and before the district courts in suits for patent infringement, this court holds
that *eBay* does not apply to Commission remedy determinations under Section 337.").

actual or constructive knowledge of defendant's infringement and counts forward. *Id.* at 1035-36.

### 3.   Implied License

An implied license may arise "where the circumstances plainly indicate that the grant of a license should be inferred." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 925 (Fed. Cir. 1984) (*citing Hunt v. Armour & Co.*, 185 F.2d 722, 729 (7th Cir. 1950)). An implied license "signifies a patentee's waiver of the statutory right to exclude others from making, using, selling, offering to sell, or importing the patented invention," and may be established by: (1) equitable estoppel, (2) acquiescence, (3) conduct, or (4) legal estoppel. *Wang Lab. v. Mitsubishi Elecs. Am.*, 103 F.3d 1571, 1580-81 (Fed. Cir. 1997).

### 4.   Patent Misuse

"Patent misuse is an equitable defense to patent infringement." *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005). A finding of misuse renders a patent temporarily unenforceable until the misuse has been purged. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008) (quoting *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1427 (Fed. Cir. 1997)). "The doctrine of patent misuse is [] grounded in the policy-based desire to 'prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right.'" *Princo Corp. v. Int'l Trade Comm'n,* 616 F.3d 1318, 1328 (Fed. Cir. 2010) (*en banc*) (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992)). Thus, "the key inquiry under the patent misuse doctrine is whether, by imposing the condition in question, the patentee has impermissibly broadened the physical or temporal scope of the patent grant and has done so with anticompetitive effects." *Id.* (citing *B. Braun Medical, Inc. v. Abbot Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997)); *see also Monsanto Co. v. McFarling,*

49

363 F.3d 1336, 1341 (Fed. Cir. 2004) (quoting *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998)).

### 5.    Waiver

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "To support a finding of implied waiver in the standard setting organization context, the accused must show by clear and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.'" *Hynix Semiconductor Inc. v. Rambus, Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011) (citing *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008)).

### 6.    Unclean Hands

A complainant who seeks justice must come into court with clean hands or "the doors of the court will be shut." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001) (quoting *Keystone Driller Co. v. General Excavator Co.*, 54 S.Ct. 146, 147 (1933)). To prove unclean hands, Arista must prove that Cisco "conducted [itself] as to shock the moral sensibilities of the judge." *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959).

### F.    Domestic Industry

A violation of section 337(a)(1)(B), (C), (D), or (E) can be found "only if an industry in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). Section 337(a) further provides:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—

50

(A) significant investment in plant and equipment;

(B) significant employment of labor or capital; or

(C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

These statutory requirements consist of an economic prong (which requires certain activities)[19] and a technical prong (which requires that these activities relate to the intellectual property being protected). *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 13 (May 16, 2008) ("*Stringed Musical Instruments*"). The burden is on the complainant to show by a preponderance of the evidence that the domestic industry requirement is satisfied. *Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, Comm'n Op. at 5 (July 22, 2011) ("*Navigation Devices*").

### 1.    Technical Prong

"With respect to section 337(a)(3)(A) and (B), the technical prong is the requirement that the investments in plant or equipment and employment in labor or capital are actually related to 'articles protected by' the intellectual property right which forms the basis of the complaint."

---

[19] The Commission practice is usually to assess the facts relating to the economic prong at the time that the complaint was filed. *See Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, Inv. No. 337-TA-560, Comm'n Op. at 39 n.17 (Apr. 14, 2010) ("We note that only activities that occurred before the filing of a complaint with the Commission are relevant to whether a domestic industry exists or is in the process of being established under sections 337(a)(2)-(3).") (citing *Bally/Midway Mfg. Co. v. U.S. Int'l Trade Comm'n*, 714 F.2d 1117, 1121 (Fed. Cir. 1983)). In some cases, however, the Commission will consider later developments in the alleged industry, such as "when a significant and unusual development occurred after the complaint has been filed." *See Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op., at 5-6 (Jan. 20, 2012) ("[I]n appropriate situations based on the specific facts and circumstances of an investigation, the Commission may consider activities and investments beyond the filing of the complaint.").

51

*Stringed Musical Instruments* at 13-14. "The test for satisfying the 'technical prong' of the industry requirement is essentially same as that for infringement, i.e., a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). "With respect to section 337(a)(3)(C), the technical prong is the requirement that the activities of engineering, research and development, and licensing are actually related to the asserted intellectual property right." *Stringed Musical Instruments* at 13.

### 2. Economic Prong

With respect to the economic prong, and whether or not section 337(a)(3)(A) or (B) is satisfied, the Commission has held that "whether a complainant has established that its investment and/or employment activities are significant with respect to the articles protected by the intellectual property right concerned is not evaluated according to any rigid mathematical formula." *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011) ("*Printing and Imaging Devices*") (citing *Certain Male Prophylactic Devices*, Inv. No. 337 TA-546, Comm'n Op. at 39 (Aug. 1, 2007)). Rather, the Commission examines "the facts in each investigation, the article of commerce, and the realities of the marketplace." *Id.* "The determination takes into account the nature of the investment and/or employment activities, 'the industry in question, and the complainant's relative size.'" *Id.* (citing *Stringed Musical Instruments* at 26).

With respect to section 337(a)(3)(C), whether an investment in domestic industry is "substantial" is a fact-dependent inquiry for which the complainant bears the burden of proof. *Stringed Musical Instruments* at 14. There is no minimum monetary expenditure that a complainant must demonstrate to qualify as a domestic industry under the "substantial investment" requirement of this section. *Id.* at 25. There is no need to define or quantify an

52

industry in absolute mathematical terms. *Id.* at 26. Rather, "the requirement for showing the existence of a domestic industry will depend on the industry in question, and the complainant's relative size." *Id.* at 25-26.

## V.   The '537 (SysDB) Patent

### A.   Claim Construction

#### 1.   Level of Ordinary Skill

Cisco's expert Dr. Almeroth testified that the level of ordinary skill in the field of art of the '537 patent is a person with a Bachelor of Science degree, or its equivalent, in electrical engineering, computer engineering, computer science, or a related field and either a Master of Science degree, or its equivalent, in one of those fields or approximately two years of related experience in the field of network devices. CX-0007C (Almeroth WS) at Q/A 26.

Arista's expert Mr. Hollingsworth testified that a person of ordinary skill in the art in January 2000, the time the application for the '537 patent was filed, would be a person with an undergraduate degree in computer science, computer engineering, electrical engineering, or a closely related field, along with at least 2-3 years of experience working in the field of computer networks. In Mr. Hollingsworth's opinion, superior education or work experience would compensate for a deficiency in the other. RX-3273C (Hollingsworth WS) at Q/A 37.

Both experts for Cisco and Arista agree that a person of ordinary skill in the art with respect to the '537 patent would have at least a Bachelor of Science degree in computer science, computer engineering, or electrical engineering. Cisco's expert also opines that a person of ordinary skill in the art would have a Master of Science degree, an additional requirement that could be satisfied with two years of experience in a relevant field. This is consistent with the opinion of Arista's expert that a person of ordinary skill in the art would have 2-3 years of

experience in a relevant field.  The experts' proposals differ in the particular field in which that experience should be gained.  Cisco's expert proposes the field of "network devices," whereas Arista's expert proposes the field of "computer networks."

In view of the expert testimony, it is determined that a person having ordinary skill in the art of the '537 patent is a person with a Bachelor of Science degree in computer science, computer engineering, electrical engineering, or a closely related field, along with at least 2-3 years of experience working in the field of network devices or computer networks.

2.     **Disputed Claim Terms**

a.     **"externally managing router data" (claims 1 and 10) / "externally manage router data" (claim 19) / "external management" (claims 1 and 10) / "management of" (claim 19)**

Below is a chart setting forth the parties' proposed constructions.[20]

---

[20] This initial determination addresses only the disputed claim terms identified by the parties as needing construction.  *See* Corrected Joint Outline of List of Issues to Be Decided (EDIS Doc. No. 566522) ("Joint Outline of Issues").  The parties identified the claim terms for construction in a joint filing required by Ground Rule 11, which provides: "On the same day the initial posthearing briefs are due, the parties shall file a comprehensive joint outline of the issues to be decided in the final Initial Determination.  The outline shall refer to specific sections and pages of the posthearing briefs.  Moreover, the claim terms briefed by the parties must be identical. For example, if the construction of the claim term 'wireless device' is disputed, the parties must brief that exact claim term.  If a party briefs only a portion of the claim term such as 'wireless' or 'device,' that section of the brief will be stricken."  Ground Rule 11 (emphasis original) (attached to Order No. 2 (Issuance of Ground Rules) (Jan. 28, 2015)).

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| The term "externally managing router data" in claims 1 and 10 are part of the preamble, which is not limiting. That term in claim 19 is not part of the preamble but does not need construction. | offloading from the centralized database subsystem control and maintenance of the principal non-cached copy of data required to configure a router | The term "externally manage router data" in claims 1 and 10 are part of the preamble, which is not limiting. That term in claim 19 is not part of the preamble but does not need construction. |
| The term "external management" does not require construction. If, however, either the preamble is limiting or a construction is necessary, "maintaining router data outside of the centralized database." | controlling and maintaining the principal non-cached copy of data required to configure a router outside the centralized database subsystem | The term "external management" does not require construction. |

The phrase "external management" appears in the preambles of claims 1 and 10, and in the body of claim 19. Although the parties disagree on whether the phrase "external management" in the preambles of claims 1 and 10 is a limitation, that dispute is overshadowed by that fact that "external management" is a requirement present in the body of those claims. As proposed by Cisco and the Staff, it is determined that no construction is needed for the claim term "external management." In particular, the construction proposed by Arista introduces terms and concepts that are not supported by the intrinsic evidence.

The claim terms "externally managing router data" and "external management" do not require construction because the meaning of "external management" is plain to a person having ordinary skill. A person having ordinary skill would understand "external management" to mean that the subsystem, which is external to the centralized database system, manages the data. Almeroth Tr. 183-184; CX-0007C (Almeroth WS) at Q/A 62-63. In such circumstances, where

"the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words," further construction is not necessary. *Phillips*, 415 F.3d at 1314; *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that claim construction is not an "exercise in redundancy").

Further construction is unnecessary because the remainder of the claim language itself provides additional information regarding what is required for external management, including precisely what data is managed, where that data is located, and how a subsystem becomes a "managing subsystem." Claim 1, for example, teaches that "external management" involves a "first managing subsystem" that "indicat[es] router configuration data" that it will manage outside the centralized database system by "transmitting a management registration request." *See, e.g.*, JX-0001 ('537 patent) at col. 15, lns. 22-40.

By contrast, Arista's proposed construction is not supported by the intrinsic record. As an initial matter, the terms used by Arista in its construction, *e.g.*, "control" and "principal non-cached copy," are not found in the claims, specification, or prosecution history of the '537 patent. *See, e.g.*, Hollingsworth Tr. 1011; Almeroth Tr. 184. Moreover, inserting "control" in place of "manage" substitutes one word for another without providing a further clarification of meaning. Similarly, inclusion of the term "authoritative" in the proposed construction provides no additional clarity as to the meaning of this phrase.

Accordingly, it is determined that the claim term "external management" and variations thereof do not need construction.

56

b.    "management registration request" (claims 1 and 10) /
"management request (claim 19)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| a request to register to provide external management services | request to control and maintain | a request to the sysDB for external management services |

The claim terms "management registration request" and "management request" are recited in asserted claims 1, 10, and 19 of the '537 patent. As proposed by Cisco, these terms are construed to mean "a request to register to provide external management services." This construction is consistent with the language of the claims and specification.[21]

According to the claims, the first managing subsystem transmits a "management registration request" "to provide external management services." JX-0001 ('537 patent) at col. 15, lns. 28-32. Consistent with the claims, the specification confirms that a management registration request is a request to register to provide external management services. A "managing subsystem" transmits a "management registration request" to "register to externally manage router configuration data." *Id.* at col. 5 lns. 18-22; *see also id.* at col. 10, lns. 45-47 ("At box 100, a managing subsystem 48 (via local managing unit 52) issues a management registration request to the sysDB 26 for external management services.").

---

[21] The construction proposed by the Staff is similar to the adopted construction, but with two differences. First, the Staff proposed that the management registration request be transmitted to "the sysDB," as opposed to the "centralized database system," which is the language used in the claims. Second, the Staff's construction refers to a "request," whereas the adopted construction refers to a "request to register," inasmuch as the claims require that the request be for registration.

Appx888.068

c.    "router configuration data" (claims 1, 2, 10, 11, and 19)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "data relating to configuration of the router." | data required to configure a router | No construction necessary. If construction is necessary, "data about the configuration of the router." |

The claim term "router configuration data" is recited in asserted claims 1, 2, 10, 11, and 19 of the '537 patent. As proposed by Cisco and the Staff, it is determined that no construction is needed for the claim term "router configuration data." In particular, the construction proposed by Arista excludes specific types of data identified in the specification as being "router configuration data."

The record reflects that the term "router configuration data" would be understood by one of ordinary skill in the art in the context of the claims and specification. *See* CX-0007C (Almeroth WS) at Q/A 72-73. Indeed, the claim language itself teaches that "router configuration data" is data "derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database." JX-0001 ('537 patent) at col. 18, lns. 35-39. Therefore, reference to the claims themselves would be sufficient for a person having ordinary skill in the art to understand the meaning of the term. Moreover, the '537 patent specification confirms that router configuration data may include any type of "router data" known in the art, listing numerous examples and then expressly stating that router configuration data could include other types of router data as well. *Id.* at col. 3, ln. 64 – col. 4, ln. 11.

58

By contrast, Arista's proposed construction conflicts with the embodiments of the patent. As an initial matter, the specification of the '537 patent does not limit "router configuration data" to what is "required" to configure a router. JX-0001 ('537 patent) at col. 4, lns. 20-26. Instead, any type of router configuration data would be consistent with the claim language as long as that data is "derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database." JX-0001 ('537 patent) at col. 18, lns. 35-39. Indeed, the specification confirms that a broad variety of data relating to the configuration of a router qualifies as "router configuration data," including any type of "router data" known in the art:

> The configuration information stored on the sysDB may include, for example, Internet protocol (IP) addresses, Ethernet configurations, subnet masks, default routes, protocol configuration, name server information, user and password data, access levels, and other router data as is known in the art.

*Id.* at col. 3, ln. 67 – col. 4, ln. 5; *see also* col. 6, ln. 66 – col. 7, ln. 3.

This not only includes specific types of data, but broad categories of "router configuration information" such as "fast changing data" or "large amounts of data." *Id.* at col. 4, lns. 20-24.

Accordingly, it is determined that the claim term "router configuration data" does not need construction.

      **d.**     **"said database" (claims 1 and 10)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| said database system / the centralized database system | Indefinite | Not indefinite |

59

The term "said database" is recited in asserted claims 1 and 10. Arista argues that the term "said database" is indefinite because it could refer to either the "database system," the "database subsystem," or the "managing subsystem." *See* Resp. Br. at 87-89; RX-3273C (Hollingsworth WS) at Q/A 82. By contrast Cisco and Staff disagree that "said database" is indefinite.[22]

Notwithstanding Arista's argument, the claims and specification are clear that the centralized database subsystem's role is "receiving said management registration request" and "registering said first managing subsystem for external management," whereas the centralized database system's role is, among other things, storing router configuration data. JX-0001 ('537 patent) at col. 15, lns. 37-40; CX-0007C (Almeroth WS) at Q/A 77-81. Moreover, claim 2 clarifies that router configuration data is stored in "said database system," and not said database subsystem. JX-0001 ('537 patent), col. 15, lns. 41-43.

Dr. Almeroth's testimony confirms that a person of ordinary skill in the art would be informed with reasonable certainly that the claim term "said database" recited in claims 1 and 10 refers to the "database system." *See* CX-0007C (Almeroth WS) at Q/A 78, Q/A 81; *see also* Hollingsworth Tr. 1040-1041. Accordingly, it is determined that this claim term is not indefinite.

---

[22] Although Cisco proposed a construction for "said database," Cisco also agrees with Staff's proposal that no construction is necessary. *See* Compl. Br. at 66 n.10.

e. **"reducing computational overhead in a centralized database system" (claims 1 and 10)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| Preamble not limiting; if limiting, plain and ordinary meaning which is "reducing the amount of computation in a centralized database system." | reducing transactions, notifications, or verifications processed in a centralized database system | Preamble is limiting. If the preamble is found to be limiting, "reducing multiple dependencies between individual subsystems" |

The claim term "reducing computational overhead in a centralized database system" is recited in the preamble of asserted claims 1 and 10. Based on the intrinsic evidence, it is determined that this claim term is limiting.

A preamble limits the scope of a claim if it "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal citations omitted). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.* (*quoting Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). "'[W]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)).

Arista adduced evidence showing that Cisco added this limitation to claims 1 and 10 during prosecution of the '537 patent. Specifically, the file wrapper shows that Cisco added the phrase "for reducing computational overhead" to distinguish the claims from the prior art. The

61

prosecution history shows that Cisco added the phrase "reducing computational overheard in a centralized database system" to the preamble of claims 1 and 10 to distinguish the claimed invention from the Ciscon reference (RX-3275) and argued that Ciscon "is not an attempt to relieve a database of its computational burden." *See* JX-0007 ('537 Patent Prosecution History) at CSI-ANI-00098149.000342, 389, 456, 465, 468. Cisco argues that the phrase "reducing computational overhead in a centralized database system" should not be read to limit the claims, inasmuch as the Examiner did not accept Cisco's argument that adding this phrase would distinguish the pending claims from the prior art. *See* Compl. Br. at 75-76. Nevertheless, the fact that Cisco amended the pending claims to add this phrase in an attempt to distinguish the prior is enough to render this a limitation of the claims, regardless of whether or not Cisco's arguments with respect to the amendment were ultimately successful.

Inasmuch as Cisco added this phrase during prosecution to distinguish the prior art, it is determined that at least the portions of the preambles of claims 1 and 10 that recite "reducing computational overhead in a centralized database system" are limiting.

Moreover, as proposed by Cisco, the phrase "reducing computational overhead in a centralized database system" is construed to mean "reducing the amount of computation in a centralized database system." This construction reflects the phrase's plain and ordinary meaning to a person of ordinary skill in the art. *See* CX-1217C (Almeroth RWS) at Q/A 42-45.

By contrast, Arista's proposed construction improperly reads in limitations from a description of the prior art. In particular, the '537 patent describes "transaction routines, notification routines, and verification routines" as an "example" of one of the problems with the prior art:

62

> However, the centralized database scheme is somewhat inefficient when the information stored in the database contains a large amount of data or is changing very fast. For example, when the data in the database is constantly changing (such as statistic counters), the sysDB may have to continuously perform transaction routines, notification routines, and verification routines.

JX-0001 ('537 patent) at col. 2, lns. 58-64.

The specification does not, however, limit "reducing computational overhead" to only the reduction of "transaction routines, notification routines, and verification routines." Indeed, when describing the embodiments of the claimed inventions, the specification refers generally to "computational tasks" without limiting them to items listed in Arista's proposed construction:

> The CPU 12 carries out the computational tasks associated with executing and running the internetwork operating system (IOS) software of the present invention and comprises circuitry or other hardware as is known in the art.

JX-0001 ('537 patent) at col 6, lns. 52-55.

Moreover, the construction proposed by the Staff also reads in a limitation unnecessarily from the specification. The Staff's proposed construction relies on a particular "objective" of the invention, that of reducing multiple dependencies. *See* JX-0001 ('537 patent) at col. 3, lns. 26-29. Although the claimed inventions of the '537 patent do achieve this goal, limiting the construction of the term "reducing computational overhead in a centralized database system" to only this goal is overly narrow. *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.").

Accordingly, it is determined that the claim term "reducing computational overhead in a centralized database system" recited in the preambles of claims 1 and 10 are limiting. It is further determined that the claim term "reducing computational overhead in a centralized

63

database system" is construed to mean "reducing the amount of computation in a centralized

database system."

> f.   **"said router configuration data managed by said database
> system and derived from configuration commands supplied by
> a user and executed by a router configuration subsystem
> before being stored in said database" (claims 1, 10, and 19)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| The plain language requires that router configuration data be "stored in said database" | The plain language requires that configuration commands be "stored in said database" | None provided |

The parties did not include proposed constructions of this claim term in the parties' Joint

Claim Construction Statement. Nevertheless, both Cisco and Arista addressed this claim term in

their post-hearing briefs. *See* Compl. Br. at 67-74; Arista Br. at 65-70. Cisco takes the position

that "Arista waived this untimely claim construction argument by failing to include it in the Joint

Claim Construction Statement." *See* Compl. Br. at 67. Although the claim term was not

identified in the parties' Joint Claim Construction Statement, Arista did disclose its argument

regarding this term in response to an interrogatory seeking information regarding Arista's

non-infringement positions. *See* CX-1011C (Arista's Ninth Supp. Resp. to Cisco's First,

Second, Third and Fourth Set of Rogs) at 35. Arista's arguments will be addressed in the section

discussing infringement below.

## B.   Literal Infringement Analysis

As discussed below on a claim-by-claim basis, the record evidence establishes that the

accused products satisfy all limitations of the asserted '573 patent.

64

### 1. Claim 19

Asserted claim 19 is an independent claim, as are asserted claims 1 and 10. Claim 1 is a method claim, claim 10 is directed to machine-executable instructions, and claim 19 is an apparatus claim. Many of the method steps of claim 1 recite limitations similar to those recited in claim 19. The same holds true with the machine-executable instructions recited in claim 10. Therefore, this initial determination will analyze claim 19 before analyzing claims 1 and 10 (and their associated dependent claims).

#### a. In a router device having a processor and memory, a router operating system executing within said memory comprising:

The record evidence establishes that the Accused '537 Products practice the preamble of claim 19. As Dr. Almeroth testified, the Accused '537 Products are router devices. CX-0007C (Almeroth WS) at Q/A 125-126. The Accused '537 Products have a processor and memory, and they also execute Arista's EOS, a router operating system, within that memory. *Id.* at Q/A 125-126. This is confirmed by the data sheet for Arista's 7010T-48 device, which demonstrates that the devices have a CPU, system, and flash memory. CX-0166. The data sheet further indicates that EOS runs processes in memory and that the processes "exchange state through an in-memory database." *Id.*

#### b. (a) a database subsystem;

Cisco adduced evidence showing that the Accused '537 Products practice this limitation. The '537 patent teaches that the "database subsystem" is the part of Sysdb that receives the management registration request from an external subsystem and registers the subsystem for external management. JX-0001 ('537 patent) at col. 15, lns 37-40; col. 16, lns. 64-67; col. 18, ln. 29. As described below with respect to the term "externally manage router data," agents in EOS

65

register for external management by [                                    ].[23] Thus, as Dr.

Almeroth testified, this limitation is satisfied by the portion of Arista's Sysdb that handles the

"mounting." CX-0007C (Almeroth WS) at Q/A 127.

### c.   (b) a plurality of client subsystems, each operatively coupled for communication to said database subsystem,

The evidence establishes that EOS contains numerous "agents," which correspond to the

"plurality of client subsystems" recited in claim 19. CX-0007C (Almeroth WS) at Q/A 128.

Each agent generally handles a particular feature or set of related features. *Id.* at Q/A 86;

CX-0035C at 6. For example, there is an MLAG agent for managing MLAG data, an STP agent

for managing STP, and an LED Driver agent for managing LED data. CX-0007C (Almeroth

WS) at Q/A 86; CX-0286; CX-1098C; CX-0419C at 1, 6; JX-0034C (Sigoure Dep. Tr.) 85-86;

CX-1098C (Transcript of [                                    ] Presentation) at 3-4. Each of these

agents is coupled to EOS's Sysdb, as discussed above. *See* CX-0286 at Fig. 3.

### d.   one of said client subsystems configured as a managing subsystem to externally manage router data

The record evidence shows that Arista's products satisfy this limitation under the claim

constructions adopted above. Specifically, agents in EOS perform external management by

[                                    ]. CX-0007C (Almeroth WS) at Q/A 90-91, Q/A 100-120, Q/A

130, Q/A 134; JX-0026C (Duda Dep. Tr.) 177-178, 192; Almeroth Tr. 191. When an EOS agent

[                ] data in Sysdb, [

                ]. CX-0007C (Almeroth WS) at Q/A 90-91, Q/A 100-120, Q/A 130, Q/A 134;

---

[23] Dr. Almeroth testified: "[




]." CX-0007C (Almeroth WS) at Q/A 88.

*see* Hollingsworth Tr. 1004; JX-0026C (Duda Dep. Tr.) 192.  Moreover, [

                              ].  CX-0007C (Almeroth WS) at Q/A 91, Q/A 100, Q/A 130,

Q/A 134; Hollingsworth Tr. 1005; JX-0026C (Duda Dep. Tr.) 194-195.

    The documentary evidence confirms that EOS's agents externally manage data.  For

example, an Arista internal presentation given by [

                                          ], states that [

                    ].  CX-0459C ([                         ] Presentation) at

ANI-ITC-944 945-1732776; *see* Duda Tr. 843; Almeroth Tr. 192; JX-0027C ([         ] Dep.

Tr.) 96-97.

    A slide from the presentation given by [                  ] is reproduced below:

            [

                                          ]

CX-0459C ([                         ] Presentation) at ANI-ITC-944 945-1732776.

    Dr. Almeroth testified regarding the slide at the hearing:

        Q.  What are we seeing here on this slide?

Appx888.078

[

]

Almeroth Tr. 192-193.

Dr. Almeroth further testified that the types of data listed in the presentation are explicitly described by the '537 patent as examples of router configuration data.  Almeroth Tr. 193-195.

Arista's expert Dr. Hollingsworth also testified that [

].  For example, he testified that [                    ]

presentation shows [                                                                                ]:

[

].

Hollingsworth Tr. 1008.

Dr. Hollingsworth also testified that, that in addition to the examples in the presentation reproduced above, [                                                                                ].

Hollingsworth Tr. 1008.  Dr. Hollingsworth further testified that [

].  Hollingsworth Tr. 1009.  He testified that [

68

]:

[

].

Hollingsworth Tr. 1008; *see* CX-1098C (Transcript of [                              ]

Presentation) at 2-3 (discussing [                                        ]);

Almeroth Tr. 192-193.

    Additional evidence establishes that [              ] is pertinent to management. *See*

CX-1098C (Transcript of [                    ] Presentation) at 42 ("[

].");

CX-0035C at 7 ("[

]"); JX-0034C (Sigoure Dep. Tr.) 98 ("[

]."). 

    **e.**    **upon issuing a management request to said database subsystem;**

    The evidence establishes that the accused products practice this claim limitation because

agents in EOS issue a [            ] request to Sysdb indicating [

]. As discussed above, agents within EOS externally manage data when they

[                                        ]. CX-0007C (Almeroth WS) at Q/A 90-91,

69

Q/A 100-120.  The first step of a [

            ].  *See* CX-0223C; CX-0457C at 15-17, 20.  This functionality satisfies the

"issuing a management request to said database subsystem" claim limitation under the claim

constructions adopted above.  CX-0007C (Almeroth WS) at Q/A 138-142.

>    **f.    and (c) a database operatively coupled to said database**
>    **subsystem, said database configured to store router**
>    **configuration data**

Cisco adduced evidence showing that Arista's products have a Sysdb, which stands for

"System Database," including a [                                  ]."  CX-1098C

(Transcript of [                        ] Presentation) at 2-3, 7, 15; CX-0007C (Almeroth

WS) at Q/A 206; CX-0459C ([                        ] Presentation) at 11.  An [      ] is a

software construct for a unit of data.  CX-0412C; CX-1098C (Transcript of [

            ] Presentation) at 15; CX-0035C.  The [                        ] is a

"database" as described in embodiments of the '537 patent.  CX-0007C (Almeroth WS) at Q/A

43; *see* JX-0001 ('537 patent) at col. 4, lns. 30-38.  Sysdb is "operatively coupled" to the

database subsystem because [                                  ].  CX-0007C (Almeroth

WS) at Q/A 143.  As explained in more detail below, the "data" stored in Sysdb is "router

configuration data."

>    **g.    and delegate management of router configuration data to a**
>    **management subsystem that requests to manage router**
>    **configuration data,**

As demonstrated by the record evidence, when Sysdb processes the write-mount request

described above, Sysdb permits the requesting agent to externally manage the data, and therefore

"delegates management" of that data to that agent as recited in this claim limitation.  CX-0007C

(Almeroth WS) at Q/A 144.  As further explained below, the "data" that is externally managed is "router configuration data."  Upon receiving a [                    ] from an agent, Sysdb will perform the next series of steps [                    ].  CX-0223C at 11; CX-0457C at 16, 19-20.  [                                        ].  CX-0223C at 11-14; CX-0457C at 23.  Dr. Almeroth testified that this functionality is present in Arista's source code for Sysdb.  CX-0007C (Almeroth WS) at Q/A 95, Q/A 99.

> **h.  said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database.**

Cisco has adduced evidence showing that the accused products satisfy this claim limitation under the constructions adopted above.  As Dr. Almeroth testified, the claimed router configuration data is "managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database."  CX-0007C (Almeroth WS) at Q/A 90-91, Q/A 100-120, Q/A 144-162 Q/A 170; *see* CX-0434C; CX-0430C.

The evidence shows that [

].  CX-0007C (Almeroth WS) at Q/A 100-120, Q/A 130, Q/A 144-156, Q/A 175; CX-0285 at 460, 964; CX-0500C; CX-0413C.  [

].  CX-0007C (Almeroth WS) at Q/A 102-106, Q/A 126; CX-0413C at 2, ANI-ITC-944_945-0086713; CX-0417C at 6; CX-1098C (Transcript of [                    ] Presentation) at 44.  Next, [

71

]. CX-0007C (Almeroth

WS) at Q/A 146.  [

]. CX-0007C (Almeroth WS) at Q/A 146; *see*

Hollingsworth Tr. 1032, 1077-1078.  [

]. CX-0007C (Almeroth WS) at Q/A 108-109, Q/A

111, Q/A 115-116, Q/A 130, Q/A 138, Q/A 146, Q/A 155.

The evidence therefore demonstrates that [

], and constitutes the claimed "router configuration data" that is "derived from

configuration commands supplied by a user."  Further, the evidence shows that [

] is "derived from" user-supplied configuration commands through a series of steps

"before being stored in said database" where "said database" refers to [        ]. CX-0007C

(Almeroth WS) at Q/A 146.

Arista raises several non-infringement arguments with respect to infringement of this

claim limitation.  As discussed below, each of Arista's arguments fails.

Arista argues that "Cisco has failed to identify any 'router configuration data' derived

from commands supplied by a user as being externally managed in Arista switches."  *See* Resp.

Br. at 104-06.  Arista's argument rests on a criticism of Dr. Almeroth's identification of the

[                       ] as producing "router configuration data."  *See* Hollingsworth Tr.

1037-1038.  Arista argues that the [        ] does not produce "router configuration data," but

is instead concerned with [        ].  *See* Resp. Br. at 105-06.  The record evidence, however,

does not support Arista's argument.

Dr. Almeroth testified that, when the configuration commands [

].

CX-0007C (Almeroth WS) at Q/A 112-119.  As a result of these commands, [

].  *Id.*  This constitutes "router configuration data," inasmuch as the patent states that

"network interface statistic counter information" is a type of such data.  JX-0007C (Almeroth

WS) at Q/A 73, Q/A 76; *see* JX-0001 ('537 patent) at col. 4, lns. 20-26.  Accordingly, it has been

shown that the [                          ], which is reflected by the [                          ], is the

claimed "router configuration data."

In addition, the evidence shows that other agents within EOS manage "router

configuration data."  Dr. Almeroth testified that other agents, such as [

] all manage router

configuration data.  Almeroth Tr. 192-195.  Specifically, these agents manage protocol

configuration information, which is identified in the patent specification as a type of router

configuration data.  *Id.*; JX-0001 ('537 patent) at col. 3, ln. 67 – col. 4, ln. 5.  Dr. Almeroth also

described the overall process for how [

]."  CX-0007C (Almeroth WS) at Q/A 144-162.

Arista also argues that the output of the agents in EOS, which Arista refers to as [      ]

data, does not constitute "router configuration data."  *See* Resp. Br. at 105; RX-3909C

(Hollingsworth RWS) at Q/A 107.  Under the construction of "router configuration data"

adopted above, however, such [          ] is router configuration data.  Moreover, Dr. Almeroth

testified that [                                                                          ].

CX-0007C (Almeroth WS) at Q/A 153; *see* CX-0419C at 2 ([

                                        ]); RX-3912C (Duda RWS) at Q/A 8.

With respect to the claim limitation "storing commands," Arista argues that "storing commands" requires storing the command as entered by the user. *See* Resp. Br. at 92-94.  As discussed above in the section addressing claim construction, Arista did not raise this issue in the parties' Joint Claim Construction Statement.  Moreover, the intrinsic evidence does not support the limitation of this phrase to storing the actual commands as entered by the user.  Nevertheless, the evidence establishes that [

                                        ]. *See*

CX-0007C (Almeroth WS) at Q/A 155, Q/A 162; Hollingsworth Tr. 1034.  Accordingly, Arista's argument must fail.

### 2.    Claim 1

Independent method claim 1 recites many limitations similar to those recited in independent apparatus claim 19, analyzed above.  As with claim 19, the record evidence shows that the accused products satisfy all limitations of claim 1.

#### a.    A method for reducing computational overhead in a centralized database system

As discussed in the previous section with respect to claim construction, the preamble claim term "reducing computational overhead" was determined to be limiting and was construed to mean "reducing the amount of computation in a centralized database system."  The record evidence establishes that the Accused '537 Products meet this limitation under the adopted construction because [

74

]. In particular, Dr. Almeroth

testified that this architecture reduces computational overhead in the centralized database system

(Sysdb) by reducing the amount of computation in that centralized database system.  CX-0007C

(Almeroth WS) at Q/A 163-182; *see also* Hollingsworth Tr. 1036 ("'[


]."").

**b.**    **by externally managing router data in conjunction with a centralized database subsystem, said database subsystem operatively coupled for communication with a plurality of router subsystems one of which is a first managing subsystem, comprising:**

Dr. Almeroth testified that the Accused '537 Products meet this element under the

adopted claim constructions for the same reasons as explained above with respect to claim 19.  In

particular, the external management is "in conjunction with a centralized database subsystem"

because the centralized database subsystem within Sysdb handles the [

].  CX-0007C (Almeroth WS) at Q/A 127.  In addition, as discussed above with respect to

claim 19, the database subsystem is coupled to a plurality of router subsystems, one of which is a

first managing subsystem.  CX-0007C (Almeroth WS) at Q/A 86, Q/A 128; CX-1098C

(Transcript of [                                    ] Presentation) at 3-4.

**c.**    **a) transmitting a management registration request by said first managing subsystem to said database subsystem,**

As Dr. Almeroth testified the Accused '537 Products meet this element under the adopted

claim constructions for the same reasons discussed above with respect to the "management

request" of claim 19.  CX-0007C (Almeroth WS) at Q/A 90-91, Q/A 100-120.

75

  **d.**  **said registration request indicating router configuration data for which said first managing subsystem is requesting to provide external management services,**

The record establishes that the Accused '537 Products meet this element under the

adopted claim constructions for the same reasons set forth above with respect to the

"management request" limitation of claim 19. In particular, Dr. Almeroth testified that the

limitation "indicating router configuration data for which said first managing subsystem is

requesting to provide external management services" is met due to the [

]. CX-0007C (Almeroth WS) at

Q/A 90-91, Q/A 100-120.

  **e.**  **said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database;**

Dr. Almeroth testified that the router configuration data present in the accused Arista

products satisfies this element for the reasons set forth with respect to claim 19 discussed above.

CX-0007C (Almeroth WS) at Q/A 90-91, Q/A 100-120, Q/A 144-162, Q/A 170.

  **f.**  **b) receiving said management registration request by said database subsystem;**

The record evidence shows that the Accused '537 Products satisfy this claim limitation.

In particular, Dr. Almeroth testified that in Arista's EOS, [

] for at least the reasons discussed with respect to claim 19. CX-0007C (Almeroth WS) at

Q/A 90-91, Q/A 100-120. Moreover, the part of Sysdb that receives the mount request in order

to perform the mount is the claimed "database subsystem." *See id.*

Appx888.087

       **g.**      **and c) registering said first managing subsystem for external management by said database subsystem.**

Dr. Almeroth testified that the Accused '537 Products satisfy this limitation.

Specifically, in Arista's EOS, [                                          ] for at least the

reasons explained with respect to claim 19. *See* CX-0007C (Almeroth WS) at Q/A 90-91, Q/A

100-120. The part of Sysdb that receives the mount request in order to perform the mount,

thereby registering the agent for external management, is the "database subsystem." *See id.*

       **3.**      **Claim 2**

       **a.**      **The method of claim 1 further comprising**

As set forth above, the record evidence shows that the accused products satisfy the

limitations of claim 1.

       **b.**      **maintaining router configuration data using a tree structure having a plurality of tuples by said database system.**

As Dr. Almeroth testified, EOS maintains router configuration data using [

                  ]. CX-0007C (Almeroth WS) at Q/A 206; CX-0459C at 11;

CX-0412C; CX-0035C at 18-19.

It is therefore determined that the accused products satisfy the limitations of claim 2.

       **4.**      **Claim 8**

       **a.**      **The method of claim 1 further comprising:**

As set forth above, the record evidence shows that the accused products satisfy the

limitations of claim 1.

**b.**     **(a) transmitting a change request for router data by a requesting subsystem to said database subsystem;**

The evidence shows that the accused products satisfy this limitation. As Dr. Almeroth testified, the '537 Accused Products transmit a change request for router data by a requesting subsystem to said database subsystem. CX-0007C (Almeroth WS) at Q/A 212-219.

In Arista's EOS, [

]. CX-0007C (Almeroth WS) at Q/A 213-214; CX-0035C at 18. For example, [

]. CX-0417C; CX-0035C at 14-15. [                                                                    ], and therefore satisfies the "requesting subsystem" limitation of claim 8.

**c.**     **(b) receiving said change request by said database subsystem;**

Dr. Almeroth testified that Sysdb receives the change request by the database subsystem discussed above. CX-0007C (Almeroth WS) at Q/A 215. This limitation is therefore satisfied by the accused products.

**d.**     **(c) determining whether said router data is externally managed by a second managing subsystem; and**

The evidence establishes that the accused products satisfy this claim limitation. Dr. Almeroth testified that the Arista products determine whether the router data is externally managed by a second managing subsystem when [

78

]. CX-0007C (Almeroth WS) at Q/A 216. Sysdb knows which agents have [                    ], and which agents have [                    ]. CX-0007C (Almeroth WS) at Q/A 100-120, Q/A 216; *see* JX-0026C (Duda Dep. Tr.) 199-200. Therefore, Sysdb would learn [

]. CX-0007C (Almeroth WS) at Q/A 100-120, Q/A 216. Accordingly, when

[                                                                                    ]

and is therefore a "second managing subsystem." *Id.*

        e.        **(d) requesting a data change for said router data to said second managing subsystem by said database subsystem when said database subsystem determines said router data is externally managed by a second managing subsystem.**

Dr. Almeroth testified that the claim limitation is satisfied when Sysdb propagates the change update to the second managing subsystem so that it will change its own data. CX-0007C (Almeroth WS) at Q/A 216.

        5.        **Claim 9**

        a.        **The method of claim 8 further comprising:**

As set forth above, the record evidence shows that the accused products satisfy the limitations of claim 8.

        b.        **a) determining whether said router data is locally cached; and b) updating the cache value to said router data when said router data is locally cached.**

Evidence adduced at the hearing establishes that the Accused '537 Products satisfy these additional limitations of claim 9. As Dr. Almeroth testified, Arista's products determine whether the router data is locally cached because [

]. CX-0286; CX-1098C; CX-0414C; CX-0434C; CX-0286; CX-0223C; CX-0035C; CX-0007C (Almeroth WS) at Q/A 220. Arista

79

products update the cache value to said router data when said router data is locally cached

because [

]. CX-0007C (Almeroth WS) at Q/A 220.

### 6.   Claim 10

Asserted claim 10 of the '537 patent is nearly identical to asserted independent method

claim 1, with the exception of the claim terms "program storage device readable by a machine,

tangibly embodying a program of instructions executable by the machine" and "registering said

first managing subsystem for external management by said managing subsystem." The evidence

shows that Arista's Accused '537 Products contain a "program storage device readable by a

machine, tangibly embodying a program of instructions executable by the machine" because they

run EOS, [                                         ]. CX-0166.  Moreover, agents within EOS register for

external management by [                                         ] and additionally by [

]. CX-0007C (Almeroth WS) at Q/A 98.

Therefore, for these reasons and the reasons discussed above with respect to claim 1, it is

determined that the accused Arista products satisfy all limitations of claim 10.

### 7.   Claim 11

#### a.   The program storage device of claim 10, said method further comprising

As set forth above, the record evidence shows that the accused products satisfy the

limitations of claim 10.

      **b.**       **maintaining router configuration data using a tree structure having a plurality of tuples by said database system.**

This additional limitation is identical to the limitation recited in claim 2. For the reasons discussed above with respect to asserted claim 2, it is determined that the Accused '537 Products infringe claim 11.

      **8.**      **Claim 17**

      **a.**       **The program storage device of claim 10, said method further comprising:**

As set forth above, the record evidence shows that the accused products satisfy the limitations of claim 10.

      **b.**       **(a) transmitting a change request for router data by a requesting subsystem to said database subsystem; (b) receiving said change request by said database subsystem; (c) determining whether said router data is externally managed by a second managing subsystem; and (d) requesting a data change for said router data to said second managing subsystem by said database subsystem when said database subsystem determines said router data is externally managed by a second managing subsystem.**

These additional limitations are identical to limitations recited in claim 8. For the reasons discussed above with respect to asserted claim 8, it is determined that the Accused '537 Products infringe claim 17.

      **9.**      **Claim 18**

      **a.**       **The program storage device of claim 17, said method further comprising:**

As set forth above, the record evidence shows that the accused products satisfy the limitations of claim 17.

81

b.  **(a) determining whether said router data is locally cached; and (b) updating the cache value to said router data when said router data is locally cached.**

These additional limitations are identical to limitations recited in claim 9. For the reasons discussed above with respect to asserted claim 9, it is determined that the Accused '537 Products infringe claim 18.

## C.  Indirect Infringement

### 1.  Specific Intent and Knowledge of the Asserted Patents

Indirect infringement requires that the infringer have specific intent to encourage infringement. *Commil USA, LLC v. Cisco Sys., Inc.,* 135 S. Ct. 1920, 1928 (2015) ("Section 271(b) requires that the defendant 'actively induce[d] infringement.' That language requires intent to 'bring about the desired result,' which is infringement."); *see also Global-Tech Appliances, Inc., v. SEB S.A.,* 131 S. Ct. 2060 (2011). Such specific intent can be shown by, for example, (1) changes in importation practices effectuated to shift infringement liability, (2) the infringer's copying of patented technology, and (3) the infringer's willful blindness of the underlying direct infringement. *See, e.g., SynQor, Inc. v. Artesyn Techs., Inc.,* 709 F.3d 1365, 1384–85 (Fed. Cir. 2013); *Commil USA, LLC,* 135 S. Ct. at 1924-25; *Global-Tech,* 131 S. Ct. at 2071-72.

"Willful blindness" is sufficient to meet the knowledge and specific intent requirement of induced infringement. *Global-Tech,* 131 S. Ct. at 2071-72. A finding of willful blindness requires (1) the subjective belief in the high probability that a fact exists, and (2) the taking of deliberate steps to avoid learning of that fact. *Id.* at 2070. The first prong may be found upon a showing that the party "was successful in its attempts to develop various functions covered by the [asserted] patent into its products." *See, e.g., Suprema,* 796 F.3d. at 1343. The failure to

82

obtain opinion of counsel through which infringing conduct and/or the asserted patent(s) can be discovered can also support a finding of deliberate avoidance. *Suprema, Inc. v. Int'l Trade Comm'n*, 2015 WL 5315371, *7 (Fed. Cir. Sept. 14, 2015) (panel remand).

As discussed below, Arista's actions indicate that it had specific intent to encourage infringement.[24]

The record evidence shows that Arista changed its importation practices soon after Cisco filed the complaint in this investigation. [



]. *See* CX-1009C (Arista's First Supplemental Response to Interrogatory No. 40); Metivier Tr. 1161. The evidence shows that [



]. Metivier Tr. 1162-1163, 1167, 1174-1175; JX-0029C (Metivier Dep. Tr.) 96. [

]. RX-3914C (Metivier WS) at Q/A 63, Q/A 66, Q/A 69; Metivier Tr. 1162, 1163; CX-1213C; CX-1009C (Arista's Third Supplemental Response to Interrogatory No. 40). [

] therefore lead to the conclusion that Arista had a specific intent to induce infringement through the importation of the accused products.

In addition, the evidence shows that Arista [                    ] Cisco products in developing Arista's products. *See, e.g.*, CX-0206C; JX-0026C; JX-0033C; CX-0201C;

---

[24] The discussion of Arista's specific intent to encourage infringement also applies to the analysis of the other patents asserted in this investigation.

83

CX-0198C; CX-0210C; CX-0200C; CX-0205C; CX-0209C; JX-0022C (Cheriton Dep. Tr.) 104,

105; JX-0042C (Ullal Dep. Tr.) 178-179; JX-0033C (Sadana Dep. Tr.) 27; CX-0001C (Wicker

WS) Q/A 220-225; CX-0003C (Jeffay WS) Q/A 372-376; CX-0007C (Almeroth WS) Q/A

238-242; CX-0008C (Bhattacharjee WS) Q/A 362-366.  Cisco has presented [


 ].  *See, e.g.*, CX-0206C, CX-0201C, CX-0198C, CX-0210C,

CX-0200C; CX-0205C; CX-0209C; Sadana Tr. 1299-1300.  For example, [


 ]"  CX-0205C; CX-0198C; Sadana Tr. 1299-1300.  Arista's Chief Technology Officer,

Kenneth Duda, testified [


 ].  JX-0026C (Duda Dep. Tr.) 217-219, 482-483.  Mr.

Duda also testified that [


 ].  CX-0206C; Duda Tr. 837, 838.  Similarly, in several instances

Anshul Sadana, Arista's Senior Vice President of Customer Engineering, testified that [


 ].  JX-0033C (Sadana Dep. Tr.) 211-212, 217, 221, 228, 231.  Moreover, Arista's

CEO also testified that [


 ].  JX-0042C (Ullal Dep. Tr.) 58, 61.

The record evidence also supports a finding that Arista at least intentionally and willfully

blinded itself to knowledge of Cisco's patented technology and Arista's infringing conduct.  That

there was a high probability of Arista's subjective belief that it was infringing Cisco's patents is

shown by [                                                                                                      ].

*See, e.g.*, JX-0026C (Duda Dep. Tr.) 217-219, 481, 482-483; JX 0033C (Sadana Dep. Tr.)

84

211-212, 217, 221, 228, 231; CX-0206C; CX-0201C; CX-0198C; CX-0210C; CX-0200C;

CX-0205C; CX-0209C; Sadana Tr. 1299; Arneja Tr. 1120-1121; CX 0001C (Wicker WS) Q/A

226-228; CX-0003C (Jeffay WS) Q/A 377-380; CX-0007C (Almeroth WS) Q/A 243-246;

CX-0008C (Bhattacharjee WS) Q/A 367-370.  Additionally, the record evidence shows that

[

                                                    ].  For example, Mr. Sadana testified that, at

Arista, [

                                                                                    ].

JX-0033C (Sadana Dep. Tr.) 221.  As another example, Mr. Bechtolsheim, Arista's co-founder,

testified that [                                                    ].  JX-0020C (Bechtolsheim

Dep. Tr.) 247.  Similarly, Mr. Duda testified that [

                        ]." Duda Tr. 789.  According to Mr. Duda, [

                                    ].  JX-0026C (Duda Dep. Tr.) 159-160, 166.

Therefore, the evidence establishes that Arista was willfully blind to Cisco's patented

technology, thereby showing knowledge and specific intent to cause infringement of the asserted

patents.

Additionally, indirect infringement, both contributory infringement and induced

infringement, requires that the infringer act with knowledge of the patent(s)-at-issue and

infringement thereof. *See, e.g.*, *Aro Mfg. Co. v. Convertible Top Replacement Co., Inc.*, 377 U.S.

476 (1964); *Global-Tech*, 131 S. Ct. at 2060.  As a preliminary matter, Arista had knowledge of

the patents asserted in this investigation at least as early as December 4, 2014, by virtue of

Cisco's filing of a complaint against Arista in the Northern District of California, and asserting

85

the same patents asserted in this investigation. *See e.g.*, CX 1003C; CX-0001C (Wicker WS)

Q/A 217-219; CX-0003C (Jeffay WS) Q/A 371; CX 0007C (Almeroth WS) Q/A 236-237;

CX-0008C (Bhattacharjee WS) Q/A 360-361. Therefore, it is determined that Arista had

specific knowledge of the patents in suit such that it could be liable for inducing infringement

and contributory infringement.[25]

### 2. Direct Infringement of the '537 Patent in the United States

Evidence shows that Arista's customers use the Accused '537 Products, including using

Sysdb, in the United States. Arista's witnesses have testified that its customers use Sysdb each

and every time they operate the Accused '537 Products, and that Arista intends for customers to

use the Arista devices this way. JX-003C (Sadana Dep. Tr.) 55-57, 75, 77-78; JX-0026C (Duda

Dep. Tr.) 201-13, 330; JX-0031C (Pech Dep. Tr.) 17-18; JX-0034C (Sigoure Dep. Tr.) 18-20,

27-28, 59, 66, 84-85; CX-0479; CX-0007C (Almeroth WS) at Q/A 231-235. These customers

include, for example, [



]. CX-0007C (Almeroth WS) at Q/A 233-235; CX-0347C ([                    ]); CX-0236C

([                                        ]); CX-0237C ([

        ]); CX-0270C ([                    ]); CX-0260C ([                    ]); CX-0482C

([                  ]); CX-0261C ([                    ]); CX-0262C ([                ]);

CX-0269C ([                        ]); CX-0266C ([                    ]); CX-0267C

([                ]); CX-0268C ([                    ]); CX-0264C ([                ]);

CX-0265C ([                    ]); CX-0331C (ANI-ITC-944_945-1602302); CX-0329C (ANI-ITC-

944_945-1614091); CX-0330C (ANI-ITC-944_945-1624373); RX-3879C (Duda WS) at Q/A 6.

---

[25] The discussion of Arista's knowledge of the infringing acts also applies to the analysis of the other patents asserted in this investigation.

The evidence cited above shows that the Accused '537 Products are used by Arista's customers to meet each limitation of each of the asserted claims in the United States and, moreover, that Arista is aware of its customers' use of Sysdb.

Arista argues that there cannot be direct infringement of the '537 patent at the time of importation because [                                                                                    ]. *See, e.g.*, RX-3909C (Hollingsworth WS) at Q/A 132-145.  Nevertheless, as discussed above in the section addressing importation issues, the record evidence shows that the accused devices [

                   ].  This alone is sufficient to establish direct infringement at the time of importation.  *See, e.g., Certain Absorbent Garments*, Inv. No. 337-TA-508, Order No. 16, 2004 WL 2251882, at *2 (Aug. 20, 2004).  In addition, [

                                      ].  *See, e.g.*, CX-1349C (Benson WS) at Q/A 15, Q/A 21-27; Benson Tr. 1438-1439, 1454, 1456, 1460-1461.  It was established that [

                   ].  *See* Benson Tr. 1448.

### 3.    Induced Infringement of the '537 Patent

Arista is liable for actively inducing third parties to infringe the '537 patent.  Arista knowingly induces infringement by encouraging, instructing, and enabling third parties to use the Accused Products in a manner that infringes the asserted claims of the '537 patent.  *See, e.g.*, CX-0007C (Almeroth WS) Q/A 275-279.  The record establishes that Arista knows and intends that [                                                                ], and that Arista encourages, aids, facilitates, and otherwise causes use of EOS.  *See* JX-0026C (Duda Dep. Tr.) 212-213;

87

CX-0273 (Arista document promoting EOS, stating that Sysdb is the "key to EOS benefits");
CX-0256C at ANI-ITC-944_945-3933367 (Sysdb provides [

                          ]).  Inasmuch as the Sysdb functionality is [

              ], Arista promotes and instructs the use of Sysdb [

       ].  JX-0026C (Duda Dep. Tr.) 212-213 ("[

      ].");  JX-0033C (Sadana Dep. Tr.) 75.  Evidence of Arista's active inducement includes
numerous Arista customer presentations, documents, and manuals.  *See, e.g.*, CX-0214;
CX-0075; CX-0273; CX-0286; CX-0673; CX-0335; CX-0328C; CX-0283C; CX-0279C;
CX-0257C; CX-0256C; CX-0274C; CX-0324C; CX-0282C; CX-0281C; CX-0280C;
CX-1031C.

     Arista's sales and promotion of switch hardware also induces infringement of the '537
patent because the hardware is designed to run the EOS software, which contains Sysdb.  *See
e.g.*, CX-0175; JX-0026C (Duda Dep. Tr.) 204-207; 212-213; 273-275; 861; JX-0033C (Sadana
Dep. Tr.) 75; Metivier Tr. 1167, 1173; CX-0035C.

### 4.    Contributory Infringement of the '537 Patent

     Arista is also liable for contributory infringement of the '537 patent.  The components
implicated in Arista's contributory infringement of the '537 are the Accused Products with EOS,
which are a material part of the claimed invention with no substantial noninfringing uses.
Arista's contention that [                                         ] does not
absolve Arista of its liability for contributory infringement.  *See, e.g.*, CX-0007C (Almeroth WS)
Q/A 249-251.  Focusing just on the switch hardware as the component, the switch hardware is
described in the claim limitations of the asserted claims of the '537 patent, and is therefore

88

material to the invention. *See* JX-0001 ('537 patent). Switch hardware, [

], is particularly necessary for independent apparatus claims 10 and 19, and is material

with respect to performing each of the steps of the limitations in independent method claim 1.

The switch hardware has no substantial non-infringing uses because it is designed for and

used exclusively with EOS, which contains the infringing Sysdb functionality. *See e.g.*,

CX-0007C (Almeroth WS) Q/A 252-273. [

], also contribute to infringement

because [

], and lack

any actual substantial noninfringing use. *See* CX-0007C (Almeroth WS) Q/A 252-273.

### D. Technical Prong of the Domestic Industry Requirement

The record evidence demonstrates that the '537 patent domestic industry products ("'537

DI Products") running Cisco's IOS XR operating system practice the asserted claims of the '537

patent. CX-0007C (Almeroth WS) at Q/A 283-293.

#### 1. Claim 19

##### a. In a router device having a processor and memory, a router operating system executing within said memory comprising:

The record evidence establishes that the '537 DI Products practice the preamble of claim

19. Dr. Almeroth testified that the '537 DI Products are router devices because they perform

routing tasks. CX-0007C (Almeroth WS) at Q/A 310-311; CX-0465 (CRS Data Sheet) at 5. For

example, the term "CRS" in the product name CRS-1 stands for "Carrier Routing System."

CX-0007C (Almeroth WS) at Q/A 311; CX-0465. The evidence further shows that the '537 DI

Products have a processor and memory, and also run a router operating system, IOS XR,

89