executing within that memory. CX-0007C (Almeroth WS) at Q/A 310-311; CX-0464 (IOS XR Fundamentals); CX-0465 at 5.

### b.    (a) a database subsystem;

The '537 patent teaches that the "centralized database system," or "database subsystem," is the part of sysDB that receives the management registration request from a subsystem and registers the subsystem for external management. JX-0001 ('537 patent) at claims 1, 10, 19. Accordingly, Dr. Almeroth testified that the database subsystem limitation of claim 19 is satisfied by the part of Cisco's SysDB that handles registering EDMs. CX-0007C (Almeroth WS) at Q/A 312; CX-0471C (IOS ENA Guide) at 15-5, 15-9, 15-11–15-12, 15-47.

### c.    (b) a plurality of client subsystems, each operatively coupled for communication to said database subsystem,

The evidence shows that IOS XR includes a number of processes, each generally focused on particular activities, *e.g.*, activities related to carrying out a particular routing protocol. CX-0007C (Almeroth WS) at Q/A 284, Q/A 313. These processes are "operatively coupled" to the subsystem in SysDB that handles EDM registration requests at least because they transmit the EDM registration requests to SysDB. *Id.* at Q/A 313. Accordingly, the '537 DI Products satisfy this claim limitation.

### d.    one of said client subsystems configured as a managing subsystem to externally manage router data

The record evidence establishes that the '537 DI Products satisfy this claim limitation under the claim constructions adopted above. In particular, it has been shown that a process in IOS XR can register as an "EDM." After registration, the EDM is in charge of, among other things, making changes to and responding to query requests for the data that it manages. CX-0007C (Almeroth WS) at Q/A 282-285, Q/A 295-307, Q/A 315; CX-0464 (IOS XR

90

Fundamentals); CX-0471C (IOS ENA Guide). Cisco documents state that "the EDM is

responsible for processing all operations relating to items in the area of the namespace that it

manages." CX-0471C at 15-5. Thus, any "create, delete, set and/or get" requests regarding that

data, called "access request[s]," that are sent by the various processes to SysDB, get "redirected

by SysDB to the EDM application" for processing by the EDM. CX-0464 at 47; CX-0471C at

15-47-15-48. As a result, other processes that want to obtain copies of or change data for which

there is a registered EDM work through SysDB to send either query requests or change requests

to the EDM, and the EDM either returns the value, or changes the value and returns it, depending

on the request. CX-0007C (Almeroth WS) at Q/A 285, Q/A 295-319; CX-0471C at 15-5, 15-9,

15-47, 15-48; CX-0464 at 47. Even though the data is externally managed, "[t]he client

accessing the items does not need to know that they are stored outside SysDB, as it uses the same

SysDB API calls to do so." CX-0471C at 15-5. "Client programs communicate with an instance

of the SysDB client library via the SysDB API." *Id.*; CX-0007C (Almeroth WS) at Q/A 285,

Q/A 295-319, Q/A 299.

Accordingly, the '537 DI Products satisfy this claim limitation because data is stored in

the EDM and managed or maintained by it there, and also because the EDM has the most

up-to-date data inasmuch as it changes its copy of the data first. CX-0007C (Almeroth WS) at

Q/A 285, Q/A 295-319.

> **e.** **upon issuing a management request to said database**
> **subsystem;**

Cisco adduced evidence showing that a process can register with SysDB to be an EDM

for a set of data it identifies in a registration request. CX-0007C (Almeroth WS) at Q/A

285-286; CX-0471C at 15-5; CX-0464 (IOS XR Fundamentals) at 47. The Cisco documentation

91

explains how a process registers as an EDM, an operation that is shown in the Cisco source code. CX-0007C (Almeroth WS) at Q/A 286-291, Q/A 294; CX-0471C (IOS ENA Guide) at 15-47; CX-0464. Accordingly, it has been shown that the '537 DI Products satisfy this claim limitation under the claim constructions adopted above.

        **f.**    **and (c) a database operatively coupled to said database subsystem, said database configured to store router configuration data**

As demonstrated by the record evidence, IOS XR's SysDB stores "config" and "oper" data, and therefore is the claimed database configured to store router configuration data. CX-0007C (Almeroth WS) at Q/A 306, Q/A 309, Q/A 320, Q/A 325-327; CX-0471C (IOS ENA Guide) at 15-2; CX-0464 (IOS XR Fundamentals) at 46. SysDB is "operatively coupled" to the database subsystem because the database subsystem is a part of SysDB. CX-0007C (Almeroth WS) at Q/A 306, Q/A 309, Q/A 320, Q/A 325-327. As explained further below, the data stored in SysDB is router configuration data. Accordingly, the '537 DI Products satisfy this claim limitation.

        **g.**    **and delegate management of router configuration data to a management subsystem that requests to manage router configuration data,**

The evidence shows that the '537 DI Products satisfy this claim limitation because they delegate management to a management subsystem. In particular, a process requests to serve as an external data manager by transmitting a registration request to SysDB. CX-0007C (Almeroth WS) at Q/A 285-286; CX-0464 (IOS XR Fundamentals) at 47; CX-0471C (IOS ENA Guide) at 15-5, 15-9, 15-11–15-12, 15-47. When SysDB processes that request and registers the process as an EDM, SysDB has delegated management to the EDM. CX-0007C (Almeroth WS) at Q/A 282-285, Q/A 295-307, Q/A 315; CX-0464; CX-0471C.

Appx888.103

h.    said router configuration data managed by said database
      system and derived from configuration commands supplied by
      a user and executed by a router configuration subsystem
      before being stored in said database.

Cisco has adduced evidence showing that the EDMs in Cisco's IOS XR externally

manage "router configuration data." Specifically, Cisco's domestic industry products externally

manage all statistical information and real-time counters for ports, which the '537 patent

identifies as types of router configuration data. *See* CX-0007C (Almeroth WS) at Q/A 326-333;

JX-0001 ('537 patent) at col. 4, lns. 20-26 ("certain router configuration information . . . [f]or

example, network interface statistic counter information"); CX-0464 (IOS XR Fundamentals) at

46-48; CX-0471C (IOS ENA Guide) at 15-8; *see also* Hollingsworth Tr. 1044-1045 ("[I]f you're

managing all the fast-changing or large amounts of data, you're going to be also managing router

configuration data.").

The evidence also establishes that the router configuration data in the '537 DI Products is

derived from user-supplied commands. The user of a Cisco switch inputs commands into the

command-line interface. These commands configure the device in various ways, *e.g.*, by starting

or stopping processes or agents, changing parameters of operation of protocols or processes the

device is running such as changing the protocol up or down status of a port, and are therefore the

claimed "configuration commands supplied by a user." CX-0007C (Almeroth WS) at Q/A

326-329, Q/A 333; CX-0464 (IOS XR Fundamentals) at 46-47; CX-0471C (IOS ENA Guide) at

15-8. Next, these configuration commands are executed by the CLI process, which is the

claimed "router configuration subsystem." CX-0007C (Almeroth WS) at Q/A 326-329, Q/A

333. The output of the CLI process's execution of the configuration commands is named "cfg"

and stored in Sysdb. *Id.* at Q/A 326-329, Q/A 333; CX-0464 at 46-48, 107-108. Sysdb then

93

requests that the managing process apply the "cfg." CX-0007C (Almeroth WS) at Q/A 326-329, Q/A 333; CX-0464 at 47-4. This application of configuration changes based on the user-issued command results in changes to the "oper" data and other fast-changing or complex data, such as route tables, statistics, and counters, which are among the types of router configuration data stored in Sysdb and managed by EDMs. CX-0007C (Almeroth WS) at Q/A 326-329, Q/A 333; CX-0464 at 46-48; CX-0471C at 15-8. Thus, the "oper" data is derived from configuration commands supplied by a user and satisfies the "router configuration data" claim limitation. CX-0007C (Almeroth WS) at Q/A 326-329, Q/A 333; CX-0464 at 46-48; CX-0471C at 15-8; *see also* CX-0007C (Almeroth WS) at Q/A 300-307 (providing a particularized example of how this process flow is implemented in IOS XR).

Accordingly, it is determined that the '537 DI Products satisfy this claim limitation.

### 2. Claim 1

Independent method claim 1 recites many limitations similar to those recited in independent apparatus claim 19, analyzed above. As with claim 19, the record evidence shows that the '537 DI Products practice all limitations of claim 1.

#### a. A method for reducing computational overhead in a centralized database system

As discussed in a previous section with respect to claim construction, the preamble claim term "reducing computational overhead" was determined to be limiting and was construed to mean "reducing the amount of computation in a centralized database system." The record evidence establishes that the '537 DI Products practice this limitation under the adopted construction because the EDM externally manages the data, thereby reducing the work to be done by SysDB. In particular, the evidence states that "the EDM is responsible for processing all

94

operations relating to items in the area of the namespace that it manages," and that "by moving the configuration-derived data into the external data managers, you add less workload into SysDB." CX-0471C (IOS ENA Guide) at 15-5, 15-9, 15-47, 15-48; JX-0054C (Kathail Dep. Tr.) 136. Accordingly, any "create, delete, set and/or get" requests regarding that data, called "access request[s]," that are sent by the various processes to SysDB, get "redirected by SysDB to the EDM application" for processing by the EDM. CX-0464 (IOS XR Fundamentals) at 47.

b. **by externally managing router data in conjunction with a centralized database subsystem, said database subsystem operatively coupled for communication with a plurality of router subsystems one of which is a first managing subsystem, comprising:**

Dr. Almeroth testified that the '537 DI Products practice this claim limitation under the adopted claim constructions for the same reasons set forth above with respect to claim 19. In particular, the external management is "in conjunction with a centralized database subsystem" because the centralized database subsystem within SysDB handles the write-mount requests in SysDB. CX-0007C (Almeroth WS) at Q/A 282-285, Q/A 295-307, Q/A 315; CX-0464; CX-0471C.

c. **a) transmitting a management registration request by said first managing subsystem to said database subsystem,**

Dr. Almeroth testified that the '537 DI Products satisfy this element for the same reasons set forth above with respect to the "management request" limitation of claim 19. CX-0007C (Almeroth WS) at Q/A 282-285, Q/A 295-307, Q/A 315; CX-0464; CX-0471C. Specifically, the claim limitation "indicating router configuration data for which said first managing subsystem is requesting to provide external management services" is satisfied because a process registers as a

95

SysDB EDM by "identif[ying] an item or subtree of the SysDB namespace for which it will act as the EDM."  CX-0007C (Almeroth WS) at Q/A 286; CX-0471C at 15-47.

> **d.**     **said registration request indicating router configuration data for which said first managing subsystem is requesting to provide external management services,**

Cisco adduced evidence establishing that the '537 DI Products practice this limitation for the same reasons set forth above with respect to the "management request" limitation of claim 19. CX-0007C (Almeroth WS) at Q/A 286; CX-0471C at 15-47.  The limitation "indicating router configuration data for which said first managing subsystem is requesting to provide external management services" is satisfied because a process registers as a SysDB EDM by "identif[ying] an item or subtree of the SysDB namespace for which it will act as the EDM." CX-0007C (Almeroth WS) at Q/A 286; CX-0471C at 15-47.  Further, the requirement that the registration request indicate "router configuration data" is met under the adopted claim constructions for the same reasons set forth above with respect to claim 19.  CX-0007C (Almeroth WS) at Q/A 286.

> **e.**     **said router configuration data managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database;**

The record evidence demonstrates that the '537 DI products practice this limitation under the adopted claim constructions.  In particular, Dr. Almeroth testified that the claimed router configuration data is "managed by said database system and derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database" for the reasons set forth with respect to claim 19 above.  CX-007C (Almeroth WS) at Q/A 326-333; CX-0464; CX-0471C.

      f.      **b) receiving said management registration request by said database subsystem;**

Dr. Almeroth testified that, in Cisco's IOS XR, the agents send the request to serve as an EDM to SysDB. CX-0007C (Almeroth WS) at Q/A 285-286, Q/A 320-324; CX-0471C at 15-5; CX-0464. The part of SysDB that receives the mount request in order to perform the mount is the "database subsystem." *See* CX-0007C (Almeroth WS) at Q/A 285-286, Q/A 290-292, Q/A 320-324. Accordingly, it is determined that the '537 DI Products practice this limitation.

      g.      **and c) registering said first managing subsystem for external management by said database subsystem.**

Dr. Almeroth testified that the '537 DI Products practice this limitation. Specifically, he testified that, in Cisco's IOS XR, the agents send the request to serve as an EDM to SysDB. CX-0007C (Almeroth WS) at Q/A 285-286, Q/A 320-324; CX-0471C at 15-5; CX-0464. The part of SysDB that receives the mount request in order to perform the mount is the "database subsystem." *See* CX-0007C (Almeroth WS) at Q/A 285-286, Q/A 320-324.

    **3.**    **Claim 2**

      a.      **The method of claim 1 further comprising**

As set forth above, the record evidence shows that the '537 DI Products satisfy the limitations of claim 1.

      b.      **maintaining router configuration data using a tree structure having a plurality of tuples by said database system.**

As Dr. Almeroth testified, SysDB stores information in a tree format, one of the described embodiments for the database. CX-0007C (Almeroth WS) at Q/A 373; CX-0471C at 15-2; CX-0464 at 46.

It is therefore determined that the '537 DI products satisfy the limitations of claim 2.

97

4.      **Claim 8**

a.      **The method of claim 1 further comprising:**

As set forth above, the record evidence shows that the '537 DI Products satisfy the

limitations of claim 1.

b.      **(a) transmitting a change request for router data by a
         requesting subsystem to said database subsystem;**

The evidence shows that the accused products satisfy this limitation. As Dr. Almeroth

testified, the '537 DI Products transmit a change request for router data by a requesting

subsystem to said database subsystem. CX-0007C (Almeroth WS) at Q/A 378-383. As

explained above, when a process wants to make a change to data, it sends that change request to

SysDB. *See id.*

c.      **(b) receiving said change request by said database subsystem;**

Dr. Almeroth testified that Sysdb receives the change request identified above.

CX-0007C (Almeroth WS) at Q/A 378-383. This limitation is therefore satisfied by the '537 DI

Products.

d.      **(c) determining whether said router data is externally managed
         by a second managing subsystem; and**

The evidence establishes that the '537 DI Products satisfy this claim limitation. Dr.

Almeroth testified that Sysdb determines whether the router data to be changed is externally

managed by a second managing subsystem. CX-0007C (Almeroth WS) at Q/A 378-383.

Inasmuch as there is no requirement that the "second managing subsystem" manage the same

data as the "first managing subsystem," the first managing subsystem (*e.g.*, the STP process)

serves as EDM for STP data, and a second managing subsystem (*e.g.*, the OSPF process) serves

as EDM for OSPF data. CX-0007C (Almeroth WS) at Q/A 378-383. When a change is

requested for that OSPF data by the claimed "requesting subsystem," Sysdb checks whether that data is externally managed and learns that it is externally managed by the OSPF process, *i.e.*, the "second managing subsystem." *See* CX-0464; CX-0471C.

> e. **(d) requesting a data change for said router data to said second managing subsystem by said database subsystem when said database subsystem determines said router data is externally managed by a second managing subsystem.**

Dr. Almeroth testified that the claim limitation is satisfied because, when an EDM manages data, SysDB "redirects" the change request to the EDM so that the EDM carries out the change request as described above. CX-0007C (Almeroth WS) at Q/A 378-383.

### 5. Claim 10

Asserted claim 10 of the '537 patent is nearly identical to asserted claim 1, with the exception of the claim terms "program storage device readable by a machine, tangibly embodying a program of instructions executable by the machine" and "registering said first managing subsystem for external management by said managing subsystem." The evidence shows that the '537 DI Products contain the claimed "program storage device readable by a machine, tangibly embodying a program of instructions executable by the machine." *See* CX-0465 at 5; CX-0464. Further, processes within IOS XR register for external management by sending a registration request to SysDB and additionally by performing some related tasks after SysDB receives the registration request. CX-0007C (Almeroth WS) at Q/A 294, Q/A 299.

Therefore, for these reasons and the reasons discussed above with respect to claim 1, it is determined that the '537 DI Products satisfy all limitations of claim 10.

6.    **Claim 11**

Claim 11 depends from claim 10, and recites an additional limitation that is identical to a limitation recited in claim 2. Inasmuch as the '537 DI Products practice the limitations of claims 10 and 2, they also practice the limitations of claim 11.

7.    **Claim 17**

Claim 17 depends from claim 10, and recites additional limitations that are identical to limitations recited in claim 8. Inasmuch as the '537 DI Products practice the limitations of claims 10 and 8, they also practice the limitations of claim 17.

E.    **Validity**

Arista relies on certain prior art references to argue that the asserted claims of the '537 patent are invalid. While there are several differences between the references and combinations, none of the cited prior art shows external management, a requirement of all the claims of the '537 patent. Instead, as discussed further below, each reference relies on some sort of centralized management.

For example, the concept of external management does not appear anywhere in Kathail '752 or Kathail '723. Prager '918 similarly discloses a system where a centralized manager machine manages the data and provides updates to remote subscribers. Hendrickson '646 discloses a centralized configuration database that provides updates to a set of software components. Moreover, Traversat '715 discloses a centralized management server that provides data to client devices.

100

1. **Anticipation**

    a. **U.S. Patent No. 5,838,918 ("Prager '918")**

Prager '918 involves a manager machine with a central configuration database that communicates with remote subscriber machines. As an initial matter, Arista's expert does not address the requirement in all asserted claims that the router configuration data be "derived from configuration commands supplied by a user and executed by a router configuration subsystem before being stored in said database." *See* RX-3273 (Hollingsworth WS) at Q/A 113-119. This omission is fatal to Arista's allegation of anticipation. Further, as Dr. Almeroth testified, Prager '918 discloses a fundamentally different system from the '537 patent. CX-1217C (Almeroth WS) at Q/A 102-103. In particular, Prager '918 does not disclose externally managing data by a subsystem. Rather, the "management" described in Prager '918 is carried out by the "manager machine." RX-3278 (Prager '918) at Fig. 4. Subscribers do not manage the data, but instead store data and receive updates from the central database, similar to the prior art centralized-management systems distinguished by the '537 patent. *Id.* at col. 6, lns. 30-39; CX-1217C (Almeroth RWS) at Q/A 105. Prager '918 similarly fails to disclose a "management registration request," inasmuch as devices only send subscription requests to receive data, not manage it. Prager '918 also does not teach or render obvious "router configuration data" under any party's construction. Prager '918 describes a distributed computer system, not routers, switches, bridges, or other networking equipment. CX-1217C (Almeroth RWS) at Q/A 111; RX-3278 at Figs. 1-4. As Dr. Almeroth testified, switches, bridges, routers, and other networking devices are very different from the types of devices shown in Prager '918. CX-1217C (Almeroth RWS) at Q/A 111. Moreover, storing data at subscriber machines as

101

taught by Prager '918 does not relieve any of the computational burden of the centralized database. CX-1217C (Almeroth RWS) at Q/A 107.

### b.   U.S. Patent No. 6,704,752 ("Kathail '752")

Kathail '752 is one of named inventor Mr. Kathail's prior art patents regarding the use of a centralized database to manage data. The abstract of Kathail '752 confirms that it relates to management by a centralized database: "The centralized database system manages a storage structure (database tree) having a plurality of tuple nodes, where each tuple node contains configuration data for the router." RX-3282 (Kathail '752) at Abstract. The concept of external management, a key concept on the '537 patent, does not appear in Kathail '752. Indeed, the '537 patent distinguishes the '752 patent in the background of the invention section. JX-0001 ('537 patent) at col. 2, lns. 42-60. The '537 patent explains that its invention is designed to overcome drawbacks associated with the centralized management provided with prior systems such as Kathail '752. *Id.*

Nevertheless, Arista takes the position that Mr. Kathail's prior patents disclose external management. First, Arista argues that Kathail '752 "teaches the use of external data stores, which are used to maintain data outside of the centralized database," and that "[a] tuple in the centralized database sysDB may include a pointer that points to an external data store which contains the value for the tuple." *See* RX-3273C (Hollingsworth WS) at Q/A 201. As Dr. Almeroth testified, this excerpt does not teach external management, but rather describes an extension to SysDB such as additional memory space that operates as if it were part of SysDB. CX-1217C (Almeroth RWS) at Q/A 142-145. In particular, auxiliary storage space that is used by SysDB is not enough to show external management by a managing subsystem because external management in the '537 patent involves more than storing data. *Id.*

102

Arista also argues that "a subsystem may store a local copy of the configuration data locally within the subsystem and periodically check the sysDB 26 for current information." *See* RX-3273C (Hollingsworth WS) at Q/A 201. This argument fails for the reason discussed above, that external storage is not external management. In Kathail '752, the centralized database manages the data and transactions on the data, not on an external subsystem. CX-1217C (Almeroth RWS) at Q/A 142-145.

Arista's expert Dr. Hollingsworth also cites the portion of Kathail '752 discussing the use of a verification handler to support Arista's anticipation argument. *See* RX-3273C (Hollingsworth WS) at Q/A 201 (citing CX-1150 at col. 13, lns. 25-40). The '537 patent, however, explicitly discusses verification handling in the background, thereby distinguishing it from external management. JX-0001 ('537 patent) at col. 2, ln. 58 – col. 3, ln. 2. Other portions of the '537 patent also distinguish verification from external management. *See, e.g., id.* at Fig. 8 (calling a verification handler in box 460 regardless of whether the data is externally managed); CX-1217C (Almeroth RWS) at Q/A 142–145.

### c. U.S. Patent No. 6,728,723 ("Kathail '723")

Kathail '723 is also a prior art patent of named inventor of Mr. Kathail. It concerns a centralized database that manages data. Arista's anticipation arguments for Kathail '723 are similar to its anticipation arguments for Kathail '752, and must fail for the same reasons discussed above. CX-1217C (Almeroth RWS) at Q/A 158-177. In particular, the '537 patent discusses the external verifications of Kathail '723 in the background, and distinguishes those external verifications from external management. JX-0001 ('537 patent) at col. 2, ln. 58 – col. 3, ln. 2; col. 3, lns. 13-19.

103

d.      **U.S. Patent No. 5,933,646 ("Hendrickson '646")**

Hendrickson '646 discloses a central "software manager" that uses a central configuration database to manage various software components on a system. RX-3276 (Hendrickson '646) at Abstract. The software components communicate with the software manager server using plug-in modules. *Id.* at col. 6, lns. 8-12. No management is done by the external software components or plug-ins. CX-1217C (Almeroth RWS) at Q/A 179-183. Instead, the central software manager is responsible for maintaining the central configuration database, and the software components receive information and updates through plug-ins. *Id.* For example, the software manager server carries out the functions to change the data, as was done in the prior art discussed in the background of the '537 patent. RX-3276 at col. 6, lns. 15-18; col. 8, lns. 29-30. Hendrickson '646 also does not teach or render obvious "router configuration data" under any party's construction. The system described in Hendrickson '646 is directed at a software manager, and not routers, switches, bridges, or other networking equipment. CX-1217C (Almeroth RWS) at Q/A 190.

Arista also uses Hendrickson '646 in combination with other references to argue that the asserted '537 claims are rendered obvious. As with Prager '918, however, the words "router," "switch," "bridge," and "networking" are not found in Hendrickson '646. As such, the discussion of computer systems in Hendrickson '646, without any specific discussion of networking devices, would not teach or render obvious to one of ordinary skill in the art that the system of Hendrickson '646 could be applied to routers. *Id.* Further, as with Prager '918, Arista fails to explain how Hendrickson '646 discloses router configuration data "derived from configuration commands supplied by a user and executed by a router configuration subsystem

104

before being stored in said database." *See* RX-3273 (Hollingsworth WS) at Q/A 323-329. Without such analysis, Arista cannot meet its burden to show invalidity.

### 2. Obviousness

#### a. NSFNET in Combination with Prager '918, Hendrickson '646, or Traversat '715

Arista argues that the combination of NSFNET with Prager, Hendrickson, or Traversat satisfies the router configuration data element. NSFNET is a report regarding the NSFNET network research project that designed and studied a backbone network infrastructure linking NSF-sponsored supercomputing centers. RX-3284. As Dr. Almeroth testified, a person of ordinary skill would not have been motivated to combine NSFNET with the references listed above solely because NSFNET discusses routers. CX-1217C (Almeroth RWS) at Q/A 114-117, Q/A 208-210, Q/A 252-254. Moreover, as discussed above with respect to Arista's anticipation arguments, the combinations each lack external management, router configuration data derived from commands, a management registration request, and reducing computational overhead.

#### b. Cisco '010 in Combination with Prager '918, Hendrickson '646, or Traversat '715

Arista argues that the combination of Cisco '010 with Prager, Hendrickson, or Traversat satisfies the router configuration data element. Cisco '010 is a patent relating to techniques for handling data in a distributed computer network, where a router process runs on each computer in the network. RX-3275. Cisco '010 was considered by the examiner during prosecution of the '537 patent. JX-0007. As Dr. Almeroth testified, a person of ordinary skill in the art would not have been motivated to combine Cisco with the references listed above solely because Cisco discusses routers. CX-1217C (Almeroth RWS) at Q/A 118-121, Q/A 211-213, Q/A 255-257. Moreover, as discussed above with respect to Arista's anticipation arguments, the

105

combinations each still lack external management, configuration data derived from commands, and reducing computational overhead, and a management registration request.

### c. Brodersen '752 in Combination with Hendrickson '646 or Traversat '715

Arista argues that the combination of Brodersen '752 with Hendrickson or Traversat satisfies the external management element, and in combination with Traversat satisfies the alleged reducing computational overhead requirement. Brodersen '752 describes a system for collecting, storing and retrieving data that uses a centralized database management scheme. RX-3286. It discusses a "master database server" or "central database" in conjunction with several "computer systems." *Id.* at Abstract; Figs. 9, 4-9. Brodersen does not describe operation of subsystems within a single router operating system running on a single device. RX-3286 at Abstract; Figs. 1-10, 1-31. It is also therefore incompatible with Hendrickson '646, which concerns an operating system. In any event, Arista does not identify why one of ordinary skill would have combined these references, when there are numerous ways to handle router configuration data, both with and without a centralized database. *See* CX-1217C (Almeroth RWS) at Q/A 193-199, Q/A 239-244. Moreover, as discussed above with respect to Arista's anticipation arguments, the combinations each still lack router configuration data, configuration commands, a management registration request, reducing computational overhead (in the Hendrickson combination), and a plurality of subsystems (in the Traversat combination).

### d. James '977 in Combination with Hendrickson '646 or Traversat '715

Arista argues that the combination of James '977 with Hendrickson or Traversat satisfies the external management element, and in combination with Traversat satisfies the alleged reducing computational overhead requirement. James '977 describes a "master database"

106

managed by a central server, and caching data stored there in various separate client devices involving the use of time stamps. RX-3285. James does not describe operation of subsystems within a single router operating system running on a single device. *Id.* It is also therefore incompatible with Hendrickson '646, which concerns an operating system on a computer. In any event, Arista does not identify why one of ordinary skill would have combined these references, when there are numerous ways to handle router configuration data, both with and without a centralized configuration database. *See* CX-1217C (Almeroth RWS) at Q/A 200-207, Q/A 245-250. Moreover, as discussed above with respect to Arista's anticipation arguments, the combinations each still lack router configuration data, configuration commands, a management registration request, reducing computational overhead (in the Hendrickson combination), and a plurality of subsystems (in the Traversat combination).

### e.    Prager '918 in Combination with Traversat '715 – Claims 2 and 11

Arista further argues that Prager '918 can be combined with Traversat '715 for the limitation in claims 2 and 11 regarding the use of a tree structure. As Dr. Almeroth testified, there are numerous different types of data structures that can be used (*e.g.*, trees, tables, pointers, lists, records, queues, etc.), and Arista's expert Dr. Hollingsworth has not provided any reason to explain why one of ordinary skill would have combined Prager '918 with Traversat '715. CX-1217C (Almeroth RWS) at Q/A 126-129. In any event, even if these references were combined, they still do not address the numerous deficiencies with Prager '918 identified above.[26]

---

[26] The Joint Outline of Issues specifies that one of the issues to be decided in this initial determination is "[w]hether Complainant has met its burden to demonstrate any secondary considerations of nonobviousness for any asserted claim of the '537 patent," and identifies pages

107

### 3. Arguments Relating to 35 U.S.C. § 112

#### a. Indefiniteness – Claims 1 and 10

For the reasons stated in the claim construction section above, the term "said database" in claims 1 and 10 is not indefinite.[27] In particular, Dr. Almeroth's testimony confirms that a person of ordinary skill in the art would be informed with reasonable certainly that the claim term "said database" recited in claims 1 and 10 refers to the "database system." *See* CX-0007C (Almeroth WS) at Q/A 78, Q/A 81; *see also* Hollingsworth Tr. 1040-1041.

#### b. Written Description and Enablement – Claims 8, 9, 17, and 18

Arista's expert Dr. Hollingsworth has taken the position that claims 8, 9, 17, and 18 are invalid for failure to satisfy the written description and enablement requirements because the '537 patent "never discloses how two 'managing subsystems'—namely the first management subsystem and the second managing subsystem—can concurrently externally manage the same data." *See* RX-3273C (Hollingsworth WS) at Q/A 355. This argument is incorrect for several reasons.

First, this invalidity argument relies on the assumption that two managing subsystems externally manage the same data. This assumption is incorrect because it is inconsistent with the claims and specification of the '537 patent, as well as the understanding of one of ordinary skill in the art. In particular, nothing in the claim language refers to two managing subsystems externally managing the same data. CX-1217C (Almeroth RWS) at Q/A 279-282. Instead,

---

135-45 of complainant's post-hearing brief as addressing this issue. Joint Outline of Issues at 5. Yet, complainant's brief does not contain arguments regarding secondary considerations of nonobviousness with respect to the '537 patent, and they will not be addressed in this initial determination.

[27] Asserted claims 2, 8, 9, 11, 17, and 18 depend from claims 1 and 10, and are not indefinite for the reasons set forth with respect to claims 1 and 10.

claims 8 and 17 describe how a requesting subsystem transmits a change request to the database subsystem. The database subsystem will then determine whether the requesting subsystem is requesting data externally managed by another subsystem. JX-0001 ('537 patent) at claim 8. This process is illustrated in detail in Figure 8 of the '537 patent, and is described in the associated section of the specification. *Id.* at Fig. 8; col. 13, ln. 48 – col. 15, ln. 11. As such, it is determined that claims, 8, 9, 17, and 18 are both supported by the written description and enabled. *See* CX-1217C (Almeroth RWS) at Q/A 279-282.

Second, the claims are enabled and described by the specification at column 13, line 48 through column 15, line 11. The claims are also illustrated in Figure 8. As Dr. Almeroth testified, a person of skill in the art would be able to use the teaching of the '537 patent and enable external monitoring of the same attribute in selected situations without undue experimentation. CX-1217C (Almeroth RWS) Q/A 279-282. For example, Arista's own documentation demonstrates techniques by which this can be accomplished. CX-0435C.

Therefore, it is determined that claims 8, 9, and 17 are not invalid for failure to satisfy the written description and enablement requirements of 35 U.S.C. § 112.

### 4. Inventorship

Arista argues that the asserted claims of the '537 patent are invalid for failing to list Mr. Andrew Valencia as an inventor. The record evidence establishes, however, that Mr. Kathail is the sole inventor of the '537 patent.

In support of its inventorship position, Arista identifies Mr. Valencia's involvement in creating the centralized database in the prior art Cisco patents. Nevertheless, Arista has not adduced evidence to establish that Mr. Valencia ever conceived of external management of

router configuration data, which is the claimed invention of the '537 patent. Indeed, Mr.

Valencia testified that he had never heard of the concept of external data management:

> Q. Have you ever heard of the concept of a term called "EDMs" or "external data managers" when used with respect to SysDB?
>
> A. That sounds completely unfamiliar in the context of SysDB.

JX-0038C (Valencia Dep. Tr.) 41.

Mr. Valencia's involvement in the development of the centralized database does not

warrant the conclusion that he should be named as an inventor on the '537 patent, inasmuch as

the evidence does not show that he made a significant contribution to the conception of one or

more of the claims of the patent. *See Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352,

1358-59 (Fed. Cir. 2004). Instead, the evidence adduced by Arista shows that Mr. Valencia and

Mr. Kathail worked together on the concept of a centralized database to manage data in an

operating system of a network device, a concept that is claimed in U.S. Patent Nos. 6,704,752,

6,952,703, and 6,728,723. *See* JX-0038C (Valencia Dep. Tr.) at 41. Accordingly, Mr. Valencia

was properly named as a co-inventor on these patents, which are prior art to the '537 patent. By

contrast, the invention claimed in the '537 is external management of the centralized database, to

which Mr. Valencia did not contribute significantly. Thus, it is determined that the '537 patent is

not invalid for failure to name the correct inventors.

## VI.    The '597 (ProcMgr) Patent

### A.    Claim Construction

#### 1.    Level of Ordinary Skill

Cisco's expert testified that a person of ordinary skill in the art at the time of invention of

the '597 patent would have at least a Bachelor of Science degree, or its equivalent, in electrical

engineering, computer engineering, computer science, or a related field and either a Master of

110

Science degree, or its equivalent, in one of those fields or approximately two years of related experience in the field of network devices. *See* CX-0001C (Wicker WS) at Q/A 29.

Arista's expert testified that a person of ordinary skill in the art would have an undergraduate degree in computer science, computer engineering, electrical engineering, or a closely related field, along with at least 2-3 years of experience working in the field of computer networks and systems. In addition, superior education or work experience could compensate for a deficiency in the other. *See* RX-3273C (Hollingsworth WS) at Q/A 361-363.

Both experts for Cisco and Arista agree that a person of ordinary skill in the art would have at least an undergraduate degree in computer science, computer engineering, electrical engineering, or a related field.

Cisco's expert also opines that a person of ordinary skill in the art would have a Master of Science degree, an additional requirement that could be satisfied with two years of experience in a relevant field. This is consistent with the opinion of Arista's expert that a person of ordinary skill in the art would have 2-3 years of experience in a relevant field. The experts' proposals differ in the particular field in which that experience should be gained. Cisco's expert proposes the field of "network devices," whereas Arista's expert proposes the field of "computer networks and systems."

In view of the expert testimony, it is determined that a person having ordinary skill in the art of the '597 patent is a person with a Bachelor of Science degree in computer science, computer engineering, electrical engineering, or a closely related field, along with at least 2-3 years of experience working in the field of network devices or computer networks and systems.

111

2.      **Disputed Claim Terms**

a.      **"a change to a configuration" (claim 1) / "a change in configuration" (claims 39 and 71)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "a change to the state of the device" | a change to the settings of the subsystem specified by the user | No construction necessary. The Staff's original proposed construction, if construction is necessary, was "a change to the state of the device." The Staff's revised construction is "a change to the settings of the subsystem" |

The claim term "a change to a configuration" is recited in asserted claim 1 of the '597 patent, and the claim term "a change in configuration" is recited in asserted claims 39 and 71. As proposed by the Cisco, the terms "a change to a configuration" and "a change in configuration" are construed to mean "a change to the state of the device," a construction that reflects the ordinary meaning of the term as understood by a person having ordinary skill in the art.

Cisco's expert Dr. Wicker testified that the phrases "a change to a configuration" and "a change in a configuration" are plain terms that are easily understood by one of ordinary skill in the art in light of the claims and specification. CX-0001C (Wicker WS) at Q/A 67. In particular, including because the '597 patent is generally directed at an invention for increasing the security of a device, a person of ordinary skill in the art would understand the patent's detected configuration changes to encompass changes related to "any compromise" of a device. CX-0001C (Wicker WS) at Q/A 67-70; JX-0004 ('597 patent) at col. 3, lns. 63-66. For example, the patent describes the logging module detecting software modifications, anomalous conditions,

112

hardware resets, user interaction through the command line interface, and the changes made by the device itself, such as a device setting its own source IP and MAC address.  JX-0004 ('597 patent) at col. 1, lns. 30-33; col. 14, lns. 52-54; col. 4, lns. 35-38; col. 9, lns. 18-21; col. 5, lns. 33-36.  Indeed, the '597 patent uses the term "state" and "configuration" interchangeably, indicating that the term "configuration" is used broadly to encompass the state of the device.  CX-0001C (Wicker WS) at Q/A 68; JX-0004 ('597 patent) at col. 13, ln. 50 – col. 14, ln. 10; col. 11, ln. 60 – col. 12, ln. 6.  For example, the patent explains that reset of a network device is a reset to a predetermined known "state" or "configuration":

> At step 525, the network device is reset to a predetermined, "known" state. . . .  At step 535, the security monitors receive the broadcast and determine that there has been a change in the network device's configuration and that the network device has been reset to a predetermined, known configuration.

JX-0004 ('597 patent) at col. 11, ln. 60 – col. 12, ln. 4.

Moreover, the patent explains that the reset of a device, *i.e.*, a reset to a "predetermined, known state," "should be logged as a configuration change."  JX-0004 ('597 patent) at col. 4, lns. 35-38; col. 11, ln. 60 – col. 12, ln. 4.  Thus, as Dr. Wicker explained, a person of ordinary skill in the art would understand the '597 patent's use of the term "configuration" to broadly encompass the state of the claimed communication device.  *See* CX-0001C (Wicker WS) at Q/A 67; Wicker Tr. 322-326.  Therefore, the patent's use of "configuration" broadly encompasses all types of changes to a variety of different aspects of the device.

In contrast, Arista's proposed construction narrows the term "configuration" to "settings . . . specified by [a] user," a modification that is not supported by the intrinsic evidence.  In particular, the term "settings" does not appear in the '597 patent or file history.  Further, as Dr. Wicker testified, a person of ordinary skill in the art would not restrict "configuration" to

113

"settings" in the context of the '597 patent because nothing in the intrinsic record supports limiting the claim scope in such a way. CX-0001C (Wicker WS) at Q/A 73.

The second part of Arista's proposed construction, which limits the changes that can be detected to those specified by a "user," also does not comport with the intrinsic evidence. *See* CX-0001C (Wicker WS) at Q/A 73-75. In particular, the '597 patent specification discloses embodiments where configuration changes are made by the network device itself, rather than by a user. For example, the specification describes situations in which the device itself changes its own IP and MAC address, thereby triggering a log entry and a potential security event. JX-0004 ('597 patent) at col. 5, lns. 33-36; CX-0001C (Wicker WS) at Q/A 73-75. Other configuration changes, such as hardware resets, are also accomplished without being specified by a user. JX-0004 ('597 patent) at col. 4, lns. 35-38; CX-0001C (Wicker WS) at Q/A 73. Moreover, inasmuch as a stated goal of the '597 patent is to alert an administrator when a communications device is compromised by an attacker, the detected "configuration" changes naturally should include any type of attack, not merely changes to a device's "settings" specified by a user. CX-0001C (Wicker WS) at Q/A 73; *see* JX-0004 ('597 patent) at col. 3 lns. 63-66.

### b.    "a logging module" (claims 1 and 39)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "a module configured to detect changes" | A module to generate a log record | "a module configured to detect changes" |

The claim term "a logging module" is recited in asserted claims 1 and 39 of the '597 patent. Cisco originally proposed a construction of "a module configured to detect changes," a

construction also proposed by the Staff. *See* Staff Br. at 51-52. Subsequently, Cisco stated in its

post-hearing brief:

> Although the parties initially disputed this construction, it is no longer
> relevant to any claim or defense. Thus, while Cisco agrees that Staff's
> construction appropriately captures that the "logging module" be
> "configured to detect changes," Cisco will adopt Arista's construction of
> "a module to generate a log record" to streamline the investigation.

Compl. Br. at 153.

The claim term "a logging module" is therefore construed to mean "a module to generate

a log record," a construction that is supported by the patent specification. For example, in

describing Figure 1, the specification states: "Logging module 120 determines a configuration of

the subsystem 115, detects a change in the configuration of the subsystem 114 and indicates that

the change has occurred." JX-0004 ('597 patent) at col. 6, lns. 7-10.

      c.     **"a logging module, coupled to said subsystem" (claim 1) / "a logging module is coupled to said subsystem" (claim 39)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "a logging module operably connected to said subsystem" / "a logging module is operably connected to said subsystem" | a logging module connected to the subsystem without using a central storage location | No construction necessary. If construction is necessary, "a logging module connected to said subsystem" / "a logging module is connected to said subsystem" |

The claim term "a logging module, coupled to a said subsystem" is recited in asserted

claim 1 of the '597 patent, and the related term "a logging module is coupled to said subsystem"

is recited in asserted claim 39. The evidence demonstrates that the meaning of these terms is

clear to a person having ordinary skill in the art, and that they do not need further construction.

115

To the extent construction of these related terms is necessary, intrinsic evidence supports a construction of "a logging module connected to said subsystem" / "a logging module is connected to said subsystem." For example, Figure 1 of the '597 patent shows a logging module connected to a subsystem and the patent shows no evidence of redefining the words. JX-004 ('597 patent) at Fig. 1.

As Dr. Wicker testified, the phrase "coupled to said subsystem" is easily understood by a person of skill in the art of the '597 patent in light of the claims and specification. CX-1216C (Wicker RWS) at Q/A 51; Wicker Tr. 371-372. In particular, a person having ordinary skill would understand from reading the specification that two components can be "coupled" to each other despite the presence of "intermediate components":

> The foregoing described embodiment wherein the different components are contained within different other components (e.g., the various elements shown as components of communications device 100). It is to be understood that such depicted architectures are merely examples, and that in fact many other architectures can be implemented which achieve the same functionality. In an abstract, but still definite sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermediate components. Likewise, any two components so associated can also be viewed as being "operably connected," or "operably coupled," to each other to achieve the desired functionality.

JX-0004 ('597 patent) at col. 6, lns. 35-51; *see* Hollingsworth Tr. 1278; CX-1216C (Wicker RWS) at Q/A 51.

116

### d. "broadcasting" (claims 29, 63, and 64) / "broadcast" (claim 73)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| "transmitting data to one or more devices without specifying what device(s) will ultimately receive the data" | "transmitting/transmission to one or more receivers" | No construction necessary. If construction is necessary, "transmitting/transmission to one or more receivers" |

The claim term "broadcasting" is recited in asserted claims 29, 63, and 64 of the '597 patent, and the related claim term "broadcast" is recited in asserted claim 73. As proposed by Arista, the terms "broadcasting" and "broadcast" are construed to mean "transmitting to one or more receivers" and "transmission to one or more receivers," respectively. This construction is consistent with the intrinsic evidence, and is also supported by the Staff. *See* Staff Br. at 53-54.

Specifically, according to the patent specification, a broadcast occurs when information is sent to one or more devices. JX-0004 ('597 patent) at col. 7, lns. 38-42; col. 11, lns. 46-51; col. 11, lns. 64-67.

### B.    Literal Infringement Analysis

As discussed in further detail below, the evidence adduced at the hearing fails to show that the Accused '597 Products infringe the asserted claims of the '597 patent.

Specifically none of the Accused '597 Products infringe asserted independent claims 1, 39, and 71 because they do not satisfy the "detect a change to a configuration of said subsystem claim limitation." Inasmuch as the asserted dependent claims all depend from claims 1, 39, 71, none of Accused '597 Products infringe the dependent claims for the same reason.

117

In addition, none of the Accused '597 Products infringe dependent claim 72 because they do not satisfy the "determine the configuration" claim limitation.[28]

### 1. The Accused Products Do Not Detect a Change to a Configuration of a Subsystem

Asserted claim 1 requires that the logging module "detect a change to a configuration of said subsystem." JX-0004 ('597 patent) at col. 16, lns. 49-50. Similarly, asserted claims 39 and 71, the other two independent claims at issue, recite "detect/[ing] a change in a configuration of a subsystem." As discussed above, these claim terms are construed to mean "a change to the state of the device." The evidence shows that the accused Arista products do not detect a change in configuration under the adopted construction of that term.

At the hearing, Cisco's expert Dr. Wicker testified that he identifies three mechanisms within ProcMgr as satisfying the limitation of detecting a change in configuration. Wicker Tr. at 257-258. Specifically, these mechanisms are: [

]. CX-0001C (Wicker WS) at Q/A 113. The three mechanisms were illustrated during Dr. Wicker's testimony, and this illustration is reproduced below:

---

[28] Inasmuch as the accused products do not literally infringe the '597 patent, there can be no finding that Arista is liable for indirect infringement of the '597 patent.

[



]

RDX-1001C (red numerals added).

None of these three mechanisms satisfies the limitation of detecting a change in configuration. The evidence shows that, regardless of the mechanism, ProcMgr [

]. RX-3912C (Duda RWS) at Q/A 49-50. [

]. *Id.* Moreover, ProcMgr, by design, [                                    ]. *Id.* Indeed, the evidence demonstrates that ProcMgr [

]. *Id.* at Q/A 51. In addition, [

]. *Id.* [

]. *Id.* Further, [

]. *Id.* at Q52-53. [

]. *Id.* at Q54.  Instead, [

        ]. *Id.*

    **a.**    **[**                                **] Do Not**

        **"Detec[t] a Change in Configuration"**

[                                    ] are related and work together to monitor for agent failures.  Wicker Tr. 265.  As Dr. Wicker testified, [

        ].  Wicker Tr. 258-259, 261, 279.  [

        ].  Wicker Tr. 259, 280; RX-3912C (Duda RWS) at Q/A 43.  [

        ].  RX-3912C (Duda RWS) at Q/A 43.  [

        ].  *Id.* at Q/A 43, Q/A 46-47; Wicker Tr. 262-265.

    ProcMgr's [

    ] does not constitute detecting whether the agent's configuration has changed as claimed in the '597 patent.  RX-3912C (Duda RWS) at Q/A 8, Q/A 46-47, Q/A 50-53; Hollingsworth Tr. 1285-1286.  Instead, it constitutes ProcMgr [

        ].  RX-3912C (Duda RWS) at Q/A 8, Q/A 46-47, Q/A 50-53; *see* Hollingsworth Tr. 1285-1286.

    **b.**    **[**                              **] Does Not Detect a Change to**

        **a Subsystem**

    Contrary to Cisco's infringement arguments, the evidence shows that ProcMgr does not satisfy the "detect a change to a configuration of said subsystem" claim limitation when it

determines [

               ]. *See* RX-3912C (Duda RWS) at

Q/A 43, Q/A 50; RX-3909C (Hollingsworth RWS) at Q/A 245; Wicker Tr. 293-294.  Indeed, the

evidence demonstrates that the [

      ]. RX-3912C (Duda RWS) at Q/A 43, Q/A 50; Hollingsworth Tr. 1272.

Moreover, Cisco's' expert Dr. Wicker testified that the files in the [

        ]. *See* CX-0001C (Wicker WS) at Q/A 125, Q/A 143-44.

  Evidence adduced at the hearing establishes that the [

        ]. RX-3912C (Duda RWS) at Q/A 43, 50; RX-3909C

(Hollingsworth RWS) at Q/A 245; Wicker Tr. 293-294.  [


     ]. RX-3909C (Hollingsworth RWS) at Q/A 245; RDX-1123; CX-0001C (Wicker WS)

at Q/A 128.  For example, [

         ]. Hollingsworth Tr. 1288-1289.  That attribute, found in

the [

        ]. Hollingsworth Tr. 1283-1284.  Rather, [

       ]. *Id.* Therefore, to the extent ProcMgr [


     ].

### 2. The Accused Arista Products Do Not Determine a Configuration (Claim 72)

  Contrary to Cisco's arguments, the Accused '597 Products do not infringe claim 72

because they do not satisfy the claim limitation "determine the configuration."  In particular,

121

Cisco's expert Dr. Wicker testified that this limitation is satisfied because "[

].ˮ *See* Compl. Br. at 181-82;

CX-0001C (Wicker WS) at Q/A 180.

The evidence shows, however, that ProcMgr does not determine the configuration of the

identified subsystems, *i.e.*, agents.  RX-3909C (Hollingsworth RWS) at Q/A 273; RX-3912C

(Duda RWS) at Q/A 49-50.  As above, [

].  RX-3912C (Duda RWS) at Q/A 43, 5 Q/A 0; RX-3909C (Hollingsworth

RWS) at Q/A 245, Q/A 273.  [

].  RX-3912C (Duda RWS)

at Q/A 43; RX-3909C (Hollingsworth RWS) at Q/A 246, Q/A 273.  Moreover, [

].  RX-3909C (Hollingsworth RWS) at

Q/A 255-261, Q/A 273.  None of these functionalities is determining a change in configuration

of an agent.  *See* RX-3909C (Hollingsworth RWS) at Q273.  Accordingly, the Accused '597

Products do not determine a configuration as required by claim 72.

### C.    Technical Prong of the Domestic Industry Requirement

At the hearing, Cisco offered evidence establishing that the technical prong of the

domestic industry requirement is satisfied because the Catalyst 6500, Catalyst 6800, ASR 901,

and Nexus 7000 Cisco products satisfy at least claims 1, 14-15, 39, and 71-72 of the '597 patent.

#### 1.    Claim 1

##### a.    An apparatus comprising:

The record evidence demonstrates that each of the '597 DI Products is an apparatus.

CX-0001C (Wicker WS) at Q/A 263-280, Q/A 282; CX-0309 ("Catalyst 6500 Data Sheet");

CX-0312 ("Catalyst 6800 Data Sheet"); CX-0306 ("ASR 901 Data Sheet"); CX-0321 ("Nexus

Appx888.133

7000 Data Sheet"); CX-0311 ("Catalyst 6800 Data Sheet"); CX-0310 ("Catalyst 6500 Data Sheet"); CX-0067 ("Nexus 7000 Data Sheet").

### b.    a communications device comprising:

The '597 DI Products satisfy this limitation because each is a communications device. Specifically, the '597 DI Products are routers and switches that are used in communications data networks. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 283; CX-0309 ("Catalyst 6500 Data Sheet"); CX-0312 ("Catalyst 6800 Data Sheet"); CX-0306 ("ASR 901 Data Sheet"); CX-0321 ("Nexus 7000 Data Sheet"); CX-0311 ("Catalyst 6800 Data Sheet"); CX-0310 ("Catalyst 6500 Data Sheet"); CX-0067 ("Nexus 7000 Data Sheet").

### c.    a subsystem;

The evidence shows that the '597 DI Products are made up of numerous subsystems. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 284. As the '597 patent explains, the communications interface itself is a subsystem. JX-0004 ('597 patent) at Figs. 1, 2. Each of the '597 DI Products is a router or switch and thus, like the '597 patent, has a communications interface subsystem through which packets are sent, processed, and received. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 284. Further, OBFL detects and logs configuration changes for individual field replaceable units, or "FRUs." Thus, another subsystem is the set of components monitored on the particular FRU monitored by OBFL. CX-0001C (Wicker WS) at Q/A 284; CX-0355C (OBFL Architecture Document) at 005-8.

### d.    and a logging module, coupled to said subsystem, and configured to detect a change to a configuration of said subsystem of said communications device,

As discussed in further detail below, the evidence establishes that the '597 DI Products meet this element under all parties' constructions.

123

### i. a logging module

Cisco has adduced evidence showing that the Cisco '597 DI Products meet this element under any party's construction. A generic diagram describing the OBFL architecture for IOS-based '597 DI Products (*i.e.*, Catalyst 6500, Catalyst 6800, ASR 901) is reproduced below:



CX-0337C (OBFL Product Requirements Document, "PRD") at 805; *see also* CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; CX-0298C ("Cat6k OBFL Design Specification").

The OBFL Agent or instance is responsible for all interactions with the non-volatile memory. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293. The OBFL Agent interacts with other software applications, such as the CLI, that require access to read or write from the non-volatile memory. *Id.* The OBFL Agent also interacts with platform dependent device drivers that provide platform-specific information, such as ASIC versions. *Id.* OBFL works similarly in NX-OS-based '597 DI Products (*i.e.*, Nexus 7000 series). CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; CX-0357C (OBFL Specification) at 763.

OBFL is "configured to detect changes," as required by the Staff's (and Cisco's initial) construction for "logging module."[29]  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-95. Various types of critical information can be tracked by OBFL related to the device's subsystems, and if that information changes, such changes will be captured and logged.  *Id.*; *see, e.g.*, CX-0337C (OBFL PRD) at 806-21.  OBFL thus also "generates a log record" as required by Arista's (and Cisco's current) construction of "logging module."  Types of information that may be detected and logged are summarized in the table in CX-0337C (OBFL PRD) at 806, and include OS Version, BIOS/Firmware Version, FPGA Version/Device ID, ASIC Version, Slot Number and Chassis Type, ASIC register dumps, Number of Resets and Uptime, and various other system messages.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293.  In addition, certain platforms, such as the ASR 901, also log certain CLI configuration commands. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; *see, e.g.*, CX-0305 (ASR 901 IOS Config Guide) at 598.

Information is logged on a field replaceable unit ("FRU") basis.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; *see, e.g.*, CX-0337C (OBFL PRD).  This means, depending on the platform-type, that OBFL instances may exist for an entire platform, on line cards, or on route processors and supervisors.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; *see, e.g.*, CX-0337C (OBFL PRD) at 802; CX-0355C (OBFL Architecture Document) at 005-8.  User control of the platform is typically through the main platform processor over the CLI.  The user may interact with the various OBFL instances through the CLI to provide logged OBFL information to the user console.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; *see,*

---

[29] Cisco agreed to Arista's construction of "logging module" to streamline the issues in this investigation.  *See* Compl. Br. at 153.

*e.g.*, CX-0355C (OBFL Architecture Document) at 005-8; CX-0337C (OBFL PRD) at 805,

CX-0382 (IOS Configuration Guide); CX-0315 (IOS Configuration Guide); CX-0305 ("ASR

901 IOS Configuration Guide); CX-0320 (NX-OS Configuration Guide).

The generated log records are stored in physical non-volatile memory and persist through

module resets, reloads, power cycles, and upgrades.  CX-0001C (Wicker WS) at Q/A 263-280,

Q/A 285-95; *see also* CX-0337C (OBFL PRD) at 802; CPX-0002C (Cisco Source Code) at IOS

\sys\obfl\ and NX-OS at \storage\common\uspace\obfl\, \storage\common\uspace\plog\, and

\storage\common\diag2\.  [

].  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-293; *see, e.g.*,

CX-0337C (OBFL PRD) at 804, 807.  [

].  CX-0001C (Wicker WS) at Q/A 263-280,

Q/A 285-293; *see also* CX-0337C (OBFL PRD) at 823.

### ii.    a logging module, coupled to said subsystem

The evidenced adduced at the hearing shows that the Cisco '597 DI Products meet this

element under all parties' constructions.  As an initial matter, OBFL is connected or operably

connected to the subsystem, satisfying Cisco's and the Staff's constructions.  As described

above, the OBFL software runs on the FRU it is monitoring and is therefore connected to the

various subsystems, such as for example the ASIC drivers and device drivers.  CX-0001C

(Wicker WS) at Q/A 263-280, Q/A 285-95; *see e.g.*, CX-0337C (OBFL PRD) at 802; CX-0355C

(OBFL Architecture Document) at 5-8.  Moreover, for the reasons discussed above with respect

to Cisco and the Staff's constructions, the '597 DI Products also meet this limitation under

Arista's construction because the OBFL software runs on the FRU it is monitoring and logs its

126

data to local non-volatile storage rather than a central storage location.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-95; *see e.g.*, CX-0337C (OBFL PRD) at 802; CX-0355C (OBFL Architecture Document) at 5-8.

>        **iii.    a logging module . . . configured to detect a change to a configuration of said subsystem of said communications device**

It has been established that the Cisco '597 DI Products meet this element under all parties' constructions.  Cisco's expert Dr. Wicker testified that at least the following items detected and logged by OBFL constitute "configuration" of a subsystem under all parties' constructions: OS Version, BIOS/Firmware Version, FPGA Version/Device ID, ASIC Version, Slot Number and Chassis Type, ASIC register dumps, Number of Resets and Uptime, and various other system messages.  The '597 DI Products log various combinations of these types of information from the subsystems, and a change to these items in the system will be detected and logged by OBFL, as Dr. Wicker testified.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-95; *see, e.g.*, CX-0382 at 920-22, 924, 926-28; CX-0315 at 288-90, 292, 294-96; CX-0320 at 285, 288; CX-0357C at 765-70, 790-91.

Further, these categories of information logged by OBFL constitute "a change to the settings of the subsystem specified by a user" or "a change to the settings of the subsystem" as required by Arista's construction and the Staff's new construction.  For example, a user can choose to upgrade or configure a system to change at least the OS Version, BIOS/Firmware Version, FPGA Version, or the content of ASIC register dumps.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 285-95.  A user can also change or select which slot number a line card is plugged into in a chassis.  *Id.*  A user can also cause a reset of the system.  *Id.*  Thus, the '597 DI Products satisfy this limitation under all parties' constructions.

127

**e.      and communicate information regarding said change to said configuration of said subsystem of said communications device.**

The evidence shows that the '597 DI Products satisfy this limitation by sending the logged information to the non-volatile memory as described above, and also by providing such information to the user through, for example, CLI commands. Various combinations of "show logging onboard" CLI commands will produce OBFL records to the user console. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 294-95; CX-0382 (IOS Configuration Guide); CX-0315 (IOS Configuration Guide); CX-0305 (ASR 901 IOS Configuration Guide); CX-0320 (NX-OS Configuration Guide).

**2.      Claim 14**

**a.      The communications device of claim 1,**

As discussed above, the '597 DI Products practice claim 1 of the '597 patent.

**b.      wherein the subsystem is a communications interface.**

The evidence further shows that the '597 DI Products practice the claim element "the subsystem is a communications interface." As described above, the '597 DI Products are coupled and detect changes to the communications interface on Cisco's products. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 297-299. Thus, the '597 DI Products satisfy this limitation.

**3.      Claim 15**

**a.      The communications device of claim 14,**

As discussed above, the '597 DI Products practice claim 14 of the '597 patent.

**b.      wherein the logging module is further configured to restrict a change to a configuration of the logging module by the communications interface.**

The evidence shows that the '597 DI Products practice the claim element "the logging module is further configured to restrict a change to a configuration of the logging module by the

128

communications interface." Certain aspects of OBFL's configuration cannot be changed by the communications interface, and therefore the '597 DI Products satisfy this limitation. For example, [

].  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 294-95; CX-0337C (OBFL PRD) at 804, 807.  [

].  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 294-95; CX-0337C (OBFL PRD) at 823; (CX-0357C (OBFL Specification) at 769-70.  The user cannot stop this from happening through the communications interface.  Thus, the '597 DI Products satisfy this limitation.

### 4.    Claim 39

Independent claim 39 is a method claim with limitations that parallel those recited in independent apparatus claim 1.  In particular, claim 39 reads as follows:

> 39. A method comprising: detecting a change in a configuration of a subsystem of a communications device wherein a logging module is coupled to said subsystem and said detecting is performed at the logging module; and communicating information regarding the change comprises causing said logging module to communicate the change information.

Cisco adduced evidence demonstrating that the '597 DI Products practice method claim 39.  In particular, Dr. Wicker testified that the '597 DI Products are communications devices that perform a method.  Moreover, the '597 DI Products practice the other limitations of this claim for the reasons discussed above with respect to claim 1.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 302-303.

5.    **Claim 71**

  a.    **A communications device comprising:**

The evidence shows that the '597 DI Products satisfy this limitation because each is a communications device. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 310-311.

  b.    **a subsystem;**

The '597 DI Products satisfy this limitation for the reasons set forth above with respect to the parallel limitation of claim 1.

  c.    **a processor, coupled to the subsystem;**

Dr. Wicker testified that the '597 DI Products include the claimed processor for at least the reasons explained above with respect to the parallel limitation recited in claim 1. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 310-311.

  d.    **computer readable medium coupled to the processor;**

Dr. Wicker testified that the domestic industry products include "computer readable medium coupled to the processor" because, as described earlier, the operating system software including the OBFL feature will run in some runtime memory that is coupled to the processor. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 310-311; CX-0356C (OBFL Generic Software Functional Specification, "FS"); CX-0326 (Catalyst 6500 Comparison); CX-0383C (Cat 6800 FS); CX-0291C (ASR-901 HW Design Specification); CX-0353C (Nexus 7000 HW FS); CX-0295C (Nexus 7700 FS); CX-0359C (Cat6500 Card FS).

  e.    **and computer code, encoded in the computer readable medium, configured to cause the processor to:**

The record evidence shows that the '597 DI Products satisfy this limitation because the operating system software that includes OBFL will run in some runtime memory that is coupled to the processor described above. CX-0001C (Wicker WS) at Q/A 263-280, Q/A 310-311;

130

CX-0356C (OBFL Generic Software FS); CX-0326 (Catalyst 6500 Comparison); CX-0383C

(Cat 6800 FS); CX-0291C (ASR-901 HW Design Specification); CX-0353C (Nexus 7000 HW

FS); CX-0295C (Nexus 7700 FS); CX-0359C (Cat6500 Card FS).

       **f.**     **detect a change in a configuration of the subsystem;**

The '597 DI Products practice this limitation for the reasons discussed above with respect

to the parallel limitation recited in claim 1.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A

302-303.

       **g.**     **and communicate information regarding the change.**

As Dr. Wicker testified, the '597 DI Products include OBFL, which is configured to

cause the processor communicate information regarding the change for at least the reasons

explained above with respect to the parallel limitation recited in claim 1.  CX-0001C (Wicker

WS) at Q/A 263-280, Q/A 302-303.

     **6.**    **Claim 72**

       **a.**     **The communications device of claim 71,**

As discussed above, the '597 DI Products practice claim 71 of the '597 patent.

       **b.**     **wherein the computer code is further configured to cause the processor to: determine the configuration.**

The evidence shows that the '597 DI Products practice the additional claim 72 limitation

"the computer code is further configured to cause the processor to: determine the configuration."

As Dr. Wicker testified, the '597 DI Products satisfy this limitation because they determine what

the changed configuration is.  CX-0001C (Wicker WS) at Q/A 263-280, Q/A 312-313.  For

example, if a line card is put into a different chassis slot, OBFL will log which slot the line card

is in. *See* CX-0337C at 812–13; CX-0382 at 926; CX-0315 at 294; CX-0357C at 766; CX-0320

at 289.

### D.     Validity

Cisco argues that the doctrine of assignor estoppel bars Arista from challenging the validity of the '597 patent in this investigation, an argument with which the Staff agrees. *See* Cisco Br. at 191-200; Staff Br. at 59-66. As set forth below, it is determined that assignor estoppel does serve as a bar to Arista's arguments that the asserted claims of the '597 patent are invalid over the prior art, or are directed to unpatentable subject matter. Nevertheless, Arista's invalidity arguments with respect to Sections 101, 102, and 103 of the Patent Act are also discussed below for the sake of completeness.

#### 1.     Assignor Estoppel

The assignor estoppel doctrine precludes the assignor of a patent (and those in privity with the assignor) from asserting at a later time that a patent previously assigned for consideration is invalid. The evidence adduced in this investigation demonstrates that assignor estoppel applies with respect to the '597 patent. Not only did named inventor Dr. Cheriton make a valid assignment of the '597 patent to Cisco, but Dr. Cheriton is in privity with Arista, thereby applying assignor estoppel to Arista. Moreover, the arguments raised by Arista against the application of assignor estoppel in this investigation are addressed below and are shown to fail.

##### a.     Dr. Cheriton's Assignment of the '597 Patent to Cisco

The evidence establishes that David Cheriton joined Cisco in [      ], when Cisco acquired his startup company (Granite Systems, Inc.) for approximately $220 million, and Dr. Cheriton remained at Cisco until [                    ]. JX-0022C (Cheriton Dep. Tr.) at 21; CX-0798 at 062-64; CX-0529C ([                         ]) at 056-61; CX-0012C (Lang WS) at Q/A 26-38, Q/A 102-106; CX-0530C ([                    ]) at 047.

132

During his [                              ], Dr. Cheriton served as [

].  CX-0797C at 506; JX-0022C (Cheriton Dep.

Tr.) at 34-35; CX-0012C (Lang WS) at Q/A 39-40.  Cisco [

] in connection with patents he

invented and assigned to Cisco.  JX-0022C (Cheriton Dep. Tr.) at 21, 23, 28-31; CX-0529C at

056; CX-0531C ([                    ]) at 555-63; CX-0012C (Lang WS) at Q/A 63-101, Q/A 100-101;

CX-0809 (copy of *In re Marriage of Cheriton*, 92 Cal. App. 4th 269, 280 (6 Dist. Ca. Sep. 14,

2001)); CX-0532C ([                              ]) at 798-801.  One such patent was U.S. Patent No.

7,340,597.  JX-0004 (U.S. Patent No. 7,340,597) at 001; Duda Tr. 795-796.

The evidence establishes that Dr. Cheriton validly assigned the '597 patent to Cisco for

consideration while he was employed there.  CX-0012C (Lang WS) at Q/A 41, Q/A 50-57, Q/A

62-63.  The assignment expressly states that Dr. Cheriton assigned "the entire right, title and

interest" in his invention "and all patent applications and patent . . . for said invention" to Cisco,

in exchange for "good and valuable consideration, receipt of which is hereby acknowledged."

JX-0016 ('597 Assignment Reel) at 002; CX-0012C (Lang WS) at Q/A 55-57.  The assignment

bears Dr. Cheriton's signature, is notarized, and was recorded in the PTO four days after it was

signed.  JX-0016 ('597 Assignment Reel) at 002; CX-0012C (Lang WS) at Q/A 52, Q/A 57, Q/A

59; JX-0022C (Cheriton Dep. Tr.) at 51, 52.  Dr. Cheriton also submitted an inventor's

declaration as part of the '597 application.  JX-0010 ('597 Certified File History) at 057-8;

CX-0012C (Lang WS) at Q/A 42-49.

The '597 patent issued on March 4, 2008.  JX-0004 ('597 patent).  In 2014, Cisco

Technology, Inc. transferred the '597 patent to Cisco Systems, Inc., the complainant in this

investigation.  JX-0016 ('597 Assignment Reel) at 004-10; CX-0012C (Lang WS) at Q/A 58,

Q/A 60-61.  Dr. Cheriton left Cisco on [                    ].  CX-0530C ([                    ]) at

047; CX-0012C (Lang WS) at Q/A 26, Q/A 102-106.  [                    ], he founded Arista with

Andreas Bechtolsheim.  Duda Tr. 796; JX-0022C (Cheriton Dep. Tr.) at 37, 38-39, 39-40;

JX-0026C ([       ] Dep. Tr.) at 33; JX-0020C (Bechtolsheim Dep. Tr.) at 60; CX-0799 (Arista's

Cross Complaint against OptumSoft) at 732.

### b.    Privity Between Dr. Cheriton and Arista

Evidence adduced at the hearing establishes that Arista is in privity with Dr. Cheriton for

purposes of assignor estoppel.  As an initial matter, Dr. Cheriton founded Arista.  When defining

a privy relationship, the Federal Circuit has identified a company "founded by the assignor" as

an example of a company that is in privity with that assignor.  *Diamond Scientific Co. v. Amico,*

*Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) ("The estoppel also operates to bar other parties in

privity with the assignor, such as a corporation founded by the assignor."); *see also Juniper*

*Networks, Inc. v. Palo Alto Networks, Inc.*, 15 F. Supp. 3d 499, 508 (D. Del. 2014) (founder

status alone "dispositive of the issue of privity."); *Shamrock Tech. Inc. v. Medical Sterilization,*

*Inc.,* 903 F.2d 789, 794 (Fed. Cir. 1990) (finding estoppel where the assignor was "far more than

a mere employee"); *Mentor Graphics Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1379 (Fed.

Cir. 1998) (same, quoting *Shamrock*).

Second, after founding Arista, Dr. Cheriton remained a high-level employee with

substantial power to influence Arista's operations.  Specifically, Dr. Cheriton was a director on

Arista's board and "Chief Scientist."  JX-0022C (Cheriton Dep. Tr.) at 37, 46, 75; Duda Tr. 796;

CX-0797C ([                    ]) at 506; CX-0803 (Arista Update by Jayshree Ullal) at 480.

Third, Dr. Cheriton was positioned to profit, and did personally profit, from Arista's

activities.  Dr. Cheriton provided [                    ] to found Arista and fund

134

development of its products.  JX-0022C (Cheriton Dep. Tr.) at 41-42, 46-47.  Dr. Cheriton took a

[      ] ownership stake at the outset, [

              ].  Over the years, the value of Dr. Cheriton's shares in Arista has increased

[                                        ].  JX-0022C (Cheriton Dep. Tr.) at 42; Duda Tr. 798; CX-0499

(Arista's Form S-1/A) at 224456-57; JX-0020C (Bechtolsheim Dep. Tr.) at 82.

        Fourth, Dr. Cheriton oversaw and was involved with the development of the accused

Arista products.  [

                                        ].  JX-0022C (Cheriton Dep.

Tr.) at 157-158; JX-0020C (Bechtolsheim Dep. Tr.) at 60, 61.  As Arista stated in a public court

filing, "Cheriton was deeply involved in knowing and setting the direction of Arista's software

development and had intimate knowledge of its software efforts over the years."  CX-0799

(Arista's Cross Complaint against OptumSoft) at 732; Duda Tr. 797-798.  Dr. Cheriton's

activities included involvement in [                                                    ].

JX-0022C (Cheriton Dep. Tr.) at 76-77, 79-82, 94-95; JX-0020C (Bechtolsheim Dep. Tr.) at 60.

Indeed, for years after Arista was founded, [

                                        ].  Duda Tr. 798-800, 805-807; JX-0022C (Cheriton Dep.

Tr.) at 76-77, 79-80; JX-0026C (Duda Dep. Tr.) at 44, 48-50, 56.

        Dr. Cheriton's influence on the accused products was substantial.  He [

                                        ].  JX-0022C (Cheriton Dep.

Tr.) at 76-77, 79-82, 158; Duda Tr. 867, 799; JX-0020C (Bechtolsheim Dep. Tr.) at 60.  Dr.

Cheriton also invented a programming environment and runtime called [      ], which is used in

both the development of Arista's software and on the switches themselves when Arista's

135

software is running, and which Arista asserts is "[                    ]." CX-0035C ([

                    ]) at ANI-ITC-944_945-0779973–74; Duda Tr. 798-800.

    Fifth, Dr. Cheriton was [                    ] in the design of the Arista

feature that is covered by his patent. Duda Tr. 808-811, 876; JX-0022C (Cheriton Dep. Tr.) at

83-86, 88-93. Specifically, Dr. Cheriton [


                    ]. CX-0245C (AID 61) at ANI-ITC-944_945-

0150232; Duda Tr. 812-816; JX-0022C (Cheriton Dep. Tr.) at 83-86; JX-0026C (Duda Dep. Tr.)

at 97-99. Dr. Cheriton [                    ]. *Id.*; *see*

*also* Duda Tr. 809-811, 876. Other documents, such as internal e-mails to and from Dr.

Cheriton, also show that [

                    ]. *Id.*; *see also* CX-0804C (Email from D. Cheriton) at 800-17;

CX-0535C (Email from K. Duda) at 256-57; CX-0932C (Email from D. Cheriton) at 188;

JX-0022C (Cheriton Dep. Tr.) at 88-89. In addition, Dr. Cheriton testified at his deposition that

[                    ], and that [

                    ]. JX-0022C (Cheriton Dep. Tr.) at 85-86, 89-93; Duda Tr.

816-817; CX-0804C (Email from D. Cheriton) at 800-17.

    Accordingly, it is determined that Dr. Cheriton is "far more than a mere employee" or

"mere shareholder" of Arista, and that Arista is in privity with Dr. Cheriton for purposes of the

assignor estoppel analysis. *See Shamrock*, 903 F.2d at 794.

### c. Assignor Estoppel Applies to Arista's Defenses Based on 35 U.S.C. § 101

Arista argues that Section 101-based defenses are exempt from the application of assignor estoppel, yet does not cite legal authority to support its position. *See* Resp. Br. at 223-24. Indeed, Arista states in its post-hearing brief: "Arista is aware of no court ever applying the doctrine of assignor estoppel to block a § 101 challenge, particularly not in this modern era of revitalized jurisprudence concerning non-patentable subject matter." *Id.* at 224.

The governing law states that the doctrine of assignor estoppel defeats "invalidity challenges based on . . . utility [and] patentable invention." *Diamond*, 848 F.2d at 1224; *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924) ("[A]n assignor . . . is estopped to attack the utility . . . of a patented invention which he has assigned."); *see* 35 U.S.C. § 101 ("Inventions Patentable"); *Brenner v. Manson*, 383 U.S. 519, 528-29 (1966) ("utility" is a requirement of § 101). Moreover, the Federal Circuit rejected the idea that assignor estoppel is limited to defenses arising under a particular subchapter of Title 35. *Shamrock*, 903 F.2d at 794 ("We reject the contention that mere classification of a defense as equitable bars consideration of assignor estoppel.").

Accordingly, the application of assignor estoppel in this investigation is applicable to Arista's defense under § 101.

### d. Arista May Not Argue That the Accused Feature Is Within the Prior Art and Thus Cannot Infringe

Arista also argues that, inasmuch as it alleges ProcMgr is within the prior art, Arista's products cannot infringe. *See* Resp. Br. at 224-25. In actuality, Arista has not established that ProcMgr is within the prior art. In any event, "there is no 'practicing the prior art' defense to literal infringement." *See Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d

137

1357, 1365 (Fed. Cir. 2002) (citing *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575,

1583 (Fed. Cir. 1995)). Furthermore, Arista's reliance on *Mentor Graphics* (which cites to *Scott*

*Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, (1945)) as justification that this argument is

permissible under the assignor estoppel doctrine is misplaced. *See* Resp. Br. at 224-25. In

particular, *Tate* distinguishes the situation in *Scott Paper*, explaining that there the assignor was

allowed to "measure the extent of anticipation for the purpose of limiting the claims of the

assigned patents, and thus avoid infringement." *Tate*, 279 F.3d at 1369 (citing *Scott Paper*, 326

U.S. at 250). In the circumstances of this investigation, Arista presents its invalidity argument as

a non-infringement theory, a practice that the Federal Circuit has held to be ineffectual. *See Tate*

279 F.3d at 1365.

### e. The Doctrine of Assignor Estoppel Applies to This Investigation

Inasmuch as "[t]he principle of fair dealing . . . whereby the assignor will not be allowed

to say that what he has sold as a patent was not a patent has been part of the fabric of our law

throughout the life of this nation," it is determined that assignor estoppel acts as a bar to Arista's

invalidity defenses with respect to the '597 patent in this investigation. *See Diamond*, 848 F.2d

at 1224. Moreover, the Federal Circuit has held that "both statutory and case law required that

assignor estoppel be considered and applied in section 337 cases," and instructed that "the

Commission's public interest responsibilities do not give it an independent duty to determine the

validity of a patent where no party made such a challenge." *Intel*, 946 F.2d at 837 (citing

*Lannom Mfg. Co. v. Int'l Trade Comm'n*, 799 F.2d 1572, 1579 (Fed. Cir. 1986)).

138

Although it has been determined that assignor estoppel bars Arista's invalidity arguments with respect to the '597 patent, those arguments are addressed in the sections below for completeness.

### 2.    Patent Eligibility Under 35 U.S.C. § 101

Arista argues that that the asserted claims of the '597 patent are invalid for claiming patent-ineligible subject matter. *See* Resp. Br. at 182-90. Arista's arguments fail, however, inasmuch as the '597 patent is directed to a specific thing, *i.e.*, a communications device with a specific arrangement of components within the device, including a logging module and a device subsystem that the logging module is coupled to and monitors, and not an abstract idea. The first sentence of the patent abstract recites "[a] logging module is disclosed," and goes on to teach that a hardware device can "be made secure through the use of[] the logging module." JX-0004 ('597 patent) at Abstract. This on-device logging module, as the specification makes clear, secures that device by "detect[ing] a change in the configuration of [a] subsystem" and communicating "that the change has occurred." *Id.* at col. 6, lns. 7-10; *see id.* at Abstract; col. 4, lns. 16-19; col. 7, lns. 20-30; col. 8, lns. 50-52. Indeed, the logging module as described in the specification is described in concrete terms as a well-defined part of the device that performs a specific role within the device's architecture and is distinct from, but coupled to, the subsystem it monitors. *Id.* at col. 6, lns. 5-7; col. 7, lns. 16-20; Figs. 1, 2.

Similarly, claim 39 recites "a logging module" that "is coupled to" a "subsystem of a communications device" to detect and communicate "a change in a configuration" of the subsystem. JX-0004 ('597 patent) at col. 19, lns. 21-28; *see id.* at col. 16, lns. 44-52 (claim 1); col. 21, lns. 23-30 (claim 71). Such a recitation is the opposite of "an idea, having no particular concrete or tangible form" that would be deemed unpatentable subject matter under Section 101.

139