the Private VLAN Patents contains various disclosures of practicing the claimed invention in routers. For example, the specification of the '145 patent describes that the claimed VLANs can be programmed in a router: "[P]rimary VLANs and secondary VLANs (that is Isolated or Community VLANs) are programmed in the router using Color Blocking Logic (CBL)." JX-0006 ('145 patent) at col. 7, lns. 25-27. The specification also describes that the data associated with private VLAN configuration can be stored in a router:

> Data shown in table 500 may be held, in a particular implementation, in a variety of places. For example some data is in the header of a received packet, some data may be held in hardware such as memory in an ASIC chip in the interface, or further, some of the data may be held in a software lookup table in the memory for a processor of the router. As a further example, an implementation may use a table such as Table 500 in main memory for a processor of the router.

JX-0006 ('145 patent) at col. 6, lns. 6-14; *see* JX-0006 ('145 patent) at col. 2, lns. 7-13; col. 7, lns. 25-27; col. 6, lns. 8-14; col. 6, lns. 53-57.

### e. Written Description – "First VLAN"

Arista argues that the term "first VLAN" appearing in asserted claims 5 and 45 of the '145 patent is indefinite for failure to satisfy the written description requirement. *See* RX-3136C (Moisand WS) at Q/A 392-396. Arista's expert Mr. Moisand, however, testified that a person skilled in the art would have known that a "first VLAN" can mean, in at least one embodiment, a primary VLAN, as indicated by Arista's proposed construction for the term, and a primary VLAN is described in detail in the specification. RX-3136C (Moisand WS) at Q/A 393, Q/A 395; *see* CX-1220C (Jeffay RWS) at Q/A 244. Mr. Moisand testimony shows that Arista's written description argument cannot succeed, as there can be no written description problem with

240

respect to the term "first VLAN" where it is shown that the claimed "first VLAN" is embodied by the primary VLAN in the specification.[42]

Moreover, as Dr. Jeffay testified, the claims that recite a "first VLAN" expressly describe the characteristics and functionality of the "first VLAN" in a way that would allow a person skilled in the art to understand the scope of the claimed invention. CX-1220C (Jeffay RWS) at Q/A 244. For example, claim 5 of the '145 patent states that the first VLAN is "from the port connected to the shared network to the plurality of user ports," with the first VLAN being configured "to receive packets from the shared network and transferring them to a designated user port," and also that the first VLAN is configured "to reject packets from the user ports." JX-0006 ('145 patent) at col. 10, ln. 62 – col. 11, ln. 10. This description of the first VLAN is sufficient to inform a person skilled in the art about the characteristics of the first VLAN and the scope of the claimed invention. CX-1220C (Jeffay RWS) at Q/A 244-245 (discussing source code and testing); JX-0006 ('145 patent) at col. 10, ln. 62 – col. 11, ln. 10.

### f.    Written Description – "Second VLAN"

Arista argues that the term "second VLAN" appearing in asserted claims 5 and 45 of the '145 patent is indefinite for failure to satisfy the written description requirement. *See* RX-3136C (Moisand WS) at Q/A 397-401. For example, Arista's expert Mr. Moisand testified:

> Under Cisco and the Staff's construction, the Second VLAN need not be the isolated or community VLAN, which I find no support for in the specification. Therefore, if Cisco and the Staff's construction is adopted, claims reciting a "Second VLAN" are invalid. . . . As with "First VLAN," the term "Second VLAN" does not appear in the specification. The specification instead describes the purported invention in relation to three

---

[42] Although the "first VLAN" is not limited to that embodiment for purposes of claim construction, it is sufficiently described by that embodiment. *See* CX-1220C (Jeffay RWS) at Q/A 244.

Appx888.252

> purportedly new types of VLANs, a primary VLAN, an isolated VLAN, and/or a community VLAN.

RX-3136C (Moisand WS) at Q/A 398, Q/A 401.

Mr. Moisand further testified:

> As I discussed in reference to claim construction, however, read in light of the specification the term "Second VLAN" requires either the "Isolated" or "Community" VLAN, one of the three recited VLAN types disclosed in the specification. To the extent that Second VLAN does not require an "Isolated" or "Community" VLAN, the specification does not show that the inventors were in possession of such a claim and in fact Inventor Foschiano directly testified that he was not in possession of such a claim.

RX-3136C (Moisand WS) at Q/A 401.

Yet, Mr. Moisand also testified that a person skilled in the art would have known that a "second VLAN" can mean, in at least some embodiments, an isolated VLAN or a community VLAN, as indicated by Arista's proposed construction for the term, and isolated and community VLANs are described in detail in the specification. RX-3136C (Moisand WS) at Q/A 398, 400; *see* CX-1220C (Jeffay RWS) at Q/A 247. Mr. Moisand testimony shows that Arista's written description argument cannot succeed, as there can be no written description problem respect to the term "second VLAN" where it has been shown that the claimed "second VLAN" is practiced by at least two different embodiments in the specification. JX-0006 ('145 patent) at col. 4, lns. 51-64; col. 5, lns. 9-19; col. 5, lns. 52-57.[43]

Moreover, as Dr. Jeffay testified, the claims that recite a "second VLAN" expressly describe the characteristics and functionality of the "second VLAN" in a way that would allow a person skilled in the art to understand the scope of the claimed invention. CX-1220C (Jeffay

---

[43] Although the "second VLAN" is not limited to these embodiments for purposes of claim construction, it is sufficiently described by these embodiments. CX-1220C (Jeffay RWS) at Q/A 247.

242

RWS) at Q/A 247. Claim 5 of the '145 patent, for example, explicitly states that the second VLAN is "from the plurality of user ports," that the second VLAN is configured "to receive packets from the user ports and transferring them to the port connected to the shared network," and also that the second VLAN is configured "to prevent transfer of packets from one of the user ports to other user ports, and . . . to reject packets from the shared network, in order to separate packet traffic of different users." JX-0006 ('145 patent) at col. 10, ln. 62 – col. 11, ln. 10. This description of the second VLAN is sufficient to inform a person skilled in the art about the characteristics of the second VLAN and the scope of the claimed invention, and nothing in the description of the VLAN limits the implementation of "second VLAN" to only isolated or community VLANs. CX-1220C (Jeffay RWS) at Q/A 247-248; JX-0006 ('145 patent) at col. 10, ln. 62 – col. 11, ln. 10.

## VIII. The '164 (Zero Touch Provisioning) Patent

### A. Claim Construction

#### 1. Level of Ordinary Skill

Arista argues that a person of ordinary skill in the field of art of the '164 patent would be a person with a Bachelor's Degree in Computer Science, Computer Engineering, Electrical Engineering, or a closely related field, along with 2-3 years of industry experience in computer networks and systems. Additional education in a relevant field, such as Computer Science, Computer Engineering, Electrical Engineering, or industry experience may compensate for a deficit in one of the other aspects of the requirements. *See* RX-2836C (Nettles WS) at Q/A 107-110.

The Staff takes the position that a person of ordinary skill would be a person with a bachelor's degree in computer science, computer engineering, electrical engineering, or a closely

Appx888.254

related field, along with at least 2-3 years of experience working in the field of network devices or computer networks. *See* Staff Br. at 67-68. Cisco is willing to accept the Staff's proposal as a compromise position between those proposed by Cisco and Arista. *See* Cisco Br. at 307; *see also* CX-1218C (Bhattacharjee RWS) at Q/A 30 (opining on the qualifications of a person having ordinary skill in the art).

Based on the testimony provided by experts for Cisco and Arista, it is determined that a person having ordinary skill in the art with respect to the '164 patent would be a person with a bachelor's degree in computer science, computer engineering, electrical engineering, or a closely related field, along with at least 2-3 years of experience working in the field of network devices or computer networks.

### 2. Disputed Claim Terms

#### a. "in response to faults of a network device" / "faults of a network device" (claims 1 and 18)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| Preamble is not limiting; if it is found to be limiting, no construction necessary. | "in response to an abnormal condition of the network device" | Preamble is limiting, however, no construction is necessary. The Staff had originally taken the position that the preamble is not limiting. If the preamble is limiting, no construction necessary. |

The claim terms "in response to faults of a network device" and "faults of a network devices" are recited in the preambles of asserted claims 1 and 18. It is determined that these terms in the preamble are limiting, inasmuch as the recited "network device" in the preamble provides the antecedent basis for the term "device" in the body of the claims. It is further

244

determined that no construction is necessary for these claim terms because the plain meaning of

the terms is evident from reading the intrinsic evidence. *See* CX-0008C (Bhattacharjee WS) at

Q/A 115-120. In particular, the patent specification describes faults and the recovery from faults

in the context of a loss of connectivity. *Id.*; JX-0003 ('164 patent) at col. 6, lns. 19-25.

### b. "configuration" (claims 1, 5, 6, 9, and 18)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "state of the various services, functions, parameters and interface devices with which the device may be equipped" | "a text format file containing configuration states" | No construction necessary. If construction is necessary, "the various services, functions, parameters and interface devices with which the device may be equipped" |

The claim term "configuration" is recited in every asserted claim of the '164 patent. As

proposed by Cisco, the term is construed to mean "state of the various services, functions,

parameters and interface devices with which the device may be equipped." This construction

comports with the understanding of a person having ordinary skill in the art and is consistent

with the teachings of the patent specification. Moreover, the adopted construction is

substantially similar to that proposed by the Staff. *See* Staff Br. at 69.

The record evidence establishes that "configuration" is a commonly used term in the art,

and that one of ordinary skill in the art would understand that configuring a device parameter

constitutes putting a device in one of multiple possible states that the parameter can assume. *See*

CX-0008C (Bhattacharjee WS) at Q/A 123. This understanding of the term "configuration" is

supported by the teachings of the patent specification:

245

> Network devices such as routers and switches and the like maintain a configuration state using a text format file also known as a "configuration file," or just "configuration" as used herein. The configuration reflects the various services, functions, parameters and interface devices with which the device may be equipped.

JX-0003 at col. 3, lns. 6-12; CX-0008C (Bhattacharjee WS) at Q/A130.

By contrast, Arista's proposed construction limits a "configuration" to "a text format file containing configuration states," a limitation excludes embodiments disclosed in the patent specification. Indeed, the specification teaches that a text format file is only one of multiple disclosed embodiments, which also include non-text files such as "machine-only readable" files:

> In various embodiments, the recovery configuration may be an XML formatted file, or a file formatted in either a human or a machine-only readable format, or may be encrypted using an encryption technique or the like. In one embodiment, however, the recovery configuration is a text file.

JX-0003 ('164 patent) at col. 8, lns. 1-6; *see* CX-0008C (Bhattacharjee WS) at Q/A 128-129. Arista does not explain why its construction improperly excludes disclosed embodiments or how it adds clarity to the claim language where it attempts to construe the term "configuration" using that same term in the definition.

Accordingly, the claim term "configuration" is construed to mean "state of the various services, functions, parameters and interface devices with which the device may be equipped."

c.   **"configuration instructions" (claims 1 and 18)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction is necessary, "requests to make a change or modification to the current configuration" | "requests to make a change or modification to the current configuration" | No construction necessary. If construction is necessary, "requests to make a change or modification to the current configuration" |

246

The claim term "configuration instructions" is recited in asserted claims 1 and 18. As proposed by all parties, this term is construed to mean "requests to make a change or modification to the current configuration." *See* Compl. Br. at 313-14; Resp. Br. at 238-39; Staff Br. at 68-69. This construction reflects the plain meaning of the term and is supported by the specification. *See* RX-2836C (Nettles WS) at Q/A 86; JX-0003 ('164 Patent) at col. 6, lns. 32-37 ("Configuration instructions may include directions to change the current configuration of the device.").

    **d.**     **"detecting a loss of connectivity between the device and a network resulting from the configuration change" (claims 1 and 18)**

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| No construction necessary. If construction necessary, "identifying that the configuration change resulted in a loss of connectivity between the device and a network" | "identifying that the configuration change caused connectivity between the device and a network to be lost" | No construction necessary. If construction is necessary, "identifying that the configuration change resulted in connectivity between the device and a network to be lost" |

The claim term "detecting a loss of connectivity between the device and a network resulting from the configuration change" is recited in asserted claims 1 and 18. As proposed by Cisco, this term is construed to mean "identifying that the configuration change resulted in a loss of connectivity between the device and a network," a construction that reflects the plain meaning of the words. The adopted construction also reflects the claim language, which requires that "a loss of connectivity" "result[s] from the configuration change."

By contrast, Arista's proposed construction is inconsistent with the intrinsic evidence. In particular, the claim language provides that a loss of connectivity "result[s]" from the

247

configuration change. The specification also uses the word "result," and not "caused," in relation to the loss of connectivity and configuration change. *See*, *e.g.*, JX-0003 ('164 patent) at col. 3, lns. 19-24; col. 5, lns. 53-65. The specification does, however, use the word "cause" in other unrelated contexts. *See*, *e.g.*, JX-0003 ('164 patent) at col. 10, lns. 47-50 ("Execution of the sequences of instructions contained in main memory 406 causes processor 404 to perform the process steps described herein.").

Accordingly, the claim term "detecting a loss of connectivity between the device and a network resulting from the configuration change" is defined to mean "identifying that the configuration change resulted in a loss of connectivity between the device and a network."

      e.    "in association with manufacturing the device" (claims 1 and 18)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
| --- | --- | --- |
| No construction necessary. If construction is necessary, "in connection with the manufacture of the device" | "at the time of manufacture of the device" | "at the time of manufacture of the device" |

The claim term "in associate with manufacturing the device" is recited in asserted claims 1 and 18. As proposed by Cisco, the term is construed to mean "in connection with the manufacture of the device," a construction that is consistent with the patent specification. The specification teaches: The disputed phrase appears in claims 1 and 18. As the specification explains, "[t]he CPEs are shipped with a generic bootstrap or minimal configuration that is copied from or generated at the vendor based on a standard template or format specified by the service provider." JX-0003 ('164 patent) at col. 1, lns. 32-38. The patent later refers to the same bootstrap configuration, which is used as a recovery configuration, as being loaded during

248

manufacture. JX-0003 ('164 patent) at col. 5, lns. 48-53 ("According to one embodiment, a generic or 'boot' configuration is 110A loaded as the current configuration of CPE A 110 during manufacture."); *see id.* at col. 3, lns. 59-60. The intrinsic evidence, therefore, describes the recovery configuration as being shipped with the device.

### f.    "network level configuration" (claim 5)

| Complainant Cisco's Proposed Construction | Respondent Arista's Proposed Construction | Staff's Proposed Construction |
|---|---|---|
| "a complete and current configuration information" | "configuration enabling the device to connect to other devices in the network" | "complete and current configuration information" |

The claim term "network level configuration" is recited in asserted claim 5. As proposed by Cisco and the Staff, the term is construed to mean "a complete and current configuration," a meaning that comports with the teachings of the patent itself. Specifically, the specification teaches:

> Accordingly, a recovery configuration for CPE A 110 need only provide sufficient information for the CPE A 110 to establish the connection with the configuration manager 152 in order to obtain complete and current configuration information (herein referred to as a network level configuration) in order to then connect with other devices, such as aggregator 150, for example using the network 103.

JX-0003 ('164 patent) at col. 5, lns. 37-43.

### B.    Literal Infringement Analysis

For the reasons set forth below, the accused Arista devices do not infringe the asserted '164 claims because they fail to satisfy one or more of the limitations of the asserted claims.[44]

---

[44] Inasmuch as the accused products do not literally infringe the '164 patent, there can be no finding that Arista is liable for indirect infringement of the '164 patent.

1. **The Accused Products Are Not Fault Recovery Processes – All Asserted Claims**

The evidence establishes that the accused ZTP functionality is an initial provisioning process, and not a fault recovery mechanism as claimed in the '164 patent. *See, e.g.*, RX-2896C (Arista, Quick Start Guide, Data Center Switches Models) at ANI-ITC-944_945-0850985; RX-3912C (Duda RWS) at Q/A 104, Q/A 106; RX-3915C (Sadana RWS) at Q/A 37. The '164 patent is directed to recovering from a fault, *i.e.*, a loss of connectivity, resulting from a configuration change. Bhattacharjee Tr. 530-531. If someone changes the configuration and interrupts connectivity, the claimed invention will restore connectivity by reverting to a factory-installed recovery configuration. *See* JX-0003 ('164 patent) at claim 1.

Evidence adduced at the hearing shows that ZTP and its role differ from the fault recovery scenario described in the '164 patent. Cisco's infringement argument rests upon a manufactured situation in which the startup-config file is removed from a working, connected device and that device is then power cycled. *See, e.g.*, Compl. Br. at 317-22. It is alleged that restarting a device with its startup-config removed is a catastrophic fault as described in the '164 patent. Bhattacharjee Tr. 552.

Yet, Arista's CTO and corporate designee on ZTP functionality, Dr. Duda, testified that the lack of a startup-config file is not a fault:

> Q     Before this case, have you ever heard anybody talking about deleting a startup-config file, placing the switch in a fault condition?
>
> A     No. In fact, we instruct our customers to delete the startup-config file and reboot the switch in order to re-enter ZTP mode. Why would we tell our users to create catastrophic faults. There's nothing faulty about deleting your startup-config. It's just a crazy notion.

Duda Tr. 874-875.

The lack of a startup-config filed does not qualify as fault under any of the party's proposed constructions. The evidence shows that a device understands whether an event or state is unexpected or abnormal only to the extent that it is designed to identify those differences. RX-3911C (Nettles RWS) at Q/A 63-64.

Arista's products are designed to presuppose the lack of a configuration on initial boot up to allow for client-specific provisioning. *See, e.g.*, RX-3912C (Duda RWS) at Q/A 110; RX-2896C ([                                                    ]) at ANI-ITC-944_945-0850972. [

                                    ]. *See, e.g.*, RX-3912C (Duda RWS) at Q/A 110, Q/A 107; RX-2896C ([

     ]) at ANI-ITC-944_945-0850985 ("[

                              ]."). The devices can operate "[          ]" even if the startup-config file is deleted or even if the device never received a startup-config in the first place. RX-3912C (Duda RWS) at Q/A 117, Q/A 124; JX-0031 (Pech Dep. Tr.) at 37. Further, a user can cancel the ZTP process and boot the switch without using a startup-config file. RX-3911C (Nettles RWS) at Q/A 51; RX-2894C ([                                    ]) at CSI-ANI-00128400.00335.

Cisco's expert Dr. Bhattacharjee has testified that an Arista device without a startup-config is abnormal. CX-0008C (Bhattacharjee WS) at Q/A 154-155, Q/A 158, Q/A 161-162. This analysis selectively quotes several documents based on the assumption that any alternative to "normal" operations constitutes abnormal behavior and is therefore a fault. *See id.* at Q/A 159-60. For example, Dr. Bhattacharjee relies on a flow chart created at least eight months before the first public release of ZTP to argue that booting an Arista device without a startup-config is a fault. CX-0008C (Bhattacharjee WS) at Q/A 159-60; CX-0177C (Arista

251

Software Status, 2010-09-14) at 1, 14.  Yet, the chart differentiates the soon-to-be introduced

process from all the processes that existed before it, and does not show that operating an Arista

device without a startup-config is a fault.  RX-3911C (Nettles WS) at Q/A 61; *see id.* at Q/A 64.

Accordingly, it is determined that the accused products are not fault recovery processes

as required by all asserted claims of the '164 patent.

### 2. The Accused Products Do Not Detect a Loss of Connectivity – All Claims

The record evidence shows that the accused Arista switches do not infringe any of the

asserted claims of the '164 patent under any party's proposed claim construction because [

].  RX-3911C (Nettles RWS) at Q/A 89.

Cisco's infringement allegations with respect to this claim limitation depend on the proposition

that a person of ordinary skill would consider checking for the presence of a locally-stored

startup-config file during switch boot-up to be "detecting the loss of connectivity between the

device and a network."  *See id.* at Q/A 90; Compl. Br. at 326-31.  The evidence adduced at the

hearing, however, contradicts Cisco's argument.

For example, Cisco's expert Dr. Bhattacharjee testified that removing an existing

startup-config file does not by itself cause a loss of connectivity.  *See* Bhattacharjee Tr. 551.  In

addition, the evidence shows that [

].  RX-3911C (Nettles RWS) at Q/A 91;

RX-3912C (Duda RWS) at Q/A 119, Q/A 123.

[

].  *See, e.g.,*

RX-3912C (Duda RWS) at Q/A 116; RX-3911C (Nettles RWS) at Q/A 92-93; RX-2894C

Appx888.263

([                                          ]) at CSI-ANI-00128400.0000052.  Indeed, a the presence of

a startup-config file filled with nonsensical or otherwise invalid text will not trigger ZTP.  *See*

RX-3912C (Duda RWS) at Q/A 112.  Moreover, [


                                                ] because it verifies only the file's existence and not its

contents.  RX-3911C (Nettles RWS) at Q/A 94; RX-3912C (Duda RWS) at Q/A 112.  At no

point in this situation does the system determine connectivity or its ability to communicate with

other devices on the network.  RX-3911C (Nettles RWS) at Q/A 93.

      Accordingly, it is determined that the accused products do not satisfy the "detecting a

loss of connectivity resulting from the configuration change" limitation of all asserted '164

claims.

**3.  The Accused Products Performing Initial Provisioning Do Not
Infringe – All Asserted Claims**

      The evidence shows that initial provisioning of a switch from the factory without a

startup-config loaded does not practice the asserted claims.  When adding the device to the

network for the first time, the ZTP process will trigger without ever receiving configuration

instructions or changing the current configuration to a new configuration based on the

non-existent configuration instructions.  *See* RX-3911C (Nettles RWS) at Q/A 54-55; RX-2896C

([                                          ]) at ANI-ITC-944_945-0850985;

RX-3912C (Duda RWS) at Q/A 107.

      Indeed, Cisco has stated that it does not accuse the initial provision functionality of the

Arista switches of infringing the '164 patent.  *See, e.g.*, Compl. Br. at 329 ("[T]he Accused

253

Products do detect a loss of connectivity during initial provisioning—just not one resulting from a configuration change, as required by the claims.").

### C.   Technical Prong of the Domestic Industry Requirement

For the reasons set forth below, the '164 DI Products do not practice the asserted '164 claims because they fail to satisfy one or more of the limitations of the claims.

Evidence adduced at the hearing establishes that Cisco's PoAP is a provisioning feature designed to provide a minimal startup configuration when a Cisco switch, especially a brand-new switch, is booted without a startup configuration file. RX-3911C (Nettles RWS) at Q/A 167. This minimal startup configuration enables the switch to contact a DHCP server, through which the switch can locate a source for a software image and a startup-config file. *Id.*

Once triggered, the PoAP software dynamically writes instructions to a temporary startup configuration file. RX-3911C (Nettles RWS) at Q/A 168. PoAP then begins DHCP discovery. *Id.* The DHCP response instructs the device to where it may obtain the rest of its configuration. *Id.* The device then downloads the configuration and/or software image from the network server. *Id.* Afterwards, the device reboots with the new configuration. *Id.*

### 1.   The Domestic Industry Products Do Not Detect a Loss of Connectivity – All Claims

The record evidence shows that the '164 DI Products do not practice any asserted claim of the '164 patent under any party's proposed claim construction because PoAP detects the lack of a file, and not the claimed loss of connectivity between the device and the network. *See* RX-3911C (Nettles RWS) at Q/A 192. Cisco's technical prong argument with respect to this claim limitation is similar to its infringement argument inasmuch as it argues that checking for the presence of a startup-config file stored locally on the device practices the limitation of

254

"detecting the loss of connectivity between the device and the network." *See id.* at Q/A 193;
Compl. Br. at 343-45.

Evidence adduced that the hearing establishes, however, that deleting the startup-config
file does not cause a loss of connectivity, and that the system does not attempt to detect a loss of
connectivity when the startup-config is deleted. RX-3911C (Nettles RWS) at Q/A 194.
Additionally, when booting up, the domestic industry products detect only whether the
startup-config exists. *Id.* At no point does the system make a determination regarding
connectivity or its ability to communicate with other devices on the network. *Id.* In addition,
Cisco's expert Dr. Bhattacharjee provided testimony stating that the system is capable of sending
and receiving packets during the boot process when a startup-config file is not present, thereby
establishing that the device does not lack connectivity. CX-0008C (Bhattacharjee WS) at Q/A
435; *see id.* at Q/A 197.

Accordingly, it is determined that the '164 DI Products do not practice the "detecting a
loss of connectivity resulting from the configuration change" limitation of the asserted '164
claims.

### 2. The Domestic Industry Products Are Not Fault Recovery Processes – All Claims

The record evidence establishes that PoAP does not revert to a recovery configuration in
response to the faults of a network device under the claim constructions proposed by any party.
*See* RX-3911C (Nettles RWS) at Q/A 172. Specifically, it has been shown that the lack of a
startup-config file within the PoAP process is not a fault as required by the asserted claims. *See
id.*

Appx888.266

Evidence adduced at the hearing demonstrates that PoAP is a provisioning process designed for new devices, direct from the manufacturer, that do not have a startup-configuration file and that must be provisioned and configured for installation in a new network. RX-3911C (Nettles RWS) at Q/A 173; *see, e.g.*, RX-2904C (Cisco Nexus 5000 Series NX-OS Configuration Guide) at CSI-ANI-00124733.000046; RX-2906C (Power On Auto Provisioning slideshow) at CSI-ANI-00188500. The lack of a startup-configuration is an expected step in the PoAP process and does not constitute an abnormal condition or a fault as claimed in the '164 patent. *See* RX-3911C (Nettles RWS) at Q/A 173-175.

### D. Validity

Arista has not met its burden to show by clear and convincing evidence that any of the asserted claims of the '164 patent is invalid. In support of its invalidity arguments, Arista relies primarily on four references: U.S. Patent No. 7,069,334 to Wysoczynski (RX-2840), Cisco's AutoInstall product, and Cisco's AutoConfig product. None of these references teaches the invention of the '164 patent or otherwise renders the claims of that patent invalid.

### 1. Anticipation – U.S. Patent No. 7,069,334 to Wysoczynski

Wysoczynski relates generally to modifying the known concept of a "debug" mode, which "gives the user the opportunity to check the configuration state or memory/register contents to find out what caused the problem." RX-2840 (Wysoczynski) at col. 1, lns. 36-39; *see* CX-1218C (Bhattacharjee RWS) at Q/A 68-70. It discloses a new user command for use on a network device in debug mode, which is used for rolling back a network device to a last known configuration. *See* RX-2840 (Wysoczynski) at col. 4, lns. 45-51. Wysoczynski teaches that a debug mode is distinct from reverting a device to a factory default. In particular, Wysoczynski characterizes the process of factory reset as "needless and undesirable." RX-2840

256

(Wysoczynski) at col. 1, lns. 49-52. Wysoczynski's debug mode comprises a command prompt that asks the user to either enter in the location of the image and configuration it wishes to download, or else to accept downloading the prior image and configuration based on the location of the last known good image. RX-2840 (Wysoczynski) at col. 4, lns. 42-51; col. 5, lns. 13-15.

### a.    Claim 1

The evidence shows that Wysoczynski does not disclose several elements of claim 1 of the '164 patent under all of the parties' proposed constructions.

In particular, Wysoczynski fails to disclose the limitation of "recovering from a loss of connectivity by reverting to a recovery configuration." CX-1218C (Bhattacharjee RWS) at Q/A 72. As discussed above, Wysoczynski discloses a debug mode. RX-2840 (Wysoczynski) at col. 1, lns. 36-39. Applying the claim constructions adopted above, this debug mode is not a "configuration" that provides the state of the various services, functions, parameters and interface devices with which the device may be equipped. Applying Arista's proposed construction, the debug mode is not a text file containing configuration states. Therefore, Wysoczynski does not satisfy the claim limitations requiring that the device "revert to a recovery configuration" by "retrieving a recovery configuration" and "making it the current configuration." *See* CX-1218C (Bhattacharjee RWS) at Q/A 72.

Wysoczynski also does not disclose the claimed "recovery configuration" that "is stored in a persistent storage of the device in association with manufacturing the device." CX-1218C (Bhattacharjee RWS) at Q/A 74. Rather, Wysoczynski teaches that the "devices 210 and 230 also have information stored on them about the last known good image and configuration values that were approved by the administrator or user." RX-2840 (Wysoczynski) at col. 5, lns. 13-16. These parameters are the "names of the last known good image and configuration file," which

257

are only known after manufacture once the device has been installed with a first set of known good image and configuration files. *See* RX-2840 (Wysoczynski) at col. 4, lns. 45–51. Accordingly, there can be no disclosure of "retrieving" factory default parameters from persistent memory and establishing connectivity to a configuration manager using those retrieved parameters.

Wysoczynski also fails to meet the limitation of "recovering from the loss of connectivity by reverting to a recovery configuration" because it requires user intervention in order to initiate a rollback file transfer with a remote file server. CX-1218C (Bhattacharjee RWS) at Q/A 75; RX-2840 (Wysoczynski) at col. 4, lns. 56-68. Specifically, Wysoczynski requires there to be a user entering a command at the console. *See* RX-2840 (Wysoczynski) at col. 4, lns. 56-68. By contrast, the '164 patent makes clear that the claimed "recovering from the loss of connectivity by reverting to a recovery configuration," *i.e.*, establishing connectivity to a configuration manager using the recovery configuration, is done without user intervention. JX-0003 ('164 patent) at col. 6, lns. 48-50 (describing "an automated recovery process"); col. 5, lns. 29-33; col. 6, lns. 24-28 (teaching recovery "substantially independent of human intervention"); col. 8, lns. 63-67; col. 8, lns. 48-51. Indeed, the stated purpose of the claimed invention is to avoid the need for user intervention in recovering a device. JX-0003 ('164 patent) at col. 1, lns. 27-31; col. 1, lns. 48-54. One of ordinary skill, reading the claims in light of the specification, would understand that "establishing connectivity to a configuration manager using the recovery configuration" is without user intervention. *See* CX-1218C (Bhattacharjee RWS) at Q/A 77. Accordingly Wysoczynski does not practice this limitation.

Accordingly, it is determined that Wysoczynski does not anticipate claim 1 of the '164 patent.

### b.     Claim 5

The evidence adduced at the hearing shows that Wysoczynski fails to disclose several elements of claim 5 of the '164 patent under all of the parties' proposed claim constructions. CX-1218C (Bhattacharjee RWS) at Q/A 83-88. As an initial matter, inasmuch as claim 5 depends from claim 1, claim 5 is not invalidated by Wysoczynski for the same reasons that it does not invalidate claim 1. *See* CX-1218C (Bhattacharjee RWS) at Q/A 84.

In addition, Wysoczynski does not disclose the "network level configuration" limitation recited in claim 5. CX-1218C (Bhattacharjee RWS) at Q/A 84. Wysoczynski discloses receiving a "last known good image and configuration file from a TFTP server." RX-2840 (Wysoczynski) at col. 4, lns. 46-55. The '164 patent distinguishes the claimed invention from rolling back to a previous configuration, and indicates that doing the latter is undesirable because it may lead to unreliable network connectivity. JX-0003 ('164 patent) at col. 1, ln. 55 – col. 2, ln. 5. Therefore, under claim constructions adopted above, the last known good image and configuration file is not the claimed "complete and current configuration information," and it is not a configuration enabling the device to connect to other devices in the network as required by Arista's proposed claim constructions.

### c.     Claim 9

The record evidence shows that Wysoczynski fails to disclose several elements of claim 9 of the '164 patent under all of the parties' proposed constructions. *See* CX-1218C (Bhattacharjee RWS) at Q/A 93-94. As an initial matter, inasmuch as claim 9 depends on claim 1, Wysoczynski does not anticipate claim 9 for the same reasons it does not anticipate claim 1. Moreover, Wysoczynski does not disclose a "configuration" under any of the proposed constructions, as previously discussed with respect to claim 5.

259

#### d. Claim 18

The steps recited in the body of claim 18, which is directed to a "computer-readable medium," are substantially similar to those recited in claim 1. JX-0003 ('164 patent) at col. 14, lns 3-23. Thus the record evidence shows that Wysoczynski does not anticipate claim 18 for the same reasons it does not anticipate claim 1. *See* CX-1218C (Bhattacharjee RWS) at Q/A 95-96.

### 2. Anticipation – AutoInstall

AutoInstall is a software feature intended to simplify the installation process when a new Cisco router running the IOS operating system is brought into a network. *See* RX-2891C (CSI-ANI-00217643) at CSI-ANI-00217644.

Arista has not established that AutoInstall invalidates the asserted '164 claims, not least because Arista has failed to show that AutoInstall discloses the '164 claim limitation "retrieving a recovery configuration." *See* CX-1218C (Bhattacharjee RWS) at Q/A 99, Q/A 103-108. Specifically, the AutoInstall code that Arista identifies as containing a recovery configuration is not retrieved from persistent storage in the order required by the claims. Additionally, AutoInstall does not disclose retrieving and executing CLI commands or text files that configure the device. *See id.*

### 3. Anticipation – AutoConfig

AutoConfig is a software feature intended to simplify the installation process when a new Cisco Catalyst 2950 switch is brought into a network. *See* RX-2854 (Catalyst 2950 Desktop Switch Software Configuration Guide – Cisco IOS Release 12.1(9)EA1); RX-2855 (Catalyst 2950 Desktop Switch Software Configuration Guide – Cisco IOS Release 12.0(5)WC(1)).

Arista has not established that AutoConfig invalidates the asserted '164 claims, not least because Arista has failed to show that AutoConfig discloses the '164 claim limitation "retrieving

260

a recovery configuration" as part of "recovering from the loss of connectivity by reverting to a recovery configuration, wherein the recovery configuration is stored in a persistent storage of the device in association with manufacturing the device." CX-1218C (Bhattacharjee RWS) at Q/A 129. It is undisputed that AutoConfig is describing a feature of Cisco's IOS operating system. Similar to devices running AutoInstall, devices running IOS load the entire software image into memory at boot, before detecting the lack of a startup-config and in contrast with the requirements of the claim language. The record evidence fails to establish that the AutoConfig feature deviates from this practice by retrieving a recovery configuration after detecting a loss of connectivity, as required by the claim language. *See* CX-1218C (Bhattacharjee RWS) at Q/A 130; JX-0003 ('164 patent) at Fig. 2A.

### 4. Obviousness – Wysoczynski in Combination with Johnson

Arista argues that Wysoczynski in combination with U.S. Patent No. 7,475,389 to Johnson ("Johnson") renders obvious asserted claim 6 of the '164 patent. *See* Resp. Br. at 288-89. Yet, the record evidence fails to establish that a person of ordinary skill in the art would be motivated to combine these two references to arrive at the invention of claim 6.

Evidence adduced at the hearing demonstrates that a person of ordinary skill would not be motivated to combine Wysoczynski with Johnson because Johnson teaches resetting a device to factory default, whereas Wysoczynski teaches away from resetting a device to factory default. *See* CX-1218C (Bhattacharjee RWS) at Q/A 91; RX-2840 (Wysoczynski) at col. 1, lns. 49-57; RX-2841 (Johnson) at col. 3, lns. 55-59; col. 3, lns. 7-11; col. 5, lns. 2-48.

Moreover, Johnson fails to teach either a "recovery configuration" that is a "boot configuration," or a situation "wherein establishing connectivity to a configuration manager using the recovery configuration" comprises "establishing connectivity with the configuration

261

manager as a new device." CX-1218C (Bhattacharjee RWS) at Q/A 91. Instead, Johnson discloses a gaming console that registers with a recovery unit when it is initially installed so that the recovery unit can keep track of what software is later installed on that gaming console. RX-2841 (Johnson) at col. 3, lns. 50-59. Registering with a remote server when the gaming console still has connectivity is not using a "recovery configuration" that is a "boot configuration" to establish "connectivity with the configuration manager as a new device" as required by claim 6. *See* CX-1218C (Bhattacharjee RWS) at Q/A 6162; JX-0003 ('164 patent) at col. 3, lns. 54-55. Thus, even if Wysoczynski were combined with Johnson, the combination would not satisfy the limitations of claim 6. CX-1218C (Bhattacharjee RWS) at Q/A 91.

Accordingly, Arista has not shown by clear and convincing evidence that Wysoczynski in combination with Johnson renders obvious claim 6 of the '164 patent.

### 5.    Secondary Considerations of Non-Obviousness

The nonobviousness of the '164 patent is also demonstrated by evidence suggesting that claimed invention fulfilled a long-unresolved need in the industry to solve the problem of remotely reconfiguring a device that has lost connectivity resulting from a change in configuration. *See* CX-1218C (Bhattacharjee RWS) at Q/A142-144; JX-0047C (Woodman Dep. Tr.) at 49-51. Others had failed to address the problem through mechanisms such as a rollback that creates security vulnerabilities and provides no certainty of re-establishing connectivity. *See* CX-1218C (Bhattacharjee RWS) at Q/A 22; JX-0003 ('164 patent) at col. 1, ln. 55 – col. 2, ln. 5. The '164 patent teaches a recovery configuration stored in persistent storage that could be used to establish connectivity to a configuration manager without manual intervention. JX-0003 ('164 patent) at col. 2, lns. 6-9.

262

## IX.   Equitable Defenses

### A.   Equitable Estoppel

To establish that Cisco is equitably estopped, Arista must prove by a preponderance of the evidence that (1) Cisco, through misleading conduct, led Arista to reasonably believe that Cisco did not intend to enforce its patents against Arista; (2) Arista relied on that conduct; and (3) due to its reliance, Arista would be materially prejudiced if Cisco were permitted to proceed with its charge of infringement. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co*, 960 F.2d 1020, 1028, 1042 (Fed. Cir. 1992) (*en banc*); *Multimedia Patent Trust* 2012 WL 6863471, No. 10–CV–2618–H (KSC) at *20.  As discussed below, Arista has failed to meet this burden.

### 1.   There Was No Misleading Conduct by Cisco

The evidence shows that Cisco was not aware of Arista's infringement of the patents in suit until May 21, 2014, approximately seven months before it sued Arista. *See* CX-1221C (Lang RWS) at Q/A 59; RX-0007C (Cisco's Response to Interrogatory No. 8) at 3.  The fact that Cisco had not addressed Arista's infringement before that time does not constitute "intentionally misleading silence" that can give rise to a finding that equitable estoppel applies. *See Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509, 512-13 (D.N.J. 1990) ("While silence alone is not sufficient to give rise to estoppel, intentionally misleading silence where 'some evidence' exists to show that the silence was misleading enough to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims will be sufficient.").  Moreover, the record evidence shows that Cisco has not been "silent" as to suspected patent infringement by Arista or others.  In the past, Cisco has taken affirmative steps to protect its intellectual property rights by asserting patents shortly after learning of infringing activities. *See* CX-1329 (Huawei Complaint) at CSI-ANI-00675877.

263

In addition, the evidence fails to establish that Cisco's public statements regarding enforcement of its intellectual property rights could lead Arista to reasonably believe that Cisco would not enforce its patents against Arista. *See, e.g.*, RX-3840 (Forbes article concerning "patent trolls" by Cisco's General Counsel, Mark Chandler); RX-3118 (Cisco White Paper regarding network standards); RX-2943 (Press Release: Google and Cisco Cross License); CX-0937 (Cisco Annual Report); RX-3078 (Cisco Annual Report). None of the public statements made by Cisco in these publications creates a reasonable inference that Cisco would not assert its patents against infringers. *See* CX-1222C (Djavaherian RWS) at Q/A 85-88. Rather, they demonstrate that Cisco would expect that those desiring to use Cisco technology would seek a patent license.

Moreover, Cisco's licensing and litigation activities with third respect to third parties do not "give rise to the necessary inference that the claim against the defendant is abandoned." *See Aukerman*, 960 F.2d at 1042. In particular, the existence of Cisco licenses establishes that Cisco does not permit other entities to use its intellectual property without a license, and it is highly unreasonable for Arista to believe that it could use Cisco's intellectual property without a license. Further, the fact that Cisco sued only Arista before the Commission without joining other respondents is not bad faith or misleading conduct. There is no evidence that other industry participants are infringing the patents. The fact that that industry participants sell products with similarly named features does not necessarily mean they infringe Cisco's patents. Awareness of product feature names does not constitute knowledge of infringement such that a patent enforcement suit would be a reasonable next step. *See* CX-1222C; RX-3136C (Moisand WS) at Q/A 75 (features that purport to be "private VLAN" do not necessarily infringe); CX-1222C (Djavaherian RWS) at Q/A 79-83, Q/A 91 Q/A 95-96; Djavaherian Tr. 1406.

264

Arista also argues that Cisco's promotion of RFC 5517 as an "informal standard" for private VLANs led Arista to believe that it would not be enforcing the Private VLAN patents against industry participants that implemented private VLAN technology in their products. *See, e.g.*, Resp. Br. at 7-8. Yet, the evidence fails to establish that encouraging adoption of a product in the industry creates any licensing obligation for patents related to that product. *See* CX-1222C (Djavaherian RWS) at Q/A 57-61, Q/A 73-75, Q/A 84, Q/A 89-91, Q/A 95-96. Evidence adduced at the hearing shows that RFC 5517 is not a standard and was never submitted to any standard setting organization for adoption. Specifically, each published version of RFC 5517 states that it is an informational submission and not standards-track. CX-1254–1264 (RFC 5517 Drafts); CX-0952 (RFC 5517) at CSI-ANI-00379874; CX-1251 (RFC 5517 approval announcement) at CSI-ANI-00666246; CX-1222C (Djavaherian RWS) at Q/A 53. Moreover, Cisco's intellectual property rights disclosure related to RFC 5517 states that a license would be required to practice any related patents unless (1) the technology were adopted as an IETF standard, and (2) the patents were necessary to the adoption of that standard. *See* CX-0492 (Cisco's IPR Disclosure) at CIS-ANI-00652998; CX-1222C (Djavaherian RWS) at Q/A 22, Q/A 24, Q/A 26, Q/A 62-72; CX-1221C (Lang RWS) at Q/A 21, Q/A 32-39, Q/A 43-47. Inasmuch as neither of these conditions were satisfied, Arista could not reasonably believe based on RFC 5517 that Cisco intended to refrain from enforcing its intellectual property rights.

## 2. There Was No Reasonable Reliance by Arista

To establish reliance, Arista must show that "the infringer . . . had a relationship or communication with the plaintiff which lulls the infringer into a sense of security" in connection with the infringer "taking some action." *Aukerman*, 960 F.2d at 1042-43. *Aukerman* also makes clear "that for equitable estoppel the alleged infringer cannot be unaware—as is possible under

265

laches—of the patentee and/or its patent." *Id.*; *see also Winbond Electronics Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001) ("Thus, for this form of estoppel, the alleged infringer must have knowledge of the patentee and its patent and must reasonably infer that the patentee acquiesced to the allegedly infringing activity for some time."). Evidence adduced at the hearing demonstrates that Arista cannot prove reasonable reliance under the circumstances, and therefore cannot succeed in its argument that equitable estoppel should bar relief in this investigation.

As an initial matter, Arista maintains that [

]. *See* RX-3879C (Duda WS) at Q/A 60; Duda Tr. 782-783, 870-871; Sweeney Tr. 1091. Accordingly, Arista could not have reasonably relied on any action by Cisco to support a belief that Cisco would not enforce the patents in suit.

Moreover, the record evidence establishes the following:

- [                                                                                      ]. JX-0042C (Ullal Dep. Tr.) 160-161; Duda Tr. 763-765, 767-768.

- [

  ]. Duda Tr. 787-788.

- [                                                          ]. Duda Tr. 793-795; Sweeney Tr. 1089, 1091.

- [                                                                      ]. Duda Tr. 770-773, 777-7781; JX-0020C (Bechtolsheim Dep. Tr.) 326; JX-0022C (Cheriton Dep. Tr.) 115-116; JX-0042C (Ullal Dep. Tr.) 161.

- [

  ]. JX-0042C (Ullal Dep. Tr.) 158-159.

- [

  ]. JX-0042C (Ullal Dep. Tr.) 153, 162; Duda Tr. 789-790; Sweeney Tr. 1091; Arneja Tr. 1145-1146; JX-0020C (Bechtolsheim Dep. Tr.) 246-247, 269-270.

266

There was no express or implied communication or relationship between Cisco and Arista that could have led Arista into a false sense of security, and any reliance under the circumstances would be unreasonable. *See* CX-1222C (Djavaherian RWS) at Q/A 14, Q/A 25, Q/A 75-76, Q/A 78, Q/A 81-82, Q/A 88, Q/A 95.

### 3. There Was No Prejudice

Arista cannot show a "change of economic position" or that its expenditure of resources with respect to the accused products was causally related to actions taken by Cisco. *See Aukerman*, 960 F.2d at 1043. The prejudice claimed by Arista here is that "Arista invested significant resources to develop the accused products," and that "during this time, Arista's sales steadily increased as it gained a greater foothold into the market, which has resulted in a substantial product base deployed by network users throughout the country." *See* Resp. Br. at 405-06.

Inasmuch as the record evidence does not show that Arista would have taken different actions had it known about Cisco's patents, such as decreasing its expenditures with respect to developing the accused products, Arista has failed to show prejudice such that equitable estoppel could bar relief in this investigation. *Cf. ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) (citing *Aukerman*, 960 F.2d at 1033) (finding prejudice because the patentee's delay and silence resulted in a change to the defendant's economic position).

### B. Implied License, Waiver, and Patent Misuse

Arista argues that "Cisco's standard setting activities are another, independent reason to bar Cisco from enforcing the '145 and '59[2] patents in this investigation" because they allegedly constitute implied license, waiver, and patent misuse. *See* Resp. Br. at 406-07. Yet,

267

the evidence adduced in this investigation fails to show that the equitable theories of implied

license, waiver, or patent misuse should bar relief in this investigation.

### 1.    Implied License

"The primary difference between the estoppel analysis in implied license cases and the

analysis in equitable estoppel cases is that implied license looks for an affirmative grant of

consent or permission to make, use, or sell: i.e., a license." *Wang Laboratories, Inc. v.*

*Mitsubishi Electronics America, Inc.*, 103 F.3d at 1571, 1581 (Fed. Cir. 1997).  In order for

Arista to succeed in its implied license defense, Arista must demonstrate that Cisco engaged in

language or conduct allowing Arista to properly infer that Cisco consented to the use of Cisco's

patents, and that Arista acted upon that consent.  *Id.*  As discussed above, Arista has set forth no

evidence of conduct by Cisco that could be interpreted as "an affirmative grant of consent or

permission" for Arista to practice its Private VLAN patents.

### 2.    Waiver

Arista's waiver theory is based on identical facts as its implied license theory, and it

suffers from the same legal deficiencies.  "[W]aiver is the "intentional relinquishment or

abandonment of a known right." *United States v. Olano,* 507 U.S. 725, 733 (1993) (quoting

*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "To support a finding of implied waiver in the

standard setting organization context, the accused must show by clear and convincing evidence

that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce

a reasonable belief that such right has been relinquished.'" *Hynix Semiconductor Inc. v. Rambus*

*Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011).  This can be shown by proving that the patentee

breached a duty of disclosure to the standard setting organization, *Id.*

As discussed above, Cisco's conduct related to RFC 5517 was appropriate under the circumstances, and could not effect a waiver. Cisco's IPR disclosure explicitly states that a licensing obligation arose only if the technology were adopted as a standard, which never occurred. *See* CX-0952 (RFC 5517); CX-0492 (Cisco's IPR Disclosure). Arista has not adduced clear and convincing evidence showing that Cisco's conduct was "so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *See Hynix*, 645 F.3d at 1348. Any reliance Arista placed on the assumption that PVLAN technology was an industry standard subject to SSO obligations was not reasonable. *See* CX-1222C (Djavaherian RWS) at Q/A 25, Q/A 40-41, Q/A 45-47, Q/A 57, Q/A 66-69, Q/A 75-76, Q/A 81, Q/A 86, Q/A 91; CX-1221C (Lang RWS) at Q/A 43-47.

### 3. Patent Misuse

Arista has not established that Cisco committed patent misuse, which requires that the patentee "impermissibly broade[n] the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects." *See Princo Corp.*, 616 F.3d 1318, 1328 (Fed. Cir. 2010); *see also id.* at 1329 ("[T]he doctrine of patent misuse 'has largely been confined to a handful of specific practices by which the patentee seemed to be trying to 'extend' his patent grant beyond its statutory limits.'"). Arista argues that Cisco violated its obligation to offer a license to its Private VLAN Patents on fair, reasonable, and non-discriminatory terms ("FRAND") by asserting its patents against Arista without offering such a license. Resp. Br. at 409-10. The record evidence shows, however, that Cisco has no obligation to license its patent on FRAND terms, because it made no such contractual undertaking. *See* CX-1222C (Djavaherian RWS) at Q/A 14, Q/A 25, Q/A 40-41, Q/A 45-47, Q/A 57, Q/A 66-69, Q/A 73-76, Q/A 81, Q/A 86-88, Q/A 91; CX-1221C (Lang RWS) at Q/A 43-47.

269

## C.    Laches

To establish laches, Arista must prove that (1) Cisco delayed in bringing an infringement lawsuit for an "unreasonable and inexcusable" length of time from when it knew or reasonably should have known of its infringement claim against the accused infringer; and (2) the delay caused "material prejudice" to the defendant. *See Aukerman*, 960 F.2d at 1028. A delay in bringing suit for more than six years creates a presumption of laches. *Id.* at 1035-36. This presumption can be eliminated if the patentee shows that the delay was reasonable or that the defendant was not prejudiced. *Id.* at 1038. The laches clock begins running with a patentee's actual or constructive knowledge of defendant's infringement. *Id.* at 1035-36.

### 1.    Laches As a Defense in Section 337 Investigations

Until now, laches has not been available as a defense in section 337 investigations before the Commission. *See, e.g.*, *Certain Sortation Systems, Parts Thereof, and Products Containing Same*, Inv. No. 337-TA-460, Initial Determination, at 142, n.20 (Oct. 22, 2002) (the Commission does not recognize laches as a defense under section 337); *Certain Personal Watercraft and Components Thereof*, Inv. No. 337-TA-452, Order No. 54 (Sept. 19, 2001) (precluding the affirmative defense of laches); *Certain EPROM, EEPROM, Flash Memory and Flash Microcontroller Semiconductor Devices*, Inv. No. 337-TA-395, Supplemental Views of Chairman Bragg, at 11 n.65 (July 9, 1998). Arista has not shown that disturbing that precedent is warranted under the circumstances of this investigation.[45] Nevertheless, as discussed below,

---

[45] Following the evidentiary hearing in this investigation, the Federal Circuit sitting *en banc* issued its opinion in *SCA Hygiene Prods. v. First Quality Baby Prods.*, No. 2013-1564, 2015 WL 5474261 (Fed. Cir. Sept. 18, 2015). The Federal Circuit held that laches may be considered in cases seeking injunctive relief, but this does not automatically transform laches into an available defense to bar any remedy that would otherwise be issued for violations of section 337. *See id.* at *16. *SCA Hygiene* limits the district courts' consideration of laches to bar injunctive relief in

270

Arista would not prevail in a laches defense here even if it were available as a defense in section 337 investigations.

### 2.    Arista's Laches Defense

The record evidence establishes that Cisco did not delay in bringing suit for an "unreasonable and inexcusable" length of time. A successful laches defense would require that Cisco knew or reasonably should have known of Arista's infringement, and not only the existence of Arista's products or features. *See, e.g.*, *Aukerman,* 960 F.2d at 1034 ("The six years for laches begins with a patentee's knowledge of infringement."); *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297-98 (Fed. Cir. 2004) ("[T]he patentee must have actual or constructive knowledge of an act of infringement that gives rise to a legal claim before that clock begins to run . . . .").

Evidence adduced at the hearing demonstrates that Cisco did not become aware of Arista's infringement of Cisco's patents until May 21, 2014, seven months before filing suit. CX-1221C (Lang RWS) at Q/A 59; RX-0007C (Cisco's Responses to Interrogatory No. 8). This is not an unreasonable or inexcusable delay, and Arista provides no authority suggesting otherwise. Instead, Arista argues: "Beyond mere awareness of the products, Cisco knew of their technical features and their allegedly infringing nature." Resp. Br. at 392. It is argued that Cisco's knowledge of Arista product features having names similar to Cisco's patented product features constitutes constructive knowledge of infringement. *See, e.g., id.* at 392-93, 414-18. The cited evidence, however, fails to show that laches should bar relief in this investigation.

---

patent cases to the confines of the *eBay* analysis, and that determination is silent as to whether or not laches is an available defense in section 337 investigations.

271

The documents cited by Arista show that Cisco had a general market-related awareness that Arista sold devices with sysDB and an ability to detect faults. Yet, these are broad in nature, and Arista has not shown why Cisco should have known that Arista's devices with general functionality infringed Cisco's patents. General knowledge of a product does not mean that a party has a duty to investigate the functionality of the device. *See Wanlass v. Fedders*, 145 F.3d 1461, 1464-65 (Fed. Cir. 1998).

Furthermore, the requirement to prove material prejudice before a defense of laches can bar recovery is the same as that required for equitable estoppel. As discussed above, Arista has failed to establish that it was materially prejudiced by Cisco's alleged delay in asserting the patents in suit.

### D. Unclean Hands

A complainant who seeks justice must come into court with clean hands or "the doors of the court will be shut." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001) (quoting *Keystone Driller Co. v. General Excavator Co.*, 54 S.Ct. 146, 147 (1933)). To prove unclean hands, Arista must prove that Cisco "conducted [itself] as to shock the moral sensibilities of the judge." *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959). As discussed above, Cisco has not committed misleading conduct, fraud, or deceit, in litigation, before the PTO, or elsewhere.

Nevertheless, Arista also argues that "Cisco has long been in possession of Arista's highly confidential documents, but has not come forward with any explanation about how it received those documents even though it admits that it should not have Arista confidential documents." *See* Resp. Br. at 419. In particular, it is argued:

272

[

].

Resp. Br. at 394 (footnote omitted).

Yet, the fact that Cisco was in possession of documents marked Arista Confidential does not establish that Cisco came before the Commission with unclean hands. In particular, Arista has not adduced evidence establishing that these documents were in fact confidential, or that they were obtained by Cisco in an improper manner. Indeed, Adam Sweeny, Arista's VP of Software Engineering, testified during the hearing that [

]. Sweeny Tr. 1096; *see also* Sweeny Tr. 1093-1096 (discussing markings on document). Mr. Sweeny also testified that [

]. *See* Sweeny Tr. at 1099-1100.[46]

Accordingly, it is determined that the equitable doctrine of unclean hands should not bar relief in this investigation.

---

[46] Cisco also performed a demonstration at the hearing suggesting that [

]. *See* Sweeny Tr. 1101-1104.

273

## X.    Domestic Industry – Economic Prong

For purposes of the economic prong analysis, and regardless of whether or not they are determined to have satisfied the technical prong for their respective asserted patents, the following products will be considered articles protected by the asserted patents:[47]

| Asserted U.S. Patent No. | Cisco Domestic Industry Products |
|---|---|
| 7,162,537 | Cisco Carrier Routing System (CRS)<br>Cisco Aggregation Services Routers (ASR): 9000 Series<br>Cisco Routers: XR 12000 Series |
| 7,290,164 | Nexus Switches: 3000, 5000, 6000, 7000, 9000 Series |
| 7,340,597 | Catalyst Switches: 6500, 6800 Series<br>Cisco Aggregation Services Routers (ASR): 901<br>Nexus Switches: 7000 Series |
| 6,741,592 | Catalyst Switches: 4500, 6500, CBS 3110-40 Series<br>Industrial Ethernet Switches: 3000 Series<br>Connected Grid Switches (CGS): 2520<br>Nexus Switches: 3000, 5000, 6000, 7000, 9000 Series |

---

[47] On August 21, 2015, the administrative law judge granted Cisco's Unopposed Motion to Partially Terminate the Investigation As to Certain Asserted Claims, including all asserted claims of U.S. Patent No. 8,356,296 ("'296 patent"). Order No. 19: Initial Determination Terminating the Investigation As to Certain Claims (EDIS Doc. No. 563724). Cisco's expert, Dr. Stephen Wicker, analyzed the '296 patent and concluded that three Cisco products practice this patent: the Cisco Aggregation Services Routers (ASR) 1000 and 9000, and the Nexus 7000 series switch. *See* Compl. Pre-Hearing Br. at 758-771. Although Cisco does not rely on the ASR 1000 product with respect to any patent currently asserted in the investigation, the analysis of Cisco's domestic industry investments conducted by Dr. Leonard included Cisco's U.S. investments in this product. Cisco is not relying on its investments in this product to demonstrate the existence of a domestic industry. *See* Compl. Br. at 430 n.54.

274

| Asserted U.S. Patent No. | Cisco Domestic Industry Products |
|---|---|
| 7,200,145 | Catalyst Switches: 4500, 6500, CBS 3110-40 Series<br>Industrial Ethernet Switches: 3000 Series<br>Connected Grid Switches (CGS): 2520<br>Nexus Switches: 3000, 5000, 6000, 7000, 9000 Series |

The record evidence shows that Cisco maintains in the ordinary course of business a database called Teradata that tracks worldwide operating expenses. Sacks Tr. 645; CX-0011C (Sacks WS) at Q/A 53-55. Mr. Collin Sacks, a Cisco Operations Manager, queried this database to generate an operating expense ("OPEX") report for R&D and engineering expenses for the business units ("BUs") responsible for the DI Products from fiscal years 2012 to 2015. Sacks Tr. 645; CX-0011C (Sacks WS) at Q/A 53-55; CPX-0020C.

The data in the Teradata database demonstrates that Cisco has a domestic industry in the DI Products. Cisco's economic expert, Dr. Gregory Leonard, analyzed this data and concluded that Cisco's total worldwide engineering and R&D investments for all of the Cisco business units that are responsible for the DI Products were approximately $1.3 billion in each of fiscal years 2012, 2013, and 2014, and $1.1 billion in fiscal year 2015 through May 22, 2015. CX-0010C (Leonard WS) at Q/A 102-108; CPX-0020C.

### A.  Cisco's Engineering and R&D Activities

Cisco has presented evidence showing that engineering and R&D of Cisco products takes place in the United States, including for the DI Products. Edsall Tr. 431, 435, 435-436, 437, 438-439; Kathail Tr. 247-248; CX-0011C (Sacks WS) at Q/A 43-49. In particular, Cisco's engineers based in San Jose, California, have contributed significantly to the engineering and R&D of the DI Products. Edsall Tr. 436; CX–0011C (Sacks WS) at Q/A 26-29. Cisco witnesses

275

testified that the DI Products have been and continue to be designed and developed in the United States, including such ongoing activities as product refinement, development of additional features, platform-specific and platform-independent software releases, hardware releases, and multiple forms of testing. CX-0011C (Sacks WS) at Q/A 47; CX-0004C (Edsall WS) at Q/A 37, Q/A 48-54, Q/A 86-89. Dr. Leonard also testified that Cisco's R&D activities include "refreshing" the DI Products to provide improved versions. Leonard Tr. 690.

### B. Dr. Leonard's Analysis of Cisco's Domestic Industry

As set forth in more detail in the sections below, Dr. Leonard's analysis demonstrates that Cisco has made significant and substantial investments in the United States with respect to the DI Products. The OPEX data was apportioned by Dr. Leonard using established economic principles to reflect conservatively only Cisco's U.S. expenditures associated with the DI Products. Leonard Tr. 689-693; CX-0010C (Leonard WS) at Q/A 109-126. Dr. Leonard apportioned Cisco's worldwide BU investments to the DI Products using allocations based on the ratio of a BU's revenues corresponding to DI Products to the BU's total revenues for all products. Leonard Tr. 689-691; CX-0010C (Leonard WS) at Q/A 109-117. Dr. Leonard then apportioned these investments to exclude investments outside the United States using the percentage of engineers in each BU located in the United States. Leonard Tr. 692-693; CX-0010C (Leonard WS) at Q/A 118-126. Dr. Leonard's analyses show that Cisco has invested billions of dollars in connection with the DI Products in the United States.

### 1. Cisco's Investments in Plant and Equipment

Under section 337(a)(3)(A), a complainant may demonstrate a domestic industry by showing a significant investment in plant and equipment with respect to articles protected by the patent. A showing of significant investment in plant and equipment is itself sufficient to meet

276

the economic domestic industry requirement.  Here, Cisco has provided evidence of its

significant investments in plant and equipment for the DI Products.  Cisco employees who

engage in engineering and R&D related to the DI Products work at facilities throughout the

United States in which Cisco makes significant investments.  CX-0010C (Leonard WS) at Q/A

91; CX-0105C (Cisco's Investments in Plant and Equipment).  Cisco's San Jose headquarters

provides space for thousands of engineering and R&D personnel working on the DI Products.

CX-0010C (Leonard WS) at Q/A 61, Q/A 92.  Cisco's other U.S. campuses also provide space

for Cisco's engineering and R&D personnel working on the DI Products.  *Id.* at Q/A 62, Q/A

91-92; CX-0004 (Edsall WS) at Q/A 90; CX-0678 (Cisco's 2014 Annual Report) at 31.

Dr. Leonard testified that the relevant Account Rollup items that capture Cisco's

investments in plant and equipment for engineering and R&D activities are the following:

> Building Rent – Expenses related to the rent for buildings.
>
> Equipment Expense – Expenses related to low value equipment such as computers and software, networking equipment, and testing equipment.
>
> Other Facilities – General building expenses that are not recorded under Building Rent (or other related line items) such as general maintenance and repair, test lab upgrades and repair, security upgrades for facilities, and general building maintenance.
>
> Prototype – Expenses related to purchasing equipment and materials for prototyping.

CX-0010C (Leonard WS) at Q/A 128-133.

The relevant P/L Level 4 categories associated with these Account Rollup items include

Engineering, General & Administrative ("G&A"), Marketing, and Sales, which cover activities

that support engineering and R&D activities.  CX-0010C (Leonard WS) at Q/A 134-136.  For

fiscal years 2012 through 2015, Cisco invested approximately $151.8 million in the '592 patent,

$72.6 in the '537 patent, $151.8 million in the '145 patent, $116.2 million in the '164 patent, and

$88.4 million in the '597 patent. *Id.* at Q/A 147. This is broken down as follows:

**Cisco's U.S. Engineering and R&D Investments in Plant and Equipment for the Cisco Domestic Industry Products by Asserted Patent**

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 6,741,592 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 36,479,809 | 34,388,002 | 44,891,352 | 36,119,060 |
| 7,162,537 | Cisco ASR 9000 Router<br>Cisco CRS<br>Cisco XR 12000 Router | 22,187,907 | 18,738,698 | 17,051,241 | 14,688,504 |

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 7,200,145 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 36,479,809 | 34,388,002 | 44,891,352 | 36,119,060 |
| 7,290,164 | Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 22,341,209 | 26,188,715 | 37,892,246 | 29,847,569 |
| 7,340,597 | Catalyst 6500 Switch<br>Catalyst 6800 Switch<br>Cisco ASR 901 Router<br>Nexus 7000 Switch | 24,650,513 | 27,012,347 | 21,588,587 | 15,178,971 |

*Id.* at Q/A 142-151; CX-0105C (Cisco's Investments in Plant and Equipment).

Dr. Leonard also testified that Cisco's investments in plant and equipment for the DI Products are significant because they are critical to its ability to competitively sell these products, and to the availability of quality products in the communications equipment industry. CX-0010C (Leonard WS) at Q/A 150-51. Dr. Leonard also compared Cisco's investments in

279

plant and equipment for the DI Products inside the United States to those outside the United

States. CX-0010C (Leonard WS) at Q/A 152-157. Total U.S. investments in plant and

equipment across all of the DI Products were a greater percentage of worldwide investments than

non-U.S. investments in every fiscal year under consideration, which were fiscal years 2012

through 2015. *Id.* Furthermore, total U.S. investments in plant and equipment for each of the DI

Products, individually, were greater than the corresponding total non-U.S. investments in every

fiscal year under consideration with just a few exceptions. *Id.*; CX-0105C (Cisco's Investments

in Plant and Equipment). The high relative value of Cisco's U.S. investments to foreign

investments demonstrates that Cisco's investments in the DI Products are significant. *See*

*Certain Male Prophylactics*, Inv. No. 337-TA-546, Comm'n Op. at 26 (June 21, 2007); *see also*

*Lelo v. Int'l Trade Comm'n*, 786 F.3d 879, 884 (Fed. Cir. 2015). Thus, Dr. Leonard has

demonstrated that Cisco's investments in plant and equipment for the DI Products are

economically significant, including at the time the complaint was filed. CX-0010C (Leonard

WS) at Q/A 152-157.

### 2. Cisco's Investments in the Employment of Labor or Capital

Under section 337(a)(3)(B), a complainant may demonstrate a domestic industry by

showing a significant investment in labor or capital with respect to articles protected by the

patent. A showing of significant investment in labor or capital is itself sufficient to meet the

economic domestic industry requirement. Here, Cisco has provided evidence showing

significant investments in labor or capital in connection with the DI Products. Dr. Leonard

testified that the relevant Account Rollup items that capture Cisco's investments in the

employment of labor for engineering and R&D activities are the following:

Salary – Expenses related to salaries paid to engineers.

Overtime – Expenses related to overtime paid to engineers.

CX-0010C (Leonard WS) at Q/A 159-160.

The only relevant P/L Level 4 category associated with these Account Rollup items is Engineering. CX-0010C (Leonard WS) at Q/A 161. For fiscal years 2012 through 2015, Cisco invested approximately $349.3 million in the '592 patent, $117.4 in the '537 patent, $349.3 million in the '145 patent, $256.2 million in the '164 patent, and $158.1 million in the '597 patent. *Id.* at Q/A 169-170; CX-0107C (Cisco's Investments in the Employment of Labor). This is broken down as follows:

**Cisco's U.S. Engineering and R&D Investments in the Employment of Labor for the Cisco Domestic Industry Products by Asserted Patent**

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 6,741,592 | Catalyst 4500 Switch Catalyst 6500 Switch Catalyst CBS 3110-40 Switch CGS 2520 Switch IE 3000 Switch Nexus 3000 Switch Nexus 5000 Switch Nexus 6000 Switch Nexus 7000 Switch Nexus 9000 Switch | 78,485,851 | 75,053,326 | 98,408,255 | 97,385,194 |
| 7,162,537 | Cisco ASR 9000 Router Cisco CRS Cisco XR 12000 Router | 31,432,564 | 32,622,049 | 31,137,259 | 22,231,893 |

281

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 7,200,145 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 78,485,851 | 75,053,326 | 98,408,255 | 97,385,194 |
| 7,290,164 | Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 46,844,173 | 51,325,146 | 76,394,216 | 81,689,064 |
| 7,340,597 | Catalyst 6500 Switch<br>Catalyst 6800 Switch<br>Cisco ASR 901 Router<br>Nexus 7000 Switch | 46,372,150 | 42,155,603 | 42,388,163 | 27,266,744 |

CX-0010C (Leonard WS) at Q/A 158–170; CX-0107C (Cisco's Investments in the Employment of Labor).

Dr. Leonard testified that the relevant Account Rollup items that capture Cisco's investments in the employment of capital for engineering and R&D activities are the following:

Building Rent – Expenses related to the rent for buildings.

282

Equipment Expense – Expenses related to low value equipment such as computers and software, networking equipment, and testing equipment.

Other Facilities – General building expenses that are not recorded under Building Rent (or other related line items) such as general maintenance and repair, test lab upgrades and repair, security upgrades for facilities, and general building maintenance.

Prototype – Expenses related to equipment and materials for prototyping.

Software – Expenses related to software for engineering development, such as Cadence, Synopsis, Net Front, Wind River, and IBM, and software for standard company operations, such as Windows, Visio, and Apple software.

Project Based Services – Expenses related to outsourced projects such as source code development.

Outsourced Services – Expenses similar to Project Based Services, but additional outsourced work.

Advisory Services – Expenses related to expert consulting or advice on technology.

CX-0010C (Leonard WS) Q/A 180-186.

The relevant P/L Level 4 categories associated with these Account Rollup items include Engineering, G&A, Marketing, and Sales, which cover activities that support engineering and R&D activities. CX-0010C (Leonard WS) at Q/A 187-189. For fiscal years 2012 through 2015, Cisco invested approximately $254.1 million in the '592 patent, $113.5 in the '537 patent, $254.1 million in the '145 patent, $184.2 million in the '164 patent, and $122.1 million in the '597 patent. *Id.* at Q/A 197-198; CX-0108C (Cisco's Investments in the Employment of Capital). This is broken down as follows:

**Cisco's U.S. Engineering and R&D Investments in the Employment of Capital for the Domestic Industry Products**

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 6,741,592 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 57,219,966 | 53,927,241 | 75,974,108 | 67,052,609 |
| 7,162,537 | Cisco ASR 9000 Router<br>Cisco CRS<br>Cisco XR 12000 Router | 35,329,458 | 30,479,557 | 27,165,278 | 20,533,570 |
| 7,200,145 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 57,219,966 | 53,927,241 | 75,974,108 | 67,052,609 |

Appx888.295

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 7,290,164 | Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 32,483,511 | 36,639,468 | 60,434,099 | 54,712,868 |
| 7,340,597 | Catalyst 6500 Switch<br>Catalyst 6800 Switch<br>Cisco ASR 901 Router<br>Nexus 7000 Switch | 35,383,474 | 34,671,892 | 29,933,642 | 22,135,722 |

CX-0010C (Leonard WS) at Q/A 180-198; CX-0108C (Cisco's Investments in the Employment of Capital).

Dr. Leonard also testified that Cisco's U.S. investments in labor and capital for the DI Products are significant because they are critical to its ability to competitively sell these products, and to the availability of quality products in the communications equipment industry. CX-0010C (Leonard WS) at Q/A 172-173, Q/A 200-201. Dr. Leonard compared Cisco's investments in labor and capital for the DI Products inside the United States to those outside the United States. CX-0010C (Leonard WS) at Q/A 171-179, Q/A 199-207. Total U.S. investments in labor and capital across all DI Products were a greater percentage of worldwide investments than non-U.S. investments in every fiscal year under consideration, which were fiscal years 2012 through 2015. *Id.* Furthermore, total U.S. investments in labor and capital for each of the Cisco DI Products, individually, were greater than the corresponding total non-U.S. investments in every fiscal year under consideration with just a few exceptions. *Id.*; CX-0106C (Cisco's

285

Investments in Labor or Capital). As discussed previously, the high relative value of U.S. investments to foreign investments demonstrates that Cisco's investments in the Cisco DI Products are significant. Thus, Dr. Leonard has demonstrated that Cisco's U.S. investments in labor and capital are economically significant, including at the time the complaint was filed. CX-0010C (Leonard WS) at Q/A 171-79, Q/A 199-207.

### 3.   Cisco's Investments in Engineering and R&D

Under section 337(a)(3)(C), a complainant may demonstrate a domestic industry by showing a substantial investment in the exploitation of the patent, including engineering, research and development, or licensing. Here, Cisco has provided evidence of its substantial investments in the exploitation of the patents through engineering and R&D. Cisco's U.S. investments in engineering and R&D include, for example, the following investments made in connection with the DI Products: equipment and designs for engineering and R&D activities; training of engineering personnel, including by attending trade shows, recruiting and relocation of engineers; compensation, including salaries and overtime pay; and operating expenses for engineering facilities, such as rent and maintenance and equipment costs. CX-0010C (Leonard WS) at Q/A 209-210. Dr. Leonard testified that all Account Rollup items capture Cisco's investments in engineering and R&D. *Id.*; CPX-0020C (Cisco's OPEX Data). The only relevant P/L Level 4 category associated with these Account Rollup items is Engineering. Leonard Tr. 674; CX-0010C (Leonard WS) at Q/A 211. For fiscal years 2012 through 2015, Cisco invested approximately $1 billion in the '592 patent, $410 million in the '537 patent, $1 billion in the '145 patent, $748.5 million in the '164 patent, and $469.6 million in the '597 patent. CX-0010C (Leonard WS) at Q/A 221; CX-0109C (Cisco's Investments in Engineering and R&D). This is broken down as follows:

286

**Cisco's U.S. Engineering and R&D Investments for the Cisco Domestic Industry Products by Asserted Patent**

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 6,741,592 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 239,636,233 | 219,342,804 | 283,075,272 | 287,576,096 |
| 7,162,537 | Cisco ASR 9000 Router<br>Cisco CRS<br>Cisco XR 12000 Router | 113,088,534 | 110,978,470 | 106,456,862 | 79,531,272 |

287

| Asserted U.S. Patent No. | Cisco Domestic Industry Products | FY 2012 ($) | FY 2013 ($) | FY 2014 ($) | FY 2015 ($) |
|---|---|---|---|---|---|
| 7,200,145 | Catalyst 4500 Switch<br>Catalyst 6500 Switch<br>Catalyst CBS 3110-40 Switch<br>CGS 2520 Switch<br>IE 3000 Switch<br>Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 239,636,233 | 219,342,804 | 283,075,272 | 287,576,096 |
| 7,290,164 | Nexus 3000 Switch<br>Nexus 5000 Switch<br>Nexus 6000 Switch<br>Nexus 7000 Switch<br>Nexus 9000 Switch | 141,358,175 | 150,144,274 | 218,344,673 | 238,729,209 |
| 7,340,597 | Catalyst 6500 Switch<br>Catalyst 6800 Switch<br>Cisco ASR 901 Router<br>Nexus 7000 Switch | 139,570,571 | 126,107,740 | 120,801,494 | 83,129,419 |

CX-0010C (Leonard WS) at Q/A 209-219; CX-0109C (Cisco's Investments in Engineering and R&D).

Cisco adduced evidence in support of its argument that it exploits the asserted patents through the ongoing engineering and R&D of the DI Products. Cisco's technical experts, Drs. Almeroth, Wicker, Jeffay, and Bhattacharjee, testified that the DI Products each practice at least

288

one claim of the asserted patents.[48]  CX-0001C (Wicker WS) at Q/A 262-305, Q/A 310-313;

CX-0003C (Jeffay WS) at Q/A 441-493, Q/A 498-499, Q/A 503-504, Q/A 513-516; CX-0007C

(Almeroth WS) at Q/A 283-393; CX-0008C (Bhattacharjee WS) at Q/A 407-472.  Dr. Leonard

also testified that the required nexus exists between the asserted patents and the DI Products

because the patents are embodied in the DI Products, and because Cisco's engineering and R&D

investments are directed in part to improving the patented features within the DI Products.

Leonard Tr. 694; CX-0010C (Leonard WS) at Q/A 231-232.

Moreover, a nexus to the asserted patents can be seen in the documentary evidence of

Cisco's ongoing engineering and R&D activities relating to the protected articles that practice

the patented features.

For example, with respect to the '145 and '592 (Private VLAN) patents, Mr. Edsall

testified about his own role in the implementation of the patented PVLAN technology in Cisco

products.  Edsall Tr. 435 (testifying that he managed a team of Cisco engineers that incorporated

PVLAN into Cisco products).  In addition, Cisco's public and internal technical documentation

describe Cisco's implementation of PVLAN in the DI Products. *See, e.g.*, CX-0062 (Cisco

Nexus 3048 Switch Data Sheet, 2014); CX-0068 (Cisco CGS 2520 Software Configuration

Guide, April 2010); CX-0069 (Cisco Nexus 3000 Series NX-OS Layer 2 Switching

Configuration Guide, last modified Sept. 2014).  In particular, these documents support the

inference that engineers performed work during the DI investment period on the patented feature

within the DI products.  For example, CX-0062, dated 2014, illustrates in detail that the PVLAN

feature is a part of the Nexus 3048 DI Product.

---

[48] As mentioned above, Cisco's domestic investments in the DI Products will be analyzed for purposes of the economic prong regardless of whether or not the DI Products are determined to have satisfied the technical prong for their respective asserted patents.

With respect to the '537 (SysDB) patent, Cisco inventor and engineer Mr. Pradeep Kathail testified regarding his own role in the implementation of the patented SysDB technology in Cisco products. Kathail Tr. 246-247 (testifying that he worked on the implementation of IOS XR, which includes the technology covered by the '537 patent in Cisco products). He further testified that he currently supervises engineers who work on designing how Cisco's products use IOS-XR. Kathail Tr. 247. Cisco's public and internal technical documentation describes SysDB and the IOS-XR software in the DI Products. *See, e.g.*, CX-0464 (Cisco IOS XR Fundamentals, June 2009); CX-0465 (Cisco CRS 4-, 8- and 16-Slot Line Card Chassis Performance Route Processors Data Sheet, 2014). In particular, these documents show that engineers in the United States worked on products that practice the patented SysDB feature. *See* CX-0464 at iv-v (describing the authors' involvement in the development of Cisco IOS-XR); *id.* at 46-50 (describing the implementation of SysDB in IOS-XR); CX-0465 at 1-2 (describing the implementation of IOS-XR on Cisco Carrier Routing System (CRS) products).

With respect to the '597 (ProcMgr) patent, Cisco's public and internal technical documentation describes OBFL, Cisco's implementation of the patented technology, in the DI Products. In particular, these documents show that engineers in the United States worked on the patented OBFL feature. *See, e.g.*, CX-0337C (Generic On-Board Failure Logging Product Requirements Document, Jan. 2013) at 2 (listing Cisco who were involved in development of the OBFL technology in the 2012-2013 time frame as shown in this Products Requirements Document, which is a technical document generated by Cisco and devoted to documenting the development of OBFL). OBFL is also discussed in Cisco configuration guides, manuals, and datasheets for Cisco's DI products. *See, e.g.*, CX-0382 (Supervisor Engine 2T Software

Configuration Guide, Release 15.2SY, Dec. 2014) at 17-1 through 17-12 (describing the implementation of OBFL in Cisco IOS Release 15.2SY).

 With respect to the '164 (Zero Touch Provisioning) patent, Cisco's public and internal technical documentation describe ZTP, which Cisco refers to as "Power On Auto-Provisioning" or "POAP," in connection with the DI Products. *See, e.g.*, CX-0187 (Cisco Nexus 3000 Series NX-OS Fundamentals Configuration Guide, Release 6.x, last modified Sept. 2014); CX-0188 (Cisco Nexus 5000 Series NX-OS Fundamentals Configuration Guide, Release 5.1(3)N2(1), March 2012); CX-0220C (N7K Series PowerOn Auto-Provisioning (POAP) Software Functional/Design Specification, last modified May 2013).  In particular, these documents support the inference that Cisco's engineers performed engineering and research and development work on the patented POAP feature in the DI Products.  For example, CX-0220C was last modified in May 2013, and illustrates in detail that the POAP feature is a part of the Nexus 7000 products.

 As such, Cisco has demonstrated that its investments in the DI Products have a direct nexus to the asserted patents.

 Dr. Leonard also testified that Cisco's investments in engineering and R&D for the DI Products in the United States are substantial because they are critical to Cisco's ability to competitively sell the DI Products, and to the availability of quality products in the communications equipment industry.  CX-0010C (Leonard WS) at Q/A 223-24.  Dr. Leonard compared Cisco's investments in engineering and R&D for the DI Products inside the United States to those outside the United States.  Total U.S. investments in engineering and R&D across all of the DI Products were a greater percentage of worldwide investments than non-U.S. investments in every fiscal year under consideration, which were fiscal years 2012 through 2015.

291

CX-0010C (Leonard WS) at Q/A 229. Furthermore, total U.S. investments in engineering and R&D for each of the DI Products was greater than the corresponding total non-U.S. investments in every fiscal year under consideration with just a few exceptions. *Id.*; CX-0109C (Cisco's Investments in Engineering and R&D). As discussed previously, the high relative value of U.S. investments to foreign investments demonstrates that Cisco's investments in the DI Products are substantial. Thus, Cisco's U.S. investments in engineering and R&D are substantial, including at the time the complaint was filed. CX-0010C (Leonard WS) at Q/A 222-30.

## XI.    Conclusions of Law

1.     The Commission has subject matter, personal, and *in rem* jurisdiction in this investigation.

2.     The accused Arista products have been imported into the United States.

3.     Arista's accused products infringe asserted claims 1, 2, 8-11, and 17-19 of U.S. Patent No. 7,162,537; asserted claims 6, 7, 20, and 21 of U.S. Patent No. 6,741,592; and asserted claims 5, 7, 45, and 46 of U.S. Patent No. 7,200,145.

4.     Arista's accused products do not infringe asserted claims 1, 14-15, 29, 39, 63-64, or 71-73 of U.S. Patent No. 7,340,597; or asserted claims 1, 5, 6, 9, or 18 of U.S. Patent No. 7,290,164.

5.     The domestic industry requirement has been satisfied with respect to the infringed '537, '592, and '145 patents.

6.     It has not been shown by clear and convincing evidence that the asserted claims of the patents in suit are invalid.

292

## XII.  Initial Determination on Violation

Accordingly, it is the initial determination of the undersigned that a violation of section 337 (19 U.S.C. § 1337) has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain network devices, related software and components thereof with respect to asserted claims 1, 2, 8-11, and 17-19 of U.S. Patent No. 7,162,537; asserted claims 6, 7, 20, and 21 of U.S. Patent No. 6,741,592; and asserted claims 5, 7, 45, and 46 of U.S. Patent No. 7,200,145

Further, this initial determination, together with the record of the hearing in this investigation consisting of (1) the transcript of the hearing, with appropriate corrections as may hereafter be ordered, and (2) the exhibits received into evidence in this investigation, is hereby certified to the Commission.

In accordance with 19 C.F.R. § 210.93(c), all material found to be confidential by the undersigned under 19 C.F.R. § 210.5 is to be given *in camera* treatment.

The Secretary shall serve a public version of this initial determination upon all parties of record and the confidential version upon counsel who are signatories to the Protective Order, as amended, issued in this investigation.

Pursuant to 19 C.F.R. § 210.42(h), this initial determination shall become the determination of the Commission unless a party files a petition for review pursuant to § 210.43(a) or the Commission, pursuant to § 210.44, orders on its own motion a review of the initial determination or certain issues herein.

## XIII.  Order

To expedite service of the public version, each party is hereby ordered to file with the Commission Secretary no later than February 9, 2016, a copy of this initial determination with

brackets to show any portion considered by the party (or its suppliers of information) to be confidential,[49] accompanied by a list indicating each page on which such a bracket is to be found. At least one copy of such a filing shall be served upon the office of the undersigned, and the brackets shall be marked in red. If a party (and its suppliers of information) considers nothing in the initial determination to be confidential, and thus makes no request that any portion be redacted from the public version, then a statement to that effect shall be filed.

David P. Shaw
Administrative Law Judge

Issued: February 2, 2016

---

[49] Confidential business information ("CBI") is defined in accordance with 19 C.F.R. § 201.6(a) and § 210.5(a). When redacting CBI or bracketing portions of documents to indicate CBI, a high level of care must be exercised in order to ensure that non-CBI portions are not redacted or indicated. Other than in extremely rare circumstances, block-redaction and block-bracketing are prohibited. In most cases, redaction or bracketing of only discrete CBI words and phrases will be permitted.

294

CERTAIN NETWORK DEVICES, RELATED SOFTWARD AND COMPONENTS
THEREOF (I):

**INV. NO. 337-TA-944**

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION** has been
served by hand upon the Commission Investigative Attorney, **Andrew Beverina, Esq.**, and the
following parties as indicated, on **MAR 0 2 2016**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street SW, Room 112A
Washington, DC 20436

| FOR COMPLAINANT CISCO SYSTEMS, INC.: | |
|---|---|
| D. Sean Trainor, Esq.<br>**KIRKLAND & ELLIS LLP**<br>655 15th Street, NW<br>Washington, DC 20005 | ( ) Via Hand Delivery<br>(X) Express Delivery<br>( ) Via First Class Mail<br>( ) Other: _____ |
| **FOR RESPONDENT ARISTA NETWORKS, INC.:** | |
| Lauren A. Degnan, Esq.<br>**FISH & RICHARDSON P.C.**<br>1425 K Street, NW<br>11th Floor<br>Washington, DC 20005 | ( ) Via Hand Delivery<br>(X) Express Delivery<br>( ) Via First Class Mail<br>( ) Other: _____ |