# **EXHIBIT I**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

QUEST DIAGNOSTICS INVESTMENTS LLC,

     Plaintiff,

     v.                            C.A. No. 1:18-cv-01436-MN

LABORATORY CORPORATION OF AMERICA     **JURY TRIAL DEMANDED**
HOLDINGS, ESOTERIC, INC., and ENDOCRINE
SCIENCES, INC.,

     Defendants.

## DEFENDANTS' INITIAL INVALIDITY CONTENTIONS

### I.    INTRODUCTION

Pursuant to Paragraph 7(d) of the Court's Scheduling Order (D.I. 18), Defendants Laboratory Corporation of America Holdings ("LCAH"), Esoterix, Inc. ("Esoterix"), and Endocrine Sciences, Inc. ("Endocrine") (collectively, "Defendants" or "LabCorp") hereby disclose their Initial Invalidity Contentions.  Defendants contend that each of the claims asserted by Plaintiff Quest Diagnostics Investments LLC ("Plaintiff") is invalid under at least one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or other equitable doctrines.

On April 12, 2019, Plaintiff served Defendants with Plaintiff's Disclosures Pursuant to Paragraph 4(c) of the Default Standard for Discovery ("Infringement Contentions"), wherein Plaintiff alleged infringement of claims 1–24 of U.S. Patent No. 8,409,862 (the "'862 Patent"), claims 21–25, 28, and 31 of U.S. Patent No. 7,972,867 (the "'867 Patent"), claims 1–6, and 9–11 of U.S. Patent No. 8,101,427 (the "'427 Patent"), and claims 9–13 of U.S. Patent No. 7,972,868 (the "'868 Patent") (collectively, the "Asserted Claims").

Defendants do not provide any Initial Invalidity Contentions regarding any claims not asserted against the Defendants.  To the extent Plaintiff is permitted to assert additional claims against any Defendant in the future, Defendants reserve all rights to disclose new or supplemental invalidity contentions regarding such claims.

In these Invalidity Contentions, with respect to each Asserted Claim, LabCorp: (i) identifies each currently known item of prior art that either anticipates or renders obvious each Asserted Claim; (ii) specifies whether each such item of prior art anticipates or renders obvious the applicable claims; (iii) submits charts for illustrative prior art references identifying where each limitation of each Asserted Claim is disclosed or rendered obvious by the prior art; and (iv) identifies the grounds for invalidating the Asserted Claims based on indefiniteness, enablement, and/or written description under 35 U.S.C. § 112.  LabCorp reserves the right to supplement these Invalidity Contentions pursuant to the Federal Rules of Civil Procedure, the Court's Local Rules, or any other order or schedule entered by the Court.

## II.      GENERAL STATEMENTS AND OBJECTIONS

Defendants' Invalidity Contentions are based on Defendants' knowledge, understanding, and belief as to the facts and information available as of the date of these Initial Invalidity Contentions.  Defendants have not yet completed its investigation, collection of information, discovery, or analysis relating to this action, and additional discovery may require Defendants to supplement or modify these contentions.  For example, Plaintiff has not produced all of the information relevant to Defendants' counterclaims and defenses, and Defendants have not yet deposed the named inventors of the Asserted Patents and/or other persons having potentially relevant information, but will engage in this and other such discovery consistent with this Court's Orders.  For these and other reasons, including those set forth below, Defendants reserve

the right to further supplement or alter the positions taken and information disclosed in these Initial Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts.  Defendants further reserve the right to introduce and use such supplemental materials at trial.

LabCorp provides the information below and in the attached claims charts, as well as the accompanying document production, in a good faith effort to comply with the Local Rules and Court's Scheduling Order.  LabCorp reserves the right to amend, modify, and/or supplement these Initial Invalidity Contentions.  In addition, LabCorp reserves the right to prove the invalidity of the Asserted Claims on bases other than those required to be disclosed in these Initial Invalidity Contentions.

### A.      Plaintiff's Infringement Contentions

These Initial Invalidity Contentions are made in response to Plaintiff's Infringement Claim Charts. Should Plaintiff modify any assertion or contention in Plaintiff's Infringement Claim Charts or present any new assertion or contention relevant to these Initial Invalidity Contentions, Defendants reserve the right to supplement or otherwise amend these Initial Invalidity Contentions and the accompanying document production.  Defendants note that Plaintiff's Infringement Contentions are deficient in a number of respects, including without limitation, relying on allegations made upon information and belief, insufficient evidence, and incorrect reasoning.  By setting forth its Invalidity Contentions in response to Plaintiff's Infringement Contentions, Defendants do not waive their objections to Plaintiff's deficient Infringement Contentions, nor do Defendants' Invalidity Contentions acquiesce to or implicitly

agree with any of the reasoning, analysis, conclusions, or other basis set forth in Plaintiff's Infringement Contentions.

### B.      Claim Construction

The Court has not yet construed the Asserted Claims. Defendants reserve the right to identify other prior art or to supplement these Initial Invalidity Contentions because Defendants' position on invalidity of certain claims may depend on how those claims are construed by the Court. Defendants' Initial Invalidity Contentions are based, at least in part, on their present understanding of the Asserted Claims and/or their present understanding of the claim constructions Plaintiff appears to be using—based on Plaintiff's Infringement Contentions— whether or not Defendants agree with such claim constructions.

To the extent that these Invalidity Contentions reflect constructions of claim terms that may be consistent with or implicit in Plaintiff's Infringement Claim Charts, no inference is intended or should be drawn that Defendants agree with such claim construction(s). Defendants take no position on any matter of claim construction in these Invalidity Contentions. Any statement herein describing or tending to describe any claim element is provided solely for the purpose of understanding the relevant prior art. Defendants expressly reserve the right to propose any claim construction it considers appropriate and/or to contest any claim construction it considers inappropriate. Indeed, Defendants may disagree with Plaintiff's interpretation of the meaning of many terms and phrases in the Asserted Claims.

Similarly, nothing stated herein shall be treated as an admission or suggestion that Defendants agree with Plaintiff regarding either the scope of any of the Asserted Claims or the claim constructions advanced directly or implicitly by Plaintiff. Additionally, nothing in these

Invalidity Contentions shall be treated as an admission that any of Defendants' accused products meet any limitations of the Asserted Claims.

Defendants anticipate the Court's construction of claim terms may significantly affect the scope of the Asserted Claims.  Therefore, Defendants reserve the right to supplement or modify these Invalidity Contentions based upon any future claim construction ruling.

### C.     Ongoing Discovery and Disclosures

Defendants provide these Initial Invalidity Contentions as provided for in the Scheduling Order in this matter. Discovery in this case is in its early stages, however, and Defendants' investigation, including Defendants' search for prior art, is ongoing.  Defendants therefore reserve the right to further supplement or alter the positions taken and information disclosed in these Initial Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts.  Defendants hereby incorporate by reference the testimony of any fact witnesses that are deposed, that provide declarations, or that otherwise testify in this lawsuit. Defendants also hereby incorporate by reference the forthcoming reports and testimony of Defendants' expert witnesses regarding invalidity of the patents.

Defendants base these Initial Invalidity Contentions on their current knowledge and understanding of the Asserted Claims, Plaintiff's Infringement Contentions, the prior art, and other facts and information available as of the date of these contentions. Defendants have not yet completed their investigation, collection of information, discovery, or analysis relating to this action, and additional discovery may require Defendants to supplement or modify these contentions. For example, Plaintiff has not produced all of the information relevant to Defendants' counterclaims and defenses, and Defendants have not yet deposed the named

5

inventors of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent, respectively, and/or other persons having potentially relevant information, but will engage in this and other such discovery consistent with this Court's Orders. Defendants therefore reserve the right to further supplement or alter the positions taken and information disclosed in these Initial Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts. Defendants further reserve the right to introduce and use such supplemental materials at trial.

Moreover, Plaintiff has made no specific disclosure regarding conception and reduction to practice. Thus, neither the '862 Patent, the '427 Patent, the '867 Patent, and the '868 Patent is not entitled to any date of invention earlier than their respective effective filing date. Defendants object to Plaintiff alleging or providing evidence of any earlier date of invention. To the extent Plaintiff is able and permitted to assert an earlier date of invention for any of the Asserted Claims, Defendants further reserve their right to supplement, modify, and/or amend these Initial Invalidity Contentions and their identification and production of prior art.

Further, as referenced above, Defendants intend to take discovery on public use and/or the on-sale bar under 35 U.S.C. § 102(b), additional prior art under 35 U.S.C. §§ 102 and 103, improper inventorship and/or derivation under 35 U.S.C. § 102(f), earlier invention by other parties under 35 U.S.C. § 102(g) and/or applicant's failure to comply with 35 U.S.C. §§ 101 and 112. Defendants therefore reserve all rights to further supplement or amend these Initial Invalidity Contentions if and when further information becomes available.

### D.  Prior Art Identification and Citation

Defendants identify portions of prior art references that disclose the elements of the Asserted Claims. Although Defendants have identified at least one citation per element for each

reference charted or otherwise discussed herein, each and every disclosure of the same element in said reference is not necessarily identified. In an effort to focus the issues, Defendants identify only limited portions of the cited references. It should be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information including other publications and general scientific or engineering knowledge.  Defendants therefore reserve the right to rely upon other portions of the prior art references not specifically cited herein, as well as on other publications and expert testimony to provide context and to aid understanding and interpretation of the identified portions. Defendants also reserve the right to rely upon other prior art references, other publications, and the testimony of experts to establish that the alleged inventions would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references.  Defendants also reserve the right to rely upon any admissions relating to prior art in '862 Patent, the '427 Patent, the '867 Patent, and/or the '868 Patent or their respective prosecution histories.

Where Defendants identify a particular figure in a prior art reference, the identification should be understood to encompass the caption and description of the figure as well as any text relating to the figure in addition to the figure itself.  Similarly, where an identified portion of text refers to a figure or other material, the identification should be understood to include the referenced figure or other material as well.

### E.      Reservation of Rights

Defendants reserve all rights to further supplement or modify these Initial Invalidity Contentions, including the prior art disclosed and stated grounds of invalidity, pursuant to the Court's Default Standard for Discovery and the Scheduling Order in this matter. In addition, Defendants reserve the right to prove the invalidity of the Asserted Claims on bases other than those required to be disclosed in these Initial Invalidity Contentions. Defendants also expressly reserve the right to amend and/or supplement these Initial Invalidity Contentions should this case be transferred to another district where different local and/or patent rules are operative.

## III.    INVALIDITY CONTENTIONS UNDER 35 U.S.C. § 102 AND/OR § 103

Each Asserted Claim is invalid for lack of novelty under 35 U.S.C. § 102 and/or for obviousness under 35 U.S.C. § 103.  The prior art cited herein discloses all the limitations of the Asserted Claims, either explicitly or inherently, and along with related art that may also be relied upon to show the state of the art in the relevant time frames.  LabCorp has identified exemplary portions of the prior art disclosing the claimed limitations.  The prior art, however, may contain additional support for particular claim limitations.  LabCorp expressly reserves the right to rely on uncited portions of the prior art, other documents, and expert testimony to provide context or to aid in the understanding of the cited portions of the prior art.  Where LabCorp identifies a particular figure in a prior art reference, the identification should be understood to encompass the caption and description of the figure as well as any text relating to the figure in addition to the figure itself.  Similarly, where an identified portion of text refers to a figure or other material, the identification should be understood to include the referenced figure or other material as well.

LabCorp has provided the accompanying exemplary charts for the '862 Patent, '427 Patent, '867 Patent, and '868 Patent.  Individual claim charts illustrate where each element of each Asserted Claim can be found in each item of the listed prior art.  To the extent one might

argue that any reference identified in the Exhibits does not disclose every aspect of an element, the reference still anticipates or renders obvious alone, or in combination, the Asserted Claim(s) because any such aspect of an element is inherently disclosed or would have been obvious to one skilled in the art.  Further, by mapping the claim language of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent to the references, LabCorp does not imply or admit that the claim language satisfies Section 112 of the Patent Act or that the claim language has patentable weight.

The cited prior art may be combined and modified in a number of ways to achieve the claimed products.  It should also be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field.  To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information including other publications and general scientific or engineering knowledge. LabCorp therefore reserves the right to rely upon other portions of the prior art references not specifically cited herein and on other publications and expert testimony to provide context and to aid understanding and interpretation of the identified portions.  LabCorp also reserves the right to rely upon other prior art references, other publications, and the testimony of experts to establish that the alleged inventions would have been obvious to a person of ordinary skill in the art, including on the basis of modifying or combining certain cited references.

LabCorp is not aware of how Plaintiff may attempt to distinguish the prior art cited herein, and thus reserves the right to identify other prior art that would have supplied the allegedly missing elements to render the Asserted Claims obvious or to present negative alleged evidence of secondary indicia of non-obviousness. Plaintiff have not identified what limitations of the Asserted Claims it alleges were not known to one skilled in the art at the time of the

alleged inventions recited in the Asserted Claims. For any claim limitation that Plaintiff allege is not disclosed in a prior art reference, LabCorp reserves the right to assert that such limitation is either inherent in the reference or would have been obvious to one skilled in the art in light of the same, or that the limitation is disclosed in one or more pieces of prior art and in combination would have rendered the Asserted Claims obvious.

The suggested obviousness combinations are in the alternative to LabCorp's Invalidity Contentions based on anticipation. The obviousness contentions set forth herein should not be construed to suggest that any prior art is not anticipatory by itself.  LabCorp reserves the right to rely on any identified piece of prior art individually to anticipate all of the Asserted Claims and/or to render obvious all of the Asserted Claims in view of the knowledge of one having ordinary skill in the art or in combination with other pieces of prior art.

LabCorp reserves the right to rely upon any admissions relating to prior art in the Asserted Patents or their prosecution histories and the prosecution histories of related patents/applications.  LabCorp also reserves the right to rely upon any related patents and patent applications, foreign counterparts of the U.S. patents identified in these Invalidity Contentions, U.S. counterparts of foreign patents and foreign patent applications identified in these Invalidity Contentions, or U.S. and foreign patents and patent applications corresponding to articles and publications identified in these Invalidity Contentions.  For prior art patents and publications identified in these Invalidity Contentions, LabCorp reserves the right to rely on the public use, offer for sale, and/or sale of the products described in those prior art patents or publications once LabCorp has had an opportunity to take discovery on these subjects.

Moreover, prior art not included in these Invalidity Contentions may become relevant depending upon the positions Plaintiff asserts, the claim constructions adopted by the Court, and

the priority dates given the Asserted Patents. In addition, discovery is ongoing and LabCorp has not had the opportunity to complete discovery in the present action. As a result, LabCorp may uncover additional prior art and/or relevant information. LabCorp reserves the right to supplement, modify, or amend these Invalidity Contentions with additional prior art, or different versions of the prior art listed herein, as discovery continues in light of information provided by Plaintiff concerning its infringement allegations, priority dates of the Asserted Patents, or in light of the Court's claim construction or other rulings and orders.

Finally, citations from the listed references are not a ratification or acceptance of the manner in which Plaintiff applies particular claim elements to the features and functions of the accused products. The citations are instead intended to demonstrate that, if certain claim elements are applied against the prior art in the same manner as Plaintiff applies them in its Infringement Contentions, then certain prior art discloses those claim elements to the same extent. The prior art may also disclose these same claim elements if the claim elements are applied differently than in the Infringement Contentions. Nothing in these Invalidity Contentions is in any way an admission that the Infringement Contentions correctly describe the scope of the '862 Patent, '427 Patent, '867 Patent, or '868 Patent or that Defendant infringes the '862 Patent, '427 Patent, '867 Patent, or '868 Patent.

LabCorp reserves the right to amend, modify, or supplement these Contentions to include additional prior art under 35 U.S.C. §§ 102(a), (b), (e), (f), and/or other equitable defenses, as discovery in this action and LabCorp's investigation proceeds. In addition, LabCorp reserves the right to assert additional invalidity grounds under 35 U.S.C. §§ 101, 102, 103, 112, and/or other equitable defenses to the extent they are already not disclosed herein and discovery and further investigation yield information forming the basis of such invalidity.

A.  **The '862 Patent**

The '862 patent (or, the "Testosterone Patent") issued on April 2, 2013 was filed on November 15, 2010 as U.S. Patent Application No. 12/946,785.  The '862 Patent claims priority to U.S. Provisional Application No. 60/501,255 filed on September 8, 2003. The '862 patent is titled "Determination of Testosterone by Mass Spectrometry" and generally describes and claims a method for determining the amount of testosterone. '862 Patent, Abstract. In particular, the '862 patent relates to determining the amount of testosterone in samples from female humans with low levels of testosterone. *Id.* at 1:49-59.

The '862 patent acknowledges that various extraction and purification steps have been used to analyze metabolites of various steroids, in particular HTLC and tandem mass spectrometry. *See, e.g.*, *id.* at 1:66-2:4, 3:24-28, 9:1-7. Thus, prior to the critical date of the '862 patent, assay methods using chromatography (gas or liquid chromatography) coupled with mass spectrometry were well known in the art.

At that time, assay methods involving gas chromatography in combination with mass spectrometry (GC-MS) were considered reliable and sensitive across the range of uses for determining testosterone levels. Immunoassays, while offering an alternative, failed to provide the reliability of results that GC-MS assay methods provided. Before September 8, 2002, various laboratories had reported experiments with modification of the GC-MS methods known in the art by replacing the gas chromatography step with a high performance liquid  chromatography (HPLC) step so as to arrive at a simpler and more cost-effective assay method that still retained the sensitivity and reliability of the GC-MS methods.

Furthermore, tandem MS (MS-MS) was also known, whereby precursor ions were fragmented or dissociated to produce fragment ion(s) for detection with MS. Clarke and Draisci

are examples of prior art references that describe HPLC/MS-MS assay methods for detecting testosterone.

### B.    The '427 Patent and '867 Patent

The '867 patent, '427 patent, and '868 patent relate to vitamin D metabolites (collectively, the "Vitamin D patents"). The '867 patent issued on July 5, 2011 and claims priority to U.S. Patent Application No. 11/101,166 filed on April 6, 2005, issued as U.S. Patent No. 7,745,226. The '427 patent issued on January 24, 2012 from U.S. Patent Application No. 13/115,916 filed on May 25, 2011. The '427 patent claims priority as a continuation of Application No. 11/386,215, filed March 21, 2006, the '867 patent, which claims priority as a continuation-in-part of Application No. 11/101,166 filed April 6, 2005 (now U.S. Patent No. 7,745,226; "the '226 patent").[1]  The '427 patent and the '867 patent are entitled "Methods for Detecting Vitamin D Metabolites by Mass Spectrometry" and generally describe and claim a method for detecting the amount of a vitamin D metabolite using mass spectrometry. '427 Patent, Abstract.

Prior to the critical dates of the '427 and '867 patents, assay methods using mass spectrometry for the detection of vitamin D metabolites were well known in the art.  In addition, the known mass spectrometry (MS) methods often included protonation and dehydration of the analyte molecules. Voyksner, Kissmeyer, Kamao, Watson, and Schoutsen are examples of prior art references that disclose methods using mass spectrometry for the detection of vitamin D metabolites, and Voyksner specifically discloses the use of such methods with a protonated, dehydrated vitamin D precursor.

---

[1] The priority claim of the '427 patent is not present on the face of the patent. EX1001, Cover. However, an application data sheet with the priority information was filed with the application. EX1003, 7-10. Petitioner is not aware of any claim to an earlier priority date that would affect any of the arguments set forth herein.  Petitioner reserves the right to respond should Patent Owner assert an earlier priority date.

13

The '427 and '867 patents provide that one can enhance the resolution of the MS technique by employing tandem MS (MS/MS). *See generally* '867 patent.[2] The patent describes that in this technique, a precursor ion (also called a parent ion) generated from a molecule of interest is filtered in an MS instrument and subsequently fragmented to yield one or more fragment ions (also called daughter or product ions) that are then analyzed in a second MS procedure. *Id*. at 8:58-9:9, 9:51-10:11. It is noted that one of ordinary skill in the art is capable of identifying fragment ions of a particular precursor. *Id*. at 10:13-17. The '867 patent provides specific transitions (precursor/fragment ion combinations) for the various vitamin D metabolites. *Id*. at 11:49-12:20. For example, 25(OH)D2, having a known molecular weight of 412.65, will form an ion having a m/z ratio of 395.30 ± 0.5 upon the addition of a proton (protonation) and removal of a water molecule (dehydration). The '867 patent notes that "[m]asspectrometry instruments can vary slightly in determining the mass of a given analyte." *Id*. at 12:25-26. Thus, the term "about" in the context of mass of anion or the m/z of an ion refers to ± 0.5 atomic mass unit." *Id*. at 12:31-34.

We note that essentially all of the text of the '867 patent from 10:12 to 12:24 was not present in the priority application, U.S. App. No. 11/101,166. As such, this text has a priority date of March 21, 2006. Similarly, essentially all of the text '427 patent from 10:15 to 12:30 was not present in the priority application, U.S. App. No. 11/101,166, but was present in the application leading to the '867 patent, having a priority date of March 21, 2006.

## C.    The '868 Patent

The '868 patent issued on July 5, 2011 from U.S. Patent Application No. 11/946,765 filed on November 28, 2007. The '868 patent is titled "Methods for Detecting Dihydroxyvitamin

---

[2] Citations will be made to the specification of the '867 patent.

D Metabolites by Mass Spectrometry" and generally describes and claims a method for detecting the amount of a dihydroxyvitamin D metabolite in a sample using mass spectrometry. '868 Patent, Abstract.  In particular, the '862 patent claims derivatizing the dihydroxyvitamin D metabolizes using 4'-carboxyphenyl-TAD, whereas the '867 and '427 patents provide for no derivatization of the vitamin D metabolites. '868 Patent, at 20:24-39.

Like the '867 and '427 patents, prior to the critical date of the '868 patent, assay methods using mass spectrometry for the detection of vitamin D metabolites were well known in the art, which are suitable for use and had been used on dihydroxyvitamin D metabolites. *See, e.g.*, Yeung; Higashi; Higashi III. In addition, the known mass spectrometry (MS) methods often included protonation and dehydration of the analyte molecules, as shown in Voyksner, Kissmeyer, Kamao, Watson, and Schoutsen.

The '427, '867, and '868 patents describe that one can enhance the resolution of the MS technique by employing tandem MS (MS/MS). *See generally* '868 patent. The patents describe that in this technique, a precursor ion (also called a parent ion) generated from a molecule of interest is filtered in an MS instrument and subsequently fragmented to yield one or more fragment ions (also called daughter or product ions) that are then analyzed in a second MS procedure. *Id.* at 14:15-32.  Thus, as with the '867 and '427 patents many of the techniques claimed in the '868 patent were disclosed in the prior art, and particularly, in prior patents assigned to Plaintiff.

Further, the specification provides that many of the methods require that the metabolites be derivatized prior to detection by mass-spectrometry. In particularly, the original claims of other Asserted Patents were amended to avoid such limitation. *See supra* discussion on '862 patent. Thus, the additional limitation of derivatizing the metabolites prior to ionization adds

nothing new to the well-known purification and detection steps of the vitamin D-family metabolites.

### D.     Identification of Prior Art

#### 1.     Patents and Printed Publications

Each of the Asserted Claims is anticipated and/or rendered obvious by prior art.  Pursuant to the Court's January 15, 2019 Scheduling Order (D.I. 18), paragraph 7(d), and subject to Defendants' reservations of rights set out above, LabCorp identifies the following references on which it may rely as invalidating one or more of the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent:

| No. | Number and Name | Country of Origin | Issue/ Publication Date |
|---|---|---|---|
| 1 | Clarke *et al.*, *Determination of Suppressed Testosterone Levels on Human Serum by LC-MS/MS*, Proceedings of the 49th ASMS Conference on Mass Spectrometry and Applied Topics, Chicago, Illinois ("Clarke") | United Kingdom, presented in United States | July 16, 2002 |
| 2 | Draisci *et al.*, *Quantitation of Anabolic Hormones and Their Metabolites in Bovine Serum and Urine by Liquid Chromatography-Tandem Mass Spectrometry*, J. Chromatogr. A 870(1-2):511–22 ("Draisci") | Italy | Feb. 18, 2000 |
| 3 | Fitzgerald and Herold, *Serum Total Testosterone: Immunoassay Compared with Negative Chemical Ionization Gas Chromatography – Mass Spectrometry*, Clin. Chem. 42(5):749–55 ("Fitzgerald") | United States | 1996 |
| 4 | Chang *et al.*, *Quantitative Measurement of Male Steroid Hormones Using Automated On-line Solid Phase Extraction-Liquid Chromatography-Tandem Mass Spectrometry and Comparison with Radioimmunoassay*, The Analyst 128:363–82 ("Chang") | Taiwan | 2003 |
| 5 | U.S. Patent No. 6,541,263 B2 ("Gao") | United States | Nov. 14, 2002 |

| No. | Number and Name | Country of Origin | Issue/ Publication Date |
|---|---|---|---|
| 6 | Williams *et al.*, *Electrospray Collision-induced Dissociation of Testosterone and Testosterone Hydroxy Analogs*, J. Mass Spectrom. 34:206–16 ("Williams") | United States | 1999 |
| 7 | Lagana *et al.*, *Liquid Chromatography Tandem Mass Spectrometry Applied to the Analysis of Natural and Synthetic Steroids in Environmental Waters*, Anal. Letters 34(6):913–26 ("Lagana") | United Kingdom | 2001 |
| 8 | Ma and Kim, *Determination of Steroids by Liquid Chromatography/Mass Spectrometry*, J. Am. Soc. Mass Spectrom. 8:1010–20 ("Ma and Kim") | United States | 1997 |
| 9 | Barron *et al.*, *Direct Determination of Anabolic Steroids in Human Urine by On-line Solid-phase Extraction/Liquid Chromatography/Mass Spectrometry*, J. Mass Spectrom. 31:309–19 ("Barron") | Spain | 1996 |
| 10 | Takino *et al.*, *Quantitative Liquid Chromatography-Mass Spectrometry Determination of Catechins in Human Plasma by Automated On-Line Extraction Using Turbulent Flow Chromatography*, The Analyst. 128:46–50 ("Takino") | Japan | 2003 |
| 11 | Joos *et al.*, *Liquid Chromatography-Tandem Mass Spectrometry of Some Anabolic Steroids*, Anal. Chem. 71:4701–10 ("Joos") | United Kingdom | 1999 |
| 12 | Jemal, Mohammed, *High-Throughput Quantitative Bioanalysis by LC/MS/MS*, Biomed. Chrom. 14:422–29 ("Jemal") | United States | 2000 |
| 13 | Taieb *et al.*, *Testosterone Measured by 10 Immunoassays and by Isotope-Dilution Gas Chromatography-Mass Spectrometry in Sera from 116 Men, Women, and Children*, Clin. Chem. 49:8:1381–95 ("Taieb") | France | 2003 |
| 14 | Ong, *Integrated Bioanalytical Support Using Turbulent Flow Chromatography-Mass Spectrometry*, Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago, Illinois, May 27-31, 2001 ("Ong") | United States | 2001 |
| 15 | Voyksner and Lee, *Improvements in LC/Electrospray Ion Trap Mass Spectrometry Performance Using an Off-Axis Nebulizer*, Anal. Chem. 71:1441–47 ("Voyksner") | United States | April 1, 1999 |

| No. | Number and Name | Country of Origin | Issue/ Publication Date |
|---|---|---|---|
| 16 | Kissmeyer and Sonne, *Sensitive Analysis of 1α,25-dihydroxyvitamin D₃ in Biological Fluids by Liquid Chromatography–Tandem Mass Spectrometry*, J. Chrom. A 935:93–101 ("Kissmeyer") | Denmark | 2001 |
| 17 | Schoutsen *et al.*, *The Analysis of Vitamin D Analogues by Atmospheric Pressure Ionization Coupled to Triple Quadrupole Mass Spectrometry*, Poster No. ThC-190, Proceedings of the 16th International Mass Spec Conference, Scotland ("Schoutsen") | United Kingdom | Sept. 4, 2003 |
| 18 | Vogeser, *Liquid Chromatography-Tandem Mass Spectrometry – Application in the Clinical Laboratory*, Clin. Chem. Lab. Med. 41(2):117–26 ("Vogeser") | Germany | 2003 |
| 19 | Watson *et al.*, *Analysis of Vitamin D and Its Metabolites Using Thermospray Liquid Chromatography/Mass Spectrometry*, Biomed. Chrom. 5:153-60 ("Watson") | United States | 1991 |
| 20 | Kamao *et al.*, *C-3 Epimerization of Vitamin D3 Metabolites and Further Metabolism of C-3 Epimers*, Manuscript M311473200, J. Biol. Chem. Papers in Press, 1-31 ("Kamao") | Japan | Feb. 2, 2004 |
| 21 | Jones and Makin, *Vitamin Ds: Metabolites and Analogues*, MODERN CHROMATOGRAPHIC ANALYSIS OF VITAMINS ("Jones") | Canada | 2000 |
| 22 | Coldwell *et al.*, *Mass Fragmentographic Assay for 25-Hydroxyvitamin D in Plasma Without Derivatization: Enhanced Sensitivity for Metabolites of Vitamins D₂ and D₃ After Pre-column Dehydration*, J. Mass Spectrom., 30:348–56 ("Coldwell") | United Kingdom | 1995 |
| 23 | Higashi *et al.*, *Simultaneous Determination of 25-Hydroxyvitamin D2 and 25-Hydroxyvitamin D3 in Human Plasma by Liquid Chromatography-Tandem Mass Spectrometry Employing Derivatization with a Cookson-Type Reagent*, Biol. Pharm. Bull. 24(7):738-43 ("Higashi") | Japan | 2001 |
| 24 | Higashi *et al.*, *Determination of 24,25-dihydroxyvitamin D3 in human plasma using liquid chromatography-mass spectrometry after derivatization with a Cookson-type reagent*, Biomed. Chrom. 15:133-40 ("Higashi II") | Japan | 2001 |

| No. | Number and Name | Country of Origin | Issue/ Publication Date |
|---|---|---|---|
| 25 | Higashi *et al.*, *Liquid chromatography-mass spectrometric method combined with derivatization for determination of 1α-hydroxyvitamin D3 in human plasma*, J. Chrom. 772:229-38 ("Higashi III") | Japan | 2002 |
| 26 | Vogeser *et al.*, *Candidate Reference Method for the Quantification of Circulating 25-Hydroxyvitamin D3 by Liquid Chromatography-Tandem Mass Spectrometry*, Clin. Chem. 50:1415-18 ("Vogeser II") | Germany | July 26, 2004 |
| 27 | Yeung *et al.*, *Characterization for vitamin D3 metabolites using continuous-flow fast atom bombardment tandem mass spectrometry and high-performance liquid chromatography*, J. Chrom. 645:115-23 ("Yeung") | United States | 1993 |
| 28 | Yeung *et al.*, *Characterization of the metabolic pathway of 1,25-dihydroxy-16-ene vitamin D3 in rat kidney by on-line high performance liquid chromatography-electrospray tandem mass spectrometry*, Biochem. Pharm. 49(8):1099-1110 ("Yeung II") | United States | 1995 |
| 29 | Holick *et al.*, *Evaluation of Precision and Accuracy of Nichol Advantage 25-Hydroxyvitamin D Assay for 25(OH)D2 and 25(OH)D3: Comparison of Four Methods with LC-Mass Spectrometry*, Poster at 26th Annual Meeting of the American Society for Bone and Mineral Research, Abstract No. SU585 ("Holick") | United States | Oct. 5, 2004 |
| 30 | Maunsell *et al.*, *Routine Isotope-Dilution Liquid Chromatography-Tandem Mass Spectrometry Assay for Simultaneous Measurement of the 25-Hydroxy Metabolites of Vitamins D₂ and D₃*, Clin. Chem. 51(9):1683-90 ("Maunsell") | United Kingdom | 2005 |
| 31 | Kissmeyer *et al.*, *Determination of the vitamin D analog EB 1089 (seocalcitol) in human and pig serum using liquid chromatography-tandem mass spectrometry*, J. Chrom. B 740:117-28 ("Kissmeyer II") | Denmark | 2000 |
| 32 | Vreeken *et al.*, *On-line post-column Diels-Alder derivatization for the determination of vitamin D₃ and its metabolites by liquid chromatography/thermospray mass spectrometry*, Biol. Mass Spectrom. 12:621-32 ("Vreeken") | Netherlands | 1993 |

In addition, LabCorp identifies the references cited on the face of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent, the admitted prior art references in the specifications of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent, prosecution histories of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent, and/or the prosecution history of any related patents/applications. Moreover, to the extent they constitute prior art, LabCorp also reserves the right to rely upon foreign counterparts of the U.S. patents identified above; U.S. counterparts of foreign patents and foreign patent applications identified above; U.S. and foreign patents and patent applications corresponding to articles and publications identified above; and any systems, products, or prior inventions that relate to any references identified above.

LabCorp further incorporates by reference the prior art references related to the '862 Patent, '427 Patent, '867 Patent, and '868 Patent, including without limitation all prior art produced by or otherwise known to Plaintiff and all prior art known to the named inventors, any past or current owner, or any individual substantively involved in the prosecution of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent.

LabCorp also incorporates by reference in their entirety each and every ground for invalidity (and all arguments and documents cited in support of those grounds for invalidity) set forth in the following:

Inter partes review no. IPR2019-00738, filed March 15, 2019.

In addition, LabCorp incorporates by reference any expert reports, invalidity contentions, identified prior art, invalidity claim charts or defense disclosed at any date by any party to any other litigation or U.S. Patent & Trademark Office proceeding involving any of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent or any related patent.

LabCorp contends that at least some of the systems and products disclosed in one or more of the prior art references identified here or in the attached exhibits are prior art under 35 U.S.C.

§§ 102(a), (b), (e) and/or (g).  LabCorp's reference to any particular component, device, machine, or other product in these Invalidity Contentions should also be interpreted as a reference to the product itself and any corresponding patents, publications, or product literature cited here or in the attached exhibits that relate to the cited component, device, machine, or other product.  LabCorp does not yet have complete information regarding the dates by which some of the cited products were publicly disclosed, used, sold, or offered for sale, the circumstances under which the research, design, and development activities were conducted, and the identities of the particular individuals involved in such activities through publicly available patents, publications, and product literature.  LabCorp anticipates that the actual dates, circumstances, and identities of individuals will be the subject of third-party discovery during this lawsuit.

It is understood that a person of ordinary skill in the art would read a prior art reference as a whole and in the context of other relevant publications, literature, and general knowledge in the field.  To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would also rely upon other information including other relevant publications and general scientific, engineering, or other relevant knowledge. LabCorp reserves the right to rely upon the general scientific, engineering, or other relevant knowledge in the field in interpreting the disclosure of the prior art references.  In addition, LabCorp reserves the right to rely upon other relevant publications and on expert testimony to provide context and aid in the understanding of the prior art references.  For example, LabCorp reserves the right to rely on well-known prior art publications, such as relevant material and product specifications, to demonstrate the state of the art at the relevant time period.  LabCorp also reserves the right to rely upon other portions of the prior art references, other publications, and the testimony of experts to establish that the alleged inventions would have been obvious to

21

a person of ordinary skill in the art, including the basis for modifying or combining the prior art references.  Furthermore, LabCorp reserves the right to rely upon any admissions relating to prior art found in the intrinsic evidence for the '862 Patent, '427 Patent, '867 Patent, and '868 Patent.

LabCorp may also rely on uncited portions of the prior art references, other publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claim obvious. Where LabCorp cites to a particular figure in a prior art reference, the citation should be understood to encompass the caption and description of the figure and any test relating to the figure in addition to the figure itself. Conversely, where a cited portion of text refers to a figure, the citation should be understood to include the figure as well.  LabCorp reserves the right to use other relevant references to establish how one of ordinary skill in the art would have understood the references to show anticipation or obviousness.

To the extent that one might argue, or the Court find, that any reference identified in the accompanying claim charts does not explicitly disclose every aspect of an element, the reference still anticipates or renders obvious the Asserted Claim(s) because any such aspect of an element is inherently disclosed or would have been obvious to a person of ordinary skill in the art.  For all of the reasons stated above and herein, LabCorp reserves the right to supplement the charts and the tables, as appropriate.

Prior art not included in this disclosure, whether known or unknown to LabCorp, may become relevant.  In particular, LabCorp is currently unaware of the extent, if any, to which Plaintiff will contend that limitations of the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent are not disclosed in the prior art that LabCorp identifies, or that any of

the identified references do not qualify as prior art under 35 U.S.C. § 102.  The identification of any patents as prior art shall be deemed to refer to the application that was submitted for the same and to include identification of any foreign counterpart patents.  To the extent that such an issue arises, LabCorp reserves the right to identify additional teachings in the same references or in other references that anticipate or would have rendered the addition of the allegedly missing limitation to the device or method obvious.

### 2.     Admitted Prior Art

The Asserted Patents admit as prior art (a) tandem mass spectrometry, (b) protein purification methods, (c) high turbulence liquid chromatography, (d) high performance liquid chromatography, and (e) derivation of vitamin D metabolites using Cookson-type reagents as a derivatizing agent. "Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007); *see also In re Nomiya*, 509 F.2d 566, 570-71 (CCPA 1975) ("We see no reason why appellants' representations in their application should not be accepted at face value as admissions that Figs. 1 and 2 may be considered 'prior art' for any purpose, including use as evidence of obviousness under § 103."); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness.").

With respect to tandem mass spectrometry, the specification of the '862 patent makes clear that tandem mass spectrometry was known and was used to "often enhance the resolution of the MS technique." '862 Patent, 6:61-63.

The Asserted Patents disclose that protein purification methods are well known in the art. For example, the '867 patent provides that "filtration, extraction, precipitation, centrifugation, dilution, and the like … are well known in the art…." '867 Patent, 6:29-34.

For high turbulence liquid chromatography, Plaintiff admitted during prosecution of a patent to which an asserted patent claims priority that high turbulence liquid chromatography was known in the prior art but not for the analysis of testosterone. Office Action dated January 10, 2007 for U.S. Patent No. 7,348,137, at 5.

Regarding high performance liquid chromatography, at least one of the Asserted Patents teaches that "high performance liquid chromatography (HPLC) has been used to purify samples containing testosterone…." '862 Patent, 8:65-67. Further, at least one of the Asserted Patents provides, for example, that "[v]arious methods have been described involving the use of HPLC for sample clean-up prior to mass spectrometry analysis," and "[o]ne of skill in the art can select HPLC instrument and columns that are suitable for use in the invention." '867 Patent, 6:62-7:7.

Finally, the Asserted Patents disclose that derivatization prior to detection by mass spectrometry is admitted prior art:

> [R]eports have been published that disclose methods for detecting specific vitamin D metabolites using mass spectrometry. For example Yeung B. et al., J Chromatogr. 1993, 645(1):115-23; Higashi T, et al., Steroids. 2000, 65(5):281-94; Higashi T, et al., Biol Pharm Bull. 2001, 24(7):738-43; and Higashi T, et al., J Pharm Biomed Anal. 2002, 29(5):947-55 disclose methods for detecting various vitamin D metabolites using liquid chromatography and mass spectrometry. These methods *require that the metabolites be derivatized prior to detection by mass-spectrometry*. Methods to detect underivatized 1,25(OH)2D3 by liquid chromatography/mass-spectrometry are disclosed in Kissmeyer and Sonne, J Chromatogr A. 2001, 935(1-2):93-103.

'868 Patent, 2:8-20.

### 3.      Related Art

Each of the patents and publications identified above evidence prior knowledge under 35 U.S.C. § 102(a).  LabCorp reserves the right to identify and rely upon as prior art under 35 U.S.C. §§ 102(a) or (b) any system, product, or public knowledge or use that embodies or otherwise incorporates any of the prior art patents or publications listed above.

In addition to the prior art identified above and in the accompanying invalidity claim charts, LabCorp plans to rely on the "Background of the Invention" and other relevant portions of the Asserted Patents, the prosecution histories of the Asserted Patents (including the cited references), and the prosecution histories of related patents (any and all continuations, divisionals, continuations-in-part, reexaminations, reissues, certificates of correction, and extensions of the Asserted Patents), whether foreign or domestic, including all patent applications (including applications under the Patent Cooperation Treaty that claim priority to or from the Asserted Patents), and fact and expert testimony about the prior art to prove that the Asserted Claims are anticipated and/or rendered obvious under 35 U.S.C. §§ 102 and/or 103. For example, this additional evidence may show that various elements of the claims were known or used by others in this country before the named inventors' alleged invention and thus qualify as prior art under 35 U.S.C. § 102(a).  LabCorp also reserves the right to rely on additional patents, publications, uses, testimony, and other evidence as background.

### 4.      Improper Inventorship and/or Derivation Under 35 U.S.C. § 101 *et seq.*

By at least December 2002 and before the priority date of the '862 patent, Defendants were practicing the invention claimed in the '862 patent, and thus, Plaintiff is the improper inventor under 35 U.S.C. § 101 *et seq.*

### a.      Dr. Caulfield Worked with Cohesive Technologies in the Early 2000s

In the 1990s, Cohesive Technologies invented high turbulence liquid chromatography (HTLC). From October 1999 through July 2000, Dr. Russell Grant, the current LabCorp Strategic Director and National Director of Mass Spectrometry, was working at Cohesive as the principal scientist for the European market. During that timeframe, Dr. Grant visited the Cohesive laboratory in Massachusetts where he met Dr. Michael Caulfield, the named inventor of the '862 patent. Dr. Grant recalls seeing Dr. Caulfield working with Dr. Joseph Takarewski, the then Vice President of Cohesive Technologies and current Director of Chemistry at Thermo Fisher Scientific.

### b.      Dr. Caulfield Saw a Presentation in 2001 that Disclosed the Analysis of Testosterone by HTLC-LC-MS

On May 27, 2001, Dr. Grant attended an American Society for Mass Spectrometry (ASMS) workshop in Chicago, Illinois.  Dr. Caulfield also attended this ASMS workshop. At this workshop, Voon Ong presented on HTLC. *See* Program Highlights – 49th ASMS Conference on Mass Spectrometry; *see generally* Ong Presentation.  During his presentation, Voon Ong demonstrated using the HTLC-LC-MS-MS method on testosterone. Dr. Grant recalls seeing Dr. Caulfield in the audience of the Voon Ong Presentation. Dr. Grant also recalls personally meeting Dr. Caulfield at this meeting at the registration desk. Dr. Grant spoke at the workshop two talks after Voon Ong gave his presentation as a fellow workshop presenter. Dr. Grant was also acknowledged at the end of Voon Ong's presentation in recognition of Dr. Grant's help with developing this HTLC-LC-MS/MS technology. *See* Ong Presentation at 38.

c.     **Esoterix Developed and Publicly Used its HTLC Technology Well Before Quest Ever Did**

In February 2002, Dr. Walter Chandler, then Executive Director at Esoterix, went to the Cohesive laboratory in Massachusetts, where the HTLC-LC-MS-MS technology was developed. At Cohesive, Dr. Chandler met and worked with Dr. Takarewski. Dr. Takarewski encouraged Dr. Chandler to develop a process in the direction of HTLC, as described in the Voon Ong presentation.

Dr. Chandler returned from this visit and began installing HTLC columns, in and around December of 2002 and January of 2003 at Esoterix in Calabasas, California. The initial HTLC-LC-MS/MS technology launched by Esoterix was an HTLC-LC-MS/MS process which analyzed a transition of the *m/z* 289 precursor ion to the *m/z* 109 product ion when detecting amounts of testosterone.

d.     **Quest Worked with Cohesive on Developing Its Technology Throughout the Development of Esoterix's Technology and After Its Public Launch**

During the development of the Esoterix technology endocrinology application, Cohesive Technologies was working with both Esoterix and Quest on this HTLC technology. *Upon information and belief,* Cohesive Technologies' interactions with Quest included, among others, interactions with Dr. Caulfield.

In and around March 2003, Esoterix publicly launched its HTLC technology and commercially offered analyte testing using this technology, including testing of the Testosterone metabolite. *See* Mass Spec Update; *see also* Validation Report – April 2003 (LC00000443-479).

Upon information and belief, all throughout this time, Cohesive Technologies was working with both Esoterix and Quest. Upon information and belief, Quest's reduction to

practice of its HTLC technology was subsequent to Esoterix's development and public launch of its HTLC-LC-MS-MS technology.

> e.   **The '862 Patent is Invalid Because Quest Did Not Invent It, Improperly Derived the Invention Claimed in the '862 Patent, and/or the Invention was in Public Use More Than One Year Before the Filing of the Application That Led to the '862 Patent.**

The Ong Presentation would sufficiently enable one of ordinary skill in the art to practice the HTLC-LC-MS/MS technology, as shown by the process depicted in the slides. *See* Ong Presentation at 6-7; *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1577 (Fed. Cir. 1997).

Quest improperly obtained, and improperly filed, patent applications on technology that was publicly disclosed during the ASMS meeting.

Quest's patent application improperly lists individuals who are not the true inventors of the technology claimed in the '862 patent. *Ex parte* Kusko, 215 USPO 972, 974 (BPAI 1981).

Esoterix publicly used and disclosed the technology that is claimed in the Quest patent more than one year before the earliest priority date of the '862 patent.

Accordingly, the '862 patent is invalid and/or unenforceable under at least 35 U.S.C. §§ 102(f), 102(b) 103, and/or applicable equitable doctrines. As discovery is ongoing, LabCorp reserved the right to supplement this disclosure and identify additional facts and legal theories relevant to Quest's conduct.

### 5.   Priority of Invention References Under Section 102(g)

To the extent the inventions identified in the patents, publications, systems, and other prior art to the '862 Patent, '427 Patent, '867 Patent, and '868 Patent identified in these Invalidity Contentions were conceived by another and diligently reduced to practice before the alleged conception and reduction to practice of the Asserted Claims of the '862 Patent, '427

Patent, '867 Patent, and '868 Patent by the named inventors of those patents, LabCorp alleges that such prior art inventions invalidate the Plaintiff's '862 Patent, '427 Patent, '867 Patent, and '868 Patent under 35 U.S.C. § 102(g).

### E.     Invalidity Claim Charts

In the attached claim charts, LabCorp identifies prior art that alone, or in combination with the knowledge of one of ordinary skill in the art, or in combination with another reference, anticipates and/or renders obvious the limitations of the Asserted Claims of the Asserted Patents. For each Asserted Claim, LabCorp's contentions based on obviousness are raised in the alternative and should not be construed to suggest that any prior art reference included in a 35 U.S.C. § 103 combination is not invalidating prior art on its own.  Thus, LabCorp reserves the right to rely on any identified piece of prior art individually to anticipate all of the Asserted Claims and/or to render obvious the Asserted Claims in view of the knowledge of one having ordinary skill in the art at the time of the alleged invention or in combination with any other identified piece of prior art.

Further, LabCorp's claim charts submitted as part of these Invalidity Contentions cite to particular, exemplary teachings and disclosures of the prior art as applied to features of the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent.  However, persons having ordinary skill in the art are supposed to view an item of prior art in its entirety, including the context of other relevant publications, literature, products, and understanding.  Accordingly, the cited portions are only examples, and LabCorp reserves the right to rely on uncited portions of the prior art references and on other relevant publications and expert testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that a claim limitation is known or disclosed.  Where LabCorp cites to a particular

figure in a reference, the citation should be understood to encompass the caption and description of the figure and any text relating to the figure. Similarly, where LabCorp cites to particular text referring to a figure, the citation should be understood to include the figure and caption as well. LabCorp further reserves the right to rely on uncited portions of the prior art references, other publications, and testimony to establish bases for combinations of certain cited references that render the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent obvious. Further, for any combination, LabCorp reserves the right to rely additionally on information generally known to those skilled in the art and/or common sense.

In the tables below, "Prior Art No." corresponds to the number of the prior art reference identified above. "A" indicates where LabCorp has charted anticipation, "O" indicates where LabCorp has charted obviousness, and "A/O" indicates where LabCorp has charted or alleges both anticipation and obviousness. "Chart" refers to the designation of the attached charts that identify where specifically in each item of prior art each Asserted Claim is found, including for each element governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function.

| '862 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 1 | Clarke | A/O | A1 |
| 2 | Draisci | O | A2 |
| 3 | Fitzgerald | O | A3 |
| 4 | Chang | A/O | A4 |
| 5 | Gao | O | A5 |
| 6 | Williams | O | A6 |
| 7 | Barron | O | A7 |
| 8 | Ma and Kim | O | A8 |

| '862 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 9 | Lagana | O | A9 |
| 10 | Takino | O | A10 |
| 11 | Joos | O | A11 |
| 12 | Jemal | A/O | A12 |
| 13 | Taieb | O | A13 |
| 14 | Ong | O | A14 |

| '867 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 15 | Voyksner | A/O | B1 |
| 16 | Kissmeyer | A/O | B2 |
| 17 | Schoutsen | A/O | B3 |
| 18 | Vogeser | A/O | B4 |
| 19 | Watson | A/O | B5 |
| 20 | Kamao | O | B6 |
| 21 | Jones | AO | B7 |
| 22 | Coldwell | A/O | B8 |
| 23 | Higashi | A/O | B9 |
| 24 | Higashi II | A/O | B10 |
| 25 | Higashi III | O | B11 |
| 26 | Yeung | O | B12 |
| 27 | Yeung II | A/O | B13 |
| 32 | Vreeken | O | B14 |

| '427 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 15 | Voyksner | A/O | C1 |

| \'427 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 16 | Kissmeyer | A/O | C2 |
| 17 | Schoutsen | O | C3 |
| 18 | Vogeser | A/O | C4 |
| 19 | Watson | O | C5 |
| 20 | Kamao | O | C6 |
| 21 | Jones | A/O | C7 |
| 22 | Coldwell | O | C8 |
| 23 | Higashi | O | C9 |
| 24 | Higashi II | O | C10 |
| 25 | Higashi III | O | C11 |
| 26 | Yeung | O | C12 |
| 27 | Yeung II | A/O | C13 |
| 32 | Vreeken | O | C14 |

| \'868 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 15 | Voyksner | A/O | D1 |
| 16 | Kissmeyer | O | D2 |
| 17 | Schoutsen | O | D3 |
| 18 | Vogeser | O | D4 |
| 21 | Jones | O | D5 |
| 23 | Higashi | A/O | D6 |
| 24 | Higashi II | O | D7 |
| 25 | Higashi III | O | D8 |
| 26 | Yeung | A/O | D9 |
| 27 | Yeung II | A/O | D10 |
| 28 | Vogeser II | O | D11 |
| 29 | Holick | O | D12 |

| '868 PATENT | | | |
|---|---|---|---|
| Prior Art No. | Prior Art Reference | Anticipation/ Obviousness | Chart |
| 30 | Maunsell | O | D13 |
| 31 | Kissmeyer II | A/O | D14 |
| 32 | Vreeken | O | D15 |

### F.    Obviousness

LabCorp contends that each prior art reference disclosed above, either alone or in combination with other above-identified references, renders the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent invalid as obvious.  In addition, each reference identified above may be combined with (1) information known to persons skilled in the art at the time of the alleged invention, and/or (2) any other reference identified herein to render the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent invalid as obvious.

In determining whether a claim is obvious, "[o]ften, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007).  In that regard, a patent claim may be obvious if the combination of elements was obvious to try or there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims.  The obviousness determination includes consideration of inferences and creative steps that a person of ordinary skill in the art might use.  In addition, when a reference is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the

same field or a different one.  If a person of ordinary skill can implement a predictable variation, 35 U.S.C. § 103 likely bars its patentability.

No showing of a specific motivation to combine prior art is required to combine the references disclosed above and in the attached charts, as each combination would have expected results, and at most would simply represent a known alternative to one of skill in the art.  *See KSR* at 415-18 (2007) (rejecting the Federal Circuit's "rigid" application of the teaching, suggestion, or motivation to combine test, instead espousing an "expansive and flexible" approach); *Q.I. Press Controls, B.V. v. Lee,* 732 F.3d 1371, 1379 (Fed. Cir. 2014).  Indeed, the Supreme Court held that a person of ordinary skill is "a person of creativity, not an automaton" and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."  *Id.* at 420-21; *see also* Examination Guidelines for Determining Obviousness Under 35 U.S.C. §103 in view of the Supreme Court Decision in *KSR International Co. v. Telefax Inc.*, 72 Fed. Reg. 57,526 (Oct. 10, 2007).  Nevertheless, in addition to the information contained elsewhere in these contentions, LabCorp hereby identifies exemplary motivations and reasons to combine.

One or more combinations of the prior art references identified above would have been obvious because these references would have been combined using: known methods to yield predictable results; known techniques in the same way; a simple substitution of one known, equivalent element for another to obtain predictable results; and/or a teaching, suggestion, or motivation in the prior art generally. *See Q.I. Press Controls*, 732 F.3d at 1379; *Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013). In addition, it would have been obvious to try combining the prior art references identified above because there were only a finite number of predictable solutions and/or because known work in one field of endeavor prompted variations

based on predictable design incentives and/or market forces either in the same field or a different one. *See KSR*, 127 S. Ct. at 1742; *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*, 748 F.3d 1354, 1360 (Fed. Cir. 2014); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1352 (Fed. Cir. 2010); *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009).  Further, the combinations of the prior art references identified above and in the claim charts would have been obvious because the combinations represent known potential options with a reasonable expectation of success. *See InTouch Techs., Inc. v. VGO Comms., Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014).

Additional evidence that there would have been a motivation to combine the prior art references identified above includes the interrelated teachings of multiple prior art references; the effects of demands known to the design community or present in the marketplace; the existence of a known problem for which there was an obvious solution encompassed by the Asserted Claims; the existence of a known need or problem in the field of the endeavor at the time of the alleged invention(s); and the background knowledge that would have been possessed by a person having ordinary skill in the art. *See Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1322-23 (Fed. Cir. 2012); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010); *Honeywell Int'l, Inc. v. U.S.*, 609 F.3d 1292, 1306-07 (Fed. Cir. 2010).

The motivation to combine the teachings of the prior art references disclosed herein is also found in the references themselves and in: (1) the nature of the problem being solved; (2) the express, implied and inherent teachings of the prior art; (3) the knowledge of persons having ordinary skill in the art; (4) the predictable results obtained in combining the different elements of the prior art; (5) the predictable results obtained in simple substitution of one known element for another; (6) the use of a known technique to improve similar devices, methods, or products in the same way; (7) the predictable results obtained in applying a known technique to a known

device, method, or product ready for improvement; (8) the finite number of identified predictable solutions that had a reasonable expectation of success; and (9) known work in various technological fields that could be applied to the same or different technological fields based on design incentives or other market forces.

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any Asserted Claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.  The motivation and/or incentive to combine each of the prior art references identified in the accompanying Exhibits A1 to D15[3] comes from many sources, including, but not limited to, the known, published prior art references and products themselves, the knowledge of those of ordinary skill in the art, the common field of technology of the references, the commonality of the objectives and purposes of the references, and the teachings in the references directed to solving the problems that the '862 Patent, '427 Patent, '867 Patent, and '868 Patent were allegedly directed to solving.

Technical references, of course, are not the only factor to be considered in determining obviousness. "In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *KSR* at 419. Here,

---

[3] The pincites to the references in the claim charts are to the PDF page numbers, rather than the original pagination of the reference.

Defendant believes that the teachings of the Asserted Claims are no more than obvious combinations of previously known elements to bring about expected or known results.

Accordingly, the teachings of the individual prior art references disclosed in these Invalidity Contentions, combined with the industry knowledge of a person of ordinary skill in the art at the time of the alleged invention of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent would render obvious the Asserted Claims of the '862 Patent, '427 Patent, '867 Patent, and '868 Patent.  Provided below are some additional examples of motivations to combine the various prior art references disclosed in these Invalidity Contentions.  These are only examples of the teachings, suggestions, motivations and/or reasons a person of ordinary skill in the art would have had to modify or combine the prior art noted in Exhibits A1 to D15.  Such teachings, suggestions, motivations, and/or reasons are also further identified in Exhibits A1 to D15 with reference to disclosure of particular limitations.  Exhibits A1 to D15 describe example points in the prior art references at which a particular aspect of the claims are taught.  Each of these teachings noted in Exhibits A1 to D15 would teach, suggest, motivate, and/or provide a reason to a person of ordinary skill in the art to modify or combine prior art references in relation to wireless communications systems.  For these reasons and others, a person of ordinary skill in the art would have been motivated to combine any one of the prior art references listed in Exhibits A1 to D15, or herein, with one or more of those prior art references list in Exhibits A1 to D15 or herein.

### 1.      Motivations to Modify and/or Combine References

A person of ordinary skill at the time of the alleged inventions of the of the Asserted Patents had reason to combine or modify one or more of the references listed above and/or charted in Exhibits A1 to D15 in light of the knowledge of a person of ordinary skill in the art at

the time of the alleged invention and information in the prior art cited herein.  For example, the references identified above and/or charted in Exhibits A1 to D15 all relate to the same field of detecting metabolites using combinations of chromatography and mass spectrometry technology, identify and address the same technical issues as the Asserted Patents, and suggest very similar if not identical solutions to the same issues—the determination of testosterone or vitamin D metabolites in a sample using mass spectrometry. Thus, a person of ordinary skill in the art would have a reasonable expectation of success in combining their various disclosures depending on desired applications and properties of testosterone or vitamin D metabolites.  Moreover, a number of these references cross-reference and discuss one another, providing explicit motivation to combine such references and further illustrating the close technical relationship among these references.

### a.    The Testosterone Patent

A person of ordinary skill ("POSA") in the art would have been motivated to combine any of the prior art identified above because the references are directed to methods for determining or detecting testosterone or related steroids or hormones in a sample, and the improvement of such methods. Multiple prior art references provide numerous variations in the manner of the purification of, extraction of, ionization of, and/or detection of hormones, demonstrating that using the claimed methods for detecting testosterone would have been obvious to a person of ordinary skill in the art at the time of the alleged inventions of the Testosterone Patent. *See, e.g.*, Clarke, Chang, Draisci. Each of these references are described briefly below.

***Clarke*** is an extended abstract related to a presentation at the Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, which took place in Chicago,

Illinois May 27-31, 2001. Clarke describes a method designed to detect suppressed testosterone levels in humans. Clarke at 1. Clarke's method of detecting testosterone levels uses solid phase extraction, liquid chromatography, and electrospray ionization (ESI) with tandem mass spectrometry (MS/MS). Clarke at 1. Clarke specifically discloses analysis of human female serum samples as a control in order to determine the accuracy of the described method for samples with lower concentrations of testosterone. Clarke at 1.

**Chang** is a scientific article published in the Analyst, Volume 128 dated October 14, 2002. Chang discloses methods for using high-performance liquid chromatography-tandem mass spectrometry (LC-MS/MS) after on-line solid-phase extraction (SPE) to quantitatively measure anabolic hormones, such as testosterone. Chang at 1. Chang further discloses ionizing analytes of the hormones in an ESI interface. Chang at 1.

**Draisci** is a scientific article published in the Journal of Chromatography A, Volume 870 (Nos. 1-2), dated February 18, 2000. Draisci discloses analysis of bovine serum and urine samples from both males and females in order to detect illegal use of steroids for meat production. Draisci at 11. Draisci relates to a method of quantifying levels of testosterone and other anabolic hormones using HPLC and atmospheric pressure chemical ionization (APCI) with (MS/MS). Draisci at 9. Draisci discloses first extracting testosterone and other analytes from the biological samples by liquid extraction and solid phase extraction and injecting the solution containing the extracted analytes into an HPLC-MS/MS system. Draisci at 9, 11. Draisci further discloses an ionization step, which creates a protonated molecule $[M+H]^+$ of each analyte. Draisci at 9.

**Gao**, U.S. Patent No. 6,541,263 B2, was granted on and published prior to April 1, 2003. Gao discloses a method for detecting a corticosteroid, such as testosterone using a micromass

LC-MS/MS system. Gao at 1:8-2:15. Gao further discloses that interfering compounds may be removed from the sample prior to analysis using, preferably, SPE. Gao at 6:20-26.

*Williams* is a scientific article published in the Journal of Mass Spectrometry, Volume 34, dated December 11, 1998. Williams discloses methods for detecting steroids, such as testosterone, using LC-MS with APCI. Williams at 1. Williams further discloses that an ESI step may be performed prior to mass spectra of the testosterone containing samples. Williams at 1. Williams showed three significant ions from the ESI mass spectrum of testosterone, at *m/z* 97, 109, and 123. Williams at 1.

*Barron* is a scientific article published in the Journal of Mass Spectrometry, Volume 31, dated November 20, 1995. Barron discloses a method for determining anabolic steroids in human urine using SPE-LC-MS. Barron at 1. More specifically, Barron is directed towards determining concentrations of testosterone to detect for doping, particularly in athletes. Barron at 1.

*Lagana* is a scientific article published in Analytical Letters, Volume 34, dated August 23, 2006. Lagana discloses a quantitative method for analyzing and detecting the presence of steroids including testosterone in environmental waters. Lagana at 3. Lagana discloses that the method includes SPE followed by LC-APCI-MS/MS. Lagana at 3.

*Fitzgerald* is a scientific article published in Clinical Chemistry, Volume 42(No. 5) in 1996. Fitzgerald discloses methods for detecting testosterone concentrations in adult male and female human serum samples using liquid-liquid extraction and electron capture negative chemical ionization in combination with gas chromatography and mass spectrometry (GC/MS). Fitzgerald at 1. Fitzgerald discloses first extracting testosterone from the serum samples with liquid-liquid extraction and then derivatizing the testosterone in preparation for gas chromatography. Fitzgerald at 2. Fitzgerald describes injecting the solution containing the

derivatized testosterone directly into the GC/MS system and monitoring the derivatized testosterone ions at a m/z of $535 \pm 0.5$. Fitzgerald at 2.

**Ma and Kim** is a scientific article published in the Journal of American Society for Mass Spectrometry, Volume 8, dated April 28, 1997. Ma and Kim described a method for improving the detection limit when measuring steroid concentrations, including testosterone. Ma and Kim at 1. Ma and Kim further discloses that the method can include either APCI-LC-MS or ESI-LC-MS. Ma and Kim at 1.

**Takino** is a scientific article published in the Abstract, Volume 128, dated December 11, 2002. Takino discloses a method for quantitative determination of catechins in human plasma. The method of Takino includes on-line extraction using turbulent flow chromatography (TFC) to prepare the sample prior to the tandem LC-LC-MS method.

**Jemal** is a scientific article published in Biomedical Chromatography, Volume 14, dated in 2000. Jemal discloses a method for the quantitation of various metabolites and biomolecules. Jemal further discloses the use of fast-flow on-line extraction, or HTLC, which it claims significant sped up analysis by LC-MS/MS.

**Joos** is a scientific article published in the Analytical Chemistry, Volume 71, Number 20 dated October 15, 1999. Joos describes a method for analyzing 36 anabolic steroids including testosterone. The methods of Joos consist of, first, separation using APCI followed by mass-analysis using LC-MS/MS. Joos further provides that HPLC is used to prepare and clean the samples prior to analysis.

**Taieb** is a scientific article published in Clinical Chemistry, Volume 49, Number 8 dated 2003. Taieb discloses a method for measuring testosterone by immunoassays and by isotope-

dilution gas chromatography-mass spectrometry (ID/GC-MS). Taieb discusses the improvements in the ID/GC-MS method over the immunoassays.

*Ong* is a presentation that was given at the Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics in Chicago, Illinois on May 27-31, 2001. Ong discloses a method for analyzing biomolecules using turbulent flow chromatography-mass spectrometry (TFC-MS/MS). Ong further provides that the samples are analyzed using parallel TFC-MS/MS. Ong further discloses that the TFC is a type of SPE.

Defendants provide exemplary obviousness combinations and motivations to combine various references below, and Defendants reserve the right to identify other prior art or to supplement these Initial Invalidity Contentions.

A person of ordinary skill in the art would have been motivated to combine, for example, Clarke, Chang, Draisci, and/or Jemal with, for example, Takino and/or Ong to arrive at the claimed invention.  For example, Clarke discloses all steps of claims 1-2, 5-16, and 18-24 and Takino discloses HTLC (*see, e.g.*, claim 3). A person of ordinary skill in the art, starting with the methods such as those disclosed in Clarke, including LC-MS/MS, ESI, and SPE, would look to improve the methods using HTLC, like those described in Takino and Ong. As Takino discloses, the use of HTLC improved the sensitivity of the LC-MS method and simplified the method. Further, sample preparation was required with the HTLC disclosed in Takino. While Takino provides a method for analysis of catechins, a person of ordinary skill in the art would look to analysis of any biological molecules and methods involving LC-MS.

Further, Clarke discloses extraction methods such as SPE and Ong discloses an improved extraction method and type of SPE—HTLC (*see, e.g.*, claim 4, 17). A person of ordinary skill in the art would look to combine Ong with Clarke as this presentation was discussed in the context

42

of mass spectrometry at a well-known conference. And, during the presentation, Ong described how the method discussed in the presentation could be used to analyze testosterone.

Likewise, Chang discloses methods for using high-performance liquid chromatography-tandem mass spectrometry (LC-MS/MS) after on-line solid-phase extraction (SPE) to quantitatively measure anabolic hormones. Barron discloses a method for determining steroids using SPE-LC-MS. Lagana discloses a method for detecting testosterone including SPE followed by LC-APCI-MS/MS. Ma and Kim discloses a method for measuring testosterone concentrations, including either APCI-LC-MS or ESI-LC-MS. A person of ordinary skill in the art would look to improve various steps of these methods, such as the extraction step and the ionization step, or even the detection limits in improving the sensitivity of such analyses.

Numerous variations of chromatography and mass spectrometry methods, purification methods, ionization methods, and extraction methods were known in the field of biomolecule detection as of the priority date of the Testosterone patent. For example, Ma and Kim discloses methods for both APCI-LC-MS and ESI-LC-MS. Ma and Kim at 1. Additionally, Gao discloses that such extraction steps may include solid phase extraction, liquid–liquid extraction, protein precipitation, etc. Gao at 9:64-66. But, as disclosed during prosecution, the addition of HTLC led to issuance of the Testosterone patent. Although SPE, liquid–liquid extraction, and protein precipitation methods were commonly used, it was known in the art that such processes had many drawbacks including lower throughput. Thus, a person of ordinary skill would be motivated to use an extraction method that does not require off-line sample preparation, such as HTLC, to avoid the known disadvantages with the common testosterone analyses.

To further illustrate why a person of ordinary skill in the art would be motivated to combine Clarke, Chang, Draisci, Barron, and/or Jemal with any of the prior art identified above, the following teachings or disclosures provide additional non-limiting examples:

- A person of ordinary skill in the art would look to methods for detecting the presence of anabolic steroids or other biomolecules to improve methods for detecting androgens, such as testosterone;

- A person of ordinary skill in the art would look to methods for detecting the presence of testosterone, or related biomolecules, in men and/or women to generate more sensitive analyses to detect low levels of testosterone in women;

- A person of ordinary skill in the art would look to improve the detection limits in such methods by looking to references, such as Draisci, for example, which disclose a sensitive method to confirm illegal hormone administration; and

- A person of ordinary skill in the art would look to sensitive analyses measuring testosterone limits in animals, or other natural samples, to improve the methods for detecting such presences of testosterone in human samples.

Thus, using the disclosed methods, and improving on such methods, as disclosed in the prior art references identified above, would have obvious to a person of ordinary skill in the art at the time of the invention of the Testosterone Patent.

In light of the above teachings and motivations, examples of specific combinations of references that invalidate the Asserted Claims include:

- Clarke in view of Fitzgerald

- Clarke in view of Ong

- Clarke in view of Takino

44

- Chang in view of Ong

- Chang in view of Takino

- Chang in view of Fitzgerald

- Draisci in view of Ong

- Draisci in view of Fitzgerald

- Draisci in view of Takino

        **b.**      **The Vitamin D Patents**

A person of ordinary skill in the art would have been motivated to combine Voyksner, Kissmeyer, Schoutsen, Vogeser, Higashi, Higashi II, Yeung, Yeung II and/or Watson with any of the prior art identified above because the references are directed to methods for determining or detecting various vitamin D metabolites by mass spectrometry, the improvement of such methods, and the applicability of such methods to various vitamin D metabolites. Many of the prior art references disclosed above provide numerous variations in the manner of the purification of, extraction of, derivatization of, ionization of, and/or detection of vitamin D metabolites. This demonstrates that using the claimed methods, such as those disclosed in Voyksner, Kissmeyer, Schoutsen, and/or Watson, would have been obvious to a person of ordinary skill in the art at the time of the alleged inventions of the Vitamin D Patents. *See, e.g.*, Kamao; Jones; Coldwell; Higashi III; Vogeser II; Kissmeyer II; Holick; Maunsell.

*Voyksner* is a scientific article that was published in Analytical Chemistry, Volume 71(7), dated April 1, 1999. Voyksner describes the optimization of electrospray processes used in a liquid chromatography (LC) (MS/MS) method and describes the use of such methods for detecting amounts of the vitamin D metabolite dihydroxyvitamin $D_3$. Voyksner at 1441-1447. Voyksner compares results obtained for dihydroxyvitamin $D_3$ using three different tandem mass

45

spectrometry methods, on-line and off-line ion trap MS/MS and triple quadrupole atmospheric pressure ionization tandem mass spectrometry (API-MS/MS). Voyksner at 1446-1447. For both ion trap and triple quadrupole MS/MS Voyksner describes generating a protonated, dehydrated precursor $[M + H - H_2O]^+$ of dihydroxyvitamin $D_3$ having a mass to charge ratio (*m/z*) of 399. Voyksner at 1443. Voyksner further discloses creating fragments of the precursor ion and detecting the amount of the precursor ions or fragments thereof. Voyksner at 1443-1444, 1446-1447.

*Kissmeyer* is a scientific article that was published in the Journal of Chromatography A, Volume 935 in 2001. Kissmeyer describes a sensitive LC-MS/MS method for the detection of 1α,25-dihydroxyvitamin $D_3$ in biological fluids. Kissmeyer at 93. Kissmeyer describes using a protein precipitation step prior to the HPLC/MS/MS analysis. Kissmeyer at 93, 95-96.

*Schoutsen* is a poster that was presented at the Proceedings of the 16th International Mass Spectrometry Conference in Scotland on September 4, 2003. Schoutsen describes a method of quantitatively detecting 25-hydroxyvitamin $D_2$ (25(OH)$D_2$) and 25-hydroxyvitamin $D_3$ (25(OH)$D_3$) using a single biological sample (patient plasma) by HPLC-tandem mass spectrometry. Schoutsen at 1. Schoutsen describes the generation of calibration samples having known amounts of 25(OH)D2 and 25(OH)D3 to generate calibration curves for quantitation of each metabolite by LC-MS/MS. Schoutsen at 1. Schoutsen provides a spectra for a patient plasma sample spiked with a known concentration of 1,25(OH)$_2$$D_2$, showing that the assay produces a spectra including fragment peaks for 25(OH)$D_3$, 25(OH)$D_2$, and 1,25(OH)$_2$$D_2$ ions. Schoutsen at 1. Schoutsen describes conditions for HPLC and protein precipitation to partially purify the sample. Schoutsen at 1.

46

*Vogeser* is a scientific article published in the Clinical Chemistry Laboratory Medium and is dated in 2003. Vogeser discloses methods for analyzing metabolites in samples, such as vitamin D metabolites. Vogeser further discloses that such methods include LC-MS/MS as well as ionization through APCI. Vogeser further discloses how powerful the new detection principles are for HPLC combined with MS/MS.

*Watson* is a scientific article that was published in Biomedical Chromatography, Volume 5 in 1991. Watson describes the analysis of vitamin D and its metabolites by thermospray (TSP) mass spectrometry. Watson at 153. Positive ion TSP mass spectra were recorded for vitamin $D_2$, vitamin $D_3$, 25-hydroxyvitamin $D_3$ (25(OH)$D_3$), 1,25-dihydroxyvitamin $D_3$ (1,25(OH)$_2D_3$), and 24,25-dihydroxyvitamin $D_3$ (24,25(OH)$_2D_3$). Watson at 153. The spectra showed protonated molecular ions, ammonium adduct ions, and fragment ions, due to the loss of one or more molecules of water. Watson at 153. Watson discloses detection of TSP mass spectrometric generated protonated, dehydrated ions $[M + H - H_2O]^+$ of the vitamin $D_3$ metabolites 25-hydroxyvitamin D3 and 1,25-dihydroxyvitamin $D_3$, dihydroxyvitamin having a *m/z* ratios of 383 and 399, respectively. Watson at 155

*Kamao* is a scientific article that was published in JBC Papers in Press, on February 2, 2004 and published later in the Journal of Biological Chemistry, Volume 279(16). Kamao is concerned with elucidating aspects of vitamin D metabolism, and teaches that a major metabolite of 25-hydroxyvitamin $D_3$ (25(OH)$D_3$) is 3-epi-25-hydroxyvitamin $D_3$ (3-epi-25(OH)$D_3$). Kamao at 2. Kamao describes the use of chiral chromatography (Sumichiral OA-2000 columns) to separate 3-epi-25(OH)$D_3$ from 25(OH)$D_3$ and detection of these vitamin D epimers by mass spectrometry Kamao at 7, 12.

47

*Higashi* is a scientific paper in the Biological Pharmaceutical Bulletin and is dated in 2001. Higashi discloses methods for the sensitive determination of vitamin $D_2$ and vitamin $D_3$ metabolites using LC-MS/MS. Higashi further discloses derivatization, prior to ionization, with a Cookson-type reagent.

*Higashi II* is a scientific paper in the Biomedical Chromatography and is dated in 2001. Higashi II discloses a method for determining the quantitation of vitamin D metabolites in human plasma. The methods of Higashi II consist of using LC-MS after protein precipitation the clean up the samples. Higashi II further discloses a Cookson-type reagent for derivatizing the sample and APCI ionization.

*Higashi III* is a scientific paper in the Journal of Chromatography B and is dated in 2002. Higashi III discloses a method for determining the quantity of synthetic vitamin D3 in human plasma. Higashi III further discloses that the method consists of extraction, followed by derivatization with a Cookson-type reagent and LC-MS/MS using APCI.

*Jones* is a chapter in the book Modern Chromatographic Analysis of Vitamins dated 2000. Jones discloses methods for analyzing vitamin D and its metabolites. Jones further discloses that these methods include tandem mass spectrometry by multiple MS (MS-MS-MS) using an ion trap MS system. Jones also includes generating a protonated and dehydrated precursor ion of the vitamin D metabolite.

*Coldwell* is a publication in the Journal of Mass Spectrometry, Volume 30 and dated in 1995. Coldwell discloses a method for measuring a vitamin D metabolite in plasma. The method of Coldwell discloses generating a dehydrated precursor ion of the metabolite and subsequently detecting the amount of that ion using chromatography methods.

*Yeung* is a scientific paper in the Journal of Chromatography and is dated April 5, 1993. Yeung discloses a method for detecting vitamin D metabolites. The method involves derivatizing the metabolites with a Cookson-type reagent and subsequent characterization of the derivatized metabolite using (MS/MS) and HTLC.

*Yeung II* is a scientific paper in the Biochemical Pharmacology and is dated in 1995. Yeung II discloses the determination and characterization of vitamin D metabolites. The method of Yeung II includes on-line HPLC-MS/MS. Yeung II further discloses derivatizing said metabolites with a Cookson-type reagent.

*Vogeser II* is a scientific candidate reference method in Clinical Chemistry and is dated in November 8, 2004. Vogeser II discloses s method for quantifying vitamin D metabolites by LC-MS/MS. Vogeser II further discloses sample preparation using SPE and the generation of protonated precursor ions.

*Holick* is a poster from a presentation at the 26th Annual Meeting of the American Society for Bone and Mineral Research and was presented in 2004. Holick discloses a method for precisely evaluating the amount of vitamin D or vitamin D metabolites. The method of Holick includes LC-MS/MS. Holick further shows that calibration curves, used to determine the amount of metabolite in a sample, are often not straight lines and are true calibration curves.

*Maunsell* is a scientific article published in the Clinical Chemistry and is dated in 2005. Maunsell discloses the measurement of vitamin D metabolites at sensitive, or deficient levels. Maunsell further discloses that the methods include ID/LC-MS/MS using an internal standard for calibration. Maunsell further discloses sample preparation using SPE.

*Kissmeyer II* is a scientific paper in the Journal of Chromatography B and is dated in 2000. Kissmeyer II discloses a method for determining the presence of a vitamin D analog in

human and pig serum. The method of Kissmeyer II includes LC-MS/MS after a pretreatment by SPE.

*Vreeken* is a scientific article published in Biological Mass Spectrometry and is dated in 1993. Vreeken discloses a method for determining vitamin D and its metabolites through LS-MS/MS. Vreeken further discloses the use of derivatizing agents for signal enhancement. The method described in Vreeken also includes generating a protonated and dehydrated precursor ion of the vitamin D metabolites.

Defendants provide exemplary obviousness combinations and motivations to combine various references below, and Defendants reserve the right to identify other prior art or to supplement these Initial Invalidity Contentions.

### (i)    The '867 Patent

A person of ordinary skill in the art would have been motivated to combine, for example, Voyksner, Kissmeyer, Vogeser, Watson, Jones, Coldwell, Higashi, Higashi II, and/or Yeung II with, for example, Kamao and/or Schoutsen to arrive at the invention claimed in the '867 patent. For example, Voyksner discloses all steps of claims of the Asserted Claims of the '867 patent, except claim 31 regarding the vitamin $D_2$ metabolite. A person of ordinary skill in the art, starting with the methods such as those in Voyksner would appreciate the applicability of those methods to vitamin $D_2$ metabolites. Further, a person of ordinary skill in the art Schoutsen or Jones, for example, to further understand and know that such methods could also quantify vitamin $D_2$ metabolites as Schoutsen and Jones quantify metabolites of both vitamin $D_2$ and $D_3$.

Further, a person of ordinary skill in the art would appreciate that Jones either anticipates or renders obvious all of the Asserted Claims. Jones discloses a method to analyze vitamin D metabolites including tandem mass spectrometry. The method includes generating a protonated

and dehydrated precursor ion of the vitamin D metabolite, generating one or more fragments of said precursor ion, and detecting the amount of said ions and relating that amount to the amount of vitamin D metabolite in the sample. Lastly, Jones is a chapter in a textbook, further evidencing that these methods disclosed were well-known as they were not merely released in a new publication or study.

To further illustrate why a person of ordinary skill in the art would be motivated to combine Voyksner, Kissmeyer, Vogeser, Watson, Jones, Coldwell, Higashi, Higashi II, and/or Yeung II with any of the prior art identified above, the following teachings or disclosures provide additional non-limiting examples:

- A person of ordinary skill in the art would look to methods for detecting the presence of vitamin $D_3$ metabolites for applicability to or improvements on methods for detecting vitamin $D_2$ metabolites, and vice versa;

- A person of ordinary skill in the art would look to methods for detecting the presence of certain hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers for applicability to other hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers (i.e. a person of ordinary skill in the art would look to an analysis of 1,25-dihydroxyvitamin $D_3$ to improve analyses for 25-hydroxyvitamin $D_3$);

- A person of ordinary skill in the art would understand that the use of liquid chromatography in analyses teaches that gas chromatography is not used; and

- A person of ordinary skill in the art would look to ionization methods that generate a dehydrated ion to improve methods that quantify a protonated ion, and vice versa.

Thus, using the disclosed methods, and improving on such methods, as disclosed in the above-mentioned prior art references, would have been obvious to a person or ordinary skill in the art at the time of the invention of the '867 patent.

In light of the above teachings and motivations, examples of specific combinations of references that invalidate the Asserted Claims include:

- Voyksner in view of Watson

- Voyksner in view of Vogeser

- Voyksner in view of Jones

- Kissmeyer in view of Watson

- Kissmeyer in view of Jones

- Kissmeyer in view of Higashi

- Schoutsen in view of Watson

- Schoutsen in view of Jones

- Higashi II in view of Watson

### (ii)     The '427 Patent

A person of ordinary skill in the art would have been motivated to combine, for example, Voyksner, Jones, Kissmeyer, Vogeser, and/or Yeung II with, for example, Schoutsen, Watson, Kamao, Higashi, Higashi II, Higashi III, and/or Yeung to arrive at the invention claimed in the '427 patent. For example, Voyksner discloses all steps of claims 1-5 and 9-10 and, for example, Kissmeyer discloses the remaining Asserted Claims, claims 6 and 11. A person of ordinary skill in the art, starting with the methods such as those disclosed in Voyksner, including various ionization steps and HPLC, would look to improve those methods using protein precipitation, like that as described in Kissmeyer, Schoutsen, and Vogeser. Such protein precipitation methods

would better purify the sample to allow for better detection of the vitamin D metabolites, and protein precipitation, generally, was well-known in the art at the time. Additionally, a person of ordinary skill in the art would apply these methods to further compounds such as vitamin $D_2$ metabolites as disclosed in Kissmeyer, Schoutsen, Vogeser, and Watson. Many of the references discussed herein disclose methods for analyzing both vitamin $D_2$ and vitamin $D_3$ metabolites. While the methods for analyzing vitamin $D_2$ and $D_3$ metabolites, and different isomers thereof (e.g., 1,25-dihydroxyvitmain $D_3$ versus 25-hydroxyvitamin $D_3$) would differ, a person of ordinary skill in the art would be well-resourced to alter various steps of the method for the specific metabolites.

Likewise, Watson discloses steps of the '427 patent such as generating a protonated and dehydrated precursor ion and detecting the amount of the generated ions. Watson further discloses quantifying the amount of vitamin D using a standard curve and the chromatography steps as required by the '427 patent. Additionally, Watson discloses the advantages of the described method over comparable gas chromatography methods, meeting the limitations of claim 9. A person of ordinary skill in the art would look to improve such steps of Watson by, for example, fragmenting the protonated and dehydrated precursor ion, as disclosed in at least Voyksner and Yeung II.

Further, Jones either anticipates or renders obvious all of the Asserted Claims. Jones discloses a method to analyze vitamin D metabolites including tandem mass spectrometry, generating a protonated and dehydrated precursor ion of a vitamin D analog, generating one or more fragments of said precursor ion, and most importantly, detecting the amount of said ions and relating that amount to the amount of vitamin D metabolite in the sample. Additionally, Jones discloses optimizing the purification procedure and discloses the use of either APCI or

PTAD to achieve the desired results. Jones also cites and discusses both the Vreeken and Watson references, which supports that a person of ordinary skill in the art would be motivated to combine the references above.

To further illustrate why a person of ordinary skill in the art would be motivated to combine Voyksner, Kissmeyer, Vogeser, and/or Yeung II with any of the prior art identified above, the following teachings or disclosures provide additional non-limiting examples:

- A person of ordinary skill in the art would look to methods for detecting the presence of vitamin $D_3$ metabolites for applicability to or improvements on methods for detecting vitamin $D_2$ metabolites, and vice versa;

- A person of ordinary skill in the art would look to methods for detecting the presence of certain hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers for applicability to other hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers (i.e. a person of ordinary skill in the art would look to an analysis of 1,25-dihydroxyvitamin $D_3$ to improve analyses for 25-hydroxyvitamin $D_3$);

- A person of ordinary skill in the art would understand that the use of liquid chromatography in analyses teaches that gas chromatography is not used; and

- A person of ordinary skill in the art would look to ionization methods that generate a dehydrated ion to improve methods that quantify a protonated ion, and vice versa.

Thus, using the disclosed methods, and improving on such methods, as disclosed in the prior art references identified above, would have obvious to a person of ordinary skill in the art at the time of the invention of the '427 patent.

In light of the above teachings and motivations, examples of specific combinations of references that invalidate the Asserted Claims include:

- Voyksner in view of Kissmeyer

- Voyksner in view of Vogeser

- Voyksner in view of Watson

- Kissmeyer in view of Jones

- Kissmeyer in view of Watson

- Kissmeyer in view of Schoutsen

- Vogeser in view of Ong

- Vogeser in view of Higashi

- Vogeser in view of Takino

### (iii)    The '868 Patent

A person of ordinary skill in the art would have been motivated to combine, for example, Voykser, Higashi, Higashi III, Yeung, Yeung II, and/or Maunsell with, for example, Kissmeyer, Schoutsen, Vogeser, Higashi II, Vogeser II, Holick, and/or Kissmeyer II to arrive at the invention claimed in the '868 patent. For example, Higashi discloses steps of claims 9-11 and Higashi II discloses steps of claims 12-13, except the immunopurification step. Starting with the methods disclosed in Higashi, such as derivatizing vitamin D metabolites, and generating precursor ions prior to tandem mass spectrometry,  a person of ordinary skill in the art would look to improve those methods using further purification methods such as HPLC, as described in Higashi II, and numerous other references described above. Such purification methods were well-known in the art and, particularly, well-known for their use in connection with tandem mass spectrometry. Further, a person of ordinary skill in the art would look to better purify the samples, through methods such as HPLC, to achieve better quantitation of the metabolites. Immunoaffinity enrichment methods for small molecules prior to LC-MS/MS were also well-

55

known in the art. *See* Cai and Henion, *On-Line Immunoaffinity Extraction-Coupled Column Capillary Liquid Chromatography/Tandem Mass Spectrometry: Trace Analysis of LSD Analogs and Metabolites in Human Urine*, Anal. Chem. 68:72-78 (1996); Nedved *et al.*, *Characterization of Benzodiazepine "Combinatorial" Chemical Libraries by On-Line Immunoaffinity Extraction, Coupled Column HPLC–Ion Spray Mass Spectrometry–Tandem Mass Spectrometry*, Anal. Chem. 68:4228-36 (1996); Onorato and Henion, *Evaluation of Triterpene Glycoside Estrogenic Activity Using LC/MS and Immunoaffinity Extraction*, Anal. Chem. 73:4704-10.

Further, while Vogeser II does not disclose a derivatizing agent as required in part (a) of claim 1, it discloses the use of a calibration curve. Thus, a person of ordinary skill in the art would be motivated to combine the methods and use of a calibration curve with other prior art references, such as Voyksner, Higashi, Higashi II, Higashi III, Yeung, and/or Yeung II, that disclose derivatizing the vitamin D metabolite to improve these methods. Further, a person of ordinary skill in the art would appreciate the teachings of Jones that show how a derivatizing step can be used to improve on APCI. Thus, based on Jones, a person of ordinary skill in the art would understand that methods disclosing APCI, such as those discussed in reference to the '867 and '427 patents, could be improved to include a derivatizing step.

To further illustrate why a person of ordinary skill in the art would be motivated to combine Voykser, Higashi, Higashi III, Yeung, Yeung II, and/or Maunsell with any of the prior art identified above, the following teachings or disclosures provide additional non-limiting examples:

- A person of ordinary skill in the art would look to methods for detecting the presence of vitamin $D_3$ metabolites for applicability to or improvements on methods for detecting vitamin $D_2$ metabolites, and vice versa;

- A person of ordinary skill in the art would look to methods for detecting the presence of certain hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers for applicability to other hydroxyvitamin D or dihydroxyvitamin D metabolites or isomers (i.e. a person of ordinary skill in the art would look to an analysis of 1,25-dihydroxyvitamin $D_3$ to improve analyses for 25-hydroxyvitamin $D_3$);

- A person of ordinary skill in the art would look to ionizations method that generate a dehydrated ion to improve methods that quantify a protonated ion, and vice versa;

- A person of ordinary skill in the art would understand that the use of liquid chromatography in analyses teaches that gas chromatography is not used; and

- A person of ordinary skill in the art would understand than any Cookson-type reagent could be used to derivatize the vitamin D metabolites and understand how to alter the analyses accordingly; and

- A person of ordinary skill in the art would understand that immunoaffinity purification could be combined with vitamin D analyses by LC-MS/MS.

Thus, using the disclosed methods, and improving on such methods, as disclosed in the above-mentioned prior art references, would have been obvious to a person or ordinary skill in the art at the time of the invention of the '868 patent.

In light of the above teachings and motivations, examples of specific combinations of references that invalidate the Asserted Claims include:

- Higashi in view of Voyksner

- Higashi in view of Vogeser

- Higashi in view of Kissmeyer

- Voyksner in view of Schoutsen

- Voyksner in view of Higashi

- Yeung in view of Voyksner

- Yeung in view of Kissmeyer II

- Yeung in view of Higashi

- Maunsell in view of Voyksner

## IV.    INVALIDITY CONTENTIONS BASED ON 35 U.S.C. § 101

Each Asserted Claim is patent-ineligible 35 U.S.C. § 101.  LabCorp herein incorporates by reference Defendants' Opening Brief and Reply Brief in Support of Their Motion for Judgment on the Pleadings under 35 U.S.C. § 101. (D.I. 27; D.I. 40.).

The patents-in-suit are directed to nothing more than observing natural phenomena, and thus are directed to patent-ineligible subject matter. Further, none of the elements in the asserted claims of the patents-in-suit contain an inventive step sufficient to transform the claimed naturally occurring phenomenon into a patent-eligible application. All the steps and limitations found in the asserted claims are described in the patents as well-known to the skilled artisan, thus merely routine and conventional.

Accordingly, all four patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101.

## V.    INVALIDITY CONTENTIONS BASED ON 35 U.S.C. § 112

LabCorp provides below an identification of Asserted Claims that are—at least as apparently construed by Plaintiff in its Infringement Contentions—invalid pursuant to 35 U.S.C. § 112 as indefinite, not enabled, or lacking a sufficient written description.  A more detailed basis for Defendants' written description, enablement, and/or indefiniteness defenses will be set forth in Defendants' respective expert reports on invalidity, to be served in accordance with the

Court's Scheduling Order.  Defendant has not yet taken any depositions related to these issues. Defendant specifically reserves the right to amend and/or supplement these Invalidity Contentions based on a failure to comply with the requirements of 35 U.S.C. § 112. Below are exemplary Asserted Claims that are invalid pursuant to 35 U.S.C. § 112:

### A.    '862 Patent

Claims 8 and 9 of the '862 patent are invalid under 35 U.S.C. § 112 ¶1 because the patent lacks adequate written description of the terms "capable of" found in claims 8 and 9.

Claims 1, 2, and 4-14 of the '862 patent are invalid under 35 U.S.C. § 112 ¶1 because the patent does not enable one of ordinary skill in the art to make and use the claimed invention to detect the analyte at the recited detection limits absent the use of HTLC.

### B.    '867 Patent

Claims 22 and 31 of the '867 patent are invalid under 35 U.S.C. § 112 ¶1 because the patent lacks adequate written description of the term "ionization" found in claim 22 and "the sample" in claim 31.

### C.    '427 Patent

Claims 2, 3, 4, 5, and 6 of the '427 patent are invalid under 35 U.S.C. § 112 ¶1 because the patent lacks adequate written description of the term "ionization" found in claim 2.

### C.    '868 Patent

Claims 9-13 of the '868 patent are invalid under 35 U.S.C. § 112 ¶1 because the specification lacks written description support and/or the patent does not enable one of skill in the art to use carboxyphyenyl-TAD as a derivatizing agent.

## VI.   DOCUMENT PRODUCTION ACCOMPANYING INITIAL INVALIDITY CONTENTIONS

Pursuant to Paragraph 4(d) of the Default Standard, LabCorp is providing a copy of each item of identified prior art that does not appear in the file histories of the Asserted Patents concurrently herewith.  A diligent search continues for other documents, and LabCorp reserves the right to supplement its production.

WILSON SONSINI GOODRICH & ROSATI, P.C.

*Of Counsel*:

Edward G. Poplawski
Olivia M. Kim
Erik Carlson
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
(323) 210-2900
epoplawski@wsgr.com
okim@wsgr.com
ecarlson@wsgr.com

Matias Ferrario
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7300
mferrario@kilpatricktownsend.com

Dated:  May 24, 2019

*/s/ Ian R. Liston*
Ian R. Liston (#5507)
Johanna Peuscher-Funk (#6451)
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
(302) 304-7600
iliston@wsgr.com
jpeuscherfunk@wsgr.com

*Counsel for Defendants Laboratory Corporation of America Holdings; Esoterix, Inc.; and Endocrine Sciences, Inc.*

60