# EXHIBIT F



## THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*November 29, 2018*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *12/946,785*
**FILING DATE:** *November 15, 2010*
**PATENT NUMBER:** *8409862*
**ISSUE DATE:** *April 02, 2013*

Certified by

*Andrew Faurena*

Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

QUESTMS-00002598

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:      Caulfield et al.

Title:      DETERMINATION OF
TESTOSTERONE BY MASS
SPECTROMETRY

Prior Appl. No.:   12/607,905

Prior Appl.
Filing Date:    10/28/2009

Examiner:    Unknown

Art Unit:    Unknown

## CONTINUING PATENT APPLICATION
## TRANSMITTAL LETTER

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Transmitted herewith for filing under 37 C.F.R. § 1.53(b) is a:

[ **X** ] Continuation    [ ] Division    [ ] Continuation-In-Part (CIP)

of the above-identified copending prior application in which no patenting, abandonment, or termination of proceedings has occurred.  Priority to the above-identified prior application is hereby claimed under 35 U.S.C. § 120 for this continuing application.  The entire disclosure of the above-identified prior application is considered as being part of the disclosure of the accompanying continuing application and is hereby incorporated by reference therein.

[ ]      Applicant claims small entity status under 37 CFR 1.27.

Enclosed are:

-1-

QUESTMS-00002599

Atty. Dkt. No. 034827-9107

[ **X** ]   Description, Claim(s), and Abstract (30 pages).

[   ]   Informal drawings (0 sheets).

[ **X** ]   Copy of the Declaration and Power of Attorney from the parent application No. 12/607,905 (3 pages).

[   ]   Assignment of the invention to Quest Diagnostics Investments Incorporated.

[   ]   Assignment Recordation Cover Sheet.

[   ]   Small Entity statement.

[   ]   Request for application not to be published with certification under 35 USC 122(b)(2)(B)(i).

[   ]   Information Disclosure Statement.

[   ]   Form PTO-1449 with copies of ___ listed reference(s).

[ **X** ]   Preliminary Amendment (5 pages)

[ **X** ]   Application Data Sheet (37 CFR 1.76).

The adjustment to the number of sheets for EFS-Web filing follows:

| Number of Sheets | | EFS-Web Adjustment | Number of Sheets for EFS-Web |
|---|---|---|---|
| 30 | x | 75% | 23 |

The filing fee is calculated below:

| | Number Filed | Included in Basic Fee | Extra | | Rate | | Fee Totals |
|---|---|---|---|---|---|---|---|
| Basic Filing Fee | | | | | $330.00 | = | $330.00 |
| Search Fee | | | | | $540.00 | | $540.00 |
| Examination Fee | | | | | $220.00 | | $220.00 |
| Size Fee | 23 | - 100 | = 0 | x | $270.00 | | $0.00 |
| Total Claims: | 16 | - 20 | = 0 | x | $52.00 | = | $0.00 |

-2-

DLMR_835051.1

QUESTMS-00002600

Atty. Dkt. No. 034827-9107

| Independents: | 1 | - | 3 | = 0 | x | $220.00 | = | $0.00 |
|---|---|---|---|---|---|---|---|---|
| If any Multiple Dependent Claim(s) present: | | | | + | | $390.00 | = | $0.00 |
| Surcharge under 37 CFR 1.16(e) for late filing of Executed Declaration or late payment of filing fee | | | | + | | $130.00 | = | $0.00 |
| | | | | SUBTOTAL: | | | = | $1090.00 |
| [ ] | | | Small Entity Fees Apply (subtract ½ of above): | | | | = | 0 |
| | | | Basic Filing Fee Reduction for Filing via EFS-Web | | | | | $0.00 |
| | | | TOTAL FILING FEE: | | | | = | $1090.00 |
| Assignment Recordation Fee: | | | | + | | $40.00 | = | $0.00 |
| Processing Fee under 37 CFR 1.17(i) for Late Filing of English Translation of Application: | | | | + | | $130.00 | = | $0.00 |
| TOTAL FEE | | | | | | | = | $1090.00 |

The above-identified fees of $1090.00 are being paid by credit card via EFS-Web.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

Date  11/15/10                          By

FOLEY & LARDNER LLP                    Barry S. Wilson, Reg. No. 39,431
Customer Number: 30542                 Anthony C. Kuhlmann, Reg. No. 57,147
Telephone:    (858) 847-6722           Attorneys for Applicant
Facsimile:    (858) 792-6773

-3-

QUESTMS-00002601

<u>**Application Data Sheet**</u>

**Application Information**

| | |
|---|---|
| **Application Type::** | Regular |
| **Subject Matter::** | Utility |
| **Suggested classification::** | |
| **Suggested Group Art Unit::** | |
| **CD-ROM or CD-R?::** | None |
| **Computer Readable Form (CRF)?::** | No |
| **Title::** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **Attorney Docket Number::** | 034827-9107 |
| **Request for Early Publication?::** | No |
| **Request for Non-Publication?::** | No |
| **Suggested Drawing Figure::** | None |
| **Total Drawing Sheets::** | None |
| **Small Entity?::** | No |
| **Petition included?::** | No |
| **Secrecy Order in Parent Appl.?::** | No |

**Applicant Information**

| | |
|---|---|
| **Applicant Authority Type::** | Inventor |
| **Primary Citizenship Country::** | UK |
| **Status::** | Full Capacity |
| **Given Name::** | Michael P. |
| **Family Name::** | Caulfield |
| **City of Residence::** | San Clemente |

Initial 11/15/10

DLMR_835061.1

QUESTMS-00002602

**State or Province of Residence::**  CA

**Country of Residence::**  US

**Street of mailing address::**  2805 Orense

**City of mailing address::**  San Clemente

**State or Province of mailing address::**  CA

**Postal or Zip Code of mailing address::**  92673


**Applicant Authority Type::**  Inventor

**Primary Citizenship Country::**  US

**Status::**  Full Capacity

**Given Name::**  Darren A

**Family Name::**  Carns

**City of Residence::**  Rancho Santa Margarita

**State or Province of Residence::**  CA

**Country of Residence::**  US

**Street of mailing address::**  249 Seacountry Lane

**City of mailing address::**  Rancho Santa Margarita

**State or Province of mailing address::**  CA

**Postal or Zip Code of mailing address::**  92688


**Applicant Authority Type::**  Inventor

**Primary Citizenship Country::**  US

**Status::**  Full Capacity

**Given Name::**  Richard E

**Family Name::**  Reitz

Initial 11/15/10

DLMR_835061.1

QUESTMS-00002603

| | |
|---|---|
| **City of Residence::** | San Clemente |
| **State or Province of Residence::** | CA |
| **Country of Residence::** | US |
| **Street of mailing address::** | 3710 Calle Fino Clarete |
| **City of mailing address::** | San Clemente |
| **State or Province of mailing address::** | CA |
| **Postal or Zip Code of mailing address::** | 92673 |

**Correspondence Information**

| | |
|---|---|
| **Correspondence Customer Number::** | 30542 |
| **E-Mail address::** | PTOMailSanDiegoNorth@foley.com |

**Representative Information**

| Representative Customer Number:: | 30542 | |
|---|---|---|

**Domestic Priority Information**

| Application:: | Continuity Type:: | Parent Application:: | Parent Filing Date:: |
|---|---|---|---|
| This Application | Continuation of | 12/607,905 | 10/28/2009 |
| 12/607,905 | Continuation of | 12/053,325 | 3/21/2008 |
| 12/053,325 | Continuation of | 11/247,409 | 10/11/2005 |
| 11/247,409 | Continuation of | 10/726,919 | 12/2/2003 |

DLMR_835061.1

QUESTMS-00002604

| 10/726919 | An application claiming the benefit under 35 USC 119(e) | 60/501,255 | 9/8/2003 |
|---|---|---|---|

## Foreign Priority Information

| Country:: | Application number:: | Filing Date:: | Priority Claimed:: |
|---|---|---|---|
|  |  |  |  |

## Assignee Information

**Assignee Name::**     Quest Diagnostics Investments Incorporated

Initial 11/15/10

DLMR_835061.1

QUESTMS-00002605

 

Atty. Dkt. No. 054827-9103

## DECLARATION AND POWER OF ATTORNEY

As a below named inventor, I HEREBY DECLARE:

THAT my residence, post office address, and citizenship are as stated below next to my name;

THAT I believe I am the original, first, and sole inventor (if only one inventor is named below) or an original, first, and joint inventor (if plural inventors are named below or in an attached Declaration) of the subject matter which is claimed and for which a patent is sought on the invention entitled

### DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

(Attorney Docket No. 054827-9103)

the specification of which (check one)

_____        is attached hereto.

__X__        was filed on __12/02/2003__ as United States Application Number or
             PCT International Application Number __10/726.919__.

THAT I do not know and do not believe that the same invention was ever known or used by others in the United States of America, or was patented or described in any printed publication in any country, before I (we) invented it;

THAT I do not know and do not believe that the same invention was patented or described in any printed publication in any country, or in public use or on sale in the United States of America, for more than one year prior to the filing date of this United States application;

THAT I do not know and do not believe that the same invention was first patented or made the subject of an inventor's certificate that issued in any country foreign to the United States of America before the filing date of this United States application if the foreign application was filed by me (us), or by my (our) legal representatives or assigns, more than twelve months (six months for design patents) prior to the filing date of this United States application;

THAT I have reviewed and understand the contents of the above-identified specification, including the claim(s), as amended by any amendment specifically referred to above;

THAT I believe that the above-identified specification contains a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise,

AR251279.*

QUESTMS-00002606

 

Atty. Dkt. No. 034827-9103

and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the invention, and sets forth the best mode contemplated by me of carrying out the invention; and

THAT I acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, §1.56.

I HEREBY CLAIM the benefit under Title 35, United States Code § 119(e) of any United States provisional application(s) listed below.

| U.S. Provisional Application Number | Filing Date |
|---|---|
| 60/501,255 | 09/08/2003 |
| | |
| | |

I HEREBY APPOINT the registered attorneys and agents at Customer Number 30542

## Customer Number: 30542

to have full power to prosecute this application and any continuations, divisions, reissues, and reexaminations thereof, to receive the patent, and to transact all business in the United States Patent and Trademark Office connected therewith.

I request that all correspondence be directed to:

> Barry S. Wilson
> FOLEY & LARDNER LLP
> ## Customer Number: 30542
>
> Telephone:    (858) 847-6722
> Facsimile:    (858) 792-6773

I UNDERSTAND AND AGREE THAT the foregoing attorneys and agents appointed by me to prosecute this application do not personally represent me or my legal interests, but instead represent the interests of the legal owner(s) of the invention described in this application.

I FURTHER DECLARE THAT all statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the

251279.1

QUESTMS-00002607

 

Atty. Dkt. No. 034827-9103

United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

| | |
|---|---|
| Name of first inventor | Michael P. Caulfield |
| Residence | San Clemente, CA |
| Citizenship | Great Britain |
| Post Office Address | 2805 Orense<br>San Clemente, CA 92673 |
| Inventor's signature | *Richard Caulfield* |
| Date | 4/2/06 |

| | |
|---|---|
| Name of second inventor | Darren A. Carns |
| Residence | Rancho Santa Margarita, California |
| Citizenship | United States |
| Post Office Address | 249 Seacountry Lane<br>Rancho Santa Margarita, CA 92688 |
| Inventor's signature | *Dan A C* |
| Date | 04 - 02 - 04 |

| | |
|---|---|
| Name of third inventor | Richard E. Reitz |
| Residence | San Clemente, California |
| Citizenship | United States |
| Post Office Address | 3710 Calle Fino Clarete<br>San Clemente, CA 92673 |
| Inventor's signature | *Richard E. Reitz* |
| Date | 2 April 2003 |

R251279.1

QUESTMS-00002608

Atty. Dkt. No. 034827-9107

# DETERMINATION OF TESTOSTERONE
# BY MASS SPECTROMETRY

## CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

[0001] This application claims priority to U.S. Application Serial Number 12/607,905 filed October 28, 2009, which is a continuation of U.S. Application Serial Number 12/053,325 filed March 21, 2008 (now U.S. Patent Number 7,754,419 issued on July 13, 2010), which is a continuation of U.S. Application Serial Number 11/247,409 filed October 11, 2005 (now U.S. Patent Number 7,348,137 issued on March 25, 2008), which is a continuation of U.S. Application Serial Number 10/726,919 filed December 2, 2003 (now U.S. Patent Number 6,977,143 issued on December 20, 2005), which claims the benefit of U.S. Application Serial Number 60/501,255 filed September 8, 2003, all of which are incorporated herein by reference in their entirety including all figures and tables.

## FIELD OF THE INVENTION

[0002] The present invention relates to methods for analyzing testosterone and for detecting testosterone in samples by mass spectrometry.

## BACKGROUND OF THE INVENTION

[0003] The following description of the background of the invention is provided simply as an aid in understanding the invention and is not admitted to describe or constitute prior art to the invention.

[0004] Testosterone (4 androsten 17β-ol-3-one) is a C19 steroid hormone with a molecular weight of 288.4 daltons. Testosterone is the major androgen in males and is controlled by luteinizing hormone (LH). LH is released from the anterior pituitary exerting the primary control on testosterone production, and acting directly on the Leydig cells in the testes, where testosterone is produced. Testosterone stimulates adult maturation of external genitalia and secondary sex organs, and the growth of beard, axillary and pubic hair. In addition, testosterone has anabolic effects leading to increased linear growth, nitrogen retention, and muscular development. Clinical evaluation of serum testosterone, along with serum LH, assists in evaluation of hypogonadal males. Major causes of lowered testosterone in males include

QUESTMS-0000260

Atty. Dkt. No. 034827-9107

hypogonadotropic hypogonadism, testicular failure, hyperprolactinemia, hypopituitarism, some types of liver and kidney diseases, and critical illness.

[0005] Testosterone levels are much lower in females compared to males. The major sources of testosterone in females are the ovaries, the adrenal glands, and the peripheral conversion of precursors, specifically the conversion of androstenedione to testosterone. In females, the normal levels of androgens may provide a substrate for estrogen production. Increased serum testosterone levels in females may be indicative of polycystic ovary syndrome and adrenal hyperplasia, among other conditions. The clinical manifestations of excess testosterone in females include infertility, hirsutism, amenorrhea, and obesity.

[0006] Testosterone strongly binds to plasma proteins such as sex hormone-binding globulin (SHBG) or testosterone-estradiol-binding globulin (TEBG). Testosterone also binds with low affinity to CBG (cortisol-binding globulins) and albumin. Less than 2.5% of testosterone circulates unbound to plasma proteins.

[0007] Numerous assays for testosterone are known to those of skill in the art. See, e.g., Marcus and Durnford, Steroids 46: 975-86 (1985); Giraudi et al., Steroids 52: 423-4 (1988); Ooi and Donnelly, Clin. Chem. 44: 2178-82 (1988); Dorgan et al., Steroids 67: 151-8 (2002); Choi et al., Clin. Chem. 49: 322-5 (2003).

## SUMMARY OF THE INVENTION

[0008] In a first aspect, the present invention relates to methods for determining the presence or amount of testosterone in a test sample, comprising ionizing all or a portion of the testosterone present in the sample to produce one or more testosterone ions that are detectable in a mass spectrometer operating in positive ion mode, and detecting the ion(s) so produced. The presence or amount of one or more testosterone ions can be related to the presence or amount of testosterone in the original test sample.

[0009] Such methods may preferably comprise ionizing all or a portion of the testosterone present in the sample to produce one or more testosterone ions, isolating the testosterone ions by mass spectrometry to provide one or more precursor ions, fragmenting the precursor ions to provide one or more daughter ions that are detectable in a mass spectrometer operating in positive ion mode, and detecting the ion(s) so produced. The presence or amount of

QUESTMS-00002610

Atty. Dkt. No. 034827-9107

the testosterone daughter ion(s) can be related to the presence or amount of testosterone in the original test sample. Such methods are known in the art as "tandem mass spectrometry."

[0010] In preferred embodiments, a separately detectable internal testosterone standard is provided in the sample, the presence or amount of which is also determined in said sample. In these embodiments, all or a portion of both the endogenous testosterone and the internal standard present in the sample is ionized to produce a plurality of ions detectable in a mass spectrometer operating in positive ion mode, and one or more ions produced from each are detected by mass spectrometry.

[0011] In preferred embodiments, the testosterone ions detectable in a mass spectrometer include ions with a mass/charge ratio (m/z) of $289.1 \pm 0.5$, $109.2 \pm 0.5$, and/or $96.9 \pm 0.5$, the latter two being fragments of the larger ion. In particularly preferred embodiments, the precursor ion has m/z of 289.1, while the fragment ions have an m/z of 109.2 and 96.9.

[0012] A preferred internal testosterone standard is 2, 2, 4, 6, 6-$d_5$ testosterone. In preferred embodiments, the internal testosterone standard ions detectable in a mass spectrometer have a mass/charge ratio (m/z) of $294.1 \pm 0.5$, $113.2 \pm 0.5$ and/or $99.9 \pm 0.5$. In particularly preferred embodiments, a precursor ion of the internal testosterone standard has an m/z of 294.1, and two fragment ions having an m/z of 113.2 and 99.9 are each detected.

[0013] In preferred embodiments, one may determine the specificity of testosterone determination by mass spectrometry by calculating a ratio of the daughter ions for that sample and comparing that ratio with that of a purified testosterone standard. The daughter ion ratio for purified testosterone is 1.43 (i.e. $109 \div 97$) while the daughter ion ratio of the internal testosterone standard (2, 2, 4, 6, 6-$d_5$ testosterone) is 1.07 (i.e. $113 \div 99$). Under experimental conditions with multiple replicates, a median or mean and range derived from the standard deviation, coefficent of variation (CV) or percentage for each daughter ion ratio also can be calculated. In this way, the presence of an "unknown" compound (interfering substance) can be detected by either an increase or decrease in the observed daughter ion ratio.

[0014] In preferred embodiments, one may increase the signal to noise detection of testosterone (or the internal standard) by summing the signal of the detectable daughter ions for that sample. This has the effect of improving detection by increasing the signal and effectively reducing the background, thus improving the signal to noise ratio. In addition, one can quantitate the amount of testosterone in a sample by comparing the summed daughter ion signal of the

Atty. Dkt. No. 034827-9107

unknown sample with a standard curve of summed daughter ion signals for known amounts of testosterone.

[0015] In certain embodiments, the testosterone present in a test sample can be purified prior to ionization. Numerous methods are known in the art to purify testosterone, including chromatography, particularly high performance liquid chromatography (HPLC), and thin layer chromatography (TLC); electrophoresis, including capillary electrophoresis; extraction methods, including ethyl acetate extraction, and methanol extraction; and affinity separations, including immunoaffinity separations; or any combination of the above.

[0016] Preferred embodiments utilize high turbulence liquid chromatography (HTLC), alone or in combination with one or more purification methods, to purify testosterone in samples. HTLC is a form of chromatography that utilizes turbulent flow of the material being assayed through the column packing as the basis for performing the separation. HTLC has been applied in the preparation of samples containing two unnamed drugs prior to analysis by mass spectrometry. See, *e.g.*, Zimmer *et al.*, *J. Chromatogr.* A 854: 23-35 (1999); see also, U.S. Patents No. 5,968,367, 5,919,368, 5,795,469, and 5,772,874, which further explain HTLC and are each hereby incorporated by reference in their entirety including all charts and drawings. Persons of ordinary skill in the art understand "turbulent flow." When fluid flows slowly and smoothly, the flow is called "laminar flow." For example, fluid moving through an HPLC column at low flow rates is laminar. In laminar flow the motion of the particles of fluid is orderly with particles moving generally in straight lines. At faster velocities, the inertia of the water overcomes fluid frictional forces and turbulent flow results. Fluid not in contact with the irregular boundary "outruns" that slowed by friction or deflected by an uneven surface. When a fluid is flowing turbulently, it flows in eddies and whirls (or vortices), with more "drag" than when the flow is laminar. Many references are available for assisting in determining when fluid flow is laminar or turbulent (e.g., Turbulent Flow Analysis: Measurement and Prediction, P.S. Bernard & J.M. Wallace, John Wiley & Sons, Inc., (2000); An Introduction to Turbulent Flow, Jean Mathieu & Julian Scott, Cambridge University Press (2001)).

[0017] Because the steps involved in these HTLC procedures can be linked in an automated fashion, the requirement for operator involvement during the purification of testosterone can be minimized. This can result in savings of time and costs, and eliminate the opportunity for operator error.

4

QUESTMS-0000261

Atty. Dkt. No. 034827-9107

[0018] Purification in this context does not refer to removing all materials from the sample other than the analyte(s) of interest. Instead, purification refers to a procedure that enriches the amount of one or more analytes of interest relative to one or more other components of the sample. In preferred embodiments, purification can be used to remove one or more interfering substances, *e.g.*, one or more substances that would interfere with detection of an analyte ion by mass spectrometry.

[0019] In various embodiments, the testosterone present in a test sample can be ionized by any method known to the skilled artisan. These methods include, but are not limited to, electron ionization, chemical ionization, fast atom bombardment, field desorption, and matrix-assisted laser desorption ionization ("MALDI"), surface enhanced laser desorption ionization ("SELDI"), photon ionization, electrospray, and inductively coupled plasma. The skilled artisan will understand that the choice of ionization method can be determined based on the analyte to be measured, type of sample, the type of detector, the choice of positive versus negative mode, *etc.*

[0020] Suitable test samples can include any liquid sample that can contain one or more testosterone. For example, samples obtained during the manufacture of synthetic testosterone can be analyzed to determine the composition and yield of the manufacturing process. In certain embodiments, a sample is a biological sample; that is, a sample obtained from any biological source, such as an animal, a cell culture, an organ culture, etc. Particularly preferred are samples obtained from a mammalian animal, such as a dog, cat, horse, etc. Particular preferred mammalian animals are primates, most preferably humans. Suitable samples include blood, plasma, serum, hair, muscle, urine, saliva, tear, cerebrospinal fluid, or other tissue sample. Such samples may be obtained, for example, from a patient; that is, a living person presenting themselves in a clinical setting for diagnosis, prognosis, or treatment of a disease or condition.

[0021] The mass spectrometer typically provides the user with an ion scan; that is, the relative abundance of each m/z over a given range (*e.g.*, 100 to 900). The results of an analyte assay, that is, a mass spectrum, can be related to the amount of the analyte in the original sample by numerous methods known in the art. For example, given that sampling and analysis parameters are carefully controlled, the relative abundance of a given ion can be compared to a table that converts that relative abundance to an absolute amount of the original molecule. Alternatively, molecular standards can be run with the samples, and a standard curve constructed

QUESTMS-0000261

Atty. Dkt. No. 034827-9107

based on ions generated from those standards. Using such a standard curve, the relative abundance of a given ion can be converted back into an absolute amount of the original molecule. Numerous other methods for relating the presence or amount of an ion to the presence or amount of the original molecule are well known to those of ordinary skill in the art.

[0022] In other preferred embodiments, the purifying step involves (i) applying the sample to an HTLC extraction column, (ii) washing the HTLC extraction column under conditions whereby testosterone is retained by the column, (iii) eluting retained testosterone from the HTLC extraction column, (iv) applying the retained material to an analytical column, and (v) eluting purified testosterone from the analytical column. In preferred embodiments, the HTLC extraction column is a large particle C-18 extraction column, and the analytical column is a C-18 analytical column. The HTLC extraction column is preferably a large particle column.

[0023] By "large particle" column is meant a column containing an average particle diameter greater than about 35 µm. In the most preferred embodiment the column contains particles of about 50 µm in diameter, and the C-18 analytical column comprises particles of about 4 µm in diameter. As used in this context, the term "about" means ± 10%.

[0024] The term "analytical column" as used herein refers to a chromatography column having sufficient chromatographic "plates" to effect a separation of materials in a sample that elute from the column sufficient to allow a determination of the presence or amount of an analyte. Such columns are often distinguished from "extraction columns," which have the general purpose of separating or extracting retained material from non-retained materials in order to obtain a purified sample for further analysis.

[0025] In various embodiments, one of more steps of the methods can be performed in an inline, automated fashion. For example, in one embodiment steps (i)-(v) are performed in an inline, automated fashion. In another, the steps of ionization and detection are performed inline following steps (i)-(v). The term "inline, automated fashion" as used herein refers to steps performed without the need for operator intervention. For example, by careful selection of valves and connector plumbing, two or more chromatography columns can be connected as needed such that material is passed from one to the next without the need for any manual steps. In preferred embodiments, the selection of valves and plumbing is controlled by a computer pre-programmed to perform the necessary steps. Most preferably, the chromatography system is also connected in such an on-line fashion to the detector system, *e.g.*, an MS system. Thus, an

6

QUESTMS-0000261

Atty. Dkt. No. 034827-9107

operator may place a tray of samples in an autosampler, and the remaining operations are performed under computer control, resulting in purification and analysis of all samples selected.

[0026] In contrast, the term "off-line" as used herein refers to a procedure requiring manual intervention of an operator. Thus, if samples are subjected to precipitation, and the supernatants are then manually loaded into an autosampler, the precipitation and loading steps are off-line from the subsequent steps.

[0027] In preferred embodiments, the purified testosterone is ionized by one or more of the following methods: electrospray ionization, chemical ionization, photon ionization, matrix-assisted laser desorption ionization (MALDI), and surface enhanced laser desorption ionization (SELDI). In the most preferred embodiment, the testosterone is ionized by electrospray ionization. In preferred embodiments, the testosterone ion is in a gaseous state and the inert collision gas is argon or nitrogen. The test sample is preferably obtained from a patient, for example, blood serum. In other embodiments the test sample can be blood plasma, or another liquid or biological fluid. In a most preferred embodiment the sample is de-proteinated prior to the ionization step by exposing the test sample to formic acid. The high turbulence liquid chromatography column most preferably contains a matrix of a C-12 carbon chain. In various embodiments, the mass spectroscopy is MS/MS/TOF mass spectroscopy, or MALDI/MS/MS/TOF mass spectroscopy, or SELDI/MS/MS/TOF mass spectroscopy.

[0028] In preferred embodiments, the presence or amount of the testosterone ion is related to the presence or amount of testosterone in the test sample by comparison to a reference 2,2,4,6,6-d5 testosterone sample.

[0029] The summary of the invention described above is non-limiting and other features and advantages of the invention will be apparent from the following detailed description of the invention, and from the claims.

## DETAILED DESCRIPTION OF THE INVENTION

[0030] The present invention describes methods and compositions for unambiguously detecting testosterone in a test sample. The methods utilize liquid chromatography (LC), most preferably HTLC, to perform an initial purification of selected analytes, and combine this with unique methods of mass spectrometry (MS), thereby providing a high-throughput assay system for detecting and quantifying testosterone in a liquid sample. The preferred embodiments are particularly well suited for application in large clinical laboratories. Testosterone assays are

QUESTMS-0000261!

Atty. Dkt. No. 034827-9107

provided that have enhanced specificity and are accomplished in less time and with less sample preparation than required in presently available testosterone assays. In various embodiments the methods of the invention accurately detect testosterone in samples where it is present in concentrations of less than 50 ng/dL, less than 25 ng/dL, less than 10 ng/dL, less than 5 ng/dL, and even less than 1 ng/dL. In various embodiments the concentration has a percent confidence of at least 90% or at least 93% or at least 95% or at least 97% or at least 98% or at least 99%. Persons of ordinary skill in the art understand statistical calculations and how to calculate a percent confidence for particular assays.

[0031] In one embodiment, the assay involves the combination of LC with mass spectrometry. In a preferred embodiment, the LC is HTLC. In another preferred embodiment, the mass spectrometry is tandem mass spectrometry (MS/MS).

[0032] Liquid chromatography (LC) and high-performance liquid chromatography (HPLC) rely on relatively slow, laminar flow technology. HPLC has been successfully applied to the separation of compounds in biological samples. But a significant amount of sample preparation is required prior to the separation and subsequent analysis with a mass spectrometer (MS), making this technique labor intensive. In addition, most HPLC systems do not utilize the mass spectrometer to its fullest potential, allowing only one HPLC system to be connected to a single MS instrument, resulting in lengthy time requirements for performing a large number of assays. High turbulence liquid chromatography (HTLC) methods that combine multiple separations in one procedure lessen the need for lengthy sample preparation and operate at a significantly greater speed. Such methods also achieve a separation performance superior to laminar flow (HPLC) chromatography. HTLC allows for direct injection of biological samples (plasma, urine, etc.). This is difficult to achieve in traditional forms of chromatography because denatured proteins and other biological debris quickly block the separation columns.

[0033] The terms "mass spectrometry" or "MS" as used herein refer to methods of filtering, detecting, and measuring ions based on their mass-to-charge ratio, or "m/z." In general, one or more molecules of interest are ionized, and the ions are subsequently introduced into a mass spectrographic instrument where, due to a combination of magnetic and electric fields, the ions follow a path in space that is dependent upon mass ("m") and charge ("z"). See, e.g., U.S. Patent Nos. 6,204,500, entitled "Mass Spectrometry From Surfaces;" 6,107,623, entitled "Methods and Apparatus for Tandem Mass Spectrometry;" 6,268,144, entitled "DNA

8

Atty. Dkt. No. 034827-9107

Diagnostics Based On Mass Spectrometry;" 6,124,137, entitled "Surface-Enhanced Photolabile Attachment And Release For Desorption And Detection Of Analytes;" Wright *et al.*, "Proteinchip surface enhanced laser desorption/ionization (SELDI) mass spectrometry: a novel protein biochip technology for detection of prostate cancer biomarkers in complex protein mixtures," *Prostate Cancer and Prostatic Diseases* 2: 264-76 (1999); and Merchant and Weinberger, "Recent advancements in surface-enhanced laser desorption/ionization-time of flight-mass spectrometry," *Electrophoresis* 21: 1164-67 (2000), each of which is hereby incorporated by reference in its entirety, including all tables, figures, and claims.

[0034] For example, in a "quadrupole" or "quadrupole ion trap" instrument, ions in an oscillating radio frequency field experience a force proportional to the DC potential applied between electrodes, the amplitude of the RF signal, and m/z. The voltage and amplitude can be selected so that only ions having a particular m/z travel the length of the quadrupole, while all other ions are deflected. Thus, quadrupole instruments can act as both a "mass filter" and as a "mass detector" for the ions injected into the instrument.

[0035] Moreover, one can often enhance the resolution of the MS technique by employing "tandem mass spectrometry," or "MS/MS." In this technique, a precursor ion or group of ions generated from a molecule (or molecules) of interest may be filtered in an MS instrument, and these precursor ions subsequently fragmented to yield one or more fragment ions that are then analyzed in a second MS procedure. By careful selection of precursor ions, only ions produced by certain analytes of interest are passed to the fragmentation chamber, where collision with atoms of an inert gas occurs to produce the fragment ions. Because both the precursor and fragment ions are produced in a reproducible fashion under a given set of ionization/fragmentation conditions, the MS/MS technique can provide an extremely powerful analytical tool. For example, the combination of filtration/fragmentation can be used to eliminate interfering substances, and can be particularly useful in complex samples, such as biological samples.

[0036] Additionally, recent advances in technology, such as matrix-assisted laser desorption ionization coupled with time-of-flight analyzers ("MALDI-TOF") permit the analysis of analytes at femtomole levels in very short ion pulses. Mass spectrometers that combine time-of-flight analyzers with tandem MS are also well known to the artisan. Additionally, multiple mass spectrometry steps can be combined in methods known as "MS/MS."

9

QUESTMS-0000261

Atty. Dkt. No. 034827-9107

[0037] Ions can be produced using a variety of methods including, but not limited to, electron ionization, chemical ionization, fast atom bombardment, field desorption, and matrix-assisted laser desorption ionization ("MALDI"), surface enhanced laser desorption ionization ("SELDI"), photon ionization, electrospray ionization, and inductively coupled plasma.

[0038] The term "electron ionization" as used herein refers to methods in which one or more analytes of interest in a gaseous or vapor phase is/are interacted with a flow of electrons. Impact of the electrons with the analyte(s) produces analyte ions, which may then be subjected to a mass spectroscopy technique.

[0039] The term "chemical ionization" as used herein refers to methods in which a reagent gas (*e.g.* ammonia) is subjected to electron impact, and analyte ions are formed by the interaction of reagent gas ions and analyte molecules.

[0040] The term "fast atom bombardment" as used herein refers to methods in which a beam of high energy atoms (often Xe or Ar) impacts a non-volatile test sample, desorbing and ionizing molecules contained in the sample. Samples are dissolved in a viscous liquid matrix, such as glycerol, thioglycerol, m-nitrobenzyl alcohol, 18-crown-6 crown ether, 2-nitrophenyloctyl ether, sulfolane, diethanolamine, and triethanolamine. The choice of an appropriate matrix for a compound or sample is an empirical process.

[0041] The term "field desorption" as used herein refers to methods in which a non-volatile test sample is placed on an ionization surface, and an intense electric field is used to generate analyte ions.

[0042] The term "matrix-assisted laser desorption ionization," or "MALDI" as used herein refers to methods in which a non-volatile sample is exposed to laser irradiation, which desorbs and ionizes analytes in the sample by various ionization pathways, including photo-ionization, protonation, deprotonation, and cluster decay. For MALDI, the sample is mixed with an energy-absorbing matrix, which facilitates desorption of analyte molecules.

[0043] The term "surface enhanced laser desorption ionization," or "SELDI" as used herein refers to another method in which a non-volatile sample is exposed to laser irradiation, which desorbs and ionizes analytes in the sample by various ionization pathways, including photo-ionization, protonation, deprotonation, and cluster decay. For SELDI, the sample is typically bound to a surface that preferentially retains one or more analytes of interest. As in MALDI, this process may also employ an energy-absorbing material to facilitate ionization.

DLMR_834879.2

QUESTMS-00002618

Atty. Dkt. No. 034827-9107

[0044] The term "electrospray ionization," or "ESI," as used herein refers to methods in which a solution is passed along a short length of capillary tube, to the end of which is applied a high positive or negative electric potential.  Solution reaching the end of the tube, is vaporized (nebulized) into a jet or spray of very small droplets of solution in solvent vapor.  This mist of droplets flows through an evaporation chamber which is heated slightly to prevent condensation and to evaporate solvent.  As the droplets get smaller the electrical surface charge density increases until such time that the natural repulsion between like charges causes ions as well as neutral molecules to be released.

[0045] The term "Atmospheric Pressure Chemical Ionization," or "APCI,"  as used herein refers to mass spectroscopy methods that are similar to ESI; however, APCI produces ions by ion-molecule reactions that occur within a plasma at atmospheric pressure. The plasma is maintained by an electric discharge between the spray capillary and a counter electrode. Then ions are typically extracted into the mass analyzer by use of a set of differentially pumped skimmer stages.  A counterflow of dry and preheated $N_2$ gas may be used to improve removal of solvent. The gas-phase ionization in APCI can be more effective than ESI for analyzing less-polar species.

[0046] The term "Atmospheric Pressure Photoionization" ("APPI") as used herein refers to the form of mass spectroscopy where the mechanism for the photoionization of molecule M is photon absorption and electron ejection to form the molecular M+.  Because the photon energy typically is just above the ionization potential, the molecular ion is less susceptible to dissociation.  In many cases it may be possible to analyze samples without the need for chromatography, thus saving significant time and expense.  In the presence of water vapor or protic solvents, the molecular ion can extract H to form MH+.  This tends to occur if M has a high proton affinity.  This does not affect quantitation accuracy because the sum of M+ and MH+ is constant.  Drug compounds in protic solvents are usually observed as MH+, whereas nonpolar compounds such as naphthalene or testosterone usually form M+. Robb, D.B., Covey, T.R. and Bruins, A.P. (2000): *See, e.g.*, Robb *et al.*, Atmospheric pressure photoionization: An ionization method for liquid chromatography-mass spectrometry. *Anal. Chem.* 72(15): 3653-3659.

QUESTMS-0000261

Atty. Dkt. No. 034827-9107

[0047] The term "inductively coupled plasma" as used herein refers to methods in which a sample is interacted with a partially ionized gas at a sufficiently high temperature to atomize and ionize most elements.

[0048] The term "ionization" and "ionizing" as used herein refers to the process of generating an analyte ion having a net electrical charge equal to one or more electron units. Negative ions are those ions having a net negative charge of one or more electron units, while positive ions are those ions having a net positive charge of one or more electron units.

[0049] The term "desorption" as used herein refers to the removal of an analyte from a surface and/or the entry of an analyte into a gaseous phase.

[0050] In those embodiments, such as MS/MS, where precursor ions are isolated for further fragmentation, collision-induced dissociation ("CID") is often used to generate the fragment ions for further detection. In CID, precursor ions gain energy through collisions with an inert gas, and subsequently fragment by a process referred to as "unimolecular decomposition." Sufficient energy must be deposited in the precursor ion so that certain bonds within the ion can be broken due to increased vibrational energy.

Sample Preparation For Mass Spectrometry

[0051] Numerous methods have been described to purify testosterone from samples prior to assay. For example, high performance liquid chromatography (HPLC) has been used to purify samples containing testosterone using C-18 column with an 8:2 methanol:water mixture at 1 ml/min. Mass spectrometry and gas chromatography has been used to analyze metabolites of anabolic steroids (See Choi et al., *Rapid Commun. Mass Spectrom* 12, 1749-55 (1998); Furuta et al., *J Chrom, Biomed Appl* (1990), Vol. 525: 15-23; Carignan et al., *J Chrom* 301(1):292-96 (1984); Minut et al., *Int'l J Biol. Markers*, Vol. 14(3); 154-59 (1999)).

[0052] Recently, high turbulence liquid chromatography ("HTLC") has been applied for sample preparation of samples containing two unnamed drugs prior to analysis by mass spectrometry. See, *e.g.*, Zimmer *et al.*, *J. Chromatogr. A* 854: 23-35 (1999); see also, U.S. Patents No. 5,968,367; 5,919,368; 5,795,469; and 5,772,874, each of which is hereby incorporated by reference in its entirety. Traditional HPLC analysis relies on column packings in which laminar flow of the sample through the column is the basis for separation of the analyte of interest from the test sample. The skilled artisan will understand that separation in such columns is a diffusional process. In contrast, it is believed that turbulent flow, such as that

12

QUESTMS-0000262o

Atty. Dkt. No. 034827-9107

provided by HTLC columns and methods, may enhance the rate of mass transfer, improving the separation characteristics provided.

[0053] Additionally, the commercial availability of HTLC apparatuses that permit multiplexing of columns and direct integration with MS instruments makes such instruments particularly well suited to high-throughput applications.

[0054] Numerous column packings are available for chromatographic separation of samples, and selection of an appropriate separation protocol is an empirical process that depends on the sample characteristics, the analyte of interest, the interfering substances present and their characteristics, etc. For HTLC, polar, ion exchange (both cation and anion), hydrophobic interaction, phenyl, C-2, C-8, and C-18 columns are commercially available. During chromatography, the separation of materials is effected by variables such as choice of eluant (also known as a "mobile phase"), choice of gradient elution and the gradient conditions, temperature, *etc*.

[0055] In certain embodiments, an analyte may be purified by applying a sample to a column under conditions where the analyte of interest is reversibly retained by the column packing material, while one or more other materials are not retained. In these embodiments, a first mobile phase condition can be employed where the analyte of interest is retained by the column, and a second mobile phase condition can subsequently be employed to remove retained material from the column, once the non-retained materials are washed through. The second mobile phase may be phased in gradually, usually under computer control directing the composition of mobile phase over time, or by an immediate change in the mobile phase. The retained materials may also be removed from the column by "backflushing" the column, or reversing the direction of flow of the mobile phase. This may be particularly convenient for material that is retained at the top of the column. Alternatively, an analyte may be purified by applying a sample to a column under mobile phase conditions where the analyte of interest elutes at a differential rate in comparison to one or more other materials. As discussed above, such procedures may enrich the amount of one or more analytes of interest relative to one or more other components of the sample.

[0056] The terms "phenyl," "C-2," "C-8," and "C-18" as used herein refer to functional groups present on a column packing material. For example, a phenyl column exposes the material flowing through the column to unsubstituted phenyl groups, while a C-18 column

13

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

exposes the material flowing through the column to unsubstituted straight or branched chain 18-carbon alkyl groups.

[0057] The term "analytical column" as used herein refers to a chromatography column having sufficient chromatographic "plates" to effect a separation of materials in a sample that elute from a column sufficient to allow a determination of the presence or amount of an analyte without further purification on a chromatography column. However, further purification may occur by one or more other methods (e.g., mass spectrometry). Such columns are often distinguished from "extraction columns," which have the general purpose of separating or extracting retained material from non-retained materials.

[0058] In preferred embodiments, one or more of the purification and/or analysis steps can be performed in an "inline" fashion. The term "inline" as used herein refers to steps performed without further need for operator intervention. For example, by careful selection of valves and connector plumbing, two or more chromatography columns can be connected such that material is passed from one to the next without the need for additional manual steps. In preferred embodiments, the selection of valves and plumbing is controlled by a computer pre-programmed to perform the necessary steps. Most preferably, the chromatography system is also connected in such an in-line fashion to the detector system, e.g., an MS system. Thus, an operator may place a tray of samples in an autosampler, and the remaining operations are performed "in-line" under computer control, resulting in purification and analysis of all samples selected.

[0059] In contrast, the term "off-line" as used herein refers to a procedure requiring manual intervention of an operator after the test sample is loaded onto the first column. Thus, if samples are subjected to precipitation, and the supernatants are then manually loaded into an autosampler, the precipitation and loading steps are off-line from the subsequent steps.

[0060] Traditional HPLC analysis relies on the chemical interactions between sample components and column packings, where laminar flow of the sample through the column is the basis for separation of the analyte of interest from the test sample. The skilled artisan will understand that separation in such columns is a diffusional process. In contrast, it is believed that "turbulent flow," such as that provided by HTLC columns and methods, enhances the rate of mass transfer, thereby improving the separation characteristics provided by the separation system. HTLC columns separate components by means of high chromatographic flow rates

14

QUESTMS-0000262

through a packed column containing rigid particles. By employing high flow rates (e.g., 3-4 ml/min), turbulent flow occurs in the column that causes nearly complete interaction between the stationary phase and the analytes. An additional advantage of HTLC columns is that the macromolecular build-up associated with biological fluid matrices is avoided since the high molecular weight species are not retained under the turbulent flow conditions.

[0061] Numerous column packings are available for chromatographic separation of samples, and selection of an appropriate separation protocol is an empirical process that depends on the sample characteristics, the analyte of interest, the interfering substances present and their characteristics, etc. In preferred embodiments the HTLC columns have a media composition of styrene-divinylbenzene cross-linked copolymer with a median particle size of 60μm (nominal) and a median particle pore size of 100 Å. In one embodiment the column dimensions are 1.0 mm ID x 50 mm length, and the wetted parts of the apparatus are 316 stainless steel and styrene-divinylbenzene copolymer in a preferred embodiment. The preferred columns are silica-based HTLC columns configured to offer rapid processing. Various packing chemistries can be used depending on the needs (e.g.,. structure, polarity, and solubility of compounds being purified).

[0062] In various embodiments the columns are polar, ion exchange (both cation and anion), hydrophobic interaction, phenyl, C-2, C-8, C-18 columns, polar coating on porous polymer, and others are also commercially available. For purification of testosterone, it has been discovered that a column packed with a C-18 or C-8 matrix produces an advantageous separation. More preferably, the C-18 matrix contains bead sizes of about 50 um, trifunctional, at about 200 mg of beads per 3 ml. The total surface area is about 500 $m^2$/gm. Most preferably, the HTLC may be followed by HPLC on a C18 column with a porous spherical silica. During chromatography, the separation of materials is effected by variables such as choice of eluant (also known as a "mobile phase"), choice of gradient elution and the gradient conditions, temperature, *etc.*

[0063] In certain embodiments, an analyte may be purified by applying a sample to a column under conditions where the analyte of interest is reversibly retained by the column packing material, while one or more other materials are not retained. In these embodiments, a first mobile phase condition can be employed where the analyte of interest is retained by the column, and a second mobile phase condition can subsequently be employed to remove retained material from the column, once the non-retained materials are washed through. Alternatively, an

15

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

analyte may be purified by applying a sample to a column under mobile phase conditions where the analyte of interest elutes at a differential rate in comparison to one or more other materials. As discussed above, such procedures may enrich the amount of one or more analytes of interest relative to one or more other components of the sample.

Daughter ion ratios for specificity determination

[0064] In preferred embodiments, one may determine the specificity of testosterone determination by mass spectrometry by calculating a ratio of the daughter ions for that sample and comparing that ratio with that of a purified testosterone standard. The daughter ion ratio for purified testosterone is 1.43 (i.e. $109 \div 97$) while the daughter ion ratio of the internal testosterone standard (2, 2, 4, 6, 6-$d_5$ testosterone) is 1.07 (i.e. $113 \div 99$). Under experimental conditions with multiple replicates, a median or mean and range derived from standard deviation, CV or percentage for each daughter ion ratio also can be calculated. In this way, the presence of an "unknown" compound (interfering substance) can be detected by either an increase or decrease in the observed daughter ion ratio. Under experimental conditions with multiple replicates, a median and range and standard deviation for each daughter ion ratio also can be calculated. Automated rules can be programmed into the calculation/reporting program to look for these changes in ratios to help in identifying the presence of an 'interfering" substance.

Daughter ion summation for quantitation and sensitivity

[0065] In preferred embodiments, one may increase the signal to noise detection of testosterone (or the internal standard) by summing the signal of the detectable daughter ions for that sample. This has the effect of improving detection by increasing the signal and effectively reducing the background, thus improving the signal to noise ratio. In addition, one can quantitate the amount of testosterone in a sample by comparing the summed daughter ion signal of the unknown sample with a standard curve of summed daughter ion signals for known amounts of testosterone. Automated rules can be programmed into the calculation/reporting program to sum the daughter ion values for each analysis.

[0066] The following examples serve to illustrate the present invention. These examples are in no way intended to limit the scope of the invention.

16

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

## EXAMPLES

Example 1: Sample preparation

[0067] A blood serum sample is collected from a human patient. The serum is first deproteinated using a 10% formic acid solution or a 1% trichloroacetic acid solution (in methanol). The deproteination also acts to release testosterone from SHBG, albumin, and other binding proteins. In other embodiments proteins can be removed from the blood with other acids such as a solution of 1% trichloroacetic acid in methanol.

[0068] Sex hormone-binding globulin (SHBG) is a glycoprotein synthesized by the liver. SHBG's has a high affinity for testosterone that impacts bioavailable testosterone levels because hormone molecules are inactive until they are released and become free. SHBG binds up to 98 percent of the steroid hormones in the blood including 5a-dihydrotestosterone (DHT), testosterone, and androstenediol with particularly high affinity. The binding capacity of SHBG for testosterone is approximately 30,000 times greater than that of albumin.

[0069] To understand the stability of testosterone in samples, two levels of sample pool were subjected to the following conditions:

Freeze/Thaw: 1,2,3,4,and 5 cycles.

Room Temperature: 0,8,24,48,96 and 168 hours.

Refrigerated (2-8°C): 0,1,2,4,7, and 14 days.

Duplicate runs of samples were run on two separate days.

Table 1 summarizes the stability of testosterone in samples:

Table 1: Sample Stability of Testosterone

| Condition | Stability |
|---|---|
| Refrigerated (0°-8°C) | 7 Days |
| Room Temp (18-25° C) | 4 Days |
| Freeze Thaw Cycles: | Up to 5 with no effect |

17

DLMR_834879.2

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

Example 2: Sample analysis

[0070] This example provides a general description of a preferred embodiment of the methods for determining total testosterone in a sample.

[0071] During the HTLC procedure sample contaminants are eliminated through the turbulent flow regimen. As unbound and unwanted debris is swept through the extraction column at high velocity, the testosterone is captured and concentrated on the column. The extraction column is then backflushed and the sample is loaded onto an analytical column. The HTLC system is then subjected to an elution gradient. The analytical column is in-line and allows for the chromatographic separation of the components of interest. A gradient/step function of 60% to 100% methanol is useful for enhancing this step.

[0072] Detection was accomplished using HTLC/MS/MS. The precursor ion, protonated molecule of interest, and any other ions of similar mass are isolated by the first MS (Q1). These ions enter a second chamber (Q2) where they collide with argon molecules. The collision-induced fragments differ for each molecular ion. Specific fragments produced only by the analyte ion are isolated by the final MS (Q3). The quantitation is based on the abundance of the final fragment ions. Mass transitions used for testosterone and the internal standard, $2,2,4,6,6\text{-}d_5$ testosterone, are shown in Table 2.

Table 2: Testosterone and $2,2,4,6,6\text{-}d_5$ Testosterone ion fragments

| Analyte | Precursor Ion | Fragment Ions |
|---------|---------------|---------------|
| Testosterone | $289.1 \pm 0.5$ m/z | $109.2 \pm 0.5$ m/z |
| | | $96.9 \pm 0.5$ m/z |
| $2,2,4,6,6\text{-}d_5$ Testosterone | $294.1 \pm 0.5$ m/z | $113.2 \pm 0.5$ m/z |
| | | $99.9\pm 0.5$ m/z |

[0073] After the removal of proteins from the serum, 90 µL of extracted sample was injected into the HTLC system using methanol and water in the mobile phase. The HTLC system is logically divided into two functions: 1) Solid phase extraction using a large particle size (e.g., 50 µm) packed column and 2) HPLC chromatography using a binary gradient and a 4 µm reverse phase analytical column. In this example a C-18 polymer column was used for extraction, which was endcapped, trifunctional, 500 m²/g, and had 50 µm particle size.

18

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

[0074] In the solid phase extraction mode of the HTLC system, the sample was first pumped through the extraction column at a high (greater than about 1.5 ml/min) flow rate using the HTLC loading pump. The high flow rate creates turbulence inside the extraction column. This turbulence ensures optimized binding of testosterone to the large particles in the column and the passage of residual protein and debris to waste.

[0075] After this loading step, the flow was reversed and the sample eluted off of the extraction column and transferred to the analytical HPLC column. The HPLC column was an all-purpose reverse phase column with a 4 µm, 80 Å silica gel. The gel particles were C-12 bonded phase with trimethyl chlorosiliane (TMS) endcapping suitable for moderately polar or non-polar analytes, acids, and bases over a broad pH range. Such HPLC columns are commercially available (e.g., MetaChem Polaris).

[0076] In the analytical mode of the HTLC, the sample was first loaded onto the analytical column. A binary gradient of from 60% to 100% methanol was used, resulting in the separation of testosterone from other analytes contained in the sample. The separated sample was then transferred to the MS/MS for quantitation.

Example 3 - Detection and Quantitation of Testosterone by MS/MS

[0077] The flow of liquid solvent from the HTLC entered the heated nebulizer interface of the MS/MS analyzer. The solvent/analyte mixture was first converted to vapor in the heated tubing of the interface. The analytes, contained in the nebulized solvent, were ionized and a positive charge added by the corona discharge needle of the interface, which applies a large voltage to the nebulized solvent/analyte mixture. The ions passed through the orifice of the instrument and entered the first quadrapole. Quadrapoles 1 and 3 (Q1 and Q3) were the mass filters, allowing selection of ions based on their mass to charge ratio (m/z). Quadrapole 2 (Q2) was the collision cell, where ions were fragmented.

[0078] The first quadrapole of the MS/MS (Q1) selected for molecules with the mass to charge ratio of testosterone (289). Ions with this m/z passed to the collision chamber (Q2), while ions with any other m/z collided with the sides of the quadrapole and were destroyed. Ions entering Q2 collided with neutral gas molecules and fragment. This process is called Collisionally Activated Dissociation (CAD). The CAD gas used in this example was argon, resulting in the generation of different fragment ions than those obtained using nitrogen. The fragment ions generated were passed into quadrapole 3 (Q3), where the two fragment ions of

19

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

testosterone to be measured (m/z $109.2 \pm 0.5$ m/z & $96.9 \pm 0.5$ m/z) were selected for, while other ions were screened out. The selected fragment ions were collected by the detector. The same process was carried out for an internal standard, which was a 5-deuterated testosterone molecule. Thus, the ion pairs measured were those shown in Table 2:

Selected MS/MS parameters were:

| | |
|---|---|
| Dwell time: | 250 msec |
| Res Q1: | 0.5 amu |
| Res Q2: | 0.7 |
| Curtain Gas: | 4 |
| CAD Gas: | 1.5 |
| NC Temp.: | 270°C |
| Temp: | 350°C |
| GS1: | 20 |
| GS2: | 0 |
| CE: | 20 |

[0079] As ions collide with the detector, they produce a pulse of electrons. The pulse was converted to a digital signal, which was counted to provide an ion count. The acquired data was relayed to the computer, which plotted counts of the ions collected vs. time. Heights of the peaks generated were computer-measured, response factors were generated from calibration material, and testosterone thereby quantitated in the sample.

[0080] The HTLC system can be operated with 1 to 4 columns in parallel. Given that a single assay requires about 4.75 minutes to traverse the column, by staggering the start time on each column, a 4-fold multiplexed system can inject four times as many test samples into the MS/MS instrument than with a single column. Thus, a set of 200 samples may be assayed for testosterone in 230 minutes using HTLC 4 fold muliplexing, as opposed to 2000 minutes by HPLC which allows only for a single column. Furthermore, following transfer of samples to the autosampler, no further operator handling of samples is required, as the HTLC may be computer-controlled to perform the subsequent purification and analysis steps in a fully in-line configuration.

Example 4: LOD (Limit of Detection)

[0081] Twenty one replicates of the zero standard (stripped serum; see below) were run to determine the reproducibility of the method. Statistical analysis was applied to determine the mean counts per second. The mean plus three standard deviations was extrapolated into the

20

QUESTMS-00002626

Atty. Dkt. No. 034827-9107

standard curve and viewed to determine the LOD. The LOD for the HTLC/MS/MS assay was 0.6 ng/dL. The results were as follows:

Table 3: LOD Determination

|  | Stripped Serum |
|---|---|
| Mean (cps): | 836.3 |
| Standard Deviation (cps): | 140.2 |
| Mean + 3 SD (cps): | 1256.9 |
| LOD testosterone (ng/dL): | 0.6 |

Example 5: LOQ (Lower Limit of Quantitation)

[0082] The LOQ is the point where measurements become quantitatively meaningful and concentration where CV of the replicates is less than 20%. Standards for LOQ determination were prepared using an in-house pool of charcoal stripped serum. Biocell serum was mixed with Activated Charcoal, centrifuged, and the supernatant removed and saved. The newly prepared stripped serum was first run to check for any endogenous testosterone, of which none was detected. Five pools of different testosterone concentrations were prepared by spiking the stripped serum with testosterone standard in methanol. The levels of pools prepared were: 0.25 ng/dL, 0.5 ng/dL, 1.0 ng/dL, and 2.5 ng/dL. Each standard was run 5 times. The LOQ for the HTLC/MS/MS was determined to be 1 ng/dL from this study. The summarized results were as follows:

Table 4: LOQ Determination

|  | 0.25 ng/dL | 0.5 ng/dL | 1.0 ng/dL | 2.5 ng/dL |
|---|---|---|---|---|
| Mean Testosterone Value (ng/dL) | 1.5 | 2 | 1.1 | 2.5 |
| Standard Deviation | 0.9 | 1.6 | 0.1 | 0.3 |
| % cv | 60% | 73% | 9% | 12% |

QUESTMS-0000262

Atty. Dkt. No. 034827-9107

Example 6: Intra- and Inter-Assay Precision

[0083] Two levels of serum pools were run 20 times each within one run to obtain a measure of intra-assay precision. The results obtained are summarized as follows:

Table 5:  Intra-assay precision

|  | Low Pool | High Pool |
|---|---|---|
| Average Testosterone Value (ng/dL) | 21.7 | 142.8 |
| Standard Deviation | 2.8 | 16.1 |
| % cv | 13.1% | 11.3 |
| N: | 23 | 22 |

[0084] Three levels of serum pools were run 14 times each over 6 separate days (13 separate assays) to obtain a measure of inter-assay precision. The results obtained are summarized as follows:

Table 6: Inter-assay precision

|  | Low Pool | Mid Pool | High Pool |
|---|---|---|---|
| Average Testosterone Value (pg/mL) | 283 | 2046 | 9148 |
| Standard Deviation | 37 | 123 | 1218 |
| % cv | 12.9% | 6.0% | 13.3% |
| n: | 32 | 32 | 32 |

Example 6: Accuracy

[0085] Total Testosterone results obtained from the HTLC/MS/MS assay were compared to those obtained using two other methodologies: Radioimmunoassay (RIA) and the Bayer Advia Centaur® automated platform.

[0086] Radioimmunoassay vs. HTLC/MS/MS:

[0087] 140 Female samples were run on both RIA and HTLC/MS/MS Testosterone assays. The results obtained are summarized as follows in Table 6:

22

QUESTMS-0000263C

Atty. Dkt. No. 034827-9107

For 140 female adult samples:

| Female Samples RIA vs. HTLC/MS/MS | |
|---|---|
| $R^2$: | 0.573 |
| Slope | 0.840 |
| Y intercept | 6.4 |
| N: | 140 |

[0088] Bayer Advia Centaur vs. LC/MS/MS

[0089] 243 adult samples (135 females and 108 males) were run on both Centaur and LC/MS/MS Testosterone assays. The results are summarized as follows in Tables 7, 8, and 9:

For all 243 samples (male and female):

| Female Samples Centaur vs. HTLC/MS/MS | |
|---|---|
| $R^2$: | 0.974 |
| Slope | 0.992 |
| Y intercept | -15.1 |
| N: | 243 |

For 135 female adult samples:

| Female Samples Centaur vs. HTLC/MS/MS | |
|---|---|
| $R^2$: | 0.437 |
| Slope | 0.529 |
| Y intercept | 4.7 |
| N: | 135 |

For 108 male adult samples:

| Female Samples Centaur vs. HTLC/MS/MS | |
|---|---|
| $R^2$: | 0.945 |
| Slope | 0.985 |
| Y intercept | -10.6 |
| N: | 108 |

DLMR_834879.2

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

Example 7: Linearity

[0090] A serial dilution consisting of 6 levels (Back calculation of the standard curve) was run in 10 separate assays.  Recovery was calculated for each level. The assay was linear to 33333 pg/mL. The final results are summarized as follows:

Table 7:  Assay Linearity

| Standard | 137 | 412 | 1235 | 3704 | 11111 | 33333 |
|---|---|---|---|---|---|---|
| Average Testosterone Value (pg/mL) | 155 | 435 | 1186 | 3683 | 11082 | 33491 |
| Theoretical Gravimetric Value (pg/mL) | 137 | 412 | 1235 | 3704 | 11111 | 33333 |
| % Recovery | 113% | 106% | 96% | 99% | 100% | 101% |

Example 8: Assay Specificity

| Compound (Dose = 10µg/dL) | Retention Time (mins.) (Analyte w/ Interference) | Observed (ng/Dl) | % Interference |
|---|---|---|---|
| 5-AD-17β | 1.22 | 1500.0 | 15.0 |
| AD | N/D | --- | 0.05 |
| 17-HP | N/D | --- | 0.05 |
| PT | N/D | --- | 0.05 |
| ESTRIOL | N/D | --- | 0.05 |
| PT-ONE | 0.88 | 50.0 | 0.5 |
| 5-PT | 1.13 | 200.0 | 2.0 |
| CORTISOL | N/D | --- | 0.05 |
| PD | N/D | --- | 0.05 |
| 5α-THA | N/D | --- | 0.05 |
| ETIO | N/D | --- | 0.05 |
| 20α-DHE | N/D | --- | 0.05 |
| 20β-DHE | N/D | --- | 0.05 |
| 20α-DHF | N/D | --- | 0.05 |
| 20β-DHF | N/D | --- | 0.05 |
| ANDRO | N/D | --- | 0.05 |
| THDOC | N/D | --- | 0.05 |
| 5α-THB | N/D | --- | 0.05 |
| THS | N/D | --- | 0.05 |
| DHA | N/D | --- | 0.05 |
| THE | N/D | --- | 0.05 |
| THF | N/D | --- | 0.05 |
| 5α-THF | N/D | --- | 0.05 |

24

QUESTMS-00002632

Atty. Dkt. No. 034827-9107

| A-CORTOLONE | N/D | --- | 0.05 |
|---|---|---|---|
| B-CORTOL | N/D | --- | 0.05 |
| CORTOLONE | N/D | --- | 0.05 |
| α-CORTOL | N/D | --- | 0.05 |
| THA | N/D | --- | 0.05 |
| THB | N/D | --- | 0.05 |
| 5α-THB | N/D | --- | 0.05 |
| METHYLTESTO | N/D | --- | 0.05 |

Example 9: Atmospheric Pressure Photoionization

[0091] This example describes an embodiment utilizing atmospheric pressure photoionization mass spectroscopy (APPI) in the present invention. As the information that follows indicates, APPI is a robust and sensitive triple quad MS system. The system offers improved ion transfer optics to enhance stability and sensitivity. An APPI system can be used either by itself or in combination with an APCI or API source.

[0092] The procedure is similar to that described in Example 2, but utilizes an APPI system, e.g. the Finnigan TSQ Quantum Discovery™ (ThermoFinnigan, San Jose, CA) or equivalent to assay for testosterone. This system is a robust and sensitive triple quadrupole mass spectrometry using photoionization. The assay offers enhanced specificity and reduced run-time and sample preparation. To this end two systems have been combined: HTLC and Tandem Mass Spectroscopy (e.g., the ThermoFinnigan system). Blood serum was used as the test sample for the assays described in this example, however, plasma samples are also acceptable. The mass transitions used where those in Table 2.

[0093] Various parameters of the assay were investigated. The limit of detection (LOD) is the point at which a measured value is larger than the uncertainty associated with it and is defined arbitrarily as 3 standard deviations (SD) from zero concentration. 21 replicates of the zero standard were analyzed to determine the mean counts per second of the twenty-one replicates and 3 SD was added. The mean +3 SD was extrapolated back into the standard curve and used to determine the LOD. The LOD for the assay was determined to be 0.6 ng/dL.

[0094] The lower limit of quantitation (LOQ) is the point where measurements become quantitatively meaningful and is set at the concentration where the CV of the replicates is <20%. Four low concentration pools were analyzed and the results statistically analyzed to determine the mean, standard deviation, and coefficient of variation. The LOQ for the assay was determined to be 1.0 ng/dL.

25

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

[0095] Intra-assay variation was measured to determine the precision of a sample value within an assay. The coefficient of variation (CV) for 20 replicates of a sample was determined and the precision was found to be acceptable (≤15% CV). Two sample pools were used to evaluate the intra-assay variation, a low concentration pool and a medium concentration pool. The low concentration pool (16-27 ng/dl) gave a CV of 13.1% with mean concentration of 21.7 ng/dL, and the medium pool (131-189 ng/dl) gave a CV of 11.3% with a mean of 142.8 ng/dL.

[0096] The inter-assay variation of a sample value was evaluated using a CV of <20% as acceptable. Three sample pools were analyzed in multiple assays. The low concentration pool (15-21 ng/dl) was found to have a CV of 11.5% with a mean concentration of 18.3 ng/dL.

[0097] Sample recovery was analyzed using two patient samples of different concentrations. These samples were diluted with mobile phase (1:1, 1:2, 1:4, 1:8). Sample #1 had 24.5 ng/dl and was diluted in the stated ratios into #2, which had a concentration of 312.7 ng/dl. Sample #3 had a concentration of 20.5 ng/dl and was diluted at the stated ratios into Sample #4, which had a concentration of 293.0 ng/dl. The samples were analyzed in singlet and the observed values (y) were compared to the expected values (x). Linear regression of the combined data showed that the mean percent recovery for all analytes was 103% for the two sets. The mean recovery was 99%.

[0098] The correlation of the assay was analyzed by assaying 49 serum samples for testosterone according to the APPI method against two commonly accepted testosterone assays – the testosterone radioimmunoassay and the ADVIA CENTAUR® assay (Bayer Diagnostics, Tarrytown, NY). Linear regression analysis was performed on the combined data showing y = 0.87x + 15.67 with a $r^2$ of 0.95.

[0099] The contents of the articles, patents, and patent applications, and all other documents and electronically available information mentioned or cited herein, are hereby incorporated by reference in their entirety to the same extent as if each individual publication was specifically and individually indicated to be incorporated by reference. Applicants reserve the right to physically incorporate into this application any and all materials and information from any such articles, patents, patent applications, or other physical and electronic documents.

[00100] The inventions illustratively described herein may suitably be practiced in the absence of any element or elements, limitation or limitations, not specifically disclosed herein. Thus, for example, the terms "comprising", "including," containing", etc. shall be read

26

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

expansively and without limitation.  Additionally, the terms and expressions employed herein have been used as terms of description and not of limitation, and there is no intention in the use of such terms and expressions of excluding any equivalents of the features shown and described or portions thereof, but it is recognized that various modifications are possible within the scope of the invention claimed.  Thus, it should be understood that although the present invention has been specifically disclosed by preferred embodiments and optional features, modification and variation of the inventions embodied therein herein disclosed may be resorted to by those skilled in the art, and that such modifications and variations are considered to be within the scope of this invention.

[00101]  The invention has been described broadly and generically herein.  Each of the narrower species and subgeneric groupings falling within the generic disclosure also form part of the invention.  This includes the generic description of the invention with a proviso or negative limitation removing any subject matter from the genus, regardless of whether or not the excised material is specifically recited herein.

[00102]  Other embodiments are within the following claims.  In addition, where features or aspects of the invention are described in terms of Markush groups, those skilled in the art will recognize that the invention is also thereby described in terms of any individual member or subgroup of members of the Markush group.

DLMR_834879.2

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

CLAIMS

1.      A method for determining the amount of testosterone present in a test sample when taken from a human comprising:

(a) purifying testosterone from the test sample by subjecting the sample to an extraction column and an analytical column to generate an eluent;

(b) ionizing the eluent to produce one or more testosterone ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the test sample.

2.      The method of claim 1, wherein the ionizing of step (b) comprises producing or more testosterone ions having a mass/charge ratio selected from the group consisting of $289.1 \pm 0.5$, $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

3.      The method of claim 1, wherein the ionizing of step (b) comprises ionizing producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

4.      The method of claim 1, wherein the test sample is blood, serum, plasma, or urine.

28

QUESTMS-00002636

Atty. Dkt. No. 034827-9107

5.      The method of claim 1, wherein the mass spectrometry is triple quadrupole tandem mass spectrometry.

6.      The method of claim 1, wherein the method is capable of detecting testosterone concentrations of less than 10 ng/dL in the test sample.

7.      The method of claim 1, wherein the method is capable of detecting testosterone concentrations of less than 5 ng/dL in the test sample.

8.      The method of claim 1, wherein the method is capable of detecting testosterone concentrations of less than 1 ng/dL in the test sample.

9.      The method of claim 1, wherein purification is achieved using a liquid chromatography system which is connected in-line to a mass spectrometer.

10.     The method of claim 1, wherein the analytical column of step (a) comprises a high pressure liquid chromatography column.

11.     The method of claim 1, wherein the extraction column of step (a) comprises a solid phase extraction column.

12.     The method of claim 1, wherein the extraction column of step (a) comprises a high turbulence liquid chromatography column.

DLMR_834879.2

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

ABSTRACT OF THE DISCLOSURE

Provided are methods for determining the presence or amount of testosterone in a test sample, comprising ionizing all or a portion of the testosterone present in the sample to produce one or more testosterone ions that are detectable in a mass spectrometer.  All or a portion of the testosterone present in the sample is ionized to produce one or more testosterone ions, which may be isolated and fragmented to produce precursor ions.  A separately detectable internal testosterone standard can be provided in the sample.  In a preferred embodiment, the reference is $2, 2, 4, 6, 6\text{-}d_5$ testosterone.

30

QUESTMS-0000263

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Caulfield et al. |
| Title: | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| Appl. No.: | Unassigned |
| Filing Date: | 11/15/2010 |
| Examiner: | Unassigned |
| Art Unit: | Unassigned |
| Confirmation Number: | Unassigned |

### PRELIMINARY AMENDMENT UNDER 37 CFR 1.115

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Prior to examination please amend the application as follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this document.

**Remarks/Arguments** begin on page 5 of this document.

Please amend the application as follows:

-1-

DLMR_834841.2

QUESTMS-00002639

Atty. Dkt. No. 034827-9107

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

    1.-12.  (Canceled)

    13.    (New) A method for determining the amount of testosterone in a sample when taken from a female human comprising:

        (a) purifying testosterone from a sample from a female human;

        (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

        (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample.

    14.    (New)  The method of claim 13, wherein said testosterone is not derivatized prior to mass spectrometry.

    15.    (New) The method of claim 13, wherein purifying testosterone comprises extracting testosterone from said sample.

    16.    (New) The method of claim 15, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

    17.    (New) The method of claim 15, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

    18.    (New) The method of claim 15, wherein said extracting comprises subjecting said sample to liquid extraction.

DLMR_834841.2

QUESTMS-00002640

Atty. Dkt. No. 034827-9107

19.    (New) The method of claim 13, wherein purifying testosterone comprises purifying testosterone by chromatography.

20.    (New) The method of claim 19, wherein said chromatography comprises liquid chromatography.

21.    (New) The method of claim 19, wherein said chromatography comprises high performance liquid chromatography (HPLC).

22.    (New) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the test sample.

23.    (New) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the test sample.

24.    (New) The method of claim 13, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$.

25.    (New) The method of claim 13, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$ and $96.9 \pm 0.5$.

26.    (New) The method of claim 13, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

-3-

QUESTMS-00002641

Atty. Dkt. No. 034827-9107

27.    (New) The method of claim 1, wherein said sample comprises urine, blood, plasma, or serum from a female human.

28.    (New) The method of claim 1, wherein said sample comprises blood, plasma, or serum from a female human.

-4-

QUESTMS-00002642

Atty. Dkt. No. 034827-9107

## REMARKS

Applicant respectfully requests that the foregoing amendments be made prior to examination of the present application.

Claims 1-12 have been canceled and claims 13-27 are newly added. The new claims are fully supported by the specification and original claims as filed. Exemplary support for the limitation of a sample taken from a female human can be found at Example 6, paragraphs [0085]-[0089]. Thus, no new matter is added by the instant amendments.

Applicant reserves the right to pursue any subject matter that is canceled by the instant amendments in future prosecution of this application or in future divisional or continuation applications.

The Examiner is invited to contact the undersigned by telephone if it is felt that a telephone interview would advance the prosecution of the present application.

Respectfully submitted,

Date ___11/15/10___

By _____

FOLEY & LARDNER LLP
Customer Number: 30542
Telephone:     (858) 847-6722
Facsimile:     (858) 792-6773

Barry S. Wilson, Reg. No. 39,431
Anthony C. Kuhlmann, Reg. No. 57,147
Attorneys for Applicant

-5-

DLMR_834841.2

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility application filing | 1011 | 1 | 330 | 330 |
| Utility Search Fee | 1111 | 1 | 540 | 540 |
| Utility Examination Fee | 1311 | 1 | 220 | 220 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1090** |

QUESTMS-00002645

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 8841738 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 30542 |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Filer Authorized By:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 15-NOV-2010 |
| **Filing Date:** | |
| **Time Stamp:** | 20:19:42 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 1090 |
| RAM confirmation Number | 6753 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00002646

| 1 | Transmittal of New Application | 034827-9107_Trans.pdf | 107135<br>8e7028cda18c1361d87fad6e053a382ca585dd57 | no | 3 |
|---|---|---|---|---|---|

| **Warnings:** |
|---|

| **Information:** |
|---|

| 2 | Application Data Sheet | 034827-9107_ADS.pdf | 91743<br>0ebffb36095bdad321f183edc0b309c70bdd4301 | no | 4 |
|---|---|---|---|---|---|

| **Warnings:** |
|---|

| **Information:** |
|---|

| This is not an USPTO supplied ADS fillable form |
|---|

| 3 | Oath or Declaration filed | 034827-9107_Decl.pdf | 218416<br>5c581dc42419308007f38e024ddaac320e84ae98 | no | 3 |
|---|---|---|---|---|---|

| **Warnings:** |
|---|

| **Information:** |
|---|

| 4 | | 034827-9107_Spec.pdf | 1593774<br>8b94f6be4baacdbbb28a533e2c01c2579dc6289b6 | yes | 30 |
|---|---|---|---|---|---|

| **Multipart Description/PDF files in .zip description** | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Specification | 1 | 27 |
| Claims | 28 | 29 |
| Abstract | 30 | 30 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| 5 | | 0348727-9107_PrelimAmd.pdf | 122282<br>f53158aa83846f9993e9df5dba2e562a11b2617 | yes | 5 |
|---|---|---|---|---|---|

| **Multipart Description/PDF files in .zip description** | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Preliminary Amendment | 1 | 1 |
| Claims | 2 | 4 |
| Applicant Arguments/Remarks Made in an Amendment | 5 | 5 |

| **Warnings:** |
|---|

| **Information:** |
|---|

QUESTMS-00002647

| 6 | Fee Worksheet (PTO-875) | fee-info.pdf | 33033<br><br>4199c60db52fcfb2d53b3a44995ff108f8224<br>1c6 | no | 2 |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 2166383 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002648



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | 1777 | 1090 | 034827-9107 | 16 | 1 |

**CONFIRMATION NO. 1630**

30542
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

**FILING RECEIPT**

*OC000000044714103*

Date Mailed: 12/01/2010

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**

    Michael P. Caulfield, San Clemente, CA;
    Darren A. Carns, Rancho Santa Margarita, CA;
    Richard E. Reitz, San Clemente, CA;

**Assignment For Published Patent Application**

    Quest Diagnostics Investments Incorporated

**Power of Attorney:** The patent practitioners associated with Customer Number 30542

**Domestic Priority data as claimed by applicant**

    This application is a CON of 12/607,905 10/28/2009
    which is a CON of 12/053,325 03/21/2008 PAT 7,754,419
    which is a CON of 11/247,409 10/11/2005 PAT 7,348,137
    which is a CON of 10/726,919 12/02/2003 PAT 6,977,143
    which claims benefit of 60/501,255 09/08/2003

**Foreign Applications**

**If Required, Foreign Filing License Granted:** 11/29/2010

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 12/946,785**

**Projected Publication Date:** 03/10/2011

**Non-Publication Request:** No

**Early Publication Request:** No

page 1 of 3

QUESTMS-00002649

**Title**

DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

**Preliminary Class**

436

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**<u>GRANTED</u>**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

QUESTMS-00002650

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

QUESTMS-00002651

## PATENT APPLICATION FEE DETERMINATION RECORD
### Substitute for Form PTO-875

Application or Docket Number
**12/946,785**

### APPLICATION AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE($) | SMALL ENTITY FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 330 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 540 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 220 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 16 | minus 20 = * | | | OR | x 52 = | 0.00 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 1 | minus 3 = * | | | | x 220 = | 0.00 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $270 ($135 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0.00 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0.00 |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | 1090 |

### APPLICATION AS AMENDED - PART II

| | | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT A | Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

| | | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT B | Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

QUESTMS-00002652



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
| --- | --- | --- | --- |
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 |

**CONFIRMATION NO. 1630**

30542
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

**PUBLICATION NOTICE**

*OC000000046469589*

**Title:** DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

**Publication No.** US-2011-0059534-A1
**Publication Date:** 03/10/2011

# NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

QUESTMS-00002653

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

30542          7590          03/21/2011
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/21/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

QUESTMS-00002654

| **Office Action Summary** | Application No.<br>12/946,785 | Applicant(s)<br>CAULFIELD ET AL. |
|---|---|---|
| | Examiner<br>MARCELA M. CORDERO GARCIA | Art Unit<br>1654 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *1* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>15 November 2010</u>.

2a)☐ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-12* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☐ Claim(s) _____ is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☒ Claim(s) *1-12* are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

| **Attachment(s)** | |
|---|---|
| 1)☐ Notice of References Cited (PTO-892) | 4)☐ Interview Summary (PTO-413)<br>    Paper No(s)/Mail Date. _____ |
| 2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948) | 5)☐ Notice of Informal Patent Application |
| 3)☐ Information Disclosure Statement(s) (PTO/SB/08)<br>    Paper No(s)/Mail Date _____. | 6)☐ Other: _____. |

QUESTMS-00002655

Application/Control Number: 12/946,785                                    Page 2
Art Unit: 1654

## DETAILED ACTION

### *Election/Restrictions*

This application contains claims directed to the following patentably distinct

species: the many and multiple methods for determining the amount of testosterone

present in a test sample when taken from a human comprising: (a) purifying

testosterone from the test sample by subjecting the sample to an extraction column and

an analytical column to generate an eluent; (b) ionizing the eluent to produce one or

more testosterone ions detectable by a mass spectrometer (e.g., 289.1 $\pm$ 0.5; 109.2 $\pm$

0.5, 96.9 $\pm$ 0.5); and (c) detecting the amount of one or more of the testosterone ions by

a mass spectrometer, wherein the amount of one or more of the testosterone ions is

related to the amount of testosterone in the test sample. The species are independent

or distinct because each ion is drawn to a different and distinct molecular composition

and/or ionization conditions. In addition, these species are not obvious variants of each

other based on the current record.

Applicant is required under 35 U.S.C. 121 to elect a single disclosed species, or

a single grouping of patentably indistinct species, [i.e., elect a single and specific

testosterone ion's m/z]  for prosecution on the merits to which the claims shall be

restricted if no generic claim is finally held to be allowable. Currently, claims 1-12 are

generic.

There is a search and/or examination burden for the patentably distinct species

as set forth above because at least the following reason(s) apply:

QUESTMS-00002656

Application/Control Number: 12/946,785                                Page 3
Art Unit: 1654

A reference that would anticipate and/or make obvious one of the species does not necessarily anticipate and/or make obvious another species.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a species or a grouping of patentably indistinct species to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected species or grouping of patentably indistinct species**, including any claims subsequently added. An argument that a claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

The election may be made with or without traverse. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the election of species requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable on the elected species or grouping of patentably indistinct species.

Should applicant traverse on the ground that the species, or groupings of patentably indistinct species from which election is required, are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing them to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the species unpatentable over the prior art, the

Application/Control Number: 12/946,785                                      Page 4
Art Unit: 1654

evidence or admission may be used in a rejection under 35 U.S.C. 103(a) of the other

species.

Upon the allowance of a generic claim, applicant will be entitled to consideration

of claims to additional species which depend from or otherwise require all the limitations

of an allowable generic claim as provided by 37 CFR 1.141.

Applicant is reminded that upon the cancellation of claims to a non-elected

invention, the inventorship must be amended in compliance with 37 CFR 1.48(b) if one

or more of the currently named inventors is no longer an inventor of at least one claim

remaining in the application. Any amendment of inventorship must be accompanied by

a request under 37 CFR 1.48(b) and by the fee required under 37 CFR 1.17(i).

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone

number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

QUESTMS-00002658

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 63 of 437 PageID #: 2452

Application/Control Number: 12/946,785                                    Page 5

Art Unit: 1654

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 03/2011

QUESTMS-00002659

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:     Caulfield et al.

Title:          DETERMINATION OF TESTOSTERONE BY MASS
                SPECTROMETRY

Appl. No.:     12/946,785

Filing Date:   November 15, 2010

Examiner:      Cordero Garcia, M.M.

Art Unit:      1654

Confirmation   1630
Number:

## REPLY UNDER 37 C.F.R. § 1.111

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the Restriction Requirement mailed March 21, 2011, please consider the following amendments and remarks.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this document.

**Remarks/Arguments** begin on page 5 of this document.

Please amend the application as follows:

QUESTMS-00002660

Atty. Dkt. No. 034827-9107

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims**:

1.-12.   (Canceled)

13.   (Previously Presented) A method for determining the amount of testosterone in a sample when taken from a female human comprising:

(a) purifying testosterone from a sample from a female human;

(b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample.

14.   (Previously Presented)  The method of claim 13, wherein said testosterone is not derivatized prior to mass spectrometry.

15.   (Previously Presented) The method of claim 13, wherein purifying testosterone comprises extracting testosterone from said sample.

16.   (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

17.   (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

18.   (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to liquid extraction.

QUESTMS-00002661

Atty. Dkt. No. 034827-9107

19.    (Previously Presented) The method of claim 13, wherein purifying testosterone comprises purifying testosterone by chromatography.

20.    (Previously Presented) The method of claim 19, wherein said chromatography comprises liquid chromatography.

21.    (Previously Presented) The method of claim 19, wherein said chromatography comprises high performance liquid chromatography (HPLC).

22.    (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the test sample.

23.    (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the test sample.

24.    (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$.

25.    (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$ and $96.9 \pm 0.5$.

26.    (Previously Presented) The method of claim 13, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

QUESTMS-00002662

Atty. Dkt. No. 034827-9107

27.     (Currently Amended) The method of claim [1] 13, wherein said sample comprises urine, blood, plasma, or serum from a female human.

28.     (Currently Amended) The method of claim [1] 13, wherein said sample comprises blood, plasma, or serum from a female human.

QUESTMS-00002663

Atty. Dkt. No. 034827-9107

## REMARKS

**Status of Claims**

Applicant respectfully requests that the foregoing amendments be made prior to examination of the present application.

Claims 26-27 are amended to correct clerical errors in the stated dependencies. As such, no new matter is added by the instant amendments.

Applicant reserves the right to pursue any subject matter that is canceled by the instant amendments in future prosecution of this application or in future divisional or continuation applications.

**Species Election**

As an initial matter, Applicant notes that the present Restriction Requirement is asserted relative to claims 1-12 as originally filed. However, claims 1-12 were canceled and replaced by claims 13-28 by way of Applicant's Preliminary Amendment filed on November 15, 2010, simultaneously with the new application filing.

Notwithstanding the foregoing and in response to the requirement to elect species, Applicant hereby elects the ion having a mass/charge ratio (m/z) of about 109.2 ± 0.5 for examination. This election is made without traverse.

Claims 13-28 read on the elected invention.

## CONCLUSION

Applicant respectfully submits that the claims are in condition for allowance. Prompt and favorable action on the application is respectfully requested.

QUESTMS-00002664

Atty. Dkt. No. 034827-9107

The Examiner is invited to contact the undersigned by telephone if it is felt that a telephone interview would advance the prosecution of the present application.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741. If any extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date _____4/7/11_____        By _____

FOLEY & LARDNER LLP              Barry S. Wilson, Reg. No. 39,431
Customer Number: 30542           Anthony C. Kuhlmann, Reg. No. 57,147
Telephone:   (858) 847-6722      Attorneys for Applicant
Facsimile:   (858) 792-6773

QUESTMS-00002665

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 9838548 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 30542 |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Filer Authorized By:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 08-APR-2011 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 14:46:52 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 034827-9107_RRR.pdf | 169212<br>9806f916befa3f33fd906f2dd44219f39cde90ae | yes | 6 |

QUESTMS-00002666

**Multipart  Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Response to Election / Restriction Filed | 1 | 1 |
| Claims | 2 | 4 |
| Applicant Arguments/Remarks Made in an Amendment | 5 | 6 |

| Warnings: | |
|---|---|
| Information: | |
| **Total Files Size (in bytes):** | 169212 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002667

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PATENT APPLICATION FEE DETERMINATION RECORD
### Substitute for Form PTO-875

| Application or Docket Number | Filing Date | |
|---|---|---|
| 12/946,785 | 11/15/2010 | ☐ To be Mailed |

### APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY ☐ | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

### APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
|  | 04/08/2011 | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| AMENDMENT | Total (37 CFR 1.16(i)) | * 16 | Minus | ** 20 | = 0 | X $ = | | X $52= | 0 |
| | Independent (37 CFR 1.16(h)) | * 1 | Minus | *** 3 | = 0 | X $ = | | X $220= | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | 0 |

|  |  | (Column 1) | | (Column 2) | (Column 3) | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|
|  | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | |
| AMENDMENT | Total (37 CFR 1.16(i)) | * | Minus | *** | = | X $ = | | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/VIOLA ROGERS/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

QUESTMS-00002668

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

30542        7590        06/14/2011
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/14/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

QUESTMS-00002669

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 12/946,785 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** |
| | MARCELA M. CORDERO GARCIA | 1654 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on <u>08 April 2011</u>.
2a) ☐ This action is **FINAL**.     2b) ☒ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4) ☒ Claim(s) <u>13-28</u> is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) <u>13-28</u> is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All   b)☐ Some * c)☐ None of:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

QUESTMS-00002670

Application/Control Number: 12/946,785                                    Page 2
Art Unit: 1654

## DETAILED ACTION

### Election/Restrictions

1.      Applicant's election without traverse of m/z of about 109.2 ± 0.5 in the reply filed

on 4/8/2011 is acknowledged. Examiner thanks Applicant for clarifying the most recent

version of claims.

### Status of the claims

2.      Claims 13-28 are pending in the application. Claims 13-28 are presented for

examination on the merits.

### Claim Rejections - 35 USC § 102

3.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

4.      Claims 13, 15-16, 19, 27-28 are rejected under 35 U.S.C. 102(b) as being

anticipated by Vierhapper et al. (J Clinical Endocrinology and Metabolism, 1997).

Vierhapper et al. teach a method for determining the amount of testosterone in a

sample when taken from a female human comprising:

(a) purifying testosterone from a sample from a female human;

(b) ionizing said purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer;

QUESTMS-00002671

Application/Control Number: 12/946,785                                      Page 3
Art Unit: 1654

(c) detecting the amount of one or more of the testosterone ion(s) by mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample (See, e.g., abstract, Tables 2A-2C, page 1494).

Vierhapper et al. teach purifying testosterone using solid phase extraction (Sep-Pak C18 cartridge, see page 1494).  The sample comprises plasma (e.g., pages 1493 and 1494).  The Protocol of Vierhapper et al. 1124is suitable for clinical use in a routine setting to obtain analytically correct estimates of testosterone production *in vivo*.

Therefore the reference is deemed to anticipate the instant claims above.

### *Claim Rejections - 35 USC § 103*

5.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

.       This application currently names joint inventors.  In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to

QUESTMS-00002672

Application/Control Number: 12/946,785                                   Page 4
Art Unit: 1654

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

6.      Claims 13-21, 24, 26-28 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Caraiman et al. (ASMS 2003, Poster Number 075, June 2003).

        Caraiman et al. disclose that there is an ever increasing burden on analytical

laboratories to make high sensitivity measurements, and to make them as quickly as

possible. For the LC/MS analysis of compounds of widely differing polarities the

demands are even higher since compounds in the same sample can often only be

ionized optimally with the use of entirely different ionization sources (most commonly

either electrospray ionization or atmospheric pressure chemical ionization (APCI)). This

study illustrates the use of a combined TIS/APCI ionization source to combat this type

of problem: as a software-selectable source, the ionization mode can be changed on

the fly, allowing the user to choose the best ionization mode for each resolved

compound in one analytical run. TurboFlow® Chromatography was used as a high

throughput method to eliminate the time-consuming sample preparation procedures for

biological samples. The samples are rat plasma samples (e.g., abstract). The gender of

the rats is not expressly identified.

        Caraiman et al. teach the following conditions:

        Instrumentation used: - API 4000TM equipped with a DuoSprayTM ion source

(Figure 1) - Cohesive® 2300 pump/valve interface module (Cohesive® Technologies,

Franklin, MA, USA) and CTC PAL HTS autosampler (Cohesive® Technologies,

Franklin, MA, USA) (Figure 2).

QUESTMS-00002673

Application/Control Number: 12/946,785                                      Page 5
Art Unit: 1654

Sample Preparation: - Calibration standards were prepared by mixing 200 µL of rat plasma with 200 µL of standard solutions in 10% methanol; - Aliquots of 100 µL plasma samples from separate pharmacokinetic studies on rats for Testosterone and Warfarin were mixed and diluted with 200 µL 10% methanol; - Calibrators and unknowns were centrifuged at 16,600 g for 15 minutes. The supernatant was transferred to 300 µL vials and loaded in the autosampler;

Chromatographic Conditions: - Extraction Column: CycloneTM HTLC (1.0 x 50 mm, 50 µm) - Analytical column: Waters, C8 Nova Pak (4.6 x 20 mm, 4 µm) - Mobile phase for loading pump and eluting pump A: Water (0.1% HCOOH) : Methanol (95:5 v/v) B: Water (0.1% HCOOH) : Methanol (5:95 v/v) - Run time: 4.33 minutes - Details for loading, transfer and eluting steps of the LC method. The ion at 289.1 was selected to produce a 97.2 (see Table 1). The sensitivity is up to 1 ng/mL (Table 3). Caraiman et al. teach that a high-throughput method combining the advantages of using the dual ions source in combination with HTCL was developed for testosterone in vivo pharmacokinetic studies. The method has quantitation limits comparable with results for neat standards analyzed with conventional HPLC and ion sources and good precision and accuracy (e.g., page 4).

Caraiman et al. do not expressly teach applying the method to plasma from a human female.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to apply the method of Caraiman et al. to female patients' plasma. One of ordinary skill in the art at the time the invention was made would have been

QUESTMS-00002674

Application/Control Number: 12/946,785                                    Page 6
Art Unit: 1654

motivated to do so in order to carry out in vivo pharmacokinetic studies in female

subjects and because the method of Caraiman et al. is a high-throughput method

combining the advantages of using the dual ions source in combination with HTCL.

One of ordinary skill in the art at the time the invention was made would have had a

reasonable expectation of success given that Caraiman et al. teach a method of

detection of testosterone in general, not restricted to any specific gender and because,

as taught by Caraiman et al., the method has testosterone quantitation limits

comparable with results for neat standards analyzed with conventional HPLC and ion

sources and good precision and accuracy (e.g., Table 3).

        Thus, the invention as a whole is prima facie obvious over the references,

especially in the absence of evidence to the contrary.

7.      Claims 13-16, 18-21, 24-28 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Shackelton et al. (Steroids, 1997).

        Shackelton et al. teach that injectable preparations of testosterone esters have

become widely misused to increase muscle mass and improve performance in athletes.

Proof of such administration is difficult to obtain, because testosterone is an

endogenous compound, and the esters are rapidly hydrolyzed to this steroid. The

accepted test for testosterone administration has been the urinary

testosterone/epitestosterone ratio, a value of >6 being taken as the hallmark of drug

misuse. However, rare false positives and many false negatives present a drawback to

the universal use of such a discriminant. One technique used to prove the presence of

synthetic testosterone or its metabolites in urine is combustion ratio mass spectrometry,

QUESTMS-00002675

which renders it possible to distinguish endogenous from synthetic testosterone by

differing 13C content. Encouraging studies utilizing this technique have been described.

Another potential method would be to characterize the intact testosterone esters in

plasma, because the short-chain ones commonly used in drug preparations are not

synthesized in the body, in contrast to long-chain fatty acid steroid esters. The major

drawback in performing this type of assay relates to the fact that the esters are

efficiently hydrolyzed following administration and only very low concentrations can be

expected in blood plasma (e.g., page 523).

Shackelton et al. teach testosterone acetate, propionate, enanthate, cypionate,

benzoate and phenylpropionate were obtained from the Sigma Chemical company.

Testosterone isocaporate and undecanoate were products of Organon, OSS. 19-Nor-

testosterone acetate was synthesized by acetylation of the parent steroid obtained from

Sigma.

Plasma samples were obtained from volunteers following intramuscular

administration of 25 mg testosterone propionate + 100 mg testosterone enanthate or oral

administration of 160 mg testosterone undecanoate. The gender of the volunteers is not

expressly identified.

The plasma samples analyzed were stored in the Barcelona laboratories where

the initial work-up was undertaken. Plasma proteins were precipitated by adding 4 ml

acetone:ethanol (1:1 v/v) to 1 mL of plasma samples. After brief sonication, the proteins

were pelleted by centrifugation at 360 rpm for 1 min. The solvent was decanted and

evaporatively removed under nitrogen. On receipt in California, the samples were

QUESTMS-00002676

Application/Control Number: 12/946,785                                        Page 8
Art Unit: 1654

reconstituted in 2 mL water: glacial acetic acid and 10 mg Girard reagent T was added.

The reaction tubes were heated at 100 degrees for 0 min to allow formation of the

Girard hydrazones. The mixture was extracted twice with 5 mL of isooctane : methylene

chloride (2:1 v/v) and the solvent (containing the bulk of the plasma lipids and

nonketonic steroids) was discarded. Girard hydrazones are water soluble and, therefore

stay in the water phase. This water phase was extracted by C18 cartridge (Waters Sep-

pak). The sample recovered from Sep-pak in 4 mL of methanol was dried in anticipation

of mass spectrometric analysis (e.g., page 524).

The analysis of testosterone ester Girard hydrazones was conducted on a

Michrom microbore HPLC instrument interfaced to a Micromass (VG) BioQ triple

quadrupole mass spectrometer. The column used was a Vydac C4 and the manual

injector utilized a 100 uL loop. The solvent flow rate was 50 uL/min. Samples for direct

infusion into the mass spectrometer were introduced at 10 uL per minute.

The voltages of capillary and HV lens were 3.9 and 1 kV, respectively. The cone

voltage was 35 V when maximum sensitivity and no fragmentation was desired, and 74

V when fragmentation in the source was needed. Collision cell MS/MS was only

conducted in association with direct infusion. The collision energy was ramped from 60

at m/z 50 to 40 at m/z 640.

All the underivatized testosterone esters gave simple mass spectra when

analyzed by direct infusion ESMS (See, e.g., Figures 1, 2). MS/MS fragmentation of

both source-produced m/z 289 and 271 resulted in formation of the ion at m/z 97 (e.g.,

page 525).

QUESTMS-00002677

Application/Control Number: 12/946,785                                    Page 9
Art Unit: 1654

The Girard hydrazones have excellent HPLC properties under reverse phase conditions. Figure 3 shows the separation of the 9 compounds, using in each case the molecular ion for detection. For achieving specificity in plasma analysis, Shackelton et al. chose to monitor three ions: the molecular ion and fragment ions m/z M-59 and M-87. The peaks in Figure 4 A represent about 100 ng injected. Figure 5B shows the equivalent data for 1 ng (e.g., page 528). Please note that this appears to correspond, based on the sample treatment above to 1 ng/10 uL, or 100 ng/mL.

Shackelton et al. do not expressly teach the method wherein the plasma is extracted from women.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to apply the method of Schackelton et al. to female patients' plasma. One of ordinary skill in the art at the time the invention was made would have been motivated to do so in order to determine if synthetic testosterone is present in female subjects such as athletes (doping control).  One of ordinary skill in the art at the time the invention was made would have had a reasonable expectation of success given that Shackleton et al. teach a method of detection of testosterone in general, not restricted to any specific gender for its application.

Thus, the invention as a whole is prima facie obvious over the references, especially in the absence of evidence to the contrary.

8.      Claims 17 and 22-23 are rejected under 35 U.S.C. 103(a) as being unpatentable over Shackelton et al. (Steroids, 1997) in view of Quinn et al. (US 5,772,874) and Zimmer et al. (J Chrom 1999).

QUESTMS-00002678

Application/Control Number: 12/946,785                                    Page 10
Art Unit: 1654

Shackelton et al. are relied upon as above. Shackelton et al. teach that it would be desirable to improve sensitivity in the method.

Shackelton et al. do not expressly teach detecting concentrations less than 5 ng/dL or 1 ng/dL or using HTLC.

Quinn et al. teach turbulent flow chromatography (columns 7-9) to provide improved chromatographic separation, capacity and resolution when combining with HPLC (e.g., col. 1) thus creating a useful and improved separation.

Zimmer et al. teach that turbulent flow chromatography (TFC) combined with the high selectivity and sensitivity of tandem mass spectrometry (MS-MS) is a new technique for the fast direct analysis of drugs from crude plasma. TFC in the 96-well plate format reduces significantly the time required for sample clean-up in the laboratory. For example, for 100 samples the workload for a technician is reduced from about 8 h by a manual liquid-liquid extraction (LLE) assay to about 1 h in the ease of TFC. Sample clean-up and analysis are performed on-line on the same column. Similar chromatographic performance and validation results were achieved using HTLC Turbo-C18 columns (Cohesive Technologies) and Oasis HLB extraction columns (Waters). One 96-well plate with 96 plasma samples is analyzed within 5.25 h, corresponding to 3.3 min per sample. Compared to this LLE and analysis of 96 samples takes about 16 h. Two structurally different and highly protein bound compounds, drug A and drug B, were analyzed under identical TFC conditions and the assays were fully validated for the application to toxicokinetics studies (compliant with Good Laboratory Practices - GLP). The limit of quantitation was 1.00 ug/l (0.1 ug/dL) and the linear

working range covered three orders of magnitude for both drugs: In the case of drug A

the quality of analysis by TFC was similar to the reference LLE assay and slightly better

than automated solid-phase extraction in 96-well plates. The accuracy was -3.1 to 6.7%

and the precision was 3.1 to 6.8% in the case of drug A determined for dog plasma by

TFC-MS-MS. For drug B the accuracy was -3.7 to 3.5% and the precision was 1.6 to

5.4% for rat plasma, which is even slightly better than what was achieved with the

validated protein precipitation assay (e.g., abstract).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the tandem mass spectrometric method for testosterone

MS/MS analysis of Shackelton et al. (e.g. abstract) by extracting with an HTLC

extraction step before the MS/MS step as taught by Zimmer et al. to quickly purify the

plasma samples containing testosterone and to improve sensitivity in the method.  The

skilled artisan would have been motivated to do use Zimmer al.'s turbulent flow

chromatographic method because it created a fast and high selectivity and sensitivity

method down to 0.1 ug/dL when coupled to MS/MS (e.g., abstract) and therefore it

would have been a desirable method to purify the biological samples comprising

testosterone of Shackelton et al. There would have been a reasonable expectation of

success, given that Zimmer et al. teaches that this kind of analysis provides direct

analysis of protein bound drugs (e.g., page 35, columns 1-2) such as testosterone (e.g.

page 2178). Further, one of ordinary skill in the art would have been motivated to

decrease the detection limit by using this higher sensitivity and selectivity and thus

determining the lower limit of detection based on the teachings of Zimmer et al.

QUESTMS-00002680

Application/Control Number: 12/946,785                                      Page 12
Art Unit: 1654

Furthermore, "[g]enerally, differences in concentration or temperature will not support

the patentability of subject matter encompassed by the prior art unless there is evidence

indicating such concentration or temperature is critical. "[W]here the general conditions

of a claim are disclosed in the prior art, it is not inventive to discover the optimum or

workable ranges by routine experimentation."" (See MPEP 2144.05).

Thus the invention as a whole was clearly prima facie obvious to one of ordinary

skill in the art at the time the invention was made.

9.      Claims 13-21, 27-28 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Ong et al. (50ths ASMS Conference Abstract Viewer, June 2002).

Ong et al. teach a method for determining the amount of testosterone present in

a test sample,

(a) purifying testosterone from the test sample by subjecting the sample to an

extraction column (HTLC, Preliminary data section) and an analytical column (LC,

Preliminary data section) to generate an eluent;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (e.g., last 2 paragraphs of Preliminary Data section).

QUESTMS-00002681

Application/Control Number: 12/946,785                                    Page 13
Art Unit: 1654

See entire abstract for the limitations drawn to HTLC separation (e.g., preliminary

data section), serum/plasma (last paragraph), detection limit (last paragraph).

Ong et al. do not expressly teach using the method in a human female

plasma/tissue sample, teaching instead the use of the method in plasma/tissue samples

obtained from animals for in vivo pharmacokinetic studies in animal models.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the method of Ong et al. with human female plasma/tissue

samples. One of ordinary skill in the art at the time the invention was made would have

been motivated to do so given the high routine sensitivity and inter-batch precision,

simplified preparation and minimal carryover of the method. One of ordinary skill in the

art at the time the invention was made would have had a reasonable expectation of

success given that the method of Ong et al. was useful for the analysis of large number

of samples in studies of structure-activity for lead optimization using in vitro metabolic

stability to in vivo pharmacokinetic studies, because Ong et al. did not restrict the

analysis results to specific genders of the animal samples and because the method of

Ong et al. in a serial configuration for plasma/tissue matrices, has a limit of quantitation

approaching 0.1 ng/ml, an accuracy < 10% relative error and a precision < 10% RSD.

Thus the invention as a whole was clearly prima facie obvious to one of ordinary

skill in the art at the time the invention was made.

### Double Patenting

10.     The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees.   A nonstatutory

QUESTMS-00002682

Application/Control Number: 12/946,785                                   Page 14
Art Unit: 1654

obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

11.     Claims 13-28 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-32 of U.S. Patent No.  7,754,419.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '419

are both drawn to a method for determining the presence or amount of testosterone in a

test sample utilizing steps encompassed or encompassed by the claimed method of US

'419. US '419 claims a method for determining the presence or amount of testosterone

in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

QUESTMS-00002683

Application/Control Number: 12/946,785                                    Page 15
Art Unit: 1654

    (c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 1 ng/dL (see claim 32 of

US "19. US '419 includes detection by MS/MS/TOF of the instantly claimed ions, which

are made by ionization techniques such as SELDI, APPI, daughter ion summation for

quantitation and HTLC (turbulent flow chromatography) including appropriate columns.

The ions detected are $289.1 \pm 0.5$, $109.2 \pm 0.5$, $96.9 \pm 0.5$.

    Although US '419 does not expressly teach the method to be applied to females,

one of ordinary skill in the art would had been motivated to use the high sensitive

method down to 1 ng/dL in determination of testosterone in samples from females,

which routinely have lower concentrations than males. One of ordinary skill in the art at

the time the invention was made would have had a reasonable expectation of success

since the method of US '491 is drawn to determining testosterone in blood, serum,

plasma or urine from a human, which includes both males and females.

    Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

12.    Claims 13-28 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-50 of U.S. Patent No.  7,348,137.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '137

are both drawn to a method for determining the presence or amount of testosterone in a

QUESTMS-00002684

Application/Control Number: 12/946,785                                    Page 16
Art Unit: 1654

test sample utilizing steps encompassed or encompassed by the claimed method of US

'137. US '137 teaches a method for determining the presence or amount of testosterone

in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '137 and also the section regarding the

limit of detection (LOD) in Example 4 which describes the LOD is 0.6 ng/dL). US '137

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) including appropriate columns. The ions

detected are 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5, 96.9 $\pm$ 0.5.

Although US '137 does not expressly teach the method to be applied to females,

one of ordinary skill in the art would had been motivated to use the high sensitive

method down to 1 ng/dL in determination of testosterone in samples from females,

which routinely have lower concentrations than males. One of ordinary skill in the art at

QUESTMS-00002685

Application/Control Number: 12/946,785                                     Page 17
Art Unit: 1654

the time the invention was made would have had a reasonable expectation of success

since the method of US '137 is drawn to determining testosterone in blood, serum,

plasma or urine from a human, which includes both males and females.

Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

13.    Claims 13-28 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-39 of U.S. Patent No. 6,977,143.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '143

are both drawn to a method for determining the presence or amount of testosterone in a

test sample utilizing steps encompassed or encompassed by the claimed method of US

'143. US '143 teaches a method for determining the presence or amount of testosterone

in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and  liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of $289.1 \pm 0.5$, $109.2 \pm 0.5$ and $96.9 \pm 0.5$;

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

QUESTMS-00002686

Application/Control Number: 12/946,785                                    Page 18
Art Unit: 1654

ng/mL] in the test sample (see all claims of US '143 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '143

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) and appropriate columns for HTLC. The ions

detected are $289.1 \pm 0.5$, $109.2 \pm 0.5$, $96.9 \pm 0.5$.

Although US '143 does not expressly teach the method to be applied to females,

one of ordinary skill in the art would had been motivated to use the high sensitive

method down to 1 ng/dL in determination of testosterone in samples from females,

which routinely have lower concentrations than males. One of ordinary skill in the art at

the time the invention was made would have had a reasonable expectation of success

since the method of US '143 is drawn to determining testosterone in blood, serum,

plasma or urine from a human, which includes both males and females.

Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

14.     Claims 13-28 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 1-13 of

copending Application No. 12/607,905.   Although the conflicting claims are not

identical, they are not patentably distinct from each other because both are drawn to

        (a) purifying testosterone from the test sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

Application/Control Number: 12/946,785                                    Page 19
Art Unit: 1654

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL such as 1 ng/dL.

Although Application '905 does not expressly teach the method to be applied to

females, one of ordinary skill in the art would had been motivated to use the high

sensitive method down to 1 ng/dL in determination of testosterone in samples from

females, which routinely have lower concentrations than males. One of ordinary skill in

the art at the time the invention was made would have had a reasonable expectation of

success since the method of Application '905 is drawn to determining testosterone in

blood, serum, plasma or urine from a human, which includes both males and females.

This is a provisional obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

### Conclusion

15.     No claim is allowed.

The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

Application/Control Number: 12/946,785                                         Page 20
Art Unit: 1654

16.     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone

number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 06/2011

| Notice of References Cited | | Application/Control No.<br>12/946,785 | | Applicant(s)/Patent Under Reexamination<br>CAULFIELD ET AL. | |
|---|---|---|---|---|---|
| | | Examiner<br>MARCELA M. CORDERO CABON | | Art Unit<br>1654 | Page 1 of 2 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-5,772,874 | 06-1998 | Quinn et al. | 210/198.2 |
| * | B | US-7,754,419 | 07-2010 | Caulfield et al. | 435/4 |
| * | C | US-7,348,137 | 03-2008 | Caulfield et al. | 435/4 |
| * | D | US-6,977,143 | 12-2005 | Caulfield et al. | 435/4 |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Vierhapper et al. Determination of Testosterone Production Rates in Men and Women Using Stable Isotope/Dilution and Mass Spectrometry. Journal of Clinical Endocrinology and Metabolism. 1997. Vo. 82, No. 5, pages 1492-1496. |
| | V | Shackelton et al. Electrospray mass spectrometry of testosterone esters: Potential for use in doping control. Steroids, 1997. Vol. 62, pages 523-529. |
| | W | Ong et al. Integrated Bioanalytical Support Using Turbulent Flow Chromatography-Mass Spectrometry. 50th ASMS Conference, June 2002, Poster 218, pages 1-2. |
| | X | Zimmer et al. Comparison of turbulent-flow chromatography with automated solid-phase extraction in 96 well plates and liquid-liquid extraction used as plasma sample preparation techniques for liquid chromatography-tandem mass spectrometry. J Chromatog. A. 1999. Vol. 854, pages 23-25. |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

QUESTMS-00002690

| *Notice of References Cited* | Application/Control No. 12/946,785 | Applicant(s)/Patent Under Reexamination CAULFIELD ET AL. | |
|---|---|---|---|
| | Examiner MARCELA M. CORDERO CABON | Art Unit 1654 | Page 2 of 2 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Salameh et al. Validation of total testosterone assay using high-turbulence liquid chromatography tandem mass-spectrometry: Total and free testosterone reference ranges. Steroids, 2010. Vol. 75, pages 169-175. |
| | V | Caraiman et al. Optimal Sensitivity and Increased Throughput Using a Dual TIS/APCI Ionization Source and TurboFlow Chromatography with LC/MS/MS. Poster Number 075. ASMS Conference, June 2003, pages 1-4. |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

QUESTMS-00002691

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 12946785 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** |
| | MARCELA M CORDERO GARCIA | 1654 |

| SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| none | none | 6/10/2011 | MMCG |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| STN search by STIC (available via SCORE / PAIR) | 5/17/2011 | MMCG |
| EAST search (attached) | 6/10/2011 | MMCG |
| also ran PALM Inventor search | 6/10/2011 | MMCG |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office        Part of Paper No. : 20110610

QUESTMS-00002692

# 50th ASMS Conference

## Abstract Search and Schedule Generator

To save your changes, click on a navigation button at the bottom of this page.  DO NOT USE THE BACK BUTTON ON YOUR BROWSER!

Abstracts are returned in sets of six. Press the Page buttons at the bottom to scroll.

**Number of Abstracts returned:**   15
**You are viewing page:**           2

---

**Session:** LC/MS Sample Prep          **Code:** ThPJ      **Time Slot/Poster Number:** 218
☐ Remove this Abstract from my Schedule.

### Integrated Bioanalytical Support Using Turbulent Flow Chromatography-Mass Spectrometry

Voon S. Ong[*]; Kevin Cook; Jeffrey Bernstein; William Brubaker
Memory Pharmaceuticals, Montvale, NJ

**Novel Aspect:** Turbulent flow chromatography-mass spectrometry for metabolic stability/pharmacokinetic screening

**Introduction:**

The bioanalytical challenges faced by a pharmaceutical company range from support of structure-activity relationship (SAR) studies for lead optimization using in vitro metabolic stability to in vivo pharmacokinetic studies in various animal models. Most often, particularly in a small pharmaceutical company, part or all of the above efforts are outsourced due to the significant investment required to acquire, operate, and maintain the necessary analytical instrumentation. However, advantages gained from conducting these analyses in-house relative to outsourcing are enormous. In this presentation, we outline programs that are supported using a single LC/MS/MS system.

**Methods:**

The LC/MS/MS system consists of a Cohesive 2300 HTLC system equipped with 2 binary pumps and a CTC PAL autosampler interfaced to an AB-Sciex API 3000 triple quadrupole mass spectrometer. One pump is used for sample loading and extraction, while the second pump operates a generic gradient to facilitate analyte elution. The main advantage of the system is the capability for on-line solid-phase extraction obviating the need for any manual sample preparation prior to mass spectrometric analysis. The system is also capable of conducting parallel on-line extractions to increase throughput.

**Preliminary Data:**

A Tecan Genesis liquid handling workstation was utilized for metabolic stability screening, which is capable of preparing approximately 400 samples (in under 4 hours) for analysis. In this program, the percentage of parent compound remaining after 1-hour incubation is determined. To complete sample analysis in a single batch overnight, the HTLC system is configured with two on-line extraction columns in parallel followed by a single analytical column. Use of this extraction column-switching mode allows one extraction column to be rinsed and equilibrated while the other is used for on-line extraction. The analytical column is operated under generic fast gradient chromatography to facilitate elution of a range of analytes with differing chemical characteristics. In this configuration, the cycle time is 2 minutes per injection facilitated by the use of higher (>1 mL/min) flow rates. Carryover is

QUESTMS-00002693

compound-dependent with 0.5% as the worst case encountered. Testosterone is used as a positive control (at 5 and 0.5 uM incubation concentrations) in this metabolic stability screening program. Within-batch precision of analysis as measured by percent testosterone remaining is typically not greater than 10% (N = 4) while inter-batch precision calculated from over 20 separate batches is not worse than 15%.

For analyses involving plasma/tissue matrices, in which lower limits of quantitation approaching 0.1 ng/mL are routinely required, a serial configuration, consisting of a single extraction column with a single analytical column, is used. The main advantages of this configuration are simplified sample preparation (even for tissue samples) prior to on-line extraction and minimal carryover (<0.05%), although a longer cycle time is encountered because extractions are carried out serially. Examination of the results from parallel and serial configurations following method validation experiments with spiked plasma samples for various analytes revealed accuracy (<10% relative error) and precision (<10% RSD) values that are comparable.

---

**Session:** LC/MS Sample Prep          **Code:** ThPJ     **Time Slot/Poster Number:** 220

☐ Remove this Abstract from my Schedule.

### Evaluation of Different Online Extraction Approach Combined with a LC-MS/MS System for Sample Analysis in Biological Fluids.

Chenier Dodard; Lynda Letarte*; Genevieve Plante; Erick Tessier; Rudolf Guilbaud
MDS Pharma Services, Montreal, Canada

**Novel Aspect:** Automated online extraction for high throughput samples analysis

**Introduction:**

Increased sample throughput has become a vital and necessary tool to adequately support drug development program. Online extraction technique provide a simple cost effective and reliable way for the quantification of compounds in biological fluids. Online extraction allow the combination of the sample preparation and the sample analysis on the LC-MS/MS system in a single step.

In this paper, we will compare 3 main approaches currently used in the pharmaceutical industry; turbulent flow chromatography using in house system (Switch valve) or an integrated system (Cohesive) and Prospekt. We will show results obtained for the analysis of different compounds and we will discuss the advantages and disadvantages of each technique.

**Methods:**

For all 3 techniques the plasma samples were treated using the same procedure. Plasma samples were diluted with the internal standard filtered and transfer directly into the injection vials for the analysis. Each validation run contained a standard curve and 4 levels of quality control samples in 6 replicates. The online extraction assays were evaluated in terms of precision, accuracy and reproducibility. On the other hand each technique were compared to evaluate the ruggedness, the carry-over, the throughput and the ease of use.

**Preliminary Data:**

The precision and accuracy was evaluated using 3 batches for the inter assay results and with a single batch of 192 samples for the intra results. Concentrations were determined by back calculation of their peak area ratios on a calibration curve. The variability observed in the results due to the use of online extraction is negligible. All QC levels results from between-batch and within batch in terms of precision and accuracy using the online extraction technique were better or were comparable to the conventional technique. The intra-batch precision and accuracy from the validation QC samples for all the tested drugs varies from 1.5% to 15.9% (%CV) and from 88.6% to 114.2% (%nominal) respectively. The between-batch precision and accuracy from the validation QC samples for all the tested drugs varies from 2.4% to 17.9% (%CV) and from 89.7% to 109.6% (%nominal) respectively. The Online approach reduced the overall analysis time without compromising the accuracy and precision. However ease of use, ruggedness, throughput and carry over is different on each technique. The comparison will clarify the advantages and the disadvantages of each technique.

QUESTMS-00002694

# Optimal Sensitivity and Increased Throughput Using a Dual TIS/APCI Ionization Source and TurboFlow® Chromatography with LC/MS/MS

Doina Caraiman[1], Tom Biesenthal[1], Nadia Pace[1], Shamim Haider[1], Takeo Sakuma[1], Lars Ynddal[2]
[1]Applied Biosystems/MDS Sciex, 71 Four Valley Drive, Concord, Ontario, Canada, L4K 4V8;
[2]Novo Nordisk A/S, Maaloev, Denmark

## ABSTRACT

A sensitive, selective and fast method was developed for the analysis of Testosterone and Warfarin in rat plasma from *in vivo* pharmacokinetic experiments. The instrumentation consisted of TurboFlow® Chromatography (TFC) coupled with an API 4000[TM] mass spectrometer equipped with a combined TIS (TurboIonSpray[TM]/APCI source. Total assay time is as short as 4.3 minutes including direct online injection of diluted plasma, HPLC separation and software-controlled switching of the ionization mode during the chromatographic run. For each compound the optimal ionization method was determined and set for the analytical run using the software. Limits of quantitation for Warfarin and Testosterone in rat plasma are comparable with LOQs obtained for neat standards using conventional ion sources and HPLC.

## INTRODUCTION

There is an ever increasing burden on analytical laboratories to make high sensitivity measurements, and to make them as quickly as possible. For the LC/MS analysis of compounds of widely differing polarities the demands are even higher since compounds in the same sample can often only be ionized optimally with the use of entirely different ionization sources (most commonly either electrospray ionization or atmospheric pressure chemical ionization (APCI)). This study illustrates the use of a combined TIS/APCI ionization source to combat this type of problem: as a software-selectable source, the ionization mode can be changed on the fly, allowing the user to choose the best ionization mode for each resolved compound in one analytical run. TurboFlow® Chromatography was used as a high-throughput method to eliminate the time-consuming sample preparation procedures for biological samples.

## MATERIALS AND METHODS

### Instrumentation
- API 4000[TM] equipped with a DuoSpray[TM] ion source (Figure 1)
- Cohesive® 2300 pump/valve interface module (Cohesive® Technologies, Franklin, MA, USA) and CTC PAL HTS autosampler (Cohesive® Technologies, Franklin, MA, USA) (Figure 2)

### Sample Preparation
- Calibration standards were prepared by mixing 200 µL of rat plasma with 200 µL of standard solutions in 10% methanol;
- Aliquots of 100 µL plasma samples from separate pharmacokinetic studies on rats for Testosterone and Warfarin were mixed and diluted with 200 µL 10% methanol;
- Calibrators and unknowns were centrifuged at 16,600 g for 15 minutes. The supernatant was transferred to 300 µL vials and loaded in the autosampler;

### Chromatografic Conditions
- Extraction Column: Cyclone[TM] HTLC (1.0 x 50 mm, 50 µm)
- Analytical column: Waters, C8 Nova Pak (4.6 x 20 mm, 4 µm)
- Mobile phase for loading pump and eluting pump
    A: Water (0.1% HCOOH) : Methanol (95:5 v/v)
    B: Water (0.1% HCOOH) : Methanol (5:95 v/v)
- Run time: 4.33 minutes
- Details for loading, transfer and eluting steps of the LC method: Figures 3-6



## Poster Number 075

**Figure 1. DuoSpray™ source for API-4000™ triple quadrupole mass spectrometer.**



TurboIonSpray™ (TIS) Inlet

APCI inlet

TurboIonSpray™ Heater

TurboIonSpray™ Probe

Corona Discharge Needle

The combined software-selectable TIS/APCI ionization system offers the ability to quickly switch between the TIS and APCI ionization techniques during a single chromatographic run. The best ionization technique can be chosen for each individual compound in a mixture of drugs with significantly different polarities.[1] Among the benefits offered are: increased sensitivity over a larger compound range, improved sample throughput and accelerated method development.

**Table 1. MS method**

| Period | Compound | Duration | Ionization Technique | Polarity | MRM transition |
|--------|----------|----------|---------------------|----------|----------------|
| 1 | Warfarin | 2.45 | TIS | negative | 307.1 → 161.0 |
| 2 | Testosterone | 1.55 | APCI | positive | 289.1 → 97.2 |

**Figure 2. Cohesive® 2300 System**



The Cohesive® system combines on-line sample preparation using TFC with analytical LC and has been successfully used for dextromethophan metabolite studies with direct injection of diluted rat plasma.[2]

Sample preparation for TFC is fast and much less labor intensive compared to the traditional off-line sample preparations such as liquid/liquid or solid phase extraction. The dual column configuration was used to improve sensitivity and selectivity of the assay.

**Figure 3. LC Methodology and Plumbing Diagram: Loading Step**



**Figure 4. LC Methodology and Plumbing Diagram: Transfer Step**



**Figure 5. LC Methodology and Plumbing Diagram: Eluting Step**

**Figure 6. LC Methodology and Plumbing Diagram: Valve switching and Equilibration**



AB Applied Biosystems

QUESTMS-00002696

Poster Number 075

# RESULTS

### Figure 7.  Warfarin and Testosterone in rat plasma - typical chromatogram



Switch ionization mode and polarity

Inject next sample

Warfarin

TIS negative

Testosterone

APCI positive

### Figure 8.  Warfarin and Testosterone in rat plasma - quantitation



|  | LOQ (fg on column) |
|---|---|
| Warfarin | 68 |
| Testosterone | 630 |

### Table 2.  Warfarin in Plasma - Calibration

| Expected concentration ng/mL | Mean calculated concentration ng/mL (n=5) | Standard Deviation | Precision C.V. (%) | Accuracy (%) |
|---|---|---|---|---|
| 0.05 | 0.049 | 0.004 | 9.12 | 97.26 |
| 0.10 | 0.106 | 0.002 | 2.09 | 106.44 |
| 0.50 | 0.480 | 0.009 | 1.90 | 96.02 |
| 5.00 | 5.014 | 0.067 | 1.33 | 100.27 |
| 10.00 | 10.001 | 0.043 | 0.43 | 100.01 |

### Figure 9.  Warfarin in rat plasma Calibration Curve



### Figure 10.  Testosterone in rat plasma Calibration Curve

### Table 3.  Testosterone in plasma - Calibration

| Expected concentration ng/mL | Mean calculated concentration ng/mL (n=5) | Standard Deviation | Precision C.V. (%) | Accuracy (%) |
|---|---|---|---|---|
| 1 | 0.908 | 0.074 | 8.13 | 90.82 |
| 2 | 1.904 | 0.095 | 4.99 | 95.22 |
| 10 | 9.768 | 0.218 | 2.23 | 97.68 |
| 100 | 108.241 | 1.588 | 1.47 | 108.24 |
| 200 | 219.841 | 3.847 | 1.75 | 109.92 |
| 1000 | 990.004 | 16.427 | 1.66 | 99.00 |
| 2000 | 1982.333 | 9.445 | 0.48 | 99.12 |


Applied Biosystems

QUESTMS-00002697

Poster Number 075

**Figure 11. Pharmacokinetic study:**
**Warfarin i.v. 0.1 mg/kg and p.o. 0.2 mg/kg**



**Figure 12.  Pharmacokinetic study:**
**Testosterone i.v. 5 mg/kg and p.o. 10 mg/kg**



## CONCLUSIONS

Fast TIS/APCI switching allows TIS and APCI ionization for Warfarin and Testosterone, respectively in one single acquisition run. Switching the ionization mode and the polarity are performed so that the two peaks situated at less than 0.3 min apart in a chromatographic run can be baseline separated in two different periods.

Cohesive® 2300 TurboFlow® Chromatography system was used to reduce the sample preparation time for rat plasma samples from in vivo pharmacokinetic studies. Dual column focusing mode was used for optimum sensitivity.

A high-throughput method combining the advantages of using the dual ion source in combination with HTLC was developed for analysis of Warfarin and Testosterone from *in vivo* pharmacokinetic studies. Quantitation limits comparable with results for neat standards analyzed with conventional HPLC and ion sources, good precision (C.V. < 10%) and accuracy were obtained.

## REFERENCES

1. Haider, S., Alary, J.-F, Kovarik, P. and Covey, T.,  poster at the Montreux Conference, Montreux, Nov. 2002.
2. Ynddal, L. and Hansen, S. H., accepted to J. Chromatography, 2003.

## ACKNOWLEDGEMENTS

Many thanks to Cohesive Technologies for the loan of the Cohesive 2300 system and to Francois Espourteille and Sarah Vannozzi from Cohesive Technologies for useful discussions.

## TRADEMARKS/LICENSING

TurbolonSpray, and API 4000 are trademarks owned by Applera Corporation or its subsidiaries in the United States and certain other countries and DuoSpray™ is a trademark owned by Applied Biosystems/MDS Sciex instruments. Applied Biosystems and AB are trademarks of the Applera Corporation. MDS Sciex is a trademark of MDS Inc. Cohesive Technologies is a registered trademark of Cohesive Technologies Inc. HTLC is a trademark of Cohesive Technologies Inc.



QUESTMS-00002698

Steroids 75 (2010) 169–175



Contents lists available at ScienceDirect

# Steroids

journal homepage: www.elsevier.com/locate/steroids



# Validation of a total testosterone assay using high-turbulence liquid chromatography tandem mass spectrometry: Total and free testosterone reference ranges

Wael A. Salameh, Mildred M. Redor-Goldman, Nigel J. Clarke, Richard E. Reitz, Michael P. Caulfield*

*Department of Endocrinology and Metabolism, Quest Diagnostics Nichols Institute, 33608 Ortega Highway, San Juan Capistrano, CA 92690, United States*

## ARTICLE INFO

*Article history:*
Received 12 June 2009
Received in revised form 2 October 2009
Accepted 9 November 2009
Available online 17 November 2009

*Keywords:*
Testosterone
High-turbulence liquid chromatography
tandem mass spectrometry (HTLC–MS/MS)
Male hypogonadism
Congenital adrenal hyperplasia (CAH)
Premature or delayed pubertyl
Polycystic ovary syndrome (PCOS)

## ABSTRACT

Accurate measurement of testosterone concentration is of critical importance when diagnosing and treating male hypogonadism, congenital adrenal hyperplasia, premature or delayed puberty, and androgen excess in polycystic ovary syndrome or other virilizing conditions. However, some assays have inherent limitations and biases that affect measurement of low-testosterone values. Therefore, we developed a highly specific online mass spectrometry method. Sera were extracted online using high-turbulence flow liquid chromatography coupled to analytical HPLC and atmospheric pressure chemical ionization tandem mass spectrometry (HTLC–APCI-MS/MS). Analyte ions were monitored by multiple reaction monitoring (MRM). Total analysis time was 1.15 min per sample when using the multiplexing system. Testosterone concentrations were measured directly from 150 µL of serum or plasma without derivatization or liquid–liquid extraction. The lower limit of quantification was 0.3 ng/dL, and the assay was linear up to 2000 ng/dL. The method compared very well with an established RIA: $y = 1.02x + 1.5$, $r^2 = 0.994$. Comparison with a platform immunoassay confirmed the previously reported ICMA positive bias at low concentrations. Male and female adult and pediatric reference ranges were developed for this very sensitive and accurate high-throughput LC–MS/MS method. This method is suitable for measuring the expected low-testosterone concentrations seen in women, children, and hypogonadal males and for monitoring testosterone suppressive therapy in prostate cancer patients.

© 2009 Elsevier Inc. All rights reserved.

## 1. Introduction

The importance of accurate total testosterone (TT) measurements, especially of low concentrations, has been the subject of much discussion in the literature [1–15]. Accurate measurements are particularly critical in five clinical scenarios: (1) detection of the initial rise in testosterone at the onset of puberty [16,17]; (2) diagnosis of polycystic ovary syndrome (PCOS), the most common endocrinopathy in women of reproductive age [18–20]; (3) diagnosis of hypoandrogenism in surgically induced menopause [5,8,21,22]; (4) diagnosis of mild hypogonadism or waning testosterone concentrations in aging males [23,24]; and (5) dose titration of GnRH analogues used to achieve medical castration in men with prostate cancer [25–27].

Prior to mass spectrometry and over the past 30 years, the accurate measurement of testosterone and other steroids for clinical diagnostic purposes has required use of methods involving organic extraction, column chromatography, and radioimmunoassay (RIA).

The specificity of these reference methods relies on completeness of the separation of closely related steroids in the chromatography step and the specificity of the primary antibody employed. Their availability is now limited to a few reference laboratories owing to development of platform immunoassay methods. Although seen as easy and rapid means of measuring TT concentrations, a growing body of literature unequivocally demonstrates that platform immunoassays lack the accuracy essential for the above clinical scenarios [1,2,4–9].

Recently, the Endocrine Society has issued a position statement [15] detailing the limitation of TT platform immunoassys and recommending use of either extraction chromatography RIA or tandem mass spectrometry methods when TT concentration is expected to be low as in the scenarios described above. LC–MS/MS has several advantages relative to extraction chromatography RIA. The liquid chromatography step lends itself to automation, and MS/MS has an obvious advantage in accuracy and specificity over immunoassays. Accuracy is gained through use of internal standards that are stable isotopes of the same compound being measured, giving accurate corrections for procedural losses. MS/MS provides increased specificity owing to its ability to select for the mass of the compound of interest (parent ion) and to fragment the

* Corresponding author. Tel.: +1 949 728 4427; fax: +1 949 728 4872.
*E-mail address:* michael.p.caulfield@questdiagnostics.com (M.P. Caulfield).

0039-128X/$ – see front matter © 2009 Elsevier Inc. All rights reserved.
doi:10.1016/j.steroids.2009.11.004

QUESTMS-00002699

170 *W.A. Salameh et al. / Steroids 75 (2010) 169–175*

parent ion into specific, smaller ions (daughter ions). Selecting one or more specific daughter ion(s) permits positive identification of the compound being measured. On the other hand, quality of available RIA methods is highly dependent on the affinity and specificity of the antibody used. Because of these limitations, the LC–MS/MS is rapidly becoming the preferred reference method for measurement of steroids and other small molecules.

Following improvements in the sensitivity and robustness of MS/MS that have occurred in recent years, we undertook development of a highly sensitive and accurate LC–MS/MS method for measuring TT over a wide dynamic range. Our intent was to address the inaccurate low concentrations that result from the platform assays. We report herein the total testosterone HTLC–MS/MS method validation, comparisons with RIA, an immunoassay platform assay, and determination of new normal TT reference ranges for both children and adults. Furthermore, we report development of new normal reference ranges for free testosterone (equilibrium dialysis method), since the accuracy of free testosterone (FT) concentrations derived from equilibrium dialysis is entirely dependent on accuracy of the TT measurement.

## 2. Materials and methods

### 2.1. Subjects

Serum samples were collected from 499 apparently normal volunteers age 8–90 years at Quest Diagnostics Nichols Institute for reference range determinations. Tanner staging was performed by self-reporting. Informed consent and IRB approval was obtained. Anonymized remnant sera, submitted for routine laboratory testing, was also used in the study.

### 2.2. Reagents

Testosterone was purchased from Sigma–Aldrich Inc. (St. Louis, MO). Testosterone-2,2,4,6,6-$d_5$ was purchased from CDN Isotopes (Quebec, Canada). Both of these had a Certificate of Analysis indicating ≥98% purity. 1,2 $^3$H-testosterone, specific activity 45 Ci/mmol was purchased from Perkin Elmer (Waltham, MA) and was repurified by chromatography every 2 months. Testosterone-free sera (double charcoal stripped, delipidated) was purchased form Golden West Biologicals (Temecula, CA) and was tested for the presence of detectable testosterone before use. All other chemicals were of reagent grade or better and were purchased from commercial sources.

### 2.3. Total testosterone by HTLC–MS/MS

The sample was prepared by acidifying 150 μL of serum or plasma with 10% formic acid to release testosterone from the binding proteins. The internal standard, prepared in deuterated methanol, was then added. After vigorous mixing, the samples were incubated at room temperature for 30 min prior to being placed in a refrigerated autosampler.

The Aria TX-4 HTLC (Cohesive Technologies Inc.; Franklin, MA; part of Thermo Fisher Scientific) injected the prepared sample onto an extraction column at high flow rate. This created turbulence inside the column, which allowed testosterone to bind to the large particles of the extraction column, while protein and other debris freely flowed through and were discarded. The flow was then reversed and slowed, and testosterone was eluted and transferred to a reverse-phase C-12 analytical column (Synergi-Max RP® from Phenomenex, Torrance, California).

TT was quantitated using a Finnigan TSQ Quantum Ultra (ThermoFisher; San Jose, CA) tandem mass spectrometer. The tandem mass spectrometer permits the isolation of the parent compound

to within ±0.5 *m/z* within the first quadrople (Q₁). In the second quadrople (Q₂), the parent ion collides with an inert gas (argon) to generate daughter ions, and the appropriate daughter ion(s) are selected in the third quadrople (Q₃). Inclusion of deuterated testosterone ($d_5$-2,2,4,6,6-testosterone) as an internal standard (IS) enabled absolute quantitation of testosterone by correcting for procedural losses or ion suppression caused by matrix effects in the atmospheric pressure chemical ionization (APCI) process. Detection of two daughter ions for both the endogenous testosterone and the IS increased the specificity by permitting ion-ratioing to be employed, thereby reducing the risk of quantitating isobaric interfering substances.

Testosterone was detected in the positive ionization mode. The parent ions monitored were 289.1 and 294.2 *m/z*; daughter ions monitored were 109.1 and 97.1 *m/z* for testosterone and 113.1 and 100.1 *m/z* for $d_5$-testosterone, respectively.

TT was then quantitated against a standard curve, wherein the standards were processed in the same manner as the samples. Peak area ratio between testosterone and the internal standard was used for quantification.

The whole process of extraction, separation, and detection is automated and takes 4.5 min. With the use of the Aria TX-4 system, which consists of a series of four extraction and separation systems that work in concert, the analytical time on the MS/MS can be reduced from 4.5 min per sample to 1.15 min per sample.

### 2.4. Total testosterone by ICMA and RIA

TT was determined in male serum samples using Bayer Advia Centaur immunoassay (Siemens Healthcare Diagnostics, Tarrytown, NY). The Advia Centaur® testosterone assay measures T concentration up to 1500 ng/dL with an analytical sensitivity of 10 ng/dL.

TT was determined in female and pediatric serum samples using an independently validated extraction/chromatography/RIA method (Quest Diagnostics Nichols Institute, San Juan Capistrano, CA). This assay employed 0.5 mL of serum to which a trace amount of tritiated testosterone was added to permit correction for procedural losses. The serum was first extracted with a cocktail of ethyl acetate and hexane, and the organic phase was collected. This was then added to a Celite column, and, after washing with different organic mixtures, the testosterone was eluted and collected in a 15% ethyl acetate/iso-octane solution. The eluted testosterone solution was then dried and reconstituted in RIA buffer. A portion was removed and used to determine recovery of the tracer. A second aliquot was then assayed in an RIA to obtain the TT concentration. This concentration was corrected for procedural losses. The limit of quantitation is 2 ng/dL at 20% coefficient of variation (CV), and the assay is linear to 1800 ng/dL. Linearity is extended by extraction of smaller volumes for samples with a concentration >200 ng/dL. The intra-assay CV is 11.8% at 2.5 ng/dL, while the inter-assay CV is 17.0%.

### 2.5. Sex hormone binding globulin (SHBG) and albumin

SHBG was determined using an automated immunoassay (IMMULITE® 2000 SHBG) on the IMMULITE instrument (Siemens; Los Angeles, CA). The IMMULITE SHBG assay was selected for use in the calculation of free and bioavailable testosterone after an internal comparison of five commercial assays and an in-house RIA.

Albumin was determined using an automated bromocresol green dye-binding assay (Albumin/BCG) on the Hitachi 917 (Boehringer Mannheim; Indianapolis, IN).

*W.A. Salameh et al. / Steroids 75 (2010) 169–175*

### 2.6. Free testosterone (tracer equilibrium dialysis)

Samples were diluted 1:5 in a physiologic (pH 7.5) salt buffer containing NaCl (90.0 mM), L-glutamic acid (3.8 mM), KCl (3.0 mM), $KH_2PO_4$ (1.3 mM), $MgSO_4$ (1.0 mM), urea (5.0 mM), DL-sodium lactate (9.0 mM), $CaCl_2$ (2.5 mM), gelatin (0.05%, w/v), HEPES (52 mM), antimycotic solution (1%, v/v), gentamycin sulfate (0.2%, v/v), $NaN_3$ (7.7 mM), and tritiated testosterone.

The diluted sample was placed on the sample side of the dialysis chamber, and the same physiological salt buffer without tracer was placed on the other (buffer) side. The chamber was incubated for 20 h at 37 °C to allow the tracer to reach equilibrium with the endogenous testosterone and binding proteins. Following incubation, a sample from each side of the membrane was removed, and the amount of tracer present in each was determined. Using the ratio of the radioactivity present (dpm) on the sample side vs. buffer side, combined with the TT that was determined by one of the methods outlined above, the percent free testosterone was calculated using the Vermeulen formula.

Dialysis was performed in a custom-made chamber. The blocks contain $10 \times 10$ chambers, each of which is divided equally into two by the dialysis membrane. Each side of the chamber holds a volume greater than 0.5 mL. The free testosterone assay by dialysis was validated using this chamber. Inter-assay variation (CV) for the $^3$H-testosterone ratios (as described above) was 4.3% and 11.3% at ratios of 8.12 (high free testosterone, male sera) and 0.97 (low free testosterone, third trimester sera), respectively.

### 2.7. Free and bioavailable (calculation)

Free testosterone and bioavailable (free plus albumin-bound) testosterone were calculated from the concentrations of TT, SHBG, and albumin present in each sample. We used a modification of the Sodergard formula, adjusted for the number of SHBG binding sites. The Sodergard [28] and Vermeulen [29,30] formulas are similar except for their estimation of the affinity constants of $T$ to both SHBG and albumin. We used the same association constants in both formulas. The formula used is:

$$[FT] = \frac{[T] - (N[FT])}{K_t\{B[SHBG] - [T] + N[FT]\}}$$

where $K_t$ is the association constant of $T$ for SHBG ($1 \times 10^9$ L/mol), $T$ = total testosterone, $B$ = number of binding sites per SHBG dimer, FT = free testosterone and $N = 1 + K_a[A]$ (where $K_a$ = association

constant of $T$ for albumin [$3.6 \times 10^4$ L/mol] and $A$ = albumin), testosterone and protein concentrations are in mol/L [29].

### 2.8. Statistics

Descriptive statistics, bias plots, and Demming regressions of testosterone and free testosterone were used.

### 2.9. Reference range modeling

The mean function was modeled by segmented regression with a sigmoidal curve (anti-logistic function) over the interval 0–25 and with linear functions over the intervals 25–40, 40–60, and 60+. The standard deviation function was estimated by segmented regression on the same family of functions with the absolute residuals as the dependent variable, the mean function was re-estimated by weighted regression. At each age, the gamma distribution was estimated from the mean and variance functions by the method of moments. The uncertainty bands for the 95% confidence bands were derived from a scaled chi-square distribution for the sum of the squared weighted residuals. The choice of intervals, the identification of outliers, and the choice of a gamma distribution in place of a normal distribution were based on examination of residual plots and other standard output.

## 3. Results

### 3.1. Total testosterone by HTLC–MS/MS

The ion chromatograms of the 0.6 ng/dL testosterone standard and the IS are shown in Fig. 1, Panels A and B, respectively. A typical standard curve is shown in Fig. 1, Panel C. The standard curve is quadratic in nature and weighted $1/x$. It contains 12 points with concentrations ranging from 2 to 2000 ng/dL. The fit of the curve typically gives a $r^2$ >0.999. The sensitivity of the assay (LOQ), set at a CV of ≤20%, was 0.3 ng/dL (Fig. 2). Table 1 lists the intra-assay and inter-assay reproducibility and accuracy data for four levels of controls. The CV for all reproducibility data was <15% and ranged from 7.6% to 10.8% for intra-assay and 9.8% to 13.4% for inter-assay.

Assay linearity was tested by dilution studies using samples with a known high concentration of testosterone. These samples were diluted with testosterone-free sera. The observed concentration was used to assess recovery. Over a wide range of dilutions (1:2 to 1:10), the mean recovery (observed over expected) was



Fig. 1. Chromatograms with a 1.15-min collection window: (A) testosterone (0.6 ng/dL); (B) internal standard; (C) calibration curve including 12 data points from 2 to 2000 ng/dL.

**Table 1**
Total testosterone by HTLC–MS/MS intra- and inter-assay variation.

| Testosterone (ng/dL) | Intra-assay | | | | Inter-assay | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean (ng/dL) | CV (%) | N | Accuracy (%) | Mean (ng/dL) | CV (%) | N | Accuracy (%) |
| 10 | 10 | 7.6 | 10 | 100 | 10 | 9.8 | 50 | 97 |
| 50 | 44 | 10.7 | 10 | 88 | 52 | 13.4 | 50 | 104 |
| 250 | 219 | 10.8 | 10 | 88 | 254 | 11.0 | 50 | 102 |
| 1200 | 1126 | 9.1 | 10 | 94 | 1218 | 12.6 | 50 | 102 |

Quality control samples (spiked stripped sera) were measured 10 times in five different assays. A single set of 10 replicates at each level was used to generate the intra-assay data. The combined data from the five assays were used to generate the inter-assay data.



**Fig. 2.** Testosterone assay limit of quantitation (LOQ). Each sample was assayed in duplicate on five separate occasions. The inter-assay coefficient of variation at 0.3 ng/mL was 14.9% (n = 10), while at 0.6 ng/mL it was 11.5%.

88.5–112.2%. There were no trends over the concentration range of the assay (data not shown).

Samples with low and high-testosterone concentrations were mixed in various proportions and then assayed to assess recovery and matrix effects. The overall mean recovery was 98.2% (range 92.1–107.2%, data not shown).

The cross-reactivity between testosterone and 100 ng/dL of 34 different steroids was assessed to determine the specificity of the method. Steroids that have the same mass as testosterone (e.g., DHEA, estriol, epitestosterone) and derivatives of testosterone were included in the assessment. None of the tested compounds showed any interference with the measurement of testosterone.

### 3.2. Correlation of TT by HTLC–MS/MS with RIA and a platform immunoassay method

Fig. 3A shows the correlation between results obtained with the MS/MS and the RIA across the entire reference range. Fig. 3B shows the correlation observed with low concentrations (i.e., <45 ng/dL), covering the normal female reference range. Correlation was good

at the lower concentrations as well as across the entire range: slope = 1.03, $r^2$ = 0.945 across all concentrations and slope = 1.006, $r^2$ = 0.988 for the lower concentrations. Since low concentrations are of particular importance when evaluating females and prepubertal boys, we performed another correlation between MS/MS and the automated TT assay with samples from women, peripubertal children, and adolescents. Fig. 4A shows the comparison for values <40 ng/dL. In addition, we compared values ranging from 100 to 500 ng/dL of TT to assess correlation in the range relevant to a diagnosis of male hypogonadism (Fig. 4B).

### 3.3. Free and bioavailable testosterone

To test the hypothesis that multiplying dimeric SHBG values by 2 correctly adjusts for the fact that each measured dimer has 2 binding sites, we compared the values of FT obtained by calculation using either one or two binding sites for SHBG dimers (data not shown) with FT concentrations measured by dialysis. The linear regression of these comparisons (N = 161, range 0.6–177 pg/mL) gave a slope, intercept and $r^2$ of: 1.51, 1.38, 0.98 and 1.02, 0.16 and 0.98 for one and two binding sites per SHBG dimer, respectively. These data clearly demonstrate that when the number of SHBG dimer binding sites for testosterone is increased to two, the calculated and dialyzed free testosterone concentrations are almost identical.

### 3.4. Reference ranges

Reference range determination was performed using 235 female and 264 male normal volunteers aged 8–90 years. Included individuals had normal AST, ALT, and WBC and were apparently healthy, non-medicated, ambulatory, community-dwelling. Excluded individuals either failed to satisfy the inclusion criteria or had a history of steroid use or endocrine related disease.

Reference ranges for TT (Table 2) and FT (Table 3) were determined for both children and adults. The TT pediatric reference ranges were stratified chronologically as well as by pubertal stage




**Fig. 3.** Correlation of testosterone concentrations derived from RIA and HTLC–MS/MS across the normal reference range (Panel A) and for low concentrations (Panel B).

QUESTMS-00002702

W.A. Salameh et al. / Steroids 75 (2010) 169–175

173




Fig. 4. Bias plots of testosterone values derived from an analogue assay and HTLC–MS/MS in the 0–40 ng/dL range (Panel A) and the 100–500 ng/dL range (Panel B).

**Table 2**
Reference ranges for total testosterone by HTLC–MS/MS.

| Age or Tanner stage | Males (ng/dL) | Females (ng/dL) |
|---|---|---|
| 1–5.9 years | 5 or less | 8 or less |
| 6–7.9 years | 25 or less | 20 or less |
| 8–10.9 years | 42 or less | 35 or less |
| 11–11.9 years | 260 or less | 40 or less |
| 12–13.9 years | 420 or less | 40 or less |
| 14–17.9 years | 1000 or less | 40 or less |
| Tanner stage 1 | 5 or less | 8 or less |
| Tanner stage 2 | 167 or less | 24 or less |
| Tanner stage 3 | 21–719 | 28 or less |
| Tanner stage 4 | 25–912 | 31 or less |
| Tanner stage 5 | 110–975 | 33 or less |
| 18–29 years | 250–1200 | 1–44 |
| 30–39 years | 250–1045 | 4–39 |
| 40–49 years | 230–1030 | 4–34 |
| 50–59 years | 250–1020 | 3–48 |
| 60–69 years | 225–1045 | 2–42 |
| 70–79 years | 120–840 | 2–38 |
| 80–89 years | 65–720 | 2–38 |
| 18–69 years | 250–1100 | 2–45 |
| 70–89 years | 90–890 | 2–40 |

(Tanner stage). Adults were grouped by decade to document the expected decline in TT concentration with age. An overall range was also determined for males and females aged 18–69 years. As expected and previously reviewed [31], there is a statistically significant decline in concentrations observed in the older male population, most notably after age 60. Concentrations in females, on the other hand, remain fairly constant throughout adulthood. Fig. 5A shows the mean TT in males throughout the life span (8–90 years) and the associated 95% confidence intervals. Fig. 5B shows the same for FT.

**Table 3**
Reference ranges for free testosterone by equilibrium dialysis.

| Age (years) | Males (pg/mL) | Females (pg/mL) |
|---|---|---|
| 5–9 | 5.3 or less | 0.2–5.0 |
| 10–13 | 0.7–52 | 0.1–7.4 |
| 14–17 | 18–111 | 0.5–3.9 |
| 18–29 | 42–160 | 0.2–6.3 |
| 30–39 | 31–160 | 0.2–6.3 |
| 40–49 | 35–122 | 0.2–6.2 |
| 50–59 | 30–147 | 0.2–6.6 |
| 60–69 | 40–145 | 0.2–6.5 |
| 70–79 | 39–148 | 0.1–3.9 |
| 80–89 | 20–127 | 0.4–3.5 |
| 18–69 | 35–155 | 0.1–6.4 |
| 70–89 | 30–135 | 0.2–3.7 |




Fig. 5. Curve fitted reference ranges for males from ages 8 to 90 years for total testosterone (Panel A) and free testosterone (Panel B). The mean is shown as the single solid line between the upper and lower triads. The 95% confidence bands were derived by robust weighted adapted non-linear regression. Identified outliers omitted from model fitting are plotted as black open circles. The gamma theory confidence limits (upper and lower triads, solid and broken lines) are plotted with their 95% confidence limits plotted as dashed lines. For ages less than 20 years, log of age is computed, and the rescaled log of age is plotted.

## 4. Discussion

Recently, there is a growing clinical concern that reported testosterone concentrations, specifically in individuals with low concentrations, are erroneous and do not reflect the true physiologic or clinical status of the individual. The advent of automated immunoassay systems, which are now utilized in most laboratories across the nation, provided analytical tools whose accuracy is limited to high-TT concentrations [2,5–9]. This phenomenon was confirmed in this study, which adds to the number of reports

demonstrating the over- or underestimation of TT measured by other automated immunoassays relative to either extraction/chromatography/RIA or mass spectrometry methods [2,5–9]. Conversely, the extraction/chromatography/RIA method is accurate at both high and low-TT concentrations. However, only a few reference laboratories still offer this type of assay because it is labor intensive and requires special handling of radioactive material. Additionally, the RIA is prone, at least theoretically, to potential interference from cross-reacting steroids.

To overcome these shortfalls, we have developed an HTLC–MS/MS method that is fast, efficient, and suitable for analyzing large numbers of samples and that provides an accurate and specific determination of TT. The use of the HTLC system was chosen because it permits online extraction of samples and negates the need for off-line extraction and/or derivitization. Testosterone is released from its binding proteins, and the sample is then passed through the turbulent flow column. The bound testosterone is eluted at a low flow rate by reversing the direction of flow and introducing a "slug" of an organic solvent from a loop located close to the extraction column. The released testosterone is then transferred at a slow flow rate to an analytical HPLC column. Testosterone separates from other compounds on the analytical column via an organic gradient and is detected in the tandem mass spectrometer. One cycle of injection, extraction, separation, detection, and re-equilibration of both columns can be accomplished in less than 5 min. By using up to four systems in concert, depending on the analysis time required by the mass spectrometer, TT concentration can be quantified in as little as 1.15 min thereby quadrupling the throughput.

Our HTLC–MS/MS is accurate and precise over a linear range of 0.3–2000 ng/dL. This precludes the necessity of extracting multiple sample volumes as is required when measuring a broad range of TT concentrations in other methods. In addition, sample volumes as low as $50 \mu L$ can be analyzed without off-line extraction and without dilution, simplifying the testing of pediatric samples.

To ensure that the values obtained using the HTLC–MS/MS method relate accurately to the clinical situation, new reference ranges were determined for TT as well as for free and bioavailable testosterone, which rely on TT for their calculation.

As with TT there are concerns that FT measurements made by different methods, including analog-based, generate different results [32]. Reports by others [33] have stated that the Vermeulen and Sodergard calculations may overestimate the free hormone concentration and that assumption-free, empirically derived formulas are more accurate in estimating FT values. One possible explanation for this observation is the long held assumption in the community and acceptance in the design of the mass action equation that 1 mol of SHBG homodimer binds to 1 mol of testosterone with a binding site at the dimerization interface [34]. This assumption has been challenged by recent crystallographic [35] and site-directed mutagenesis studies that clearly show the dimerization and steroid binding domains of SHBG are distinct [36]. Furthermore, dimerization-deficient SHBG variants show that each monomer binds testosterone with equal affinity and specificity. The authors conclude that the measurement of molar concentration of SHBG has been overestimated by 2-fold [36]. In the mass action equation, the assumption should then be that 0.5 mol of dimeric SHBG binds 1 mol of testosterone. This means that dimeric SHBG concentrations should be multiplied by 2 to account for the ability of homodimers to bind 2 testosterone molecules. Correlation between the calculated FT and FT by dialysis with or without a correction factor of 2 for SHBG concentration shows a comparable $r^2$ of >0.98, but the slope and intercept without correction were 1.5 and 1.38, respectively, indicating overestimation of free testosterone values. After correction for two binding sites per SHBG dimer the slope and intercept were 1.02 and 0.16,

respectively. Similar results were obtained at low FT concentrations.

A word of caution needs to be given for physicians or others who use Internet-based FT calculators. They need to be aware that the formulas used on the internet do not all use the same TT association constants and most likely use a single testosterone binding site per SHBG molecule. In addition, the assay used and form of SHBG measured, whether dimeric or monomeric, need to be known. We went to great lengths to identify an accurate SHBG assay for which we knew the form of SHBG being measured. All of these factors can contribute to different FT concentrations when calculated via an Intenet program.

The concentrations of testosterone measured in males from pre-puberty to >70 years of age showed the expected distribution, i.e., low concentrations in prepuberty, rising through adolescence and the second decade, and declining after the sixties. The 250 ng/dL lower limit of our normal range in males (18–60 years) is slightly lower than the most quoted cutoff of 320 ng/dL [31]. This is probably related to lack of interference in the LC–MS/MS assay from other androgenic metabolites and avoidance of the positive bias introduced by most antibody-based assays. It is noteworthy that while we are reporting a substantial decline in testosterone concentration in the elderly population, this observed reference range should not be construed as "normal." In a recent report of the Endocrine Society's guidelines for treatment of hypogonadism, experts failed to agree on a threshold for initiation of therapy [37]. There is, however, consensus that values between 200 and 300 ng/dL measured on more than one occasion and associated with symptoms of hypogonadism in the elderly male should prompt for counseling on the risk/benefits of androgen therapy. An outcome-based reference range interval in males based on the Framingham cohort using LC–MS/MS methodology is forthcoming. Harmonization of testosterone measurements across laboratories and methods will allow adoption of a universal outcome-based reference range.

As expected, females had low concentrations throughout the age groups. These concentrations were lower than previously reported, presumably a reflection of the improved accuracy of this new method. Our reference ranges for females suffer from the fact that the population studied is "normal" by self-report. It is conceivable that the population might be "contaminated" by women with mild PCOS. The high prevalence of this condition in the general population made us seek an independent validation of the female reference range in clinically well-characterized normal and PCOS individuals. The results of these studies with the recommended cutoffs for diagnosis of PCOS will be published separately.

The availability of a TT assay with accurate low-end sensitivity will permit better clinical decisions to be made in the detection and diagnosis of the five conditions noted previously; detection of the initial rise in testosterone at the onset of puberty [16,17]; diagnosis of PCOS, future studies will help elucidate cutoff values; diagnosis of hypoandrogenism in surgically induced menopause; diagnosis of mild hypogonadism or waning testosterone concentrations in aging males; dose titration of GnRH analogues used to achieve medical castration in men with prostate cancer.

The high sensitivity of our assay has important ramifications for situations in which complete blockade of androgen production is desirable such as the last condition listed above. The determination of complete suppression is limited by the sensitivity and accuracy of the assay. An attractive hypothesis is that assays with very high sensitivity may allow for further suppression of testosterone leading to added intraprostatic testosterone reduction.

In conclusion, we have developed a sensitive and accurate HTLC–MS/MS assay for total testosterone measurement that requires small sample volume and improved analysis of samples with low concentrations. Our method requires minimal labor and offers rapid throughput. The newly established total, free, and

W.A. Salameh et al. / Steroids 75 (2010) 169–175

175

bioavailable reference ranges for children and adults, along with the forthcoming studies in well-characterized females, should permit better clinical evaluation of patients for precocious puberty, PCOS, hypogonadism, hirsutism, and other androgen-related disorders as well as better assessment of testosterone suppression in men with prostate cancer.

## Acknowledgements

Funding for this study was provided by Quest Diagnostcics Inc. We would like to thank Souchin Chen and Patricia M. Vendely, Quest Diagnostics Nichols Institute, for help in the preparation of this manuscript.

## References

[1] Cawood ML, Field HP, Ford CG, Gillingwater S, Kicman A, Cowan D, et al. Testosterone measurement by isotope-dilution liquid chromatography–tandem mass spectrometry: validation of a method for routine clinical practice. Clin Chem 2005;51:1472–9.

[2] Wang C, Catlin DH, Demers LM, Starcevic B, Swerdloff RS. Measurement of total serum testosterone in adult men: comparison of current laboratory methods versus liquid chromatography–tandem mass spectrometry. J Clin Endocrinol Metab 2004;89:534–43.

[3] Holownia P, Conway GS, Shrivastava U, Round J, Honour JW. A clinical evaluation of a direct radioimmunoassay of testosterone. Clin Chim Acta 1993;214:31–43.

[4] Wheeler MJ. Measurement of androgens. Methods Mol Biol 2006;324:197–211.

[5] Stanczyk FZ. Measurement of androgens in women. Semin Reprod Med 2006;24:78–85.

[6] Chang YC, Li CM, Long SB, Liao PC, Chang LW. Quantitative measurement of male steroid hormones using automated on-line solid phase extraction–liquid chromatography–tandem mass spectrometry and comparison with radioimmunoassay. Analyst 2003;128:363–8.

[7] Matsumoto AM, Bremner WJ. Serum testosterone assays—accuracy matters. J Clin Endocrinol Metab 2004;89:520–4.

[8] Herold DA, Fitzgerald RL. Immunoassays for testosterone in women: better than a guess? Clin Chem 2003;49:1250–1.

[9] Taieb J, Mathian B, Millot F, Patricot M-C, Mathieu E, Queyrel N, et al. Testosterone measured by 10 immunoassays and by isotope-dilution gas chromatography–mass spectrometry in sera from 116 men, women, and children. Clin Chem 2003;49:1381–95.

[10] Fitzgerald RL, Herold DA. Serum total testosterone: immunoassay compared with negative chemical ionization gas chromatography–mass spectrometry. Clin Chem 1996;42:749–55.

[11] Sikaris K, McLachlan RI, Kazlauskas R, deKretser D, Holden CA, Handelsman DJ. Reproductive hormone reference intervals for healthy fertile young men: evaluation of automated platform assays. J Clin Endocrinol Metab 2005;90:5928–36.

[12] Goncharov N, Katsya G, Dobracheva A, Nizhnik A, Kolesnikova G, Todua T, et al. Serum testosterone measurement in men: evaluation of modern immunoassay technologies. Aging Male 2005;8:194–202.

[13] Kushnir MM, Rockwood AL, Roberts WL, Pattison EG, Bunker AM, Fitzgerald RL, et al. Performance characteristics of a novel tandem mass spectrometry assay for serum testosterone. Clin Chem 2006;52:120–8.

[14] Starcevic B, DiStefano E, Wang C, Catlin DH. Liquid chromatography–tandem mass spectrometry assay for human serum testosterone and trideuterated testosterone. J Chromatogr B: Analyt Technol Biomed Life Sci 2003;792:197–204.

[15] Rosner W, Auchus RJ, Azziz R, Sluss PM, Raff H. Position statement: utility, limitations, and pitfalls in measuring testosterone: an Endocrine Society position statement. J Clin Endocrinol Metab 2007;92:405–13.

[16] Ankarberg C, Norjavaara E. Diurnal rhythm of testosterone secretion before and throughout puberty in healthy girls: correlation with 17beta-estradiol and dehydroepiandrosterone sulfate. J Clin Endocrinol Metab 1999;84:975–84.

[17] Albertsson-Wikland K, Rosberg S, Lannering B, Dunkel L, Selstam G, Norjavaara E. Twenty-four-hour profiles of luteinizing hormone, follicle-stimulating hormone, testosterone, and estradiol levels: a semilongitudinal study throughout puberty in healthy boys. J Clin Endocrinol Metab 1997;82:541–9.

[18] Azziz R, Carmina E, Dewailly D, Diamanti-Kandarakis E, Escobar-Morreale HF, Futterweit W, et al. Positions statement: criteria for defining polycystic ovary syndrome as a predominantly hyperandrogenic syndrome: an Androgen Excess Society guideline. J Clin Endocrinol Metab 2006;91:4237–45.

[19] Revised 2003 consensus on diagnostic criteria and long-term health risks related to polycystic ovary syndrome. Fertil Steril 2004;81:19–25.

[20] Ehrmann DA, Rosenfield RL, Barnes RB, Brigell DF, Sheikh Z. Detection of functional ovarian hyperandrogenism in women with androgen excess. N Engl J Med 1992;327:157–62.

[21] The role of testosterone therapy in postmenopausal women: position statement of The North American Menopause Society. Menopause 2005;12:496–511.

[22] Miller KK, Rosner W, Lee H, Hier J, Sesmilo G, Schoenfeld D, et al. Measurement of free testosterone in normal women and women with androgen deficiency: comparison of methods. J Clin Endocrinol Metab 2004;89:525–33.

[23] Bhasin S, Wu F. Making a diagnosis of androgen deficiency in adult men: what to do until all the facts are in? Nat Clin Pract Endocrinol Metab 2006;2:529.

[24] Romanelli F, Latini M. The laboratory assessment of partial androgen deficiency of the aging male. J Endocrinol Invest 2005;28:39–42.

[25] Debruyne FM. Gonadotropin-releasing hormone antagonist in the management of prostate cancer. Rev Urol 2004;6:S25–32.

[26] Page ST, Lin DW, Mostaghel EA, Hess DL, True LD, Amory JK, et al. Persistent intraprostatic androgen concentrations after medical castration in healthy men. J Clin Endocrinol Metab 2006;91:3850–6.

[27] Weckermann D, Harzmann R. Hormone therapy in prostate cancer: LHRH antagonists versus LHRH analogues. Eur Urol 2004;46:279–83.

[28] Sodergard R, Backstrom T, Shanbhag V, Carstensen H. Calculation of free and bound fractions of testosterone and estradiol-17 beta to human plasma proteins at body temperature. J Steroid Biochem 1982;16:801–10.

[29] Vermeulen A, Verdonck L, Kaufman JM. A critical evaluation of simple methods for the estimation of free testosterone in serum. J Clin Endocrinol Metab 1999;84:3666–72.

[30] Vermeulen A, Stoica T, Verdonck L. The apparent free testosterone concentration, an index of androgenicity. J Clin Endocrinol Metab 1971;33:759–67.

[31] Kaufman JM, Vermeulen A. The decline of androgen levels in elderly men and its clinical and therapeutic implications. Endocrinol Rev 2005;26:833–76.

[32] Rosner W. Letters to the Editor: errors in the measurement of plasma free testosterone. J Clin Endocrinol Metab 1997;82:2014–5.

[33] Ly LP, Handelsman DJ. Empirical estimation of free testosterone from testosterone and sex hormone-binding globulin immunoassays. Eur J Endocrinol 2005;152:471–8.

[34] Bocchinfuso WP, Hammond GL. Steroid-binding and dimerization domains of human sex hormone-binding globulin partially overlap: steroids and Ca$^{2+}$ stabilize dimer formation. Biochemistry 1994;33:10622–9.

[35] Grishkovskaya I, Avvakumov GV, Sklenar G, Dales D, Hammond GL, Muller YA. Crystal structure of human sex hormone-binding globulin: steroid transport by a laminin G-like domain. EMBO J 2000;19:504–12.

[36] Avvakumov GV, Grishkovskaya I, Muller YA, Hammond GL. Resolution of the human sex hormone-binding globulin dimer interface and evidence for two steroid-binding sites per homodimer. J Biol Chem 2001;276:34453–7.

[37] Bhasin S, Cunningham GR, Hayes FJ, Matsumoto AM, Snyder PJ, Swerdloff RS, et al. Testosterone therapy in adult men with androgen deficiency syndromes: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 2006;91:1995–2010.

QUESTMS-00002705



**ELSEVIER**

Journal of Chromatography A, 854 (1999) 23–35

**JOURNAL OF CHROMATOGRAPHY A**

# Comparison of turbulent-flow chromatography with automated solid-phase extraction in 96-well plates and liquid–liquid extraction used as plasma sample preparation techniques for liquid chromatography–tandem mass spectrometry

Dieter Zimmer*, Volker Pickard, Waldemar Czembor, Christoph Müller

*Bayer AG, Preclinical Pharmacokinetics, PF 101709, 42096 Wuppertal, Germany*

## Abstract

Turbulent flow chromatography (TFC) combined with the high selectivity and sensitivity of tandem mass spectrometry (MS–MS) is a new technique for the fast direct analysis of drugs from crude plasma. TFC in the 96-well plate format reduces significantly the time required for sample clean-up in the laboratory. For example, for 100 samples the workload for a technician is reduced from about 8 h by a manual liquid–liquid extraction (LLE) assay to about 1 h in the case of TFC. Sample clean-up and analysis are performed on-line on the same column. Similar chromatographic performance and validation results were achieved using HTLC Turbo-$C_{18}$ columns (Cohesive Technologies) and Oasis HLB extraction columns (Waters). One 96-well plate with 96 plasma samples is analyzed within 5.25 h, corresponding to 3.3 min per sample. Compared to this LLE and analysis of 96 samples takes about 16 h. Two structurally different and highly protein bound compounds, drug A and drug B, were analyzed under identical TFC conditions and the assays were fully validated for the application to toxicokinetics studies (compliant with Good Laboratory Practices – GLP). The limit of quantitation was 1.00 μg/l and the linear working range covered three orders of magnitude for both drugs. In the case of drug A the quality of analysis by TFC was similar to the reference LLE assay and slightly better than automated solid-phase extraction in 96-well plates. The accuracy was −3.1 to 6.7% and the precision was 3.1 to 6.8% in the case of drug A determined for dog plasma by TFC–MS–MS. For drug B the accuracy was −3.7 to 3.5% and the precision was 1.6 to 5.4% for rat plasma, which is even slightly better than what was achieved with the validated protein precipitation assay.   © 1999 Elsevier Science B.V. All rights reserved.

*Keywords:* Turbulent flow chromatography; Sample preparation; Validation; Pharmaceutical analysis

## 1. Introduction

Liquid chromatography interfaced to tandem mass spectrometry (LC–MS–MS) using atmospheric pressure chemical ionization (APCI) or electrospray ionization (ESI) in its high-flow version (TurboIonspray) has led to a breakthrough in sensitivity, selectivity and speed of bioanalysis in the pharma-

ceutical industry. Due to the high selectivity of MS–MS, sample run times of less than 5 min (mostly 2 to 3 min) are typically achieved which gives rise to sample throughputs of 150–200 samples during overnight runs. Sample preparation became clearly the rate-limiting step in bioanalysis. In pharmacokinetics plasma samples are prepared using liquid–liquid extraction (LLE), solid-phase extraction (SPE) (manually or on robotics), protein precipitation or different approaches for direct injection of

*Corresponding author.

0021-9673/99/$ – see front matter   © 1999 Elsevier Science B.V. All rights reserved.
PII: S0021-9673(99)00535-X

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 111 of 437 PageID #: 2500

crude plasma onto suitable sample extraction columns by column switching. For the latter approach the LiChrospher RP-18 ADS column (Merck) had been used in our laboratory for the determination of Azlocillin and its metabolites [1]. The analysis time was too long (6 min per sample) since 4 min were required to get rid of the plasma constituents followed by 2 min analysis on an analytical column.

The analysis time can be significantly reduced when chromatography is performed under turbulent flow conditions in open tubular columns [2].

Turbulent flow chromatography (TFC) in packed columns was recently introduced by Quinn and Takarewski from Cohesive Technologies (Franklin, MA, USA) in 1997 [3] as a fast method for direct injection of crude plasma onto special columns packed with 50 μm spherical porous particles. These columns serve as extraction and analytical column at the same time, total analysis time is about 2 min with high flow-rates of e.g., 4 to 6 ml/min on a 1 mm I.D. column. While such high flow-rates are far outside the usual optimum conditions (reduced plate height, $h$, about 2) for laminar flow conditions, a second optimum of the Van Deemter curve was found [3] under turbulent flow conditions. Thus the chromatographic efficiency with turbulent flow at high flow-rates is similar to laminar flow at the commonly used much lower flow-rates. Under turbulent flow conditions a fast and efficient separation of the small drug from the large plasma proteins is thus achieved even in case of 99% protein bound drugs (see below). Proteins are eluted as a sharp peak within 0.5 min using a pure water or buffer mobile phase, meanwhile the drug is retained on e.g., $C_2$, $C_8$, $C_{18}$ or phenyl chains inside the pores of the particles. The high flow-rate and the plug profile solvent front allow for very steep changes in the mobile phase composition from 100% water to e.g., 90% acetonitrile within typically 5 s which causes the drug(s) and internal standard(s) to elute in a sharp peak.

The suitability of TFC–MS–MS for the analysis of plasma samples was recently reported by Ayrton et al. [4]. They used a standard HP1090 liquid chromatograph for TFC and showed a brief validation for an isoquinoline drug. Other high-throughput sample preparation techniques are based on automatized SPE in the 96- or 384-well microplate format using pipetting robots [5] followed by off-line per-

formed LC–MS–MS analysis of the extracts. We applied this technique to drug A before the introduction of TFC to our laboratory. The control of the vacuum and the evaporation of the extracts were critical and limiting factors.

This report describes fully validated assays which had been applied to toxicokinetics studies [Good Laboratory Practices (GLP)] with two of our development compounds, drug A and drug B which are highly protein bound. Some physiochemical parameters of drugs A and B are given in Table 1. The structures cannot be disclosed for commercial reasons.

## 2. Experimental

### 2.1. Chemicals

Drugs A and B are development compounds of Bayer (Leverkusen, Germany).

Ammonium acetate was supplied by Merck (Darmstadt, Germany), acetonitrile (gradient grade), formic acid (analytical-reagent grade) and water (gradient grade) were obtained from Riedel-de Haen (Seelze, Germany).

### 2.2. Historic assays before the introduction of TFC

Since the main focus of this paper lies on TFC the formerly used techniques are not outlined in detail here. Before the introduction of TFC drugs A and B were analyzed in our laboratory using different (validated) approaches for sample preparation. In case of drug A two assays were in use before: (1) manual LLE of 0.2 ml plasma using a mixture of ethyl acetate–$n$-heptane (70:30, v/v) followed by reconstitution of the dry extract in 0.2 ml mobile

Table 1
Brief physiochemical characterization of drugs A and B

|  | Drug A | Drug B |
|---|---|---|
| Salt (form) | No (Betaine) | HCl |
| Water solubility | Insoluble ($<10^{-6}$ g/l) | 35 g/l |
| Protein binding | 99.8% | 94–95% |
| $f_u$ | 0.2% | 5–6% |
| Log $P$ (octanol–water) | 6.3 | 2.9 |

QUESTMS-00002707

phase yielding a limit of quantitation (LOQ) of 0.100 μg/l and (2) automated SPE on a Packard Multiprobe 104 liquid handler (Packard, Meriden, CT, USA) using 96-well extraction plates filled with Waters Oasis (30 mg) or Whatman-C$_{18}$ (100 mg). The extract was not evaporated giving an end volume of 1 ml and a LOQ of 1.00 μg/l. One 96-well plate was processed within 60 min. The general procedure of 96-well plate SPE on a Packard Multiprobe liquid handler was earlier described in Ref. [5]. Sample analysis was performed by LC–MS–MS using either APCI or TurboIonspray.

For drug B a simple manual protein precipitation out of 0.2 ml plasma with 1.00 ml acetonitrile was done followed by evaporation of the supernatant and reconstitution in 0.300 ml mobile phase. Analysis was performed by TurboIonspray-MS–MS with an LOQ of 0.500 μg/l.

### 2.3. Preparation of stock and working solutions of the analytes and internal standards

Two stock solutions denoted A and B were prepared for drug A by dissolving duplicate weighings of 10 mg of the authentic analyte reference standard in 10 ml of acetonitrile. Dilutions of the stock were made with acetonitrile in order to yield working solutions which were used for the preparation of calibration samples and quality control samples. The stock solution of the internal standard [$^2$H$_2^{15}$N]drug A was prepared by dissolving 10 mg in 10 ml of acetonitrile. This solution was further diluted in acetonitrile to working solutions which were used to prepare an internal standard (I.S.) spiking plasma pool. The concentration of the I.S. in the spiking plasma pool was 300 μg/l.

Two stock solutions denoted A and B were prepared for drug B by dissolving duplicate weighings of 10.7 mg of the authentic analyte reference standard (hydrochloride) in 10 ml of a mixture of methanol–water (80:20). Dilutions of the stock were made with the same mixture in order to yield working solutions which were used for the preparation of calibration samples and quality control samples. The stock solution of the internal standard [$^2$H$_5$]drug B was prepared by dissolving 10 mg in 10 ml of methanol–water (80:20). This solution was further diluted in the same mixture to working

solutions which were used to prepare an I.S. spiking plasma pool.

All stock and working solutions were stored in the refrigerator at about 5°C for no longer than eight weeks. The I.S. spiking plasma pools were freshly prepared on each analysis day.

### 2.4. Preparation of calibration and validation samples and validation

Calibration samples were prepared freshly in duplicates always on the day of sample analysis by spiking control rat or dog plasma with 10 μl of working solutions containing the analyte in appropriate concentration. In case of drug A the concentrations of the calibration samples were 1.00, 2.00, 10.0, 100, 1000 and 2500 μg/l while for drug B samples were prepared at 0.500, 1.00, 2.50, 5.00, 25.0, 50.0, 250, 500, 1000 and 2500 μg/l.

For pre-study validation two independent sets of validation samples were prepared on two days by spiking control rat or dog plasma, each set consisting of four concentration levels with six replicates at each level. For drug A the four levels were 5.00, 50.0, 500 and 1500 μg/l and for drug B they were 2.00, 10.0, 100 and 1000 μg/l. The samples were run independently on two validation days together with calibration samples in duplicates and four blanks.

In case of drug A one set of validation samples was run twice on the same day: the first run was performed on the HTLC Turbo-C$_{18}$ column, the second run on the Waters Oasis HLB column.

### 2.5. Cross validation

Since TFC is a new technique and chromatographic retention times are very short the assay was checked for its selectivity regarding possible interferences from drug metabolites, drug formulation, sample matrix and other sources inherent to real study samples. Therefore study samples which had been analyzed previously using the fully validated historic reference assays were reanalyzed by TFC. For example in case of drug A 42 study samples obtained from three Beagle dogs, taken at time points 5, 10, 15, 20, 30, 45 min, 1, 1.5, 2, 3, 5, 7, 9 and 24 h after a single oral administration of 0.3

QUESTMS-00002708

*D. Zimmer et al. / J. Chromatogr. A 854 (1999) 23–35*

mg/kg which were originally analyzed by the reference LLE assay were re-analyzed by TFC–MS–MS. These study samples and the corresponding quality control samples were stored for four months at $-20°C$ between the first analysis and the re-analysis by TFC.

## 2.6. Sample preparation for TFC

Sample preparation has been minimized to centrifugation, I.S. addition and aliquotation into a 96-well plate (or HPLC vial). Centrifugation is essential in order to protect the column from particles which might cause early plugging.

Large plasma volumes like e.g., plasma pools used for the preparation of calibration and validation samples were centrifuged in a Beckman centrifuge type GS-6R at 3700 $g$ for 10 min. Study samples and quality control samples (typically stored in Eppendorf vessels) were centrifuged in an Eppendorf 5415 centrifuge at 17 500 $g$ for 10 min. In the case of drug A, after centrifugation of the plasma an aliquot (150 µl) was transferred to a 96-well plate and mixed with a 20-µl aliquot of the I.S. spiking plasma pool (resulting I.S. concentration in the sample 35.3 µg/l).

In the case of drug B, 0.100 ml plasma was mixed with 50 µl of the I.S. spiking plasma pool (resulting I.S. concentration in sample 1667 µg/l).

## 2.7. Waters Oasis HLB column ruggedness test

One hundred and sixty eight injections with an injection volume of 25 µl of rat plasma, consisting of six blanks and plasma samples spiked at 1.00 µg/l (LOQ) (118 samples) and 10.0 µg/l (44 samples) with drug A and with the stable-isotope-labeled drug as I.S. were made onto a Waters Oasis HLB column. The peak height of the analyte and of the I.S. was evaluated regarding the relative standard deviation (RSD).

The ruggedness of the HTLC Turbo-$C_{18}$ columns was proven during the numerous validation runs with both drugs.

## 2.8. Instrumentation and chromatographic conditions for TFC

TFC was performed using a 2300 HTLC System

(Cohesive Technologies) which is a modified HP 1100 modular liquid chromatograph (Hewlett-Packard, Palo Alto, CA, USA) consisting of an isocratic pump for clean-up and flush of liquid lines, a binary pump for elution of retained analytes and a valve switching module with two Rheodyne six-port valves. The autosampler was a CTC HTS PAL (CTC Analytics, Zingen, Switzerland) equipped with a 100-µl injection syringe. The 2300 HTLC system was controlled by the 2300 HTLC V 1.4.1 software from Cohesive Technologies.

Either the 50×1.0 mm HTLC Turbo-$C_{18}$ columns (Cohesive Technologies) packed with 50 µm porous particles or the 50×1.0 mm Waters Oasis HLB extraction columns (Waters, Milford, MA, USA) filled with 30 µm particles were used. These columns serve as extraction and analytical column at the same time, hence no other (analytical) column is needed. Identical chromatographic conditions were applied to both types of columns and to all compounds reported here. Furthermore in the meantime these conditions were applied after minor modifications to other drugs and drug candidates hence they appear to be generic.

In the first load and clean-up step (duration 60 s) 20 µl of the crude plasma sample were injected onto the column, the mobile phase delivered by the isocratic pump at 4.0 ml/min was buffer (2 m$M$ aqueous ammonium acetate, pH 6.8). The proteins were flushed to the waste while the small molecules were retained on the $C_{18}$ chains inside the porous particles. During this step the binary pump delivered acetonitrile–2 m$M$ ammonium acetate (pH 6.8; 10:90) at a flow-rate of 1.5 ml/min to the mass spectrometer. In the second step (duration 30 s) the valves were switched and the isocratic pump flushed the tubings and valves with buffer at a flow-rate of 6.0 ml/min to waste, while elution of the retained analytes (and I.S.) was performed in forward-flush with the binary pump at a flow-rate of 1.5 ml/min by increasing the acetonitrile content in the mobile phase (buffer) within 5 s from zero to 95% which was held for 25 s. In the third flush step the valves were switched back to the initial position and the isocratic pump was re-connected to the column (forward) flushing the column and tubings at 4.0 ml/min with pure acetonitrile for 30 s while the binary pump was delivering mobile phase (acetonitrile–2 m$M$ ammonium acetate, pH 6.8,

QUESTMS-00002709

10:90) to the mass spectrometer. In the last step (duration 30 s) a re-equilibration of the column was performed with buffer at a flow-rate of 4.0 ml/min, while the binary pump was instantly pumping mobile phase to the mass spectrometer like in step 3. Thus the whole run time was 2.5 min per sample.

## 2.9. Mass spectrometry and data evaluation

Samples were analyzed by MS–MS using a Perkin-Elmer Sciex API 365 triple quadrupole tandem mass spectrometer (Concord, Canada). The liquid flow from the TFC column was directed either directly to the APCI interface (analysis of drug A) or after a 1:5 split to the TurboIonSpray interface (analysis of drug B). The mass spectrometer was operated in positive-ion multiple reaction monitoring (MRM) mode with key parameter settings given in Table 2.

Nitrogen 5.0 grade was used for the auxiliary gas, the nebulizer gas, the curtain gas and the collision gas. The required sensitivity was achieved by lens voltage tuning and by additionally reducing mass resolution of the quadrupoles to 1.0 u ($Q_1$) and 1.5 u ($Q_3$) peak width at half height. The API 365 was equipped with a so called "Autobox" (made to our order by Mr. Möller from Perkin-Elmer, Langen, Germany) with digital readouts for the ionization current (in $\mu A$), the interface temperature and with a solenoid switching valve for gas 2 (auxiliary). Two Apple MacIntosh Power PC 8500 computers were used, one for data acquisition and one for data processing. The peaks in the MRM traces were

integrated with the PE-Sciex MacQuan processing software version 1.5. Calibration and concentration calculations were done by the laboratory-written software [6]. The calibration curves were calculated from the peak area ratios of drug A and drug B to their corresponding internal standards using a $1/y^2$-weighted linear least-squares regression model.

## 3. Results and discussion

### 3.1. Mass spectra and chromatograms of drug A and the I.S.

The pseudo molecular ion $[M+H]^+$ of the analyte drug A was recorded at $m/z$ 532.3. After collisionally induced dissociation (CID) of $[M+H]^+$ the product ion spectrum shows two strong fragment ions at $m/z$ 299.2 and 209.2. These two key fragment ions were used to monitor drug A in MRM mode. Since the signal-to-noise ratio in plasma samples was better in favor of the ion at $m/z$ 299 this ion was used for quantitation (quantifier ion) whereas the ion at $m/z$ 209 was used as a qualifier ion for confirmation. The intensity ratio of the two MRM signals at $m/z$ 532.3/299.1 and at $m/z$ 532.3/209.1 is usually about 1:1 to 1:0.8 in pure standards as well as in spiked plasma samples or real samples, respectively, as seen in Fig. 1. In cases where the quantifier ion at $m/z$ 299 was superimposed by chemical noise the quantitation was done using the ion at $m/z$ 209.

An I.S. is usually required for precise and accurate quantitative determinations in bioanalysis. It should

Table 2
Key parameters for the analysis of drugs A and B by LC–MS–MS in positive-ion MRM mode on a PE Sciex API 365 instrument

| Analyte | Drug A | Drug B |
|---|---|---|
| Interface | APCI | TurboIonspray |
| Temperature | 500°C | 300°C |
| Ionization current/voltage | 3 $\mu A$ | 4800 V |
| Orifice potential | 48 V | 44 V |
| Ring potential | 270 V | 220 V |
| Collision energy | 44.5 eV | 51 eV |
| MRM quantifier ions $Q_1/Q_3$ | *m/z* 532.3/299.1 | *m/z* 489.3/168.8 |
| Dwell time | 700 ms | 500 ms |
| MRM qualifier ions $Q_1/Q_3$ | *m/z* 532.3/209.1 | *m/z* 489.3/312.1 |
| Dwell time | 200 ms | 500 ms |
| MRM ions for I.S. $Q_1/Q_3$ | *m/z* 535.3/209.1 | *m/z* 494.4/168.8 |
| Dwell time | 100 ms | 200 ms |

QUESTMS-00002710







Fig. 1. Drug A in a toxicity study sample 4 h after oral administration of 80 mg/kg to rats. Plasma concentration by TFC: 56.5 µg/l (reference assay: 58.5 µg/l). Monitored transitions: $m/z$ 532.3→299.1 (drug A, quantifier), $m/z$ 535.3→299.1 (I.S.) and $m/z$ 532.3→209.1 (drug A, qualifier). Time scale in min.

QUESTMS-00002711

D. Zimmer et al. / J. Chromatogr. A 854 (1999) 23–35

29





Fig. 2. Drug A: TFC–MS–MS chromatogram from the validation in dog plasma. Calibration sample at 1.00 µg/l (LOQ), HTLC Turbo-C$_{18}$ column. Monitored transitions: $m/z$ 532.3→299.1 (drug A) and $m/z$ 535.3→299.1 (I.S.). Time scale in min.

match the structure of the analyte as closely as possible. The ideal I.S. used in mass spectrometric quantitation either by LC–MS or GC–MS is the stable-isotope-labeled analyte. Amongst others the most important reason to use the isotope-labeled analyte is its coelution with the analyte thus compensating for ion suppression effects which are a common observation in LC–ESI–MS–MS. Two-fold deuterium- and in one position $^{15}$N-labeled drug A was used as I.S. ([$^2$H$_2^{15}$N]drug A). The fragmentation pattern is similar to that of the analyte and therefore the reaction $m/z$ 535.3/299.1 was used to monitor the I.S.

Quantitation was performed using the peak area (or height) ratios of drug A and the coeluting I.S. Typical chromatograms of a calibration sample at the LOQ (1.00 µg/l), and of a real study sample are shown in Figs. 1 and 2. The peak area (or height) ratios of drug A to the I.S. were linear from 1.00 (LOQ) to 2500 µg/l out of rat, dog and mouse plasma.

### 3.2. Mass spectra and chromatograms of drug B and the I.S.

The pseudo molecular ion [M+H]$^+$ of the analyte drug B was recorded at $m/z$ 489.3. After CID of [M+H]$^+$ the product ion spectrum shows two strong

QUESTMS-00002712

fragment ions at $m/z$ 312.1 and $m/z$ 168.8, respectively. These two key fragment ions were used to monitor drug B in the MRM mode. Since the signal-to-noise ratio in plasma samples was better in favor of the ion at $m/z$ 312.1 this ion was mainly used for quantitation whereas the ion at $m/z$ 168.8 was used as a qualifier ion for confirmation.

Five-fold deuterium-labeled drug B was used as I.S. The fragmentation pattern is similar to that of the analyte and the reaction $m/z$ 494.4/168.8 was used to monitor the I.S.

Quantitation is performed using the peak area (or height) ratios of drug B and the coeluting I.S. A typical chromatogram of a calibration sample at the LOQ (1.00 µg/l) is shown in Fig. 3. The peak area (or height) ratios of drug B to the I.S. were linear from 1.00 (LOQ) to 2500 µg/l out of rat plasma.

### 3.3. Drug A: Validation results

The validation results are given in Tables 3–6. Rat, mouse and dog plasma samples were analyzed on the HTLC Turbo-$C_{18}$ column (Tables 3–5). The dog plasma samples were additionally run on the Oasis HLB column as well (Table 6). Inter-assay accuracy of rat plasma was −1.2 to 11.0% and inter-assay precision was 2.1 to 8.2% (two validation days, three concentrations). In the case of mouse plasma accuracy was −5.1 to 4.5% and precision was 4.0 to 8.7% (one validation day, four concentrations). For dog plasma, inter-assay accuracy was −3.1 to 6.7% and inter-assay precision was 3.1 to 6.8% (two validation days, four concentrations) for the HTLC Turbo-$C_{18}$ column. In case of the Oasis HLB column the results were similar (one validation day, four concentrations), intra-assay accuracy was −5.2 to 3.8% and precision 2.8 to 4.6%. Peak shape and response were similar for both types of column, the slope of the calibration curve was 0.016 with the HTLC Turbo-$C_{18}$ column and 0.012/0.015 during the cross validation/validation using the Oasis HLB column (dog plasma in each case).

### 3.4. Comparison of TFC with automated 96-well SPE and manual LLE for drug A

Comparing the three different techniques for dog plasma one has to keep in mind that different plasma

volumes were used, consequently the LOQ was different. While in TFC only 25 µl of crude plasma was injected yielding an LOQ of 1.00 µg/l, in automated 96-well plate SPE and in LLE 0.2 ml plasma was worked up. In LLE no dilution was applied to the sample since 0.2 ml plasma were extracted into 0.2 ml sample solvent, while in SPE a dilution to 1 ml solvent was done, consequently the LOQ was 0.100 µg/l by LLE and 1.00 µg/l by SPE.

Regarding accuracy the best results were achieved by LLE (−3.7 to 4.4%), closely followed by TFC (−3.1 to 6.7%) and automated SPE (−4.1 to 10.6%). In terms of precision TFC and LLE were similar (3.1 to 6.8% and 3.1 to 5.1%) and automated SPE showed a precision of 5.1 to 5.5%. Therefore TFC compares well with LLE while automated SPE demonstrated slightly lower accuracy but still better than 15%.

The key advantage of TFC is clearly the significant reduction of working time needed in the laboratory for sample preparation and the reduction of total run time per sample. By the example of drug A, in the case of LLE 8 h were needed for sample preparation including labeling of extraction tubes and vials, whereas for TFC and automated SPE (both in 96-well plates) only 1 h was needed (without evaporation of extract in SPE). Automated SPE requires about 1 h to process a 96-well plate where only some minor intervention by the operator was needed (change of the extraction plate for the collection plate, supervision of vacuum). In total the whole duration of one batch (96 samples) consisting of sample preparation and analysis takes 5.25 h (TFC), 9 h (automated SPE) and 16 h (LLE). Thus the most efficient technique is TFC which has the additional advantage that it is on-line linked to the MS–MS analyzer hence saving additional time for manual sample transfer from the sample preparation laboratory to the MS laboratory.

### 3.5. Drug A: Cross validation results from real study samples

The re-analysis of 42 real study samples (dog, drug A, 0.3 mg/kg single oral dose) by TFC–MS–MS revealed very good agreement between the plasma concentrations measured by TFC–MS–MS and those measured earlier with the reference LLE–

QUESTMS-00002713

D. Zimmer et al. / J. Chromatogr. A 854 (1999) 23–35

31



Fig. 3. Drug B: TFC–MS–MS chromatogram from the validation in rat plasma. Calibration sample at 1.00 µg/l (LOQ), HTLC Turbo-$C_{18}$ column. Monitored transitions: $m/z$ 489.3→312.1 (drug B, qualifier), $m/z$ 494.4→168.8 (I.S.) and $m/z$ 489.3→168.8 (drug B, quantifier). Time scale in min.

LC–MS–MS assay (reference concentrations). The deviations of the data obtained by TFC–MS–MS from the reference concentrations were between −17.8 and 15.5% (Fig. 4). The mean of the deviations of 42 values was −1.84% with a RSD of 5.14% only. A similar cross validation was per-formed with 20 rat study samples. The deviations of the measured concentrations by TFC–MS–MS from the reference concentrations were between −4.89 and 15.4% (mean 7.77%). A chromatogram of a plasma sample obtained during a toxicity study in rats is shown in Fig. 1. The measured plasma

Table 3
Drug A: Validation of TFC assay on a HTLC Turbo-$C_{18}$ column by injection of 25 µl crude rat plasma

|  | Concentration (µg/l) | | | |
|---|---|---|---|---|
|  | 5.00 | 50.0 | 500 | 1.00 (LOQ) |
| $n$ | 12 | 12 | 12 | 8 |
| Student $t$ value, $p=95\%$ | 2.20 | 2.20 | 2.20 | 2.37 |
| Mean (µg/l) | 5.55 | 52.4 | 494 | 1.00 |
| SD (µg/l) | 0.187 | 4.27 | 10.5 | 0.025 |
| Precision (%) | 3.4 | 8.2 | 2.1 | 2.5 |
| Accuracy (%) | 11.0 | 4.7 | −1.2 | 0.4 |
| Upper limit of CI[a] (µg/l) | 5.67 | 55.1 | 500 | 1.03 |
| Lower limit of CI[a] (µg/l) | 5.43 | 49.7 | 487 | 0.983 |

[a] CI=Confidence interval.

concentration in this sample was 56.5 µg/l (TFC–MS–MS) or 58.5 µg/l (LLE–LC–MS–MS), respectively.

The good agreement between the concentrations measured by the two independent assays clearly demonstrates that there were no interferences from drug metabolites, drug formulation or endogenous plasma constituents, therefore the TFC–MS–MS assay is selective.

### 3.6. Drug B: Validation results

Drug B, although structurally completely different from drug A, was run under the TFC conditions of drug A using the HTLC Turbo-$C_{18}$ column as well as the Oasis HLB column. The results are given in

Table 5
Drug A: Validation of TFC assay on a HTLC Turbo-$C_{18}$ column by injection of 25 µl crude dog plasma

|  | Concentration (µg/l) | | | |
|---|---|---|---|---|
|  | 5.00 | 50.0 | 500 | 1.500 |
| $n$ | 12 | 12 | 12 | 12 |
| Student $t$ value, $p=95\%$ | 2.20 | 2.20 | 2.20 | 2.20 |
| Mean (µg/l) | 4.84 | 51.8 | 533 | 1456 |
| SD (µg/l) | 0.329 | 2.52 | 16.6 | 97.9 |
| Precision (%) | 6.8 | 4.9 | 3.1 | 6.7 |
| Accuracy (%) | −3.1 | 3.7 | 6.7 | −2.9 |
| Upper limit of CI[a] (µg/l) | 5.05 | 53.5 | 544 | 1518 |
| Lower limit of CI[a] (µg/l) | 4.63 | 50.2 | 523 | 1394 |

[a] CI=Confidence interval.

Table 6
Drug A: Combined of results obtained on a HTLC Turbo-$C_{18}$ column and on a Oasis HLB column by injection of 25 µl crude dog plasma

|  | Concentration (µg/l) | | | |
|---|---|---|---|---|
|  | 5.00 | 50.0 | 500 | 1.500 |
| $n$ | 11 | 12 | 12 | 12 |
| Student $t$ value, $p=95\%$ | 2.23 | 2.20 | 2.20 | 2.20 |
| Mean (µg/l) | 4.85 | 50.3 | 524 | 1458 |
| SD (µg/l) | 0.237 | 1.94 | 16.3 | 46.4 |
| Precision (%) | 4.9 | 3.9 | 3.1 | 3.2 |
| Accuracy (%) | −3.1 | 0.5 | 4.8 | −2.8 |
| Upper limit of CI[a] (µg/l) | 5.00 | 51.5 | 534 | 1487 |
| Lower limit of CI[a] (µg/l) | 4.68 | 49.0 | 513 | 1428 |

[a] CI=Confidence interval.

Table 4
Drug A: Validation of TFC assay on a HTLC Turbo-$C_{18}$ column by injection of 25 µl crude mouse plasma

|  | Concentration (µg/l) | | | | |
|---|---|---|---|---|---|
|  | 5.00 | 50.0 | 500 | 1.500 | 1.0 (LOQ) |
| $n$ | 12 | 12 | 12 | 12 | 16 |
| Student $t$ value, $p=95\%$ | 2.20 | 2.20 | 2.20 | 2.20 | 2.13 |
| Mean (µg/l) | 5.05 | 51.4 | 522 | 1437 | 0.957 |
| SD (µg/l) | 0.433 | 4.25 | 21.4 | 49.0 | 0.0712 |
| Precision (%) | 8.6 | 8.3 | 4.1 | 3.4 | 7.4 |
| Accuracy (%) | 1.0 | 2.8 | 4.4 | −4.2 | −4.3 |
| Upper limit of CI[a] (µg/l) | 5.33 | 54.1 | 536 | 1468 | 0.995 |
| Lower limit of CI[a] (µg/l) | 4.78 | 48.7 | 508 | 1406 | 0.919 |

[a] CI=Confidence interval.

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 120 of 437 PageID #: 2509



Fig. 4. Drug A: Cross Validation TFC versus LLE reference method with study samples after oral administration of 0.3 mg/kg to dogs. Deviation of concentration measured by TFC from results by LLE.

Tables 7 and 8. The results at four concentrations from crude rat plasma were similar for both types of columns except with poorer precision and accuracy for the Oasis near the LOQ (1.00 µg/l): accuracy 3.7 to 6.7%, near the LOQ −15.9% (Oasis) and −3.7 to

3.5% (Turbo-$C_{18}$), precision 0.8 to 9.1%, near the LOQ 20.6% (Oasis) and 1.6 to 5.4% (Turbo-$C_{18}$). A comparison of the TFC results with the reference assay shows good agreement between TFC and protein precipitation (Table 9). Accuracy and preci-

Table 7
Drug A: Validation of TFC assay on a HTLC Turbo-$C_{18}$ column by injection of 25 µl crude rat plasma

|  | Concentration (µg/l) | | | |
| --- | --- | --- | --- | --- |
|  | 2.00 | 10.0 | 100 | 1000 |
| $n$ | 3 | 6 | 6 | 6 |
| Student $t$ value, $p=95\%$ | 4.30 | 2.57 | 2.57 | 2.57 |
| Mean (µg/l) | 2.07 | 10.3 | 98.2 | 963 |
| SD (µg/l) | 0.111 | 0.323 | 1.93 | 14.9 |
| Precision (%) | 5.4 | 3.1 | 2.0 | 1.6 |
| Accuracy (%) | 3.5 | 2.9 | −1.8 | −3.7 |
| Upper limit of CI[a] (µg/l) | 2.35 | 10.6 | 100 | 978 |
| Lower limit of CI[a] (µg/l) | 1.79 | 9.95 | 96.1 | 947 |

[a] CI=Confidence interval.

Table 8
Drug B: Validation of TFC assay on a Oasis HLB column by injection of 25 µl crude rat plasma

|  | Concentration (µg/l) | | | |
| --- | --- | --- | --- | --- |
|  | 2.00 | 10.0 | 100 | 1000 |
| $n$ | 4 | 6 | 6 | 6 |
| Student $t$ value, $p=95\%$ | 3.18 | 2.57 | 2.57 | 2.57 |
| Mean (µg/l) | 1.68 | 10.6 | 107 | 1037 |
| SD (µg/l) | 0.347 | 0.962 | 2.34 | 8.73 |
| Precision (%) | 20.6 | 9.1 | 2.2 | 0.8 |
| Accuracy (%) | −15.9 | 6.3 | 6.7 | 3.7 |
| Upper limit of CI[a] (µg/l) | 2.23 | 11.6 | 109 | 1046 |
| Lower limit of CI[a] (µg/l) | 1.13 | 9.62 | 104 | 1028 |

[a] CI=Confidence interval.

QUESTMS-00002716

Table 9
Drug B: Comparison of validation data – TFC assay versus manual protein precipitation

| Nominal concentration (µg/l) | Drug B | Turbulent flow chromatography | | Reference, Protein precipitation |
|---|---|---|---|---|
| | | HTLC C$_{18}$ column | Oasis column | |
| 2.00 | Replicates ($n$) | 3 | 4 | 8 |
| | Precision (%) | 5.4 | 20.6 | 10.5 |
| | Accuracy (%) | 3.5 | −15.9 | 6.9 |
| 10.0 | Replicates ($n$) | 6 | 6 | 12 |
| | Precision (%) | 3.1 | 9.1 | 8.6 |
| | Accuracy (%) | 2.9 | 6.3 | 5.5 |
| 100 | Replicates ($n$) | 6 | 6 | 12 |
| | Precision (%) | 2.0 | 2.2 | 3.6 |
| | Accuracy (%) | −1.8 | 6.7 | 2.8 |
| 1000 | Replicates ($n$) | 6 | 6 | 12 |
| | Precision (%) | 1.6 | 0.8 | 3.9 |
| | Accuracy (%) | −3.7 | 3.7 | 0.0 |



Fig. 5. Ruggedness test on Oasis column (118 injections). Peak height of drug A (1.00 µg/l) in dog plasma analyzed by TFC–MS–MS.

sion were better than 10% except near the LOQ with the Oasis column, where accuracy was $-15.9\%$ and precision 20.6%.

### 3.7. Ruggedness and life-time of columns

A ruggedness test was performed with drug A on a Oasis HLB column (Fig. 5).

The ruggedness test with drug A demonstrated a low variability of the peak areas and heights. The peak height of drug A showed a RSD of 7.3% from 118 injections at 1.00 µg/l (LOQ) and a RSD of 9.0% from 44 injections at 10.0 µg/l. The peak height of the I.S. had a RSD of 8.5 and 9.5% calculated from the 1.00 µg/l and the 10.0 µg/l samples (in total 162 injections), respectively.

The columns lasted for about 400 to 600 injections of 25 µl of undiluted crude plasma.

## 4. Conclusions

TFC is a pioneering technique for the direct analysis of even highly protein bound drugs from crude plasma. TFC eliminates the need for time-consuming sample clean-up in the laboratory, instead of this one 96-well plate with 96 plasma samples is analyzed by TFC–MS–MS within 5.25 h, corresponding to 3.3 min per sample (which can be shortened by reduction of the autosampler duty cycle). Two structurally completely different compounds were analyzed under identical TFC conditions and one assay was fully validated for the application to GLP studies. With TFC even better validation results were achieved than with automated 96-well SPE and manual LLE.

The sensitivity of the assays with an LOQ of 1.00 µg/l and the linear working range of three- up to four-orders of magnitude fully met the demands of preclinical pharmacokinetic and toxicokinetic studies. The quality of analysis by TFC measured in terms of accuracy and precision compares well with the reference LLE assay. Similar chromatographic performance and validation results were achieved using original Turboflow columns (Cohesive Technologies) and the Oasis columns (Waters). TFC–MS–MS proved to be rugged and selective.

## Acknowledgements

The authors thank Dr. Pleiss and Dr. Seidel (Bayer AG, Department Metabolism and Isotope Chemistry, Wuppertal, Germany) for the synthesis of the stable isotope labeled internal standards.

## References

[1] D. Zimmer, W. Czembor, V. Pickard, 1996, unpublished results
[2] V. Pretorius, T. Smuts, Anal. Chem. 38 (1966) 274–280.
[3] H.M. Quinn, J.J. Takarewski, Int. Pat. WO 97/16724 (1997).
[4] J. Ayrton, G.J. Dear, W.J. Leavens, D.N. Mallett, R.S. Plumb, Rapid Commun. Mass Spectrom. 11 (1997) 1953–1958.
[5] J. Allanson, R.A. Biddlecombe, A.E. Jones, S. Pleasance, Rapid Commun. Mass Spectrom. 10 (1996) 811–816.
[6] Concalc Software version 1.23, Bayer, Wuppertal, Germany, 1995.

QUESTMS-00002718

0021-972X/97/$03.00/0
Journal of Clinical Endocrinology and Metabolism
Copyright © 1997 by The Endocrine Society

Vol. 82, No. 5
Printed in U.S.A.

# Determination of Testosterone Production Rates in Men and Women Using Stable Isotope/Dilution and Mass Spectrometry*

H. VIERHAPPER, P. NOWOTNY, AND W. WALDHÄUSL

*Clinical Division of Endocrinology and Metabolism, Clinic for Internal Medicine III, A-1090 Wien, Austria*

## ABSTRACT

Production rates of testosterone were determined in healthy men and women during the follicular phase of their menstrual cycle using the stable isotope dilution technique and analysis by gas chromatography/mass spectrometry. In an initial series of experiments, 0.07 mg/h (men) or 0.01 mg/h (women) 1,2-$d$-testosterone was infused for 36 h. After an equilibration period of 12 h, blood samples were obtained at 20-min intervals throughout 24 h. In men, no diurnal rhythmicity of testosterone production was observed, whereas in women, testosterone production rates were largest from 0400–1200 h. In a second series of experiments, the infused dose of 1,2-$d$-testosterone was reduced to 0.015 mg/h (men) and 0.0001 mg/h (women), respec-

tively. Blood samples were obtained at 20-min intervals during the last 12 h (0800–2000 h) of the observation period. In accordance with results obtained by others using radioactive tracers, estimated production rates were $147 \pm 31$ $\mu$g/h ($3.7 \pm 2.2$ mg/day in men) and $1.8 \pm 0.6$ $\mu$g/h ($0.4 \pm 0.1$ mg/day in women). To reduce both the duration of the experiment and the number of samples to be processed, we subsequently demonstrated that similar production rates may be obtained when the equilibration period before blood sampling is reduced to 6 h and the period of blood sampling is reduced to 4 h. This protocol is suitable for clinical use in a routine setting to obtain analytically correct estimates of testosterone production *in vivo*. (*J Clin Endocrinol Metab* **82:** 1492–1496, 1997)

G AS CHROMATOGRAPHY/MASS spectrometry (GC/MS) and stable isotope-labeled analogs of testosterone are used to determine concentrations (1–3) and MCRs of testosterone and its conversion rates into its main metabolic products (4–6). This technique is superior to the use of radioactive tracers, both analytically (7) and ethically. In the present series of experiments we used infusions of deuterium-labeled testosterone and analysis by GC/MS to determine the production rates of testosterone in healthy men and women and to establish a protocol suitable for clinical use in patients with potentially abnormal testosterone production rates.

## Materials and Methods

### Experimental protocol

Twelve healthy nonobese men, aged 22–34 yr, and 10 healthy nonobese women, aged 19–32 yr (in the follicular phase of the menstrual cycle), who had been carefully informed about the aims and the possible risks of the study gave their written consent to participate in 1 or several parts of this investigation. On the day of the experiments, an indwelling catheter was inserted into an antecubital vein, and 1,2-$d$-testosterone (in 500 mL 0.9% saline also containing 2 mL of the individual's own blood) was infused iv and continuously (Infusomat, Braun-Melsungen, Germany) until the end of the respective experimental protocol. At the beginning and end of each infusion, a sample of the infusate was obtained from the end of the infusion line to permit correction of losses

Received November 19, 1996. Revision received January 30, 1997. Accepted February 13, 1997.
Address all correspondence and requests for reprints to: H. Vierhapper, M.D., Clinical Division of Endocrinology and Metabolism, University Clinic for Internal Medicine III, Wahringer Gurtel 18–20, A-1090 Wien, Austria.
* This work was supported by Grant 4628 from the Jubiläumsfonds der Österreichischen Nationalbank.

by adsorption and determination of actual infusion rates by GC/MS analysis. After an equilibration period of 12 h (Exp 1 and 2) or 6 h (Exp 3), a second indwelling catheter was inserted into the contralateral arm, and blood samples (5 mL) were obtained at 20-min intervals until the end of the respective experimental protocol. Blood samples were subsequently pooled for periods of 4 h. In addition, one sample was pooled for the entire period of blood sampling (24, 12, or 4 h, respectively).

### Exp 1

Six healthy men and five healthy women participated in this protocol. The infusion of 1,2-$d$-testosterone was started at 0800 h (13 mL/h) to provide a theoretical infusion rate of 0.2 mg/h (men) or 0.04 mg/h (women), respectively. However, due to losses by adsorption, mean actual infusion rates during this protocol were only 0.07 mg/h (men) and 0.01 mg/h (women). Starting at 2000 h, blood samples (5.0 mL) were obtained at 20-min intervals for the next 24 h.

### Exp 2

Seven healthy men and seven healthy women participated in this protocol. The infusion of 1,2-$d$-testosterone (20 mL/h) was started at 2000 h to provide a theoretical infusion rate of 0.02 mg/h (men) or 0.0004 mg/h (women). However, due to losses by adsorption, mean actual infusion rates during this protocol were only 0.015 mg/h in six of the seven men. The seventh male volunteer received only one tenth of this dose, *i.e.* 0.0015 mg/h. In five of the seven healthy women, the mean actual infusion rate was 0.0001 mg/h. The remaining two women received an approximately 7-fold smaller dose (17 and 14 ng/h, respectively). Starting at 0800 h on the following morning, blood samples were obtained at 20-min intervals for the next 12 h.

### Exp 3

The five healthy men and five healthy women participating in this protocol had been part of Exp 2. The infusion of 1,2-$d$-testosterone (40 mL/h) was started at 0800 h with the attempted infusion rates as in Exp 2 (men, 0.02 mg/h; women, 0.0004 mg/h). Starting at 1400 h, blood samples were obtained at 20-min intervals for one 4-h period.

QUESTMS-00002719

**TABLE 1A.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T (2000–2000 h) in six healthy men

**Exp 1**

Infusion rate of 1, 2-$d$-T (36 h; 13 mL/h):
 Theoretical: 0.2 mg/h
 Actual: 0.07 mg/h (mean), equivalent to 168 $\mu$g/24 h

|  | 1 | 2 | 3 | 4 | 5 | 6 | Mean ± SD |
|---|---|---|---|---|---|---|---|
| 2000–2400 h |  |  |  |  |  |  |  |
| T (ng/mL) | 3.74 | 3.74 | 2.63 | 4.08 | 5.19 | 7.70 | 4.51 ± 1.76 |
| PR T ($\mu$g/h) | 232 | 47 | 84 | 105 | 63 | 72 | 101 ± 67 |
| 0000–0400 h |  |  |  |  |  |  |  |
| T (ng/mL) | 4.59 | 3.04 | 2.89 | 4.15 | 4.51 | 6.69 | 4.31 ± 1.37 |
| PR T ($\mu$g/h) | 130 | 51 | 84 | 71 | 63 | 61 | 76 ± 28 |
| 0400–0800 h |  |  |  |  |  |  |  |
| T (ng/mL) | 3.84 | 3.91 | 5.42 | 5.53 | 3.72 | 6.72 | 4.86 ± 1.22 |
| PR T ($\mu$g/h) | 89 | 51 | 95 | 76 | 63 | 69 | 74 ± 16 |
| 0800–1200 h |  |  |  |  |  |  |  |
| T (ng/mL) | 3.90 | 2.48 | 4.71 | 4.63 | 3.48 | 3.92 | 3.85 ± 0.82 |
| PR T ($\mu$g/h) | 111 | 42 | 108 | 71 | 62 | 55 | 75 ± 28 |
| 1200–1600 h |  |  |  |  |  |  |  |
| T (ng/mL) | 4.05 | 2.45 | 3.20 | 2.23 | 3.95 | 4.24 | 3.35 ± 0.86 |
| PR T ($\mu$g/h) | 114 | 43 | 83 | 95 | 50 | 54 | 73 ± 28 |
| 1600–2000 h |  |  |  |  |  |  |  |
| T (ng/mL) | 3.01 | 2.23 | 3.22 | 2.99 | 3.35 | 3.51 | 3.05 ± 0.45 |
| PR T ($\mu$g/h) | 88 | 40 | 99 | 62 | 43 | 49 | 64 ± 25 |
| 2000–2000 h (mean values calculated from above figures) |  |  |  |  |  |  |  |
| T (ng/mL) | 3.86 | 2.98 | 3.67 | 3.94 | 4.03 | 5.46 | 3.99 ± 0.81 |
| PR T ($\mu$g/h) | 127 | 46 | 92 | 80 | 57 | 60 | 77 ± 30 |
| 2000–2000 h (estimated from additional sample by GC-MS analysis) |  |  |  |  |  |  |  |
| T (ng/mL) | 3.80 | 2.95 | 3.72 | 3.95 | 3.97 | 5.36 | 3.96 ± 0.78 |
| PR T ($\mu$g/h) | 119 | 50 | 97 | 80 | 58 | 60 | 77 ± 33 |

**TABLE 1B.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T in seven healthy men

**Exp 2**

Infusion rate of 1, 2-$d$-T (24 h; 20 mL/h):
 Theoretical: 0.02 mg/h
 Actual: 0.015 mg/h (mean of subjects 1–6; subject 7, 0.0015 mg/h)

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean ± SD |
|---|---|---|---|---|---|---|---|---|
| 0800–1200 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 7.81 | 6.81 | 6.19 | 9.21 | 5.84 | 5.87 | 13.93 | 7.96 ± 2.90 |
| PR T ($\mu$g/h) | 149 | 115 | 161 | 329 | 56 | 266 | 76 | 165 ± 100 |
| 1200–1600 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 9.71 | 6.94 | 7.45 | 9.59 | 8.07 | 3.98 | 12.86 | 8.37 ± 2.76 |
| PR T ($\mu$g/h) | 91 | 108 | 164 | 247 | 72 | 336 | 63 | 154 ± 39 |
| 1600–2000 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 9.55 | 6.81 | 5.55 | 4.85 | 10.79 | 5.62 | 9.66 | 7.54 ± 2.40 |
| PR T ($\mu$g/h) | 95 | 92 | 160 | 188 | 86 | 328 | 67 | 145 ± 92 |
| 0800–2000 h (mean values calculated from above figures) |  |  |  |  |  |  |  |  |
| T (ng/mL) | 9.02 | 6.85 | 6.40 | 7.88 | 8.23 | 5.16 | 12.15 | 7.96 ± 2.24 |
| PR T ($\mu$g/h) | 112 | 105 | 162 | 255 | 71 | 310 | 69 | 155 ± 94 |
| 0800–2000 h (estimated by GC-MS from additional pooled plasma sample) |  |  |  |  |  |  |  |  |
| T (ng/mL) | 8.72 | 7.10 | 6.48 | 8.06 | 8.19 | 4.93 | 12.7 | 8.03 ± 2.43 |
| PR T ($\mu$g/h) | 111 | 103 | 150 | 241 | 70 | 281 | 71 | 147 ± 31 |

**TABLE 1C.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T in five healthy men during a 12-h infusion of 1,2-$d$

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean ± SD |
|---|---|---|---|---|---|---|---|---|
| 1400–1800 h |  |  |  |  |  |  |  |  |
| T (ng/mL) |  |  | 8.61 | 5.91 | 9.77 | 5.78 | 9.76 | 7.97 ± 1.99 |
| PR T ($\mu$g/h) |  |  | 160 | 188 | 86 | 328 | 67 | 166 ± 103 |

## Materials

All organic solvents were of high performance liquid chromatography grade and purchased from Baker Chemicals (Phillipsburg, NJ). Nonactive testosterone (17β-hydroxy-4-androsten-3-one) was obtained from Steraloids (Wilton, NH). Radioactive [³H]1,2,6,7-testosterone (SA, 100 Ci/mmol) and stable labeled 1,2-$d$-testosterone (isotopic enrich-

ment, 99.0%) were purchased from New England Nuclear (Boston, MA) and CIL (Andover, MA), respectively.

## Sample preparation and analysis by GC-MS

Plasma samples (5.0 mL) supplemented with 20,000 dpm [³H]testosterone for later control of recovery and with 20 mL 0.5% trifluoroaceti

QUESTMS-00002720

VIERHAPPER, NOWOTNY, AND WALDHÄUSL JCE & M • 1997
Vol 82 • No 5

**TABLE 2A.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T in 5 healthy women

**Exp 1**

Infusion rate of 1,2-D-T (36 h: 13 mL/H):
Theoretical: 0.4 mg/h
Actual: 0.01 mg/h (mean), equivalent to 0.24 mg/24 h

|  | 1 | 2 | 3 | 4 | 5 | Mean ± SD |
|---|---|---|---|---|---|---|
| 2000–2400 h |  |  |  |  |  |  |
| T (ng/mL) | 0.184 | 0.100 | 0.150 | 0.124 | 0.124 | 0.136 ± 0.032 |
| PR T (µg/h) | 6 | 4 | 7 | 3 | 2 | 4.4 ± 2.1 |
| 0000–0400 h |  |  |  |  |  |  |
| T (ng/mL) | 0.164 | 0.110 | 0.147 | 0.125 | 0.162 | 0.142 ± 0.024 |
| PR T (µg/h) | 5 | 5 | 3 | 2 | 3 | 3.6 ± 1.3 |
| 0400–0800 h |  |  |  |  |  |  |
| T (ng/mL) | 0.146 | 0.106 | 0.138 | 0.160 | 0.175 | 0.144 ± 0.026 |
| PR T (µg/h) | 8 | 6 | 9 | 2 | 4 | 5.8 ± 2.9 |
| 0800–1200 h |  |  |  |  |  |  |
| T (ng/mL) | 0.208 | 0.097 | 0.142 | 0.090 | 0.145 | 0.136 ± 0.047 |
| PR T (µg/h) | 10 | 3 | 7 | 2 | 8 | 6.0 ± 3.4 |
| 1200–1600 h |  |  |  |  |  |  |
| T (ng/mL) | 0.117 | 0.107 | 0.107 | 0.126 | 0.176 | 0.127 ± 0.029 |
| PR T (µg/h) | 4 | 5 | 5 | 2 | 4 | 4.0 ± 1.2 |
| 1600–2000 h |  |  |  |  |  |  |
| T (ng/mL) | 0.174 | 0.076 | 0.089 | 0.110 | 0.186 | 0.127 ± 0.050 |
| PR T (µg/h) | 6 | 3 | 5 | 2 | 4 | 4.0 ± 1.6 |
| 0800–2000 h (mean values calculated from above figures) |  |  |  |  |  |  |
| T (ng/mL) | 0.166 | 0.099 | 0.129 | 0.123 | 0.161 | 0.136 ± 0.028 |
| PR T (µg/h) | 7 | 4 | 6 | 2 | 4 | 4.6 ± 1.9 |
| 0800–2000 h (estimated by GC/MS from additional pooled plasma sample) |  |  |  |  |  |  |
| T (ng/mL) | 0.185 | 0.102 | 0.129 | 0.121 | 0.161 | 0.140 ± 0.033 |
| PR T (µg/h) | 14 | 11 | 9 | 5 | 9 | 9.6 ± 1.5 |

**TABLE 2B.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T in seven healthy women

**Exp 2**

Infusion rate of 1,2-*d*-T (24 h; 20 mL/h)
Theoretical: 0.0004 mg/h
Actual: 0.0001 mg/h (mean of patients 1–5, patient 6, 14 ng/h; patient 7, 14 ng/h)

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean ± SD |
|---|---|---|---|---|---|---|---|---|
| 0800–1200 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 0.136 | 0.138 | 0.276 | 0.186 | 0.197 | 0.206 | 0.128 | 0.181 ± 0.053 |
| PR T (µg/h) | 1.0 | 2.1 | 2.3 | 2.8 | 2.5 | 2.0 | 1.3 | 2.0 ± 0.6 |
| 1200–1600 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 0.127 | 0.130 | 0.203 | 0.147 | 0.150 | 0.157 | 0.136 | 0.150 ± 0.026 |
| PR T (µg/h) | 0.9 | 2.9 | 2.1 | 2.4 | 1.6 | 1.6 | 1.0 | 1.8 ± 0.7 |
| 1600–2000 h |  |  |  |  |  |  |  |  |
| T (ng/mL) | 0.121 | 0.099 | 0.218 | 0.126 | 0.118 | 0.138 | 0.109 | 0.133 ± 0.040 |
| PR T (µg/h) | 1.0 | 2.1 | 2.3 | 2.0 | 1.8 | 1.5 | 0.9 | 1.7 ± 0.6 |
| 0800–2000 h (mean values calculated from above figures) |  |  |  |  |  |  |  |  |
| T (ng/mL) | 0.128 | 0.122 | 0.232 | 0.153 | 0.155 | 0.167 | 0.124 | 0.154 ± 0.038 |
| PR T (µg/h) | 1.0 | 2.2 | 2.2 | 2.5 | 2.0 | 1.7 | 1.0 | 1.8 ± 0.6 |
| 0800–2000 h (estimated by GC-MS from additional pooled plasma sample) |  |  |  |  |  |  |  |  |
| T (ng/mL) | 0.127 | 0.121 | 0.235 | 0.160 | 0.161 | 0.171 | 0.118 | 0.156 ± 0.041 |
| PR T (µg/h) | 1.0 | 2.2 | 2.2 | 2.5 | 2.0 | 1.7 | 1.0 | 1.8 ± 0.6 |

**TABLE 2C.** Plasma concentrations of native T as determined by GC-MS and calculated production rates of T in five healthy women during a 12-h infusion of 1,2-*d*-T

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean ± SD |
|---|---|---|---|---|---|---|---|---|
| 1400–1800 h |  |  |  |  |  |  |  |  |
| T (ng/mL) |  |  | 0.185 | 0.202 | 0.224 | 0.221 | 0.135 | 0.193 ± 0.036 |
| PR T (µg/h) |  |  | 4.9 | 4.3 | 4.2 | 5.1 | 1.2 | 3.9 ± 1.6 |

acid (TFA) were applied to Sep-Pak $C_{18}$ cartridges (500 mg; Waters/Millipore, Milford, MA) pretreated with successive application of 5.0 mL methanol, 5.0 mL ethyl acetate, 20 mL water, and 5.0 mL TFA (0.5%, wt/vol). After sample application, the cartridges were first treated with three doses of 5.0 mL TFA (0.5%, wt/vol). Testosterone was subsequently eluted by ethyl acetate (two doses, 1.0 mL), dried under a stream of nitrogen at 37 C, reconstituted in 100 µl $CH_2Cl_2$, and further prepu-

rified by thin layer chromatography (chloroform-acetone, 70:30). The zone containing testosterone was eluted (twice, 2.5 mL methanol) and supplemented with 10 ng dehydrotestosterone (1,4-androstadien-17β-ol-3-one) as an internal standard for GC/MS analysis. Derivatization was subsequently performed with heptafluorobutyric anhydride-acetone (1:4; 60 min) at room temperature. Recovery of [$^3$H]testosterone from the derivatized samples was 38.5 ± 5.0% (n = 40). Analysis by

GC-MS (Finnigan MAT95 equipped with a 25-m CB5 fused silica column, San Jose, CA) was then performed using the selected ion monitoring mode and electric ionization (resolution, 6000). The tracer ions were [m/e 678 (dehydrotestosterone; internal standard), m/e 680 (native testosterone), and m/e 682 (1,2-$d$-testosterone)]. The sensitivity at a peak to noise ratio of 10:1 was less than 100 fg.

*Calculation of testosterone production rate*

Production rates of testosterone (PR[T]) were calculated from the product of the known infusion rate (Rt) and the ratio of tracer infusate enrichment (Et) to tracer dilution in the plasma (Es): (PR[T] = Rt × (Et/Es − 1) (8).

## Results

The plasma concentrations of unlabeled (native) testosterone and the testosterone production rates for Exp 1, 2, and 3 are summarized in Tables 1 and 2 for men and women, respectively. In men, production rates of testosterone ranged from 64 ± 25 to 101 ± 67 μg/h during a 24-h period when 1,2-$d$-testosterone was infused in a comparatively large dose (Exp 1). No diurnal rhythmicity was apparent. The average production rate, determined as the mean of six individual samples obtained in each volunteer, was 77 ± 30 μg/h, which was identical (77 ± 33 μg/h) to the value obtained by analysis of an additional sample pooled throughout the 24 h. Thus, daily testosterone production based on this experiment was 1.8 ± 0.7 mg/day, a quantity roughly 10-fold larger than the amount of infused 1,2-$d$-testosterone during this period (Table 1A).

In healthy women, testosterone production rates during this initial series of experiments ranged from 3.6 ± 1.3 to 6.0 ± 3.4 μg/h. The largest production rates were seen from 0400–0800 h and from 0800–1200 h. The average production rate, determined as the mean of six individual samples obtained in each female volunteer, was 4.6 ± 1.9 μg/h. Analyzing an additional sample pooled throughout the 24 h resulted in a value of 9.6 ± 1.5 μg/h. Thus, daily testosterone production rates during this experiment ranged from 0.1–0.2 mg/day, a quantity in the same order as the amount of infused 1,2-$d$-testosterone during this period (Table 2A).

By reducing the dose of infused 1,2-$d$-testosterone by a factor of 5 to 0.015 mg/h in men and by a factor of 100 to 0.0001 mg/h in women (Exp 2), we ascertained the total infused amount of 1,2-$d$-testosterone to be far below the expected production rate of the hormone, thus excluding any potential interference by exogenous testosterone with its endogenous production. In this setting, the calculated mean production rates of testosterone were 155 ± 94 μg/h (3.7 ± 2.2 mg/day in men; Table 1B) and 1.8 ± 0.6 μg/h (0.4 ± 0.1 mg/day in women; Table 2B). Similar mean production rates of testosterone were found using an identical infusion rate of 1,2-$d$-testosterone, but reducing the equilibration period from 12 to 6 h (Exp 3; men, 166 ± 103 μg/h; women, 3.9 ± 1.6 μg/h; Tables 1C and 2C).

## Discussion

Using short (70-min) infusions of a radioactive tracer, Rivarola *et al.* (9) 30 yr ago found the production rates of testosterone in two healthy men to be 6.4 and 5.5 mg/day, respectively. In two healthy women, testosterone production

rates were 0.37 and 0.27 mg/day, respectively. Using the same technology, later investigators reported testosterone production rates ranging from 3.0–7.0 mg/day (10, 11) in healthy men and around 0.3 mg/day (12) in healthy women.

The advantages of stable labeled radioactive tracers compared to radioactive materials include (13) the ability of long term infusions to achieve steady state conditions, the avoidance of incomplete recovery of the tracer and the tracee from biological materials, and the fact that both labeled and endogenous materials are simultaneously analyzed using an identical technology. In addition, ethical considerations preclude infusions of radioactive materials causing some countries, including Austria, to prohibit by law the use of radioactive tracers in healthy volunteers.

The aim of this study was first to determine the production rates of testosterone in healthy men and women throughout 24 h for 4-h periods using a stable labeled compound and GC/MS analysis under steady state conditions, *i.e.* after a 12-h preequilibration period. The analytical precision of the method used is demonstrated by the fact that average testosterone production rates throughout 24 h, mathematically calculated as the mean value of these six individual samples, were similar to an analytically obtained value obtained from an additional plasma sample pooled for 24 h.

During 1,2-$d$-testosterone infusions of 0.07 and 0.01 mg/h in men and women, respectively, mean estimated production rates were 77 μg/h (1.8 mg/day) in men and 4.6 μg/h (0.1 mg/day) in women. For both sexes, these values are below those previously reported by others (10–12) and uncomfortably close to the testosterone infusion rates employed. The question, therefore, arose whether such a comparatively large amount of exogenous testosterone could have suppressed its endogenous production rate.

Therefore, in a second series of experiments the infused tracer dose was reduced to 0.015 mg/h in men and 0.0001 mg/h in women, amounts equivalent to about 10% (men) or 5% (women) of the potential testosterone production rates. Mean production rates of testosterone during this second series of experiments were 147 μg/h in men and 1.8 μg/h in women. One man (no. 7) and two women (no. 5 and 6) received even smaller tracer doses (1.5 and 0.015 μg/h, respectively), stretching the currently available limits of detection to their extreme. Nevertheless, production rates of testosterone in these three individuals were in the same range as those in the remaining subjects. Based on these results, it is unlikely that the smaller doses of testosterone employed have some impact on its endogenous production rate, although we cannot exclude this possibility with certainty. Rather, we feel justified to conclude that the mean production rates of testosterone determined during this second series of experiments (men, 3.7 ± 2.2 mg/day; women, 0.43 ± 0.14 mg/day) represent accurate endogenous testosterone production rates, in line with estimates in young healthy men reported by researchers using radioactive tracers (10, 11), whereas those in healthy women were slightly lower than rates previously reported (12). Additional individually conducted experiments, described below, led us to suggest that testosterone production rates in females up to at least 0.3 ± 0.4 mg/day must be regarded as normal, as previously described by Samoljik *et al.* (12) for healthy nono-

QUESTMS-00002722

bese women. Production rates of cortisol obtained by GC/MS analysis appear to be lower than hitherto assumed (13). In regard to testosterone production rates, however, results obtained using this more advanced technology are in keeping with data obtained by means of the radiotracer technique.

Production rates of testosterone in men failed to show any diurnal variation during either series 1 (24-h observation period) or series 2 (12-h observation period). In women, however, testosterone production was higher after 0400 h. As both male and female volunteers were studied under the same experimental conditions in the largely stress-free setting of a metabolic ward, it is unlikely that methodological differences should account for these sex-specific differences. Apparently, the diurnal rhythm of ACTH is of inadequate importance in healthy men, in whom the main share of testosterone is of testicular origin, but influences adrenal testosterone secretion in women.

The results discussed above were supposed to provide the basis for future studies in patients with disorders of androgen secretion. Thus, to permit routine estimation of testosterone production rates 1,2-*d*-testosterone infusion was reduced to 6 h and subsequent blood sampling to 4 h, as a 36-h or even a 24-h experimental protocol represents a logistical challenge for any semiroutine investigation and *de facto* precludes its use on an out-patient basis. This also reduced the number of samples to be analyzed by GC/MS to one per individual. To demonstrate the validity of this approach, experiments were performed in the same group of volunteers who had taken part in protocol 2, employing identical 1,2-*d*-testosterone infusion rates (men, 0.015 mg/h; women, 0.0001 mg/h). Using this approach in healthy men, both plasma concentrations of endogenous testosterone and its estimated production rates were in the same range as those determined after a more prolonged tracer infusion. In regard to healthy women, the production rates of testosterone during this series were higher, although in a comparable range. This protocol, therefore, provides a comparatively simple way to evaluate testosterone secretion rates in various pathological situations.

## Acknowledgments

The technical assistance of Ms. A. Fürst, Ms. A. Hofer, and Ms. E. Nowotny is gratefully acknowledged.

## References

1. **Baba S, Shonohara Y, Kasuya Y.** 1980 Differentiation between endogenous and exogenous testosterone in human plasma and urine after oral administration of deuterium-labeled testosterone by mass fragmentography. J Clin Endocrinol Metab. 50:889–894.
2. **Shinohara Y, Baba S, Kasuya Y.** 1980 Absorption, metabolism and excretion of oral testosterone in humans by mass fragmentography. J Clin Endocrinol Metab. 51:1459–1462.
3. **Fujioka M, Shinohara Y, Baba S, Irie M, Inoue K.** 1986 Pharmacokinetic properties of testosterone propionate in normal men. J Clin Endocrinol Metab. 63:1361–1364.
4. **Johnson DW, McEnvoy M, Seamark RF, Cox LW, Phillipou G.** 1985 Deuterium labelled steroid hormones: tracers for the measurement of androgen plasma clearance rates in women. J Steroid Biochem. 22:349–353.
5. **Vierhapper H, Nowotny P, Waldhäusl W.** 1988 Estimation by gas chromatography-mass spectrometry with selected ion monitoring of urinary excretion rates of 3$\alpha$-androstanediol during/after i.v. administration of $^{13}$C-labelled testosterone in man. J Steroid Biochem. 29:105–109.
6. **Vierhapper H.** 1990 Formation of androstanediol from $^{13}$C-labelled testosterone in humans. Steroids. 55:177–180.
7. **Bier DM.** 1987 The use of stable isotopes in metabolic investigation. Bailliere Clin Endocrinol Metab. 1:817–836.
8. **Wootton R, Ford GC, Cheng KN, Halliday D.** 1985 Calculation of turnover rates in stable-isotope studies. Phys Med Biol. 30:1143–1149.
9. **Rivarola MA, Saez JM, Meyer WJ, Jenkins ME, Migeon CJ.** 1966 Metabolic clearance rate and blood production rate of testosterone and androst-4-ene-3,17-dione under basal conditions, ACTH and hCG stimulation. Comparison with urinary production rate of testosterone. J Clin Endocrinol Metab. 26:1208–1218.
10. **Kley HK, Niederau C, Stremmel W, Lax R, Strohmeyer G, Krüskemper HL.** 1985 Conversion of androgens to estrogens in idiopathic hemochromatosis: comparison with alcoholic liver cirrhosis. J Clin Endocrinol Metab. 61:1–6.
11. **Meikle AW, Stringham JD, Bishop DT, West DW.** 1988 Quantitating genetic and nongenetic factors influencing androgen production and clearance rates in men. J Clin Endocrinol Metab. 67:104–109.
12. **Samojlik E, Kirschner MA, Silber D, Schneider G, Ertel NH.** 1984 Elevated production and metabolic clearance rates of androgens in morbidly obese women. J Clin Endocrinol Metab. 59:949–953.
13. **Esteban NV, Loughlin T, Yergey AL, Zawadzki JK, Booth JD, Winterer JC, Loriaux DL.** 1991 Daily cortisol production rate in man determined by stable isotope dilution/mass spectrometry. J Clin Endocrinol Metab. 71:39–45.

QUESTMS-00002723


ELSEVIER

# Electrospray mass spectrometry of testosterone esters: Potential for use in doping control

Cedric H.L. Shackleton,* Hans Chuang,* John Kim,* Xavier de la Torre,† and Jordi Segura†

*Children's Hospital Oakland Research Institute, Oakland, California, USA; and †Drug Abuse Research Unit, Institut Municipal d'Investigació Mèdica (IMIM), Barcelona, Spain

The study described involves an attempt to identify 17β-fatty acid esters of testosterone in blood plasma following administration of such agents. These drugs are therapeutic but are increasingly misused by athletes in an attempt to improve sports performance. The mass spectral properties of testosterone esters under electrospray ionization are described. These esters (testosterone acetate, propionate, isocaproate, benzoate, enanthate, cypionate, phenylpropionate, decanoate, and undecanoate) essentially give only a protonated molecular ion (MH⁺) under "optimum sensitivity" mass spectrometric conditions but could be induced to fragment in the source or collision cell of a triple quadrupole mass spectrometer. The underivatized steroid esters were analyzed by direct infusion because development of solvent systems compatible with high-performance liquid chromatography (HPLC) was not achieved for these nonpolar compounds. HPLC/MS (mass spectrometry) was possible when the steroids were converted to polar, water soluble, Girard hydrazones, and almost all compounds were separated by microbore $C_4$ HPLC using a water, acetonitrile, TFA gradient. The mass spectra under optimal ionization conditions essentially comprised only a molecular ion (M⁺), but source fragmentation gave major ions at M - 59 and M - 87 for all compounds. The molecular ion and these fragment ions were monitored in a selected–ion-recording (SIR) method developed for detecting the steroids in plasma. Using this methodology, testosterone enanthate and undecanoate could be detected after intramuscular injection or oral administration of the drugs. Further development of the technique could form the basis of a protocol for confirming the misuse of testosterone in sport, especially if sensitivity could be improved.   (Steroids 62:523–529, 1997) © 1997 by Elsevier Science Inc.

Keywords: doping control; testosterone esters; high-performance liquid chromatography/electrospray mass spectrometry (HPLC/ESMS)

## Introduction

Injectable preparations of testosterone esters have become widely misused to increase muscle mass and improve performance in athletes. Proof of such administration is difficult to obtain, because testosterone is an endogenous compound, and the esters are rapidly hydrolyzed to this steroid. The accepted test for testosterone administration has been the urinary testosterone/epitestosterone ratio,[1] a value of >6 being taken as the hallmark of drug misuse. However, rare false positives and many false negatives present a drawback to the universal use of such a discriminant. One technique used to prove the presence of synthetic testosterone or its metabolites in urine is combustion isotope ratio mass spectrometry, which renders it possible to distinguish endogenous from synthetic testosterone by differing [13]C content.

Encouraging studies utilizing this technique have been described.[2–4] Another potential method would be to characterize the intact testosterone esters in plasma, because the short-chain ones commonly used in drug preparations are not synthesized in the body, in contrast to long-chain fatty acid steroid esters.[5,6] The major drawback in performing this type of assay relates to the fact that the esters are efficiently hydrolyzed following administration and only very low concentrations can be expected in blood plasma.

In a previous study, we reported the gas chromatography–mass spectrometric (GC/MS) analysis of testosterone esters in plasma and found that levels down to 1 ng/ml could be detected.[7] An alternate mass spectrometric technique to GC/MS is HPLC/electrospray MS which has been used for characterizing steroids esterfied with long-chain fatty acids.[5] This communication details the electrospray mass spectrometric properties of testosterone esters and the development of a potential method for testosterone ester characterization utilizing the technology.

Address reprint requests to Cedric H.L. Shackleton, Children's Hospital Oakland Research Institute, 747 52nd Street, Oakland, CA 94609, USA. Received December 16, 1996; accepted February 17, 1997.

© 1997 by Elsevier Science Inc. All rights reserved.
655 Avenue of the Americas, New York, NY 10010

0039-128X/97/$17.00
PII S0039-128X(97)00004-4

QUESTMS-00002724

*Papers*

## Experimental

### Source of steroid esters

Testosterone acetate, propionate, enanthate, cypionate, benzoate, and phenylpropionate were obtained from the Sigma Chemical Company, St. Louis, Missouri, USA. Testosterone isocaproate and undecanoate were products of Organon, OSS, The Netherlands. 19-Nor-testosterone acetate was synthesized by acetylation of the parent steroid obtained from Sigma.

### Plasma samples

Plasma samples were obtained from volunteers following intramuscular administration of 25 mg testosterone propionate + 110 mg testosterone enanthate (Testoviron® depot, Schering, Berlin) or oral administration of 160 mg testosterone undecanoate (Androxon®, Organon, Netherlands). These experiments were approved by the Institutional Review board of IMIM (Institut Municipal d'Investigació Medica, Barcelona), and the volunteers gave informed consent.

### Extraction of plasma

The plasma samples analyzed were stored in the Barcelona laboratories where the initial work-up was undertaken. Plasma proteins were precipitated by adding 4 mL acetone : ethanol (1 : 1 v/v) to 1 mL of plasma samples. After brief sonication, the proteins were pelleted by centrifugation at 3600 rpm for 1 min. The solvent was decanted and evaporatively removed under nitrogen. On receipt in California, the samples were reconstituted in 2 mL water : glacial acetic acid (1 : 1 v/v) and 10 mg Girard reagent T was added.[8] The reaction tubes were heated at 100° for 30 min to allow formation of the Girard hydrazones. The mixture was extracted twice with 5 mL isooctane : methylene chloride (2 : 1 v/v), and the solvent (containing the bulk of the plasma lipids and "nonketonic" steroids) was discarded. Girard hydrazones are water soluble and, therefore, stay in the water phase. This water phase was extracted by $C_{18}$ cartridge (Waters Sep-pak) according to the method of Shackleton and Whitney.[9]

The sample recovered from Sep-pak in 4 mL of methanol was dried in anticipation of mass spectrometric analysis.

### HPLC/ESMS analysis

The analysis of testosterone ester Girard hydrazones was conducted on a Michrom microbore HPLC instrument interfaced to a Micromass (VG) BioQ triple quadrupole mass spectrometer. The column used was a Vydac $C_4$ (150 × 1.0 mm), and the manual injector utilized a 100 μL loop. The solvent flow rate was 50 μL/min, although the eluant was split 7 : 1 after passing through an ultraviolet cell, so only 7 μL/min entered the mass spectrom-



**Structure 1** Chemical structure of testosterone enanthate Girard hydrazone.

eter. Solvent A was 98% water, 2% acetonitrile, and 0.1% TFA. Solvent B was 10% water, 90% acetonitrile, and 0.0975% TFA. The following elution profile was utilized. Between 0 and 1 min, the proportion of A was decreased from 65 to 45%; by 9 min, A was 20%; by 10 min, 2%, where it remained for 10 min. Samples for *direct infusion* into the mass spectrometer were introduced at 10 μL per minute.

### Mass spectrometric conditions

The voltages of capillary and HV lens were 3.9 and 1 kv, respectively. The cone voltage was 35 v when maximum sensitivity and no fragmentation was desired, and 75 v when fragmentation in the source was needed. Typically between 9 and 26 ions were recorded by selected ion monitoring using dwell times of 0.5 and 0.2 s, respectively.

Collision cell MS/MS was only conducted in association with direct infusion. Capillary and HV lens voltages were kept as before and cone voltages of 35 or 75 v were utilized. The collision energy was ramped from 60 at $m/z$ 50 to 40 at $m/z$ 650.

## Results and discussion

### ESMS of underivatized testosterone esters

All the underivatized testosterone esters gave simple mass spectra when analyzed by direct infusion ESMS, the protonated molecular ion (MH)$^+$ dominating; namely, testosterone acetate $m/z$ 331, propionate $m/z$ 345, isocaproate $m/z$ 387, benzoate $m/z$ 393, enanthate $m/z$ 401, cypionate $m/z$ 413, phenylpropionate $m/z$ 421, decanoate $m/z$ 443, and undecanoate $m/z$ 457. Attempts to develop a mass spectrometric compatible HPLC system for their separation proved futile because of their extreme non-polar properties.

### MS/MS of underivatized esters

Many collision cell-induced fragmentations of the molecular ions were common to all the esters and can be illustrated by the spectrum of testosterone enanthate (Figure 1). The fragment ion of highest mass present in all testosterone ester spectra represented a 41 or 42 mass unit loss from the protonated molecular ion, illustrated for testosterone enanthate by the ion at $m/z$ 360. When this ion was produced by source fragmentation and further cleaved in the collision cell the products formed by B ring fission ($m/z$ 109, 123, discussed below) were not obtained, providing evidence for A-ring fission with loss of the 3-carbonyl. It is probable that the loss is related to the ketene fragment (−42 mass units) produced from underivatized testosterone during electron impact fragmentation.[10] Loss of enanthate ion $C_6H_{13}CO$ is illustrated by fragment ion at $m/z$ 113 and loss of 112 mass units (113 - H) from the protonated molecular ion. A prominent ion is seen at MH$^+$ - 130 ($m/z$ 271), probably representing loss of protonated $C_6H_{13}COOH$. The $m/z$ 271 ion is found in all spectra of testosterone esters, and further loss of water gives rise to the $m/z$ 253 ion, representing the fundamental steroid ring structure.

Among the low mass ions common to all the testosterone esters, the one at $m/z$ 123 is readily explained by the well-known cleavage of 9–10 and 6–7 bonds. Similarly, the $m/z$ 109 ion is probably formed by fission of 9–10 and 5–6 bonds.[10] MS/MS fragmentation of the $m/z$ 123 ion does not

QUESTMS-00002725

*Mass spectrometry of testosterone esters: Shackleton et al.*



**Figure 1**  MS/MS mass spectra of testosterone enanthate. The upper panel shows the collision cell-induced fragmentation of the protonated molecular ion of the underivatized ester, and the bottom panel attempts to rationalize the fragmentations.

give rise to the ion at *m/z* 109. Testosterone esters with phenyl containing fatty acids (testosterone benzoate and testosterone phenylpropionate) have very intense ions (usually the base peak) at *m/z* 105, an ion representing the phenylic group.

One of the two major low mass ions common to all testosterone esters was at *m/z* 97. MS/MS fragmentation of both source produced *m/z* 289 and *m/z* 271 resulted in formation of the ion but fragmentation of *m/z* 253 failed to generate it, suggesting an intact A-ring requirement. The ion

was not formed by fragmentation of 19-nor-testosterone acetate so presumably the C-19 methyl group forms part of the structure. Although clearly important, we have failed to determine the genesis of this ion component.

### ESMS of Girard hydrazones of testosterone esters

Failure of attempts to develop HPLC methods for separating unmodified testosterone esters necessitated development of polar and ionizable derivatives more compatible with water/



**Figure 2**  Daughter ion mass spectrum and proposed MS/MS fragmentation of testosterone enanthate Girard hydrazone.

QUESTMS-00002726

*Papers*



**Figure 3** HPLC/ESMS separation of nine testosterone ester Girard hydrazones. These were scanned data; the plots represent the molecular ions of each compound. The small peak or shoulder ahead of main component suggests that syn- and anti-forms of the derivative are at least partially resolved.

methanol or water/acetonitrile type solvent systems, and we chose Girard hydrazones. These derivatives add 113 mass units to the mass of the testosterone esters. Under ESMS conditions for maximizing sensitivity (low cone voltage), the spectra of the steroids was essentially comprised only of the molecular ion ($M^+$), as follows: testosterone acetate $m/z$ 444, propionate $m/z$ 458, isocaproate $m/z$ 500, benzoate $m/z$ 506, enanthate $m/z$ 514, cypionate $m/z$ 526, phenylpropionate $m/z$ 506, decanoate $m/z$ 556, and undecanoate $m/z$ 570.

### MS/MS fragmentation of Girard hydrazones

MS/MS was carried out both by source induced cleavage achieved by increasing the nozzle-skimmer voltage and by collision cell fragmentation. One of the requirements for potential detection methods for testosterone ester misuse is high specificity, usually achievable by monitoring more than one ion per steroid component. Although daughter ions

can be obtained by source or collision cell fragmentation, only the former is practical under our HPLC conditions, partly because of prohibitive cost of collision gas required to pass through the cells continuously, and partly because of compromised sensitivity.

Similar daughter spectra were obtained for source and collision cell fragmentation, and all the testosterone esters gave spectra with fragmentations in common, the example of testosterone enanthate Girard hydrazone (TEGH) being given in Figure 2. The molecular ion ($M^+$ of TE was at $m/z$ 514, and prominent ions are found at $m/z$ 455 (M - 59) and $m/z$ 427 (M - 87). The 59 and 87 mass unit losses are common to all the esters, and the latter almost certainly represents a 28 mass unit loss from the former. The M - 59 loss is readily explained by loss of $(CH_3)_3N$ from the Girard derivative, and a corresponding strong fragment ion is seen at $m/z$ 60, $(CH_3)_3NH$. Loss of $(CH_3)_3N$ must involve a

QUESTMS-00002727

*Mass spectrometry of testosterone esters: Shackleton et al.*



**Figure 4** HPLC/ESMS analysis of testosterone enanthate Girard hydrazone (TEGH). Panel A shows the three ions (*m/z* 514, 455 and 427) monitored for 100 ng of standard injected, and panel B gives equivalent data for 1 ng. Panel C shows TEGH isolated from plasma, and panel D a plasma blank.

rearrangement, because direct cleavage would give the unstable primary ion $^{+}CH_2CONH$ -. A six-membered intermediate is likely formed, which readily loses CO (−28).

Major low mass ions are seen in all esters at *m/z* 60, 123, 135, 151, 163, and 177. MS/MS studies showed that *m/z* 151, 163, and 177 can be generated by fragmentation of $M^+$ and M - 59, and corresponding ions (less 28 mass units) are formed from dissociation of M - 87 (i.e., *m/z* 123, 135, and 149). A well-known steroid fission breaks the 9–10 and 7–8 bonds and this gives rise to identifiable ions at *m/z* 177 and *m/z* 149 (*m/z* 177–28). The *m/z* 163 and related *m/z* 135 (163–28) ions are likely formed by cleavage across 9–10 and 5–6 bonds. The major ions *m/z* 151 and its "−28" derivative M - 123 have yet to be rationalized. The *m/z* 151 ion corresponds to the prominent *m/z* 97 ion in the spectrum of underivatized TE that was also not characterized (*m/z* 151 = 97 + 113−59). These ions were not found in 19-nortestosterone acetate giving further evidence that C - 13 and

C - 19 must form part of the ion structure. As in the spectra of the unmodified steroid esters, low intensity ions corresponding to losses of fatty acid (RCOOH) and fatty acid anhydride (RCO) are also present.

## HPLC/ESMS analysis of testosterone ester Girard hydrazones

The Girard hydrazones have excellent HPLC properties under reverse phase conditions. Figure 3 shows the separation of each of the nine compounds, using in each case the molecular ion for detection. Virtually all peaks seem to have a separable component or a shoulder ahead of the major peak, which is probably caused by full or partial separation of the syn- and anti- forms of the hydrazones, both of which are presumably formed in the reaction, but apparently to different extent. Chromatographic separation, although not necessary in a selected–ion-recording method, was achieved

QUESTMS-00002728

*Papers*



**Figure 5** HPLC/ESMS analysis of testosterone undecanoate Girard hydrazone (TUGH). Panel A shows the three ions (*m/z* 570, 511, and 483) monitored for 100 ng standard; panel B equivalent data for 1 ng; panel C shows TUGH isolated from plasma, and panel D is a plasma blank.

for all compounds, except the T-benzoate and phenylpropionate pair and the T-enanthate and cypionate pair.

For achieving specificity in plasma analysis, we chose to monitor three ions: the molecular ion and fragment ions *m/z* M - 59; and M - 87. In the samples we intended to analyze: i.e., those following testosterone ester administration, only testosterone enanthate, testosterone propionate, and testosterone undecanoate could be present, so our SIR methodology was only directed toward identification of these compounds. Analysis of other esters would only require variation in the choice of ions monitored.

Figure 4A illustrates the HPLC/MS chromatography of reference TEGH with monitoring of M⁺, M - 59 and M - 87. Under the conditions used TEGH has a retention time of about 12.4 min. The peaks represent about 100 ng injected. Figure 5B shows the equivalent data for 1 ng, which represents about the maximum sensitivity, and Figure 5C illustrates TEGH isolated from plasma collected 96 h after

intramuscular administration of 110 mg testosterone enanthate and 25 mg propionate (Testoviron depot, Schering, Berlin, Germany). While there are many more components present and a high background, the presence of TEGH is clearly indicated. The steroid was not quantified, but previous analysis of the sample by GC MS/MS[7] indicated that the concentration was 0.8 ng/mL. Figure 4D indicates analysis of a sample collected 12 h before drug administration. Equivalent data for analysis of testosterone undecanoate GH(TUGH) is shown in Figure 5A–D. The plasma sample analyzed was obtained 1 h after oral administration of 80 mg testosterone undecanoate (Androxon, Organon, Netherlands). Once again, peaks appropriate for the TUGH are represented, but the amount, estimated about 1 ng, is clearly at the borderline of method sensitivity. Improvements in sensitivity could be achieved either by sample clean-up to remove the major part of nonsteroidal contaminants and background *or* by employing a more sensitive chromato-

QUESTMS-00002729

graphic technique, such as capillary HPLC. Sampling a greater proportion of the extract would also help, because under the current conditions, only 14% of the eluant from the microbore column reaches the mass spectrometer. This is necessary to achieve the desired sampling rate of 7 $\mu$L/min into the mass spectrometer.

## Conclusion

We describe here a straightforward method for extracting and analyzing intact testosterone esters by preparing their Girard hydrazones. Excellent HPLC properties and simple but informative MS/MS spectra allow accurate characterization of such esters with further development. With further development, a method may be established suitable for routine use in sports doping control, although it must be noted that ESMS instruments are much more costly to purchase and maintain as compared to their GC/MS equivalent. Such routine use would also depend upon blood samples being regularly collected during athletic events or during random inter-event testing. Trial blood sampling during athletic events has been undertaken by the IAAF and routine sampling was done at the 1994 winter Olympics for detection of homologous blood transfusions.[11]

## Acknowledgments

The California authors acknowledge financial support from the U.S. Olympic Committee and the NIH through whose grant (RR06505) the electrospray mass spectrometer was purchased. The Spanish authors acknowledge the financial support of CIRIT (Generalitat de Catalunya, Grants FI93/77 and 95-SGR-432, and Ministerio de Sanidad y Consumo FIS 96/1050). CHLS is grateful to Fred McLafferty for helpful suggestions on mass spectrometric fragmentation.

## References

1. Catlin DH, Cowan DA, De la Torre R, Donike M, Fraisse D, Oftegro H, Hatton CK, Starcevic B, Becchi M, de la Torre X, Norli H, Geyer H, Walker CJ (1996). Urinary testosterone (T) to epitestosterone (E) ratios by GC/MS. I. Initial comparison of uncorrected T/E in six international laboratories. *J Mass Spectrom* **31**:397–402.
2. Becchi M, Aguilera R, Farizon Y, Flament IM-M, Casabianca H, James P (1994). Gas chromatography/combustion/isotope-ratio mass spectrometry analysis of urinary steroids to detect misuse of testosterone in sport. *Rapid Commun Mass Spectrom* **8**:301–308.
3. Aguilera R, Becchi M, Casabianca H, Hatton CK, Catlin DH, Starcevic B, Pope J, HG (1996). Improved method of detection of testosterone abuse by gas chromatography/combustion/isotope ratio mass spectrometry analysis of urinary steroids. *J Mass Spectrom* **31**:169–176.
4. Shackleton CHL, Phillips A, Chang T, Li Y (1997). Confirming testosterone administration by isotope ratio mass spectrometric analysis of urinary androstanediol. *Steroids* **62**:379–387.
5. Larner JM, Pahuja SL, Shackleton CH, McMurray WJ, Giordano G, Hochberg RB (1993). The isolation and characterization of estradiol-fatty acid esters in human ovarian follicular fluid. *J Biol Chem* **268**:13893–13899.
6. Borg W, Shackleton CHL, Pahuja SL, Hochberg RB (1995). Long-lived testosterone esters in the rat. *Proc Natl Acad Sci USA* **92**:1545–1549.
7. de la Torre X, Segura J, Polettini A, Montagna M (1995). Detection of testosterone esters in human plasma. *J Mass Spectrom* **30**:1393–1404.
8. Girard A, Sandulesco G (1936). Sur une nouvelle serie de réactif du groupe carbonyle, leurs utilisation à l'extraction des substances cetoniques et à la characterisation microchimique des aldehydes et cetones. *Helv Chim Acta* **19**:1095–1107.
9. Shackleton CHL, Whitney JO (1980). Use of Sep-pak® cartridges for urinary steroids extraction: Evaluation of the method for use prior to gas chromatographic analysis. *Clin Chim Acta* **107**:231–243.
10. Zaretskii ZV (1996). *Mass Spectrometry of Steroids*. Wiley, New York, pp. 28–31.
11. Lillehammer Olympic Organizing Committee (LOOC) (1994). *Guidelines for Doping Control (Blood Testing Procedures)*. (Internal work), LOOC, Lillehammer, Norway.

QUESTMS-00002730

EAST Search History

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L6 | 76 | testosterone same "mass spectrometry" and (woman or female) and (quantitate or quantification or analysis)and chromatography | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:40 |
| L7 | 28 | testosterone same "mass spectrometry" and (woman or female) and (quantitate or quantification or analysis)and chromatography and testosterone.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:41 |
| L8 | 2 | testosterone same "mass spectrometry" same (woman or female) same (quantitate or quantification or analysis) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:41 |
| L9 | 26 | testosterone same "mass spectrometry" and (woman or female) and (quantitate or quantification or analysis)and chromatography and (turbulent or HTLC) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:43 |

**EAST Search History (Interference)**

< This search history is empty>

**6/10/2011 6:43:45 PM**
**C:\Users\mgarcia\Documents\EAST\Workspaces\12396266-b.wsp**

QUESTMS-00002731

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid
OMB control number.

| Substitute for form 1449/PTO<br><br>**INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT**<br><br>*(use as many sheets as necessary)* | | **Complete if Known** | |
|---|---|---|---|
| | | Application Number | 12/946,785 |
| | | Filing Date | 11/15/2010 |
| | | First Named Inventor | Michael P. Caulfield |
| | | Art Unit | 1654 |
| | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 1 | of | 5 | Attorney Docket Number | 034827-9107 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Document Number<br>Number-Kind Code[2] *(if known)* | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1 | 2004/0235193 | 11-25-2004 | SOLDIN | |
| | A2 | 5,772,874 | 06-30-1998 | QUINN ET AL. | |
| | A3 | 5,795,469 | 08-18-1998 | QUINN ET AL. | |
| | A4 | 5,919,368 | 07-06-1999 | QUINN ET AL. | |
| | A5 | 5,968,367 | 10-19-1999 | QUINN ET AL. | |
| | A6 | 6,107,623 | 08-22-2000 | BATEMAN ET AL. | |
| | A7 | 6,124,137 | 09-26-2000 | HUTCHENS ET AL. | |
| | A8 | 6,204,500 | 03-20-2001 | WHITEHOUSE ET AL. | |
| | A9 | 6,410,913 | 06-25-2002 | BREKENFELD ET AL. | |
| | A10 | 6,855,703 | 02-15-2005 | HILL ET AL. | |
| | A11 | 7,473,560 | 01-06-2009 | SOLDIN | |

**UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS**

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document<br>Serial Number-Kind Code[2] *(if known)* | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Foreign Patent Document<br>Country Code[3] Number[4] Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | *Complete if Known* | |
|---|---|---|
| Substitute for form 1449/PTO | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| | Art Unit | 1654 |
| *(use as many sheets as necessary)* | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 2 | of | 5 | Attorney Docket Number | 034827-9107 |

| | | NON PATENT LITERATURE DOCUMENTS | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A12 | CARAIMAN et al, Optimal sensitivity and increased throughout using a dual TIS/APCI ionization source and turbo flow chromatography with LC/MS/MS, Poster number 075, 51st conference on mass spectrometry and allied topics, American Society for Mass Spectrometry, Montreal, Quebec, June 2003, 4 pages | |
| | A13 | Carignan et al., High-performance liquid chromatographic analysis of estradiol valerate-testosterone enanthate in oily formulations, J Chrom 301(1):292-96 (1984) | |
| | A14 | Chang et al., Quantitative measurement of male steroid hormones using automated on-line solid phase extraction-liquid chromatography-tandem mass spectrometry and comparison with radioimmunoassay. Analyst, 123:363-368, 2003. | |
| | A15 | Choi et al., Determination of Four Anabolic Steroid Metabolites by Gas Chromatogrophy/Mass Spectrometry with Negative Ion Chemical Ionization and Tandem Mass Spectrometry, Rapid Commun. Mass Spectrom 12, 1749-55 (1998) | |
| | A16 | Choi et al., Rapid HPLC-Electrospray Tandem Mass Spectrometric Assay for Urinary Testosterone and Dihydrotestosterone Glucuronides from Patients with Benign Prostate Hyperplasia. Clin. Chem. 49: 322-5 (2003) | |
| | A17 | Corrected Notice of Allowance dated 12/17/2007 US Application No. 11/247,409 (034827-9104) | |
| | A18 | Dorgan et al., Measurement of steroid sex hormones in serum: a comparison of radioimmunoassay and mass spectrometry, Steroids, 67: 151-8 (2002). | |
| | A19 | Draisci et al., Confirmatory analysis of 17ß-boldenone, 17alpha-boldenone and androsta-1,4-diene-3,17-dione in bovine urine by liquid chromatography-tandem mass spectrometry. Journal of Chromatography B, 789:219-226, 2003. | |
| | A20 | Draisci et al., Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography-tandem mass spectrometry, Journal of Chromatography A, 2000, Vol. 870, pages 511-522. | |
| | A21 | Furuta et al., Simultaneous Measurements of Endogenous and Deuterium-Labelled Tracer Variants of Androstenedione and Testosterone by Capillary Gas Chromatography-Mass Spectrometry, J Chrom, Biomed Appl Vol. 525: 15-23, (1990) | |
| | A22 | Giraudi et al., Effect of Tracer Binding to Serum Proteins on the Reliability of a Direct Free Testosterone Assay. Steroids 52: 423-4 (1988) | |
| | A23 | Griffiths et al., Derivatisation for the characterisation of neutral oxosteroids by electrospray and matrix-assisted laser desorption/ionisation tandem mass spectrometry: the Girard P derivative, Rapid Commun Mass Spectrom 2003:17, 924-935. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid
OMB control number.

| Substitute for form 1449/PTO | | | | Complete if Known | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | | | Application Number | 12/946,785 |
| | | | | Filing Date | 11/15/2010 |
| | | | | First Named Inventor | Michael P. Caulfield |
| *(use as many sheets as necessary)* | | | | Art Unit | 1654 |
| | | | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 3 | of | 5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A24 | Herman et al., Generic method for on-line extraction of drug substances in the presence of biological matrices using turbulent flow chromatography. Rapid Communications in Mass Spectrometry, 16:412-426, 2002. | |
| | A25 | Kicman et al., Human chorionic gonadatrophin and sport, Br J Sp Med, 25(2):73-80, 1991 | |
| | A26 | Lewis et al., DOT/FAAIAM-00/20 A Novel Method for the Determination of Sildenafil (Viagra) and Its Metabolite (UK-103,320) in Postmortem Specimens Using LC/MS/MS and LC/MS/MS/MS National Technical Information Service, 2000, 3 cover pages and pages 1-12. | |
| | A27 | Magnusson et al., Quantitative analysis of eight testosterone metabolites using column switching and liquid chromatography/tandem mass spectrometry. Rapid Commun. Mass Spectrom, 30 May 2004, 18:1089-1094. | |
| | A28 | Marcus and Durnford, A Simple Enzyme-Linked Immonosorbent Assay for Testosterone. Steroids 46: 975-86 (1985) | |
| | A29 | Merchant and Weinberger, Recent advancements in surface-enhanced laser desorption/ionization-time of flight-mass spectrometry. Electrophoresis 21: 1164-67 (2000) | |
| | A30 | Minut et al., Urinary 5alpha-androstanediol and 5ß-androstanediol measurement by gas chromatography after solid-phase extraction and high-performance liquid chromatography. Int 19I J Biol. Markers, Vol. 14(3); 154-59 (1999) | |
| | A31 | Notice of Allowance dated 04/12/2010 for US Application No. 12/053,325 (034827-9105) | |
| | A32 | Notice of Allowance dated 08/18/2005 for US Application No. 10/726,919 (034827-9103) | |
| | A33 | Notice of Allowance dated 11/05/2007 US Application No. 11/247,409 (034827-9104) | |
| | A34 | Office Action dated 01/10/2007 for US Application No. 10/726,919 (034827-9104) | |
| | A35 | Office Action dated 02/18/2010 for US Application No. 12/053,325 (034827-9105) | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid
OMB control number.

| Substitute for form 1449/PTO | | Complete if Known | |
|---|---|---|---|
| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application Number | 12/946,785 |
| | | Filing Date | 11/15/2010 |
| | | First Named Inventor | Michael P. Caulfield |
| (use as many sheets as necessary) | | Art Unit | 1654 |
| | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 4  of  5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A36 | Office Action dated 03/04/2005 for US Application No. 10/726,919 (034827-9103) | |
| | A37 | Office Action dated 04/29/2009 for US Application No. 12/053,325 (034827-9105) | |
| | A38 | Office Action dated 09/05/2008 for US Application No. 12/053,325 (034827-9105) | |
| | A39 | Ong et al, Integrated bioanalytical support using turbulent flow chromatography-mass spectrometry, Powerpoint Presentation, Memory Pharmaceuticals Corp., ASMS 2002, 03/01/2001, pp. 1-39 | |
| | A40 | Ooi and Donnelly, More on the Analog Free-Testosterone Assay, Clin. Chem. 45: 714-715 (1999). | |
| | A41 | Peng et al., Plasma and urinary markers of oral testosterone undecanoate misuse.  Steroids, 67: 39-50, 2002. | |
| | A42 | Plumb et al., Quantitative analysis of pharmaceuticals in biological fluids using high-performance liquid chromatography coupled to mass spectrometry: a review, Xenobiotica, 2001, 31(8/9):599-617. | |
| | A43 | Robb et al., Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography-Mass Spectrometry, Anal. Chem., 72:3653-3659 (2000) | |
| | A44 | Ropero-Miller et al., Simultaneous Quantitation of Opioids in Blood by GC-EI-MS Analysis Following Deproteination, Detautomerizati~ Keto Analytes, Solid-Phase Extraction, and Trimethylsilyl Derivatization, J of Anal Tox 2002, Vol. 26, pages 524-528. | |
| | A45 | SALAMEH et al, Validation of a total testosterone assay using high-turbulence liquid chromoatography tandem mass spectrometry, Steroids, (2010), pp 169-175 | |
| | A46 | SHACKELTON et al, Electrospray mass spectrometry of testosterone ester: potential for use in doping control, Steroids, (1997), 62(78):523-529 | |
| | A47 | Starcevic, et al., Liquid Chromatography 14tandem Mass Spectrometry Assay For Human Serum Testosterone And Trideuterated Testosterone, Journal of Chromatography, 792:197-204 (2003) | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEPP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.

DLMR_900598.1

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid
OMB control number.

| Substitute for form 1449/PTO | | **Complete if Known** | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | Application Number | 12/946,785 |
| | | Filing Date | 11/15/2010 |
| | | First Named Inventor | Michael P. Caulfield |
| | | Art Unit | 1654 |
| *(use as many sheets as necessary)* | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 5 | of | 5 | Attorney Docket Number | 034827-9107 |

| | | **NON PATENT LITERATURE DOCUMENTS** | | |
|---|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | | T[6] |
| | A48 | Tiller et al. Drug quantitation on a benchtop liquid chromatography-tandem mass spectrometry system. Journal of Chromatography A, 1997, Vol. 771, pages 119-125. | | |
| | A49 | US Office Action dated 6/8/2011 in application 12/607,905 (034827-9106) | | |
| | A50 | Williams, et al., Electrospray Collision-induced Dissociation of Testosterone and Testosterone Hydroxy Analogs, Journal of Mass Spectrometry 34:206-216 (1999) | | |
| | A51 | Winters et al., The analog free testosterone assay: are the results in men clinically useful?, Clin. Chem. 44:2178-2182, (1998). | | |
| | A52 | Yoon and Lee, Gas chromatographic and mass spectrometic analysis of conjugated steroids in urine, J.Biosci. 2001; 26:627-634 | | |
| | A53 | Zimmer et al., Comparison of turbulent-flow chromatography with automated solid-phase extraction in 96-well plates and liquid-liquid extraction used as plasma sample preparation techniques for liquid chromatography-tandem mass spectrometry, J. Chromatogr. A 854: 23-35 (1999) | | |
| | | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

QUESTMS-00002736

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 10318377 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 30542 |
| **Filer:** | Anthony Charles Kuhlmann/Teresa Joel |
| **Filer Authorized By:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 16-JUN-2011 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 13:53:09 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

### File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 9107.pdf | 483586 ae66bbdc8b2167bd611dddd0e61890c1ed7505abd | yes | 7 |

QUESTMS-00002737

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Transmittal Letter | 1 | 2 |
| Information Disclosure Statement (IDS) Form (SB08) | 3 | 7 |

| Warnings: | |
|---|---|
| Information: | |
| **Total Files Size (in bytes):** | 483586 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002738

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Caulfield et al.

Title:          DETERMINATION OF
                TESTOSTERONE BY MASS
                SPECTROMETRY

Appl. No.:      12/946,785

Filing Date:    11/15/2010

Examiner:       Cordero Garcia, Marcela M.

Art Unit:       1654

Confirmation    1630
Number:

## INFORMATION DISCLOSURE STATEMENT
## UNDER 37 CFR §1.56

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Submitted herewith on Form PTO/SB/08 is a listing of the documents cited by or submitted to the U.S. PTO in parent application Serial Nos.: 12/607,905 filed on 10/28/2009; 12/053,325 filed on 3/21/2008; 11/247,409 filed on 10/11/2005; and 10/726,919 filed on 12/02/2003.  As provided in 37 CFR §1.98(d), copies of the documents are not being provided since they were previously submitted to the United States Patent & Trademark Office in the above-identified parent application.

The submission of any document herewith, which is not a statutory bar, is not intended as an admission that such document constitutes prior art against the claims of the present application or that such document is considered material to patentability as defined in 37 CFR

QUESTMS-00002739

Atty. Dkt. No. 034827-9107

§1.56(b). Applicants do not waive any rights to take any action which would be appropriate to antedate or otherwise remove as a competent reference any document which is determined to be a *prima facie* art reference against the claims of the present application.

## TIMING OF THE DISCLOSURE

The listed documents are being submitted in compliance with 37 CFR §1.97(b), before the mailing date of the first Office Action on the merits.

## RELEVANCE OF EACH DOCUMENT

All of the documents are in English.

Applicants respectfully request that each listed document be considered by the Examiner and be made of record in the present application and that an initialed copy of Form PTO/SB/08 be returned in accordance with MPEP §609.

Although Applicant believes that no fee is required, the Commissioner is hereby authorized to charge any additional fees which may be due to Deposit Account No. 19-0741.

Respectfully submitted,

Date _____6/15/11_____     By _____

FOLEY & LARDNER LLP                Barry S. Wilson, Reg. No. 39,431
Customer Number: 30542             Anthony C. Kuhlmann, Reg. No. 57,147
Telephone:    (858) 847-6776       Attorneys for Applicant
Facsimile:    (858) 792-6773

QUESTMS-00002740

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:     Caulfield et al.

Title:         DETERMINATION OF
                 TESTOSTERONE BY MASS
                 SPECTROMETRY

Appl. No.:     12/946,785

Filing Date:   11/15/2010

Examiner:    Cordero Garcia, M.M.

Art Unit:     1654

Confirmation  1630
Number:

## AMENDMENT AND REPLY UNDER 37 CFR 1.111

Mail Stop Amendment
Commissioner for Patents
PO Box 1450
Alexandria, Virginia 22313-1450

Sir:

In response to the Office Action mailed June 14, 2011, please enter the following amendments and consider the following remarks.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this document.

**Remarks/Arguments** begin on page 6 of this document.

Please amend the application as follows:

-1-

QUESTMS-00002741

Atty. Dkt. No. 034827-9107

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims**:

    1.-12.   (Canceled)

    13.    (Currently Amended) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

        (a) purifying testosterone from a sample from a female human;

        (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

        (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

        <u>wherein said testosterone is not derivatized prior to mass spectrometry</u>.

    14.    (Canceled)

    15.    (Previously Presented) The method of claim 13, wherein purifying testosterone comprises extracting testosterone from said sample.

    16.    (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

    17.    (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

    18.    (Previously Presented) The method of claim 15, wherein said extracting comprises subjecting said sample to liquid extraction.

4830-3950-1837.1

QUESTMS-00002742

Atty. Dkt. No. 034827-9107

19.    (Previously Presented) The method of claim 13, wherein purifying testosterone comprises purifying testosterone by chromatography.

20.    (Previously Presented) The method of claim 19, wherein said chromatography comprises liquid chromatography.

21.    (Previously Presented) The method of claim 19, wherein said chromatography comprises high performance liquid chromatography (HPLC).

22.    (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the test sample.

23.    (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the test sample.

24.    (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$.

25.    (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$ and $96.9 \pm 0.5$.

26.    (Previously Presented) The method of claim 13, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

-3-

QUESTMS-00002743

Atty. Dkt. No. 034827-9107

27.     (Previously Presented) The method of claim 13, wherein said sample comprises urine, blood, plasma, or serum from a female human.

28.     (Previously Presented) The method of claim 13, wherein said sample comprises blood, plasma, or serum from a female human.

29.     (New) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

> (a) purifying testosterone from a sample from a female human by subjecting said sample to liquid chromatography;

> (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

> (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample.

30.     (New) The method of claim 29, wherein said testosterone is not derivatized prior to mass spectrometry.

31.     (New) The method of claim 29, wherein purifying testosterone further comprises extracting testosterone from said sample.

32.     (New) The method of claim 31, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

33.     (New) The method of claim 31, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

34.     (New) The method of claim 31, wherein said extracting comprises subjecting said sample to liquid extraction.

-4-

QUESTMS-00002744

Atty. Dkt. No. 034827-9107

35.     (New) The method of claim 31, wherein said liquid chromatography comprises high performance liquid chromatography (HPLC).

36.     (New) The method of claim 31, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of 289.1 ± 0.5.

37.     (New) The method of claim 31, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of 109.2 ± 0.5 and 96.9 ± 0.5.

38.     (New) The method of claim 31, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about 289.1 ± 0.5;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of 109.2 ± 0.5, and 96.9 ± 0.5.

39.     (New) The method of claim 31, wherein said sample comprises urine, blood, plasma, or serum from a female human.

40.     (New) The method of claim 31, wherein said sample comprises blood, plasma, or serum from a female human.

-5-

QUESTMS-00002745

Atty. Dkt. No. 034827-9107

# REMARKS

## Status of the Claims

This paper amends claim 13, adds new claims 29-40, and cancels claim 14.  Applicants reserve the right to prosecute canceled subject matter in related applications.  After the amendments set forth above are entered, claims 13 and 15-40 are pending and under examination.

Claim 13 has been amended to include the limitation of claim 14.  Claim 13 has also been amended to correct a clerical informality.

New claim 29 is original claim 20, rewritten in independent form.  Claims 30-40 are various original dependant claims rewritten to depend from new independent claim 29.

Thus, no new matter is introduced by the instant amendments.

A detailed listing of all claims that are, or were, in the application, irrespective of whether the claim(s) remain under examination in the application, is presented, with an appropriate defined status identifier.

## Rejections under 35 U.S.C. § 102 (b)

Claims 13, 15-16, 19, and 27-28 stand rejected as allegedly anticipated by Vierhapper et al (J. Clinical Endocrinology and Metabolism, 1997, hereafter 'Vierhapper').  Claim 13, from which the remaining rejected claims depend, has been amended to include the limitation of unrejected claim 14; namely that in the claimed methods, testosterone is not derivatized prior to mass spectrometry.

Applicant submits that amendment of claim 13 to include the limitations of previously unrejected claim 14 renders rejection over Vierhapper moot and respectfully requests withdrawal.

-6-

QUESTMS-00002746

Atty. Dkt. No. 034827-9107

New claims 29-40 is also not anticipated by Vierhapper.  New claim 29 is previously unrejected claim 20 rewritten in independent form.  New claims 30-40 all depend from new claim 29.  Thus, this rejection should also not apply to new claims 29-40.

**Rejections under 35 U.S.C. § 103 (a)**

### *Caraiman et al (ASMS 2003)*

Claims 13-21, 24, and 26-28 stand rejected over Caraiman et al. (ASMS 2003, Poster Number 075, June 2003).  Applicants respectfully traverse as the present invention was reduced to practice prior to publication of Caraiman.

Applicant herewith submits a declaration under 37 CFR 1.131 executed by inventor Dr. Michael P. Caulfield demonstrating reduction to practice prior to publication of the Caraiman reference.  Exhibits 1 and 2 accompanying the declaration are excerpts from a Validation Summary Report demonstrating application of the claimed method for quantitation of testosterone in human serum and plasma samples.

Dr. Caulfield attests that the data shown in Exhibit 2 were collected by the method described in Exhibit 1 prior to June 2003, the publication date of Caraiman et al.

Thus, Applicant respectfully submits that the subject matter of claims 1-13 was invented prior to the publication of Caraiman et al.  As such, Caraiman et al. is not prior art against the pending claims.  Applicant respectfully requests withdrawal of this rejection.

### *Shackelton et al (Steroids, 1997) alone or in combination with Quinn et al. (U.S. 5,772,874) and Zimmer et al. (J. Chrom, 1999)*

Claims 13-16, 18-21, and 24-28 are rejected as allegedly obvious over Shackelton. Claims 17 and 22-23 are rejected as allegedly obvious over Shackelton in view of Quinn and Zimmer.  Applicants respectfully traverse.  Claim 13, from which the remaining rejected claims depend, has been amended to include the limitation of claim 14; namely that testosterone is not

-7-

QUESTMS-00002747

Atty. Dkt. No. 034827-9107

derivatized prior to mass spectrometry. Also, claim 20 has been canceled and rewritten as independent claim 29, thus the comments that follow apply equally to claims 29-40.

The instant claims are directed to methods of determining the amount of testosterone in a sample when taken from a female human. The methods include purifying testosterone from a sample from a female human and ionizing the purified testosterone. Claims 13 and 15-28 have amended to specify that the testosterone is not derivatized prior to mass spectrometry. Claims 29-40 lack this limitation but require that the sample testosterone is purified by liquid chromatography.

*Shackelton*

Shackelton is deficient as a primary reference on which to base an obviousness rejection for all pending claims because Shackelton is not concerned with the same analyte. Shackelton is concerned only with quantitation of testosterone-esters, not testosterone as required by the present claims. Shackelton reports MS detection of underivatized testosterone esters, and quantitation of Girard hydrazone-derivatives of testosterone esters in human plasma. See, e.g., Extraction from Plasma, p. 524 left col.; HPLC/ESMS, p. 524, left col.; and ESMS of underivatized testosterone esters, p. 524, right col. Testosterone esters detected and quantitated by Shackelton include: testosterone acetate, testosterone propionate; testosterone isocaproate; testosterone benzoate; testosterone enanthate; testosteronecypionate; testosterone phenylpropionate; testosterone decanoate; and testosterone undecanoate. These esters are different chemical species from testosterone and can be expected to behave differently with respect to purification and ionization. Shackelton makes no mention of quantitating, detecting, or ionizing testosterone. Thus, Shackelton does not disclose, teach, or suggest a method for quantitating testosterone in female patient samples. For this reason alone, the present claims are distinct from Shackelton, mandating withdrawal of the present rejection.

Additionally, with respect to claims 13, 15-16, 18-21, and 24-28, Shackelton teaches away from methods which do not include a derivatization step. Shackelton describes purifying

-8-

QUESTMS-00002748

Atty. Dkt. No. 034827-9107

derivatized testosterone esters using a combination of protein precipitation, solid phase extraction, and HPLC.  See, Extraction from Plasma, p. 524, left col.  However, Shackelton reports that attempts to develop a mass spectrometry compatible HPLC system for preparation of underivatized testosterone esters were futile, and instead merely indicates that the underivatized testosterone esters were ionized and detected by MS/MS by direct infusion into the mass spectrometer (i.e., not purified from a patient sample).  See, ESMS of underivatized testosterone esters, p. 524, right col.

Thus, even accepting *arguendo* that methods of analyzing testosterone esters are somehow informative regarding methods of analyzing testosterone, Shackelton teaches away from methods which do not include derivatization, such as those methods recited in claims 13, 15-16, 18-21, and 24-28.  Shackelton's teaching away from the purification of underivatized analytes as presently claimed is a second independent basis for traversal of this rejection for claims 13, 15-16, 18-21, and 24-28.

### Shackelton, in combination with Quinn and Zimmer

Quinn and Zimmer are cited as secondary references in the rejection of claims 17 and 22-23.  Neither Quinn nor Zimmer cure Shackelton's defects, nor are they alleged to do so.  Rather, Quinn is cited as allegedly teaching turbulent flow chromatography as an improved means of achieving chromatographic separation, capacity, and resolution when combined with HPLC.  Quinn is cited as a generic teaching and provides no specific information about the suitability of the technique to purification of testosterone from samples from a human.

Similarly, Zimmer compares HTLC-MS/MS versus solid-phase extraction LC-MS/MS versus liquid-phase extraction LC-MS/MS in the single case of two drugs, referred to simply as drug A and drug B.  Zimmer's reported comparison is a purely academic exercise in that it withholds the identity and chemical nature of the two tested drugs "for commercial reasons."  Zimmer et al., p. 24, column 2.

4830-3950-1837.1

QUESTMS-00002749

The Examiner asserts that the skilled artisan would have been motivated to incorporate Zimmer's TFLC method because it created a fast and high selectivity and sensitivity down to 0.1 µg/dL when coupled to MS/MS.  Zimmer, however, does not support such a broad assertion. First, Zimmer only discloses results of studies of two unidentified analytes.  This meager demonstration of two unidentified analytes does not provide a sufficient basis to establish a reasonable expectation of success of all potential species within the genus (i.e., that all potential analytes could be expected to be detected at similarly low levels).  Second, Zimmer provides no structural or chemical information (such as polarity of drug A and drug B, strength of protein binding, the nature and extent of interaction of an analyte with the column packing material, etc.) on which to base a prediction of analyte behavior.  In sum, Applicant respectfully traverses the reading of Zimmer as disclosing and enabling TFLC extraction coupled to MS/MS to achieve detection at levels down to 0.1 µg/dL for all analytes.  One cannot predict with any reasonably certainty the level at which a specific analyte (such as testosterone) could be quantitated via Zimmer's method because Zimmer simply does not provide enough information to base a prediction.

Finally, the Examiner cites MPEP 2144.05 in asserting that differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence that such concentration is critical.  Specifically, the Examiner asserts that it is not inventive to discover optimum or workable ranges by routine experimentation. Applicant respectfully submits that the cited MPEP section is being misapplied.  The pending claims require quantitation of testosterone in samples when taken from a female human.  At the time of Applicant's invention, the ability to measure testosterone at levels present in female human samples was not simply a matter of routine optimization of prior art methods, but rather was unobtainable by prior art methods.  For example, Starcevic et al. (J Chromatog B, 2003, submitted in IDS dated June 15, 2011) reports a limit of quantitation for testosterone from male plasma samples as being 50 ng/dL.  Starcevic, p. 201, right column.  Comparison of this limit of quantitation to the reference intervals provided in Table 3 of Kushnir et al. (Clinical Chemistry, 2006, submitted herewith as Exhibit 1) demonstrates the futility of applying the prior art methods

-10-

QUESTMS-00002750

Atty. Dkt. No. 034827-9107

to quantitation of female serum samples.  Kushnir lists reference intervals for testosterone in female human serum as falling within the range of 2 to 64 ng/dL (with some sub-ranges defined according to age).  Thus, the majority of the normal reference range for total testosterone in female human serum is at a level that was <u>undetectable</u> by methods of the prior art.  All pending claims specifically recite quantitation of testosterone in samples from female humans via mass spectrometry, and nothing in the prior art provides a reasonable expectation that such analyses could be conducted.

In sum, Applicant respectfully submits that Shackelton, alone or in combination with Quinn and Zimmer, fail to teach or suggest at least two elements of the present claims.  Further, none of Shackelton, Quinn, and Zimmer provide a reasonable expectation of success for the successful quantitation of testosterone in samples from female humans according to methods of the instant claims.  The rejection of claims 13-16, 18-21, and 24-28, based solely on Shackelton, and the rejection of claims 17 and 22-23, based on the combination of Shackelton, Quinn, and Zimmer, are therefore traversed and should be withdrawn.

*Ong et al (50th ASMS Conference Abstract, 2001)*

Claims 13-21, and 27-28 are rejected as allegedly obvious over the Ong Abstract.  Claim 14 has been canceled, rendering rejection of that claim moot.  Further original claim 20 has been rewritten in independent form as claim 29.  Applicants respectfully traverse.

The Ong Abstract is asserted to allegedly teach a mass spectrometric method for determining testosterone levels in animal samples such as plasma samples.  Applicant respectfully disagrees.  First, Ong merely describes mass spectrometric detection of testosterone as an internal standard in an unknown matrix.  Second, even if the unknown matrix is assumed to be plasma or serum (which applicant does not concede), the levels of testosterone used by Ong are in vast excess of testosterone levels found in female human samples and there is no indication that Ong's method could be successfully employed to quantitate testosterone at the requisite levels.

-11-

QUESTMS-00002751

Atty. Dkt. No. 034827-9107

The Ong Abstract presents two instrumental configurations for conducting metabolic stability screening by high turbulent flow liquid chromatography (HTLC)-mass spectrometry. The first configuration utilizes parallel extraction columns with a single analytical column (i.e., the parallel configuration), while the second configuration utilizes a serial configuration of a single extraction column and a single analytical column (i.e., the serial configuration).  The only reference to testosterone in the Ong Abstract is found in the description of the parallel configuration, which indicates that testosterone was used as a positive assay control.  Ong Abstract, second to last paragraph.  No sample matrix is recited in the parallel configuration studies.  Further, Ong reports that a *different* column configuration is required for analysis of unspecified analytes in *plasma/tissue* samples.  Ong Abstract, last paragraph.  Thus, it can be inferred that Ong's parallel configuration studies (the only studies where testosterone is mentioned) were not conducted with plasma or tissue samples.

In describing analysis involving plasma/tissue matrices, Ong makes no indication that testosterone was detected.  Instead, Ong merely indicates that analysis of "various analytes" by the parallel and serial configurations were compared during method validation experiments.  Ong Abstract, last paragraph.

Additionally, the levels of testosterone used by Ong are far greater than those typically found in human samples.  Ong used testosterone as a positive assay control at concentrations of 5 µM and 0.5 µM.  Ong Abstract, second to last paragraph.  Using testosterone's molecular weight of about 288.42 g/mol, Ong's 5 µM and 0.5 µM testosterone concentrations correspond to concentrations of over 140,000 ng/dL and 14,000 ng/dL, respectively.  These concentrations are in vast excess of the about 2 to about 63 ng/dL normal range of total testosterone in female humans.  See Table 3 of Exhibit 1 (Kushnir et al., attached hereto, indicating normal ranges of total testosterone in female humans).

Applicant respectfully submits that due to well known unpredictability of ion suppression effects across different sample matrices, Ong's use of testosterone as a positive assay control in analysis of non-plasma/tissue matrix samples is simply not predictive of an ability either to

-12-

QUESTMS-00002752

Atty. Dkt. No. 034827-9107

quantitate testosterone in a female human sample or to perform that quantitation at testosterone levels present when taken from the female human. The instant claims are not obvious over Ong without some express application of an MS method to quantitate testosterone in female human samples, and an indication of a reasonable likelihood of success. Applicant respectfully requests reconsideration and withdrawal of this rejection.

**Double Patenting Rejections**

Claims 13-28 stand rejected as on the ground of nonstatutory obviousness-type double patenting as allegedly obvious over claims 1-32 of U.S. Patent 7,754,419, claims 1-50 of U.S. Patent No. 7,348,137, and claims 1-39 of U.S. Patent 6,977,142.

All three of U.S. Patent 7,754,419, U.S. Patent No. 7,348,137 and U.S. Patent No. 6,977,143 are commonly owned with this application and terminal disclaimers signed by Assignee's representative are submitted herewith. As such, Applicant respectfully requests withdrawal of the obviousness-type double patenting rejections.

Claims 13-28 also stand provisionally rejected on the ground of nonstatutory obviousness-type double patenting as allegedly obvious over claims 1-13 of copending Application No. 12/607,905.

With respect to the provisional rejection over claims 1-13 of Application 12/607,905, Applicant requests that the provisional rejection be held in abeyance until otherwise allowable subject matter is identified. Applicant will address any address any provisional double patenting rejections at that time, should this rejection remain.

<u>CONCLUSION</u>

Applicant respectfully submits that the pending claims are in condition for allowance. In the event that any matters remain to be resolved in view of this communication, the Examiner is encouraged to call the undersigned so that a prompt disposition of this application can be achieved.

-13-

QUESTMS-00002753

Atty. Dkt. No. 034827-9107

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by a check or credit card payment form being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any additional extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date ___11/14/11_____

By _____

FOLEY & LARDNER LLP
Customer Number: 30542
Telephone:    (858) 847-6722
Facsimile:    (858) 792-6773

Barry S. Wilson, Reg. No. 39,431
Anthony C. Kuhlmann, Reg. No. 57,147
Attorneys for Applicant

-14-

4830-3950-1837.1

QUESTMS-00002754

# Exhibit 1

QUESTMS-00002755

*Clinical Chemistry* 52:1
120–128 (2006)

Endocrinology and
Metabolism

# Performance Characteristics of a Novel Tandem Mass Spectrometry Assay For Serum Testosterone

Mark M. Kushnir,[1*] Alan L. Rockwood,[1] William L. Roberts,[2] Elizabeth G. Pattison,[1] Ashley M. Bunker,[1] Robert L. Fitzgerald,[3] and A. Wayne Meikle[2,4]

**Background:** Commercial immunoassays for testosterone (Te) may give inaccurate results for samples from women and children, leading to misdiagnosis and inappropriate treatment. We developed a sensitive and specific tandem mass spectrometric assay for measurement of Te at the concentrations encountered in women and children.

**Methods:** Te was extracted with methyl *tert*-butyl ether from 100 $\mu$L of serum or plasma, derivatized to form an oxime, and reextracted by solid-phase extraction. Instrumental analysis was performed on an API 4000 HPLC tandem mass spectrometer in the multiple-reaction monitoring (MRM) mode. The MRM transitions ($m/z$) were 304→124 and 304→112 for Te and 307→124 and 307→112 for $d_3$-Te.

**Results:** Within- and between-run CVs were <12% and 7.9%, respectively. The limit of quantification was 0.0346 nmol/L (1 ng/dL). Reference intervals for sex hormone–binding globulin and total, free, and bioavailable Te were established for children of Tanner stages 1 through 5 and adult males and females.

**Conclusions:** The sensitivity and specificity of the method are adequate for analysis of Te in samples from women and children. The method requires small sample volumes, has adequate precision, and is not subject to interferences.

© 2006 American Association for Clinical Chemistry

Testosterone (Te)[5] is the major androgen in males and is involved in development and maintenance of the male phenotype. In women, Te is also the predominant bioactive androgen, and circulating concentrations are 5%–10% of those in men. Te is important for many non–sex-specific functions, including growth, bone metabolism, and bone remodeling.

A sensitive and specific assay for measurement of Te is needed in many clinical applications. In women, Te is frequently measured in cases of alopecia, acne, and hirsutism; for detection of androgen-secreting tumors of ovarian and adrenal origin; and to determine the minimum drug dose required to suppress androgen secretion in hyperandrogenic women *(1–6)*. In children, the circulating Te concentration is determined for sex assignment of newborns and young infants with ambiguous genitalia, and in follow-up of children with precocious or delayed puberty *(7–13)*. Te is also closely monitored in the follow-up of patients with congenital adrenal hyperplasia resulting from deficiency of 21-hydroxylase or other enzymes *(14)*. Other clinical applications of Te measurement include evaluation of inborn errors of sex-steroid metabolism, disorders of puberty, and Te deficiency and therapeutic drug monitoring in cases of low-dose female hormone replacement therapy or antiandrogen treatment in some forms of cancer *(5, 9, 11–15)*.

Immunoassays for Te have acceptable performance for concentrations characteristic of healthy men but lack specificity and precision at concentrations characteristic of women and children *(16–18)*. Even high-sensitivity Te

[1] ARUP Institute for Clinical and Experimental Pathology, Salt Lake City, UT.

Departments of [2] Pathology and [4] Medicine, University of Utah, Salt Lake City, UT.

[3] Department of Pathology, VA San Diego Healthcare System, University of California, San Diego, CA.

*Address correspondence to this author at: ARUP Institute for Clinical and Experimental Pathology, 500 Chipeta Way, Salt Lake City, UT 84108. Fax 801-584-5207; e-mail kushnmm@aruplab.com.

Received April 7, 2005; accepted October 28, 2005.
Previously published online at DOI: 10.1373/clinchem.2005.052167

[5] Nonstandard abbreviations: Te, testosterone; MS, mass spectrometry; GC, gas chromatography; LC-MS/MS, liquid chromatography–tandem mass spectrometry; MTBE, methyl *tert*-butyl ether; SPE, solid-phase extraction; LOD, limit of detection; LOQ, limit of quantification; SHBG, sex hormone–binding globulin; ESI, electrospray ionization; APCI, atmospheric pressure chemical ionization; APPI, atmospheric pressure photoionization; DHEA, dehydroepiandrosterone; and TS, Tanner stage.

QUESTMS-00002756

immunoassays are inadequate for testing samples from women and children because physiologic serum concentrations are typically <1.73 nmol/L (<50 ng/dL) in adult women and <0.346 nmol/L (<10 ng/dL) in infants and children of both sexes. Taieb and coworkers (17, 18) reported that none of the commercially available automated assays for Te has adequate specificity for the analysis of Te in the serum of children and women. In addition, there is often very poor agreement among the results obtained by different immunoassays, even assays from the same manufacturer (17–26).

Numerous studies found acceptable concordance between immunoassay results for samples from men (27–29) but significant overestimation of the Te concentration in samples from women and children (19, 25, 30–34). To eliminate interference from binding globulins and structurally related molecules, RIAs have been combined with extraction and chromatographic separation, but these assays do not compare well with isotope-dilution mass spectrometry (MS) (18, 32). Because interference is less likely in gas chromatographic (GC)-MS than in nonchromatographic methods, GC-MS is often used as a reference method for steroid analysis (35–38). GC-MS methods typically require at least 1 mL of sample, however, and their throughput is limited.

We developed a sensitive and specific liquid chromatography–tandem MS (LC-MS/MS) assay to measure Te at the concentrations encountered in women and children and used isotope-dilution MS to establish reference intervals for males and females of different Tanner stages and ages.

## Materials and Methods

### CALIBRATORS AND REAGENTS

Te and $d_3$-Te (both 98% purity) were purchased from Sigma. Stock solutions were prepared in methanol at concentrations of 3.46 mmol/L (1 g/L) and 0.346 mmol/L (0.1 g/L) for Te and $d_3$-Te, respectively. Working calibrators and internal standards were prepared at concentrations of 8.65 and 17.3 nmol/L (2.5 and 5 μg/L), respectively. With every set of samples, Te calibrators were prepared in 10 g/L bovine serum albumin at concentrations of 0.346, 1.73, 3.46, and 6.92 nmol/L (10, 50, 100, and 200 ng/dL). Controls analyzed with every batch of samples were human plasma samples containing 0.415 and 7.23 nmol/L (12 and 209 ng/dL) Te, respectively. HPLC-grade water, methanol, methyl tert-butyl ether (MTBE), and acetonitrile were obtained from Fisher Scientific. Hydroxylamine hydrochloride, sodium hydroxide, trifluoroacetic acid, and formic acid were obtained from Sigma. Strata X solid-phase extraction (SPE) columns were purchased from Phenomenex.

### SAMPLE PREPARATION

We transferred 0.1-mL portions of calibrators, controls, and patient sera to microcentrifuge tubes and added 20 μL of a working internal standard, $d_3$-Te, to each tube.

We then extracted the samples with 1.5 mL of MTBE and transferred the upper organic layer to clean glass tubes. After evaporating the solvent under nitrogen in a 35 °C water bath, we redissolved the dried residue for derivatization in 300 μL of an aqueous hydroxylamine solution (1.5 mol/L, pH 10), vortex-mixed the tubes, incubated them in a heating block at 60 °C for 5 min, and added 2 mL of water to each tube. The derivatized Te was extracted with SPE as follows. The SPE columns were conditioned with methanol followed by water, and the samples were applied to the columns. After the columns were washed with 200 mL/L acetonitrile in water and dried for 10 min, Te was eluted with MTBE. The solvent was evaporated and the residue reconstituted with 75 μL of mobile phase; the samples were then transferred to autosampler vials, sealed, and assayed.

### LC-MS/MS

We validated the method on an API 4000™ triple-quadrupole mass spectrometer (Applied Biosystems/MDS Sciex) equipped with a V-spray ionization source operated at 700 °C. The system included an Agilent series 1100 HPLC pump and a Perkin-Elmer series 200 autosampler. The chromatographic separation was performed on a 50 × 2.0 (i.d.) mm Phenomenex Luna $C_{18}$ column with 5-μm particles. The oven temperature was 50 °C. The mobile phase consisted of methanol–0.22 mol/L aqueous formic acid (70:30 by volume) and was delivered at a flow rate of 0.25 mL/min. The injection volume was 15 μL, and the total instrumental analysis time was 3 min. Between injections, the autosampler injection syringe was washed 12 times with methanol–water (4:1 by volume) containing 1 mL/L trifluoroacetic acid. The quadrupoles Q1 and Q3 were tuned for unit resolution, and the MS conditions were optimized for maximum signal intensity. The instrument was operated in positive-ion mode with the following optimized voltages: ion spray, 4200 V; declustering potential, 85 V; entrance potential, 10 V; collision energy, 40 V; collision cell exit potential, 5 V. Nitrogen was the collision gas. The data were acquired and processed with Analyst 1.4™ software (Applied Biosystems/MDS Sciex). We performed a quantitative calibration with every batch of samples and used these results in conjunction with the intensities of the transitions of internal standards to calculate Te concentrations in unknown samples. We used an API 3000™ (Applied Biosystems/MDS Sciex) triple-quadrupole mass spectrometer to study relative sensitivity among different ion sources and for initial evaluation of the method performance.

### ASSAY PERFORMANCE CHARACTERISTICS

Evaluation of the method performance included imprecision, limit of detection (LOD), limit of quantification (LOQ), upper limit of linearity, and recovery. Method imprecision was determined from analysis of 2 human serum samples analyzed as controls [concentrations of 0.415 and 7.23 nmol/L (12 and 209 ng/dL)]. The samples

QUESTMS-00002757

were analyzed in duplicate on 20 consecutive days. In addition, the imprecision of the method was determined by analyzing 3 replicates per run of 10 g/L bovine serum albumin samples containing Te at concentrations of 0.139, 0.866, 2.43, 10.38, and 20.18 nmol/L (4, 25, 70, 300, and 700 ng/dL) over a 3-day period. The instrument imprecision was determined by repetitive injections of an extracted patient sample containing 0.381 nmol/L (11 ng/dL) Te from the same vial. Method linearity was evaluated by analyzing samples prepared at 0.35, 28, 55.6, 83.2, 110.8, and 138.4 nmol/L (10, 800, 1600, 2400, 3200, and 4000 ng/dL). Method sensitivity was determined by analyzing calibrators containing progressively lower concentrations of Te. To determine the upper limit of linearity, we used the criteria of maintaining accuracy within 15%, imprecision (CV) <20%, and a branching ratio of the mass transitions within 30% of the value set by the calibration. The branching ratio is the ratio of peak intensities of 2 transitions of Te ($304{\rightarrow}112/304{\rightarrow}124$) and $d_3$-Te ($307{\rightarrow}112/307{\rightarrow}124$), used to assure specificity of the detection *(39)*. The branching ratios were compared with the ratios of the same transitions in the calibrator containing 1.73 nmol/L (50 ng/dL) Te. The LOQ was the lowest concentration at which Te peaks were present in both transitions at the expected retention time with a branching ratio within established limits and the observed concentration was within ±20% of the expected concentration. The LOD was the lowest concentration at which Te peaks were present in both transitions at the expected retention time. Each calibrator was analyzed in duplicate over a 2-day period. Recovery of the sample preparation was determined by analyzing a patient sample containing 1.21 nmol/L (35 ng/dL) endogenous Te enriched with 1.73 nmol/L (50 ng/dL) Te. The observed difference in the concentrations was compared with the expected concentration.

To determine cross-reactivity, we analyzed steroids with structures similar to that of Te, derivatized and extracted according to the method. We also assayed more than 3000 random patient samples to detect potential drug- or disease-related interferences. A branching ratio of the transitions outside of established limits, broadening of the Te peak, split peaks, or a significant increase in background were interpreted as potential interferences.

We evaluated ion suppression by analyzing extracted samples from females, injected in the flow of a solution of derivatized Te prepared at a concentration of 14 nmol/L (400 ng/dL) and infused with a syringe at flow rate of 1.2 mL/h. The patient samples were prepared by the method outlined above. A decrease in the intensity of the baseline in the mass transitions of Te was considered a criterion for evaluation of ion suppression.

### REFERENCE INTERVALS, SPECIMEN-TYPE SUITABILITY, AND STABILITY

For the reference interval study, we collected serum samples from apparently healthy volunteers after obtain-

ing informed consent. We excluded from the study women on oral contraceptives and those receiving female hormone replacement therapy. We also collected samples from children of Tanner stages 1 through 5 (ages 7–17 years) after obtaining parental informed consent. The mean (median) ages of the adult volunteers were 32 (31.2), 52.5 (52), and 28.5 (37.5) years for pre- and postmenopausal females and males, respectively. After collection, the samples were stored at −70 °C and thawed once before the analysis. The samples from volunteers were tested for sex hormone–binding globulin (SHBG) on an IMMULITE 2000 analyzer (DPC). Concentrations of free and bioavailable Te were calculated based on binding constants with SHBG and albumin *(40)*. Samples from 2 volunteers were tested for Te stability. Samples sets were stored at ambient temperature, 4 °C, and −20 °C. The samples were analyzed every 4–7 days during 1 month of storage. To assess specimen-type suitability, we collected blood samples from volunteers into serum separator, sodium EDTA, and sodium heparin tubes. All studies with samples from human participants were approved by the Institutional Review Board of the University of Utah.

### METHOD COMPARISON

The LC-MS/MS method was compared with a high-sensitivity automated immunoassay for Te (Vitros ECi; Ortho-Clinical Diagnostics), LC-MS/MS at a commercial reference laboratory (Esoterix Inc., Austin, TX), and GC-MS *(27)*. For method comparison with the immunoassay, we analyzed all samples collected for the adult reference interval studies. For the comparison with the LC-MS/MS and GC-MS methods, we analyzed subsets of 20 and 15 serum samples, respectively. To account for imprecision in both the reference and the evaluated methods, we evaluated the results with Deming regression *(41)*.

### Results

We studied the ionization efficiency of nonderivatized Te in positive-ion mode with mobile phases containing various solvents and buffers with electrospray ionization (ESI), heated nebulizer [atmospheric pressure chemical ionization (APCI)], and atmospheric pressure photoionization (APPI) ion sources on an API 3000 tandem mass spectrometer. Samples containing 34.7 nmol/L (1000 ng/dL) Te were injected in mobile phase (flow rate, 250 μL/min). The $[M+H]^+$ molecular ion of underivatized Te was observed with each ionization method. The absolute signal intensity did not change significantly in the experiments with different ion sources, but the signal-to-noise ratio of the $[M+H]^+$ molecular ion of Te was highest with the APPI, followed by the APCI and ESI ion sources (Fig. 1). In experiments with the APPI ion source, we used toluene as a dopant in an amount that was 10% relative to the other mobile phase components.

Evaluation of the method sensitivity with the APPI ion source showed insufficient sensitivity for the intended

QUESTMS-00002758

*Clinical Chemistry* 52, No. 1, 2006

123



Fig. 1. Relative magnitude of the signal-to-noise ratio for the molecular ions of testosterone ($m/z$ 289; □), and testosterone oxime ($m/z$ 304; ■), with Turbolonspray (*experiments 1, 4,* and *7*), APCI (*experiments 2* and *5*), and APPI (*experiments 3* and *6*) ion sources.

Experiments 1–6 were performed by flow injection analysis with mobile phase consisting of methanol–5 mmol/L ammonium formate (50:50 by volume); in experiment 7, the mobile phase consisted of methanol–22 mmol/L aqueous formic acid (50:50 by volume).



Fig. 2. Multiple-reaction monitoring chromatograms of extracted samples containing 0.104 nmol/L (3 ng/dL) Te (*A* and *B*), 138.4 nmol/L (4000 ng/dL) Te (*C* and *D*), and extracted female serum sample containing 0.381 nmol/L (11 ng/dL) Te (*E* and *F*).

MS/MS transitions: (*A, C,* and *E*), $m/z$ 304→112; (*B, D,* and *F*), 304→124. s/n, signal-to-noise ratio.

clinical application of measuring Te in samples from women and children. We therefore evaluated various derivatizing reagents to improve the ionization efficiency and decrease the LOD. The oximation reaction with hydroxylamine greatly increased sensitivity and was adopted for the method. Hydroxylamine reacts with keto groups to form oxime derivatives. Comparison of the detection sensitivity for the derivatized Te in positive-ion mode showed the highest sensitivity with the ESI, followed by the APPI and APCI ion sources (Fig. 1). Evaluation of the method performance on API 3000 and API 4000 tandem mass spectrometers (using conditions optimal for each instrument and the oxime derivative of Te) revealed that the assay performed on the API 4000 was ~8-fold more sensitive. Ionization was more efficient when the ammonium formate buffer was replaced with formic acid (Fig. 1).

Because the sample preparation is specific to neutral molecules containing keto groups, LC separation plays a lesser role in the method. We evaluated the potential for ion suppression by injecting extracted samples with Te concentrations <0.346 nmol/L (10 ng/dL) in the flow of Te oxime derivative infused with a syringe pump at constant flow rate. We observed a decrease in the baseline in the samples at a retention time of 0.5 min; the baseline recovered by 0.8 min, and no ion suppression was observed at the retention time of Te (1.8 min). The chromatograms of 2 multiple-reaction monitoring transitions of Te for calibrators and a patient sample are presented in Fig. 2. We used the calibrator containing 1.73 nmol/L (50 ng/dL) Te to set a threshold for the branching ratio of the Te mass transitions. The acceptance limit for the branching ratio was established in every batch of samples as ±30% of the value observed in the 1.73 nmol/L (50 ng/dL) calibrator.

Within-run, between-run, and total imprecision data are shown in Table 1. The CV at the lowest concentration evaluated, 0.139 nmol/L (4 ng/dL), was 13% and was

<8% at concentrations >0.346 nmol/L (10 ng/dL). The total CV for the controls analyzed with routine batches of samples (n = 20) was 9.9% at a concentration of 0.415 nmol/L (12 ng/dL) and 5.1% at 7.23 nmol/L (209 ng/dL). Method imprecision was comparable to methods for other steroids present at similar concentrations *(36, 37, 42)*. For a sample containing 0.346 nmol/L (10 ng/dL) Te, 1.5 pg was injected on the column, and the corresponding mean (SD) signal-to-noise ratio (n = 8) was 32 (5). The overall method recovery was 98%. The assay was linear up to 138 nmol/L (4000 ng/dL) with inaccuracy <5% at the highest

QUESTMS-00002759

**Table 1. Method imprecision.**

| Concentration, nmol/L (ng/dL) | CV, % | | |
|---|---|---|---|
| | Within-run | Between-run/day | Total |
| 0.139 (4)[a] | 12 | 5.9 | 13 |
| 0.866 (25)[a] | 5.3 | 5.3 | 7.5 |
| 2.43 (70)[a] | 2.4 | 4.7 | 5.3 |
| 10.38 (300)[a] | 3.3 | 3.9 | 5.1 |
| 20.18 (700)[a] | 1.9 | 2.5 | 3.1 |
| 0.415 (12)[b] | 6.2 | 7.9 | 9.9 |
| 7.23 (209)[b] | 2.3 | 4.5 | 5.1 |

[a] Three replicates per run over 3 days.
[b] Two replicates per run over 20 days.

concentration ($r = 0.998$). The LOQ of the method was 0.0345 nmol/L (1 ng/dL), and the LOD was 0.0173 nmol/L (0.5 ng/dL).

A set of 20 serum samples from female volunteers was analyzed by our method and by an LC-MS/MS method of Esoterix Inc., and a set of 15 samples was analyzed by a GC-MS method *(27)* (Fig. 3). Deming regression analysis gave a regression line with the equation: $y = 1.01x - 0.09$ ng/dL ($r = 0.953$; $S_{y|x} = 2.86$ ng/dL).

We also compared the method performance with that of the Vitros ECi immunoassay. A total of 216 split patient samples (150 samples from females and 66 samples from males) were analyzed by the methods (in groups of 10 to 35 samples per batch), and the results were compared. When all of the results (samples from men and women) were included in the method comparison with the Vitros ECi method, the Deming regression equation, correlation coefficient, and standard error of the residuals were as follows: Vitros ECi = $1.15 \times$ LC-MS/MS + 11.2 ng/dL

($r = 0.976$; $S_{y|x} = 5.0$ ng/dL). The results (Fig. 4) showed substantial disagreement between the methods at concentrations <1.73 nmol/L (50 ng/dL). Agreement between the methods was better for results with higher Te concentrations. The branching ratio of the 2 mass transitions for Te and $d_3$-Te in >98% of the patient samples was within the acceptance limits established by the calibrators analyzed with each batch of samples

Structurally related compounds [methyltestosterone, nandralone, dihydrotestosterone, *trans*-dehydrotestosterone, *trans*-androsterone, dehydroepiandrosterone (DHEA), and androstenedione] were evaluated for potential interference with the method. The steroids were added to a concentration of 500 000 ng/dL in human serum containing 0.345 nmol/L (10 ng/dL) Te. Nandralone produced a peak that eluted earlier than Te but did not affect the Te result. DHEA is an isomer of Te that is different from Te by the positions of the keto and hydroxyl groups. DHEA produced peaks at both mass transitions of Te at a relative retention time of 0.88 and did not interfere with the method. The branching ratio of the transitions of DHEA was 8 (0.5) vs 1 (0.1) for Te. Androstenedione has 2 keto groups and produced single ($m/z$ 302) and double ($m/z$ 317) oxime derivatives. A second isotopic peak (A + 2) of the molecular ion of androstenedione monooxime is an isobar of Te that has the same product ions as Te and increased the apparent concentration of Te by ~0.4%. Hemolyzed and lipemic samples were analyzed by the method and did not interfere with the method performance. No differences in Te concentrations or recovery were observed for different collection tubes (serum separator tubes, EDTA, heparin). No degradation of Te was observed after 4 weeks at refrigerator temperatures and after 12 months at −20 °C. In evaluating carryover potential, we did not detect Te in the negative control analyzed after a sample containing 173 nmol/L (5000 ng/dL) Te.

The LC-MS/MS method was used to establish reference intervals for total, free, and bioavailable Te in volunteers of different age and Tanner stage groups (Tables



Fig. 3. Plot of differences between the LC-MS/MS method and the reference LC-MS/MS and GC-MS methods with samples from females. The mean difference was 0.2 ng/dL (0.007 nmol/L). The hatched lines represent 2 SD.



Fig. 4. Plot of differences between the LC-MS/MS method and the Vitros ECi method for samples with concentration <50 ng/dL (1.73 nmol/L; n = 150). The mean difference was 4.1 ng/dL (0.142 nmol/L).

#### Table 2. Summary of reference interval data for SHBG and total, free, and bioavailable Te by Tanner stage.

| | n | SHBG, nmol/L | Testosterone | | |
| | | | Total, nmol/L (ng/dL) | Free, pmol/L (pg/mL) | Bioavailable, nmol/L (ng/dL) |
|---|---|---|---|---|---|
| **Females** | | | | | |
| TS 1 | 147 | 25–144 | <0.588 (17) | <7.63 (2.2) | 0.010–0.190 (0.3–5.5) |
| TS 2 | 66 | 13–106 | 0.138–1.35 (4–39) | 1.39–15.61 (0.4–4.5) | 0.042–0.519 (1.2–15) |
| TS 3 | 85 | 10–82 | 0.346–2.07 (10–60) | 4.51–26.02 (1.3–7.5) | 0.131–0.969 (3.8–28) |
| TS 4 | 77 | 12–147 | 0.277–2.18 (8–63) | 3.82–53.78 (1.1–15.5) | 0.097–1.35 (2.8–39) |
| TS 5 | 123 | 15–150 | 0.346–2.07 (10–60) | 2.77–31.92 (0.8–9.2) | 0.076–0.796 (2.2–23) |
| **Males** | | | | | |
| TS 1 | 143 | 21–144 | <0.657 (19) | <12.84 (3.7) | 0.0104–0.450 (0.3–13) |
| TS 2 | 66 | 18–141 | 0.069–5.16 (2–149) | 1.04–72.87 (0.3–21) | 0.010–2.04 (0.3–59) |
| TS 3 | 65 | 11–87 | 0.242–26.37 (7–762) | 3.47–340 (1–98) | 0.066–10.24 (1.9–296) |
| TS 4 | 98 | 9–50 | 5.71–29.54 (165–854) | 121–586 (35–169) | 1.38–16.78 (40–485) |
| TS 5 | 42 | 9–59 | 6.71–27.09 (194–783) | 142–829 (41–239) | 4.29–20.62 (124–596) |

2 and 3). Nonparametric reference intervals were determined based on the central 95% interval.

## Discussion

Published LC-MS/MS methods for measurement of Te have sufficient sensitivity and accuracy for analyzing samples from healthy adult men, but are not sufficiently sensitive for measurement of the low concentrations characteristic of females and children (43). Recently, Cawood et al. (32) published an LC-MS/MS method for the routine analysis of Te that had an LOD of 0.3 nmol/L (8.6 ng/dL), which is adequate for the analysis of majority of female specimens but not sufficiently sensitive for measurement of Te in children. We improved the sensitivity of the assay through optimization of the sample preparation, analysis of derivatized Te vs nonderivatized TE [as in Ref. (32)], finding conditions for efficient ionization,

and elimination of ion suppression. Because high sensitivity is required, a large number of coextracted compounds could potentially produce background noise and affect method performance. One class of compounds present in biological samples that may cause ion suppression is phospholipids. An efficient way of purifying biological samples that does not coextract phospholipids is liquid–liquid extraction with MTBE (44, 45). A combination of liquid–liquid extraction, formation of the Te oxime derivative, and SPE on polymer adsorbent allowed high-sensitivity, selective analysis of Te. Our sample preparation procedure thus removed the majority of compounds that may potentially cause ion suppression and interference.

Preliminary experiments for evaluation of the method with nonderivatized Te (mass transitions of $m/z$ 289→109 and 289→97) using an ESI ion source demonstrated a

#### Table 3. Summary of reference interval data for SHBG and total, free, and bioavailable Te by age.

| Age, years | n | SHBG, nmol/L | Testosterone | | |
| | | | Total, nmol/L (ng/dL) | Free, pmol/L (pg/mL) | Bioavailable, nmol/L (ng/dL) |
|---|---|---|---|---|---|
| **Females** | | | | | |
| 7–9 | 103 | 31–143 | <0.519 (15) | <6.25 (1.8) | 0.0104–0.173 (0.3–5.0) |
| 10–11 | 69 | 15–145 | 0.069–1.45 (2–42) | 0.347–12.14 (0.1–3.5) | 0.014–0.332 (0.4–9.6) |
| 12–13 | 69 | 10–108 | 0.208–2.21 (6–64) | 3.12–23.60 (0.9–6.8) | 0.059–0.650 (1.7–18.8) |
| 14–15 | 70 | 11–106 | 0.311–1.70 (9–49) | 4.16–26.02 (1.2–7.5) | 0.104–0.782 (3.0–22.6) |
| 16–17 | 70 | 16–160 | 0.277–2.18 (8–63) | 4.16–34.35 (1.2–9.9) | 0.114–0.990 (3.3–28.6) |
| 18–30 | 55 | 18–203 | 0.381–2.04 (11–59) | 2.78–25.68 (0.8–7.4) | 0.076–0.713 (2.2–20.6) |
| 31–40 | 43 | 20–126 | 0.381–1.94 (11–56) | 4.51–31.92 (1.3–9.2) | 0.142–0.882 (4.1–25.5) |
| 41–51 | 18 | 26–110 | 0.311–1.90 (9–55) | 3.82–20.13 (1.1–5.8) | 0.097–0.571 (2.8–16.5) |
| 50–62 (menopause) | 16 | 18–97 | 0.208–0.865 (6–25) | 2.08–13.19 (0.6–3.8) | 0.052–0.325 (1.5–9.4) |
| **Males** | | | | | |
| 7–9 | 105 | 24–170 | <0.311 (9) | <3.12 (0.9) | 0.010–0.097 (0.3–2.8) |
| 10–11 | 68 | 20–133 | 0.069–1.97 (2–57) | 0.35–21.86 (0.1–6.3) | 0.003–0.619 (0.1–17.9) |
| 12–13 | 69 | 15–144 | 0.242–25.85 (7–747) | 1.73–340 (0.5–98) | 0.048–9.96 (1.4–288) |
| 14–15 | 70 | 8–71 | 1.14–20.24 (33–585) | 10.41–479 (3–138) | 0.329–11.66 (9.5–337) |
| 16–17 | 70 | 8–50 | 6.40–30.66 (185–886) | 132–600 (38–173) | 1.21–17.61 (35–509) |
| 18–30 | 20 | 8–54 | 6.88–27.13 (199–784) | 236–770 (68–222) | 5.85–19.10 (169–552) |
| 31–52 | 19 | 12–49 | 7.58–22.35 (219–646) | 194–489 (56–141) | 4.81–12.25 (139–354) |

LOQ similar to that described by Cawood et al. [0.346 nmol/L (10 ng/dL)] *(32)*. Because sensitivity was insufficient for our intended clinical applications, we evaluated derivatization as a means to improve the ionization efficiency and sensitivity. Derivatization with hydroxylamine was highly effective; the reaction is fast, quantitative, and goes to completion, and the derivative is stable. Data for the comparison of the intensity of the molecular ion with different ionization techniques for nonderivatized Te and the Te oxime are shown in Fig. 1. Derivatization with formation of Te oxime improved the ionization efficiency considerably; this improvement is likely related to the tertiary amine moiety present within Te oxime. The derivative was efficiently ionized at relatively low voltage. Evaluation of different mobile phase additives showed that ionization was most efficient with an ESI ion source and a mobile phase consisting of methanol and 0.022 mol/L aqueous formic acid. The LOQ and precision of the assay incorporating oxime derivatization were adequate for Te measurement in clinical samples from women and children.

Chromatographic separation on a short reversed-phase LC column provides sufficient specificity, prevents ion suppression, and allows selective detection of Te. The method has high specificity, which is assured through monitoring of 2 unique mass transitions for Te and $d_3$-Te. Use of 2 transitions and branching ratios for Te and $d_3$-Te enables evaluation of the specificity of the analysis for every sample *(39, 44–46)* and rejection of results for which interference is detected.

METHOD PERFORMANCE

Method comparison with the Vitros ECi immunoassay (Fig. 4) for samples with concentrations <1.73 nmol/L (50 ng/dL) indicated 53% overestimation of the concentration by the immunoassay. In addition to a significant difference in the slope, at concentrations <1.73 nmol/L (50 ng/dL), the results were more disperse and the methods correlated poorly with each other. The method comparison with LC-MS/MS using a subset of samples showed good agreement between the methods (Fig. 3), except for 1 sample, which was considered as an outlier with probability greater than 99% based on the Mahalanobis distance test *(47)*. Combined data for the comparison with the LC-MS/MS and GC-MS tests (Fig. 3) showed good agreement of the results. The results of the comparison were consistent with observations by Fitzgerald and Herold *(27)* and Taieb et al. *(18)*: Immunoassay results agreed with an MS-based method for samples from healthy men, but in samples from women, the methods correlated poorly with each other. Possible reasons for the lack of agreement between the results obtained with the immunoassays are matrix effects and cross-reactivity of the antibody with structurally related steroids *(17–27)*. Low physiologic concentrations of Te in women and children and limited sample size for pediatric samples challenge method sensitivity. The results obtained by most immunoassays for samples from women and children are inaccurate because of insufficient method specificity at low Te concentrations *(16–18, 27)*. Because interfering substances and the degree of interference vary among assays from different manufacturers, results obtained with different immunoassays often do not agree with each other and cannot be used interchangeably. To address this issue, we recommend using the isotope-dilution LC-MS/MS method for measurement of Te in women and children.

Some potential pitfalls of the method are cross-contamination between samples during sample preparation and carryover during instrumental analysis. The large variation in Te concentrations attributable to sex and age can contribute to this potential problem. This is why successful implementation of the LC-MS/MS method requires strict adherence to quality control, evaluation of system performance, and batch acceptance criteria.

CHANGES IN SHBG AND Te CONCENTRATIONS IN
MALES AND FEMALES BY TANNER STAGE AND AGE

Results of the analysis of samples from volunteers of different Tanner stages are summarized in Table 2. Boys and girls at Tanner stage (TS) 1 had comparable SHBG reference intervals. After TS 1, the SHBG concentrations decreased. In females, the lowest reference limits were observed at TS 3, followed by an increase through TS 4 and TS 5 back to the values characteristic of TS 1. SHBG concentrations in males gradually decreased between TS 1 and TS 4 to adult reference limits. The reference limits for total Te in females increased starting from TS 1, reached concentrations characteristic of adult females by TS 3, and then decreased to prepubertal concentrations at menopause. In males, the greatest increase in total Te reference limits was observed between TS 2 and TS 3 (~5-fold), followed by a 15% increase between TS 3 and TS 4 and a 15% decrease between TS 4 and TS 5. The highest reference limits for free Te in females were observed at TS 4, followed by a decrease of ~50% by TS 5 and an additional decrease to prepubertal concentrations at menopause. The highest increase in free Te concentrations in males (~3.5 fold) was observed between TS 2 and TS 3, followed by an ~70% increase between TS 3 and TS 4 and an additional ~40% increase between TS 4 and TS 5. The highest reference limits for bioavailable Te in females were observed at TS 4, followed by decreases of ~50% by TS 5 and ~60% at menopause. The greatest increase of the bioavailable Te reference limits in males (~5-fold) was between TS 2 and TS 3, followed by steady increase of an additional ~80% by TS 5.

The results of analysis of samples from volunteers of different age groups are summarized in Table 3. In females, SHBG reference limits decreased by ~30% between ages 10 and 13, followed by an increase in reference limits to the peak values observed in the 18- to 30-year age group and an ~30% decrease in the 31- to 40-year age group back to the concentrations observed in teenagers.

QUESTMS-00002762

*Clinical Chemistry* 52, No. 1, 2006

127

Total Te concentrations in females started to increase at age 10–11 years, reached reference limits characteristic of adult women by age 12–13 years, and remained at these concentrations until menopause, when they decreased, on average, by ~60%. The concentration of bioavailable Te in females increased starting from age 10–11 years and reached adult concentrations by age 16–17 years, with a parallel increase in free Te concentrations in females from age 7 through 17 years. The concentrations of bioavailable and free Te in women peaked between ages 17 and 40 years, followed by a decrease to prepubertal concentrations at menopausal.

In males 7–13 years of age, SHBG concentrations were stable and then decreased by ~50% to concentrations characteristic of adult males. The total Te reference limits increased at age 10–11 years, then increased to the concentrations characteristic of adult men by age 16–17 years. The total Te concentrations did not differ significantly among the 16–17, 18–30, and 31–52 age groups. Concentrations of free and bioavailable Te in males started to increase at age 10, reached maximum values at age 16–17 years, and decreased, on average, by ~30% in the 31–52 age group.

In conclusion, we have developed a highly sensitive and specific LC-MS/MS method suitable for analysis of Te in children and pre- and postmenopausal women and established reference intervals for total, free, and bioavailable Te and SHBG for males and females of different Tanner stages and age groups. Measurement of Te by LC-MS/MS was precise and accurate down to 0.0346 nmol/L (1 ng/dL). With a 3-min run time, the assay is a good alternative to immunoassays in clinical reference laboratories because it is free of interference and cross-reactivity with structurally related compounds. Compared with GC-MS methods for Te analysis, the LC-MS/MS method offers better sensitivity along with higher throughput. The small sample volume required for this test may reduce the volume of blood drawn from patients, a useful feature for pediatric testing.

We thank the ARUP Institute for Clinical and Experimental Pathology for financial support, John Simmons for assistance with determining Tanner stages of the children, and William Owen for assistance with the reference interval study.

## References

1. Mauvais-Jarvis P, Kuttenn F, Mowszowicz I. Hirsutism. Berlin: Springer-Verlag, 1981:110pp.
2. Rosenfield RL. Pilosebaceous physiology in relation to hirsutism and acne [Review]. Clin Endocrinol Metab 1986;15:341–62.
3. Bergfeld WF. Hirsutism in women. Effective therapy that is safe for long-term use. Postgrad Med 2000;93:99–104.
4. Waggoner W, Boots LR, Azziz R. Total testosterone and DHEAS levels as predictors of androgen-secreting neoplasms: a population study. Gynecol Endocrinol 1999;16:394–400.
5. Rittmaster RS, Arab DM, Lehman L. Dose-response effect of depot leuprolide acetate on serum androgens in hirsute women. Fertil Steril 1996;65:912–5.
6. Escobar-Morreale HF, San Millan JL, Smith RR, Sancho J, Witchel SF. The presence of the 21-hydroxylase deficiency carrier status in hirsute women: phenotype-genotype correlations. Fertil Steril 1999;72:629–38.
7. New MI, White PC, Pang S, Dupont B, Speiser PW. The adrenal hyperplasias. In: Scriver CR, Beaudet AL, Sly WS, Valle D, eds. The metabolic bases of inherited disease. New York: McGraw-Hill, 1989:1881–917.
8. Migeon CJ, Berkovitz GD. Congenital defects of the external genitalia in the newborn and prepubertal child. In: Carpenter SE, Rock JA, eds. Pediatric and adolescent gynecology. New York: Raven Press, 1992:77–94.
9. Iughetti L, Predieri B, Ferrari M, Gallo C, Livio L, Milioli S, et al. Diagnosis of central precocious puberty: endocrine assessment. J Pediatr Endocrinol Metab 2000;13:709–15.
10. Traggiai C, Stanhope R. Delayed puberty. Best Pract Res Clin Endocrinol Metab 2002;16:139–51.
11. Migeon CJ, Berkovitz GD, Brown TR. Sexual differentiation and ambiguity. In: Kappy MS, Blizzard RM, Migeon CJ, eds. The diagnosis and treatment of endocrine disorders in childhood and adolescence. Springfield, IL: Charles C. Thomas, 1994:573–715.
12. Lee PA. Laboratory monitoring of children with precocious puberty. Arch Pediatr Adolesc Med 1994;148:369–76.
13. Kulin HE, Finkelstein JW, D'Arcangelo MR, Susman EJ, Chinchilli V, Kunselman S, et al. Diversity of pubertal testosterone changes in boys: constitutional delay in growth and/or adolescence. J Pediatr Endocrinol Metab 1997;10:395–400.
14. Summers RH, Herold DA, Seely BL. Hormonal and genetic analysis of a patient with congenital adrenal hyperplasia. Clin Chem 1996;42:1483–7.
15. Choi HH, Gray PB, Storer TW, Calof OM, Woodhouse L, Singh AB, et al. Effects of testosterone replacement in human immunodeficiency virus-infected women with weight loss. J Clin Endocrinol Metab 2005;90:1531–41.
16. Herold DA, Fitzgerald RL. Immunoassays for testosterone in women: better than a guess? Clin Chem 2003;49:1250–1.
17. Taieb J, Benattar C, Birr AS, Lindenbaum A. Limitations of steroid determination by direct immunoassay. Clin Chem 2002;48:583–5.
18. Taieb J, Mathian B, Millot F, Patricot MC, Mathieu E, Queyre N, et al. Testosterone measured by 10 immunoassays and by isotope-dilution gas chromatography—mass spectrometry in sera from 116 men, women, and children. Clin Chem 2003;49:1381–95.
19. Wheeler MJ, Lowry C. Warning on serum testosterone measurement. Lancet 1987;2:514–5.
20. Dorgan JF, Fears TR, McMahon RP, Aronson Friedman L, Patterson BH, et al. Measurement of steroid sex hormones in serum: a comparison of radioimmunoassay and mass spectrometry. Steroids 2002;67:151–8.
21. Middle J. Standardization of steroid hormone assays. Ann Clin Biochem 1998;35:354–63.
22. Valdes R Jr, Jortani S. Unexpected suppression of immunoassay results by cross-reactivity: now a demonstrated cause for concern. Clin Chem 2002;48:405–6.
23. Luppa P, Neumeier D. Effect of sex-hormone globulin on no-extraction immunoassays for testosterone. Clin Chem 1990;36:172–3.
24. Sabot JF, Deruaz D, Dechaud H, Bernard P, Pinatel H. Determination of plasma testosterone by mass fragmentography using [3,4-13C] testosterone as internal standard. J Chromatogr 1985;339:233–42.
25. Wheeler MJ, D'Souza A, Matadeen J, Croos P. Ciba Corning

QUESTMS-00002763

ACS:180 testosterone assay evaluated. Clin Chem 1996:42: 1445–9.

26. Boots LR, Potter S, Potter D, Azziz R. Measurement of total serum testosterone levels using commercially available kits: high degree of between-kit variability. Fertil Steril 1998;69:286–92.

27. Fitzgerald R, Herold DA. Serum total testosterone: immunoassay compared with negative chemical ionization gas chromatography–mass spectrometry. Clin Chem 1996;42:749–55.

28. Levesque A, Letellier M, Swirski C, Lee C, Grant A. Analytical evaluation of the testosterone assay on the Bayer Immuno-1 system. Clin Biochem 1998;31:23–8.

29. Sanchez-Carbayo M, Mauri M, Alfayate R, Miralles C, Soria F. Elecsys testosterone assay evaluated. Clin Chem 1998;44: 1744–6.

30. Fuqua JS, Sher ES, Migeon CJ, Berkovitz GD. Assay of plasma testosterone during the first six months of life: importance of chromatographic purification of steroids. Clin Chem 1995;41: 1146–9.

31. Wudy SA, Wachter UA, Homoki J, Teller WM. 17-Hydroxyprogesterone, 4-androstenedione, and testosterone profiled by routine stable isotope dilution/gas chromatography-mass spectrometry in plasma of children. Pediatr Res 1995;38:76–80.

32. Cawood ML, Field HP, Ford CG, Gillingwater S, Kicman A, Cowan D, et al. Testosterone measurement by isotope-dilution liquid chromatography–tandem mass spectrometry: validation of a method for routine clinical practice. Clin Chem 2005;51:1472–9.

33. Slaats EH, Kennedy JC, Kruijswijk H. Interference of sex-hormone binding globulin in the "Coat-A-Count" testosterone no-extraction radioimmunoassay. Clin Chem 1987;33:300–2.

34. Lashansky G, Saenger P, Fishman K, Gautier T, Mayes D, Berg G. Normative data for adrenal steroidogenesis in a healthy pediatric population: age- and sex-related changes after adrenocorticotropin stimulation. J Clin Endocrinol Metab 1991;73:674–86.

35. Aguilera R, Becchi M, Casabianca H, Hatton CK, Catlin DH, Starcevic B, et al. Improved method of detection of testosterone abuse by gas chromatography/combustion/isotope ratio mass spectrometry analysis of urinary steroids. J Mass Spectrom 1996;31:169–76.

36. Shackleton CHL, Phillips A, Chang T, Li Y. Confirming testosterone administration by isotope ratio mass spectrometric analysis of urinary androstanediols. Steroids 1997;62:379–87.

37. Becchi M, Aguilera R, Farizon Y, Flament M-M, Casabianca H, James P. Gas chromatography/combustion/isotope-ratio mass spectrometry analysis of urinary steroids to detect misuse of testosterone in sport. Rapid Commun Mass Spectrom 1994;8: 304–8.

38. Aguilera R, Catlin DH, Becchi M, Phillips A, Wang C, Swerdloff RS, et al. Screening urine for exogenous testosterone by isotope ratio mass spectrometric analysis of one pregnanediol and two androstanediols. J Chromatogr B 1999;727:95–105.

39. Kushnir MM, Rockwood AL, Nelson GJ, Yue B, Urry FM. Assessing analytical specificity in quantitative analysis using tandem mass spectrometry. Clin Biochem 2005;38:319–27.

40. Vermeulen A, Verdonck L, Kaufman JM. A critical evaluation of simple methods for the estimation of free testosterone in serum. J Clin Endocrinol Metab 1999;84:3666–72.

41. Cornbleet PJ, Gochman N. Incorrect least-squares regression coefficients in method-comparison analysis. Clin Chem 1979;25: 432–8.

42. Nelson RE, Grebe SK, O'Kane DJ, Singh RJ. Liquid chromatography–tandem mass spectrometry assay for simultaneous measurement of estradiol and estrone in human plasma. Clin Chem 2004;50:373–84.

43. Gillingwater SD, Morris MR. High throughput analysis of plasma testosterone using LC-MS/MS. Proceedings 49th ASMS Conference on Mass Spectrometry and Allied Topics, June 3–6, 2002, Orlando, FL.

44. Kushnir MM, Komaromy-Hiller G, Shushan B, Urry FM, Roberts WL. Analysis of dicarboxylic acids by tandem mass spectrometry. High throughput quantitative measurement of methylmalonic acid in serum, plasma and urine. Clin Chem 2001;47:1993–2002.

45. Kushnir MM, Neilson R, Roberts WL, Rockwood AL. Cortisol and cortisone analysis in serum and plasma by atmospheric pressure photoionization tandem mass spectrometry. Clin Biochem 2004; 37:357–62.

46. Kushnir MM, Rockwood AL, Nelson GJ, Terry AH, Meikle AW. Analysis of cortisol in urine by LC-MS/MS. Clin Chem 2002;49: 965–7.

47. Hart MK, Hart RF. Statistical process control for health care. Pacific Grove, CA: Duxbury, 2002:343pp.

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office:  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO<br><br>**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>Date Submitted: November 2, 2011<br><br>*(use as many sheets as necessary)* | | | | ***Complete if Known*** | |
|---|---|---|---|---|---|
| | | | | **Application Number** | 12/946,785 |
| | | | | **Filing Date** | 11/15/2010 |
| | | | | **First Named Inventor** | Michael P. Caulfield |
| | | | | **Art Unit** | 1654 |
| | | | | **Examiner Name** | Cordero Garcia, Marcela M. |
| Sheet | 1 | of | 1 | **Attorney Docket Number** | 034827-9107 |

### U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number<br><br>Number-Kind Code[2] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document<br><br>Serial Number-Kind Code[2] *(if known)* | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document<br><br>Country Code[3] Number[4] Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | A1 | Office Action dated 09/07/2011 for US Application No. 13/118180 (034827-9108) | |
| | | | |
| | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

4842-0950-0685.1

QUESTMS-00002765

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/118,180 | 05/27/2011 | Michael P. Caulfield | 034827-9108 | 9065 |

30542      7590      09/07/2011
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/07/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

QUESTMS-00002766

|  | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 13/118,180 | CAULFIELD ET AL. |
|  | **Examiner** | **Art Unit** |
|  | MARCELA M. CORDERO GARCIA | 1654 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>27 May 2011</u>.

2a) ☐ This action is **FINAL**.   2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5) ☒ Claim(s) <u>1-12</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1-12</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>7/21/2011</u>.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____ .

QUESTMS-00002767

Application/Control Number: 13/118,180                                Page 2

Art Unit: 1654

## DETAILED ACTION

### Status of the claims

1.      Claims 1-15 are pending in the examination. Claims 1-15 are presented for

examination on the merits.

### Claim Rejections - 35 USC § 102

2.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

3.      Claims 1-3, 5-7, 9-11 are rejected under 35 U.S.C. 102(a) as being anticipated

by Chang et al. (Analyst, 13 March 2003, citation A14 in the IDS dated 6/16/2011).

        Chang et al. teach a method for determining the amount of testosterone present

in a test sample when taken from a human comprising,

        (a) purifying testosterone from the test sample by subjecting the sample to an

extraction column (on line solid-phase extraction SPE, Section 2.2, page 364) and an

analytical column (HPLC, Section 2.3, page 364) to generate an eluent; (e.g., Section

2.3, page 364);

        (b) ionizing (Electrospray ionization tandem mass spectrometry EI-MS-MS,

Section 2.4, page 364) the eluent to produce one or more testosterone ions detectable

by a mass spectrometer; (See ions 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5; in Figure 1

and Figure 2);

QUESTMS-00002768

Application/Control Number: 13/118,180                                    Page 3
Art Unit: 1654

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of testosterone ion(s) is related to the

amount of testosterone in the test sample. (e.g., concentrations of less than 10 ng/dL

[equivalent to 0.1 ng/mL and less than 5 ng/dL (such as 0.02 ng/mL)] in the test sample,

see Section 3.3, page 364; Tables 1-2).

Therefore, the reference is deemed to anticipate the instant claims above.

4.      Claims 1-5, 9-12 are rejected under 35 U.S.C. 102(a) as being anticipated by

Caraiman et al. (ASMS 2003, Poster Number 075, June 2003).

Caraiman et al. disclose that there is an ever increasing burden on analytical

laboratories to make high sensitivity measurements, and to make them as quickly as

possible. For the LC/MS analysis of compounds of widely differing polarities the

demands are even higher since compounds in the same sample can often only be

ionized optimally with the use of entirely different ionization sources (most commonly

either electrospray ionization or atmospheric pressure chemical ionization (APCI)). This

study illustrates the use of a combined TIS/APCI ionization source to combat this type

of problem: as a software-selectable source, the ionization mode can be changed on

the fly, allowing the user to choose the best ionization mode for each resolved

compound in one analytical run. TurboFlow® Chromatography was used as a high

throughput method to eliminate the time-consuming sample preparation procedures for

biological samples.

Caraiman et al. teach the following conditions:

Application/Control Number: 13/118,180                              Page 4
Art Unit: 1654

Instrumentation used: - API 4000TM equipped with a DuoSprayTM ion source
(Figure 1) - Cohesive® 2300 pump/valve interface module (Cohesive® Technologies,
Franklin, MA, USA) and CTC PAL HTS autosampler (Cohesive® Technologies,
Franklin, MA, USA) (Figure 2).

Sample Preparation: - Calibration standards were prepared by mixing 200 µL of
rat plasma with 200 µL of standard solutions in 10% methanol; - Aliquots of 100 µL
plasma samples from separate pharmacokinetic studies on rats for Testosterone
and Warfarin were mixed and diluted with 200 µL 10% methanol; - Calibrators and
unknowns were centrifuged at 16,600 g for 15 minutes. The supernatant was
transferred to 300 µL vials and loaded in the autosampler;

Chromatografic Conditions: - Extraction Column: CycloneTM HTLC (1.0 x 50
mm, 50 µm) - Analytical column: Waters, C8 Nova Pak (4.6 x 20 mm, 4 µm) - Mobile
phase for loading pump and eluting pump A: Water (0.1% HCOOH) : Methanol (95:5
v/v) B: Water (0.1% HCOOH) : Methanol (5:95 v/v) - Run time: 4.33 minutes
- Details for loading, transfer and eluting steps of the LC method. The ion at 289.1 was
selected to produce a 97.2 (see Table 1). The sensitivity is up to 1 ng/mL.

Therefore the reference is deemed to anticipate the instant claims above.

5.      Claims 1-5, 10-12 are rejected under 35 U.S.C. 102(b) as being anticipated
Shackelton et al. (Steroids, 1997).

Shackelton et al. teach that injectable preparations of testosterone esters have
become widely misused to increase muscle mass and improve performance in athletes.
Proof of such administration is difficult to obtain, because testosterone is an

QUESTMS-00002770

Application/Control Number: 13/118,180                                    Page 5
Art Unit: 1654

endogenous compound, and the esters are rapidly hydrolyzed to this steroid. The

accepted test for testosterone administration has been the urinary

testosterone/epitestosterone ratio, a value of >6 being taken as the hallmark of drug

misuse. However, rare false positives and many false negatives present a drawback to

the universal use of such a discriminant. One technique used to prove the presence of

synthetic testosterone or its metabolites in urine is combustion ratio mass spectrometry,

which renders it possible to distinguish endogenous from synthetic testosterone by

differing 13C content. Encouraging studies utilizing this technique have been described.

Another potential method would be to characterize the intact testosterone esters in

plasma, because the short-chain ones commonly used in drug preparations are not

synthesized in the body, in contrast to long-chain fatty acid steroid esters. The major

drawback in performing this type of assay relates to the fact that the esters are

efficiently hydrolyzed following administration and only very low concentrations can be

expected in blood plasma (e.g., page 523).

Shackelton et al. teach testosterone acetate, propionate, enanthate, cypionate,

benzoate and phenylpropionate were obtained from the Sigma Chemical company.

Testosterone isocaporate and undecanoate were products of Organon, OSS. 19-Nor-

testosterone acetate was synthesized by acetylation of the parent steroid obtained from

Sigma.

Plasma samples were obtained from volunteers following intramuscular

administration of 25 mg testosterone propionate + 100 mg testosterone enathate or oral

administration of 160 mg testosterone undecanoate.

Application/Control Number: 13/118,180                                    Page 6
Art Unit: 1654

     The plasma samples analyzed were stored in the Barcelona laboratories where

the initial work-up was undertaken. Plasma proteins were precipitated by adding 4 ml

acetone:ethanol (1:1 v/v) to 1 mL of plasma samples. After brief sonication, the proteins

were pelleted by centrifugation at 360 rpm for 1 min. The solvent was decanted and

evaporatively removed under nitrogen. On receipt in California, the samples were

reconstituted in 2 mL water: glacial acetic acid and 10 mg Girard reagent T was added.

The reaction tubes were heated at 100 degrees for 0 min to allow formation of the

Girard hydrazones. The mixture was extracted twice with 5 mL of isooctane : methylene

chloride (2:1 v/v) and the solvent (containing the bulk of the plasma lipids and

nonketonic steroids) was discarded. Girard hydrazones are water soluble and, therefore

stay in the water phase. This water phase was extracted by C18 cartridge (Waters Sep-

pak). The sample recovered from Sep-pak in 4 mL of methanol was dried in anticipation

of mass spectrometric analysis (e.g., page 524).

     The analysis of testosterone ester Girard hydrazones was conducted on a

Michrom microbore HPLC instrument interfaced to a Micromass (VG) BioQ triple

quadrupole mass spectrometer. The column used was a Vydac C4 and the manual

injector utilized a 100 uL loop. The solvent flow rate was 50 uL/min. Samples for direct

infusion into the mass spectrometer were introduced at 10 uL per minute.

     The voltages of capillary and HV lens were 3.9 and 1 kV, respectively. The cone

voltage was 35 V when maximum sensitivity and no fragmentation was desired, and 74

V when fragmentation in the source was needed. Collision cell MS/MS was only

QUESTMS-00002772

Application/Control Number: 13/118,180                                    Page 7
Art Unit: 1654

conducted in association with direct infusion. The collision energy was ramped from 60

at m/z 50 to 40 at m/z 640.

All the underivatized testosterone esters gave simple mass spectra when

analyzed by direct infusion ESMS (See, e.g., Figures 1, 2). MS/MS fragmentation of

both source-produced m/z 289 and 271 resulted in formation of the ion at m/z 97 (e.g.,

page 525).

The Girard hydrazones have excellent HPLC properties under reverse phase

conditions. Figure 3 shows the separation of the 9 compounds, using in each case the

molecular ion for detection. For achieving specificity in plasma analysis, Shackelton et

al. chose to monitor three ions: the molecular ion and fragment ions m/z M-59 and M-

87. The peaks in Figure 4 A represent about 100 ng injected. Figure 5B shows the

equivalent data for 1 ng (e.g., page 528). Please note that this appears to correspond,

based on the sample treatment above to 1 ng/10 uL, or 100 ng/mL.

Therefore the reference is deemed to anticipate the instant claims above.

### Claim Rejections - 35 USC § 103

6.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

.       This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

QUESTMS-00002773

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

7.       Claims 1, 4-6, 9-12 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Ong et al. (50ths ASMS Conference Abstract Viewer, ASMS 2001, citation A39 in

the IDS dated 6/16/2011).

        Ong et al. teach a method for determining the amount of testosterone present in

a test sample,

        (a) purifying testosterone from the test sample by subjecting the sample to an

extraction column (HTLC, Preliminary data section) and an analytical column (LC,

Preliminary data section) to generate an eluent;

        (b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

        (c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (e.g., last 2 paragraphs of Preliminary Data section).

QUESTMS-00002774

Application/Control Number: 13/118,180                                      Page 9
Art Unit: 1654

See entire abstract for the limitations drawn to HTLC separation (e.g., preliminary

data section), serum/plasma (last paragraph), detection limit (last paragraph).

Ong et al. do not expressly teach using the method in a human sample, teaching

instead the use of the method in animal samples such as plasma.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the method of Ong et al. with human samples. One of

ordinary skill in the art at the time the invention was made would have been motivated

to do so given the high routine sensitivity and inter-batch precision, simplified

preparation and minimal carryover of the method. One of ordinary skill in the art at the

time the invention was made would have had a reasonable expectation of success

given that the method of Ong et al. was useful for the analysis of large number of

samples in studies of structure-activity for lead optimization using in vitro metabolic

stability to in vivo pharmacokinetic studies in various animal models.

Thus the invention as a whole was clearly prima facie obvious to one of ordinary

skill in the art at the time the invention was made.

9.      Claims 6-9 and 12 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Shackelton et al. (Steroids, 1997) in view of Quinn et al. (US 5,772,874, cited in the

IDS dated 2/23/2010) and Zimmer et al. (J Chrom 1999, citation A53 in the IDS dated

6/16/2011).

Shackelton et al. teach that injectable preparations of testosterone esters have

become widely misused to increase muscle mass and improve performance in atheltes.

Proof of such administration is difficult to obtain, because testosterone is an

QUESTMS-00002775

Application/Control Number: 13/118,180                                    Page 10
Art Unit: 1654

endogenous compound, and the esters are rapidly hydrolyzed to this steroid. The

accepted test for testosterone administration has been the urinary

testosterone/epitestosterone ratio, a value of >6 being taken as the hallmark of drug

misuse. However, rare false positives and many false negatives present a drawback to

the universal use of such a discriminant. One technique used to prove the presence of

synthetic testosterone or its metabolites in urine is combustion ratio mass spectrometry,

which renders it possible to distinguish endogenous from synthetic testosterone by

differing 13C content. Encouraging studies utilizing this technique have been described.

Another potential method would be to characterize the intact testosterone esters in

plasma, because the short-chain ones commonly used in drug preparations are not

synthesized in the body, in contrast to long-chain fatty acid steroid esters. The major

drawback in performing this type of assay relates to the fact that the esters are

efficiently hydrolyzed following administration and only very low concentrations can be

expected in blood plasma (e.g., page 523).

    Shackelton et al. teach testosterone acetate, propionate, enanthate, cypionate,

benzoate and phenylpropionate were obtained from the Sigma Chemical company.

Testosterone isocaporate and undecanoate were products of Organon, OSS. 19-Nor-

testosterone acetate was synthesized by acetylation of the parent steroid obtained from

Sigma.

    Plasma samples were obtained from volunteers following intramuscular

administration of 25 mg testosterone propionate + 100 mg testosterone enathate or oral

administration of 160 mg testosterone undecanoate.

Application/Control Number: 13/118,180                                Page 11
Art Unit: 1654

The plasma samples analyzed were stored in the Barcelona laboratories where

the initial work-up was undertaken. Plasma proteins were precipitated by adding 4 ml

acetone:ethanol (1:1 v/v) to 1 mL of plasma samples. After brief sonication, the proteins

were pelleted by centrifugation at 360 rpm for 1 min. The solvent was decanted and

evaporatively removed under nitrogen. On receipt in California, the samples were

reconstituted in 2 mL water: glacial acetic acid and 10 mg Girard reagent T was added.

The reaction tubes were heated at 100 degrees for 0 min to allow formation of the

Girard hydrazones. The mixture was extracted twice with 5 mL of isooctane : methylene

chloride (2:1 v/v) and the solvent (containing the bulk of the plasma lipids and

nonketonic steroids) was discarded. Girard hydrazones are water soluble and, therefore

stay in the water phase. This water phase was extracted by C18 cartridge (Waters Sep-

pak). The sample recovered from Sep-pak in 4 mL of methanol was dried in anticipation

of mass spectrometric analysis (e.g., page 524).

The analysis of testosterone ester Girard hydrazones was conducted on a

Michrom microbore HPLC instrument interfaced to a Micromass (VG) BioQ triple

quadrupole mass spectrometer. The column used was a Vydac C4 and the manual

injector utilized a 100 uL loop. The solvent flow rate was 50 uL/min. Samples for direct

infusion into the mass spectrometer were introduced at 10 uL per minute.

The voltages of capillary and HV lens were 3.9 and 1 kV, respectively. The cone

voltage was 35 V when maximum sensitivity and no fragmentation was desired, and 74

V when fragmentation in the source was needed. Collision cell MS/MS was only

QUESTMS-00002777

conducted in association with direct infusion. The collision energy was ramped from 60

at m/z 50 to 40 at m/z 640.

All the underivatized testosterone esters gave simple mass spectra when

analyzed by direct infusion ESMS (See, e.g., Figures 1, 2).

The Girard hydrazones have excellent HPLC properties under reverse phase

conditions. Figure 3 shows the separation of the 9 compounds, using in each case the

molecular ion for detection. For achieving specificity in plasma analysis, Shackelton et

al. chose to monitor three ions: the molecular ion and fragment ions m/z M-59 and M-

87. Previous analysis of the samples by GC NS/MS indicated that the concentration

was 0.8 ng/mL or 80 ng/dL (e.g., page 528).

Shackelton et al. do not expressly teach detecting concentrations less than 10

ng/dL , 5 ng/dL or 1 ng/dL or using HTLC.

Quinn et al. teach turbulent flow chromatography (columns 7-9) to provide

improved chromatographic separation, capacity and resolution when combining with

HPLC (e.g., col. 1) thus creating a useful and improved separation.

Zimmer et al. teach that turbulent flow chromatography (TFC) combined with the

high selectivity and sensitivity of tandem mass spectrometry (MS-MS) is a new

technique for the fast direct analysis of drugs from crude plasma. TFC in the 96-well

plate format reduces significantly the time required for sample clean-up in the

laboratory. For example, for 100 samples the workload for a technician is reduced from

about 8 h by a manual liquid-liquid extraction (LLE) assay to about 1 h in the ease of

TFC. Sample clean-up and analysis are performed on-line on the same column. Similar

QUESTMS-00002778

Application/Control Number: 13/118,180                                    Page 13
Art Unit: 1654

chromatographic performance and validation results were achieved using HTLC Turbo-

C18 columns (Cohesive Technologies) and Oasis HLB extraction

columns (Waters). One 96-well plate with 96 plasma samples is analyzed within 5.25 h,

corresponding to 3.3 min per sample. Compared to this LLE and analysis of 96 samples

takes about 16 h. Two structurally different and highly protein bound compounds, drug

A and drug B, were analyzed under identical TFC conditions and the assays were fully

validated for the application to toxicokinetics studies (compliant with Good Laboratory

Practices - GLP). The limit of quantitation was 1.00 ug/l (0.1 ug/dL) and the linear

working range covered three orders of magnitude for both drugs: In the case of drug A

the quality of analysis by TFC was similar to the reference LLE assay and slightly better

than automated solid-phase extraction in 96-well  plates. The accuracy was -3.1 to 6.7%

and the precision was 3.1 to 6.8% in the case of drug A determined for dog plasma by

TFC-MS-MS. For drug B the accuracy was -3.7 to 3.5% and the precision was 1.6 to

5.4% for rat plasma, which is even slightly better than what was achieved with the

validated protein precipitation assay (e.g., abstract).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the tandem mass spectrometric method for testosterone

MS/MS analysis of Shackelton et al. (e.g. abstract) by extracting with an HTLC

extraction step before the MS/MS step as taught by Zimmer et al. to quickly purify the

plasma samples containing testosterone.  The skilled artisan would have been

motivated to do use Zimmer al.'s turbulent flow chromatographic method because it

created a fast and high selectivity and sensitivity method down to 0.1 ug/dL when

QUESTMS-00002779

Application/Control Number: 13/118,180                                    Page 14
Art Unit: 1654

coupled to MS/MS (e.g., abstract) and therefore it would have been a desirable method

to purify the biological samples comprising testosterone of Shackelton et al. There

would have been a reasonable expectation of success, given that Zimmer et al. teaches

that this kind of analysis provides direct analysis of protein bound drugs (e.g., page 35,

columns 1-2) such as testosterone (e.g. page 2178). Further, one of ordinary skill in the

art would have been motivated to decrease the detection limit by using this higher

sensitivity and selectivity and thus determining the lower limit of detection based on the

teachings of Zimmer et al.  Furthermore, "[g]enerally, differences in concentration or

temperature will not support the patentability of subject matter encompassed by the

prior art unless there is evidence indicating such concentration or temperature is critical.

"[W]here the general conditions of a claim are disclosed in the prior art, it is not

inventive to discover the optimum or workable ranges by routine experimentation.""

(See MPEP 2144.05).

　　　　Thus the invention as a whole was clearly prima facie obvious to one of ordinary

skill in the art at the time the invention was made.

### Double Patenting

10.　　The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees.　A nonstatutory
obviousness-type double patenting rejection is appropriate where the conflicting claims
are not identical, but at least one examined application claim is not patentably distinct
from the reference claim(s) because the examined application claim is either anticipated
by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140
F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29
USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir.
1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422

QUESTMS-00002780

Application/Control Number: 13/118,180                                    Page 15
Art Unit: 1654

F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163
USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on a nonstatutory
double patenting ground provided the conflicting application or patent either is shown to
be commonly owned with this application, or claims an invention made as a result of
activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a
terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with
37 CFR 3.73(b).

11.   Claims 1-12 are rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,754,419 (citation

A16 in the IDS dated 6/16/2011). Although the conflicting claims are not identical, they

are not patentably distinct from each other because the instantly claimed invention and

the invention claimed in US '419 are both drawn to a method for determining the

presence or amount of testosterone in a test sample utilizing steps encompassed or

encompassed by the claimed method of US '419. US '419 teaches a method for

determining the presence or amount of testosterone in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

QUESTMS-00002781

Application/Control Number: 13/118,180                                    Page 16
Art Unit: 1654

ng/mL] in the test sample (see all claims of US '419 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '419

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) including appropriate columns. The ions

detected are 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5, 96.9 $\pm$ 0.5.

Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

12.     Claims 1-12 are rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,348,137 (citation

A13 i/n the IDS dated 6/16/2011). Although the conflicting claims are not identical, they

are not patentably distinct from each other because the instantly claimed invention and

the invention claimed in US '137 are both drawn to a method for determining the

presence or amount of testosterone in a test sample utilizing steps encompassed or

encompassed by the claimed method of US '137. US '137 teaches a method for

determining the presence or amount of testosterone in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

QUESTMS-00002782

Application/Control Number: 13/118,180                                    Page 17
Art Unit: 1654

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '137 and also the section regarding the

limit of detection (LOD) in Example 4 which describes the LOD is 0.6 ng/dL). US '137

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) including appropriate columns. The ions

detected are $289.1 \pm 0.5$, $109.2 \pm 0.5$, $96.9 \pm 0.5$.

Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

13.     Claims 1-12 are rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-39 of U.S. Patent No. 6,977,143 (citation

A12 i/n the IDS dated 6/16/2011).  Although the conflicting claims are not identical, they

are not patentably distinct from each other because the instantly claimed invention and

the invention claimed in US '143 are both drawn to a method for determining the

presence or amount of testosterone in a test sample utilizing steps encompassed or

encompassed by the claimed method of US '143. US '143 teaches a method for

determining the presence or amount of testosterone in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

Application/Control Number: 13/118,180                    Page 18
Art Unit: 1654

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '143 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '143

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) and appropriate columns for HTLC. The ions

detected are 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5, 96.9 $\pm$ 0.5.

Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

14.    Claims 1-12 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 13-28 of

copending Application No. 12/946,785.   Although the conflicting claims are not

identical, they are not patentably distinct from each other because both are drawn to

(a) purifying testosterone from the test sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

QUESTMS-00002784

Application/Control Number: 13/118,180                                    Page 19
Art Unit: 1654

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL such as 1 ng/dL.

This is a provisional obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

15.     Claims 1-12 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 1-13 of

copending Application No. 12/607,905.   Although the conflicting claims are not

identical, they are not patentably distinct from each other because both are drawn to

(a) purifying testosterone from the test sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL such as 1 ng/dL.

QUESTMS-00002785

Application/Control Number: 13/118,180                                    Page 20
Art Unit: 1654

This is a <u>provisional</u> obviousness-type double patenting rejection because the conflicting claims have not in fact been patented.

### *Conclusion*

16.     No claim is allowed.

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

17.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone number is (571)272-2939. The examiner can normally be reached on M-F 8:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Cecilia J. Tsang can be reached on (571) 272-0562. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

QUESTMS-00002786

Application/Control Number: 13/118,180                                      Page 21
Art Unit: 1654

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 09/2011

QUESTMS-00002787

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| ***Notice of References Cited*** | | 13/118,180 | CAULFIELD ET AL. |
| | | Examiner | Art Unit | |
| | | MARCELA M. CORDERO | 1654 | Page 1 of 1 |

## U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

## FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

## NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Caraiman et al. Optimal Sensitivity and Increased Throughput Using a Dual TIS/APCI Ionization Source and TurboFlow Chromatography with LC/MS/MS. Poster Number 075. 51st Conference on Mass Spectrometry and Allied Topics, American Society for Mass Spectrometry, Montreal, Quebec, June 2003, 4 pages. |
| | V | Salameh et al. Validation of a total testosterone assay using high-turbulence liquid chromatography tandem mass spectrometry: Total and free testosterone reference ranges. Steroids. 2010, pages 169-175. |
| | W | Shackelton et al. Electrospray of mass spectrometry of testosterone esters: potential for use in doping control. Steroids. 1997. Vol. 62, Nol. 78, pages 523-529. |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20110901

QUESTMS-00002788

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 12946785 |
| **Filing Date:** | 15-Nov-2010 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Claims in excess of 20 | 1202 | 7 | 60 | 420 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

QUESTMS-00002789

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension - 2 months with $0 paid | 1252 | 1 | 560 | 560 |
| **Miscellaneous:** | | | | |
| Statutory or terminal disclaimer | 1814 | 3 | 160 | 480 |
| **Total in USD ($)** | | | | **1460** |

QUESTMS-00002790

# Electronic Acknowledgement Receipt

| EFS ID: | 11404443 |
|---|---|
| Application Number: | 12946785 |
| International Application Number: | |
| Confirmation Number: | 1630 |
| Title of Invention: | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| First Named Inventor/Applicant Name: | Michael P. Caulfield |
| Customer Number: | 30542 |
| Filer: | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| Filer Authorized By: | Anthony Charles Kuhlmann |
| Attorney Docket Number: | 034827-9107 |
| Receipt Date: | 14-NOV-2011 |
| Filing Date: | 15-NOV-2010 |
| Time Stamp: | 19:59:47 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1460 |
| RAM confirmation Number | 7540 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00002791

| 1 | Extension of Time | 034827-9107_EOT.pdf | 84036<br><br>559f6bcd07672e9c4def0b1bdbbbc8e949c73ce1 | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | | 034827-9107_Resp.pdf | 1484449<br><br>7c05f9b073504a3452e8a3d12b6be90728c04f88 | yes | 24 |
|---|---|---|---|---|---|

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|
| | **Document Description** | | **Start** | | **End** |
| | Amendment/Req. Reconsideration-After Non-Final Reject | | 1 | | 1 |
| | Claims | | 2 | | 5 |
| | Applicant Arguments/Remarks Made in an Amendment | | 6 | | 14 |
| | Non Patent Literature | | 15 | | 24 |

**Warnings:**

**Information:**

| 3 | Terminal Disclaimer Filed | 034827-9107_TD-137.pdf | 72548<br><br>e7e37e403e696a38a6a0136edd918807dfdc81ea | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Terminal Disclaimer Filed | 034827-9107_TD-142.pdf | 72690<br><br>b3c94cae2c02266e781d47e77d61e1da861b1a60 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Terminal Disclaimer Filed | 034827-9107_TD-419.pdf | 72845<br><br>8968b1a8666422376e5fb845f40aa7f84075cd9 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 6 | | 034827-9107_IDS.pdf | 125572<br><br>bcf5fca23c58998bdddb5fdb1996ec462c114492 | yes | 3 |
|---|---|---|---|---|---|

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|
| | **Document Description** | | **Start** | | **End** |
| | Transmittal Letter | | 1 | | 2 |

QUESTMS-00002792

| | Information Disclosure Statement (IDS) Form (SB08) | | 3 | 3 |
|---|---|---|---|---|
| **Warnings:** | | | | |
| **Information:** | | | | |
| 7 | Non Patent Literature | US-OA_dated-9-7-11.pdf | 949945<br><br>30bbea9e913448999d175607901c7436bf15bab4 | no | 23 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| 8 | Fee Worksheet (SB06) | fee-info.pdf | 33914<br><br>340aa9ede4efa8e6ab989d11326833d14b8877d8 | no | 2 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| | | **Total Files Size (in bytes):** | 2895999 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002793

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:       Caulfield et al.

Title:           DETERMINATION OF
                 TESTOSTERONE BY MASS
                 SPECTROMETRY

Appl. No.:       12/946,785

Filing Date:     11/15/2010

Examiner:        Cordero Garcia, Marcela M.

Art Unit:        1654

Confirmation     1630
Number:

## AMENDMENT TRANSMITTAL

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Transmitted herewith is an amendment in the above-identified application.

[   ]   Small Entity status under 37 C.F.R. § 1.9 and § 1.27 has been established by a previous
        assertion of Small Entity status.

Enclosed are:

[ X ]   Three (3) Terminal Disclaimers over U. S. Patent Nos. 7,754,419, 7,348,137 and
        6,977,142.

[ X ]   Information Disclosure Statement and Form PTO/SB/08.

4831-6521-4990.1                          -1-

QUESTMS-00002794

Atty. Dkt. No. 034827-9107

[ X ]    The fee required for additional claims is calculated below:

| | Claims As Amended | | Previously Paid For | | Extra Claims Present | | Rate | | Additional Claims Fee |
|---|---|---|---|---|---|---|---|---|---|
| Total Claims: | 27 | - | 20 | = | 7 | x | $60.00 | = | $420.00 |
| Independent Claims: | 2 | - | 3 | = | 0 | x | $250.00 | = | $0.00 |
| First presentation of any Multiple Dependent Claims: | | | | + | | $450.00 | | = | $0.00 |
| | | | | | | CLAIMS FEE TOTAL | | = | $420.00 |

[ X ]    Applicant hereby petitions for an extension of time under 37 C.F.R. §1.136(a) for the total number of months checked below:

| | | | |
|---|---|---|---|
| [   ] | Extension for response filed within the first month: | $150.00 | $0.00 |
| [ X ] | Extension for response filed within the second month: | $560.00 | $560.00 |
| [   ] | Extension for response filed within the third month: | $1,270.00 | $0.00 |
| [   ] | Extension for response filed within the fourth month: | $1,980.00 | $0.00 |
| [   ] | Extension for response filed within the fifth month: | $2,690.00 | $0.00 |
| | EXTENSION FEE TOTAL: | | $560.00 |
| [ X ] | Statutory Disclaimer Fee under 37 C.F.R. 1.20(d): | $160.00 | $480/00 |
| | CLAIMS, EXTENSION AND DISCLAIMER FEE TOTAL: | | $1,460.00 |
| [ ] | Small Entity Fees Apply (subtract ½ of above): | | $0.00 |
| | Extension Fees Previously Paid: | | $0.00 |
| | TOTAL FEE: | | $1,460.00 |

The above-identified fees of $1,460.00 are being paid by credit card via EFS-Web.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to

QUESTMS-00002795

Atty. Dkt. No. 034827-9107

Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

If any extensions of time are needed for timely acceptance of papers submitted herewith, applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

Date ___11/14/11___

By _____

FOLEY & LARDNER LLP
Customer Number: 30542
Telephone:     (858) 847-6776
Facsimile:      (858) 792-6773

Anthony C. Kuhlmann
Attorney for Applicant
Registration No. 57,147

QUESTMS-00002796

PTO/SB/26 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 034827-9107 |
|---|---|

In re Application of: Michael P. Caulfield, Darren A Carns and Richard E Reitz

Application No.: 12/946,785

Filed: 11/15/2010

For: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

The owner*, __Quest Diagnostics Investments Incorporated__, of ____100____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term **prior patent** No. _7,348,137_ as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
  expires for failure to pay a maintenance fee;
  is held unenforceable;
  is found invalid by a court of competent jurisdiction;
  is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
  has all claims canceled by a reexamination certificate;
  is reissued; or
  is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐   For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

  I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. ☑   The undersigned is an attorney or agent of record.   Reg. No. _57,147_

| | |
|---|---|
| _(signature)_ | 11-14-2011 |
| Signature | Date |

Anthony C. Kuhlmann
Typed or printed name

(858) 847-6776
Telephone Number

☑   Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MEPP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

QUESTMS-00002797

PTO/SB/26 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 034827-9107 |
|---|---|

In re Application of: Michael P. Caulfield, Darren A Carns and Richard E Reitz

Application No.: 12/946,785

Filed: 11/15/2010

For: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

The owner*, __Quest Diagnostics Investments Incorporated__, of __100__ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term **prior patent** No. __6,977,142__ as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
  expires for failure to pay a maintenance fee;
  is held unenforceable;
  is found invalid by a court of competent jurisdiction;
  is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
  has all claims canceled by a reexamination certificate;
  is reissued; or
  is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐ For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. ☑ The undersigned is an attorney or agent of record. Reg. No. 57,147

| _____[signature]_____ | 11-14-2011 |
|---|---|
| Signature | Date |

Anthony C. Kuhlmann
Typed or printed name

(858) 847-6776
Telephone Number

☑ Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MEPP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

QUESTMS-00002798

PTO/SB/26 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 034827-9107 |
|---|---|

In re Application of: Michael P. Caulfield, Darren A Carns and Richard E Reitz

Application No.: 12/946,785

Filed: 11/15/2010

For: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

The owner*, ___Quest Diagnostics Investments Incorporated___, of ___100___ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term **prior patent** No. _7,754,419_____ as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
    expires for failure to pay a maintenance fee;
    is held unenforceable;
    is found invalid by a court of competent jurisdiction;
    is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
    has all claims canceled by a reexamination certificate;
    is reissued; or
    is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. [  ]   For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

    I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. [✓]   The undersigned is an attorney or agent of record. Reg. No. _57,147_____

| | |
|---|---|
| _____ | 11-14-2011 |
| Signature | Date |

Anthony C. Kuhlmann
Typed or printed name

(858) 847-6776
Telephone Number

[✓]   Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

QUESTMS-00002799

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Caulfield et al.

Title:          DETERMINATION OF
                TESTOSTERONE BY MASS
                SPECTROMETRY

Appl. No.:      12/946,785

Filing Date:    11/15/2010

Examiner:       Cordero Garcia, Marcela M.

Art Unit:       1654

Confirmation    1630
Number:

## INFORMATION DISCLOSURE STATEMENT
## UNDER 37 CFR §1.56

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Submitted herewith on Form PTO/SB/08 is a listing of a document known to Applicants in order to comply with Applicants' duty of disclosure pursuant to 37 CFR §1.56.

The submission of any document herewith, which is not a statutory bar, is not intended as an admission that such document constitutes prior art against the claims of the present application or that such document is considered material to patentability as defined in 37 CFR §1.56(b). Applicants do not waive any rights to take any action which would be appropriate to antedate or otherwise remove as a competent reference any document which is determined to be a *prima facie* art reference against the claims of the present application.

4815-2494-9517.1                        -1-

QUESTMS-00002800

Atty. Dkt. No. 034827-9107

## TIMING OF THE DISCLOSURE

The listed document is being submitted in compliance with 37 CFR §1.97(b), within three (3) months of the filing date of the application.

## RELEVANCE OF EACH DOCUMENT

All of the documents are in English.

Applicants respectfully request that each listed document be considered by the Examiner and be made of record in the present application and that an initialed copy of Form PTO/SB/08 be returned in accordance with MPEP §609.

Although Applicant believes that no fee is required, the Commissioner is hereby authorized to charge any additional fees which may be due to Deposit Account No. 19-0741.

Respectfully submitted,

Date ___11/14/11___          By _____

FOLEY & LARDNER LLP                    Anthony C. Kuhlmann
Customer Number: 30542                 Attorney for Applicant
Telephone:    (858) 847-6776           Registration No. 57,147
Facsimile:    (858) 792-6773

4815-2494-9517.1

QUESTMS-00002801

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD  Substitute for Form PTO-875 | Application or Docket Number  12/946,785 | Filing Date  11/15/2010 | ☐ To be Mailed |
|---|---|---|---|

### APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY ☐ | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  | N/A |  |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  | N/A |  |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  | N/A |  |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = |  | X $ = |  |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = |  | X $ = |  |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

### APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT | **11/14/2011** | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * 27 | Minus | ** 20 | = 7 | X $ = | | X $60= | 420 |
|  | Independent (37 CFR 1.16(h)) | * 2 | Minus | ***3 | = 0 | X $ = | | X $250= | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
|  | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | **420** |

|  |  | (Column 1) | | (Column 2) | (Column 3) | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT |  | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | |
|  | Total (37 CFR 1.16(i)) | * | Minus | *** | = | X $ = | | X $ = | |
|  | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | X $ = | |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
|  | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/BRUCE HARRISON/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

QUESTMS-00002802

Atty. Dkt. No. 034827-9107

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Caulfield et al. |
| Title: | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| Appl. No.: | 12/946,785 |
| Filing Date: | 11/15/2010 |
| Examiner: | Cordero Garcia, M.M. |
| Art Unit: | 1654 |
| Confirmation Number: | 1630 |

### SUPPLEMENTAL AMENDMENT

Mail Stop Amendment
Commissioner for Patents
PO Box 1450
Alexandria, Virginia 22313-1450

Sir:

This reply supplements the Amendment filed on November 14, 2011

**Remarks/Arguments** begin on page 2 of this document.

-1-

QUESTMS-00002803

Atty. Dkt. No. 034827-9107

## REMARKS

Applicant herewith submits a declaration under 37 CFR 1.131 executed by inventor Dr. Michael P. Caulfield demonstrating reduction to practice prior to publication of the Caraiman reference.  Exhibits 1 and 2 accompanying the declaration are excerpts from a Validation Summary Report demonstrating application of the claimed method for quantitation of testosterone in human serum and plasma samples.   Dr. Caulfield attests that the data shown in Exhibit 2 were collected by the method described in Exhibit 1 prior to June 2003, the publication date of Caraiman et al.

Applicants respectfully request that the declaration be considered along with the Amendment and Reply filed November 14, 2011, which references the instant declaration.

## <u>CONCLUSION</u>

Applicant respectfully submits that the pending claims are in condition for allowance.  In the event that any matters remain to be resolved in view of this communication, the Examiner is encouraged to call the undersigned so that a prompt disposition of this application can be achieved.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by a check or credit card payment form being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any additional extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

4848-2819-2782.1

QUESTMS-00002804

Atty. Dkt. No. 034827-9107

Respectfully submitted,

Date _____ 11/15/11 _____     By _____

FOLEY & LARDNER LLP                   Barry S. Wilson, Reg. No. 39,431
Customer Number: 30542                Anthony C. Kuhlmann, Reg. No. 57,147
Telephone:    (858) 847-6722          Attorneys for Applicant
Facsimile:    (858) 792-6773

-3-

4848-2819-2782.1

QUESTMS-00002805

Atty. Dkt. No. 034827-9107

### *IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

Applicant:     Caulfield et al.

Title:         DETERMINATION OF
               TESTOSTERONE BY MASS
               SPECTROMETRY

Appl. No.:     12/946,785

Filing Date:   11/15/2010

Examiner:      Cordero Garcia, M.M.

Art Unit:      1614

Conf. No.:     1630

### DECLARATION OF MICHAEL P. CAULFIELD UNDER 37 CFR 1.131

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

I, Michael P. Caulfield, being duly warned, declare as follows:

1.     I was educated in biochemistry and microbiology at Sussex University and Bristol University, both in England, where I received a B.S. degree and a PhD. degree, respectively.

2.     I was a research fellow at Harvard Medical School, Boston Massachusetts and a postdoctoral associate at the Massachusetts Institute of Technology.  I have been a Scientific Director in Endocrinology & Metabolism at Quest Diagnostics/Nichols Institute since 1997.  I am the author or co-author of over 100 published scientific articles and abstracts in the field of Biochemistry, Endocrinology and Metabolism.

-1-

4849-0513-0510.1

QUESTMS-00002806

Atty. Dkt. No. 034827-9107

3.      I am a co-inventor of the above-referenced patent application and the subject matter described and claimed therein.

4.      I have read the Office Action dated June 14, 2011 for the above-referenced application, and I understand that June 2003 is the date of a reference cited by the Examiner (i.e., Caraiman *et al.*, ASMS 2003, Poster Number 075, June 2003), which allegedly discloses or renders obvious my invention.

5.      Prior to June 2003, the inventors put into practice the method described in the above-referenced application for determining the levels testosterone in a sample when taken from a human.  The method includes purifying testosterone from a sample by subjecting the sample to an extraction column and an analytical column to generate an eluent; ionizing the eluent to produce one or more testosterone ions detectable by a mass spectrometer; and (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the test sample. In some embodiments, the ionizing comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$; isolating the precursor ion by mass spectrometry; and effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having a mass/charge ratio of $96.9 \pm 0.5$.  In some embodiments the sample comprises serum.  In some embodiments, the extraction column comprises a high turbulence liquid chromatography column.  This invention is reflected in the specification and claims of the above mentioned application.

6.      Exhibits 1 and 2 contain excerpts from a laboratory Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan).  Exhibit 1 is a photocopy of p. 4 of the Report, describing the method employed to collect data for validation of the method. Exhibit 2 is a photocopy of p. 18 of the Report with data resulting from execution of the method. The data in Exhibit 2 were collected at the laboratories of Quest Diagnostics Incorporated, San Juan Capistrano, CA.  Exhibits 1 and 2 are true and complete copies of the above-mentioned

4849-0513-0510.1

QUESTMS-00002807

Validation Summary Report pages, except that the date has been redacted. I attest that the redacted date is earlier than June 2003.

7.      As seen in Exhibit 1, the inventors performed the method by first purifying testosterone from human plasma and serum with a high turbulence liquid chromatography (HTLC) extraction column, followed by further purification with a high performance liquid chromatography (HPLC) analytical column. Eluent from the analytical column was ionized, and testosterone precursor ions with m/z of $289.1 \pm 0.5$ were generated. These testosterone precursor ions were then isolated by mass spectrometry and fragmented to generate fragment ions comprising a fragment ion with m/z of $96.9 \pm 0.5$. Quantitation of testosterone present in the plasma and serum samples was based on the abundance of fragment ions.

8.      As seen in Exhibit 2, the above method was performed on samples of both human plasma and serum, and the results compared to determine the consistency of the method across both sample types.

        I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements are made with the knowledge that willful false statements are so made punishable by fine or imprisonment, or both, under Section 101 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

_November 14, 2011_                           _Michael P. Caulfield_
Date                                          Michael P. Caulfield, Ph.D.

Attachments:

- Exhibit 1: True and complete copy of p. 4 of Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan), dated prior to June 2003.

-3-

QUESTMS-00002808

Atty. Dkt. No. 034827-9107

- Exhibit 2: True and complete copy of p. 18 of Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan), dated prior to June 2003.

4849-0513-0510.1

QUESTMS-00002809

Atty. Dkt. No. 034827-9106

**Exhibit 1: True and complete copy of p. 4 of Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan), dated prior to June 2003.**

DLMR_937367.1

QUESTMS-00002810

 Quest
Diagnostics

Nichols Institute

## II. PRINCIPLE
### 1. Methodology:

The overall design of this assay is to have enhanced specificity, a reduced run-time and sample preparation. To achieve this, two systems have been combined. The first is the High Throughput Liquid Chromatography system (HTLC) by Cohesive Technologies and the second is the Tandem Mass Spectrometer (LC/MS/MS) by ThermoFinnigan.

When operating the HTLC system, the elimination of unwanted sample components occurs in a turbulent flow regime. As the unbound and unwanted debris is swept through the extraction column at high velocity, the components of interest are captured and concentrated on the column. The extraction column is then backflushed and the sample is placed onto an analytical column. The next step is the gradient regime of the HTLC system. The analytical column is in-line and allows chromatographic separation of the components of interest. A gradient/step function of 60% to 100% methanol is used to enhance this step.

The detection is carried out by LC/MS/MS. The precursor ion, protonated molecule of interest, and any other ions of similar mass, are isolated by the first MS (Q1). These ions enter a second chamber (Q2) where they collide with Argon molecules. The collision-induced fragments differ for each molecular ion. Specific fragments produced only by the analyte ion are isolated by the final MS (Q3). The quantitation is based on the abundance of the final fragment ions. The following mass transitions are used:

|  | Positive Mode | |
| Analyte | Precursor Ion | Fragment Ions |
| --- | --- | --- |
| Testosterone | 289.1 m/z | 96.8 & 109.3 m/z |
| $d_5$-Testosterone | 294.1 m/z | 99.8 & 113.3 m/z |

### 2. Intended Use:

Clinical evaluation of serum testosterone, along with serum LH, assists in evaluation of hypogonadal males. Major causes of lowered testosterone in males include hypogonadotropic hypogonadism, testicular failure, hyperprolactinemia, hypopituitarism, some types of liver and kidney diseases, and critical illness.
Increased serum testosterone levels in females may be indicative of polycystic ovary syndrome and adrenal hyperplasia, among other conditions. The clinical manifestations of excess testosterone include infertility, hirsutism, amenorrhea, and obesity.

.Total Testosterone by HTLC/MS/MS Validation Summary

Atty. Dkt. No. 034827-9106

**Exhibit 2: True and complete copy of p. 18 of Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan), dated prior to June 2003.**

DLMR_937367.1

QUESTMS-00002812

**Quest Diagnostics**

**Nichols Institute**

Figure 4: Specimen Type



### Total Testosterone HTLC/MS/MS
#### Serum vs. Plasma

$y = 1.0936x - 36.573$
$R^2 = 0.902$

Total Testosterone by HTLC/MS/MS Validation Summary

QUESTMS-0000281

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 11411372 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 30542 |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Filer Authorized By:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 15-NOV-2011 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 19:17:04 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Supplemental Response or Supplemental Amendment | 023716-0502_SuppAmd.pdf | 279386<br>257e7cb66734e74876923e34ceabb5e8320467e0 | no | 11 |

**Warnings:**

**Information:**

QUESTMS-00002814

Total Files Size (in bytes):        279386

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002815

| *Application Number* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| [barcode] | 12946785 | CAULFIELD ET AL. |
| | | |

| **Document Code -** DISQ | **Internal Document – DO NOT MAIL** |
|---|---|

| **TERMINAL DISCLAIMER** | ☐ APPROVED | ☒ DISAPPROVED |
|---|---|---|
| **Date Filed:** 11/14/2011 | **This patent is subject to a Terminal Disclaimer** | |

| **Approved/Disapproved by:** | |
|---|---|
| Rugenia Logan | 3 TD - 2 TD's approved, 1 TD disapproved. Patent no. 6,977,142 is incorrect, should be 6,977,143. |

U.S. Patent and Trademark Office

QUESTMS-00002816

Uᴎɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oꜰꜰɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

30542        7590        01/13/2012
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/13/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

QUESTMS-00002817

| ***Office Action Summary*** | Application No. | Applicant(s) |
| | 12/946,785 | CAULFIELD ET AL. |
| | Examiner | Art Unit | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>11/14/2011 and 11/15/2011</u>.

2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5) ☒ Claim(s) <u>13 and 15-40</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>13, 15-40</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some * c) ☐ None of:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____.

        3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date <u>6/16/2011 and 11/14/2011</u>.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

5) ☐ Notice of Informal Patent Application

6) ☐ Other: _____.

Application/Control Number: 12/946,785                                          Page 2
Art Unit: 1654

## DETAILED ACTION

1.      This Office Action is in response to the reply received on 11/15/2011.

        Any rejection from the previous office action, which is not restated here, is

withdrawn.

### Election/Restrictions

2.      Applicant's election without traverse of m/z of about 109.2 $\pm$ 0.5 in the reply filed

on 4/8/2011 was previously acknowledged.

### Status of the claims

3.      Claims 13-28 were pending in the application. Claim 13 has been amended.

Claims 29-40 are new claims. Claim 14 has been cancelled. Claims 13, 15-40 are now

pending. Claims 13, 15-40  are presented for examination on the merits.

### Claim Rejections - 35 USC § 102

4.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed
> publication in this or a foreign country, before the invention thereof by the applicant for a patent.
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in
> public use or on sale in this country, more than one year prior to the date of application for patent in
> the United States.

5.      Claims 13, 15-16, 19, 27-28 were previously rejected under 35 U.S.C. 102(b) as

being anticipated by Vierhapper et al. (J Clinical Endocrinology and Metabolism, 1997).

        This rejection is withdrawn in view of Applicant's amendments to the claims

because Vierhapper et al. teaches derivatizing testosterone before mass spectrometric

analysis (e.g., pages 1494-1495).

QUESTMS-00002819

Application/Control Number: 12/946,785                                    Page 3
Art Unit: 1654

6.      Claims 13, 15-16, 18-22, 24-32, 34-40 are rejected under 35 U.S.C. 102(e) as

being anticipated by Soldin (US 7,473,560, citation A11 in the IDS dated 6/16/2011).

        Soldin discloses a method for determining the amount of testosterone in a

sample when taken from a female human (e.g., cols. 1-5), comprising:

        (a) purifying testosterone from the sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

        (b) ionizing testosterone from the eluent to produce one or more testosterone

ions detectable by a mass spectrometer; and

        (c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the test sample;

        wherein said testosterone is not derivatized prior to mass spectrometry.

        Soldin teaches that the invention produces a fast and accurate method of

hormone analysis and quantification using a mass spectrometer. The procedure allows

for as little as 700 uL of a sample to be analyzed. In addition, minimal sample

preparation time is required. Soldin teaches analysis of hormones including

testosterone in a number of complex matrices as they might be found in nature, e.g., the

human body. For example, hormone analysis can be performed on samples of blood,

saliva, serum, plasma and urine. The limit of detection of testosterone is 5 pg/mL (e.g.,

col. 4).

        The hormones are then introduced into a mass spectrometer. Optionally, the

separation step and step of introducing the hormones into a mass spectrometer can be

QUESTMS-00002820

Application/Control Number: 12/946,785                                    Page 4
Art Unit: 1654

combined using a combined liquid chromatography spectrometry apparatus (LC/MS).
This procedure is based on an online extraction of the injected sample with subsequent
introduction into the mass spectrometer using a built-in switching valve. LC/MS and
liquid chromatography-tandem mass spectrometry (LC-MS-MS) are specific and offer
simple approaches to sample preparation without sample derivation steps.

The hormones are subjected to ionization. Various ionization techniques can be
used. For example, photoionization, electrospray ionization (ESI), atmospheric pressure
chemical ionization (APCI), and electron capture ionization may be used. Preferably,
photoionization is used when analyzing steroid hormones. It is presently preferred that
an atmospheric pressure photoionization (APPI) source be used when analyzing steroid
hormones.

Ionization may be performed by utilizing the mass spectrometer in the negative
or the positive mode. Factors such as a particular analyte's tendency to give rise to a
particular ion form, as is known to those skilled in the art, may make either the negative
mode or the positive mode more preferable. For example, analysis in the positive mode
is typically made for DHEA, Aldosterone, Cortisol, 11 -Deoxycortisol, Androstenedione,
Testosterone, Estradiol, 17-OH Progesterone, Progesterone, Allopregnalone, and
Vitamin D whereas analysis in the negative mode is typically made for 16-OH Estrone,
2-OH Estrone. Estriol and DHEAS. However, it is possible to analyze any of the
hormones in either positive or negative mode.

A sample of 800 uL of plasma was used. Proteins were precipitated with 1.2 mL
of acetonitrile, containing deuterated internal standard, and vortexed. The sample was

QUESTMS-00002821

Application/Control Number: 12/946,785                                    Page 5
Art Unit: 1654

centrifuged, and 1.7 mL of the supematant was injected onto a C-18 column coupled to

a LC/MS/MS. The column was washed with 2% methanol in 5 mM ammonium acetate

for 3 minutes. The valve on the column was switched and the sample was eluted in a

methanol gradient of 2 to 100%. The total run time was 12 minutes. Slight adjustments

to the volumes, concentrations and times described can be made, as is known to those

skilled in the art.

　　　1.7 ml of the eluant was introduced into the mass spectrometer and the sample

was ionized by photoionization and analyzed in an API-3000.TM. mass spectrometer, in

the negative or positive mode as described above. FIGS. 1 and 2 show the analysis of

steroid hormones in the positive and negative modes.

　　　Simultaneous measurement of 9 steroids in a 760 uL of serum or plasma

sample, without derivatization and with minimal sample workup-acetonitrile protein

precipitation was carried out. The reliability of the method has been evaluated by

correlation with currently used immunoassays, and assessment of within-day and

between-day imprecision, recovery and accuracy. The method described allows for the

simultaneous quantitation of 9 steroids in positive ion mode by tandem mass

spectrometry within 18 minutes. The method is based on isotope dilution and unlike

immunoassays is very specific for the analytes of interest. The method possesses

adequate sensitivity (due to use of the APPI source, with the lower level of sensitivity

being 100 pg/mL [which corresponds to 1 ng/dL] for each steroid) and precision to be

used in the routine clinical laboratory. The method has been used for the measurement

of steroid concentrations in patient samples.

Application/Control Number: 12/946,785                                   Page 6
Art Unit: 1654

> Therefore the reference is deemed to anticipate the instant claims above.

## *Claim Rejections - 35 USC § 103*

7.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

.       This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

8.      Claims 13-21, 24, 26-28 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Caraiman et al. (ASMS 2003, Poster Number 075, June 2003).

> The declaration filed on 11/15/2011 under 37 CFR 1.131 is sufficient to

overcome this rejection.

9.      Claims 13-16, 18-21, 24-28 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Shackelton et al. (Steroids, 1997).

Application/Control Number: 12/946,785                                        Page 7
Art Unit: 1654

This rejection is withdrawn in view of Applicant's amendments to the claims because Shackelton et al. teaches mass spectrometric analysis of testosterone esters.

10.    Claims 17 and 22-23 were rejected under 35 U.S.C. 103(a) as being unpatentable over Shackelton et al. (Steroids, 1997) in view of Quinn et al. (US 5,772,874) and Zimmer et al. (J Chrom 1999).

This rejection is withdrawn in view of Applicant's amendments to the claims because Shackelton et al. teaches mass spectrometric analysis of testosterone esters.

11.    Claims 13, 15-21, 27-40 are rejected under 35 U.S.C. 103(a) as being unpatentable over Ong et al. (50ths ASMS Conference Abstract Viewer, June 2002).

Ong et al. teach a method for determining the amount of testosterone present in a test sample,

(a) purifying testosterone from the test sample by subjecting the sample to an extraction column (HTLC, Preliminary data section) and an analytical column (LC, Preliminary data section) to generate an eluent;

(b) ionizing the purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass spectrometer, wherein the presence or amount of the testosterone ion(s) is related to the presence or amount of testosterone in the test sample, wherein the method is capable of detecting concentrations of less than 10 ng/dL [equivalent to 0.1 ng/mL] in the test sample (e.g., last 2 paragraphs of Preliminary Data section).

QUESTMS-00002824

Application/Control Number: 12/946,785                                    Page 8
Art Unit: 1654

See entire abstract for the limitations drawn to HTLC separation (e.g., preliminary data section), serum/plasma (last paragraph), detection limit (last paragraph).

Ong et al. do not expressly teach using the method in a human female plasma/tissue sample, teaching instead the use of the method in plasma/tissue samples obtained from animals for in vivo pharmacokinetic studies in animal models.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to use the method of Ong et al. with human female plasma/tissue samples. One of ordinary skill in the art at the time the invention was made would have been motivated to do so given the high routine sensitivity and inter-batch precision, simplified preparation and minimal carryover of the method and because testosterone is used as a control which necessarily implies that testosterone is intended to be measured. One of ordinary skill in the art at the time the invention was made would have had a reasonable expectation of success given that the method of Ong et al. was useful for the analysis of large number of samples in studies of structure-activity for lead optimization using in vitro metabolic stability to in vivo pharmacokinetic studies, because Ong et al. did not restrict the analysis results to specific genders of the animal samples and because the method of Ong et al. in a serial configuration for plasma/tissue matrices, has a generic limit of quantitation approaching 0.1 ng/ml, an accuracy < 10% relative error and a precision < 10% RSD.

Thus the invention as a whole was clearly prima facie obvious to one of ordinary skill in the art at the time the invention was made.

**Applicant's arguments**

Application/Control Number: 12/946,785                                    Page 9
Art Unit: 1654

12.     The Ong Abstract is asserted to allegedly teach a mass spectrometric method for

determining testosterone levels in animal samples such as plasma samples. Applicant

respectfully disagrees. First, Ong merely describes mass spectrometric detection of

testosterone as an internal standard in an unknown matrix. Second, even if the

unknown matrix is assumed to be plasma or serum (which applicant does not concede),

the levels of testosterone used by Ong are in vast excess of testosterone levels found in

female human samples and there is no indication that Ong's method could be

successfully employed to quantitate testosterone at the requisite levels.

        The Ong Abstract presents two instrumental configurations for conducting

metabolic stability screening by high turbulent flow liquid chromatography (HTLC)-mass

spectrometry. The first configuration utilizes parallel extraction columns with a single

analytical column (i.e., the parallel configuration), while the second configuration utilizes

a serial configuration of a single extraction column and a single analytical column (i.e.,

the serial configuration). The only reference to testosterone in the Ong Abstract is found

in the description of the parallel configuration, which indicates that testosterone was

used as a positive assay control. Ong Abstract, second to last paragraph. No sample

matrix is recited in the parallel configuration studies. Further, Ong reports that a different

column configuration is required for analysis of unspecified analytes in plasma/tissue

samples. Ong Abstract, last paragraph. Thus, it can be inferred that Ong's parallel

configuration studies (the only studies where testosterone is mentioned) were not

conducted with plasma or tissue samples.

Application/Control Number: 12/946,785                                   Page 10
Art Unit: 1654

In describing analysis involving plasma/tissue matrices, Ong makes no indication that testosterone was detected. Instead, Ong merely indicates that analysis of "various analytes" by the parallel and serial configurations were compared during method validation experiments. Ong Abstract, last paragraph.

Additionally, the levels of testosterone used by Ong are far greater than those typically found in human samples. Ong used testosterone as a positive assay control at concentrations of 5 uM and 0.5 uM. Ong Abstract, second to last paragraph. Using testosterone's molecular weight of about 288.42 g/mol, Ong's 5 uM and 0.5 uM testosterone concentrations correspond to concentrations of over 140,000 ng/dL and 14,000 ng/dL, respectively. These concentrations are in vast excess of the about 2 to about 63 ng/dL normal range of total testosterone in female humans. See Table 3 of Exhibit 1 (Kushnir et al., attached hereto, indicating normal ranges of total testosterone in female humans).

Applicant respectfully submits that due to well known unpredictability of ion suppression effects across different sample matrices, Ong's use of testosterone as a positive assay control in analysis of non-plasma/tissue matrix samples is simply not predictive of an ability either to quantitate testosterone in a female human sample or to perform that quantitation at testosterone levels present when taken from the female human. The instant claims are not obvious over Ong without some express application of an MS method to quantitate testosterone in female human samples, and an indication of a reasonable likelihood of success. Applicant respectfully requests reconsideration and withdrawal of this rejection.

QUESTMS-00002827

Application/Control Number: 12/946,785                                    Page 11
Art Unit: 1654

### *Response to arguments*

13.     Applicant's arguments have been carefully considered, but are not deemed

persuasive for the reasons of record, for the reasons set forth above, and for the

following reasons: It has been held that under KSR that "obvious to try" may be an

appropriate test under 103   The Supreme Court stated in KSR:

> When there is motivation "to solve a problem and there are a finite number of
> identified, predictable solutions, a person of ordinary skill has good reason to
> pursue the known options within his or her technical grasp. If this     leads to
> anticipated success, it is likely the product not of innovation but of ordinary skill
> and common sense. In that instance the fact that a combination was obvious to
> try might show that it was obvious under § 103." KSR Int'l Co. v. Teleflex Inc.,
> 127 S. Ct. 1727, ___, 82 USPQ2d 1385, 1397 (2007).

The "problem" facing those in the art was the measurement of testosterone in

female humans, and there were a limited number of methodologies available to do so

having generic detection limits of less than 10 ng/dL (0.1 ng/mL). The skilled artisan

would have had reason to try these methodologies with the reasonable expectation that

at least one would be successful. In the instant case Ong teaches analysis involving

plasma/tissue matrices using serial configurations having generic detection limits of less

than 10 ng/dL (0.1 ng/mL) which would be able to detect testosterone levels in women,

with the main advantages of simplified sample preparation (even for tissue samples)

prior to on-line extraction and minimal carryover. Ong Abstract, last paragraph. Thus,

determining testosterone in female blood/plasma is a "the product not of innovation but

of ordinary skill and common sense," leading to the conclusion that invention is not

patentable as it would have been obvious.

Application/Control Number: 12/946,785                                      Page 12
Art Unit: 1654

In addition, KSR forecloses the argument that a specific teaching, suggestion or

motivation is required to support a finding of obviousness.

See the recent Board decision Ex parte Smith, --USPQ2d--, slip op. at 20, (Bd.

Patt. App. & Interf. June 25, 2007) (citing KSR, 82 USPQ2s at 1396) (available at

http://www.uspto.gov/web/offices/dcom/bpai/prec/fd071925.pdf).

14.     Claims 13, 16-17, 19-21, 25-30, 35-40 are rejected under 35 U.S.C. 103(a) as

being unpatentable over Tiller et al. (J Chrom A, 1997, citation A48 in the IDS dated

6/12/2011).

Tiller et al. teach a method for determining the amount of testosterone in a

sample when taken from a human comprising:

(a) purifying testosterone from the sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

(b) ionizing testosterone from the eluent to produce one or more testosterone

ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the test sample (e.g., pages 119-122);

wherein the testosterone is not derivatized prior to mass spectrometry.

Tiller et al. teach human plasma aliquots were extracted using C8 extraction

columns, the disc was conditioned with 0.2 ml of methanol followed by elution of the

steroids with 1 ml of ethyl acetate. The eluate was evaporated to dryness, spiked with

steroids (testosterone was spiked at the level of 94 pg/mL to 12088 pg/mL and the

QUESTMS-00002829

Application/Control Number: 12/946,785                                    Page 13
Art Unit: 1654

internal standards 2H3 testosterone at a level of 10000 pg/mL) and reconstituted with

200 uL of mobile phase and 100 uL injected on-column.

A HP 1050 modular system was used with a flow of methanol water through a

Supelcosil LC-18-DB column. The LC was operated using APCI and full scan MS/MS

data were obtained for testosterone m/z 289->80-305; and deuterated testosterone m/z

292-> 80-305. Human plasma was used for the analysis (e.g., pages 122-125). See

also Figure 3.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the method of Tiller et al. with female human plasma. One of

ordinary skill in the art at the time the invention was made would have been motivated

to do so because the reference does not teach the gender of the subject from where the

plasma in obtained, and females form about half of the human population. One of

ordinary skill in the art at the time the invention was made would have had a reasonable

expectation of success given that it is noted that the internal standard was at 94 pg/mL

for testosterone and because, as claimed, the instant method do not preclude from

preconcentration of the sample.

Thus, the invention as a whole is prima facie obvious over the references,

especially in the absence of evidence to the contrary.

### *Double Patenting*

15.     The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees.   A nonstatutory
obviousness-type double patenting rejection is appropriate where the conflicting claims
are not identical, but at least one examined application claim is not patentably distinct

QUESTMS-00002830

Application/Control Number: 12/946,785                                    Page 14
Art Unit: 1654

from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

16.     Claims 13-28 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-32 of U.S. Patent No. 7,754,419.

The terminal disclaimer filed on 11/14/2011 disclaiming the terminal portion of

any patent granted on this application which would extend beyond the expiration date of

US 7,754,419 has been reviewed and is accepted.  The terminal disclaimer has been

recorded.

17.     Claims 13-28 were rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,348,137.

The terminal disclaimer filed on 11/14/2011 disclaiming the terminal portion of

any patent granted on this application which would extend beyond the expiration date of

US 7,348,137 has been reviewed and is accepted.  The terminal disclaimer has been

recorded.

18.     Claims 13, 15-40 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-39 of U.S. Patent No. 6,977,143.

QUESTMS-00002831

Application/Control Number: 12/946,785                                    Page 15
Art Unit: 1654

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '143

are both drawn to a method for determining the presence or amount of testosterone in a

test sample utilizing steps encompassed or encompassed by the claimed method of US

'143. US '143 teaches a method for determining the presence or amount of testosterone

in a test sample comprising:

(a) purifying testosterone from the test sample by HTLC extraction and  liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '143 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '143

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) and appropriate columns for HTLC. The ions

detected are 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5, 96.9 $\pm$ 0.5.

QUESTMS-00002832

Application/Control Number: 12/946,785                                    Page 16
Art Unit: 1654

Although US '143 does not expressly teach the method to be applied to females, one of ordinary skill in the art would had been motivated to use the high sensitive method down to 1 ng/dL in determination of testosterone in samples from females, which routinely have lower concentrations than males. One of ordinary skill in the art at the time the invention was made would have had a reasonable expectation of success since the method of US '143 is drawn to determining testosterone in blood, serum, plasma or urine from a human, which includes both males and females.

Thus, the invention as a whole is prima facie obvious over the patent, especially in the absence of evidence to the contrary.

The terminal disclaimer filed on 11/14/2011 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of US 6,977,143 has been reviewed and has not been accepted.  The TD received for this patent had an incorrect patent number (US 6,977,142 instead of US 6,977,143). Appropriate correction is required.

19.    Claims 13, 15-40 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-13 of copending Application No. 12/607,905.   Although the conflicting claims are not identical, they are not patentably distinct from each other because both are drawn to

(a) purifying testosterone from the test sample by subjecting the sample to an extraction column and an analytical column to generate an eluent;

QUESTMS-00002833

Application/Control Number: 12/946,785                                    Page 17
Art Unit: 1654

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL such as 1 ng/dL.

Although Application '905 does not expressly teach the method to be applied to

females, one of ordinary skill in the art would had been motivated to use the high

sensitive method down to 1 ng/dL in determination of testosterone in samples from

females, which routinely have lower concentrations than males. One of ordinary skill in

the art at the time the invention was made would have had a reasonable expectation of

success since the method of Application '905 is drawn to determining testosterone in

blood, serum, plasma or urine from a human, which includes both males and females.

This is a provisional obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

*Applicant's arguments*

20.    With respect to the provisional rejection over claims 1-13 of Application

12/607,905, Applicant requests that the provisional rejection be held in abeyance until

otherwise allowable subject matter is identified. Applicant will address any address any

provisional double patenting rejections at that time, should this rejection remain.

*Response to arguments*

QUESTMS-00002834

Application/Control Number: 12/946,785                                    Page 18
Art Unit: 1654

21.    This provisional ODP rejection is therefore maintained.

## Conclusion

22.    No claim is allowed.

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

23.    Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

24.    A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

23.    Any inquiry concerning this communication or earlier communications from the examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

Application/Control Number: 12/946,785                                      Page 19
Art Unit: 1654

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 01/2012

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 241 of 437 PageID #: 2630

12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid
OMB control number.

| Substitute for form 1449/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** Date Submitted: November 2, 2011 *(use as many sheets as necessary)* | | | | ***Complete if Known*** | |
|---|---|---|---|---|---|
| | | | | Application Number | 12/946,785 |
| | | | | Filing Date | 11/15/2010 |
| | | | | First Named Inventor | Michael P. Caulfield |
| | | | | Art Unit | 1654 |
| | | | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 1 | of | 1 | Attorney Docket Number | 034827-9107 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

**UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS**

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document Serial Number-Kind Code[2] *(if known)* | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | A1 | Office Action dated 09/07/2011 for US Application No. 13/118180 (034827-9108) | |
| | | ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./ | |

| Examiner Signature | /Marcela Cordero Garcia/ | Date Considered | 01/12/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

4842-0950-0685.1

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

QUESTMS-00002837

Receipt date: 06/16/2011

12946785 - GAU: 1654
PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| | Art Unit | 1654 |
| *(use as many sheets as necessary)* | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 1 | of | 5 | Attorney Docket Number | 034827-9107 |

### U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number — Number-Kind Code[2] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1 | 2004/0235193 | 11-25-2004 | SOLDIN | |
| | A2 | 5,772,874 | 06-30-1998 | QUINN ET AL. | |
| | A3 | 5,795,469 | 08-18-1998 | QUINN ET AL. | |
| | A4 | 5,919,368 | 07-06-1999 | QUINN ET AL. | |
| | A5 | 5,968,367 | 10-19-1999 | QUINN ET AL. | |
| | A6 | 6,107,623 | 08-22-2000 | BATEMAN ET AL. | |
| | A7 | 6,124,137 | 09-26-2000 | HUTCHENS ET AL. | |
| | A8 | 6,204,500 | 03-20-2001 | WHITEHOUSE ET AL. | |
| | A9 | 6,410,913 | 06-25-2002 | BREKENFELD ET AL. | |
| | A10 | 6,855,703 | 02-15-2005 | HILL ET AL. | |
| | A11 | 7,473,560 | 01-06-2009 | SOLDIN | |

### UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document Serial Number-Kind Code[2] *(if known)* | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

QUESTMS-00002838

Receipt date: 06/16/2011                                                        12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | **Complete if Known** | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| | Art Unit | 1654 |
| *(use as many sheets as necessary)* | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 2 | of | 5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A12 | CARAIMAN et al, Optimal sensitivity and increased throughout using a dual TIS/APCI ionization source and turbo flow chromatography with LC/MS/MS, Poster number 075, 51st conference on mass spectrometry and allied topics, American Society for Mass Spectrometry, Montreal, Quebec, June 2003, 4 pages | |
| | A13 | Carignan et al., High-performance liquid chromatographic analysis of estradiol valerate-testosterone enanthate in oily formulations, J Chrom 301(1):292-96 (1984) | |
| | A14 | Chang et al., Quantitative measurement of male steroid hormones using automated on-line solid phase extraction-liquid chromatography-tandem mass spectrometry and comparison with radioimmunoassay. Analyst, 123:363-368, 2003. | |
| | A15 | Choi et al., Determination of Four Anabolic Steroid Metabolites by Gas Chromatography/Mass Spectrometry with Negative Ion Chemical Ionization and Tandem Mass Spectrometry, Rapid Commun. Mass Spectrom 12, 1749-55 (1998) | |
| | A16 | Choi et al., Rapid HPLC-Electrospray Tandem Mass Spectrometric Assay for Urinary Testosterone and Dihydrotestosterone Glucuronides from Patients with Benign Prostate Hyperplasia. Clin. Chem. 49: 322-5 (2003) | |
| | A17 | Corrected Notice of Allowance dated 12/17/2007 US Application No. 11/247,409 (034827-9104) | |
| | A18 | Dorgan et al., Measurement of steroid sex hormones in serum: a comparison of radioimmunoassay and mass spectrometry, Steroids, 67: 151-8 (2002). | |
| | A19 | Draisci et al., Confirmatory analysis of 17ß-boldenone, 17alpha-boldenone and androsta-1,4-diene-3,17-dione in bovine urine by liquid chromatography-tandem mass spectrometry. Journal of Chromatography B, 789:219-226, 2003. | |
| | A20 | Draisci et al., Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography-tandem mass spectrometry, Journal of Chromatography A, 2000, Vol. 870, pages 511-522. | |
| | A21 | Furuta et al., Simultaneous Measurements of Endogenous and Deuterium-Labelled Tracer Variants of Androstenedione and Testosterone by Capillary Gas Chromatography-Mass Spectrometry, J Chrom, Biomed Appl Vol. 525: 15-23, (1990) | |
| | A22 | Giraudi et al., Effect of Tracer Binding to Serum Proteins on the Reliability of a Direct Free Testosterone Assay. Steroids 52: 423-4 (1988) | |
| | A23 | Griffiths et al., Derivatisation for the characterisation of neutral oxosteroids by electrospray and matrix-assisted laser desorption/ionisation tandem mass spectrometry: the Girard P derivative, Rapid Commun Mass Spectrom 2003:17, 924-935. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

QUESTMS-00002839

Receipt date: 06/16/2011             12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | | | Complete if Known | |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | | Application Number | 12/946,785 |
| | | | Filing Date | 11/15/2010 |
| | | | First Named Inventor | Michael P. Caulfield |
| *(use as many sheets as necessary)* | | | Art Unit | 1654 |
| | | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 3 | of | 5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A24 | Herman et al., Generic method for on-line extraction of drug substances in the presence of biological matrices using turbulent flow chromatography. Rapid Communications in Mass Spectrometry, 16:412-426, 2002. | |
| | A25 | Kicman et al., Human chorionic gonadatrophin and sport, Br J Sp Med, 25(2):73-80, 1991 | |
| | A26 | Lewis et al., DOT/FAAIAM-00/20 A Novel Method for the Determination of Sildenafil (Viagra) and Its Metabolite (UK-103,320) in Postmortem Specimens Using LC/MS/MS and LC/MS/MS/MS National Technical Information Service, 2000, 3 cover pages and pages 1-12. | |
| | A27 | Magnusson et al., Quantitative analysis of eight testosterone metabolites using column switching and liquid chromatography/tandem mass spectrometry. Rapid Commun. Mass Spectrom, 30 May 2004, 18:1089-1094. | |
| | A28 | Marcus and Durnford, A Simple Enzyme-Linked Immonosorbent Assay for Testosterone. Steroids 46: 975-86 (1985) | |
| | A29 | Merchant and Weinberger, Recent advancements in surface-enhanced laser desorption/ionization-time of flight-mass spectrometry. Electrophoresis 21: 1164-67 (2000) | |
| | A30 | Minut et al., Urinary 5alpha-androstanediol and 5ß-androstanediol measurement by gas chromatography after solid-phase extraction and high-performance liquid chromatography. Int 19I J Biol. Markers, Vol. 14(3); 154-59 (1999) | |
| | A31 | Notice of Allowance dated 04/12/2010 for US Application No. 12/053,325 (034827-9105) | |
| | A32 | Notice of Allowance dated 08/18/2005 for US Application No. 10/726,919 (034827-9103) | |
| | A33 | Notice of Allowance dated 11/05/2007 US Application No. 11/247,409 (034827-9104) | |
| | A34 | Office Action dated 01/10/2007 for US Application No. 10/726,919 (034827-9104) | |
| | A35 | Office Action dated 02/18/2010 for US Application No. 12/053,325 (034827-9105) | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

Receipt date: 06/16/2011

12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| *(use as many sheets as necessary)* | Art Unit | 1654 |
| | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 4 | of | 5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[2] |
| | A36 | Office Action dated 03/04/2005 for US Application No. 10/726,919 (034827-9103) | |
| | A37 | Office Action dated 04/29/2009 for US Application No. 12/053,325 (034827-9105) | |
| | A38 | Office Action dated 09/05/2008 for US Application No. 12/053,325 (034827-9105) | |
| | A39 | Ong et al, Integrated bioanalytical support using turbulent flow chromatography-mass spectrometry, Powerpoint Presentation, Memory Pharmaceuticals Corp., ASMS 2002, 03/01/2001, pp. 1-39 | |
| | A40 | Ooi and Donnelly, More on the Analog Free-Testosterone Assay, Clin. Chem. 45: 714-715 (1999). | |
| | A41 | Peng et al., Plasma and urinary markers of oral testosterone undecanoate misuse. Steroids, 67: 39-50, 2002. | |
| | A42 | Plumb et al., Quantitative analysis of pharmaceuticals in biological fluids using high-performance liquid chromatography coupled to mass spectrometry: a review, Xenobiotica, 2001, 31(8/9):599-617. | |
| | A43 | Robb et al., Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography-Mass Spectrometry, Anal. Chem., 72:3653-3659 (2000) | |
| | A44 | Ropero-Miller et al., Simultaneous Quantitation of Opioids in Blood by GC-EI-MS Analysis Following Deproteination, Detautomerizati~ Keto Analytes, Solid-Phase Extraction, and Trimethylsilyl Derivatization, J of Anal Tox 2002, Vol. 26, pages 524-528. | |
| | A45 | SALAMEH et al, Validation of a total testosterone assay using high-turbulence liquid chromoatography tandem mass spectrometry, Steroids, (2010), pp 169-175 | |
| | A46 | SHACKELTON et al, Electrospray mass spectrometry of testosterone ester: potential for use in doping control, Steroids, (1997), 62(78):523-529 | |
| | A47 | Starcevic, et al., Liquid Chromatography 14tandem Mass Spectrometry Assay For Human Serum Testosterone And Trideuterated Testosterone, Journal of Chromatography, 792:197-204 (2003) | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

Receipt date: 06/16/2011                                                12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| | Art Unit | 1654 |
| *(use as many sheets as necessary)* | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 5 | of | 5 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A48 | Tiller et al. Drug quantitation on a benchtop liquid chromatography-tandem mass spectrometry system. Journal of Chromatography A, 1997, Vol. 771, pages 119-125. | |
| | A49 | US Office Action dated 6/8/2011 in application 12/607,905 (034827-9106) | |
| | A50 | Williams, et al., Electrospray Collision-induced Dissociation of Testosterone and Testosterone Hydroxy Analogs, Journal of Mass Spectrometry 34:206-216 (1999) | |
| | A51 | Winters et al., The analog free testosterone assay: are the results in men clinically useful?, Clin. Chem. 44:2178-2182, (1998). | |
| | A52 | Yoon and Lee, Gas chromatographic and mass spectrometic analysis of conjugated steroids in urine, J.Biosci. 2001; 26:627-634 | |
| | A53 | Zimmer et al., Comparison of turbulent-flow chromatography with automated solid-phase extraction in 96-well plates and liquid-liquid extraction used as plasma sample preparation techniques for liquid chromatography-tandem mass spectrometry, J. Chromatogr. A 854: 23-35 (1999) | |
| | | | |

| Examiner Signature | /Marcela Cordero Garcia/ | Date Considered | 09/01/2011 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

DLMR_900598.1

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

QUESTMS-00002842

EAST Search History

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L6 | 76 | testosterone same "mass spectrometry" and (woman or female) and (quantitate or quantification or analysis)and chromatography | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:40 |
| L7 | 28 | testosterone same "mass spectrometry" and (woman or female) and (quantitate or quantification or analysis)and chromatography and testosterone.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:41 |
| L8 | 2 | testosterone same "mass spectrometry" same (woman or female) same (quantitate or quantification or analysis) | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | OFF | 2011/06/10 18:41 |

**EAST Search History (Interference)**

< This search history is empty>

**6/10/2011 6:43:08 PM**
**C:\Users\mgarcia\Documents\EAST\Workspaces\12396266-b.wsp**

QUESTMS-00002843

EAST Search History

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 3 | testosterone same measurement same women same spectrometry | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:41 |
| L2 | 8 | testosterone same women same spectrometry | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:41 |
| L3 | 339 | testosterone same women and spectrometry | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:42 |
| L4 | 50 | testosterone same women and spectrometry and testosterone.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:42 |
| L5 | 121 | testosterone same (female or women) and spectrometry and testosterone.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:43 |
| L6 | 5 | testosterone same (female or women) same spectrometry and testosterone.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | AND | ON | 2012/01/12 19:44 |

**EAST Search History (Interference)**

< This search history is empty>

**1/12/2012 7:44:42 PM**

QUESTMS-00002844

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 12946785 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** |
| | MARCELA M CORDERO GARCIA | 1654 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| none | none | 6/10/2011 | MMCG |

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| STN search by STIC (available via SCORE / PAIR) | 5/17/2011 | MMCG |
| EAST search (attached) | 6/10/2011 | MMCG |
| also ran PALM Inventor search | 6/10/2011 | MMCG |

### INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No. : 20110610

QUESTMS-00002845

Atty. Dkt. No. 034827-9107

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:     Caulfield et al.

Title:         DETERMINATION OF
                TESTOSTERONE BY MASS
                SPECTROMETRY

Appl. No.:     12/946,785

Appl. Filing Date:  11/15/2010

Examiner:     Cordero Garcia, Marcela M.

Art Unit:     1654

Confirmation     1630
Number:

### REQUEST FOR CONTINUED EXAMINATION (RCE) TRANSMITTAL

Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

    This is a Request for Continued Examination (RCE) under 37 C.F.R. § 1.114 of the above-identified application. This RCE and the enclosed items listed below are being filed prior to the earliest of: (1) payment of the issue fee (unless a petition under 37 C.F.R. § 1.313 is granted); (2) abandonment of the application; or (3) the filing of a notice of appeal to the U.S. Court of Appeals for the Federal Circuit under 35 U.S.C. §141, or the commencement of a civil action under 35 U.S.C. §145 or §146 (unless the appeal or civil action is terminated).

1. <u>Submission **required** under 37 C.F.R. §1.114</u>:  (check items that apply)

    a. Previously submitted:

-1-

QUESTMS-00002846

Atty. Dkt. No. 034827-9107

[ ]   Please enter and consider the amendment and/or reply previously filed on __.

[ ]   Please consider the Affidavit(s)/Declaration(s) previously filed on __ but not
considered.

[ ]   Please consider the arguments in the Appeal Brief or Reply previously filed on __.

[ ]   Other __.

b.  Enclosed are:

[ X ]   Amendment/Reply (11 pages)

[ X ]   Declaration of Michael P. Caulfield Under 37 CFR 1.131 (5 pages)

[ X ]   Information Disclosure Statement.

[ X ]   Form PTO/SB/08 with copies of  6 listed reference(s).

[ X ]   Terminal Disclaimer over U.S. Patent No. 6,977,143 (1 page)

Miscellaneous:

[ ]   Suspension of action of the above-identified application is requested under 37
C.F.R. § 1.103(c) for a period of __ months.

The filing fee is calculated below:

| | Claims as Amended | | Previously Paid For | | Extra Claims Present | Rate | | Fee Totals |
|---|---|---|---|---|---|---|---|---|
| RCE Fee 1.17(e): | | | | | | $930.00 | = | $930.00 |
| Total Claims: | 24 | - | 27 | = 0 | | x   $60.00 | = | $0.00 |
| Independents | 2 | - | 3 | = 0 | | x   $250.00 | = | $0.00 |
| First presentation of any Multiple Dependent Claims: | | | | | + | $450.00 | = | $0.00 |

QUESTMS-00002847

Atty. Dkt. No. 034827-9107

CLAIMS FEE TOTAL:   =   $930.00

[ ]   Applicant hereby petitions for an extension of time under 37 C.F.R. §1.136(a) for the total number of months checked below:

| | | | |
|---|---|---:|---:|
| [ ] | Extension for response filed within the first month: | $150.00  0 | $0.00 |
| [ ] | Extension for response filed within the second month: | $560.00 | $0.00 |
| [ ] | Extension for response filed within the third month: | $1,270.00 | $0.00 |
| [ ] | Extension for response filed within the fourth month: | $1,980.00 | $0.00 |
| [ ] | Extension for response filed within the fifth month: | $2,690.00 | $0.00 |
| | EXTENSION FEE SUBTOTAL: | | $0.00 |
| | EXTENSION FEE ALREADY PAID:  - | | $0.00 |
| | EXTENSION FEE TOTAL | | $0.00 |
| | CLAIMS AND EXTENSION FEE TOTAL: | | $930.00 |
| [ ] | Small Entity Fees Apply (subtract ½ of above): | | $0.00 |
| [ ] | Suspension of action requested under 37 C.F.R. § 1.103(c) | | $0.00 |
| [ X ] | Terminal Disclaimer Fee | | $160.00 |
| | Subtotal | | $1,090.00 |
| [ X ] | Less previously paid Terminal Disclaimer Fee | | $160.00 |
| | TOTAL FEE: | | $930.00 |

The above-identified fees of $930.00 are being paid by credit card via EFS-Web.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

4811-9298-0751.1

QUESTMS-00002848

Atty. Dkt. No. 034827-9107

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

Date _____3/29/12_____

By _____

FOLEY & LARDNER LLP
Customer Number: 30542
Telephone:    (858) 847-6776
Facsimile:    (858) 792-6773

Barry S. Wilson, Reg. No. 39,431
Anthony C. Kuhlmann, Reg. No. 57,147
Attorneys for Applicant

4811-9298-0751.1

QUESTMS-00002849

Atty. Dkt. No. 034827-9107

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant: Caulfield et al.

Title: DETERMINATION OF
TESTOSTERONE BY MASS
SPECTROMETRY

Appl. No.: 12/946,785

Filing Date: 11/15/2010

Examiner: Cordero Garcia, M.M.

Art Unit: 1654

Confirmation 1630
Number:

### REQUEST FOR CONTINUED EXAMINATION UNDER 37 C.F.R. § 1.114

Mail Stop RCE
Commissioner for Patents
PO Box 1450
Alexandria, Virginia 22313-1450

Sir:

In response to the Office Action mailed January 13, 2012, please enter the following amendments and consider the following remarks.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this document.

**Remarks/Arguments** begin on page 6 of this document.

Please amend the application as follows:

-1-

4814-2117-6335.1

QUESTMS-00002850

Atty. Dkt. No. 034827-9107

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

    1.-12.   (Canceled)

    13.    (Currently Amended) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

        (a) purifying testosterone from a sample from a female human, wherein said purifying comprises extracting testosterone from said sample;

        (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

        (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

        wherein said testosterone is not derivatized prior to mass spectrometry, and wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample.

    14.-15. (Canceled)

    16.    (Currently Amended) The method of claim [15] 13, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

    17.    (Currently Amended) The method of claim [15] 13, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

    18.    (Currently Amended) The method of claim [15] 13, wherein said extracting comprises subjecting said sample to liquid extraction.

-2-

QUESTMS-00002851

Atty. Dkt. No. 034827-9107

19.　　(Currently Amended) The method of claim 13, wherein purifying testosterone <u>further</u> comprises purifying testosterone <u>from said sample</u> by chromatography.

20.　　(Previously Presented) The method of claim 19, wherein said chromatography comprises liquid chromatography.

21.　　(Previously Presented) The method of claim 19, wherein said chromatography comprises high performance liquid chromatography (HPLC).

22.　　(Currently Amended) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the ~~test~~ sample.

23.　　(Currently Amended) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the ~~test~~ sample.

24.　　(Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$.

25.　　(Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$ and $96.9 \pm 0.5$.

26.　　(Previously Presented) The method of claim 13, wherein the ionizing of step (c) comprises:

　　　　producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

　　　　isolating the precursor ion by mass spectrometry; and

　　　　effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

-3-

QUESTMS-00002852

27.     (Previously Presented) The method of claim 13, wherein said sample comprises urine, blood, plasma, or serum from a female human.

28.     (Previously Presented) The method of claim 13, wherein said sample comprises blood, plasma, or serum from a female human.

29.     (Currently Amended) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

(a) purifying testosterone from a sample from a female human by extracting testosterone from said sample by high turbulence liquid chromatography (HTLC) and subjecting said sample the extracted testosterone to high performance liquid chromatography (HPLC);

(b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the test sample.

30.     (Previously Presented) The method of claim 29, wherein said testosterone is not derivatized prior to mass spectrometry.

31.-33. (Canceled)

34.     (Currently Amended) The method of claim 31, wherein said extracting further comprises subjecting said sample to liquid extraction.

35.     (Canceled)

-4-

QUESTMS-00002853

Atty. Dkt. No. 034827-9107

36.    (Currently Amended) The method of claim [31] 29, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of 289.1 ± 0.5.

37.    (Currently Amended) The method of claim [31] 29, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of 109.2 ± 0.5 and 96.9 ± 0.5.

38.    (Currently Amended) The method of claim [31] 29, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about 289.1 ± 0.5;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of 109.2 ± 0.5, and 96.9 ± 0.5.

39.    (Currently Amended) The method of claim [31] 29, wherein said sample comprises urine, blood, plasma, or serum from a female human.

40.    (Currently Amended) The method of claim [31] 29, wherein said sample comprises blood, plasma, or serum from a female human.

41.    (New) The method of claim 31, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the sample.

42.    (New) The method of claim 31, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the sample.

4814-2117-6335.1

QUESTMS-00002854

Atty. Dkt. No. 034827-9107

# REMARKS

**Status of the Claims**

This paper amends claims 13, 16-19, 29, 34, and 36-40, adds claims 41-42, and cancels claims 15, 31-33, and 35. Applicants reserve the right to prosecute canceled subject matter in related applications. After the amendments set forth above are entered, claims 13, 16-30. and 36-40 are pending and under examination.

Claim 13 has been amended to include the limitation of canceled claim 15; namely that purifying testosterone comprises extracting testosterone from the sample. Claim 13 has also been amended to specify that the claimed methods are capable of detecting testosterone at concentrations of less than 10 ng/dL. Support for this detection limit is found, e.g., in the Specification at paragraph [0030].

Claims 16-18 have been amended to adjust dependencies necessitated by incorporation of the limitation of claim 15 into claim 13.

Claim 19 has been amended to specify that purifying testosterone further comprises chromatography. This change was also necessitated by incorporation of the limitation of claim 15 into claim 13.

Claims 22 and 23 have been amended to replace "test sample" with "sample", consistent with the language of the base claim from which they depend.

Claim 29 has been amended to incorporate the limitations of canceled claims 33 and 35; namely, that testosterone is purified by extracting from a sample by high turbulence liquid chromatography (HTLC) (claim 33) and subjecting the extracted testosterone to high performance liquid chromatography (HPLC) (claim 35). Claim 29 has also been amended to specify that the claimed methods are capable of detecting testosterone at concentrations of less than 10 ng/dL. Support for these detection limits is found, e.g., in the Specification at paragraph [0030].

-6-

QUESTMS-00002855

Atty. Dkt. No. 034827-9107

Claims 36-40 have been amended to adjust dependencies necessitated by cancelation of claim 31 and incorporation of the limitations of canceled claims 33 and 35 into claim 29.

New claims 41 and 42 depend from claim 29 and further specify that the methods are capable of detecting testosterone in the sample at concentrations of less than 5 ng/dL (claim 41), and less than 1 ng/dL (claim 42). Support for these detection limits is found, e.g., in the Specification at paragraph [0030].

As such, no new matter is introduced by the instant amendments.

A detailed listing of all claims that are, or were, in the application, irrespective of whether the claim(s) remain under examination in the application, is presented, with an appropriate defined status identifier.

**Interview Summary**

Applicant thanks Examiner Cordero for courtesies extended to Applicant's representative in the telephonic interview of March 27, 2012. During that interview, the prior art-based rejections over Soldin, Ong, and Tiller were discussed. The substance of the interview is reflected in the claim amendments and arguments presented herein.

**Rejections under 35 U.S.C. § 102 (e)**

Claims 13, 15-16, 18-22, 24-32, and 34-40 stand rejected as allegedly anticipated by Soldin (U.S. Pat. No. 7,473,560). Applicants respectfully traverse as the present invention was reduced to practice prior to Soldin's earliest filing date.

Applicant herewith submits a declaration under 37 CFR 1.131 executed by inventor Dr. Michael P. Caulfield demonstrating reduction to practice prior to the filing date of the Soldin patent application. Exhibits 1 and 2 accompanying the declaration are excerpts from a Validation Summary Report demonstrating application of the claimed method for quantitation of testosterone in human serum and plasma samples.

-7-

QUESTMS-00002856

Atty. Dkt. No. 034827-9107

Dr. Caulfield attests that the data shown in Exhibit 2 were collected by the method described in Exhibit 1 prior to April 14, 2003, the filing date of Soldin's earliest patent application.

Thus, Applicant respectfully submits that the subject matter of claims 13, 15-16, 18-22, 24-32, and 34-40 was invented prior to the filing date of Soldin's earliest patent application. As such, Soldin is not prior art against the pending claims. Applicant respectfully requests withdrawal of this rejection.

## Rejections under 35 U.S.C. § 103 (a)

### *Ong et al (50th ASMS Conference Abstract, 2001)*

Claims 13, 15-21, and 27-40 are rejected as allegedly obvious over the Ong Abstract. Claims 15, 31-33, and 35 have been canceled, rendering rejection of those claims moot. Claims 13 and 29, from which all other rejected claims depend, have been amended to specify that the claimed methods are capable of detecting testosterone at concentrations of less than 10 ng/dL. Applicants respectfully request reconsideration and withdrawal.

The Ong Abstract is asserted to allegedly teach a mass spectrometric method for determining testosterone in test samples, such as plasma samples, at concentrations of less than 10 ng/dL. Applicant respectfully disagrees.

Ong describes use of testosterone as an internal standard and mass spectrometric detection in an unknown matrix at concentrations of over 14,000 ng/dL. This detection is conducted with a first instrumental configuration involving parallel extraction columns and a single analytical column (i.e., the parallel configuration). Ong Abstract, second to last paragraph. Ong also describes use of a second instrumental configuration involving single extraction column and a single analytical column (i.e., the serial configuration) for the detection of "various analytes" in plasma or tissue samples. Ong Abstract, last paragraph. Ong does not specify analytes that were measured using the serial configuration, but rather generically suggests that for

-8-

QUESTMS-00002857

Atty. Dkt. No. 034827-9107

analyses in biological matrices "in which lower limits of quantitation approaching 0.1 ng/mL are routinely required" (emphasis added) the serial configuration may be used. Ong Abstract, last paragraph.

Thus, even if it is assumed that the cited portion of Ong teaches detection of testosterone in biological samples lower limits of quantitation approaching 0.1 ng/mL (which Applicant does not concede), Ong still does not provide any reasonable expectation that testosterone could be detected in biological samples at levels below 0.1 ng/mL (or 10 ng/dL) as required in the instant claims.

As such, Applicant respectfully requests reconsideration and withdrawal.

_Tiller et al (J. Chromatogr. A, 1997)_

Claims 13, 16-17, 19-21, 25-30, and 35-40 stand rejected over Tiller et al. (J. chromatogr. A, (1997) 771:119-125). Claim 13, from which claims 16-17, 19-21, and 25-28 depend, has been amended to include the limitation of unrejected claim 15; namely that in the claimed methods, purifying testosterone comprises extracting testosterone from the sample. Similarly, claim 29, from which claims 30 and 35-40 depend, has been amended to include the limitation of unrejected claim 33; namely that testosterone is purified by extracting from a sample by high turbulence liquid chromatography (HTLC).

Applicant submits that amendment of claim 13 to include the limitation of previously unrejected claim 15 and amendment of claim 29 to include the limitation of previously unrejected claim 33 renders rejection over Tiller moot and respectfully requests withdrawal.

**Double Patenting Rejections**

Claims 13-28 stand rejected as on the ground of nonstatutory obviousness-type double patenting as allegedly obvious over claims 1-39 of U.S. Patent 6,977,143. The terminal disclaimer submitted with the last response to Office Action had a typographical error indicating

-9-

QUESTMS-00002858

Atty. Dkt. No. 034827-9107

an incorrect patent number.  A new terminal disclaimer correcting this clerical error is submitted herewith.  As such, Applicant respectfully requests withdrawal of the obviousness-type double patenting rejection.

Claims 13 and 15-40 also stand provisionally rejected on the ground of nonstatutory obviousness-type double patenting as allegedly obvious over claims 1-13 of copending Application No. 12/607,905.  Applicant has requested that this provisional rejection be held in abeyance until otherwise allowable subject matter is identified.  Applicant will address any address any provisional double patenting rejections at that time, should this rejection remain.

## **CONCLUSION**

In the event that any matters remain to be resolved in view of this communication, the Examiner is encouraged to call the undersigned so that a prompt disposition of this application can be achieved.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by a check or credit card payment form being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any additional extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

-10-

4814-2117-6335.1

Atty. Dkt. No. 034827-9107

Respectfully submitted,

Date ___3/28/12_____         By _____

FOLEY & LARDNER LLP             Barry S. Wilson, Reg. No. 39,431
Customer Number: 30542          Anthony C. Kuhlmann, Reg. No. 57,147
Telephone:    (858) 847-6722    Attorneys for Applicant
Facsimile:    (858) 792-6773

-11-

4814-2117-6335.1

QUESTMS-00002860

Atty. Dkt. No. 034827-9107

## *IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

Applicant:     Caulfield et al.

Title:         DETERMINATION OF
               TESTOSTERONE BY MASS
               SPECTROMETRY

Appl. No.:     12/946,785

Filing Date:   11/15/2010

Examiner:      Cordero Garcia, M.M.

Art Unit:      1614

Conf. No.:     1630

### DECLARATION OF MICHAEL P. CAULFIELD UNDER 37 CFR 1.131

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

I, Michael P. Caulfield, being duly warned, declare as follows:

1.     I was educated in biochemistry and microbiology at Sussex University and Bristol University, both in England, where I received a B.S. degree and a PhD. degree, respectively.

2.     I was a research fellow at Harvard Medical School, Boston Massachusetts and a postdoctoral associate at the Massachusetts Institute of Technology.  I have been a Scientific Director in Endocrinology & Metabolism at Quest Diagnostics/Nichols Institute since 1997.  I am the author or co-author of over 100 published scientific articles and abstracts in the field of Biochemistry, Endocrinology and Metabolism.

-1-

QUESTMS-00002861

Atty. Dkt. No. 034827-9107

3.      I am a co-inventor of the above-referenced patent application and the subject matter described and claimed therein.

4.      I have read the Office Action dated January 13, 2012 for the above-referenced application, and I understand that April 14, 2003 is the earliest priority date for the Soldin patent cited by the Examiner (i.e., U.S. Patent No. 7,473,560), which allegedly discloses or renders obvious my invention.

5.      Prior to April 14, 2003, the inventors put into practice the method described in the above-referenced application for determining the levels testosterone in a sample when taken from a human.  The method includes purifying testosterone from a sample by subjecting the sample to an extraction column and an analytical column to generate an eluent; ionizing the eluent to produce one or more testosterone ions detectable by a mass spectrometer; and (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the test sample. In some embodiments, the ionizing comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$; isolating the precursor ion by mass spectrometry; and effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having a mass/charge ratio of $96.9 \pm 0.5$.  In some embodiments the sample comprises serum.  In some embodiments, the extraction column comprises a high turbulence liquid chromatography column.  This invention is reflected in the specification and claims of the above mentioned application.

6.      Exhibits 1 and 2 contain excerpts from a laboratory Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan).  Exhibit 1 is a photocopy of p. 4 of the Report, describing the method employed to collect data for validation of the method. Exhibit 2 is a photocopy of p. 18 of the Report with data resulting from execution of the method. The data in Exhibit 2 were collected at the laboratories of Quest Diagnostics Incorporated, San Juan Capistrano, CA.  Exhibits 1 and 2 are true and complete copies of the above-mentioned

4814-3257-9855.1

QUESTMS-00002862

Atty. Dkt. No. 034827-9107

Validation Summary Report pages, except that the date has been redacted.  I attest that the redacted date is earlier than April 14, 2003.

7.      As seen in Exhibit 1, the inventors performed the method by first purifying testosterone from human plasma and serum with a high turbulence liquid chromatography (HTLC) extraction column, followed by further purification with a high performance liquid chromatography (HPLC) analytical column.  Eluent from the analytical column was ionized, and testosterone precursor ions with m/z of 289.1 ± 0.5 were generated.  These testosterone precursor ions were then isolated by mass spectrometry and fragmented to generate fragment ions comprising a fragment ion with m/z of 96.9 ± 0.5.  Quantitation of testosterone present in the plasma and serum samples was based on the abundance of fragment ions.

8.      As seen in Exhibit 2, the above method was performed on samples of both human plasma and serum, and the results compared to determine the consistency of the method across both sample types.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements are made with the knowledge that willful false statements are so made punishable by fine or imprisonment, or both, under Section 101 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

_March 28th 2012_
Date

_Michael P Caulfield_
Michael P. Caulfield, Ph.D.

Attachments:

- Exhibit 1: True and complete copy of p. 4 of Validation Summary Report for Total Testosterone (HTLC/MS/MS TSQ Quantum ThermoFinnigan), dated prior to April 14, 2003.

-3-

4814-3257-9855.1

QUESTMS-00002863

 Quest
Diagnostics

**Nichols Institute**

## II. PRINCIPLE

### 1. Methodology:

The overall design of this assay is to have enhanced specificity, a reduced run-time and sample preparation. To achieve this, two systems have been combined. The first is the High Throughput Liquid Chromatography system (HTLC) by Cohesive Technologies and the second is the Tandem Mass Spectrometer (LC/MS/MS) by ThermoFinnigan.

When operating the HTLC system, the elimination of unwanted sample components occurs in a turbulent flow regime. As the unbound and unwanted debris is swept through the extraction column at high velocity, the components of interest are captured and concentrated on the column. The extraction column is then backflushed and the sample is placed onto an analytical column. The next step is the gradient regime of the HTLC system. The analytical column is in-line and allows chromatographic separation of the components of interest. A gradient/step function of 60% to 100% methanol is used to enhance this step.

The detection is carried out by LC/MS/MS. The precursor ion, protonated molecule of interest, and any other ions of similar mass, are isolated by the first MS (Q1). These ions enter a second chamber (Q2) where they collide with Argon molecules. The collision-induced fragments differ for each molecular ion. Specific fragments produced only by the analyte ion are isolated by the final MS (Q3). The quantitation is based on the abundance of the final fragment ions. The following mass transitions are used:

| | Positive Mode | |
| Analyte | Precursor Ion | Fragment Ions |
| --- | --- | --- |
| Testosterone | 289.1 m/z | 96.8 & 109.3 m/z |
| $d_5$-Testosterone | 294.1 m/z | 99.8 & 113.3 m/z |

### 2. Intended Use:

Clinical evaluation of serum testosterone, along with serum LH, assists in evaluation of hypogonadal males. Major causes of lowered testosterone in males include hypogonadotropic hypogonadism, testicular failure, hyperprolactinemia, hypopituitarism, some types of liver and kidney diseases, and critical illness.

Increased serum testosterone levels in females may be indicative of polycystic ovary syndrome and adrenal hyperplasia, among other conditions. The clinical manifestations of excess testosterone include infertility, hirsutism, amenorrhea, and obesity.

Total Testosterone by HTLC/MS/MS Validation Summary

QUESTMS-00002864

Quest
Diagnostics

Nichols Institute

Figure 4: Specimen Type



**Total Testosterone HTLC/MS/MS**

Serum vs. Plasma

y = 1.0936x - 36.573
$R^2 = 0.902$

Total Testosterone by HTLC/MS/MS Validation Summary

QUESTMS-00002865

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(use as many sheets as necessary)* | | | *Complete if Known* | |
|---|---|---|---|---|
| | | | Application Number | 12/946,785 |
| | | | Filing Date | 11/15/2010 |
| | | | First Named Inventor | Michael P. Caulfield |
| | | | Art Unit | 1654 |
| | | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 1 | of 2 | Attorney Docket Number | 034827-9107 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1 | 6,743,448 | 06-01-2004 | Kryger | |

**UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS**

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document Serial Number-Kind Code[2] *(if known)* | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | A2 | ALARY, "Comparative Study: LC-MS/MS Analysis of Four Steroid Compounds Using a New Photoionization Source and a Conventional APCI Source," Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago Illinois, May 27-31, 2001 | |
| | A3 | DRAISCI et al., "Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography-tandem mass spectrometry," J. of Chromatography A, (2000), 870:511-522 | |
| | A4 | ROBB, et al., "Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography-Mass Spectrometry," Anal. Chem., (2000) 72:3653-3659 | |
| | A5 | TILLER, et al, "Drug quantitation on a benchtop liquid chromatography-tandem mass spectrometry system," J. Chromatography A, (1997), 771:119-125 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

4852-2841-2430.1

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | | | | *Complete if Known* | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | | | Application Number | 12/946,785 |
| | | | | Filing Date | 11/15/2010 |
| | | | | First Named Inventor | Michael P. Caulfield |
| | | | | Art Unit | 1654 |
| *(use as many sheets as necessary)* | | | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 2 | of | 2 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A6 | US Non-Final Office Action dated December 16, 2011 in related U.S. Patent Appl Serial No. 12/607,905 (034827-9106) | |
| | A7 | US Non-Final Office Action dated November 17, 2011 in related U.S. Patent Appl. Serial No. 13/118,180 (034827-9108) | |
| | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

4852-2841-2430.1

QUESTMS-00002867

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 12946785 |
| **Filing Date:** | 15-Nov-2010 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for continued examination | 1801 | 1 | 930 | 930 |
| **Total in USD ($)** | | | | **930** |

QUESTMS-00002869

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 12417422 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 30542 |
| **Filer:** | Anthony Charles Kuhlmann/Mercedes Dipasupil |
| **Filer Authorized By:** | Anthony Charles Kuhlmann |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 28-MAR-2012 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 19:42:26 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 930 |
| RAM confirmation Number | 6550 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00002870

| 1 | Non Patent Literature | Alary2001.pdf | 252155<br><br>9f992fef2bac477c7dc962f2b55de0eb15b5cb2a | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Non Patent Literature | Draisci2000.pdf | 154219<br><br>7392c59bd44da283860cea5467602f7f1f83eb9 | no | 12 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Non Patent Literature | Robb2000.pdf | 690140<br><br>f560602c694cc802dc9066e0d416347be9ee5bf7 | no | 7 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Non Patent Literature | Tiller1997.pdf | 389274<br><br>44157b85d0dd83739c14bcd8b88d5ed7e8482c9e | no | 7 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Non Patent Literature | 034827-9106_OA_12-16-2011.pdf | 2241762<br><br>180a18ec08187905aa367fec7ecaa0044782d66b | no | 28 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 6 | Non Patent Literature | 034827-9108_OA_11-17-2011.pdf | 1301681<br><br>6c7fb0d6ada96a953dbed92d843bf06636b3487f | no | 22 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 7 | Request for Continued Examination (RCE) | 034827-9107_RCETrans.pdf | 107764<br><br>e3dc5101850c42b602b167e3033111c411c7841e | no | 4 |
|---|---|---|---|---|---|

**Warnings:**

This is not a USPTO supplied RCE SB30 form.

**Information:**

| 8 | | 034827-9107_Amendment.pdf | 403209<br><br>e8d227813eca6cca02b711374b7cf999818349ef | yes | 11 |
|---|---|---|---|---|---|

| Multipart  Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Amendment Submitted/Entered with Filing of CPA/RCE | 1 | 1 |

QUESTMS-00002871

| | | Claims | 2 | 5 |
|---|---|---|---|---|
| | | Applicant Arguments/Remarks Made in an Amendment | 6 | 11 |

**Warnings:**

**Information:**

| 9 | Rule 130, 131 or 132 Affidavits | 034827-9107_Decl.pdf | 191951<br><br>8d203c7e0f809e5afaac7b0e973c2f0c7ad7f1c6 | no | 5 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 10 | Terminal Disclaimer Filed | 034827-9107_TD-143.pdf | 75559<br><br>45b0e2fa2ddd8cdd73b6b53e30ad94136316976c | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 11 | | 034827-9107_IDS.pdf | 195023<br><br>178b673ef10146b97fb2fd1ae1b3277519a45834 | yes | 4 |
|---|---|---|---|---|---|

| **Multipart  Description/PDF files in .zip description** | | | |
|---|---|---|---|
| **Document Description** | | **Start** | **End** |
| Transmittal Letter | | 1 | 2 |
| Information Disclosure Statement (IDS) Form (SB08) | | 3 | 4 |

**Warnings:**

**Information:**

| 12 | Fee Worksheet (SB06) | fee-info.pdf | 30390<br><br>d9bfea393fc06e53e644ca4939c9e91b8009c380 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 6033127 |
|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00002873

Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago, Illinois, May 27-31, 2001

## Comparative Study: LC-MS/MS Analysis of Four Steroid Compounds Using a New Photoionization Source and a Conventional APCI Source

Jean-François Alary, Applied Biosystems/MDS SCIEX, 71 Four Valley Drive, Concord, Ontario, Canada, L4K 4V8

### INTRODUCTION

Robb, Covey and Bruins[1] have recently described a new atmospheric-pressure photoionization (PI) source. The source uses 10.0 eV photons emitted by a krypton lamp to ionize large quantities of a dopant molecule added concurrently with the vaporized mobile phase. Analyte molecules get efficiently ionized through secondary reactions initiated by the charged dopant. Performance comparison between the photoionization source versus an APCI source have been performed for four steroids usually exhibiting dissimilar sensitivities and mass fragmentation pattern with a corona-discharge source.[2] Three of the four steroids tested were $5\alpha$-Androstan-$3\alpha$,$17\beta$-diol (I; MW 292.5), $5\alpha$-Androstan-$17\beta$-ol-3-one (II; MW 290.4) and testosterone (III; MW 288.4), showing a progression from a diol, to -one then to a conjugated –ene -one system with a parallel increase in sensitivity in APCI.[2] Ethynyl Estradiol (IV; MW 296.4) is a steroid-like compounds having significant economical importance for its estrogenic effect. The objective of this study is to compare sensitivity of these steroids with the two sources in MS scan to evaluate relative ionization efficiency, and to measure LOD and LOQ using MRM transitions. A prototype photoionization source has been used for this evaluation.

### EXPERIMENTAL

All steroids have been obtained from Sigma Chemical Co. (St-Louis, USA). The photoionization source has been installed on an *API 3000™ LC/MS/MS* system. Toluene was used as dopant for the source at a typical flow rate of 20 µL/min. Mobile phase composition used in normal phase mode was isocratic isooctane (94%)/ isopropyl alcohol (6%) and in reversed phase mode isocratic methanol (50%)/water (50%). The mobile phase flow rate was 200 µL/min and no additives were used throughout. The prototype photoionization source as illustrated in Figure 1 adapts at the end

**Figure 1. PhotoIonization Source.**



of a conventional heated nebulizer probe. The UV lamp power supply and source block are kept at floating electrical potential to optimize ion transfer to the instrument.

### RESULTS AND DISCUSSION

In photoionization, steroids I, II and III generated similar MS scan spectra as in APCI; the diol steroid (I) exhibiting major loss of water to form mostly the $[M-35]^+$ ion whereas protonated ions dominated spectra of steroids II and III. Steroid IV was almost completely fragmented in the

QUESTMS-00002874

Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago, Illinois, May 27-31, 2001

source to form a base peak at 279 amu. Similar in-source fragmentation pattern were observed in APCI. In single MS scan, steroid II exhibits similar sensitivity with both sources, however, the other steroids show signals enhanced by a factor of 3 to 10 with the photoionization source. In Figure 2 are illustrated the relative signal for the steroids III and IV in MRM mode, showing the important signal improvement generated by the photoionization source.

**Figure 2. Relative Signal Obtained by Photoionization and APCI.**



The addition of toluene as dopant appears to be essential in reversed phase conditions to obtain an intense signal. In contrast, the photoionization process occurs with a very good efficiency without any added dopant in the normal phase conditions investigated. The effect of the temperature of the heated nebulizer probe was investigated between 300°C and 400°C. It was observed that steroids I exhibited an increase in signal at higher temperature due to enhanced water loss in-source, whereas signal from the three other steroids decreased. Sensitivity for steroids I and III were higher in reversed phase conditions than in normal phase conditions. The other steroids exhibited similar sensitivity in both conditions. In Table 1 and 2 are listed the estimated limits of detection for each steroid as well as the relative improvement compared with APCI, in normal and reversed phase conditions. In MS scan and MRM mode, the signal obtained by photoionization was more intense by a factor of 3 to 10 when compared to APCI. This gain in signal when combined with a reduction in background noise, translated into gain factors from 3 to 20 in signal-to-noise ratios.

**Table 1. LODs; Normal Phase Conditions**

| Steroid | LODs PI | Ratio PI/APCI |
|---------|---------|---------------|
| I | 9.8 pg | 5.5 |
| II | 2.3 pg | 3.3 |
| III | 0.16 pg | 7.5 |
| IV | 1.0 pg | 5.0 |

**Table 2. LODs; Reversed Phase Conditions**

| Steroid | LODs PI | Ratio PI/APCI |
|---------|---------|---------------|
| I | 3.6 pg | 20.1 |
| II | 5.7 pg | 4.1 |
| III | 0.08 pg | 22.2 |
| IV | 1.1 pg | 8.1 |

## CONCLUSION

Two steroids of the steroids selected for this study were thermally fragmented in the photoionization source, very similarly as in APCI. However, the source appeared to ionize fragment ions to a greater extent and/or transfer them to the spectrometer more efficiently than in APCI. Significant gains were also obtained for thermally stable steroids, resulting in consistent LOD improvement for all of the steroids studied. Doping the source with large quantities of an easily ionisable molecule appeared to be essential to obtain good sensitivity in reversed phase conditions, but not to be required in normal phase conditions.

## REFERENCE

1. Robb D. B., Covey T. R., Bruins A. P., *Anal. Chem*. **2000**, 72, 3653-3659.
2. Ma Y.-C., Kim H.-Y., *J. Am. Soc. Mass Spectrom*. **1997**, 8, 1010-1020.

QUESTMS-00002875



ELSEVIER

Journal of Chromatography A, 870 (2000) 511–522

JOURNAL OF
CHROMATOGRAPHY A

www.elsevier.com/locate/chroma

# Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography–tandem mass spectrometry

R. Draisci*, L. Palleschi, E. Ferretti, L. Lucentini, P. Cammarata

*Laboratorio di Medicina Veterinaria, Istituto Superiore di Sanità, Viale Regina Elena 299, 00161 Rome, Italy*

## Abstract

A specific and sensitive method based on tandem mass spectrometry with on-line high-performance liquid chromatography using atmospheric pressure chemical ionisation (LC–APCI-MS–MS) for the quantitation of anabolic hormone residues (17β-19-nortestosterone, 17β-testosterone and progesterone) and their major metabolites (17α-19-nortestosterone and 17α-testosterone) in bovine serum and urine is reported. $[^{2}H_{2}]17\beta$-Testosterone was used as internal standard. The analytes were extracted from urine (following enzymatic hydrolysis) and serum samples by liquid–liquid extraction and purified by $C_{18}$ solid-phase extraction. Ionisation was performed in a heated nebulizer interface operating in the positive ion mode, where only the protonated molecule, $[M+H]^{+}$, was generated for each analyte. This served as precursor ion for collision-induced dissociation and two diagnostic product ions for each analyte were identified for the unambiguous hormone confirmation by selected reaction monitoring LC–MS–MS. The overall inter-day precision (relative standard deviation) ranged from 6.37 to 2.10% and from 6.25 to 2.01%, for the bovine serum and urine samples, respectively, while the inter-day accuracy (relative error) ranged from −5.90 to −3.18% and from −6.40 to −2.97%, for the bovine serum and urine samples, respectively. The limit of quantitation of the method was 0.1 ng/ml for all the hormones in bovine serum and urine. On account of its high sensitivity and specificity the method has been successfully used to confirm illegal hormone administration for regulatory purposes.   © 2000 Published by Elsevier Science B.V. All rights reserved.

*Keywords:* Food analysis; Hormones

## 1. Introduction

The use of natural and synthetic hormones for growth promotion purposes in meat producing animals is prohibited in the European Union (EU) [1] to protect consumers from possible harmful effects due to the intake of hormone residues and their metabolites.

Very recently, a risk to the consumer has been identified for a number of hormones, such as 17β-testosterone and progesterone, as endocrine, developmental, immunological, neurobiological, immunotoxic, genotoxic and carcinogenic effects could be envisaged, particularly in prepubertal children [2]. In view of the intrinsic properties of the hormones and in consideration of the epidemiological findings, no threshold level and therefore no acceptable daily intake (ADI) can be established [2].

On account of possible illegal uses of endogenous steroids, such as 17β-testosterone and progesterone, the Italian legislation [3] has fixed "action limits" in order to discriminate between the physiological

---

*Corresponding author. Tel.: +39-06-4990-2327; fax: +39-06-4990-2327 or 4938-7077.
*E-mail address:* draisci@iss.it (R. Draisci)

0021-9673/00/$ – see front matter   © 2000 Published by Elsevier Science B.V. All rights reserved.
PII: S0021-9673(99)01293-5

QUESTMS-00002876

512                                    *R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522*

concentrations in bovine plasma or serum and the hormone levels depending on illegal administrations. In order to check the compliance with regulations, an enforcement system has been set up in each of the EU member States. The control may be either direct, such as identification or quantitation of residues of the parent compound or the metabolites in the muscle tissue or edible organs, or indirect, by their detection in injection sites, blood, urine and faeces. The development of sensitive, specific and multi-residue analytical methods is therefore required for a successful control of the illegal use of growth promoters in meat production.

Various methods for the detection of anabolic agents in biological fluids have been proposed.

Radioimmunoassay (RIA) has been widely used for routine screening [4–6] since this technique is rapid and sensitive and permits inexpensive screening of a large number of samples; however, its reduced specificity depending on cross-reactivity and drawbacks due to the use of a radioactive agent led to the proposal of enzyme immunoassay (EIA) as a profitable alternative method [7,8]. On the other hand gas chromatography (GC) coupled to mass spectrometry (MS) and tandem mass spectrometry (MS–MS) has been used as confirmatory method because the information on the molecular structure of the analyte, obtained by electron impact (EI) ionisation [9–16] or negative chemical ionisation (NCI) [17,18], result in higher specificity.

The combination of liquid chromatography (LC) with MS and MS–MS offers a rapid, simplified, specific and sensitive alternative to GC–MS methods involving simple extraction procedures and removing the need for derivatization reactions.

The development of *soft* ionisation techniques employed in LC–MS and LC–MS–MS methods is of great interest to research groups for bovine hormone residue determination purposes [19–23].

In a previous paper [21] we reported the use of micro-LC–MS–MS with an atmospheric pressure ionisation (API) source and an ion spray (IS) interface for the specific direct detection of natural (17β-testosterone and progesterone) and synthetic (17β-19-nortestosterone, methyltestosterone and medroxy-progesterone) hormone residues in bovine blood. Recently, we have shown the feasibility of using LC–MS–MS with an atmospheric pressure chemical

ionisation (APCI) source and a heated nebulizer (HN) interface, compatible with flow-rates of conventional high-performance liquid chromatography (HPLC), for the quantitation of 17β-estradiol in bovine serum [23].

In this study we investigated the possibility of using LC–MS–MS via HN interface for the detection and quantitation of 17β-19-nortestosterone (17β-NT), 17β-testosterone (17β-T), progesterone (P) and their major metabolites 17α-19-nortestosterone (17α-NT), 17α-testosterone (17α-T) in complex biological matrices, such as bovine serum and urine, using [$^2$H$_2$]17β-testosterone (17β-T-d$_2$) as deuterated internal standard (I.S.).

## 2. Experimental

### 2.1. Chemicals and reagents

Acetonitrile, methanol, ammonium acetate, sodium acetate and hydrochloric acid were HPLC-grade and purchased from Carlo Erba (Milan, Italy). Water was purified in a Milli-Q system (Millipore, Bedford, MA, USA). β-Glucuronidase/arylsulphatase (*Helix pomatia*) from Boehringer Mannheim (Germany) were used as supplied. 17β-NT, 17α-T, 17β-T and P were provided by Sigma (St. Louis, MO, USA); 17α-NT was purchased from Steraloids (Wilton, NH, USA); deuterated internal standard 17β-T-d$_2$ (>95% isotopic purity) was obtained from RIVM (Bilthoven, The Netherlands). Individual hormone standard stock solutions of 0.2 mg/ml were prepared in methanol. Individual and composite working standard solutions were prepared daily by appropriate dilution of the standard stock solutions with methanol. All solutions were stored at 4°C and were stable for at least 1 month.

### 2.2. Samples

Blank control samples of bovine serum and urine were collected, in compliance with the procedures provided by the national program for residue control in Italy, from cattle purposely born and fattened for this study. Two independent pools of serum and urine, obtained from various bovine specimens, were assayed by selected reaction monitoring (SRM) LC–

*R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522*                    513

MS–MS and the absence of the analyte under investigation was verified.

Eighteen serum and urine samples were collected from animals of both sexes at different farms and slaughterhouses as part of the national program for residue control in Italy. All samples were stored at −20°C until assayed.

## 2.3. Sample preparation procedure

### 2.3.1. Serum samples

An aliquot (2.0 ml) of serum was fortified with 4 ng of I.S. and 15.0 ml of acetate buffer solutions (ABS) 0.15 $M$, pH 5, and the mixture was sonicated with an ultrasonic bath for 5 min. The sample was purified by solid-phase extraction (SPE) using a $C_{18}$ cartridge (Baker $C_{18}$, 500 mg, 3 ml cartridges) which had previously been conditioned with 2.5 ml of methanol and 5.0 ml of water. After sample loading, the cartridge was washed with 5.0 ml of ABS, 10.0 ml of water and 2.5 ml of methanol–water (40:60, v/v). Finally analytes were eluted with 4.0 ml of methanol, the solvent removed under nitrogen stream and the residue dissolved in 100 μl of methanol. A 5-μl volume of the solution was injected into the LC–MS–MS system.

### 2.3.2. Urine samples

An aliquot (2.0 ml) of urine was fortified with 10 ng of I.S. and added with 20 μl of the crude enzyme solution (*Helix pomatia*) and the mixture was incubated for 12 h at 37°C. The hydrolysate was cooled at room temperature and 15.0 ml of ABS 0.15 $M$, pH 5, was added. Analytes were then extracted as above described for the serum samples.

## 2.4. Liquid chromatography–mass spectrometry

Analyses were carried out with a Phoenix 20 CU LC pump (Fisons, Milan, Italy) liquid chromatograph. A Valco (Valco, Houston, TX, USA) injection valve equipped with a 5-μl internal loop was used for injection by flow injection analysis (FIA)–MS, FIA–MS–MS and LC–MS–MS. Chromatographic separations were obtained under isocratic conditions using a reversed-phase Kingsorb $C_{18}$ column (Phenomenex, Torrance, CA, USA) (250×2 mm I.D., 5 μm) at room temperature, with a mobile phase of

acetonitrile–water (70:30, v/v) containing 2 m$M$ ammonium acetate, and at a flow-rate of 150 μl/min.

Mass spectral analyses were performed on a PE-Sciex API III plus triple-quadrupole (PE-Sciex, Thornill, Canada) equipped with an APCI source and a HN operating in the positive ion mode. Ultra-high-purity nitrogen was used as curtain gas (0.6 l/min), while air was used as nebulizer gas (400 kPa) and auxiliary gas (1.5 l/min). The HN temperature was set at 350°C and the discharge current at 4 μA. The orifice potential voltage (OR) was set at 90 V for all the analytes. Full-scan mass spectra were acquired in the positive ion mode from $m/z$ 200–400. In the MS–MS experiments, product ion mass spectra were acquired in positive ion mode by colliding quadrupole 1 (Q1) selected precursor ion, with argon (gas thickness 300·10$^{13}$ molecules/cm$^2$) in quadrupole 2 (Q2) operated in radio frequency (RF)-only mode, and scanning the third quadrupole mass spectrometer, Q3, from $m/z$ 50–350. The MS and MS–MS experiments were run with a resolution of 0.8 u measured at half peak height for both the mass-resolving quadrupoles. A collision energy of 25 eV was chosen for the collision-induced dissociation (CID) experiments. The protonated molecule, [M+H]$^+$, at $m/z$ 275 for 17α-NT and 17β-NT, $m/z$ 289 for 17α-T and 17β-T, $m/z$ 315 for P and $m/z$ 291 for 17β-T-d$_2$, was the precursor ion for CID and two product ions for each anabolic hormone were identified for SRM LC–MS–MS analyses. The double precursor–product ion combinations of $m/z$ 275→109 and $m/z$ 275→83 were used for both 17α-NT and 17β-NT, $m/z$ 289→109 and $m/z$ 289→97 for both 17α-T and 17β-T, $m/z$ 315→109 and $m/z$ 315→97 for P, $m/z$ 291→111 and $m/z$ 291→99 for 17β-T-d$_2$. The dwell time for each monitored transition was 150 ms. Peak-area ratios of the analyte to internal standard were computed using MacQuan version 1.3 software from PE-Sciex.

## 2.5. Calibration and quantitation

In order to evaluate the extraction efficiency of the analytes, standard curves were prepared daily in the range 2–600 ng/ml by plotting peak area ratios of the analyte to I.S. versus hormone concentrations using a least-squares linear regression model.

Calibration curves were prepared daily by spiking

serum and urine control samples with mixtures of the anabolic compounds to obtain concentration in the range 0.1–30 ng/ml. Estimates of the amount of the analyte in fortified and real samples were interpolated from these calibration graphs, constructed in the same way as standard curves.

Three replicates of serum and urine blank control samples, fortified with mixtures of the hormones to obtain concentrations of 0.1, 2.0, 10.0 and 30.0 ng/ml, were prepared and analysed on each of three days for each concentration to evaluate extraction efficiency, accuracy and precision of the method.

## 3. Results and discussion

Positive-ion FIA–MS was initially performed by adopting a mixture of acetonitrile–water (70:30, v/v) containing 2 mM ammonium acetate and at a flow-rate of 150 µl/min. Representative HN full-scan (mass range $m/z$ 200–400) mass spectra as obtained by FIA in the MS positive ion mode for the analytes under investigation are shown in Fig. 1. The formation of the protonated molecule, $[M+H]^+$, of 17α-NT and 17β-NT ($m/z$ 275), 17α-T and 17β-T ($m/z$ 289), P ($m/z$ 315) and 17β-T-d$_2$ ($m/z$ 291), was observed with negligible fragmentation.

Following experiments were performed to obtain spectra with maximum intensities of the protonated molecular ion of each analyte by selected ion monitoring (SIM) FIA–MS analyses at $m/z$ 275, 289, 291 and 315. The effect of varying orifice potential voltage was investigated between the range 60–100 V. An OR of 90 V was adopted for all the hormones as the best compromise in terms of signal-to-noise ratio. Although the simplicity of the FIA–MS spectra is useful for the identification of the analytes based on their molecular-related ions, they do not provide further structural information. Tandem mass spectrometry was therefore used in order to obtain additional structural information by detecting diagnostic product ions obtained by CID of the precursor ion.

The protonated molecule, $[M+H]^+$, served as the precursor ion for CID in the MS–MS experiments, carried out by FIA–MS–MS on the individual hormone standard solutions. Fig. 2 shows the positive product ion mass spectra (mass range $m/z$ 50–350) of the protonated molecules, $[M+H]^+$, of 17α-NT, 17β-NT, 17α-T, 17β-T, P and 17β-T-d$_2$. Comparison of the spectra reveals the production of the most abundant product ions at $m/z$ 109 and 83 for 17α-NT and 17β-NT, at $m/z$ 109 and 97 for 17α-T, 17β-T and P, at $m/z$ 111 and 99 for 17β-T-d$_2$. Transitions of the respective protonated molecules to these product ions were therefore selected according to the SRM technique.

In order to achieve targeted analyses and maximum sensitivity as well as for quantitative purposes SRM LC–MS–MS analyses were finally performed using a reversed-phase Kingsorb C$_{18}$ column at room temperature, with a mobile phase of acetonitrile–water (70:30, v/v) containing 2 mM ammonium acetate, at a flow-rate of 150 µl/min.

Under the adopted conditions, the separation of 17β-NT (5.6 min), 17β-T and 17β-T-d$_2$ (6.1 min), 17α-NT (6.4 min), 17α-T (7.2 min), and P (11.4 min) observed in SRM LC–MS–MS profiles of a standard mixture was not excellent (data not shown). However, the specificity of MS–MS reduces the need for complete chromatographic resolution of individual compounds and the focus in developing the confirmatory LC–MS–MS method was rather on providing simple and fast treatment of samples and reducing the analytical run time by APCI-compatible mobile phases. Specificity of the SRM LC–MS–MS method was also proved by processing and analysing serum and urine blank (Figs. 3A and 4A) control samples. No interference was noticed around the hormones retention times either in serum or urine samples.

Calibration graphs were constructed by plotting peak-area ratios versus hormone concentrations using a least-squares linear regression model; the linearity was good for all analytes in the whole range of tested concentrations, as proved by the correlation coefficients ($r^2$) greater than 0.995 for all curves.

Fortified bovine serum and urine samples were prepared at four different concentrations (0.1, 2.0, 10.0 and 30.0 ng/ml) and analysed to determine the extraction efficiency of the hormones and to evaluate the intra- and inter-day precision and accuracy of the analytical method. Representative chromatograms of serum and urine spiked control samples are reported in Figs. 3B and 4B, respectively. The relative retention time, for each analyte, corresponded to that

R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522

515



Fig. 1. Positive ion mass spectra of 17α-19-nortestosterone, 17β-19-nortestosterone, 17α-testosterone, 17β-testosterone, progesterone and [$^2$H$_2$]17β-testosterone. Conditions: FIA; mobile phase: acetonitrile–water (70:30, v/v) containing 2 m$M$ ammonium acetate; flow-rate 150 μl/min; OR was set at 90 V.

QUESTMS-00002880

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 285 of 437 PageID #: 2674



Fig. 2. Positive product ion mass spectra of 17α-19-nortestosterone, 17β-19-nortestosterone, 17α-testosterone, 17β-testosterone, progester-one and [²H₂]17β-testosterone, with the [M+H]⁺ ion as precursor, at *m/z* 275 for 17α-NT and 17β-NT, at *m/z* 289 for 17α-T and 17β-T, at *m/z* 315 for P, and at *m/z* 291 for 17β-T-d₂. Conditions: FIA; mobile phase: acetonitrile–water (70:30, v/v) containing 2 m*M* ammonium acetate; flow-rate 150 μl/min; OR was set at 90 V. Argon was used as the collision gas. CID was carried out with a collision energy of 25 eV.

QUESTMS-00002881



R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522

Fig. 3. SRM LC–MS–MS chromatograms of (A) extract of blank control bovine serum spiked with 2 ng/ml of 17β-T-d$_2$ as I.S.; (B) extract of blank control bovine serum spiked with 2 ng/ml of 17β-NT, 17β-T, 17β-T-d$_2$, 17α-NT, 17α-T and P; (C) extract of a positive bovine serum sample (female>6 months old) containing 17β-NT (4.2 ng/ml) and P (6.7 ng/ml). Precursor–product ion combinations used in SRM detection are shown. Conditions: isocratic HPLC analysis; column reversed-phase Kingsorb C$_{18}$ column (250×2 mm, 5 µm); mobile phase: acetonitrile–water (70:30, v/v) containing 2 m$M$ ammonium acetate; flow-rate 150 µl/min; OR was set at 90 V. Argon was used as the collision gas. CID was carried out with a collision energy of 25 eV.

QUESTMS-00002882

518

R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522



Fig. 4. SRM LC–MS–MS chromatograms of (A) extract of blank control bovine urine spiked with 5 ng/ml of 17β-T-d₂ as I.S.; (B) extract of blank control bovine urine spiked with 5 ng/ml of 17β-NT, 17β-T, 17β-T-d₂, 17α-NT, 17α-T and P; (C) extract of a bovine urine sample (male>6 months old) containing 17β-T (1.6 ng/ml), 17α-T (10.2 ng/ml) and P (2.1 ng/ml). Precursor–product ion combinations used in SRM detection are shown. Conditions: isocratic HPLC analysis; column reversed-phase Kingsorb C₁₈ column (250×2 mm, 5 μm); mobile phase: acetonitrile–water (70:30, v/v) containing 2 mM ammonium acetate; flow-rate 150 μl/min; OR was set at 90 V. Argon was used as the collision gas. CID was carried out with a collision energy of 25 eV.

*R. Draisci et al. / J. Chromatogr. A 870 (2000) 511–522*

519

of the calibration standard within a tolerance of ±0.4%.

The extraction efficiency of the analytes and the I.S. were determined by comparing the peak areas of fortified samples with those of the corresponding standards and of I.S. Three replicates at each concentration were analysed on each day for 3 days ($n=9$) and the following mean percentages of extraction efficiencies were estimated: $81.5\pm6.9\%$ and $83.9\pm5.8\%$ for 17α-NT, $83.1\pm5.5\%$ and $85.6\pm5.2\%$ for 17β-NT, $81.8\pm6.9\%$ and $84.1\pm5.8\%$ for 17α-T, $82.8\pm6.1\%$ and $85.3\pm5.8\%$ for 17β-T, $72.1\pm7.8\%$

and $75.4\pm6.2\%$ for P, $82.4\pm5.5\%$ and $87.9\pm4.7\%$ for 17β-T-$d_2$, for bovine serum and urine samples, respectively.

The inter-day precision and accuracy of the method were obtained by analysing three replicates at 0.1, 2.0, 10.0 and 30.0 ng/ml on each of 3 days for bovine serum and urine. Precision was determined by calculating the relative standard deviation (RSD, %) for the repeated measurements and the accuracy (relative error, RE, %) was calculated by the agreement between the measured and the nominal concentrations of the fortified samples. For inter-day

Table 1
Inter-day precision and accuracy for hormones in bovine serum samples

| Hormone | Parameter | Validation sample level (ng/ml) | | | |
|---|---|---|---|---|---|
| | | 0.1 | 2.0 | 10.0 | 30.0 |
| 17α-NT | Average (ng/ml) | 0.09 | 1.88 | 9.61 | 28.93 |
| | SD (ng/ml) | 0.01 | 0.10 | 0.21 | 0.68 |
| | Precision (RSD, %) | 6.37 | 5.31 | 2.20 | 2.35 |
| | Accuracy (RE, %) | −5.80 | −5.90 | −3.87 | −3.56 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-NT | Average (ng/ml) | 0.09 | 1.90 | 9.55 | 28.89 |
| | SD (ng/ml) | 0.01 | 0.09 | 0.20 | 0.66 |
| | Precision (RSD, %) | 6.24 | 4.83 | 2.12 | 2.28 |
| | Accuracy (RE, %) | −5.50 | −4.80 | −4.46 | −3.69 |
| | *n* | 9 | 9 | 9 | 9 |
| 17α-T | Average (ng/ml) | 0.09 | 1.92 | 9.62 | 29.04 |
| | SD (ng/ml) | 0.01 | 0.08 | 0.22 | 0.64 |
| | Precision (RSD, %) | 6.26 | 4.37 | 2.30 | 2.21 |
| | Accuracy (RE, %) | −5.80 | −3.95 | −3.77 | −3.19 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-T | Average (ng/ml) | 0.09 | 1.89 | 9.65 | 28.99 |
| | SD (ng/ml) | 0.01 | 0.08 | 0.20 | 0.63 |
| | Precision (RSD, %) | 6.12 | 4.38 | 2.10 | 2.18 |
| | Accuracy (RE, %) | −5.20 | −5.30 | −3.46 | −3.36 |
| | *n* | 9 | 9 | 9 | 9 |
| P | Average (ng/ml) | 0.09 | 1.90 | 9.61 | 28.95 |
| | SD (ng/ml) | 0.01 | 0.10 | 0.22 | 0.66 |
| | Precision (RSD, %) | 5.84 | 5.36 | 2.31 | 2.28 |
| | Accuracy (RE, %) | −5.90 | −4.85 | −3.88 | −3.50 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-T-$d_2$ | Average (ng/ml) | 0.09 | 1.91 | 9.68 | 29.02 |
| | SD (ng/ml) | 0.01 | 0.09 | 0.20 | 0.69 |
| | Precision (RSD, %) | 6.35 | 4.86 | 2.11 | 2.38 |
| | Accuracy (RE, %) | −5.50 | −4.30 | −3.18 | −3.25 |
| | *n* | 9 | 9 | 9 | 9 |

QUESTMS-00002884

assays, the overall precision ranged from 6.37 to 2.10% and from 6.25 to 2.01%, for the serum and urine samples, respectively, while the accuracy ranged from −5.90 to −3.18% and from −6.40 to −2.97%, for the serum and urine samples, respectively (Tables 1 and 2). These values were considered satisfactory, on account of the complexity of the biological matrices.

The limit of quantitation (LOQ), defined as the lowest concentration on the calibration graph at which an acceptable accuracy and precision is obtained, was 0.1 ng/ml for all the analytes under

investigation in both the biological fluids, which makes the procedure described suitable for control purposes.

The SRM LC–MS–MS method was then used to analyse real samples collected from animals of both sexes, as part of the national program for hormone control in Italy (Table 3). 17β-NT was found in 3/9 of the serum samples, 17β-T was detected in 6/9 serum samples and P was present in 4/9 serum samples. For the urine samples 17β-NT and 17α-NT were detected in 2/9 samples, 17β-T and 17α-T were detected in 7/9 samples and P in 3/9 samples.

Table 2
Inter-day precision and accuracy for hormones in bovine urine samples

| Hormone | Parameter | Validation sample level (ng/ml) | | | |
|---|---|---|---|---|---|
| | | 0.1 | 2.0 | 10.0 | 30.0 |
| 17α-NT | Average (ng/ml) | 0.09 | 1.90 | 9.66 | 29.09 |
| | SD (ng/ml) | 0.01 | 0.10 | 0.20 | 0.62 |
| | Precision (RSD, %) | 6.16 | 5.37 | 2.09 | 2.15 |
| | Accuracy (RE, %) | −5.80 | −4.95 | −3.37 | −3.02 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-NT | Average (ng/ml) | 0.09 | 1.87 | 9.65 | 29.08 |
| | SD (ng/ml) | 0.01 | 0.10 | 0.19 | 0.59 |
| | Precision (RSD, %) | 5.91 | 5.40 | 2.01 | 2.04 |
| | Accuracy (RE, %) | −5.30 | −6.40 | −3.48 | −3.07 |
| | *n* | 9 | 9 | 9 | 9 |
| 17α-T | Average (ng/ml) | 0.09 | 1.91 | 9.62 | 29.06 |
| | SD (ng/ml) | 0.01 | 0.09 | 0.20 | 0.60 |
| | Precision (RSD, %) | 6.25 | 4.81 | 2.10 | 2.07 |
| | Accuracy (RE, %) | −5.60 | −4.45 | −3.80 | −3.12 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-T | Average (ng/ml) | 0.09 | 1.89 | 9.68 | 29.10 |
| | SD (ng/ml) | 0.01 | 0.08 | 0.20 | 0.64 |
| | Precision (RSD, %) | 6.01 | 4.44 | 2.11 | 2.19 |
| | Accuracy (RE, %) | −5.10 | −5.35 | −3.19 | −2.99 |
| | *n* | 9 | 9 | 9 | 9 |
| P | Average (ng/ml) | 0.09 | 1.89 | 9.64 | 29.09 |
| | SD (ng/ml) | 0.01 | 0.10 | 0.21 | 0.66 |
| | Precision (RSD, %) | 5.81 | 5.45 | 2.21 | 2.26 |
| | Accuracy (RE, %) | −5.40 | −5.45 | −3.60 | −3.03 |
| | *n* | 9 | 9 | 9 | 9 |
| 17β-T-d$_2$ | Average (ng/ml) | 0.09 | 1.90 | 9.70 | 29.07 |
| | SD (ng/ml) | 0.01 | 0.08 | 0.20 | 0.59 |
| | Precision (RSD, %) | 5.96 | 4.47 | 2.08 | 2.04 |
| | Accuracy (RE, %) | −6.10 | −4.85 | −2.97 | −3.10 |
| | *n* | 9 | 9 | 9 | 9 |

QUESTMS-00002885

Table 3
Hormone concentrations in real samples of bovine serum and urine provided by the national program for hormone control in Italy, assayed by LC–MS–MS

| Samples | 17β-NT (ng/ml) | | 17α-NT (ng/ml) | 17β-T (ng/ml) | | 17α-T (ng/ml) | P (ng/ml) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Determined values | Maximum physiological limit[a] | Determined values | Determined values | Maximum physiological limit[a] | Determined values | Determined values | Maximum physiological limit[a] |
| *Serum* | | | | | | | | |
| M>6 m | 1.9 | – | | n.d. | 30.0 | | n.d. | 1.5 |
| M>6 m | n.d. | – | | 2.4 | 30.0 | | 1.7 | 1.5 |
| M>6 m | n.d. | – | | 1.4 | 30.0 | | 2.7 | 1.5 |
| M>6 m | n.d. | – | | 2.2 | 30.0 | | 3.4 | 1.5 |
| M>6 m | 2.3 | – | | n.d. | 30.0 | | n.d. | 1.5 |
| F>6 m | 4.2 | – | | n.d. | 0.5 | | 6.7 | 14.0 |
| F>6 m | n.d. | – | | 2.3 | 0.5 | | n.d. | 14.0 |
| F<6 m | n.d. | – | | 0.6 | 0.5 | | n.d. | 1.0 |
| F<6 m | n.d. | – | | 2.6 | 0.5 | | n.d. | 1.0 |
| *Urine* | | | | | | | | |
| M>6 m | n.d. | | n.d. | 1.6 | | 10.2 | 2.1 | |
| M>6 m | 0.5 | | 4.9 | n.d. | | n.d. | n.d. | |
| M>6 m | 0.8 | | 8.4 | n.d. | | n.d. | n.d. | |
| M<6 m | n.d. | | n.d. | 0.7 | | 6.2 | 0.3 | |
| M<6 m | n.d. | | n.d. | 4.0 | | 24.1 | 1.4 | |
| M<6 m | n.d. | | n.d. | 0.9 | | 8.1 | n.d. | |
| F>6 m | n.d. | | n.d. | 0.5 | | 4.8 | n.d. | |
| F<6 m | n.d. | | n.d. | 0.4 | | 4.2 | n.d. | |
| F<6 m | n.d. | | n.d. | 0.6 | | 5.9 | n.d. | |

[a] From reference; M: male; m: months; F: female; n.d.: not detected.

Representative SRM LC–MS–MS chromatographic profiles of a bovine serum sample (female>6 months old) (Fig. 3C) show presence of 17β-NT (4.2 ng/ml) and P (6.7 ng/ml). The level of 17β-NT, as determined by the SRM LC–MS–MS, confirmed an illegal administration of this synthetic anabolic compound, whereas the concentration of progesterone was considered in compliance with the maximum physiological limits [3]. Representative SRM LC–MS–MS chromatograms of a bovine urine sample (male>6 months old) containing P (2.1 ng/ml), 17β-T (1.6 ng/ml) and 17α-T (10.2 ng/ml) are shown in Fig. 4C. Unsurprisingly, 17α-T, the main metabolite of 17β-T in cattle urine, was found to have a higher concentration (i.e., 10.2 ng/ml) than the precursor compound.

Importantly, the suitability of the SRM LC–MS–MS to assess physiological concentrations of anabolic hormones in bovine urine was shown.

## 4. Conclusion

The aim of this research was to develop a specific, sensitive and reliable LC–APCI-MS–MS method for the measurement of anabolic hormone residues (17β-NT, 17β-T and P) and their metabolites (17α-NT and 17α-T) in bovine serum and urine.

The unambiguous confirmation of the presence of the hormones both in bovine serum and urine in the proposed method results from the retention time information, the presence of the protonated molecule of the analyte, and the employment of a double precursor–product ion reaction, thus achieving a confidence in identification higher than 99.99% [24].

The developed method complies with the criteria proposed by the recent revision of the Commission Decision 93/256/EEC [25] for confirmatory methods of substances listed in Group A of Annex I of Council Directive 96/23/EC [26], such as anabolic

QUESTMS-00002886

steroids, requiring the identification of the analyte based on the presence of at least one precursor and two transition product ions for LC–MS–MS.

The ability to perform multi-residue analyses involving simple extraction procedures and highly selective and sensitive determination by SRM LC–MS–MS, along with the widespread presence of benchtop LC–MS$^n$ apparatus in laboratories, makes this analytical method particularly valuable for routine control of the illegal use of anabolic hormones and their potentially toxic metabolites in livestock production.

Research activities by our group are ongoing in order to obtain more detailed profiles of the hormones here investigated and of their metabolites in the biological fluids of interest, which would allow further development in the control strategies of illegal treatments.

## References

[1] Commission of the European Communities, Council Directive 96/22/EC, Off. J. Eur. Communities: Legis. L125 (1996) 3.
[2] Report of the Assessment of Potential Risks to Human Health from Hormone Residues in Bovine Meat and Meat Products, Scientific Committee on Veterinary Measures Relating to the Public Health, 30 April 1999.
[3] Gazzetta Ufficiale della Repubblica Italiana, No. 24, 30 January 1997.
[4] W.R. Jondorf, D.F. Macdougall, Vet. Rec. 100 (1977) 56.
[5] E.H.J.M. Jansen, R.H. van den Berg, G. Zomer, R.W. Stephany, J. Clin. Chem. Clin. Biochem. 23 (1985) 145.
[6] P. Evrard, P. Gaspar, G. Maghuin-Rogister, J. Immunoassay 7 (1986) 353.
[7] G. Degand, P. Schmitz, G. Maghuin-Rogister, J. Chromatogr. 489 (1989) 235.
[8] H.H.D. Meyer, D. Falckenberg, T. Janowsky, M. Rapp, E.F. Rosel, L. Van Look, H. Karg, Acta Endocrinol. 126 (1992) 369.
[9] L.A. Van Ginkel, R.W. Stephany, H.J. Van Rossum, H.M. Steinbuch, G. Zomer, E. Van De Heeft, A.P.J.M. De Jong, J. Chromatogr. 489 (1989) 111.
[10] M. Vandenbroeck, G. Van Vyncht, P. Gaspar, C. Dasnois, P. Delahaut, G. Pelzer, J. De Graeve, G. Maghuin-Rogister, J. Chromatogr. 564 (1991) 405.
[11] E. Daeseleire, A. De Guesquiere, C. Van Peteghem, J. Chromatogr. 562 (1991) 673.
[12] E. Daeseleire, A. De Guesquiere, C. Van Peteghem, J. Chromatogr. Sci. 30 (1992) 409.
[13] B. Le Bizec, M.P. Montrade, F. Monteau, F. Andre, Anal. Chim. Acta 275 (1993) 123.
[14] G. Casademont, B. Perez, J.A. Garcia Regueiro, J. Chromatogr. B 686 (1996) 189.
[15] E. Daeseleire, R. Vandeputte, C. Van Peteghem, Analyst 123 (1998) 2595.
[16] T.P. Samuels, A. Nedderman, M.A. Seymor, E. Houghton, Analyst 123 (1998) 2401.
[17] R. Bagnati, R. Fanelli, J. Chromatogr. 547 (1991) 325.
[18] C. Legrand, B. Dousset, H. Tronel, F. Belleville, P. Nabet, J. Chromatogr. B 663 (1995) 187.
[19] S. Hsu, T.R. Covey, J.D. Henion, J. Liq. Chromatogr. 10 (1987) 30–33.
[20] S.A. Hewiyy, W.J. Blanchflower, W.J. McCaughey, C.T. Elliott, D.G. Kennedy, J. Chromatogr. 639 (1993) 185.
[21] R. Draisci, L. Giannetti, L. Lucentini, L. Palleschi, I. Purificato, G. Moretti, J. High Resolut. Chromatogr. 20 (1997) 421.
[22] B. Le Bizec, M.P. Montrade, F. Monteau, I. Gaudin, F. Andre, Clin. Chem. 44 (1998) 973.
[23] R. Draisci, L. Palleschi, E. Ferretti, C. Marchiafava, L. Lucentini, P. Cammarata, Analyst 123 (1998) 2605.
[24] S. Porter, R. Patel, I. Kay, Residue of Veterinary Drugs in Food, in: N. Haagsma, A. Ruiter (Eds.), Proceedings of the EuroResidue III, Veldhoven, Utrecht University, Faculty of Veterinary Medicine, Utrecht, 6–8 May 1996, p. 795.
[25] Revision of Commission Decision 93/256/EEC, European Commission, Directorate General For Agriculture VI B II 2, in preparation.
[26] Commission of the European Communities, Council Directive 96/23/EC, Off. J. Eur. Communities: Legis. L125 (1996) 3.

QUESTMS-00002887

*Anal. Chem.* **2000,** *72,* 3653–3659

# Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography–Mass Spectrometry

**Damon B. Robb,†,‡ Thomas R. Covey,§,∥ and Andries P. Bruins*,†**

*University Center for Pharmacy, University of Groningen, Antonius Deusinglaan 1, 9713 AV Groningen, The Netherlands, and MDS SCIEX, 71 Four Valley Drive, Concord, Ontario, Canada, L4K 4V8*

**Atmospheric pressure photoionization (APPI) has been successfully demonstrated to provide high sensitivity to LC–MS analysis. A vacuum-ultraviolet lamp designed for photoionization detection in gas chromatography is used as a source of 10-eV photons. The mixture of samples and solvent eluting from an HPLC is fully evaporated prior to introduction into the photoionization region. In the new method, large quantities of an ionizable dopant are added to the vapor generated from the LC eluant, allowing for a great abundance of dopant photoions to be produced. Because the ion source is at atmospheric pressure, and the collision rate is high, the dopant photoions react to completion with both solvent and analyte molecules present in the ion source. Using APPI, at an LC flow rate of 200 $\mu$L/ min, it is possible to obtain analyte signal intensities 8 times as high as those obtainable with a commercially available corona discharge-atmospheric pressure chemical ionization source.**

The aim of this paper is to introduce atmospheric pressure photoionization (APPI) as a new ionization method for liquid chromatography–mass spectrometry (LC–MS). To the best of our knowledge, there have been no prior publications regarding the combination of PI with LC–MS, and there have been very few reports of PI combined with LC,[1–4] despite the longstanding use of photoionization detection (PID) with gas chromatography (GC).[5–7]

Photoionization detection in GC typically involves the use of a discharge lamp that generates vacuum-ultraviolet (VUV) photons. If one of these photons is absorbed by a species in the column eluant with a first ionization potential (IP) lower than the photon energy, then single-photon ionization may occur. The photoions

thereby generated are detected as current flowing through a suitable collection electrode. A chromatogram can be obtained by plotting the current detected during a chromatographic run versus time. For PID-GC, the discharge lamp is normally selected such that the energy of the photons is greater than the IP of the analyte but below that of the carrier gas. Most organic molecules have IPs in the range of 7–10 eV, while the common GC carrier gases have higher values. Selective ionization of the analyte can then occur, and low background currents may be achieved. The few early investigations of PI coupled with LC also relied upon direct detection of the photoion current without mass analysis.[1–4] Selective ionization was possible in these experiments, too, because the common LC solvents also have relatively high IPs. Thus, the early PI-LC methods, particularly those that incorporated a vaporization stage between the LC and the PI detector, were substantially the same as PID-GC. (Note that one of the reported PI-LC studies utilized direct photoionization of the liquid-phase eluant.[2])

As part of the introduction to the use of photoionization with LC–MS, any prior reports of APPI combined with mass spectrometry must also be considered. There has never been a widely applied or studied mass spectrometry technique that utilized PI at atmospheric pressure, and, while there have been numerous examples of APPI coupled with ion mobility spectrometry (PI-IMS; for examples, see refs 8–10), we have found only two reports of true mass analysis of photoions created at atmospheric pressure.[11,12] In these first APPI-MS experiments that demonstrated the feasibility of the combination, direct analysis was performed of vaporized samples that were transported to the ionization region by a flow of helium carrier gas. A hydrogen discharge lamp ($h\nu$ = 10.2 eV) was utilized to create ions for a quadrupole mass analyzer. Significantly, the relative abundance of ions in the spectra obtained was found to depend on sample concentration. At high sample concentrations, ion–molecule reactions, particularly charge (electron) exchange, distorted the

* Corresponding author: (phone) +31-50-363-3262; (fax) +31-50-363-3184; (e-mail) A.P.Bruins@farm.rug.nl.
† University of Groningen.
‡ E-mail: D.B.Robb@farm.rug.nl.
§ MDS SCIEX.
∥ (Phone) (905) 660-9005; (fax) (905) 660-2623; (e-mail) CoveyTR@SCIEX.com.
(1) Schermund, J. T.; Locke, D. C. *Anal. Lett.* **1975,** *8,* 611–625.
(2) Locke, D. C.; Dhingra, B. S.; Baker, A. D. *Anal. Chem.* **1982,** *54,* 447–450.
(3) Driscoll, J. N.; Conron, D. W.; Ferioli, P.; Krull, I. S.; Xie, K.-H. *J. Chromatogr.* **1984,** *302,* 43–50.
(4) De Wit, J. S. M.; Jorgenson, J. W. *J. Chromatogr.* **1987,** *411,* 201–212.
(5) Driscoll, J. N.; Spaziani, F. F. *Res./Dev.* **1976,** *50–54.*
(6) Driscoll, J. N. *Am. Lab.* **1976,** 71–75.
(7) Langhorst, M. L. *J. Chromatogr. Sci.* **1981,** *19,* 98–103.

(8) Baim, M. A.; Eatherton, R. L.; Hill, H. H., Jr. *Anal. Chem.* **1983,** *55,* 1761–1766.
(9) Leasure, C. S.; Fleischer, M. E.; Anderson, G. K.; Eiceman, G. A. *Anal. Chem.* **1986,** *58,* 2142–2147.
(10) Spangler, G. E.; Roehl, J. E.; Patel, G. B.; Dorman, A. U.S. Patent 5,338,931, 1994.
(11) Revel'skii, I. A.; Yashin, Y. S.; Kurochkin, V. K.; Kostyanovskii, R. G. *Chem. Physiochem. Methods Anal.* **1991,** 243–248.
(12) Revel'skii, I. A.; Yashin, Y. S.; Voznesenskii, V. N.; Kurochkin, V. K.; Kostyanovskii, R. G. USSR Inventor's Certificate no. 1159412, 1985.

10.1021/ac0001636 CCC: $19.00  © 2000 American Chemical Society
Published on Web 07/07/2000

QUESTMS-00002888

appearance of the mass spectra: the majority of charge resided on the species with the lowest IP. Another finding was that predominantly molecular or quasi-molecular ions are created by PI at atmospheric pressure, indicating that little fragmentation occurs during the ionization step. Finally, when an abundance of solvent vapor (water or methanol) was added to the sample mixture, a decrease in sensitivity for the method was observed.

With regard to the prospect of combining APPI with LC−MS, the finding that the presence of solvent vapor decreases the efficiency of ion formation is troublesome. (This effect was well-known to the last researchers to study PID-LC, who described the various means by which vaporized solvent molecules can affect the ion current that is ultimately detected.[4]) Another interesting observation from the early APPI-MS studies is the effect that charge-exchange reactions have on the final appearance of the spectra. This reflects the obvious: the relative abundance of ions in an APPI spectrum will depend on the reactions that the original photoions undergo prior to mass analysis. As is generally true for atmospheric pressure ionization methods, the high collision frequency ensures that species with high proton affinities and/or low ionization potentials tend to dominate the positive ion spectra acquired, unless special measures are taken to sample the ions from the source before significant reactions occur.[13]

Postionization reactions may complicate the analysis of APPI mass spectra, but *it is also possible to exploit these reactions to improve the sensitivity of the method.* Consider the case of PI of vaporized LC eluant: the direct PI of an analyte molecule is a statistically unlikely event, in part because of the excess of solvent molecules that may also absorb the limited photon flux. The lamps used to date for PI-LC have all had photon energies below the IPs of the most commonly used LC solvents (water, IP = 12.6 eV; methanol, IP = 10.8 eV; acetonitrile, IP = 12.2 eV); hence, the total ion production in these experiments has been quite low. The number of ions produced by a discharge lamp can be greatly increased, however, if the percentage of ionizable molecules in the vaporized LC eluant is raised to a significant fraction of the total. One way to achieve this is to add a large quantity of an ionizable dopant to the liquid eluant or to the vapor generated from the eluant. If the dopant is selected such that its photoions have a relatively high recombination energy, or a low proton affinity, then the dopant photoions may react by charge exchange or proton transfer with species present in the ionization region. Because the ionization region is at atmospheric pressure, the high collision rate will ensure that the charge on the photoions is efficiently transferred to the analyte, provided that the thermodynamics are favorable. Of course, any number of competing reactions may also occur, depending upon the impurities present in the reaction region.

The idea of using a dopant to increase the efficiency of ion formation by APPI is not entirely without precedent, as there have been several reported instances where dopants have been used with atmospheric pressure ionization. For instance, the use of acetone as a dopant to enhance the sensitivity of PI-IMS has been described in a patent.[10] Also, charge-exchange reactions involving benzene have been successfully exploited to increase the sensitivity of corona discharge-APCI toward samples with low proton



**Figure 1.** Schematic diagram of the complete APPI-LC-MS system.

affinity.[14] To the best of our knowledge, though, a dopant has never before been used to enhance the production of photoions from the eluant of a liquid chromatograph. In this paper, it will be shown that the use of a dopant provides a means to overcome the low sensitivity heretofore associated with PID-LC and that the atmospheric pressure photoionization method has the potential to provide significantly enhanced sensitivity to LC−MS.

## EXPERIMENTAL SECTION

A schematic of the experimental apparatus is provided in Figure 1. Descriptions of the operation of the individual components of the system can be found in their respective sections. All the experiments described herein utilized a PE SCIEX (Concord, ON, Canada) API 365 triple-quadrupole mass spectrometer, two PE series 200 micro-LC pumps, and a PE series 200 autosampler. A Harvard Apparatus (Holliston, MA) model 2400-001 syringe pump was used to deliver the dopant to the APPI ion source. The APPI source was constructed in part from a heated nebulizer (HN) APCI source supplied with the mass spectrometer. With the new ion source, experiments were performed to demonstrate the increase in APPI-LC−MS sensitivity that can be obtained for various sample types through the use of a dopant; two dopants, toluene (IP = 8.83 eV) and acetone (IP = 9.70 eV), were tested for their utility in this regard. Further, to evaluate the relative sensitivity of the APPI method, the samples used for the APPI experiments were also analyzed via an additional, unmodified, APCI source. And, because solvent composition is an important variable that can affect ionization efficiency, the LC−MS experiments were repeated with the two most commonly used solvent combinations: methanol−water and acetonitrile−water. Last, an additional series of compounds was analyzed by APPI, in both positive and negative full-scan mode, to further characterize the range of compounds that the method may be applied to.

**APPI Source.** When constructing the APPI source for LC−MS, it was convenient to modify a standard HN-APCI source, principally because it was anticipated that in order for APPI to be effective, the LC eluant would require nebulization and vaporization in the same manner as for corona discharge-APCI. A further benefit to this approach was that the new source could be directly connected with the mass analyzer, without having to modify the vacuum interface. Comparisons between the new source and the standard APCI source were also facilitated, because their housings were essentially identical.

(13) Carroll, D. I.; Dzidic, I.; Horning, E. C.; Stillwell, R. N. *Appl. Spectrosc. Rev.* **1981**, *17*, 337−406.

(14) Ketkar, S. N.; Dulak, J. G.; Dheandhanoo, S.; Fite, W. L. *Anal. Chim. Acta* **1991**, *245*, 267−270.

QUESTMS-00002889



**Figure 2.** Schematic of the APPI ion source, including the heated nebulizer probe, photoionization lamp, and lamp mounting bracket.

Figure 2 is a schematic of the APPI source used in the investigations described here. This ion source, like the unmodified APCI version, made use of a heated nebulizer, whose heater was maintained at 450 °C for all these experiments. Nitrogen was used to nebulize the liquid eluant (nebulizer gas) and also to transport the finely dispersed sample drops through the heated quartz tube in which they were vaporized (auxiliary gas). A tee was placed in the auxiliary gas line, so that a fused-silica capillary could be run into the HN to supply the dopant required for the APPI method, while the same auxiliary gas flow used for the unmodified APCI source was maintained. The fused-silica capillary was connected to the syringe pump. The high temperature inside the HN ensured that the liquid dopant was vaporized immediately and then swept by the auxiliary gas through the heated quartz tube and into the photoionization region, along with the nebulized LC eluant.

A bracket for the photoionization lamp, made of stainless steel and Vespel (DuPont), was constructed (Machine Shop, University of Groningen) so that it could be mounted directly to the end of the HN probe. Because the mounting bracket was to be held at a high potential, while the HN was grounded, a Vespel insulating sleeve was inserted between it and the HN probe. It was necessary to make the walls of the sleeve fairly thick (3.5 mm) in order to prevent arcing and also to minimize the likelihood that thermal degradation of the Vespel would cause deterioration of the mechanical strength and/or the insulating capacity of the insert. The mounting bracket was fixed in place by a Vespel thumbscrew.

The photoionization lamp used for these experiments was a Cathodeon Ltd. (Cambridge, England) model PKS 100 krypton discharge lamp. Once ignited, this lamp provides a continuous output (i.e., the emission is not pulsed on and off). The high voltage required to ignite and maintain the discharge was supplied by a Cathodeon Ltd. model C200 power supply. The nominally 10.0-eV lamp had a magnesium fluoride window that enabled transmission of the 10.0- and 10.6-eV photons emitted from the discharge. The lamp was used as supplied by the vendor; no attempt was made to determine the absolute or relative intensity of the lamp's emission at the two ionizing wavelengths. The C200 power supply was incorporated into a home-built device (Electronic Services, University of Groningen) that was insulated and enabled the lamp power supply, along with the lamp and its mounting bracket, to be floated at up to ±3 kV relative to ground. A 1.0-MΩ current-limiting resistor was inserted in series between the negative lead of the C200 power supply and the cathode of the lamp, yielding a lamp current of 0.7 mA (without the extra resistor, the lamp could be driven at ~2.0 mA).

The sensitivity of the method was found to depend on the electrical potential applied to the lamp and the mounting bracket, hereafter referred to as the *offset potential*. A separate high-voltage power supply was used to provide the offset potential. In general, the optimum value for the offset potential appears to be directly related to the separation of the lamp bracket from the curtain plate, with the condition that its magnitude remain at least slightly above that of the curtain plate (±1.1 kV relative to ground), during normal operation of the API 365 mass spectrometer, the polarity being the same as that of the ions being analyzed. For the experiments described here, where the tube protruding from the lamp bracket was fixed at a position only a few millimeters in front of the curtain plate, the optimum offset potential was +1.2 kV for positive ions, i.e., 100 V above the potential of the curtain plate. In negative ion mode, high sensitivity could be achieved by simply switching the polarity of the offset potential, after its magnitude had been optimized for positive ion analysis.

Electrical connections to the lamp were made through the side of the source housing. The original HV connection for the corona discharge needle was replaced with a two-pin connector; one connection was made to the ring cathode of the lamp, and another was made to the body of the lamp bracket, which was in electrical contact with the anode at the base of the lamp. The new connector was installed in a manner such that the source retained its seal, so that ambient air was excluded from the ionization region.

**Mass Spectrometer.** The PE SCIEX API 365 triple-quadrupole mass spectrometer used for these experiments was essentially

QUESTMS-00002890

unmodified, with the only significant changes being those made to one of the HN ion sources, as described above. System control and data acquisition was accomplished using the MassChrom version 1.0 data system. Single MS mode only was used for the experiments described here. The mass spectrometer was tuned with the LC2Tune 1.3 instrument control and data acquisition application to provide optimum sensitivity for each analyte using direct sample infusion and selected-ion monitoring (SIM). Also using the Tune application, full-scan spectra were obtained for each analyte using the instrument state files established during optimization. For the mixture analysis experiments, Sample Control (version 1.3) software was used. In these experiments, SIM of each of four analytes was performed, with the dwell time at each mass being 200 ms; for each ion monitored, the voltages of the mass spectrometer were set to the optimum values that were predetermined using the Tune application. During the final experiments, where an additional series of compounds was analyzed qualitatively, a single generic Tune state file was used, in which the voltages in the vacuum interface region were kept low in order to prevent up-front collision-induced dissociation that could complicate the desired analysis.

During the experiments comparing the APPI and corona discharge-APCI methods, the operating parameters of the mass spectrometer, including the temperature and gas flow settings for each heated nebulizer, were unchanged. The needle current for the APCI experiments was set to 2.5 $\mu$A; this value was confirmed by direct measurement of the current generated by the ions impinging on the curtain plate. The ion current generated by the APPI source, with the dopant and solvent flowing, was also measured at the curtain plate; this was found to be ~10 nA.

**Chemicals.** Carbamazepine, acridine, naphthalene, diphenyl sulfide, and 5-fluorouracil were used as standard test compounds for the bulk of the experiments described here. These compounds were selected, somewhat arbitrarily, on the basis of their differing functional groups, to illustrate the affect of proton affinity on APPI sensitivity under various conditions. Fresh supplies of these chemicals were purchased from Aldrich and used without further purification. Concentrated stock solutions were made for each of these samples in methanol. For the full-scan experiments, where each sample was to be analyzed individually, dilute methanol–water solutions (50/50 by volume) were made for each of the samples. The same solutions were used for both the methanol–water and the acetonitrile–water LC–MS experiments. The concentration of the carbamazepine solution was the same as that of acridine, 0.2 $\mu$M; the concentrations of the naphthalene and diphenyl sulfide solutions were both 20 $\mu$M. The concentration of the 5-fluorouracil solution was 1 $\mu$M. For the SIM mixture analysis experiments, another methanol–water solution (50/50) containing all the above samples (with the exception of 5-fluorouracil) was prepared such that the concentration of each component was the same as that of its single-component solution.

Stock solutions were also made for a second series of compounds: reserpine, caffeine, testosterone, anthracene, 2,6-dimethylphenol, myristic acid, and benzoic acid. These were diluted in 50/50 methanol–water to make 1 $\mu$M solutions for each compound in the series.

All solvents used, including the dopants toluene and acetone, were of HPLC grade.

**Liquid Chromatograph.** For all the experiments described here, the total combined flow rate provided by the two PE micro-LC pumps was 200 $\mu$L/min. Pump A was used to deliver water, while pump B delivered the organic mobile phase, methanol or acetonitrile. The LC solvents were sparged with helium before and during the experiments. No buffers or other solvent additives were used. The column used had an inner diameter of 2 mm and a length of 50 mm (Betabasic-18; 3-$\mu$m particle size; Keystone Scientific, Inc., Bellefonte, PA). A 5-$\mu$L loop was used in the injector of the autosampler. The dopant was delivered at 25 $\mu$L/min. by the Harvard Apparatus syringe pump.

For the first full-scan experiments, the samples were injected on-column and eluted using isocratic methods. Methanol was the organic mobile phase used in these experiments; the methanol/water ratio for each analysis was set so that acceptable peak shapes and short retention times were achieved. For carbamazepine, acridine, naphthalene, diphenyl sulfide, and 5-fluorouracil, respectively, the methanol/water ratio used was 60/40, 70/30, 75/25, 80/20, and 70/30. Gradient elution was employed for the mixture analysis experiments. For the methanol–water experiments, the percentage of methanol was ramped from 60 to 90% over 2 min, while for acetonitrile–water, the gradient was from 50 to 80% acetonitrile, also over 2 min. For the final full-scan flow injection experiments, of the second series of analytes, a column was not used, and the LC solvent consisted of methanol and water (60/40).

## RESULTS AND DISCUSSION

**APPI Mass Spectra.** Full-scan APPI mass spectra for the first series of analytes are presented in Figure 3. These spectra were obtained by isocratic, on-column, flow injection analysis of single-component solutions. Toluene was used as the dopant. The spectrum shown for each sample was taken from the top of the peak in its chromatogram and has been background subtracted. The mass range from 30 to 100 amu has been omitted from the figures, so that the analyte ions, and not incompletely subtracted solvent ions, dominate the spectra.

Panels a and b of Figure 3 are spectra of carbamazepine (MW 236) and acridine (MW 179), respectively, that clearly show the MH$^+$ ions of each sample. Carbamazepine is a relatively fragile molecule which was subject to thermal degradation when analyzed by APPI (or HN-APCI), as evidenced by the prominent signal from its fragment at $m/z$ 194. Hardly any signal is obtained for the M$^{+\cdot}$ radical cations of carbamazepine and acridine. Conversely, as displayed in panels c and d of Figure 3, the spectra of naphthalene (MW 128) and diphenyl sulfide (MW 186) show only M$^{+\cdot}$ radical cations. Recall that the latter spectra were taken from samples 100 times more concentrated than those of carbamazepine and acridine, though the signal intensities attributable to the various species are similar. It is clear from these data that the efficiency of the APPI method, in it present form, is much lower for naphthalene and diphenyl sulfide than it is for carbamazepine and acridine.

To explain the discrepancies in ionization efficiencies observed for these species, it is first necessary to establish that ionization depends primarily upon reactions that are initiated by dopant photoions. This knowledge stems from the observation that ion production without a dopant is very low (see Figures 4 and 5, along with the accompanying discussion). Thus, when a dopant

QUESTMS-00002891



**Figure 3.** Full-scan APPI spectra of five compounds: (a) carbamazepine; (b) acridine; (c) naphthalene; (d) diphenyl sulfide; (e) 5-fluorouracil.

is used, differences in photoionization cross sections of the analytes can be discounted, and it can be surmised that ionization efficiency is governed largely by the ion–molecule reactions occurring after photoionization of the dopant in the APPI source. With regard to the mechanism responsible for the preferential ionization of certain species, the most obvious difference between the molecules selected for analysis lies in their relative proton affinities: carbamazepine and acridine both have at least one nitrogen-containing functional group that can accept a proton, while naphthalene and diphenyl sulfide have no such basic site. Hence, the observation that relatively high proton affinity species are ionized preferentially points toward the empirical conclusion that proton-transfer reactions are more prominent than charge-exchange reactions in the APPI source. Preliminary investigations (data not presented here) indicate that there may be several reaction pathways responsible for the observed results; one important process involves the reaction of dopant photoions with solvent molecules, which in turn may react by proton transfer with analytes having a high proton affinity. It is, however, beyond the scope of this article to expound on the ion–molecule chemistry

of the APPI source, and further discussion of this topic will be postponed until more information is available.

The final spectrum in the series, Figure 3e, is from a negative ion scan of 5-fluorouracil (MW 130), and the prominent peak at $m/z$ 129 corresponds to $(M - H)^-$. This figure has been included to illustrate that the APPI method presented here can also be used in negative ion mode. Thus far we have performed few investigations of this mode and have not begun to study the reactions that lead to the formation of the observed $(M - H)^-$ ions.

**APPI Chromatograms.** The APPI chromatograms presented in Figure 4 are composed of the sum of the ion current detected by SIM of $m/z$ 237, 180, 128, and 186. The four peaks, in order of elution, correspond to the signals for carbamazepine (1 pmol injected), acridine (1 pmol), naphthalene (100 pmol), and diphenyl sulfide (100 pmol). Both of these chromatograms were obtained without the benefit of an added dopant. Figure 4a shows a typical chromatogram obtained when the LC solvent consisted of methanol and water, while Figure 4b is representative of chromatograms obtained for the acetonitrile–water experiments. The composition of the solvent has little effect here on the chromatograms, other

*Analytical Chemistry, Vol. 72, No. 15, August 1, 2000*  **3657**

QUESTMS-00002892





**Figure 4.** Chromatograms of carbamazepine, acridine, naphthalene, and diphenyl sulfide, obtained by APPI without the use of a dopant, for eluants (a) methanol−water and (b) acetonitrile−water.



**Figure 5.** APPI chromatograms obtained for the same solution analyzed in Figure 4, showing the effects of the use of a dopant. Toluene and acetone are compared for their utility as dopants, and the LC eluant was methanol−water.

than the factor of 2−3 times increase in sensitivity observed for naphthalene and diphenyl sulfide when methanol is used for the organic mobile phase. For both solvent systems, though, the efficiency of ionization is again found to be much higher for carbamazepine and acridine than for the low proton affinity species (note the sample load for each analyte). It is not clear that direct photoionization is the sole, or even the principal, mechanism responsible for the ionization observed in this case, because it seems unlikely that there are such marked differences in the photoionization cross sections of these four species (they all contain aromatic rings and have IPs below the photon energy). It may be then that analyte ionization occurs largely through photoion intermediates formed from trace amounts of impurities in the solvent, which react in a manner similar to that observed for toluene. Though there is presently insufficient evidence available to say with certainty what the ionization mechanism is, these data do serve, in any event, to illustrate that the efficiency





**Figure 6.** Comparison of APPI and corona discharge-APCI. (a) The LC eluant is methanol−water. APPI is more sensitive than APCI, especially toward naphthalene and diphenyl sulfide. (b) For acetonitrile−water, APPI is still more sensitive, but APCI shows improved sensitivity toward the low proton affinity compounds.

of direct photoionization as an ionization method for LC−MS is quite low.

The chromatogram in Figure 5 was obtained from the same sample solution analyzed to collect the data presented in Figure 4, and the organic solvent used for the gradient was methanol. Similar results were obtained for acetonitrile−water. Two chromatograms have been overlaid in Figure 5: one was collected by utilizing toluene as a dopant, and the other with acetone. First considering the toluene example, the increase in sensitivity (and signal-to-noise ratio) relative to the no-dopant case is striking: for carbamazepine and acridine, the increase in peak area is ∼100 times. The increase for naphthalene and diphenyl sulfide is somewhat less pronounced, but still substantial at a factor of ∼25. These data illustrate that toluene used as dopant can enhance the sensitivity of APPI toward species of both high and low proton affinity, through either proton-transfer or charge-exchange reactions. Note again that proton-transfer reactions appear to be much more prominent. The APPI chromatogram obtained using acetone, on the other hand, illustrates that acetone is an effective dopant only for those compounds having high proton affinity; acetone is not suitable as a dopant for the promotion of molecular ion formation of samples having a low proton affinity. Hence, the choice of dopant is an important factor affecting the sensitivity and selectivity of APPI.

**Comparison between APPI and APCI.** Results from the experiments comparing APPI and the standard corona discharge-APCI source are presented in Figure 6. When methanol was the organic solvent, Figure 6a, the signals obtained for carbamazepine and acridine by APPI were at least 8 times as high as those obtainable with the APCI source; the increase for naphthalene

QUESTMS-00002893

**Table 1. Additional Series of Compounds Analyzed by APPI[a]**

| Compound | Base Peak | | Assignment |
|---|---|---|---|
| | Positive | Negative | |
| reserpine, MW 608 | 609 | -607 | [M+H]+, [M-H]- |
| caffeine, MW 194 | 195 | n.o. | [M+H]+ |
| testosterone, MW 288 | 289 | n.o. | [M+H]+ |
| anthracene, MW 178 | 179 | n.o. | [M+H]+ |
| 2,6-dimethyl phenol, MW 122 | n.o. | -121 | [M-H]- |
| myristic acid, MW 228 | n.o. | -227 | [M-H]- |
| benzoic acid, MW 122 | n.o. | -121 | [M-H]- |

[a] n.o., not observed for 1 $\mu$M solutions under full-scan conditions.

and phenyl sulfide was much greater, since the sensitivity of APCI toward low proton affinity species in the presence of methanol was found to be almost nil. When acetonitrile was used, Figure 6b, the advantage of APPI over APCI was maintained for carbamazepine and acridine, though the sensitivity of APCI toward naphthalene and diphenyl sulfide was much improved and was not much lower than that of APPI.

The chromatograms selected for display here provide a first indication of the type of performance that is attainable with APPI, and they are representative of the data that were routinely obtained over the course of these experiments. To more fully assess the potential utility of APPI though, it will be necessary to formally validate a bioanalysis assay using APPI under strictly controlled and realistic conditions.

**Qualitative Analysis of a Second Series of Compounds.** The high sensitivity of the APPI method seems to be quite general and is not limited to those species chosen for the experiments described above. A selection of additional compounds that have

been successfully analyzed by APPI is presented in Table 1, along with the most prominent ions observed in their spectra. It is evident from this table that most of the species analyzed by APPI to-date have yielded protonated molecules, while molecules containing acidic functional groups may be deprotonated and detected in negative ion mode. In this regard, the APPI method follows behavior similar to that of corona discharge-APCI; i.e., like APCI, APPI seems most suitable for samples having a high basicity or acidity in the gas phase.

**Comment on the Importance of the Offset Potential.** There is one additional feature of the APPI method presented here that has yet to be discussed: ion formation by APPI does not require any element within the ionization region to be held at a high potential; i.e., unlike electrospray and APCI, where the spray capillary and corona discharge needle are operated at several kilovolts, the APPI ionization region is essentially field free. This characteristic allows for the independent optimization of the offset potential of the APPI source, a parameter that has been found to have a tremendous effect upon the sensitivity of the method (data not presented here). It is believed that the careful control of the offset potential allows for optimization of the transport of ions toward the sampling orifice of the mass analyzer. Recall that the total ion production by APPI is relatively low (the ion current measured at the curtain plate for APPI is ~10 nA, as compared to 2.5 $\mu$A for corona discharge-APCI), while the sensitivity of the method has been found to be high. Thus, we surmise that efficient transport of ions toward the sampling orifice is likely a key factor responsible for the high sensitivity of APPI relative to APCI. More research must certainly be done to prove this point, however, because other factors, such as variations in reaction time, may also be important.

**CONCLUSION**

Atmospheric pressure photoionization, through the use of a dopant, has been shown to be capable of providing enhanced sensitivity to LC$-$MS, relative to that attainable through corona discharge-APCI. First indications are that the range of compounds that can be efficiently ionized by APPI closely follows that of APCI, a finding that points toward the conclusion that the ion$-$molecule reactions responsible for analyte ionization in each source ultimately follow similar pathways, despite the fact that the initial reagent ions are different. Accordingly, it is anticipated that the APPI source may find utility in many areas of application where the corona discharge-APCI method is presently employed, provided that the increase in sensitivity demonstrated here can be maintained for real samples. Of course, robustness of the source will also need to be demonstrated, if the method is to prove suitable for routine use.

**ACKNOWLEDGMENT**

Major funding and other support for this work was provided by PE SCIEX as part of a collaborative research agreement with the University of Groningen.

Received for review February 8, 2000. Accepted May 10, 2000.

AC0001636

QUESTMS-00002894



**ELSEVIER**

Journal of Chromatography A, 771 (1997) 119–125

JOURNAL OF
CHROMATOGRAPHY A

# Drug quantitation on a benchtop liquid chromatography–tandem mass spectrometry system[1]

P.R. Tiller[a,*], J. Cunniff[a], A.P. Land[a], J. Schwartz[a], I. Jardine[a], M. Wakefield[a], L. Lopez[a], J.F. Newton[b], R.D. Burton[b], B.M. Folk[b], D.L. Buhrman[b], P. Price[b], D. Wu[b]

[a]*Finnigan MAT, 355 River Oaks Parkway, San Jose, CA 95134, USA*
[b]*Sanofi Research Division, 25 Great Valley Parkway, Malvern, PA 19355, USA*

Received 20 December 1996; revised 8 February 1997; accepted 14 February 1997

**Abstract**

The specificity and selectivity of LC–MS–MS is illustrated to explain why LC–MS–MS has become the method of choice for quantitation within the pharmaceutical industry. Two assays are described that demonstrate the facility with which new ion trap technology can utilize the selectivity and sensitivity of LC–MS–MS to quantitate trace level components within complex matrices, in particular human plasma. One assay undergoes a validation procedure and demonstrates the utility of this new technology for drug quantitation within a regulated environment.

*Keywords:* Liquid chromatography–mass spectrometry; Detection, LC; Steroids; SR 27417

## 1. Introduction

In recent years the application of liquid chromatography–tandem mass spectrometry (LC–MS–MS) has been used to an increasing degree for quantitative analysis of drug compounds at trace levels. The reason for this is the facility with which LC–MS–MS is able to analyze trace components in complex matrices such as plasma. A comparison with LC–UV serves to illustrate the unique capabilities of tandem MS [1,2] and explains why its use is so prevalent within the pharmaceutical industry (see Fig. 1).

An LC–UV analysis affords retention time data based on the elution characteristics of the compound of interest and this data will change if the eluent used is altered or if a different LC column is used. If a photodiode array detector is used the spectral information affords increased confidence in the conclusions derived as the complete UV spectrum is generated. If only partial separation is achieved, quantitation of the two components can be problematic, particularly if they are analogues with similar absorbance characteristics. When analyzing complex matrices such as plasma, the non-specific nature of UV detection means that extensive sample clean-up and LC separation is often required.

An LC–MS analysis affords retention time data based on a summation of all the ions that are detected, referred to as the total ion chromatogram (TIC). Each data point along this chromatogram consists of a mass spectrum affording molecular mass data. A change of eluent or LC column will result in a different retention time but will not alter

*Corresponding author.
[1] 67C:\CAPD\CHROMA\3859\Presented at the 20th International Symposium on High-Performance Liquid Phase Separations and Related Techniques, San Francisco, CA, 16–21 June 1996.

0021-9673/97/$17.00 Copyright © 1997 Elsevier Science B.V. All rights reserved
*PII* S0021-9673(97)00147-7

120                    *P.R. Tiller et al. / J. Chromatogr. A 771 (1997) 119–125*



Fig. 1. Schematic depiction of the information content within (a) LC–UV, (b) LC–MS and (c) LC–MS–MS data.

the mass spectrum obtained. Therefore LC–MS methods are inherently more robust. If two analogues are partially resolved or even co-elute, the mass spectra obtained will be different for the two species (as most species have a different molecular mass). The mass spectra can be used to generate a reconstructed ion chromatogram (RIC) which will enable quantitation of two co-eluting analogues to be carried out. LC–MS analyses are still subject to interference from complex matrices and this means that it is often necessary to carry out sample clean-up and LC separation to afford meaningful data.

An LC–MS–MS analysis, in common with LC–UV and LC–MS, affords retention time data based on a summation of all the ions that are detected. In addition to molecular mass information the MS–MS spectrum yields structurally specific data based on the collisionally induced dissociation (CID) fragments that are generated. These fragments are characteristic of the structural moieties present in the analyte. As a result, the MS–MS spectrum ensures highly specific data affording a very high confidence in the results obtained and is therefore inherently less susceptible to interference from complex matrices.

CID is a process by which translational energy is imparted to an ionized molecule so that the molecule fragments into two or more ions [3]. CID is carried

out by accelerating selected (parent) ions into a region that has a higher density of gas molecules. The resultant collisions with the gas induce dissociation of the parent molecule. Because the fragment (daughter) ions, reflect the structure of the parent ion, CID affords structurally specific data.

Complex matrices often afford interference from the matrix across a wide retention time range. In an MS–MS experiment the mass for the parent ion of interest is specifically selected with the concomitant elimination of all ions of differing molecular mass. If there is a contaminant with the same molecular mass (isobaric) that co-elutes with the parent of interest, then only those two ions are selected. After CID, only fragment ions derived from the analyte of interest are selected, thus eliminating the CID fragments from the contaminant. This two stage filtering process allows very selective data to be derived from complex matrices in the presence of co-eluting, isobaric contaminants.

Because LC–MS–MS is able to extract specific, quantitative data from gross sample mixtures the development of high-resolution LC methods has not been necessary. For the same reason method development and validation times for an LC–MS–MS assay are typically 1–2 weeks and analysis times are typically 2–5 min, resulting in a very high sample

QUESTMS-00002896

*P.R. Tiller et al. / J. Chromatogr. A 771 (1997) 119–125*

121

throughput. These are the core reasons why the application of LC–MS–MS, particularly in the pharmaceutical industry, has become the method of choice. The high cost of instrumentation capable of LC–MS–MS has been the reason for it not being utilized more widely.

The recent developments in ion trap technology, including the use of external ionization, trivial MS and MS–MS experimental setup and interfacing to atmospheric pressure ionization sources, now offers all the advantages and facility of LC–MS–MS [4–6] at approximately half the cost of triple quadrupole systems. Also triple quadrupole systems have typically required extensive training to operate optimally whereas that is not the case with modern ion traps. They are physically smaller, truly benchtop, instruments and that serves to make the acceptance of this technology less daunting.

It is the intention of this paper to demonstrate that this new technology is able to provide reliable validated quantitative data. To that end two analyses are described demonstrating quantitation of human plasma samples and validation of one of those methods at the 25 pg/ml level.

## 2. Experimental

### 2.1. Steroid assay

#### 2.1.1. Reagents

HPLC-grade methanol and water (Burdick and Jackson, Muskegon, MI, USA), acetic acid (Curtin Matheson Scientific, Houston, TX, USA), testosterone, hydrocortisone, [$^2H_3$]hydrocortisone (Sigma, St Louis, MO, USA) and [$^2H_3$]testosterone (Cambridge Isotope Labs., Andover, MA, USA) were used in these analyses.

#### 2.1.2. Sample preparation

Human plasma (1-ml aliquots) were extracted using SPECPLUS 3ML $C_8$ extraction columns (ANSYS, Irvine, CA, USA). The disc was conditioned with 0.2 ml of methanol followed by elution of the steroids with 1 ml of ethyl acetate. The eluate was evaporated to dryness, spiked with steroids (testosterone and hydrocortisone were spiked at a

level of 94 pg/ml to 12 088 pg/ml and the internal standards, [$^2H_3$]testosterone and [$^2H_3$]hydrocortisone, at a level of 10 000 pg/ml) and reconstituted with 200 µl of mobile phase and 100 µl injected on-column.

#### 2.1.3. LC–MS–MS

A Hewlett-Packard (HP) 1050 modular LC system was used with a flow of methanol–water (5% acetic acid) (60:40) at 0.5 ml/min through a Supelcosil LC-18-DB (33×4.6 mm, 5 µm) column. The LCQ (Finnigan MAT, San Jose, CA, USA) was operated using the atmospheric pressure chemical ionization (APCI) probe in the positive ion selection mode, with the vaporizer set to 450°C and the heated capillary to 175°C. Full scan MS–MS data were obtained for the four components as follows: testosterone $m/z$ 289→80–305; [$^2H_3$]testosterone $m/z$ 292→80–305; hydrocortisone $m/z$ 363→100–305 and [$^2H_3$]hydrocortisone $m/z$ 366→100–305.

Under these LC conditions hydrocortisone and testosterone have retention times of 2.04 and 4.97 min, respectively. Therefore the mass spectrometer was set to analyze hydrocortisone and [$^2H_3$]hydrocortisone between 0–3.5 min and then switched to analyze testosterone and [$^2H_3$]testosterone between 3.5–6.0 min.

### 2.2. SR 27417 assay

#### 2.2.1. Reagents

HPLC-grade acetonitrile, hexane and water (Burdick and Jackson), formic acid, ammonium acetate (J.T. Baker, Phillipsburg, NJ, USA) and SR 27417 and the deuterated internal standard (obtained inhouse) were used throughout these analyses.

#### 2.2.2. Sample preparation

A 1-ml volume of human plasma was spiked with internal standard (100 pg/ml) and extracted with 6 ml of hexane by rotary mixing for 20 min, followed by centrifugation for 10 min. The organic layer was transferred to a conical tube and evaporated to dryness under nitrogen at 45°C. The extract was reconstituted with 200 µl of acetonitrile–water (50:50) and 50 µl injected on-column.

QUESTMS-00002897

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 302 of 437 PageID #: 2691

### 2.2.3. LC–MS–MS

A Hewlett-Packard (HP) 1050 modular LC system was used with a flow-rate 0.5 ml/min through a Keystone BDS Hypersil $C_{18}$ (30×4.6 mm, 5 μm) column. Gradient elution was performed with the first 2.8 min diverted to waste.

Mobile phase A consisted of 2 m$M$ ammonium acetate–0.2% formic acid in HPLC-grade water and mobile phase B consisted of 2 m$M$ ammonium acetate–0.2% formic acid in HPLC-grade acetonitrile–water (98:2, v/v). Gradient was 50:50 A–B to 100% B in 3.0 min, 1.0 min hold at 100% B, return to 50:50 at 4.5 min, 7.0 min run time.

The LCQ (Finnigan MAT) was operated using the electrospray (ESI) probe in the positive ion selection mode, with the spray voltage set to 4.5 kV and the heated capillary set to 250°C. Selected reaction monitoring (SRM) data were obtained by monitoring the two transitions: SR 27417 $m/z$ 465→420 and [$^2H_4$]SR 27417 $m/z$ 469→424.

This assay was previously validated on a TSQ-7000 triple quadrupole mass spectrometer and the same samples were analyzed on the LCQ in order to determine how the LCQ compares with the TSQ-7000. The results of this comparison have been published [5,7]. This is the reason why SRM and not full scan MS–MS was performed.

### 3. Results and discussion

#### 3.1. Steroid assay

A calibration curve was generated by making five injections of a series of nine standards over a period of 5 h. Thus at each of the nine levels there were five replicates each injected 1 h apart. The zero level standards contained endogenous levels of hydrocortisone and testosterone (Figs. 2 and 3) which caused an offset from zero to be observed in the calibration curves. The calibration curve obtained for hydrocortisone gave a $R^2 = 0.9934$ ($y = 0.0001x + 0.0917$), while the curve for testosterone afforded a $R^2 = 0.9986$ ($y = 0.00001x + 0.1535$).

The peak at a retention time of 1.50 min observed in the hydrocortisone chromatogram is clearly not simply an analogue as the full scan MS–MS spec-



Fig. 2. Chromatogram and full scan MS–MS spectrum for zero level standard of hydrocortisone (peak at 2.04 min).

QUESTMS-00002898

Case 1:18-cv-01436-MN   Document 72-6   Filed 09/25/19   Page 303 of 437 PageID #: 2692

*P.R. Tiller et al. / J. Chromatogr. A 771 (1997) 119–125*                    123



Fig. 3. Chromatogram and full scan MS–MS spectrum for zero level standard of testosterone (peak at 4.97 min).

trum obtained is significantly different from that obtained for hydrocortisone (see Fig. 4).

The use of full-scan MS–MS aids method development in that it allows the decision as to which product ion(s) to use for quantitation to be made after a calibration curve has been acquired. It is then possible to perform the quantitation using different ions or combinations of ions so as to afford the best results. In the case of hydrocortisone, the ions at $m/z$ 309 and 327 were used as the quantitation masses and $m/z$ 97, 109 and 253 were used for testosterone. Thus several ions can be monitored simultaneously by the use of full-scan MS–MS. In addition full-scan MS–MS allows matrix contaminants to be identified immediately, as in the case of the peak at 1.50 min within the hydrocortisone chromatogram, based on the spectral differences observed.

### 3.2. SR 27417 assay

A calibration curve for SR 27417 (Fig. 5) was generated using standards at 10, 25, 50, 100, 200, 400, 600, 800 and 1000 pg/ml. A single injection was made at each concentration except for the 10

and 1000 pg/ml levels which were injected in triplicate. Fig. 6 reproduces the mass chromatogram for the 10 pg SR 27417 standard and the internal standard. Since one quarter of the reconstituted plasma extract was injected, this chromatogram represents a 2.5-pg on-column injection.

The data obtained afforded a quadratic $1/X^2$ calibration curve with a correlation coefficient of 0.9973.

Having obtained the results certain criteria were tested to determine if the LCQ generated data that can be validated. These criteria were divided into two areas, within-day variability and between-day variability.

The within-day variability was tested by use of quality control (QC) samples at levels of 10, 25, 400 and 1000 pg/ml. Six replicates of the QC set were analyzed.

The between-day variability was tested by use of QC samples at levels of 10, 400 and 1000 pg/ml. This QC set was used on three separate occasions.

Validations were accepted by the following criteria: no more than 33% of samples within a given concentration level were beyond ±15% of nominal,

QUESTMS-00002899

**PCT/US2009/059090 04.12.2009**



Fig. 4. Chromatogram and full scan MS–MS spectrum for matrix contaminant within the zero level standard (peak at 1.50 min).

except at the minimum quantifiable level (MQL), where the acceptance criteria was ±20% of nominal. The accuracy and precision for each level were not greater than ±15% of nominal, except at the MQL, where values were not beyond ±20% of nominal.

Accuracy and precision were calculated as follows:

$$\text{Accuracy} = \frac{(\text{observed conc.} - \text{expected conc.})}{\text{expected conc.}} \cdot 100\%$$

$$\text{Precision} = \frac{\text{standard deviation}}{\text{mean}} \cdot 100\%$$

The validation data are given in Tables 1 and 2.

Fig. 5. Structure of SR 27417.

### 3.2.1. Within-day validation

The 10 pg/ml level afforded accuracy and precision data of ±15.54% and ±13.36%, respectively. Though these data strictly speaking meet the criteria, we prefer data sets to be no more than ±10% for both precision and accuracy during the method development stage to leave a sufficient margin so that any minor variations during assay analysis are still within validated criteria.

### 3.2.2. Between-day validation

The 10 pg/ml level afforded accuracy and precision data of ±12.69% and ±7.86%, respectively. Again this data set met the criteria but the accuracy data are above the ±10% level we prefer.

The within-day and between-day validation data, taken in combination, demonstrate that the LCQ is capable of validating this assay with a MQL of 25 pg/ml.

## 4. Conclusions

The intention of this paper was to demonstrate that

QUESTMS-00002900

P.R. Tiller et al. / J. Chromatogr. A 771 (1997) 119–125      125



Fig. 6. Mass chromatograms of SR 27417 10 pg/ml (2.5 pg on-column) and SR 27417 100 pg/ml (25 pg on-column).

Table 1
Within-day validation data for SR 27417

| | Nominal concentration (pg/ml) ($n=6$) | | | |
|---|---|---|---|---|
| | 10 | 25 | 400 | 1000 |
| Mean | 11.5 | 25.37 | 408.02 | 1006.22 |
| S.D. | 1.58 | 2.13 | 17.16 | 44.03 |
| R.S.D. (%) | 13.36 | 8.41 | 4.21 | 4.38 |
| M%D[a] | 15.54 | 1.47 | 2.00 | 0.62 |

[a] mean percent deviation.

the LCQ offers a lower-cost alternative for quantitative LC–MS–MS analysis of trace level components within complex matrices. The data are unequivocal, clearly this new technology affords the sensitivity, accuracy and precision necessary to generate validated quantitative data.

Table 2
Between-day validation data for SR 27417

| | Nominal concentration (pg/ml) ($n=3$) | | |
|---|---|---|---|
| | 10 | 400 | 1000 |
| Mean | 11.27 | 430.66 | 999.63 |
| S.D. | 0.89 | 27.48 | 45.86 |
| R.S.D. (%) | 7.86 | 6.38 | 4.62 |
| M%D[a] | 12.69 | 7.67 | −0.84 |

[a] Mean percent deviation.

## Acknowledgments

We would like to thank Gail Mueller and Dennis Blevins of Ansys Inc. for providing the human plasma extract used for the steroid assay.

## References

[1] K.L. Busch, G.L. Glish and S.A. McLuckey, Mass Spectrometry/Mass Spectrometry: Tehniques and Applications of Tandem Mass Spectrometry, VCH, New York, 1988.
[2] G. Rule, L.G. McLaughlin and J. Henion, Anal. Chem., 65 (1993) 857A.
[3] K. Levsen and H. Schwartz Angew, Chem. Int. Ed. Engl., 15 (1976) 509.
[4] J. Cunniff, P.R. Tiller, A.P. Land, T. Vasconcellos and M. Wakefield, Proceedings of the 44th ASMS Conference of Mass Spectrometry and Allied Topics, Portland, OR, 1996, p. 623.
[5] M. Wakefield, A.P. Land, J. Newton, R. Burton, B. Folk, D. Burhrman, P. Price and D. Wu, Proceedings of the 44th ASMS Conference of Mass Spectrometry and Allied Topics, Portland, OR, 1996, p. 615.
[6] J. Paulson, J. Cunniff and J. Schwartz, Proceedings of the 44th ASMS Conference of Mass Spectrometry and Allied Topics, Portland, OR, 1996, p. 1148.
[7] M. Wakefield, L. Lopez, J. Newton, R. Burton, B. Folk and D. Burhrman, Application report 258, Finnigan Corporation.

QUESTMS-00002901



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/607,905 | 10/28/2009 | Michael P. Caulfield | 034827-9106 | 5433 |

30542        7590        12/16/2011
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/16/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

QUESTMS-00002902

| *Office Action Summary* | **Application No.** | **Applicant(s)** |
|---|---|---|
| | 12/607,905 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒  Responsive to communication(s) filed on <u>11 October 2011</u>.

2a)☐ This action is **FINAL**.          2b)☒ This action is non-final.

3)☐  An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐  Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒  Claim(s) <u>*1-13*</u> is/are pending in the application.

　　5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐  Claim(s) _____ is/are allowed.

7)☒  Claim(s) <u>*1-13*</u> is/are rejected.

8)☐  Claim(s) _____ is/are objected to.

9)☐  Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

　　Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

　　Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

　　a)☐ All   b)☐ Some * c)☐ None of:

　　　　1.☐  Certified copies of the priority documents have been received.

　　　　2.☐  Certified copies of the priority documents have been received in Application No. _____ .

　　　　3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

　　* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
　　Paper No(s)/Mail Date <u>10/11/2011</u>.

4)☐ Interview Summary (PTO-413)
　　Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

QUESTMS-00002903

Application/Control Number: 12/607,905            Page 2

Art Unit: 1654

## DETAILED ACTION

1.     This Office Action is in response to the reply received on 10/11/2011.

     Any rejection from the previous office action, which is not restated here, is

withdrawn.

### *Election/Restrictions*

2.     Applicant's election without traverse of the following species:

     (I) Single mass/charge ratio for the testosterone ion is about $109.2 \pm 0.5$, in the

reply filed on 3/18/2011 is acknowledged.

### *Status of the claims*

3.     Claims 1-13 are pending in the examination. Claims 1-13 read upon the elected

species. Claims 1 and 4 have been amended. Claims 1-13 are presented for

examination on the merits.

### *Claim Rejections - 35 USC § 102*

4.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

QUESTMS-00002904

Application/Control Number: 12/607,905                                    Page 3
Art Unit: 1654

5.        Claims 1-3, 5-7, 9-11 and 13 are rejected under 35 U.S.C. 102(a) as being

anticipated by Chang et al. (Analyst, 13 March 2003, citation A11 in the IDS dated

5/20/2010).

          Chang et al. teach a method for determining the amount of testosterone present

in a test sample when taken from a human comprising,

          (a) purifying testosterone from the test sample by subjecting the sample to an

extraction column (on line solid-phase extraction SPE, Section 2.2, page 364) and an

analytical column (HPLC, Section 2.3, page 364) to generate an eluent; (e.g., Section

2.3, page 364);

          (b) ionizing (Electrospray ionization tandem mass spectrometry EI-MS-MS,

Section 2.4, page 364) the eluent to produce one or more testosterone ions detectable

by a mass spectrometer; (See ions $289.1 \pm 0.5$, $109.2 \pm 0.5$ and $96.9 \pm 0.5$; in Figure 1

and Figure 2);

          (c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of testosterone ion(s) is related to the

amount of testosterone in the test sample. (e.g., concentrations of less than 10 ng/dL

[equivalent to 0.1 ng/mL and less than 5 ng/dL (such as 0.02 ng/mL)] in the test sample,

see Section 3.3, page 364; Tables 1-2).

          Please note that the sample was taken from a human as it contains human

adrenocortical cancer cells in DMEM/F-12 medium supplemented with 10% fetal bovine

serum. Furthermore, please note that the method is claimed as "comprising" a set of

steps, which do not preclude the method from having more steps including pretreatment

QUESTMS-00002905

Application/Control Number: 12/607,905                                    Page 4
Art Unit: 1654

or dilution of the sample. The transitional term "comprising", which is synonymous with

"including," "containing," or "characterized by," is inclusive or open-ended and does not

exclude additional, unrecited elements or method steps. See, e.g., MPEP 2111.03.

Therefore, the reference is deemed to anticipate the instant claims above.

### Applicant's arguments

6.      Chang fails to anticipate the present claims because Chang does not measure

testosterone in "a sample when taken from a human." Chang reports detection of

determination of steroid content in cell culture medium, and standard solutions of SPE

loading buffer and fresh cell culture medium. See, e.g., Abstract, p. 363, and Section

2.5, p. 364, left column. Chang describes initially maintaining human adrenocortical

cancer cells in DMEM/F-12 medium supplemented with 10% fetal bovine serum. At 70-

80% confluency, the cells were then transferred to serum-free medium with and without

8-Br-cAMP for 24 hours. This second, serum-free, medium was then collected for

testosterone analysis. Clearly, Chang's samples were not taken from a human. At page

368 and Section 2.12, Chang does mention the potential application of the described

method for analysis of human samples (including blood, serum, plasma); however,

Chang does not describe any attempt to actually perform such an analysis. Therefore,

Chang fails to anticipate the instant claims because each and every limitation of the

claimed invention is not disclosed.

Applicant further submits that the skilled artisan would have no immediate

expectation of success in applying Chang's methodology to human samples. Human

samples are more complex than Chang's cell culture media and it is therefore

QUESTMS-00002906

Application/Control Number: 12/607,905                                    Page 5
Art Unit: 1654

reasonable to expect that human samples would have higher levels of potentially

interfering species (such as proteins) which could result in a higher detection limit or

failure of the method entirely due to ionization suppression effects. Fiehn et al. (Exhibit

1) and Aguera et al. (Exhibit 2) evidence the known problems of ion suppression. Fiehn

et al. stands for the proposition that ionization efficiencies for a particular analyte in

complex sample matrices are unpredictable. For example, Fiehn et al. (Exhibit 1) states:

> The most difficult aspect of quantitation in LC/MS is the ionization process, . . [T]here are
> numerous fundamental publications showing the quenching effect of co-eluting compounds on
> the ionization efficiency of the target molecules. This phenomenon is called ion suppression and
> is fundamental to all 'soft" ionization techniques... [P]rediction of the severity of ion suppression is
> impossible.

Fiehn et al., Mass spectrometry: Quantitation. In: Encyclopedic Reference of

Genomics and Proteomics in Molecular Medicine. Ganten D, Ruckpaul K (eds.),

Springer, New York/Heidelberg, ISBN: 3-540-44244-8, DOI 10.1007/3-540-29623-

9_3550, part 13, 1030-1034, 1031-32. Emphasis added.

Aguera et al. (Exhibit 2) further discusses the unpredictability of ion suppression

as dependent on the type of sample being analyzed. Aguera et al. (Exhibit 2) states:

> Another limitation is the ion suppression effect, observed as a consequence of the presence of
> sample matrix during ionization of the target analytes that can reduce drastically the
> chromatographic signal and, thus, affect both quantitation and detectability of [analytes] in real
> samples. This problem has a more difficult solution because of its unpredictability and the high
> dependence on the kind of matrix considered.

Aguera et al., J. Chromatog. A, 1045:125-35 (2004), p. 126, left column, second

paragraph. Emphasis added.

In sum, it is generally known in the art that it is not possible to predict the severity

of ion suppression when changing from one sample matrix to another, and the artisan

QUESTMS-00002907

Application/Control Number: 12/607,905                                    Page 6
Art Unit: 1654

would expect this phenomenon to be more pronounced with greater sample complexity

(e.g., body fluids including serum and plasma relative to serum-free cell culture media).

Finally, it is unclear whether Chang discloses any method for measuring

testosterone in human serum. Section 2.12 of Chang contains discussion of a

radioimmunoassay technique employed for comparison with the developed LC-MS/MS

method. This section states that the radioimmunoassay technique is used to determine

serum sample concentration of testosterone; however, comparative data presented in

Tables 2 and 3 on p. 366 are indicated as being from measurement of testosterone in

cell culture media. Given these contradictory descriptions of the use of the

radioimmunoassay, it is unclear if Chang analyzed human serum by radioimmunoassay.

Regardless, nowhere does Chang describe mass spectrometric analysis of a sample

from a human for testosterone.

**Response to arguments**

7.     Applicant's arguments have been carefully considered but not deemed

persuasive for the reasons of record, for the reasons set forth above and for the

following reasons:

Please note that the instant rejection does not encompass claim 4, which is

drawn specifically to the sample comprising blood, serum, plasma or urine.

Furthermore, it is noted that the sample used by Chang et al. was taken from a human

as it contains human adrenocortical cancer cells in DMEM/F-12 medium supplemented

with 10% fetal bovine serum. Moreover, the method as claimed comprises a set of

steps, which do not preclude the method from having more steps including pretreatment

Application/Control Number: 12/607,905                                    Page 7
Art Unit: 1654

or dilution of the sample. The transitional term "comprising", which is synonymous with

"including." "containing," or "characterized by," is inclusive or open-ended and does not

exclude additional, unrecited elements or method steps. See, e.g., MPEP 2111.03.

     Therefore the 102 rejection over Chang et al. is maintained.

8.     Claims 1-5, 9-13 are rejected under 35 U.S.C. 102(a) as being anticipated by

Caraiman et al. (ASMS 2003, Poster Number 075, June 2003).

     The declaration of Michael P. Caulfield under 37 CFR 1.131 has been

considered and relied upon to withdraw this rejection.

9.     Claims 1-5, 10-11, 13 are rejected under 35 U.S.C. 102(b) as being anticipated

Shackelton et al. (Steroids, 1997).

     Applicant's arguments and amendments have been carefully considered and

deemed persuasive. Therefore the rejection over Shackelton et al. has been withdrawn.

10.     Claims 1-4, 6-7, 11-12 are rejected under 35 U.S.C. 102(b) as being anticipated

by Vierhapper et al. (J Clinical Endocrinology and Metabolism, 1997).

     Vierhapper et al. teach a method for determining the amount of testosterone in a

sample when taken from a female human comprising:

     (a) purifying testosterone from the sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

     (b) ionizing testosterone from the eluent to produce one or more testosterone

ions detectable by a mass spectrometer; and

QUESTMS-00002909

Application/Control Number: 12/607,905                                    Page 8
Art Unit: 1654

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the test sample.

Vierhapper et al. teach purifying testosterone using solid phase extraction (Sep-

Pak C18 cartridge, see page 1494). The sample comprises plasma (e.g., pages 1493-

1494). The protocol of Vierhapper et al. is suitable for clinical use in a routine setting to

obtain analytically correct estimates of testosterone production in vivo.

Twelve healthy nonobese men, aged 22-34 yr, and 10 healthy nonobese women,

aged 19-32 yr (in the follicular phase of the menstrual cycle), who had been carefully

informed about the aims and the possible risks of the study gave their written consent to

participate in i or several parts of this investigation. On the day of the experiments, an

indwelling catheter was inserted into an antecubital vein, and 1,2-d-testosterone (in 500

mL 0.9% saline also containing 2 mL of the individual's own blood) was infused iv and

continuously (Infusomat, Braun-Melsungen, Germany) until the end of the respective

experimental protocol. At the beginning and end of each infusion, a sample of the

infusate was obtained from the end of the infusion line to permit for correction of losses

by adsorption and determination of actual infusion rates by GC/MS analysis. After an

equilibration period of 12 h (Exp 1 and 2) or 6 h (Exp 3), a second indwelling catheter

was inserted into the contralateral arm, and blood samples (5 mL) were obtained at 20-

min intervals until the end of the respective experimental protocol. Blood samples were

subsequently pooled for periods of 4 h. In addition, one sample was pooled for the

entire period of blood sampling (24, 12, or 4 h, respectively).

QUESTMS-00002910

Application/Control Number: 12/607,905                                         Page 9
Art Unit: 1654

Plasma samples (5.0 mL) supplemented with 20,000 dpm [3H]testosterone for later control of recovery and with 20 mL 0.5% trifluoroacetic acid (TFA) were applied to Sep-Pak Cls cartridges (500 mg, Waters/ Millipore, Milford, MA) pretreated with successive application of 5.0 mL methanol, 5.0 mL ethyl acetate, 20 mL water, and 5.0 mL TFA (0.5%, wt/vol). After sample application, the cartridges were first treated with three doses of 5.0 mL TFA (0.5%, wt/vol). Testosterone was subsequently eluted by ethyl acetate (two doses, 1.0 mL), dried under a stream of nitrogen at 37 C, reconstituted in 100/*1 CH2C12, and further prepurified by thin layer chromatography (chloroform-acetone, 70:30). The zone containing testosterone was eluted (twice, 2.5 mL methanol) and supplemented with 10 ng dehydrotestosterone (1,4-androstadien-17/3- ol-3-one) as an internal standard for GC/MS analysis. Derivatization was subsequently performed with heptafluorobutyric anhydride-acetone (1:4; 60 rain) at room temperature. Recovery of [3H]testosterone from the derivatized samples was 38.5 $\pm$ 5.0% (n = 40). Analysis by GC-MS (Finnigan MAT95 equipped [BE configuration] with a 25-m CB5 fused silica column, San Jose, CA) was then performed using the selected ion monitoring mode and electric ionization (resolution, 6000). The tracer ions were [m/e 678 (dehydrotestosterone; internal standard), m/e 680 (native testosterone), and m/e 682 (1,2-d-testosterone)]. The sensitivity at a peak to noise ratio of 10:1 was less than 100 fg.

The plasma concentrations of unlabeled (native) testosterone and the testosterone production rates for Exp 1, 2, and 3 are summarized in Tables 1 and 2 for men and women, respectively. In men, production rates of testosterone ranged from 64

QUESTMS-00002911

Application/Control Number: 12/607,905                                    Page 10
Art Unit: 1654

± 25 to 101 ± 67 ug/h during a 24-h period when 1,2-d-testosterone was infused in a

comparatively large dose (Exp 1). No diurnal rhythmicity was apparent. The average

production rate, determined as the mean of six individual samples obtained in each

volunteer, was 77 ± 30 ug/h, which was identical (77 ± 33 ug/h) to the value obtained by

analysis of an additional sample pooled throughout the 24 h. Thus, daily testosterone

production based on this experiment was 1.8 ± 0.7 mg/day, a quantity roughly 10-fold

larger than the amount of infused 1,2-d-testosterone during this period (Table 1A).

In healthy women, testosterone production rates during this initial series of

experiments ranged from 3.6 ± 1.3 to 6.0 ± 3.4 ug/h. The largest production rates were

seen from 0400-0800 h and from 0800-1200 h. The average production rate,

determined as the mean of six individual samples obtained in each female volunteer,

was 4.6 + 1.9 ug/h. Analyzing an additional sample pooled throughout the 24 h resulted

in a value of 9.6 ± 1.5 ug/h. Thus, daily testosterone production rates during this

experiment ranged from 0.1-0.2 mg/day, a quantity in the same order as the amount of

infused 1,2-d-testosterone during this period (Table 2A).

By reducing the dose of infused 1,2-d-testosterone by a factor of 5 to 0.015 mg/h

in men and by a factor of 100 to 0.0001 mg/h in women (Exp 2), we ascertained the

total infused amount of 1,2-d-testosterone to be far below the expected production rate

of the hormone, thus excluding any potential interference by exogenous testosterone

with its endogenous production. In this setting, the calculated mean production rates of

testosterone were 155 ± 94/ug/h (3.7 + 2.2 mg/day in men; Table 1B) and 1.8 ± 0.6 ug/h

(0.4 + 0.1 mg/day in women; Table 2B). Similar mean production rates of testosterone

QUESTMS-00002912

Application/Control Number: 12/607,905                          Page 11
Art Unit: 1654

were found using an identical infusion rate of 1,2-d-testosterone, but reducing the

equilibration period from 12 to 6 h (Exp 3; men, 166 + 103/xg/h; women, 3.9 ± 1.6 ug/h;

Tables 1C and 2C).

Therefore the reference is deemed to anticipate the instant claims above.

11.     Claims 1-7, 9-10, 13 are rejected under 35 U.S.C. 102(e) as being anticipated by

Soldin (US 7,473,560, cited in the IDS dated 10/11/2011).

Soldin discloses a method for determining the amount of testosterone in a

sample when taken from a female human comprising:

(a) purifying testosterone from the sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

(b) ionizing testosterone from the eluent to produce one or more testosterone

ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the test sample.

Soldin teaches that the invention produces a fast and accurate method of

hormone analysis and quantification using a mass spectrometer. The procedure allows

for as little as 700 uL of a sample to be analyzed. In addition, minimal sample

preparation time is required. Soldin teaches analysis of hormones including

testosterone in a number of complex matrices as they might be found in nature, e.g., the

human body. For example, hormone analysis can be performed on samples of blood,

saliva, serum, plasma and urine.

QUESTMS-00002913

Application/Control Number: 12/607,905                                    Page 12
Art Unit: 1654

The hormones are then introduced into a mass spectrometer.  Optionally, the separation step and step of introducing the hormones into a mass spectrometer can be combined using a combined liquid chromatography spectrometry apparatus (LC/MS). This procedure is based on an online extraction of the injected sample with subsequent introduction into the mass spectrometer using a built-in switching valve.  LC/MS and liquid chromatography-tandem mass spectrometry (LC-MS-MS) are specific and offer simple approaches to sample preparation without sample derivation steps.

The hormones are subjected to ionization.  Various ionization techniques can be used.  For example, photoionization, electrospray ionization (ESI), atmospheric pressure chemical ionization (APCI), and electron capture ionization may be used. Preferably, photoionization is used when analyzing steroid hormones.  It is presently preferred that an atmospheric pressure photoionization (APPI) source be used when analyzing steroid hormones.

Ionization may be performed by utilizing the mass spectrometer in the negative or the positive mode.  Factors such as a particular analyte's tendency to give rise to a particular ion form, as is known to those skilled in the art, may make either the negative mode or the positive mode more preferable.  For example, analysis in the positive mode is typically made for DHEA, Aldosterone, Cortisol, 11-Deoxycortisol, Androstenedione, Testosterone, Estradiol, 17-OH Progesterone, Progesterone, Allopregnalone, and Vitamin D whereas analysis in the negative mode is typically made for 16-OH Estrone, 2-OH Estrone.  Estriol and DHEAS.  However, it is possible to analyze any of the hormones in either positive or negative mode.

QUESTMS-00002914

Application/Control Number: 12/607,905                                    Page 13
Art Unit: 1654

A sample of 800 uL of plasma was used.  Proteins were precipitated with 1.2 mL

of acetonitrile, containing deuterated internal standard, and vortexed.  The sample was

centrifuged, and 1.7 mL of the supernatant was injected onto a C-18 column coupled to

a LC/MS/MS.  The column was washed with 2% methanol in 5 mM ammonium acetate

for 3 minutes.  The valve on the column was switched and the sample was eluted in a

methanol gradient of 2 to 100%. The total run time was 12 minutes.  Slight adjustments

to the volumes, concentrations and times described can be made, as is known to those

skilled in the art.

1.7 ml of the eluant was introduced into the mass spectrometer and the sample

was ionized by photoionization and analyzed in an API-3000.TM. mass spectrometer,

in the negative or positive mode as described above.    FIGS. 1 and 2 show the analysis

of steroid hormones in the positive and negative modes.

Simultaneous measurement of 9 steroids in a 760 uL of serum or plasma

sample, without derivatization and with minimal sample workup-acetonitrile protein

precipitation was carried out.  The reliability of the method has been evaluated by

correlation with currently used immunoassays, and assessment of within-day and

between-day imprecision, recovery and accuracy.  The method described allows for the

simultaneous quantitation of 9 steroids in positive ion mode by tandem mass

spectrometry within 18 minutes. The method is based on isotope dilution and unlike

immunoassays is very specific for the analytes of interest.  The method possesses

adequate sensitivity (due to use of the APPI source, with the lower level of sensitivity

being 100 pg/mL [which corresponds to 1 ng/dL] for each steroid) and precision to be

QUESTMS-00002915

Application/Control Number: 12/607,905                                    Page 14
Art Unit: 1654

used in the routine clinical laboratory.  The method has been used for the measurement

of steroid concentrations in patient samples.

Therefore the reference is deemed to anticipate the instant claims above.

12.      Claims 1-7,  9-11, 13 are rejected under 35 U.S.C. 102(b) as being anticipated by

Tiller et al. (I J Chromatog, 1997).

Tiller et al. teach a method for determining the amount of testosterone in a

sample when taken from a female human comprising:

(a) purifying testosterone from the sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

(b) ionizing testosterone from the eluent to produce one or more testosterone

ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the test sample (e.g., pages 119-122).

Tiller et al. teach human plasma aliquots were extracted using C8 extraction

columns, the disc was conditioned with 0.2 ml of methanol followed by elution of the

steroids with 1 ml of ethyl acetate. The eluate was evaporated to dryness, spiked with

steroids (testosterone was spiked at the level of 94 pg/mL to 12088 pg/mL and the

inernal standards 2H3 testosterone at a level of 10000 pg/mL) and reconstituted with

200 uL of mobile phase and 100 uL injected on-column.

A HP 1050 modular system was used with a flow of methanol water through a

Supelcosil LC-18-DB column. The LC was operated using APCI and full scan MS/MS

Application/Control Number: 12/607,905                                    Page 15
Art Unit: 1654

data were obtained for testosterone m/z 289->80-305; and deuterated testosterone m/z

292-> 80-305. Human plasma was used for the analysis (e.g., pages 122-125). See

also Figure 3.

     Therefore the reference is deemed to anticipate the instant claims above.

### *Claim Rejections - 35 USC § 103*

13.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

.    This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

14.    Claims 1, 4-5, 9-13 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Ong et al. (50ths ASMS Conference Abstract Viewer, ASMS 2001, cited by

Applicants).

QUESTMS-00002917

Application/Control Number: 12/607,905                                      Page 16
Art Unit: 1654

Ong et al. teach a method for determining the amount of testosterone present in

a test sample,

(a) purifying testosterone from the test sample by subjecting the sample to an

extraction column (HTLC, Preliminary data section) and an analytical column (LC,

Preliminary data section) to generate an eluent;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (e.g., last 2 paragraphs of Preliminary Data section).

See entire abstract for the limitations drawn to HTLC separation (e.g., preliminary

data section), serum/plasma (last paragraph), detection limit (last paragraph).

Ong et al. do not expressly teach using the method in a human sample, teaching

instead the use of the method in animal samples such as plasma.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the method of Ong et al. with human samples. One of

ordinary skill in the art at the time the invention was made would have been motivated

to do so given the high routine sensitivity and inter-batch precision, simplified

preparation and minimal carryover of the method. One of ordinary skill in the art at the

QUESTMS-00002918

Application/Control Number: 12/607,905                                    Page 17
Art Unit: 1654

time the invention was made would have had a reasonable expectation of success

given that the method of Ong et al. was useful for the analysis of large number of

samples in studies of structure-activity for lead optimization using in vitro metabolic

stability to in vivo pharmacokinetic studies in various animal models.

　　　　Thus the invention as a whole was clearly prima facie obvious to one of ordinary

skill in the art at the time the invention was made.

### *Applicant's arguments*

15.　　The Ong Abstract is asserted to allegedly teach a mass spectrometric method for

determining testosterone levels in animal samples such as plasma samples. Applicant

respectfully disagrees. First, Ong merely describes mass spectrometric detection of

testosterone as an internal standard in an unknown matrix. Second, even if the

unknown matrix is assumed to be plasma or serum (which applicant does not concede),

the levels of testosterone used by Ong are in vast excess of testosterone levels found in

humans. The Ong Abstract presents two instrumental configurations for conducting

metabolic stability screening by high turbulent flow liquid chromatography (HTLC)-mass

spectrometry. The first configuration utilizes parallel extraction columns with a single

analytical column (i.e., the parallel configuration), while the second configuration utilizes

a serial configuration of a single extraction column and a single analytical column (i.e.,

the serial configuration). The only reference to testosterone in the Ong Abstract is found

in the description of the parallel configuration, which indicates that testosterone was

used as a positive assay control. Ong Abstract, second to last paragraph. No sample

matrix is recited in the parallel configuration studies. Further, Ong reports that a *different*

QUESTMS-00002919

Application/Control Number: 12/607,905                                Page 18
Art Unit: 1654

column configuration is required for analysis of

unspecified analytes in *plasma-tissue* samples. Ong Abstract, last paragraph. Thus, it

can be inferred that Ong's parallel configuration studies (the only studies where

testosterone is mentioned) were not conducted with plasma or tissue samples.

In describing analysis involving plasma/tissue matrices, Ong makes no indication

that testosterone was detected. Instead, Ong merely indicates that analysis of "various

analytes" by the parallel and serial configurations were compared during method

validation experiments. Ong Abstract, last paragraph.

Additionally, the levels of testosterone used by Ong are far greater than those

typically tbund in human samples. Ong used testosterone as a positive assay control at

concentrations of 5 laM and 0.5 pM. Ong Abstract, second to last paragraph. Using

testosterone's molecular weight of about 288.42 g/mol, Ong's 5 gM and 0.5 gM

testosterone concentrations correspond to concentrations of over 140,000 ng/dL and

14,000 ng/dL, respectively. These concentrations are in vast excess of the about 90 to

about 1100 ng/dL normal range of total testosterone in adult male humans and the

about 2 to about 45 ng/dL in adult female humans. See Exhibit 3, attached hereto,

indicating normal range of total testosterone in adult male and female humans.

Applicant respectfully submits that, for the reasons described above regarding

the unpredictability of ion suppression effects across different sample matrices, Ong's

use of testosterone as a positive assay control in analysis of non-plasma/tissue matrix

samples is simply not predictive of an ability either to quantitate testosterone in a human

sample or to perform that quantitation at testosterone levels present when taken from

Application/Control Number: 12/607,905                                    Page 19
Art Unit: 1654

the human. The instant claims are not obvious over Ong without some express

application of an MS method to quantitate testosterone in human samples at levels

present when taken from the human, and an indication of a reasonable likelihood of

success. Applicant respectfully requests reconsideration and withdrawal of this

rejection.

### *Response to arguments*

16.     Applicant's arguments have been carefully considered and deemed persuasive

with respect to claim 6 which is drawn to a concentration. However, the other rejected

claims do not require any specific concentration or detection limit. It is  noted that the

methods are claimed as "comprising" a series of steps, which does not preclude the use

of other steps such as, e.g., sample pre-concentration. The transitional term

"comprising", which is synonymous with "including," "containing," or "characterized by,"

is inclusive or open-ended and does not exclude additional, unrecited elements or

method steps. See, e.g., MPEP 2111.03.

        Further, with regards to the use of LC system which is connected in-line to a

mass spectrometer it has been held that under KSR that "obvious to try" may be an

appropriate test under 103   The Supreme Court stated in KSR:

> When there is motivation "to solve a problem and there are a finite number of
> identified, predictable solutions, a person of ordinary skill has good reason to
> pursue the known options within his or her technical grasp. If this     leads to
> anticipated success, it is likely the product not of innovation but of ordinary skill
> and common sense. In that instance the fact that a combination was obvious to
> try might show that it was obvious under § 103." KSR Int'l Co. v. Teleflex Inc.,
> 127 S. Ct. 1727, ___, 82 USPQ2d 1385, 1397 (2007).

QUESTMS-00002921

Application/Control Number: 12/607,905                                    Page 20
Art Unit: 1654

The "problem" facing those in the art was the measurement of testosterone in human samples, and there were a limited number of methodologies available to do so. The skilled artisan would have had reason to try these methodologies with the reasonable expectation that at least one would be successful. In the instant case the detection of testosterone was taught by the prior art as set forth above. Thus, detecting testosterone using combined LC and MS is a "the product not of innovation but of ordinary skill and common sense," leading to the conclusion that invention is not patentable as it would have been obvious.

In addition, KSR forecloses the argument that a specific teaching, suggestion or motivation is required to support a finding of obviousness.

See the recent Board decision Ex parte Smith, --USPQ2d--, slip op. at 20, (Bd. Patt. App. & Interf. June 25, 2007) (citing KSR, 82 USPQ2s at 1396) (available at http://www.uspto.gov/web/offices/dcom/bpai/prec/fd071925.pdf).

Therefore the obviousness rejection of record is maintained.

17.     Claims 6-9 and 12 are rejected under 35 U.S.C. 103(a) as being unpatentable over Shackelton et al. (Steroids, 1997) in view of Quinn et al. (US 5,772,874, cited in the IDS dated 2/23/2010) and Zimmer et al. (J Chrom 1999, cited in the IDS dated 2/23/2010).

This rejection is withdrawn in view of Applicant's arguments and amendments.

### Double Patenting

18.     The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.   A nonstatutory

Application/Control Number: 12/607,905

Page 21

Art Unit: 1654

obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

19.    Claims 1-13 are rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,754,419.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '419

are both drawn to a method for determining the presence or amount of testosterone in a

test sample utilizing steps encompassed or encompassed by the claimed method of US

'419. US '419 teaches a method for determining the presence or amount of testosterone

in a test sample comprising,

(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

(b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

Application/Control Number: 12/607,905                                   Page 22
Art Unit: 1654

　　　(c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '419 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '419

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) including appropriate columns. The ions

detected are $289.1 \pm 0.5$, $109.2 \pm 0.5$, $96.9 \pm 0.5$.

　　　Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

20.　　Claims 1-13 are rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,348,137.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '137

are both drawn to a method for determining the presence or amount of testosterone in a

test sample utilizing steps encompassed or encompassed by the claimed method of US

'137. US '137 teaches a method for determining the presence or amount of testosterone

in a test sample comprising,

　　　(a) purifying testosterone from the test sample by HTLC extraction and liquid

chromatography;

QUESTMS-00002924

Application/Control Number: 12/607,905                                    Page 23
Art Unit: 1654

    (b) ionizing the purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer having a mass/charge ratio selected from the group consisting of 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5 and 96.9 $\pm$ 0.5;

    (c) detecting the presence or amount of the testosterone ion(s) by a mass spectrometer, wherein the presence or amount of the testosterone ion(s) is related to the presence or amount of testosterone in the test sample, wherein the method is capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1 ng/mL] in the test sample (see all claims of US '137 and also the section regarding the limit of detection (LOD) in Example 4 which describes the LOD is 0.6 ng/dL). US '137 includes detection by MS/MS/TOF of the instantly claimed ions, which are made by ionization techniques such as SELDI, APPI, daughter ion summation for quantitation and HTLC (turbulent flow chromatography) including appropriate columns. The ions detected are 289.1 $\pm$ 0.5, 109.2 $\pm$ 0.5, 96.9 $\pm$ 0.5.

    Thus, the invention as a whole is prima facie obvious over the patent, especially in the absence of evidence to the contrary.

21.    Claims 1-13 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-39 of U.S. Patent No. 6,977,143. Although the conflicting claims are not identical, they are not patentably distinct from each other because the instantly claimed invention and the invention claimed in US '143 are both drawn to a method for determining the presence or amount of testosterone in a test sample utilizing steps encompassed or encompassed by the claimed method of US

Application/Control Number: 12/607,905                                    Page 24
Art Unit: 1654

'143. US '143 teaches a method for determining the presence or amount of testosterone

in a test sample comprising,

    (a) purifying testosterone from the test sample by HTLC extraction and  liquid

chromatography;

    (b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer having a mass/charge ratio selected from the group

consisting of $289.1 \pm 0.5$, $109.2 \pm 0.5$ and $96.9 \pm 0.5$;

    (c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL [equivalent to 0.1

ng/mL] in the test sample (see all claims of US '143 and also the section regarding the

limit of detection (LOD) in Example 9 which describes the LOD is 0.6 ng/dL). US '143

includes detection by MS/MS/TOF of the instantly claimed ions, which are made by

ionization techniques such as SELDI, APPI, daughter ion summation for quantitation

and HTLC (turbulent flow chromatography) and appropriate columns for HTLC. The ions

detected are $289.1 \pm 0.5$, $109.2 \pm 0.5$, $96.9 \pm 0.5$.

    Thus, the invention as a whole is prima facie obvious over the patent, especially

in the absence of evidence to the contrary.

20.    Claims 1-13 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 13-28 of

QUESTMS-00002926

Application/Control Number: 12/607,905                                    Page 25
Art Unit: 1654

copending Application No. 12/946,785.   Although the conflicting claims are not

identical, they are not patentably distinct from each other because both are drawn to

     (a) purifying testosterone from the test sample by subjecting the sample to an

extraction column and an analytical column to generate an eluent;

     (b) ionizing the purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer (e.g., LC/MS/MS triple quadrupole mass

spectrometry);

     (c) detecting the presence or amount of the testosterone ion(s) by a mass

spectrometer, wherein the presence or amount of the testosterone ion(s) is related to

the presence or amount of testosterone in the test sample, wherein the method is

capable of detecting testosterone concentrations of less than 10 ng/dL such as 1 ng/dL.

     This is a <u>provisional</u> obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

### *Conclusion*

22.    No claim is allowed.

     The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

23.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone

number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

QUESTMS-00002927

Application/Control Number: 12/607,905                                      Page 26
Art Unit: 1654

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 12/2011

QUESTMS-00002928

| *Notice of References Cited* | Application/Control No. 12/607,905 | Applicant(s)/Patent Under Reexamination CAULFIELD ET AL. | |
|---|---|---|---|
| | Examiner MARCELA M. CORDERO | Art Unit 1654 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Draisci et al. Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography-tandem mass spectrometry, Journal of Chromatography A, 870, pages 511-522. |
| | V | Robb et al. Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography-Mass Spectrometry. Anal. Chem. 2000, 72, pages 3653-3659. |
| | W | Tiller et al. Drug quantitation on a benchtop liquid chromatography-tandem mass spectrometry system. Journal of Chromatography A. 1997, 771, pages 119-125. |
| | X | Alary. Comparative Study: LC-MS/MS Analysis of Four Steroid Compounds Using a New Photoionization Source and a Conventional APCI Source. Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago, Illinois, May 27-31, 2001. |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)          **Notice of References Cited**          Part of Paper No. 20111214

QUESTMS-00002929



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/118,180 | 05/27/2011 | Michael P. Caulfield | 034827-9108 | 9065 |

30542        7590        11/17/2011
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/17/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

QUESTMS-00002930

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 13/118,180 | CAULFIELD ET AL. |
| | Examiner | Art Unit | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>27 May 2011</u>.

2a)☐ This action is **FINAL**.     2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) <u>13-39</u> is/are pending in the application.

  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>13-39</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

  a)☐ All   b)☐ Some * c)☐ None of:

    1.☐ Certified copies of the priority documents have been received.

    2.☐ Certified copies of the priority documents have been received in Application No. _____.

    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

  * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application
6)☐ Other: _____.

QUESTMS-00002931

Application/Control Number: 13/118,180                                          Page 2
Art Unit: 1654

## DETAILED ACTION

1.      The previous Office Action dated 9/7/2011 is herein vacated and replaced by this

Office Action in order to correct for the fact that examiner used the original set of claims

rather than the amended one.

### *Status of the claims*

2.      Claims 1-12 have been cancelled. Claims 13-39 are new claims. Claims 13-39

are pending and are presented for examination on the merits.

### *Claim Rejections - 35 USC § 103*

3.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

4.      This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

QUESTMS-00002932

Application/Control Number: 13/118,180                                      Page 3
Art Unit: 1654

5.       Claims 13, 15, 19-20, 23-25 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Ong et al. 50th ASMS Conference Abstract Viewer, ASMS 2001,

citation A44 in the IDS dated 7/21/2011) in view of Kryger (US 6,743,448).

       Ong et al. teach a method for determining the amount of testosterone present in

a plasma sample, the method comprising:

       (b) purifying testosterone by (a) high turbulence liquid chromatography ("HTLC");

       (c) further purifying testosterone in the processed sample by liquid

chormatography;

       (d) ionizing testosterone obtained in (c) to produce one or more testosterone ions

detectable by mass spectrometry; and

       (e) detecting the amount of one or more testosterone ion(s) by a mass

spectrometer, wherein the amount of the testosterone ion(s) is related to the amount of

testosterone in the plasma sample.

       Ong et al. teach that the bioanalytical challenges faced by a pharmaceutical

company range from support of structure-activity relationship (SAR) studies for lead

optimization using in vitro metabolic stability to in vivo pharmacokinetic studies in

various animal models. Most often, particularly in a small pharmaceutical company, part

or all of the above efforts are outsourced due to the significant investment required to

acquire, operate, and maintain the necessary analytical instrumentation. However,

advantages gained from conducting these analyses in-house relative to outsourcing are

enormous. Ong et al. teach programs that are supported using a single LC/MS/MS

system.

QUESTMS-00002933

Application/Control Number: 13/118,180                                     Page 4
Art Unit: 1654

Ong et al. describe an LC/MS/MS system consisting of a Cohesive 2300 HTLC system equipped with 2 binary pumps and a CTC PAL autosampler interfaced to an AB-Sciex API 3000 triple quadrupole mass spectrometer. One pump is used for sample loading and extraction, while the second pump operates a generic gradient to facilitate analyte elution. The main advantage of the system is the capability for on-line solid-phase extraction obviating the need for any manual sample preparation prior to mass spectrometric analysis. The system is also capable of conducting parallel on-line extractions to increase throughput.

Ong et al. teach a Tecan Genesis liquid handling workstation was utilized for metabolic stability screening, which is capable of preparing approximately 400 samples (in under 4 hours) for analysis. In this program, the percentage of parent compound remaining after 1-hour incubation is determined, to complete sample analysis in a single batch overnight, the HTLC system is configured with two on-line extraction columns in parallel followed by a single analytical column. Use of this extraction column-switching mode allows one extraction column to be rinsed and equilibrated while the other is used for on-line extraction. The analytical column is operated under generic fast gradient chromatography to facilitate elution of a range of analytes with differing chemical characteristics, In this configuration, the cycle time is 2 minutes per injection facilitated by the use of higher (>1mL/min) flow rates. Carryover is compound-dependent with 0.5% as the worst case encountered. Testosterone is used as a positive control (at 5 and 0.5 uM incubation concentrations) in this metabolic stability screening program. Within-batch precision of analysis as measured by percent testosterone remaining is

QUESTMS-00002934

Application/Control Number: 13/118,180                                        Page 5
Art Unit: 1654

typically not greater than 10% (N = 4) while inter-batch precision calculated from over

20 separate batches is not worse than 15%.

For analyses involving plasma tissue matrices, in which lower limits of

quantitation approaching 0.1 ng/mL are routinely required, a serial configuration,

consisting of a single extraction column with a single analytical column, is used. The

main advantages of this configuration are simplified sample preparation (even for tissue

samples) prior to on-line extraction and minimal carryover (0.05%), although a longer

cycle time is encountered because extractions are carried out serially. Examination of

the results from parallel and serial configurations following method validation

experiments with spiked plasma samples for various analytes revealed accuracy (10%

relative error) and precision (10% RSD) values that are comparable (see pages 1-2).

Ong et al. do not expressly teach precipitation of protein before step (b) or taking

the sample expressly from a human.

Kryger teaches that "bioavailable testosterone" and similar terms refer to

testosterone that is not bound to sex hormone-binding globulin (SHBG) or albumin.

Therefore testosterone which is "free" (unbound) or "weakly bound to" (easily

dissociates from) serum albumin is considered to be bioavailable to tissues. Because of

the high binding capacity (non-saturability) of albumin for testosterone, the serum

concentration of albumin-bound testosterone will, in general, be proportional to the

concentration of free testosterone. The proportionality factor corresponds to the product

of the albumin -testosterone binding constant ($3.6 \times 10^4$ L/mole) and the serum albumin

concentration (expressed in mole/Liter). The concentration of bioavailable testosterone

QUESTMS-00002935

Application/Control Number: 13/118,180                                             Page 6
Art Unit: 1654

is commonly measured using an ammonium sulfate precipitation method. Kryger

teaches that "total testosterone" refers to the sum of: (1) free testosterone; (2)

testosterone which is weakly bound to serum proteins, such as albumin-bound

testosterone; and (3) testosterone which is tightly bound to high affinity binding serum

proteins, such as SHBG-bound testosterone (col. 8). Further, Kryger teaches measuring

free testosterone and total testosterone levels in humans before and after receiving

testosterone (e.g., col. 5, Figures 5-6).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the invention of Ong et al. to measure total testosterone

by doing a protein precipitation with ammonium sulfate in human serum as taught by

Kryger. One of ordinary skill in the art at the time the invention was made would have

been motivated to do so in order to determine baselines and also the effects of

testosterone topical administration as taught by Kryger. One of ordinary skill in the art at

the time the invention was made would have had a reasonable expectation of success

given that Kryger teaches that total testosterone in females after transdermal

testosterone application was about 50-70 ng/dL which is equivalent to 0.5-0.7 ng/ml

which is within the LOQ reported by Ong et al.

From the teachings of the references, it is apparent that one of ordinary skill in

the art would have had a reasonable expectation of success in producing the claimed

invention.  Therefore, the invention as a whole was *prima facie* obvious to one of

ordinary skill in the art at the time the invention was made, as evidenced by the

references, especially in the absence of evidence to the contrary.

Application/Control Number: 13/118,180                                    Page 7
Art Unit: 1654

6.        Claims 13-16, 19-20, 22-25, 28-32, 35, 36, 38-39 are rejected under 35 U.S.C.

103(a) as being unpatentable over Caraiman et al. (ASMS 2003, poster number 075,

citation A17 in the IDS dated 7/21/2011) in view of Kryger (US 6,743,448).

        Caraiman et al. disclose a method for determining the amount of testosterone in

a plasma or serum sample, the method comprising:

        (b) purifying testosterone by (a) high turbulence liquid chromatography ("HTLC");

        (c) further purifying testosterone in the processed sample by liquid

chormatography;

        (d) ionizing testosterone obtained in (c) to produce one or more testosterone ions

detectable by mass spectrometry; and

        (e) detecting the amount of one or more testosterone ion(s) by a mass

spectrometer, wherein the amount of the testosterone ion(s) is related to the amount of

testosterone in the plasma sample.

        Caraiman et al. teach a sensitive, selective and fast method was developed for

the analysis of Testosterone and Warfarin in rat plasma from in vivo pharmacokinetic

experiments. The instrumentation consisted of TurboFlow- Chromatography (TFC)

coupled with an API 4000 TM mass spectrometer equipped with a combined TIS

(TurbolonSpraymM)/APCI source. Total assay time is as short as 4.3 minutes including

direct online injection of diluted plasma, HPLC separation and software-controlled

switching of the ionization mode during the chromatographic run. For each compound

the optimal ionization method was determined and set for the analytical run using the

software. Limits of quantitation for Warfarin and Testosterone in rat plasma are

QUESTMS-00002937

Application/Control Number: 13/118,180                                    Page 8
Art Unit: 1654

comparable with LOQs obtained for neat standards using conventional ion sources and

HPLC (e.g., abstract).

Caraiman et al. go on to teach that there is an ever increasing burden on

analytical laboratories to make high sensitivity measurements, and to make them as

quickly as possible. For the LC/MS analysis of compounds of widely differing polarities

the demands are even higher since compounds in the same sample can often only be

ionized optimally with the use of entirely different ionization sources (most commonly

either electrospray ionization or atmospheric pressure chemical ionization (APCI, which

reads upon a heated nebulizer, see also Figure 1)). This study illustrates the use of a

combined TIS/APCI ionization source to combat this type of problem: as a software-

selectable source, the ionization mode can be changed on the fly, allowing the user to

choose the best ionization mode for each resolved compound in one analytical run.

TurboFlow-Chromatography was used as a high- throughput method to eliminate the

time-consuming sample preparation procedures for biological samples (e.g.,

introduction).

Instrumentation described by Caraiman et al. includes:

- API 4000 TM equipped with a DuoSpray TM ion source (Figure 1)

-Cohesive® 2300 pump/valve interface module (Cohesive® Technologies,

Franklin, MA, USA) and CTC PAL HTS autosampler (Cohesive® Technologies,

Franklin, MA, USA) (Figure 2)

The sample preparation comprises:

QUESTMS-00002938

Application/Control Number: 13/118,180                                    Page 9
Art Unit: 1654

    - Calibration standards were prepared by mixing 200 uL of rat plasma with 200 uL of standard solutions in 10% methanol;

    - Aliquots of 100 uL plasma samples from separate pharmacokinetic studies on rats for Testosterone and Warfarin were mixed and diluted with 200 uL 10% methanol;

    -Calibrators and unknowns were centrifuged at 16,600 g for 15 minutes. The supernatant was transferred to 300 uL vials and loaded in the autosampler;

    Chromatographic Conditions described by Caraiman:- Extraction Column: Cyclone TM HTLC (1.0 x 50 mm, 50 um)

    - Analytical column: Waters, C8 Nova Pak (4.6 x 20 mm, 4 um)

    - Mobile phase for loading pump and eluting pump

    A: Water (0.1% HCOOH) : Methanol (95:5 v/v)

    B: Water (0.1% HCOOH) : Methanol (5:95 v/v)

    - Run time: 4.33 minutes

    - Details for loading, transfer and eluting steps of the LC method: Figures 3-6

    Caraiman et al. teach that fast TIS/APCI switching allows TIS and APCI ionization for Warfarin and Testosterone, respectively in one single acquisition run. Switching the ionization mode and the polarity are performed so that the two peaks situated at less than 0.3 min apart in a chromatographic run can be baseline separated in two different periods.

    Cohesive® 2300 TurboFlow® Chromatography system was used to reduce the sample preparation time for rat plasma samples from in vivo pharmacokinetic studies. Dual column focusing mode was used for optimum sensitivity.

QUESTMS-00002939

Application/Control Number: 13/118,180                                    Page 10
Art Unit: 1654

Caraiman et al. conclude that a high-throughput method combining the advantages of using the dual ion source in combination with HTLC was developed for analysis of Warfarin and Testosterone from in vivo pharmacokinetic studies. Quantitation limits comparable with results for neat standards analyzed with conventional HPLC and ion sources, good precision (C.V. 10%) and accuracy were obtained. See, e.g., Table 3. The transition 289.1 -> 97.2 is used (see Table 1).

Caraiman et al. do not expressly teach precipitation of protein before step (b) or taking the sample expressly from a human.

Kryger teaches that "bioavailable testosterone" and similar terms refer to testosterone that is not bound to sex hormone-binding globulin (SHBG) or albumin. Therefore testosterone which is "free" (unbound) or "weakly bound to" (easily dissociates from) serum albumin is considered to be bioavailable to tissues. Because of the high binding capacity (non-saturability) of albumin for testosterone, the serum concentration of albumin-bound testosterone will, in general, be proportional to the concentration of free testosterone. The proportionality factor corresponds to the product of the albumin -testosterone binding constant ($3.6 \times 10^4$ L/mole) and the serum albumin concentration (expressed in mole/Liter). The concentration of bioavailable testosterone is commonly measured using an ammonium sulfate precipitation method. Kryger teaches that "total testosterone" refers to the sum of: (1) free testosterone; (2) testosterone which is weakly bound to serum proteins, such as albumin-bound testosterone; and (3) testosterone which is tightly bound to high affinity binding serum proteins, such as SHBG-bound testosterone (col. 8). Further, Kryger teaches measuring

QUESTMS-00002940

Application/Control Number: 13/118,180                                    Page 11
Art Unit: 1654

free testosterone and total testosterone levels in humans before and after receiving

testosterone (e.g., col. 5, Figures 5-6).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the invention of Caraiman et al. to measure total

testosterone by doing a protein precipitation with ammonium sulfate in human serum as

taught by Kryger. One of ordinary skill in the art at the time the invention was made

would have been motivated to do so in order to determine baselines and also the effects

of testosterone topical administration as taught by Kryger. One of ordinary skill in the art

at the time the invention was made would have had a reasonable expectation of

success given that Kryger teaches that total testosterone in females after 0.7 ng/

transdermal testosterone application was about 50-70 ng/dL which is equivalent to 0.5-

ml which is within the detection limits reported in Table 3, Figure 10 of Caraiman et al.

From the teachings of the references, it is apparent that one of ordinary skill in

the art would have had a reasonable expectation of success in producing the claimed

invention.  Therefore, the invention as a whole was *prima facie* obvious to one of

ordinary skill in the art at the time the invention was made, as evidenced by the

references, especially in the absence of evidence to the contrary.

### *Claim Rejections - 35 USC § 112*

7.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

QUESTMS-00002941

Application/Control Number: 13/118,180                                          Page 12
Art Unit: 1654

8.      Claims 13, 15, 17-28, 30-31, 33-39 are rejected under 35 U.S.C. 112, first

paragraph, as failing to comply with the written description requirement. The claim(s)

contains subject matter which was not described in the specification in such a way as to

reasonably convey to one skilled in the relevant art that the inventor(s), at the time the

application was filed, had possession of the claimed invention. The MPEP states that

the purpose of the written description requirement is to ensure that the inventor had

possession, as of the filing date of the application, of the specific subject matter later

claimed by him.    The MPEP lists factors that can be used to determine if sufficient

evidence of possession has been furnished in the disclosure of the Application.  These

include "level of skill and knowledge in the art, partial structure, physical and/or

chemical properties, functional characteristics alone or coupled with a known or

disclosed correlation between structure and function, and the method of making the

claimed invention. Disclosure of any combination of such identifying characteristics that

distinguish the claimed invention from other materials and would lead one of skill in the

art to the conclusion that the applicant was in possession of the claimed species is

sufficient." MPEP 2163.

        The MPEP does state that for generic claim the genus can be adequately

described if the disclosure presents a sufficient number of representative species that

encompass the genus. MPEP 2163.   If the genus has a substantial variance, the

disclosure must describe a sufficient variety of species to reflect the variation within that

genus. See MPEP 2163.  Although the MPEP does not define what constitute a

sufficient number of representative, the Courts have indicated what do not constitute a

QUESTMS-00002942

Application/Control Number: 13/118,180                                    Page 13
Art Unit: 1654

representative number species to adequately describe a broad generic.  In <u>Gostelli</u>, the

Court determined that the disclosure of two chemical compounds within a  subgenus did

not describe that subgenus.   <u>In re Gostelli</u>,  872 F.2d at 1012,  10 USPQ2d at 1618.

*In the instant case, the claims are drawn to a method for determining the*

*amount of testosterone in a plasma or serum sample when taken from a human,*

*the method comprising:*

*(a) processing a human plasma or serum sample by one or more methods*

*to generate a processed sample, wherein at least one method used is protein*

*precipitation;*

*(b) purifying testosterone in the processed sample of step (a) by high*

*turbulence liquid chromatography ("HTLC");*

*(c) following step (b), further purifying testosterone in the processed*

*sample by liquid chromatography;*

*(d) ionizing testosterone obtained in step (c) to produce one or more*

*testosterone ions detectable by mass spectrometry; and*

*(e) detecting the amount of one or more testosterone ion(s) by a mass*

*spectrometer, wherein the amount of testosterone in the plasma or serum sample*

*when taken from a human.*

With regards to the "testosterone ion(s)" the instant disclosure teaches at [0008]-

[0009] that the methods comprise ionizing all or portion of the testosterone present in a

test sample to produce one or more testosterone ions detectable in a mass

spectrometer operating in positive mode. However, the examples are drawn exclusively

QUESTMS-00002943

Application/Control Number: 13/118,180                                      Page 14
Art Unit: 1654

to the largest ion produced by testosterone, i.e., 289.1 $\pm$ 0.5 m/z and fragment ions

thereof: 109.2 $\pm$ 0.5 m/z and 96.9 $\pm$ 0.5 m/z.  Further, the broad claims do not require

MS/MS analysis, however all the examples provided and the LOQ and LOD are drawn

to HTLC/MS/MS analysis. The examples provided are as follows: Example 1 is drawn to

sample preparation of the sample including protein precipitation. Example 2 is drawn to

detection of precursor ion 289.1 $\pm$ 0.5 m/z and penta-deuterated equivalent at 294.1 $\pm$

0.5 m/z. Example 3 is drawn to detection and quantitation of testosterone by MS/MS

using the parent ion and fragment ions 109.2 $\pm$ 0.5 m/z and 96.9 $\pm$ 0.5 m/z.  Example 4

is drawn to LOD determination, which is corresponding to 0.6 ng/dL (0.006 ng/mL) for

HTLC/MS/MS using stripped serum. Example 5 is drawn to LOQ determination, which

was determined to be 1 ng/dL for HTLC/MS/MS. Example 6 is drawn to a comparison of

total testosterone results obtained from the HTLC/MS/MS, radioimmunoassay (RIA) and

the Bayer Advia Centaur® automated platform.  Example 7 is drawn to assay linearity.

Example 8 is drawn to assay specificity. Example 9 is drawn to atmospheric pressure

photoionization. Thus, all examples are drawn to the use of the largest ion produced by

testosterone, i.e., 289.1 $\pm$ 0.5 m/z and fragment ions thereof: 109.2 $\pm$ 0.5 m/z and 96.9

$\pm$ 0.5 m/z.  As stated earlier, the MPEP states that written description for a genus can

be achieved by a representative number of species within a broad generic.  It is

unquestionable claim 1 is a broad generic with respect all possible ions encompassed

by the claims.  Here, the claims lack written description because there is no disclosure

of other ions being used and/or being available for analysis based on their ionic

concentration as disclosed in the examples in the specification.  Moreover, the

QUESTMS-00002944

Application/Control Number: 13/118,180                                        Page 15
Art Unit: 1654

specification lack sufficient variety of ionic species to reflect this variance in the genus

since the specification does not provide any examples of any other testosterone ions

beyond the parent ion 289.1 $\pm$ 0.5 m/z and fragment ions thereof: 109.2 $\pm$ 0.5 m/z and

96.9 $\pm$ 0.5 m/z. Furthermore, the LOQ and LOD are drawn to HTLC/MS/MS

determination using 289.1 $\pm$ 0.5 m/z and fragment ions the largest ion produced by

testosterone, i.e., 289.1 $\pm$ 0.5 m/z and fragment ions thereof: 109.2 $\pm$ 0.5 m/z and 96.9

$\pm$ 0.5 m/z. No other positive ions are shown to be used. The description requirement of

the patent statute requires a description of an invention, not an indication of a result that

one might achieve if one made that invention.   See In re Wilder, 736 F.2d 1516, 1521,

222 USPQ 369, 372-73 (Fed. Cir. 1984) (affirming rejection because the specification

does "little more than outlin[e] goals appellants hope the claimed invention achieves and

the problems the invention will hopefully ameliorate.").  Accordingly, it is deemed that

the specification fails to provide adequate written description for the genus of the claims

and does not reasonably convey to one skilled in the relevant art that the inventor(s), at

the time the application was filed, had possession of the entire scope of the claimed

invention.

### Double Patenting

9.      The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees.   A nonstatutory

obviousness-type double patenting rejection is appropriate where the conflicting claims

QUESTMS-00002945

Application/Control Number: 13/118,180                                    Page 16
Art Unit: 1654

are not identical, but at least one examined application claim is not patentably distinct

from the reference claim(s) because the examined application claim is either anticipated

by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140

F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29

USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir.

1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422

F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163

USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on a nonstatutory

double patenting ground provided the conflicting application or patent either is shown to

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement.

        Effective January 1, 1994, a registered attorney or agent of record may sign a

terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with

37 CFR 3.73(b).

10.     Claims 13-39 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-39 of U.S. Patent No. 6,977,143.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the instantly claimed invention and the invention claimed in US '143

are both drawn to a method for determining the amount of testosterone in a plasma or

serum sample when taken from a human, the method comprising:

QUESTMS-00002946

Application/Control Number: 13/118,180                           Page 17
Art Unit: 1654

    (a) processing a human plasma or serum sample by one or more methods to generate a processed sample, wherein at least one method used is protein precipitation;

    (b) purifying testosterone in the processed sample of step (a) by high turbulence liquid chromatography ("HTLC");

    (c) following step (b), further purifying testosterone in the processed sample by liquid chromatography;

    (d) ionizing testosterone obtained in step (c) to produce one or more testosterone ions detectable by mass spectrometry; and

    (e) detecting the amount of one or more testosterone ion(s) by a mass spectrometer, wherein the amount of testosterone in the plasma or serum sample when taken from a human.

    . Further, the instantly claimed method encompasses and/or is encompassed by the claimed method of US '413.

11.    Claims 13-39 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-50 of U.S. Patent No. 7,348,137. Although the conflicting claims are not identical, they are not patentably distinct from each other because the instantly claimed invention and the invention claimed in US '137 are both drawn to a method for determining the amount of testosterone in a plasma or serum sample when taken from a human, the method comprising:

QUESTMS-00002947

Application/Control Number: 13/118,180                          Page 18
Art Unit: 1654

　　　(a) processing a human plasma or serum sample by one or more methods to generate a processed sample, wherein at least one method used is protein precipitation;

　　　(b) purifying testosterone in the processed sample of step (a) by high turbulence liquid chromatography ("HTLC");

　　　(c) following step (b), further purifying testosterone in the processed sample by liquid chromatography;

　　　(d) ionizing testosterone obtained in step (c) to produce one or more testosterone ions detectable by mass spectrometry; and

　　　(e) detecting the amount of one or more testosterone ion(s) by a mass spectrometer, wherein the amount of testosterone in the plasma or serum sample when taken from a human.

　　　Further, the instantly claimed method encompasses and/or is encompassed by the claimed method of US '137.

12.　　Claims 13-39 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-32 of U.S. Patent No. 7,754,419 Although the conflicting claims are not identical, they are not patentably distinct from each other because the instantly claimed invention and the invention claimed in US '419 are both drawn to a method for determining the amount of testosterone in a plasma or serum sample when taken from a human, the method comprising:

Application/Control Number: 13/118,180                                    Page 19
Art Unit: 1654

(a) processing a human plasma or serum sample by one or more methods to generate a processed sample, wherein at least one method used is protein precipitation;

(b) purifying testosterone in the processed sample of step (a) by high turbulence liquid chromatography ("HTLC");

(c) following step (b), further purifying testosterone in the processed sample by liquid chromatography;

(d) ionizing testosterone obtained in step (c) to produce one or more testosterone ions detectable by mass spectrometry; and

(e) detecting the amount of one or more testosterone ion(s) by a mass spectrometer, wherein the amount of testosterone in the plasma or serum sample when taken from a human.

Further, the instantly claimed method encompasses and/or is encompassed by the claimed method of US '419.

### *Conclusion*

13.    No claim is allowed.

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

14.    Any inquiry concerning this communication or earlier communications from the examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

QUESTMS-00002949

Application/Control Number: 13/118,180                                         Page 20
Art Unit: 1654

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 11/2011

| | Notice of References Cited | Application/Control No.<br>13/118,180 | Applicant(s)/Patent Under Reexamination<br>CAULFIELD ET AL. | | |
|---|---|---|---|---|---|
| | | Examiner<br>MARCELA M. CORDERO | Art Unit<br>1654 | Page 1 of 1 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-6,743,448 | 06-2004 | Kryger, Abraham H. | 424/489 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)          **Notice of References Cited**          Part of Paper No. 20111112

QUESTMS-00002951

PTO/SB/26 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 034827-9107 |
|---|---|

In re Application of:  Michael P. Caulfield, Darren A Carns and Richard E Reitz

Application No.: 12/946,785

Filed: 11/15/2010

For: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

The owner*, __Quest Diagnostics Investments Incorporated__, of ___100___ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term __prior patent__ No. __6,977,143__ as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
expires for failure to pay a maintenance fee;
is held unenforceable;
is found invalid by a court of competent jurisdiction;
is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
has all claims canceled by a reexamination certificate;
is reissued; or
is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐ For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

   I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. ☑ The undersigned is an attorney or agent of record.  Reg. No. __57,147__

| | |
|---|---|
| _(signature)_ | 03-28-2012 |
| Signature | Date |
| | |
| Anthony C. Kuhlmann | |
| Typed or printed name | |
| | (858) 847-6776 |
| | Telephone Number |

☐ Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

QUESTMS-00002952

Atty. Dkt. No. 034827-9107

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Caulfield et al. |
| Title: | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| Appl. No.: | 12/946,785 |
| Filing Date: | 11/15/2010 |
| Examiner: | Cordero Garcia, Marcela M. |
| Art Unit: | 1654 |
| Confirmation Number: | 1630 |

### INFORMATION DISCLOSURE STATEMENT
### UNDER 37 CFR §1.56

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Submitted herewith on Form PTO/SB/08 is a listing of documents known to Applicants in order to comply with Applicants' duty of disclosure pursuant to 37 CFR §1.56.

A copy of each non-U.S. patent document and each non-patent document is being submitted to comply with the provisions of 37 CFR §1.97 and §1.98.

The submission of any document herewith, which is not a statutory bar, is not intended as an admission that such document constitutes prior art against the claims of the present application or that such document is considered material to patentability as defined in 37 CFR §1.56(b).  Applicants do not waive any rights to take any action which would be appropriate to

QUESTMS-00002953

Atty. Dkt. No. 034827-9107

antedate or otherwise remove as a competent reference any document which is determined to be a *prima facie* art reference against the claims of the present application.

## TIMING OF THE DISCLOSURE

The listed documents are being submitted in compliance with 37 CFR §1.97(b), before the mailing of a first Office action after the filing of a Request for Continued Examination under §1.114.

## RELEVANCE OF EACH DOCUMENT

All of the documents are in English.

Applicants respectfully request that each listed document be considered by the Examiner and be made of record in the present application and that an initialed copy of Form PTO/SB/08 be returned in accordance with MPEP §609.

Although Applicant believes that no fee is required, the Commissioner is hereby authorized to charge any additional fees which may be due to Deposit Account No. 19-0741.

Respectfully submitted,

Date ___3/28/12___     By ___[signature]___

FOLEY & LARDNER LLP
Customer Number: 30542
Telephone:    (858) 847-6776
Facsimile:    (858) 792-6773

Anthony C. Kuhlmann
Attorney for Applicant
Registration No. 57,147

QUESTMS-00002954

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**PATENT APPLICATION FEE DETERMINATION RECORD**
Substitute for Form PTO-875

| Application or Docket Number | Filing Date | |
|---|---|---|
| 12/946,785 | 11/15/2010 | ☐ To be Mailed |

### APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY ☐ | OR | OTHER THAN SMALL ENTITY |
|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | OR | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

### APPLICATION AS AMENDED – PART II

OTHER THAN

|  |  | (Column 1) | (Column 2) | (Column 3) | SMALL ENTITY | OR | SMALL ENTITY |
|---|---|---|---|---|---|---|---|
| AMENDMENT | **03/28/2012** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 24 | Minus ** 27 | = 0 | X $ = | OR | X $60= | 0 |
| | Independent (37 CFR 1.16(h)) | * 2 | Minus ***3 | = 0 | X $ = | | X $250= | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | |
| | Total (37 CFR 1.16(i)) | * | Minus ** | = | X $ = | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | X $ = | | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/DESHONNE T. MARTINO/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

QUESTMS-00002955

| *Application Number* | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 12/946,785 | CAULFIELD ET AL. |
| | | |

| **Document Code - DISQ** | **Internal Document – DO NOT MAIL** |
|---|---|

| **TERMINAL DISCLAIMER** | ☒ APPROVED | ☐ DISAPPROVED |
|---|---|---|
| **Date Filed : 03/28/12** | **This patent is subject to a Terminal Disclaimer** | |

**Approved/Disapproved by:**

Angie Walker

U.S. Patent and Trademark Office

QUESTMS-00002956

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

30542          7590          04/05/2012
FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/05/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

QUESTMS-00002957

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) |
| | 12/946,785 | CAULFIELD ET AL. |
| | Examiner | Art Unit | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *MARCELA M. CORDERO GARCIA*.        (3) _____.

(2) *TIM LOBRING*.        (4) _____.

Date of Interview: _____.

Type:  ☒ Telephonic  ☐ Video Conference
       ☐ Personal [copy given to: ☐ applicant  ☐ applicant's representative]

Exhibit shown or demonstration conducted:  ☐ Yes  ☐ No.
    If Yes, brief description: _____.

Issues Discussed  ☐101 ☐112 ☐102 ☐103 ☒Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *All, in general*.

Identification of prior art discussed: *Prior art rejections of record*.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*Applicant's representative contacted Examiner to discuss potential amendments that would place the application in condition for allowance. Applicants plan to file the response along with a Request for Continued Examination*.

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /MARCELA M CORDERO GARCIA/ Primary Examiner, Art Unit 1654 | |

U.S. Patent and Trademark Office
PTOL-413 (Rev. 8/11/2010)                    Interview Summary                    Paper No. 20120327

QUESTMS-00002958

**Summary of Record of Interview Requirements**

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

—————

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication.  If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

**Examiner to Check for Accuracy**

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

QUESTMS-00002959

Application/Control Number: 12/946,785                                          Page 2
Art Unit: 1654

QUESTMS-00002960

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

30542      7590      08/15/2012

FOLEY & LARDNER LLP
P.O. BOX 80278
SAN DIEGO, CA 92138-0278

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/15/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

QUESTMS-00002961

| **Office Action Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 12/946,785 | CAULFIELD ET AL. |
| | Examiner | Art Unit | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on <u>28 March 2012</u>.

2a) ☐ This action is **FINAL**.     2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5) ☒ Claim(s) <u>13,16-30,34 and 36-42</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☐ Claim(s) _____ is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☒ Claim(s) <u>13,16-30,34 and 36-42</u> are subject to restriction and/or election requirement.

## Application Papers

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

---

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
Paper No(s)/Mail Date <u>3/28/2012</u>.

4) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____ .

5) ☐ Notice of Informal Patent Application

6) ☐ Other: _____.

Application/Control Number: 12/946,785                                    Page 2
Art Unit: 1654

## DETAILED ACTION

### *Continued Examination Under 37 CFR 1.114*

1.      A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on

3/28/2012 has been entered.

### *Status of the claims*

2.      Claims 13, 16-30, 34, 36-42 are pending. Claims 13, 16-19, 22-23, 29, 34, 36-40

have been amended.  Claims 13, 16-30, 34, 36-42 are presented for examination on the

merits.

### *Declaration under 37 CFR 1.131*

3.      The declaration of Michael P. Caulfied filed on 3/28/2012 under 37 CFR 1.131 is

sufficient to overcome the Soldin (US 7,473,560) reference.

### *Terminal Disclaimer*

4.      The terminal disclaimer for US 6,977,143 has been reviewed and is accepted.

The terminal disclaimer has been recorded.

### *Interview*

5.      Examiner contacted Applicant's representative (Joseph P. Meara) to request TDs

for 12/607,905 and 13/118,180 in order to place the application in condition for

QUESTMS-00002963

Application/Control Number: 12/946,785                                Page 3
Art Unit: 1654

allowance. However, Examiner was not able to get a timely response. Therefore the

corresponding ODP rejections are set forth as follows:

### Double Patenting

6.      The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees.   A nonstatutory

obviousness-type double patenting rejection is appropriate where the conflicting claims

are not identical, but at least one examined application claim is not patentably distinct

from the reference claim(s) because the examined application claim is either anticipated

by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140

F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29

USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir.

1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422

F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163

USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on a nonstatutory

double patenting ground provided the conflicting application or patent either is shown to

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement.

Application/Control Number: 12/946,785                                    Page 4
Art Unit: 1654

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

7.     Claims 13, 16-30, 34, 36-42  are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-5, 7-11, 13-14 of copending Application No. 12/607,905 in view of Sowers et al. (American Journal of Epidemiology, 2001).  Although the conflicting claims are not identical, they are not patentably distinct from each other because both the instant application and US '905 are drawn to a method for determining the amount of testosterone in a sample when taken from a human, comprising:

(a) purifying testosterone from a sample from a female human, wherein said purifying comprises extracting testosterone from said sample;

(b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

wherein said testosterone is not derivatized prior to mass spectrometry, and wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample.

US '905 does not expressly teach measuring testosterone in samples from a human female.

Application/Control Number: 12/946,785                                    Page 5
Art Unit: 1654

Sowers et al. teach that estrogens and their effect on reproductive health and chronic diseases, including cardiovascular disease and cancers, particularly breast cancer, have been the overwhelming focus of hormone studies in women. In contrast, there is relatively little information about the role of androgens in women's health. However, testosterone products are being increasingly promoted to women in the lay press as a means of increasing well-being.

Testosterone is the most important circulating and naturally occurring androgen in both men and women. In women, testosterone is produced primarily through peripheral conversion of androstenedione (50 percent) with the remainder of production concentrated in the ovary (25 percent) and adrenal cortex (25 percent). During pregnancy, the placenta may also serve as a source of the hormone.

In women, abnormally high levels of testosterone have been associated with hirsutism and polycystic ovary syndrome. Hirsutism is a consequence of increased production of testosterone or testosterone precursors (dehydroepiandrosterone, 3*-androstanediol, or androst-4-ene-3,17-dione) and depression of sex hormone binding globulin. Circulating levels of free to total testosterone in hirsute women are double those of nonhirsute women. Polycystic ovary syndrome is related to ovulatory dysfunction and is a common cause of female infertility.

Testosterone concentrations have been evaluated for their associations with chronic diseases. Serum levels of testosterone have been suspected in the etiology of breast cancer of postmenopausal women. Zeleniuch-Jacquotte et al. reported an increased risk of breast cancer with increasing concentrations of serum total

QUESTMS-00002966

Application/Control Number: 12/946,785                              Page 6
Art Unit: 1654

testosterone (unadjusted p for trend < 0.05). However, this trend was no longer

significant after adjustment for total estradiol concentrations and the percent of sex

hormone binding globulin-bound estradiol. Nonetheless, those authors speculated that

testosterone or its metabolites might still play a role in breast cancer etiology by altering

the availability of estrogens, by competitively binding with sex hormone binding globulin,

and/or by acting as an estrogen precursor. Likewise, androgen concentrations have

been associated with insulin levels and diabetes mellitus. However, a temporal

sequence between higher levels of androgen and increased insulin levels has not been

firmly established, as higher androgen concentrations may result in increased insulin

resistance or increased insulin production may stimulate androgen production in the

ovary. Sowers et al. have reported an association of osteoarthritis and serum

testosterone concentrations in women aged 25–45 years.

Numerous studies have examined factors that influence testosterone

concentrations in men, and these may provide an indication of the factors that influence

or are associated with testosterone concentrations in women. In men, older age has

been consistently associated with declining levels of testosterone. Lower testosterone

concentrations were associated with increased body mass. Smoking was also

associated with increased concentrations of serum testosterone in men, whereas

alcohol consumption and moderate physical activity do not appear to be associated with

variation in testosterone concentrations (e.g., abstract).

Testosterone levels. Women were evaluated annually on the anniversary of their

initial assessment (±1 month). At each examination, blood was drawn in days 3–7 of the

QUESTMS-00002967

Application/Control Number: 12/946,785                                    Page 7
Art Unit: 1654

follicular phase of the menstrual cycle and after an 8-hour fast. For women not normally

menstruating within 3 months of the examination, blood was drawn after fasting and

indexed to the anniversary date of their first annual examination. Serum was frozen at

−80°C. Total testosterone was assessed with a solid-phase 125I radioimmunoassay

based on a testosterone-specific antibody immobilized to the wall of a polypropylene

tube. The assay precision was ±15.5 percent. Table 1 shows that total testosterone in

pg/mL has a concentration of about 209-223 pg/mL and 33 pg/mL for low

concentrations in women (e.g., page 258). Please note that 209 pg/mL x (100 mL/dL) x

(1 ng/1000 pg) is equal to 20.9 pg/dL which is within the detection limit. Further, the

method also includes extraction of testosterone which reads upon concentrating the

sample and thus would potentially encompass lower levels than the testosterone

circulating levels in women.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the method of US '905 to measure testosterone in women.

One of ordinary skill in the art at the time the invention was made would have been

motivated to do so because estrogens and their effect on reproductive health and

chronic diseases, including cardiovascular disease and cancers, particularly breast

cancer, have been the overwhelming focus of hormone studies in women. In contrast,

there is relatively little information about the role of androgens in women's health.

However, testosterone products are being increasingly promoted to women in the lay

press as a means of increasing well-being.  One of ordinary skill in the art at the time

the invention was made would have had a reasonable expectation of success because

QUESTMS-00002968

the method of US '905 was more sensitive than the average values of testosterone in

serum in women and because the method includes concentrating the sample extraction

before testosterone measurement.

This is a provisional obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

8.      Claims 13, 16-30, 34, 36-42 are provisionally rejected on the ground of

nonstatutory obviousness-type double patenting as being unpatentable over claims 13-

39 of copending Application No. 13/118,180 in view of Sowers et al. (American Journal

of Epidemiology, 2001).  Although the conflicting claims are not identical, they are not

patentably distinct from each other because Although the conflicting claims are not

identical, they are not patentably distinct from each other because both the instant

application and US '180 are drawn to a method for determining the amount of

testosterone in a sample when taken from a human, comprising:

(a) purifying testosterone from a sample from a female human, wherein said

purifying comprises extracting testosterone from said sample;

(b) ionizing said purified testosterone to produce one or more testosterone ions

detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass

spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to

the amount of testosterone in the sample;

QUESTMS-00002969

wherein said testosterone is not derivatized prior to mass spectrometry, and

wherein the method is capable of detecting testosterone at concentrations of less than

10 ng/dL in the sample.

US '180 does not expressly teach measuring testosterone in samples from a

human female.

Sowers et al. teach that estrogens and their effect on reproductive health and

chronic diseases, including cardiovascular disease and cancers, particularly breast

cancer, have been the overwhelming focus of hormone studies in women. In contrast,

there is relatively little information about the role of androgens in women's health.

However, testosterone products are being increasingly promoted to women in the lay

press as a means of increasing well-being.

Testosterone is the most important circulating and naturally occurring androgen

in both men and women. In women, testosterone is produced primarily through

peripheral conversion of androstenedione (50 percent) with the remainder of production

concentrated in the ovary (25 percent) and adrenal cortex (25 percent). During

pregnancy, the placenta may also serve as a source of the hormone.

In women, abnormally high levels of testosterone have been associated with

hirsutism and polycystic ovary syndrome. Hirsutism is a consequence of increased

production of testosterone or testosterone precursors (dehydroepiandrosterone, 3*-

androstanediol, or androst-4-ene-3,17-dione) and depression of sex hormone binding

globulin. Circulating levels of free to total testosterone in hirsute women are double

QUESTMS-00002970

Application/Control Number: 12/946,785                                      Page 10
Art Unit: 1654

those of nonhirsute women. Polycystic ovary syndrome is related to ovulatory

dysfunction and is a common cause of female infertility.

Testosterone concentrations have been evaluated for their associations with

chronic diseases. Serum levels of testosterone have been suspected in the etiology of

breast cancer of postmenopausal women. Zeleniuch-Jacquotte et al. reported an

increased risk of breast cancer with increasing concentrations of serum total

testosterone (unadjusted p for trend < 0.05). However, this trend was no longer

significant after adjustment for total estradiol concentrations and the percent of sex

hormone binding globulin-bound estradiol. Nonetheless, those authors speculated that

testosterone or its metabolites might still play a role in breast cancer etiology by altering

the availability of estrogens, by competitively binding with sex hormone binding globulin,

and/or by acting as an estrogen precursor. Likewise, androgen concentrations have

been associated with insulin levels and diabetes mellitus. However, a temporal

sequence between higher levels of androgen and increased insulin levels has not been

firmly established, as higher androgen concentrations may result in increased insulin

resistance or increased insulin production may stimulate androgen production in the

ovary. Sowers et al. have reported an association of osteoarthritis and serum

testosterone concentrations in women aged 25–45 years.

Numerous studies have examined factors that influence testosterone

concentrations in men, and these may provide an indication of the factors that influence

or are associated with testosterone concentrations in women. In men, older age has

been consistently associated with declining levels of testosterone. Lower testosterone

QUESTMS-00002971

Application/Control Number: 12/946,785                                    Page 11
Art Unit: 1654

concentrations were associated with increased body mass. Smoking was also

associated with increased concentrations of serum testosterone in men, whereas

alcohol consumption and moderate physical activity do not appear to be associated with

variation in testosterone concentrations (e.g., abstract).

Testosterone levels. Women were evaluated annually on the anniversary of their

initial assessment (±1 month). At each examination, blood was drawn in days 3–7 of the

follicular phase of the menstrual cycle and after an 8-hour fast. For women not normally

menstruating within 3 months of the examination, blood was drawn after fasting and

indexed to the anniversary date of their first annual examination. Serum was frozen at

−80°C. Total testosterone was assessed with a solid-phase 125I radioimmunoassay

based on a testosterone-specific antibody immobilized to the wall of a polypropylene

tube. The assay precision was ±15.5 percent. Table 1 shows that total testosterone in

pg/mL has a mean concentration of about 209-223 pg/mL and 33 pg/mL for low

concentrations in women (e.g., page 258). Please note that 209 pg/mL x (100 mL/dL) x

(1 ng/1000 pg) is equal to 20.9 pg/dL which is within the detection limit. Further, the

method also includes extraction of testosterone which reads upon concentrating the

sample and thus would potentially encompass lower levels than the testosterone

circulating levels in women.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the method of US '180 to measure testosterone in women.

One of ordinary skill in the art at the time the invention was made would have been

motivated to do so because estrogens and their effect on reproductive health and

QUESTMS-00002972

Application/Control Number: 12/946,785                                    Page 12
Art Unit: 1654

chronic diseases, including cardiovascular disease and cancers, particularly breast

cancer, have been the overwhelming focus of hormone studies in women. In contrast,

there is relatively little information about the role of androgens in women's health.

However, testosterone products are being increasingly promoted to women in the lay

press as a means of increasing well-being. One of ordinary skill in the art at the time the

invention was made would have had a reasonable expectation of success because the

method of US '180 was more sensitive than the average values of testosterone in serum

in women and because the method includes concentrating the sample extraction before

testosterone measurement.

This is a provisional obviousness-type double patenting rejection because the

conflicting claims have not in fact been patented.

### Conclusion

9.      No claim is currently allowed.

The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone

number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

QUESTMS-00002973

Application/Control Number: 12/946,785                                      Page 13
Art Unit: 1654

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 08/2012

QUESTMS-00002974

| | Notice of References Cited | Application/Control No.<br>12/946,785 | Applicant(s)/Patent Under Reexamination<br>CAULFIELD ET AL. | |
|---|---|---|---|---|
| | | Examiner<br>MARCELA M. CORDERO GARCIA | Art Unit<br>1654 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2011/0226946 | 09-2011 | Caulfield et al. | 250/282 |
| * | B | US-2010/0047849 | 02-2010 | Caulfield et al. | 435/29 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Sowers et al. Testosterone Concentrations in Women Aged 25-50 Years: Associations with Lifestyle, Body Composition, and Ovarian Status. American Journal of Epidemiology, 2001. Vol. 153, No. 3, pages 256-264. |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

QUESTMS-00002975

Receipt date: 03/28/2012                                           12946785 - GAU: 1654

Approved for use through 03/31/2007. OMB 0651-0031
PTO/SB/08 (09-06)
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(use as many sheets as necessary)* | **Complete if Known** | |
|---|---|---|
| | Application Number | 12/946,785 |
| | Filing Date | 11/15/2010 |
| | First Named Inventor | Michael P. Caulfield |
| | Art Unit | 1654 |
| | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 1 | of | 2 | Attorney Docket Number | 034827-9107 |

### U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A1 | 6,743,448 | 06-01-2004 | Kryger | |

### UNPUBLISHED U.S. PATENT APPLICATION DOCUMENTS

| Examiner Initials* | Cite No.[1] | U.S. Patent Application Document Serial Number-Kind Code[2] (if known) | Filing Date of Cited Document MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | | | | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Documents | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
|---|---|---|---|
| | A2 | ALARY, "Comparative Study: LC-MS/MS Analysis of Four Steroid Compounds Using a New Photoionization Source and a Conventional APCI Source," Proceedings of the 49th ASMS Conference on Mass Spectrometry and Allied Topics, Chicago Illinois, May 27-31, 2001 | |
| | A3 | DRAISCI et al., "Quantitation of anabolic hormones and their metabolites in bovine serum and urine by liquid chromatography-tandem mass spectrometry," J. of Chromatography A, (2000), 870:511-522 | |
| | A4 | ROBB, et al., "Atmospheric Pressure Photoionization: An Ionization Method for Liquid Chromatography-Mass Spectrometry," Anal. Chem., (2000) 72:3653-3559 | |
| | A5 | TILLER, et al, "Drug quantitation on a benchtop liquid chromatography-tandem mass spectrometry system," J. Chromatography A, (1997), 771:119-125 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

4852-2841-2430.1

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

QUESTMS-00002976

Receipt date: 03/28/2012

12946785 - GAU: 1654

PTO/SB/08 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(use as many sheets as necessary)* | | **Complete if Known** | |
|---|---|---|---|
| | | Application Number | 12/946,785 |
| | | Filing Date | 11/15/2010 |
| | | First Named Inventor | Michael P. Caulfield |
| | | Art Unit | 1654 |
| | | Examiner Name | Cordero Garcia, Marcela M. |
| Sheet | 2 | of | 2 | Attorney Docket Number | 034827-9107 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[6] |
| | A6 | US Non-Final Office Action dated December 16, 2011 in related U.S. Patent Appl Serial No. 12/607,905 (034827-9106) | |
| | A7 | US Non-Final Office Action dated November 17, 2011 in related U.S. Patent Appl. Serial No. 13/118,180 (034827-9108) | |
| | | | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /M.M.C.G./

| Examiner Signature | /Marcela Cordero Garcia/ | Date Considered | 07/19/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached. This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

4852-2841-2430.1

EAST Search History

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 15 | "7,022,674" | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/08/13 08:55 |
| L2 | 3 | "12607905" | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/08/13 09:36 |
| L3 | 20 | (woman or women or female) same testosterone same (mass near3 spectrometry) | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/08/13 09:51 |
| L4 | 21 | (woman or women or female) same testosterone same (mass near3 (spectrometry or spectrometric)) | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/08/13 09:51 |
| L5 | 18 | testosterone same (extraction or extracting) same mass same (spectrometer or spectrometry) | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/08/13 10:23 |

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L6 | 4 | testosterone same (extraction or extracting) same mass same (spectrometer or spectrometry) | USPAT; UPAD | ADJ | ON | 2012/08/13 10:25 |

**8/13/2012 10:25:34 AM**

QUESTMS-00002978

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S4 | 15 | testosterone same (mass near3 (spectrometry or spectrometric)) same turbulence | US-PGPUB; USPAT; EPO; JPO; DERWENT | ADJ | ON | 2012/07/15 19:03 |
| S5 | 15 | testosterone same (mass near3 (spectrometry or spectrometric or spectrometer)) same turbulence | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | ADJ | ON | 2012/07/15 19:04 |
| S6 | 3 | testosterone same (mass near3 (spectrometry or spectrometric or spectrometer)) same turbulence same extraction | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | ADJ | ON | 2012/07/15 19:06 |

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S7 | 4 | testosterone same (mass near3 (spectrometry or spectrometric)) same turbulence | USPAT; UPAD | ADJ | ON | 2012/07/15 19:03 |
| S8 | 4 | testosterone same (mass near3 (spectrometry or spectrometric or spectrometer)) same turbulence | USPAT; UPAD | ADJ | ON | 2012/07/15 19:04 |

**7/20/2012 3:59:13 PM**

QUESTMS-00002979

American Journal of Epidemiology
Copyright © 2001 by The Johns Hopkins University School of Hygiene and Public Health
All rights reserved

Vol. 153, No. 3
Printed in U.S.A.

# Testosterone Concentrations in Women Aged 25–50 Years: Associations with Lifestyle, Body Composition, and Ovarian Status

MF. Sowers, J. L. Beebe, D. McConnell, John Randolph, and M. Jannausch

While there is substantial evidence of the importance of endogenous and exogenous estrogen in reproductive health and chronic disease, there is little consideration of androgens in women's health. In the Michigan Bone Health Study (1992–1995), the authors examined the correlates of testosterone concentrations in pre- and perimenopausal women (i.e., age, menopausal status, body composition, and lifestyle behaviors) in a population-based longitudinal study including three annual examinations among 611 women aged 25–50 years identified through a census in a midwestern community. Current smokers had the highest testosterone concentrations with decreasing values in former and nonsmokers ($p = 0.0001$). Body composition measures (body mass index, body fat (%), weight (kg), lean body mass (kg), and fat mass (kg)) were significantly and positively associated with total testosterone concentrations in a dose-response manner. Hysterectomy with oophorectomy was associated with significantly lower testosterone concentrations. Alcohol consumption, physical activity, and dietary macronutrient intake were not associated with testosterone concentrations. This is one of the first studies to examine correlates of serum testosterone concentrations in anticipation of the growing interest in the role of androgens in women's health. The greater circulating levels of testosterone in obese women and smokers suggest that testosterone concentrations should be considered in the natural history of disease conditions where obesity and smoking are risk factors, including cardiovascular disease. *Am J Epidemiol* 2001;153:256–64.

alcohol drinking; body composition; body mass index; hysterectomy; ovariectomy; smoking; testosterone

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

Estrogens and their effect on reproductive health and chronic diseases, including cardiovascular disease and cancers, particularly breast cancer, have been the overwhelming focus of hormone studies in women (1). In contrast, there is relatively little information about the role of androgens in women's health. However, testosterone products are being increasingly promoted to women in the lay press as a means of increasing well-being.

Testosterone is the most important circulating and naturally occurring androgen in both men and women. In women, testosterone is produced primarily through peripheral conversion of androstenedione (50 percent) with the remainder of production concentrated in the ovary (25 percent) and adrenal cortex (25 percent) (2). During pregnancy, the placenta may also serve as a source of the hormone (3).

In women, abnormally high levels of testosterone have been associated with hirsutism and polycystic ovary syndrome (2). Hirsutism is a consequence of increased production of testosterone or testosterone precursors (dehydroepiandrosterone, 3α-androstanediol, or androst-4-ene-3,17-dione (3)) and depression of sex hormone binding globulin (2). Circulating levels of free to total testosterone in hirsute women are double those of nonhirsute women (2). Polycystic ovary syndrome is related to ovulatory dysfunction and is a common cause of female infertility (2).

Testosterone concentrations have been evaluated for their associations with chronic diseases. Serum levels of testosterone have been suspected in the etiology of breast cancer of postmenopausal women. Zeleniuch-Jacquotte et al. (4) reported an increased risk of breast cancer with increasing concentrations of serum total testosterone (unadjusted $p$ for trend < 0.05). However, this trend was no longer significant after adjustment for total estradiol concentrations and the percent of sex hormone binding globulin-bound estradiol. Nonetheless, those authors speculated that testosterone or its metabolites might still play a role in breast cancer etiology by altering the availability of estrogens, by competitively binding with sex hormone binding globulin, and/or by acting as an estrogen precursor. Likewise, androgen concentrations have been associated with insulin levels and diabetes mellitus (5). However, a temporal sequence between higher levels of androgen and increased insulin levels has not been firmly established, as higher androgen concentrations may result in increased insulin resistance or increased insulin production may stimulate androgen production in the ovary (6). Sowers et al. (7) have reported an association of

Received for publication July 26, 1999, and accepted for publication March 31, 2000.

Abbreviations: DEXA, dual energy x-ray absorptiometry; MET, metabolic equivalent.

From the Department of Epidemiology, School of Public Health, University of Michigan, Ann Arbor, MI.

Correspondence to Dr. MF. Sowers, Department of Epidemiology, School of Public Health, University of Michigan, 108 S. Observatory Street, Ann Arbor, MI 48109-2029 (e-mail: mfsowers@umich.edu).

QUESTMS-00002980

osteoarthritis and serum testosterone concentrations in women aged 25–45 years.

Numerous studies have examined factors that influence testosterone concentrations in men, and these may provide an indication of the factors that influence or are associated with testosterone concentrations in women. In men, older age has been consistently associated with declining levels of testosterone (8, 9). Lower testosterone concentrations were associated with increased body mass (8). Smoking was also associated with increased concentrations of serum testosterone in men, whereas alcohol consumption and moderate physical activity do not appear to be associated with variation in testosterone concentrations (8, 10).

Using testosterone concentrations measured at three consecutive annual examinations in a longitudinal study, we describe the factors that are associated with those testosterone levels in pre- and perimenopausal Caucasian women. The study examined total serum testosterone concentrations in relation to the following: 1) *lifestyle variables*, including smoking behavior, alcohol consumption, dietary intake, and amount of physical activity; 2) changes in *ovarian function*, specifically exogenous hormone use and hysterectomy; 3) *age*, and 4) *body composition and body topology*. This is one of the few papers to describe correlates of testosterone concentrations in a population-based study of women and the only one that focuses largely on pre- and perimenopausal women.

## MATERIALS AND METHODS

### Study population

The measures used in this study were collected as part of the longitudinal Michigan Bone Health Study (11). Briefly, in 1988, 542 premenopausal Caucasian women, aged 20–40 years, were recruited for participation. These women represented more than 80 percent of the age-eligible female offspring listed in the family records of the Tecumseh, Michigan, Community Health Study (1959–1972). Age-eligible women whose parents had not been participants of the original Tecumseh Community Health Study were added in 1992. There were 135 female residents who were contacted using a population-based sampling frame (Kohl's directory) that included age, name, address, and telephone number, and of these, 122 were enrolled.

A total of 664 women (aged 25–45 years) were eligible for participation in the subsequent examinations that began in 1992–1993. Participation varied according to pregnancy status, willingness to participate in any given year, and availability to participate in the examination time window. There were 589 women (89 percent) in the first examination, 575 women (87 percent) in the second examination, and 542 women (82 percent) in the third examination. There were 511 women (77 percent) participating in all three rounds, and 85 percent (561 women) provided data from at least two examinations.

### Measurements

*Testosterone levels.* Women were evaluated annually on the anniversary of their initial assessment (±1 month). At

each examination, blood was drawn in days 3–7 of the follicular phase of the menstrual cycle and after an 8-hour fast. For women not normally menstruating within 3 months of the examination, blood was drawn after fasting and indexed to the anniversary date of their first annual examination. Serum was frozen at –80°C. Total testosterone was assessed with a solid-phase $^{125}$I radioimmunoassay based on a testosterone-specific antibody immobilized to the wall of a polypropylene tube. The assay precision was ±15.5 percent.

*Behavioral characteristics.* The annual examinations included the administration of health questionnaires. Smoking status was based on questionnaires and women were categorized as never, former, or current smokers. The participants were classified by their self-reported consumption of alcohol as 1) nondrinkers, 2) currently consuming ≤10 g (less than one drink) per week, 3) currently consuming 10–17 g per week, and 4) currently consuming >17 g (more than two drinks) per week. Groups 2, 3, and 4 are the first, second, and third tertiles, respectively, among those who report consuming alcohol at least once a week.

Annually, women reported physical activity during the previous week, previous July, and previous December. These data were averaged, and an algorithm modeled on the Stanford Five City instrument was used to indicate average weekly activity in metabolic equivalents (METs) (12). One MET is the energy consumed per minute of sitting at rest. METs per week were divided into tertiles of <311, 311–344, and >344.

*Anthropometric measures.* Height (cm) and weight (kg) were measured using a stadiometer and balance-beam scale, and body mass index was calculated as weight (kg)/height (m)². The waist/hip ratio was calculated using hip and waist circumference measures (cm). Body composition (body fat (percent), lean and fat mass (kg)) was determined using dual energy x-ray absorptiometry (DEXA) (Lunar Corporation, Madison, Wisconsin). The DEXA instrumentation uses a constant potential (76 kV(p) x-ray tube with K-edge filtration (350 mg/cm²)) with effective beam energies at 38 and 70 kV. Scanning speed was selected for the anterior-posterior abdominal thickness of the woman being evaluated.

*Reproductive measures.* Women were classified as never, former, or current users of hormone replacement therapy and oral contraceptives, based on self-report. Current use was confirmed with interviewer observation of container labels. Women were also identified as having a hysterectomy with and without double oophorectomy and confirmed by medical record.

*Nutritional measures.* Daily macronutrient intake was estimated from the 98-item Health Habits and History Questionnaire (13). The food frequency portion of the Health Habits and History Questionnaire estimates "usual past year" nutrient intake from the recall of the frequency of consumption of particular food items and portion size.

### Data analysis

All statistical procedures in this analysis were performed using SAS software version 6.12 (SAS Institute, Cary, North Carolina). Univariate statistics were calculated for continu-

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002981

ous variables, and frequency statistics were calculated for categorical variables. Testosterone concentrations were analyzed using a square root transformation, but the data presented in tables 1 through 4 have been untransformed to facilitate recognition of the units. However, the beta coefficients and standard errors in the longitudinal models (table 5) remain in their transformed state because of the complexity of the standard error measure.

Analysis of variance was used in comparing the mean testosterone levels and standard errors for groups at the first, second, and third examinations. The comparison groups for the cross-sectional evaluations of the data were defined by lifestyle factors and reproductive status. Regression models were used to identify those variables independently associated with testosterone concentrations from among the significant associations in the bivariate analysis.

Longitudinal mixed models were used to evaluate possible time trends and the influence of the time-varying variables (measures of body composition and ovarian status) with respect to testosterone concentrations over the 3-year period (Proc Mixed; SAS Institute). The random intercept and random slope, plus measurement error, were used to model the variability in the correlated measurements. Only those variables identified as consistently important in the cross-sectional analyses were entered into the longitudinal

analyses, and then those variables that were no longer significant in an overall model were removed (i.e., lean mass), and a final longitudinal model was identified.

Because there was concern that the population might include women with undiagnosed polycystic ovary syndrome, we withdrew from analysis the data of women who were at the 95th percentile or greater of the body mass index and reran our "final model" to ensure that the same variables retained their importance. A similar process was also used for the data of women who were at the 95th percentile or greater of the baseline testosterone distribution.

## RESULTS

The characteristics of participants are shown in table 1. Among the participants, the average age was 38 years, and the age range was 27–47 years at the last examination. Older age (within this cohort of relatively younger women) was not an important explanatory variable.

Significant increases in percent body fat, weight, and body mass index were observed among study subjects over the 3-year period (test for trend, $p < 0.05$). The mean amount of alcohol consumed increased somewhat, although, overall, the amounts reported were quite low. The proportion of the population that reported current smoking behavior

TABLE 1. Characteristics of the participants of the Michigan Bone Health Study reported from each of the three consecutive annual examinations

| Characteristic | 1992–1993 | 1993–1994 | 1994–1995 |
|---|---|---|---|
| Total testosterone (pg/ml) | | | |
| Mean (SD*) | 209 (20.6) | 210 (19.2) | 223 (20.7) |
| Median (25th–75th percentiles) | 199 (131–299) | 209 (135–297) | 221 (142–312) |
| Range | 432 | 473 | 557 |
| Body composition (mean (SD)) | | | |
| Weight (kg) | 71.6 (16.9) | 71.9 (16.6) | 72.7 (17.6) |
| Height (cm) | 163.4 (5.9) | 163.4 (5.9) | 163.3 (5.9) |
| BMI* (kg/m²) | 26.8 (6.2) | 26.9 (6.0) | 27.2 (6.4) |
| Fat mass (kg) | 28.6 (12.5) | 29.6 (12.4) | 30.0 (12.9) |
| Lean mass (kg) | 39.2 (5.4) | 38.8 (5.3) | 39.1 (5.3) |
| % body fat | 40.6 (8.8) | 41.6 (8.7) | 41.7 (9.0) |
| Alcohol (g/day)† | 1.0 (2.4) | 1.1 (2.5) | 1.3 (2.5) |
| Physical activity (METs*/week) | 337 (47) | 333 (41) | 339 (42) |
| Smoking (no. (%)) | | | |
| Never | 377 (66) | 369 (66) | 356 (67) |
| Former | 67 (12) | 78 (14) | 76 (14) |
| Current | 127 (22) | 115 (20) | 103 (19) |
| Oral contraceptive use (no. (%)) | | | |
| Never | 332 (57) | 333 (59) | 309 (57) |
| Former | 161 (28) | 187 (33) | 181 (33) |
| Current | 85 (15) | 48 (8) | 51 (10) |
| Hormone replacement therapy (no. (%)) | | | |
| Never | 540 (93) | 525 (92) | 483 (89) |
| Former | 6 (1) | 10 (2) | 10 (2) |
| Current | 37 (6) | 33 (6) | 48 (9) |
| Hysterectomy (no. (%)) | | | |
| With oophorectomy | 35 (6) | 33 (6) | 35 (7) |
| Without oophorectomy | 29 (5) | 31 (5) | 33 (6) |

* SD, standard deviation; BMI, body mass index; METs, metabolic equivalents.
† Among women who report drinking alcohol.

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002982

decreased slightly. The mean level of physical activity remained constant. The prevalence of hysterectomy was 11 percent.

**Lifestyle variables and testosterone concentrations**

Smoking behavior was associated with increased serum testosterone levels. Women who reported that they were currently smoking had significantly higher testosterone concentrations when compared with women who did not currently smoke (table 2, $p < 0.0001$). The pattern among current, former, and nonsmokers was consistent at each examination. Current smokers had the highest mean levels, with mean total testosterone concentrations decreasing in former and nonsmokers.

Self-reported alcohol consumption was not associated with total testosterone concentrations cross-sectionally. The mean testosterone levels did not differ significantly between drinkers and nondrinkers with the exception of the 1994-1995 examination. However, when the analysis was then restricted to only those individuals participating in all years of the study, differences in concentrations in the third examination were no longer statistically significant.

Physical activity was not associated with testosterone concentrations in any of the 3 years of examination (table 2). Women in the upper tertile of the physical activity distribution had testosterone concentrations similar to those in women in the lowest tertile of physical activity cross-sectionally and across time. The grams of protein, fat, or carbohydrate intake, as well as total energy intake (calories), were not associated with total testosterone concentrations (data not shown).

**Reproductive status**

Women using oral contraceptives and women using hormone replacement therapy had significantly lower testosterone concentrations than did women who were nonusers (table 3). Whereas women with oophorectomy had significantly lower testosterone concentrations than did premenopausal women, women with hysterectomy and ovarian conservation had testosterone concentrations that were not significantly different from those of premenopausal women.

**Body composition**

Increasing weight was associated with increasing total testosterone concentration at every examination (table 4). Women in the highest body mass index category ($>30$ $kg/m^2$) had testosterone concentrations that were 50–70 pg/ml higher than did women in the lowest category ($\leq22$ $kg/m^2$). Measures of body composition were consistently

TABLE 2.   Mean total testosterone concentrations (pg/ml) in relation to age and self-reported lifestyle behaviors including smoking practice, alcohol consumption, and amount of physical activity as measured from serum collected at three consecutive annual examinations, Michigan Bone Health Study

| | 1992–1993 | | 1993–1994 | | 1994–1995 | |
|---|---|---|---|---|---|---|
| | Mean | SD* | Mean | SD | Mean | SD |
| Age | | | | | | |
| ≤34 years | 224 | 4.3 | 216 | 4.6 | 232 | 6.0 |
| >34 to ≤38 years | 215 | 4.3 | 219 | 4.5 | 242 | 5.2 |
| >38 to ≤41 years | 197 | 4.4 | 208 | 4.7 | 200 | 4.7 |
| >41 years | 201 | 4.5 | 203 | 4.0 | 216 | 3.9 |
| p value† | 0.28 | | 0.70 | | 0.07 | |
| Smoking status | | | | | | |
| Never | 196 | 2.5 | 193 | 2.5 | 222 | 2.9 |
| Former | 217 | 6.6 | 224 | 6.3 | 249 | 7.1 |
| Current | 267 | 5.9 | 271 | 6.3 | 289 | 7.2 |
| p value | <0.01 | | <0.01 | | <0.01 | |
| Alcohol consumption | | | | | | |
| Nondrinkers | 216 | 4.9 | 210 | 4.3 | 220 | 4.1 |
| ≤1 drink/week | 212 | 3.9 | 211 | 4.3 | 208 | 4.9 |
| >1 to ≤2 drinks/week | 206 | 4.7 | 205 | 4.7 | 209 | 5.0 |
| >2 drinks/week | 207 | 4.2 | 217 | 4.4 | 245 | 5.3 |
| p value | 0.92 | | 0.91 | | 0.09 | |
| Physical activity | | | | | | |
| ≤311 METs*/week | 208 | 3.8 | 215 | 3.9 | 226 | 4.5 |
| >311 to ≤344 METs/week | 212 | 3.9 | 213 | 3.9 | 220 | 4.1 |
| >344 METs/week | 213 | 3.9 | 205 | 3.8 | 198 | 3.6 |
| p value | 0.91 | | 0.74 | | 0.89 | |

\* SD, standard deviation; METs, metabolic equivalents.
† p value testing from analysis of variance on transformed data that were then untransformed.

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002983

**260**  Sowers et al.

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

TABLE 3.   Mean total testosterone concentrations (pg/ml) associated with selected reproductive characteristics, from serum collected at three consecutive annual examinations, Michigan Bone Health Study

|  | 1992–1993 | | 1993–1994 | | 1994–1995 | |
|---|---|---|---|---|---|---|
|  | Mean | SD* | Mean | SD | Mean | SD |
| Oral contraceptives |  |  |  |  |  |  |
| Current users | 153 | 4.2 | 139 | 5.1 | 175 | 6.3 |
| Nonusers | 221 | 2.5 | 218 | 2.4 | 227 | 2.6 |
| p value† | <0.01 | | <0.01 | | <0.01 | |
| Hormone replacement therapy |  |  |  |  |  |  |
| Current users | 163 | 6.8 | 177 | 7.7 | 171 | 6.2 |
| Nonusers | 214 | 2.3 | 213 | 2.3 | 227 | 2.6 |
| p value | 0.02 | | 0.11 | | <0.01 | |
| Hysterectomy with ovary conservation |  |  |  |  |  |  |
| Yes | 240 | 10.9 | 235 | 10.5 | 266 | 11.4 |
| No | 211 | 2.3 | 213 | 2.4 | 224 | 2.6 |
| p value | 0.14 | | 0.34 | | 0.09 | |
| Double oophorectomy |  |  |  |  |  |  |
| Yes | 185 | 7.9 | 159 | 6.9 | 152 | 6.5 |
| No | 214 | 2.3 | 215 | 2.3 | 226 | 2.5 |
| p value | 0.20 | | <0.01 | | <0.01 | |

\* SD, standard deviation.
† p value testing from analysis of variance on transformed data that were then untransformed.

associated with testosterone concentrations in a dose-response relation. The amount of fat mass explained more variation in total testosterone than did lean body mass, although both were significantly associated with testosterone concentrations. Increased percent body fat, assessed with DEXA, was associated with higher levels of testosterone. The relation persisted following adjustment for smoking. There were no significant interactions between smoking and any of the anthropometric measures in relation to testosterone concentrations.

A greater waist circumference was associated with higher testosterone concentrations cross-sectionally. Women with a waist circumference of ≥87 cm had testosterone concentrations that were 50–70 pg/ml higher than the mean concentrations in women with waist circumferences of <70 cm. Whereas there appeared to be a trend of increasing total testosterone with increasing waist/hip ratio, this association was not statistically significant across all examinations.

### Independent contributors to testosterone concentrations

Cross-sectional regression models considered smoking, hormone use, oophorectomy, fat mass, lean body mass, and waist circumference simultaneously. The correlations between smoking, fat mass, hormone use, and oophorectomy and total testosterone remained statistically significant, while lean body mass and waist circumference were no longer significantly correlated.

We also evaluated the association of testosterone concentrations over time in longitudinal models considering body composition, smoking behavior, hormone use, and repro-

ductive surgery status (table 5). Smoking behavior and increasing body mass index were each associated with increasing testosterone concentrations over time, whereas hysterectomy with oophorectomy was associated with a decline in testosterone concentrations over time. These relations were consistent whether the entire population was considered (table 5, panel A) or whether the women with the highest 5 percent of body composition were excluded from analysis (table 5, panel B). Likewise, the same variables remained important when the data from women with the highest 5 percent of testosterone concentration (table 5, panel C) were excluded in the event that they might have undiagnosed polycystic ovary syndrome.

### DISCUSSION

In this population-based study, smoking behavior and measures of body composition were associated with increased serum testosterone concentrations. There were no significant associations with other lifestyle variables representing alcohol consumption, physical activity, and intake of energy and the macronutrients, protein, carbohydrate, and fat.

Smoking was associated with increased serum testosterone concentrations and after adjustment for other factors, including body mass index. Of the few studies that have previously examined smoking and androgen levels in women, the findings are highly inconsistent. Longcope and Johnston (14) measured the metabolic clearance rates and production rates of estrogen and androgens in smokers and nonsmokers as part of an ongoing study of hormones and osteoporosis in

QUESTMS-00002984

TABLE 4.   Mean total testosterone concentrations (pg/ml) in association with measures of body composition and body topology (waist/hip ratio), from serum collected at three consecutive annual examinations, Michigan Bone Health Study

| | 1992–1993 | | 1993–1994 | | 1994–1995 | |
|---|---|---|---|---|---|---|
| | Mean | SD* | Mean | SD | Mean | SD |
| Weight (kg) | | | | | | |
| ≤60 | 179 | 3.7 | 178 | 3.7 | 192 | 4.1 |
| >60 to ≤68 | 188 | 3.9 | 199 | 4.4 | 203 | 4.7 |
| >68 to ≤80 | 228 | 4.7 | 226 | 4.6 | 234 | 5.1 |
| >80 | 254 | 5.4 | 242 | 5.0 | 258 | 5.4 |
| p value† | <0.01 | | <0.01 | | <0.01 | |
| Body mass index (kg/m²) | | | | | | |
| ≤22 | 174 | 3.8 | 170 | 3.9 | 196 | 4.5 |
| >22 to ≤26 | 193 | 3.6 | 192 | 3.7 | 200 | 4.1 |
| >26 to ≤30 | 222 | 4.9 | 244 | 5.4 | 246 | 5.5 |
| >30 | 262 | 5.5 | 242 | 4.9 | 246 | 5.1 |
| p value | <0.01 | | <0.01 | | <0.01 | |
| % body fat‡ | | | | | | |
| ≤34 | 170 | 3.6 | 174 | 4.1 | 201 | 4.8 |
| >34 to ≤42 | 192 | 3.7 | 205 | 4.1 | 205 | 4.3 |
| >42 to ≤48 | 226 | 4.8 | 211 | 4.3 | 231 | 4.9 |
| >48 | 268 | 5.9 | 248 | 5.1 | 247 | 5.1 |
| p value | <0.01 | | <0.01 | | <0.01 | |
| Fat mass (kg)‡ | | | | | | |
| ≤20 | 1,750 | 3.4 | 176 | 3.7 | 195 | 4.2 |
| >20 to ≤27 | 182 | 3.9 | 201 | 4.6 | 201 | 4.6 |
| >27 to ≤37 | 232 | 4.7 | 223 | 4.3 | 233 | 4.9 |
| >37 | 269 | 6.0 | 246 | 5.3 | 257 | 5.4 |
| p value | <0.01 | | <0.01 | | <0.01 | |
| Lean body mass (kg)‡ | | | | | | |
| ≤35 | 186 | 4.2 | 197 | 4.1 | 195 | 4.7 |
| >35 to ≤39 | 210 | 3.8 | 205 | 3.8 | 213 | 3.9 |
| >39 to ≤42 | 210 | 4.7 | 203 | 4.7 | 224 | 5.4 |
| >42 | 234 | 4.9 | 243 | 5.3 | 255 | 5.5 |
| p value | 0.03 | | 0.02 | | <0.01 | |
| Waist/hip ratio | | | | | | |
| ≤0.73 | 190 | 3.7 | 211 | 4.2 | 206 | 3.7 |
| >0.73 to ≤0.76 | 199 | 4.3 | 200 | 4.2 | 218 | 5.2 |
| >0.76 to ≤0.80 | 220 | 4.7 | 227 | 4.9 | 235 | 7.7 |
| >0.80 | 239 | 5.1 | 219 | 4.7 | 241 | 5.4 |
| p value | 0.02 | | 0.20 | | 0.09 | |
| Waist circumference (cm) | | | | | | |
| ≤70 | 176 | 3.6 | 174 | 3.6 | 195 | 4.0 |
| >70 to ≤78 | 195 | 3.6 | 209 | 4.0 | 208 | 4.5 |
| >78 to ≤87 | 227 | 5.3 | 223 | 5.0 | 247 | 5.7 |
| >87 | 261 | 5.7 | 246 | 5.3 | 244 | 5.2 |
| p value | <0.01 | | <0.01 | | <0.01 | |

* SD, standard deviation.
† p value testing from analysis of variance on transformed data that were then untransformed.
‡ Determined using dual energy x-ray absorptiometry instrumentation.

88 pre- and postmenopausal women. They found that the metabolic clearance rates for smokers were lower for androstenedione, testosterone, estrone, and estradiol when compared with those of nonsmokers. However, following adjustment for weight, these differences disappeared with the exception of androstenedione. Khaw et al. (15) examined the relation between smoking and endogenous sex hormone levels in 233 White, postmenopausal women aged 60–79 years. Current cigarette use was positively associated with concentrations of the adrenal androgens, dehydroepiandrosterone sulfate, and androstenedione. However, mean concentrations of estrone, estradiol, sex hormone

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002985

TABLE 5.   Longitudinal models of testosterone concentrations (pg/ml) considering all participants (panel A), participants less than the 95th percentile of body mass index (panel B), and participants less than the 95th percentile of testosterone (panel C), Michigan Bone Health Study

| | All participants (panel A) | | | <95th percentile body mass index (panel B) | | | <95th percentile testosterone (panel C) | | |
|---|---|---|---|---|---|---|---|---|---|
| | β | SE* (β) | p value† | β | SE (β) | p value† | β | SE (β) | p value† |
| Random intercept‡ | 10 | 1 | <0.01 | 9 | 1 | <0.01 | 10 | 1 | <0.01 |
| Participation year | | | | | | | | | |
| 1992–1993§ | | | | | | | | | |
| 1993–1994 | −1 | 1 | 0.94 | 1 | 1 | 0.53 | 1 | 1 | 0.08 |
| 1994–1995 | 1 | 1 | 0.11 | 1 | 1 | 0.04 | 1 | 1 | <0.01 |
| Baseline smoking | | | | | | | | | |
| No§ | | | | | | | | | |
| Yes | 2 | 1 | <0.01 | 2 | 1 | <0.01 | 2 | 1 | <0.01 |
| Body mass index (kg/m²) | 1 | 1 | <0.01 | 1 | 1 | <0.01 | 1 | 1 | <0.01 |
| Reproductive status | | | | | | | | | |
| No surgery§ | | | | | | | | | |
| Hysterectomy only | 1 | 1 | 0.12 | 1 | 1 | 0.11 | 1 | 1 | 0.09 |
| Hysterectomy and double oophorectomy | −2 | 1 | <0.01 | −2 | 1 | <0.01 | −2 | 1 | <0.01 |

* SE, standard error.
† p value for individual level of fixed effect.
‡ Based on square-root transform (i.e., if transformed, β = 9.86 is 97.23).
§ Referent group.

binding globulin, and testosterone did not differ significantly between smokers and nonsmokers. Thomas et al. (16) compared estradiol, as well as androgen and salivary progesterone, concentrations in 25 normal premenopausal smokers and 21 nonsmokers measured in a single menstrual cycle. They found no significant differences in plasma testosterone, androstenedione, and dehydroepiandrosterone concentrations.

A possible explanation for the inconsistency between our findings and those of other studies is the choice of populations to study. The Michigan Bone Health Study subjects are largely premenopausal while the other studies focused primarily on postmenopausal women or a combination of pre- and postmenopausal participants. In premenopausal women, testosterone is produced in the ovaries and adrenals, while in postmenopausal women, testosterone is produced by the adrenals and the peripheral conversion of androstenedione in adipose tissue.

We speculate that the greater concentrations of testosterone observed among current smokers were more likely a product of decreased metabolism rather than increased biosynthesis of the hormone. Longcope and Johnston (14) provide evidence to support this theory. Cytochrome P-450 hydroxylases are responsible for the oxidative metabolism of steroid hormones in general. These enzymes mediate the introduction of an oxygen atom (derived from water or molecular oxygen) into the steroid nucleus. P-450 hydroxylases are subject to inhibition by carbon monoxide. Smokers have greater circulating carbon monoxide concentrations as a by-product of tobacco smoke. This may inhibit P-450 hydroxylases and explain the increased concentrations of testosterone and its precursors. Thus, future studies of androgen and smoking in women need to consider products in the androgen pathway as well as the availability of bioactive testosterone, concentrations of sex hormone binding globulin, and receptor binding.

Alcohol consumption was not associated with testosterone concentrations in this study, and findings are inconsistent in other studies. For example, Cigolini et al. (17) observed that daily alcohol intake was positively and independently correlated with plasma-free and total testosterone in 87 light-to-moderate drinking premenopausal women, while Gavaler and VanThiel (18) identified increased metabolism of testosterone. One likely explanation for the contrast in findings may be related to the amount and frequency of alcohol consumption. Eighty percent of our population reported drinking ≤1 drink per week, while other study populations consumed alcohol daily or in much larger quantities (4–5 drinks per week).

Testosterone concentrations did not change with the level of physical activity in our study participants, but most studies that have examined the relation between testosterone and physical activity in women have focused on female athletes or on acute changes in testosterone following heavy exercise (19–21).

**Reproductive factors**

We found that users of oral contraceptives and hormone replacement therapy had significantly lower testosterone concentrations when compared with nonusers, although hormone use was not included in the longitudinal summary models, because women with hysterectomy/oophorectomy were more likely to be using hormones leading to colinearity in the models. Our findings are consistent with those of other studies that have examined exogenous hormone use and androgen levels (22–25).

Study participants with hysterectomy/oophorectomy had significantly lower testosterone levels when compared with

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002986

women who had neither procedure. Few studies have examined the relation between hysterectomy and testosterone levels, and none have made the distinction between hysterectomy with and without bilateral oophorectomy. There are two general metabolic pathways by which testosterone is produced, one via the ovary and the other via the adrenals. In the follicular tissue of the ovary and the adrenal cortex, the $\Delta^4$ and $\Delta^5$ pathways produce testosterone from progesterone and pregnenolone. Pregnenolone appears to be a more efficient precursor of testosterone than progesterone in ovaries without corpus luteum. Women with oophorectomy have decreased levels of testosterone because production relies primarily on the adrenal cortex and peripheral conversion of androstenedione (3). In a recent paper (26), it was argued that lower testosterone levels in women with hysterectomy are a key risk factor for cardiovascular risk and that "removal of the uterus compromises the function of the ovaries even when they are spared" (26, p. 829). In our study, hysterectomy with ovarian conservation was associated with significantly higher testosterone concentrations when compared with those of other participants.

### Body composition and body topology variables

Body mass index, waist/hip ratio, and percent body fat were all positively associated with testosterone concentrations. Of the studies that have focused on the anthropometric predictors of androgen concentrations in women, one found a positive relation (27) and two found no relation after adjustment for other factors (17, 28). Increases in lean body mass were also reported to be associated with higher testosterone levels in a previous paper from this study (29).

It has long been appreciated that a subset of women with significantly higher androgen concentrations was more likely to be obese. Androgen metabolism is accelerated in obese individuals and is associated with lower sex hormone binding globulin levels, but it is not known whether increased clearance precedes or follows accelerated production of androgen (30). We evaluated whether the observed association of body composition measures and testosterone concentrations was being unduly influenced by a small group of women with hyperandrogenism (and its accompanying obesity). We reconstructed the data set to remove the contribution of those women whose total testosterone level was in the top 5 percent of the androgen distribution. Even in their absence, we still observed significant associations with body composition and smoking behavior. Likewise, because polycystic ovary syndrome is associated with obesity, we reconstructed the data set to remove the contribution of those women in the top 5 percent of the body mass index distribution. The same variables remained statistically important. This suggests that the findings of smoking, body composition, and reproductive status are not the reflection of undue influence by a subgroup of women in the population with subclinical or undiagnosed polycystic ovary syndrome.

This is one of the first papers to describe the correlates of testosterone concentrations in women and the only one that focuses largely on pre- and perimenopausal women. However, the measures are of total testosterone rather than free, bioavailable testosterone. In addition, there are other limitations in our study design. Although our sample size was large enough to detect significant differences in mean testosterone in most situations, we were unable to contrast differences between postmenopausal women and the other groups because of the small number of postmenopausal participants. In addition, a 3-year follow-up of these individuals is insufficient to assess changes in testosterone over time and with age.

In summary, past research efforts have focused primarily on the relation between estrogen and disease in women and have largely ignored testosterone in relation to health and disease states in women with the exception of a few disorders. The greater circulating levels of testosterone with obese women and smokers suggest that testosterone may be an important contribution to those disease conditions where obesity and smoking are risk factors, including cardiovascular disease.

### ACKNOWLEDGMENTS

This research was funded by grant AR R01-40888 from the National Institutes of Health, National Institute of Arthritis, Musculoskeletal, and Skin Diseases.

The authors thank Mary Crutchfield of the Michigan Bone Health Study and Dr. Stanley Korneman for their respective contributions.

### REFERENCES

1. Fauser BC, Van Heusden AM. Manipulation of human ovarian function: physiological concepts and clinical consequences. Endocr Rev 1997;18:71–106.
2. Speroff L, Glass RH, Kase NG. Clinical gynecologic endocrinology and infertility. 5th ed. Baltimore, MD: Williams and Wilkins, 1994:457–515.
3. Norman AW, Litwack G. Hormones. 2nd ed. San Diego, CA: Academic Press, 1997:9–86.
4. Zeleniuch-Jacquotte A, Bruning PF, Bonfrer JMG, et al. Relation of serum levels of testosterone and dehydroepiandrosterone sulfate to risk of breast cancer in postmenopausal women. Am J Epidemiol 1997;145:1030–8.
5. Andersson B, Marin P, Lissner L, et al. Testosterone concentrations in women and men with NIDDM. Diabetes Care 1994; 17:405–11.
6. Haffner SM. Sex hormone-binding protein, hyperinsulinemia, insulin resistance and noninsulin-dependent diabetes. Horm Res 1996;45:233–7.
7. Sowers MF, Hochberg M, Crabbe JP, et al. Association of bone mineral density and sex hormone levels with osteoarthritis of the hand and knee in premenopausal women. Am J Epidemiol 1996;143:38–47.
8. Ben-Aryeth H, Abu-Nassar A, Laufer D, et al. Salivary testosterone levels in men and women: changes with age and correlation with plasma testosterone. Isr J Med Sci 1989;25:344–6.
9. Dai WS, Kuller LH, LaPorte RE, et al. The epidemiology of plasma testosterone levels in middle-aged men. Am J Epidemiol 1981;114:804–16.
10. Zmuda JM, Cauley JA, Kriska A, et al. Longitudinal relation between endogenous testosterone and cardiovascular disease risk factors in middle-aged men: a 13-year follow-up of former

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002987

Multiple Risk Factor Intervention Trial participants. Am J Epidemiol 1997;146:609–17.

11. Sowers MF, Crutchfield M, Bandekar R, et al. Bone mineral density and its change in pre- and perimenopausal white women: the Michigan Bone Health Study. J Bone Miner Res 1998;13:1134–40.

12. Sallis JF, Haskell WL, Wood PD, et al. Physical activity assessment methodology in the Five-City Project. Am J Epidemiol 1985;121:91–106.

13. Block G, Hartman AM, Dresser CM, et al. A data-based approach to diet questionnaire design and testing. Am J Epidemiol 1986;124:453–69.

14. Longcope C, Johnston CC Jr. Androgen and estrogen dynamics in pre- and postmenopausal women: a comparison between smokers and nonsmokers. J Clin Endocrinol Metab 1988;67:379–83.

15. Khaw KT, Tazuke S, Barrett-Conner E. Cigarette smoking and levels of adrenal androgens in postmenopausal women. N Engl J Med 1988;318:1705–9.

16. Thomas EJ, Edridge W, Weddell A, et al. The impact of cigarette smoking on the plasma concentrations of gonadotrophins, ovarian steroids and androgens and upon the metabolism of oestrogens in the human female. Hum Reprod 1993;8:1187–93.

17. Cigolini M, Targher G, Bergamo-Andreis IA, et al. Moderate alcohol consumption and its relation to visceral fat and plasma androgens in healthy women. Int J Obes Relat Metab Disord 1996;20:206–12.

18. Gavaler JS, VanThiel DH. The association between moderate alcohol beverage consumption and serum estradiol and testosterone levels in normal postmenopausal women: relationship to the literature. Alcohol Clin Exp Res 1992;16:87–92.

19. Tsai L, Johansson C, Pousette A, et al. Cortisol and androgen concentrations in female and male elite endurance athletes in relation to physical activity. Eur J Appl Physiol 1991;63:308–11.

20. Cumming DC, Wall SR, Quinney HA, et al. Decrease in serum testosterone levels with maximal intensity swimming exercise in trained male and female swimmers. Endocr Res 1987;13:31–41.

21. Keizer H, Janssen GM, Menheere P, et al. Changes in basal plasma testosterone, cortisol, and dehydroepiandrosterone sulfate in previously untrained males and females preparing for a marathon. Int J Sports Med 1989;10(suppl):S139–45.

22. Moutos D, Smith S, Zacur H. The effect of monophasic combinations of ethinyl estradiol and norethindrone on gonadotrophins, androgens and sex hormone binding globulin: a randomized trial. Contraception 1995;52:105–9.

23. Coenen CM, Thomas CM, Borm GF, et al. Changes in androgens during treatment with four low-dose contraceptives. Contraception 1996;53:171–6.

24. Kuhnz W, Staks T, Jutting G. Pharmacokinetics of levonorgestrel and ethinyl estradiol in 14 women during three months of treatment with a tri-step combination oral contraceptive; serum protein binding of levonorgestrel and influence of treatment on free and total testosterone levels in the serum. Contraception 1994;50:563–79.

25. Tazuke S, Khaw KT, Barrett-Conner E, et al. Exogenous estrogen and endogenous sex hormones. Medicine (Baltimore) 1992;71:44–51.

26. Rako S. Testosterone deficiency: a key factor in the increased cardiovascular risk to women following hysterectomy or with natural aging? J Womens Health 1998;7:825–9.

27. Cauley JA, Gutai JP, Kuller KH, et al. The epidemiology of serum sex hormones in postmenopausal women. Am J Epidemiol 1989;129:1120–31.

28. Goodman-Gruen D, Barrett-Connor E. Total but not bioavailable testosterone is a predictor of central adiposity in postmenopausal women. Int J Obes Relat Metab Disord 1995;19:293–8.

29. Sowers MF, Crutchfield M, Jannausch ML, et al. Longitudinal changes in women approaching the midlife. Ann Hum Biol 1996;23:253–65.

30. Conway GS. Polycystic ovary syndrome: clinical aspects. Baillieres Clin Endocrinol Metab 1996;10:263–79.

Downloaded from http://aje.oxfordjournals.org/ at uspto on August 13, 2012

QUESTMS-00002988

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 12946785 | CAULFIELD ET AL. |
| | Examiner | Art Unit |
| | MARCELA M CORDERO GARCIA | 1654 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| none | none | 6/10/2011 | MMCG |

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| STN search by STIC (available via SCORE / PAIR) | 5/17/2011 | MMCG |
| EAST search (attached) | 6/10/2011 | MMCG |
| also ran PALM Inventor search | 6/10/2011 | MMCG |
| EAST search (attached) | 7/20 & 8/13/2012 | MMCG |
| also updated PALM Inventor | 8/13/2012 | MMCG |

### INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| EAST search | attached | 8/13/2012 | MMCG |

| | |
|---|---|
| | |

QUESTMS-00002989

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | PATENT NUMBER | GROUP ART UNIT | FILE WRAPPER LOCATION |
|---|---|---|---|
| 12/946,785 | | 1654 | PLRC |



# Correspondence Address/Fee Address Change

**The following fields have been set to Customer Number 23524 on 09/06/2012**
- **Correspondence Address**

**The address of record for Customer Number 23524 is:**

23524
FOLEY & LARDNER LLP
150 EAST GILMAN STREET
P.O. BOX 1497
MADISON, WI 53701-1497

PART 1 - ATTORNEY/APPLICANT COPY
page 1 of 1

QUESTMS-00002990

Atty. Dkt. No. 034827-9107

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:        Michael P. CAULFIELD et al.

Title:             DETERMINATION OF TESTOSTERONE BY MASS
                   SPECTROMETRY

Appl. No.:         12/946,785

Filing Date:       11/15/2010

Examiner:          Marcela M. CORDERO GARCIA

Art Unit:          1654

Confirmation No.   1630

### AMENDMENT AND REPLY UNDER 37 C.F.R. § 1.111

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

    This communication is responsive to the Non-Final Office Action dated August 15, 2012, concerning the above-referenced patent application.  Submitted herewith is a Terminal Disclaimer.

    **Amendments to the Claims** are reflected on the Listing of Claims which begins on page 2.

    **Remarks** begin on page 6.

    Please amend the application as follows:

-1-

QUESTMS-00002991

Atty. Dkt. No. 034827-9107

## AMENDMENTS TO THE CLAIMS

**Listing of Claims:**

1. - 12.  (Canceled).

13.     (Previously Presented) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

> (a) purifying testosterone from a sample from a female human, wherein said purifying comprises extracting testosterone from said sample;

> (b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

> (c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

> wherein said testosterone is not derivatized prior to mass spectrometry, and wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample.

14. - 15.  (Canceled).

16.     (Previously Presented) The method of claim 13, wherein said extracting comprises subjecting said sample to solid phase extraction (SPE).

17.     (Previously Presented) The method of claim 13, wherein said extracting comprises subjecting said sample to high turbulence liquid chromatography (HTLC).

18.     (Previously Presented) The method of claim 13, wherein said extracting comprises subjecting said sample to liquid extraction.

-2-

QUESTMS-00002992

Atty. Dkt. No. 034827-9107

19.     (Previously Presented) The method of claim 13, wherein purifying testosterone further comprises purifying testosterone from said sample by chromatography.

20.     (Previously Presented) The method of claim 19, wherein said chromatography comprises liquid chromatography.

21.     (Previously Presented) The method of claim 19, wherein said chromatography comprises high performance liquid chromatography (HPLC).

22.     (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the sample.

23.     (Previously Presented) The method of claim 13, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the sample.

24.     (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of $289.1 \pm 0.5$.

25.     (Previously Presented) The method of claim 13, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of $109.2 \pm 0.5$ and $96.9 \pm 0.5$.

26.     (Previously Presented) The method of claim 13, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about $289.1 \pm 0.5$;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of $109.2 \pm 0.5$, and $96.9 \pm 0.5$.

-3-

QUESTMS-00002993

Atty. Dkt. No. 034827-9107

27.     (Previously Presented) The method of claim 13, wherein said sample comprises urine, blood, plasma, or serum from a female human.

28.     (Previously Presented) The method of claim 13, wherein said sample comprises blood, plasma, or serum from a female human.

29.     (Previously Presented) A method for determining the amount of testosterone in a sample when taken from a female human, comprising:

(a) purifying testosterone from a sample from a female human by extracting testosterone from said sample by high turbulence liquid chromatography (HTLC) and subjecting the extracted testosterone to high performance liquid chromatography (HPLC);

(b) ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer; and

(c) detecting the amount of one or more of the testosterone ion(s) by a mass spectrometer, wherein the amount of one or more of the testosterone ion(s) is related to the amount of testosterone in the sample;

wherein the method is capable of detecting testosterone at concentrations of less than 10 ng/dL in the test sample.

30.     (Previously Presented) The method of claim 29, wherein said testosterone is not derivatized prior to mass spectrometry.

31. - 33.  (Canceled).

34.     (Currently Amended) The method of claim [[31]] 29, wherein said extracting further comprises subjecting said sample to liquid extraction.

35.  (Canceled).

-4-

QUESTMS-00002994

Atty. Dkt. No. 034827-9107

36.     (Previously Presented) The method of claim 29, wherein the ionizing of step (b) comprises producing a testosterone ion having a mass/charge ratio of 289.1 ± 0.5.

37.     (Previously Presented) The method of claim 29, wherein the ionizing of step (b) comprises producing one or more testosterone fragment ions having a mass/charge ratio selected from the group consisting of 109.2 ± 0.5 and 96.9 ± 0.5.

38.     (Previously Presented) The method of claim 29, wherein the ionizing of step (c) comprises:

producing a testosterone precursor ion having a mass/charge ratio (m/z) of about 289.1 ± 0.5;

isolating the precursor ion by mass spectrometry; and

effecting a collision between the isolated precursor ion and an inert collision gas to produce one or more testosterone ions detectable by mass spectrometry having m/z selected from the group consisting of 109.2 ± 0.5, and 96.9 ± 0.5.

39.     (Previously Presented) The method of claim 29, wherein said sample comprises urine, blood, plasma, or serum from a female human.

40.     (Previously Presented) The method of claim 29, wherein said sample comprises blood, plasma, or serum from a female human.

41.     (Currently Amended) The method of claim [[31]] 29, wherein the method is capable of detecting testosterone at concentrations of less than 5 ng/dL in the sample.

42.     (Currently Amended) The method of claim [[31]] 29, wherein the method is capable of detecting testosterone at concentrations of less than 1 ng/dL in the sample.

QUESTMS-00002995

Atty. Dkt. No. 034827-9107

## <u>REMARKS</u>

The Applicants thank the Examiner for the examination to date and respectfully request reconsideration of the present application.

Clams 34 and 41-42 are amended to make minor clerical changes. No new matter is introduced. Claims 13, 16-30, 34, and 36-42 are currently pending to be examined on their merits.

The only remaining rejections are that the Office has provisionally rejected claims 13, 16-30, 34, 36-42 on the ground of non-statutory obviousness-type double patenting as being unpatentable over claims 1-5, 7-11, 13-14 of co-pending Application No. 12/607,905 in view of Sowers et al., *American Journal of Epidemiology,* 2001 ("Sowers"); and claims 13, 16-30, 34, 36-42 over claims 13-39 of co-pending Application No. 13/118,180 in view of Sowers.

Without acquiescing to the merits of the rejections, the Applicants respectfully submit that the Terminal Disclaimer submitted herewith should now render moot the rejections.

The Applicants believe that the present application is now in condition for allowance.

The Applicants respectfully request that the Office contact the undersigned if there is any issue preventing the next communication from the Office from being a Notice of Allowance.

-6-

QUESTMS-00002996

Atty. Dkt. No. 034827-9107

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.

Respectfully submitted,

Date November 2, 2012                          By /Joseph P. Meara/

FOLEY & LARDNER LLP                            Joseph P. Meara
Customer Number: 23524                         Attorney for the Applicants
Telephone:     (608) 258-4303                  Registration No. 44,932
Facsimile:     (608) 258-4258

-7-

4832-9738-9840.1

QUESTMS-00002997

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 12946785 |
| **Filing Date:** | 15-Nov-2010 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Joseph P. Meara/Nancy Kloster |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

QUESTMS-00002998

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Statutory or terminal disclaimer | 1814 | 1 | 160 | 160 |
| **Total in USD ($)** | | | | **160** |

QUESTMS-00002999

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 14132869 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 23524 |
| **Filer:** | Joseph P. Meara/Nancy Kloster |
| **Filer Authorized By:** | Joseph P. Meara |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 02-NOV-2012 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 12:33:13 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $160 |
| RAM confirmation Number | 9450 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00003000

| 1 | Terminal Disclaimer Filed | 9107TerminalDisclaimer.pdf | 104037 <br><br> 321af7a0848ca6a0da5d6e66be0f7d78b41 b54c6 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | | 9107AmendmentandReply.pdf | 118578 <br><br> 22467df5230dde994c7a6794b29bb4a2294 22bcf | yes | 7 |
|---|---|---|---|---|---|

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|

| Document Description | Start | End |
|---|---|---|
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 5 |
| Applicant Arguments/Remarks Made in an Amendment | 6 | 7 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30382 <br><br> 339be575d1b1309c64f9fcf36508669db51a 0b46 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | | 252997 |
|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00003001

PTO/SB/25 (07-09)
Approved for use through 07/31/2012, OMB 0551-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TERMINAL DISCLAIMER

Docket Number (Optional)
034827-9107

In re Application of: CAULFIELD et al.

Application No.: 12/946,785

Filed: 11/15/2010

For: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

The owner, QUEST DIAGNOSTICS INVESTMENTS INCORPORATED, of 100 percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of any patent granted on **co-pending U.S. Patent Applications Nos. 12/607,905 and 13/118,180,** filed 10/28/09 and 5/27/11, respectively, as such term is defined in 35 U.S.C. 154 and 173, and as the term of any patent granted on said co-pending applications may be shortened by any terminal disclaimer filed prior to the grant of any patent on said co-pending applications. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and any patent granted on said co-pending applications are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of any patent granted on said co-pending applications, as the term of any patent granted on said co-pending applications may be shortened by any terminal disclaimer filed prior to the grant of any patent on said co-pending application, in the event that any such patent granted on said co-pending applications: expires for failure to pay a maintenance fee; is held unenforceable; is found invalid by a court of competent jurisdiction; is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321; has all claims canceled by a reexamination certificate; is reissued, or is in any manner terminated prior to the expiration of its full statutory term as shortened by any terminal disclaimer filed prior to its grant.

Check either box 1 or **2 below,** if appropriate.

1. ☐   For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. ☒ The undersigned is an attorney or agent of record. Reg. No. 44,932

/Joseph P. Meara/                                    November 2, 2012
_____        _____
Signature                                                 Date

_____
Joseph P. Meara
Typed or printed name

(608) 258-4303
_____
Telephone Number

**Terminal disclaimer fee under 37 CFR 1.20(d) is included.**

WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

QUESTMS-00003002

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD Substitute for Form PTO-875 | Application or Docket Number 12/946,785 | Filing Date 11/15/2010 | ☐ To be Mailed |
|---|---|---|---|

### APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | SMALL ENTITY ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | OR | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | |

### APPLICATION AS AMENDED – PART II

| | | (Column 1) | | (Column 2) | (Column 3) | | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT | **11/02/2012** | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 24 | Minus | ** 27 | = 0 | | X $ = | | OR X $62= | 0 |
| | Independent (37 CFR 1.16(h)) | * 2 | Minus | ***3 | = 0 | | X $ = | | X $250= | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | OR | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | | (Column 2) | (Column 3) | | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | | | | |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | | X $ = | | OR X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | | X $ = | | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | OR | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | | TOTAL ADD'L FEE | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/ERIC DAVIS/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

QUESTMS-00003003

| *Application Number* | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 12/946,785 | CAULFIELD ET AL. |
| | | |

| **Document Code - DISQ** | **Internal Document – DO NOT MAIL** |
|---|---|

| **TERMINAL DISCLAIMER** | ☒ APPROVED | ☐ DISAPPROVED |
|---|---|---|
| **Date Filed : 11/02/12** | **This patent is subject to a Terminal Disclaimer** | |

**Approved/Disapproved by:**

Angie Walker

U.S. Patent and Trademark Office

QUESTMS-00003004



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 23524 | 7590 | 11/30/2012 |
|---|---|---|

FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

DATE MAILED: 11/30/2012

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

TITLE OF INVENTION: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1770 | $300 | $0 | $2070 | 02/28/2013 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

QUESTMS-00003005

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>   **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or <u>Fax</u>   (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

```
23524        7590        11/30/2012
FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109
```

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

TITLE OF INVENTION: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1770 | $300 | $0 | $2070 | 02/28/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CORDERO GARCIA, MARCELA M | 1654 | 436-071000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a. The following fee(s) are submitted:**
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.   ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____   Date _____

Typed or printed name _____   Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

QUESTMS-00003006



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

23524        7590        11/30/2012

FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

| EXAMINER |
|---|
| CORDERO GARCIA, MARCELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1654 | |

DATE MAILED: 11/30/2012

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 0 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 0 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

QUESTMS-00003007

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 12/946,785 | CAULFIELD ET AL. | |
| | Examiner | Art Unit | |
| | MARCELA M. CORDERO GARCIA | 1654 | |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to <u>11/2/2012</u>.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are <u>13,16-30,34 and 36-42</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see <u>http://www.uspto.gov/patents/init_events/pph/index.jsp</u> or send an inquiry to <u>PPHfeedback@uspto.gov</u>.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☒ Examiner's Amendment/Comment

6. ☐ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____ .

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

Application/Control Number: 12/946,785                                    Page 2
Art Unit: 1654

## DETAILED ACTION

This Office Action is in response to the reply received on April 15, 2005.

Any rejection from the previous office action, which is not restated here, is

withdrawn.

### *Status of the claims*

Claims 13, 16-30, 34, 36-42 are pending. Claims 13, 16-30, 34, 36-42 are

presented for examination on the merits.

### *Terminal Disclaimer*

The terminal disclaimer filed on 11/2/2012 has been reviewed and accepted.

### *Conclusion*

Claims 13, 16-30, 34, 36-42 are allowed.

The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MARCELA M. CORDERO GARCIA whose telephone

number is (571)272-2939.  The examiner can normally be reached on M-F 8:30-5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Cecilia J. Tsang can be reached on (571) 272-0562.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

QUESTMS-00003010

Application/Control Number: 12/946,785                                         Page 3
Art Unit: 1654

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MARCELA M CORDERO GARCIA/
Primary Examiner, Art Unit 1654

MMCG 11/2012

EAST Search History

## EAST Search History

### EAST Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|-------|------|--------------|-----|------------------|---------|------------|
| L1 | 26 | "6977143" | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | ADJ | ON | 2012/11/16 16:00 |
| L2 | 21 | testosterone same (spectrometer or spectrometry) same ng | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | ADJ | ON | 2012/11/16 16:16 |
| L3 | 1 | testosterone same (spectrometer or spectrometry) same ng.clm. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | ADJ | ON | 2012/11/16 16:16 |

### EAST Search History (Interference)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|-------|------|--------------|-----|------------------|---------|------------|
| L4 | 6 | testosterone same (spectrometer or spectrometry) same ng | USPAT; UPAD | ADJ | ON | 2012/11/16 16:17 |
| L5 | 1 | testosterone same (spectrometer or spectrometry) same ng.clm. | USPAT; UPAD | ADJ | ON | 2012/11/16 16:17 |

**11/16/2012 4:17:55 PM**

QUESTMS-00003012

| **Issue Classification** | **Application/Control No.** | **Applicant(s)/Patent Under Reexamination** |
|---|---|---|
| | 12946785 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** |
| | MARCELA M CORDERO GARCIA | 1654 |

| ORIGINAL | | INTERNATIONAL CLASSIFICATION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLAIMED | | | | | | NON-CLAIMED | | | |
| 436 | 71 | G | 0 | 1 | N | 33 / 92 (2006.01.01) | | | | | |
| **CROSS REFERENCE(S)** | | | | | | | | | | | |
| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| ☒ Claims renumbered in the same order as presented by applicant | | | | ☐ CPA | | ☒ T.D. | | ☐ R.1.47 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** | |
|---|---|---|---|
| | | 24 | |
| (Assistant Examiner) | (Date) | | |
| /MARCELA M CORDERO GARCIA/ Primary Examiner.Art Unit 1654 | 11/16/2012 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | none |

QUESTMS-00003013

| Search Notes | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| [barcode] | 12946785 | CAULFIELD ET AL. |
| | **Examiner** | **Art Unit** |
| | MARCELA M CORDERO GARCIA | 1654 |

| SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| none | none | 6/10/2011 | MMCG |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| STN search by STIC (available via SCORE / PAIR) | 5/17/2011 | MMCG |
| EAST search (attached) | 6/10/2011 | MMCG |
| also ran PALM Inventor search | 6/10/2011 | MMCG |
| EAST search (attached) | 7/20 & 8/13/2012 | MMCG |
| also updated PALM Inventor | 8/13/2012 | MMCG |
| EAST updated (attached) | 11/16/2012 | MMCG |
| also ran PALM Inventor search | 11/16/2012 | MMCG |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| EAST search | attached | 8/13/2012 | MMCG |
| EAST search | attached | 11/16/2012 | MMCG |

| | |
|---|---|
| | |

QUESTMS-00003014



**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 1630**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | 514 | 1654 | 034827-9107 |
| | RULE | | | |

**APPLICANTS**
Michael P. Caulfield, San Clemente, CA;
Darren A. Carns, Rancho Santa Margarita, CA;
Richard E. Reitz, San Clemente, CA;

**\*\* CONTINUING DATA \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
This application is a CON of 12/607,905 10/28/2009 PAT 8,318,418
which is a CON of 12/053,325 03/21/2008 PAT 7,754,419
which is a CON of 11/247,409 10/11/2005 PAT 7,348,137
which is a CON of 10/726,919 12/02/2003 PAT 6,977,143
which claims benefit of 60/501,255 09/08/2003

**\*\* FOREIGN APPLICATIONS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\* IF REQUIRED, FOREIGN FILING LICENSE GRANTED \*\***
11/29/2010

| Foreign Priority claimed ☐ Yes ☑ No | ☐ Met after Allowance | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ☐ Yes ☐ No | | CA | 0 | 16 | 1 |
| Verified and Acknowledged  /MARCELA M CORDERO GARCIA/ Examiner's Signature    Initials | | | | | |

**ADDRESS**

FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109
UNITED STATES

**TITLE**

DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

| FILING FEE RECEIVED 1510 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

BIB (Rev. 05/07).

QUESTMS-00003015

Atty. Dkt. No. 034827-9107

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:    Michael P. CAULFIELD et al.

Title:    DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

Appl. No.:    12/946,785

Filing Date:    11/15/2010

Examiner:    Marcela M. CODERO GARCIA

Art Unit:    1654

Conf. No:    1630

### ISSUE FEE TRANSMITTAL

Mail Stop Issue Fee
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

    Enclosed herewith please find Issue Fee Transmittal Form PTOL-85(B).

    Fees in the amount of $2,070.00 for payment of the Issue Fee and the Publication Fee are being paid by credit card via EFS-Web.

    The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

Respectfully submitted,

Date  February 27, 2013        By  /Bruce Wu/

FOLEY & LARDNER LLP           Bruce Wu
Customer Number: 23524          Attorney for the Applicants
Telephone:    (617) 342-4089        Registration No. L0571
Facsimile:    (617) 342-4001

QUESTMS-00003016

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**or Fax** (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

23524     7590     11/30/2012

FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 11/15/2010 | Michael P. Caulfield | 034827-9107 | 1630 |

TITLE OF INVENTION: DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1770 | $300 | $0 | $2070 | 02/28/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CORDERO GARCIA, MARCELA M | 1654 | 436-071000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 Foley & Lardner LLP

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Quest Diagnostics Investments Incorporated

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Wilmington, Delaware

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☒ Corporation or other private group entity ☐ Government

**4a. The following fee(s) are submitted:**

☒ Issue Fee

☒ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☒ Payment by credit card. Form PTO-2038 is attached. ~~XXXXXXXXXXXXXXXX~~ Via EFS-Web

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number 19-0741 ~~, and enclose an extra copy of this form.~~

**5. Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature   /Bruce Wu/                     Date   February 27, 2013

Typed or printed name   Bruce Wu                      Registration No.   L0571

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 12946785 |
| **Filing Date:** | 15-Nov-2010 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Bruce Wu/Sue Gibson |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1770 | 1770 |
| Publ. Fee- early, voluntary, or normal | 1504 | 1 | 300 | 300 |

QUESTMS-00003018

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **2070** |

QUESTMS-00003019

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 15064634 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 23524 |
| **Filer:** | Bruce Wu/Sue Gibson |
| **Filer Authorized By:** | Bruce Wu |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 27-FEB-2013 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 14:39:50 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 2070 |
| RAM confirmation Number | 1247 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00003020

| 1 | Issue Fee Payment (PTO-85B) | Quest9107IssueFeeTransmittal22713.pdf | 178509 | no | 2 |
| | | | 7e8370d89b4c614dd99196707747eb0400552f9a | | |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 32135 | no | 2 |
| | | | fadb3a3b280ec2057517e9b36230f0958e929497 | | |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 210644 |

---

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00003021

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/946,785 | 04/02/2013 | 8409862 | 034827-9107 | 1630 |

23524          7590          03/13/2013
FOLEY & LARDNER LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 0 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Michael P. Caulfield, San Clemente, CA;
Darren A. Carns, Rancho Santa Margarita, CA;
Richard E. Reitz, San Clemente, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit <u>SelectUSA.gov</u>.

IR103 (Rev. 10/09)

QUESTMS-00003022

Atty. Dkt. No. 034827-9107

### *IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

Applicants:     Michael P. CAULFIELD et al.

Title:          DETERMINATION OF
                TESTOSTERONE BY MASS
                SPECTROMETRY

Patent. No.:    8,409,862

Issue Date:     4/2/2013

Examiner:       Marcela M. CODERO GARCIA

Art Unit:       1654

Confirmation    1630
Number:

### REQUEST FOR CERTIFICATE OF CORRECTION
### PURSUANT TO 37 C.F.R. § 1.323

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Enclosed, in duplicate, is a Certificate of Correction, Form PTO-SB/44, for United States Patent Number 8,409,862 issued April 2, 2013.

It is certified that errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

### IN THE CLAIMS

The exact claim and line number where the errors in the issued patent are:

QUESTMS-00003023

Atty. Dkt. No. 034827-9107

**Claim 12, Column 20, line 27**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 13, Column 20, line 38**

Delete "a" and insert -- said --, therefor.

**Claim 14, Column 20, line 40**

Delete "a" and insert -- said --, therefor.

**Claim 20, Column 21, line 2**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 21, Column 22, line 2**

Delete "a" and insert -- said --, therefor.

**Claim 22, Column 22, line 4**

Delete "a" and insert -- said --, therefor.

Applicants submit that the noted errors do not constitute new matter, and correction thereof would not require reexamination.

Pursuant to 37 C.F.R. §1.323, Applicants request that the enclosed Certificate of Correction be approved.

Since at least one of the noted errors is not the fault of the Patent Office, payment is enclosed of the required fee of $100.00.

The above-identified fees are being paid by credit card via EFS-Web.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

4834-5268-1749.1

QUESTMS-00003024

Atty. Dkt. No. 034827-9107

Respectfully submitted,

Date _____October 3, 2013_____        By  _/Bruce Wu/_____

FOLEY & LARDNER LLP                                    Bruce Wu
Customer Number: 23524                                 Attorney for Applicants
Telephone:      (617) 342-4089                         Registration No. L0571
Facsimile:      (617) 342-4001

4834-5268-1749.1

MODIFIED PTO/SB/44 (04-05)
Approved for use through 04/30/2007.  OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control
number.

(Also Form PTO-1050)

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.         :     8,409,862

APPLICATION NO.    :     12/946,785

DATED              :     04/02/2013

INVENTOR(S)        :     Michael P. Caulfield; Darren A Carns; Richard E Reitz

It is certified that an error appears or errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

## IN THE CLAIMS

The exact claim and line number where the errors in the issued patent are:

**Claim 12, Column 20, line 27**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 13, Column 20, line 38**

Delete "a" and insert -- said --, therefor.

**Claim 14, Column 20, line 40**

Delete "a" and insert -- said --, therefor.

**Claim 20, Column 21, line 2**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 21, Column 22, line 2**

Delete "a" and insert -- said --, therefor.

**Claim 22, Column 22, line 4**

Delete "a" and insert -- said --, therefor.

MAILING ADDRESS OF SENDER (Please do not use customer number below):

Suite 5000
150 E Gilman Street
Madison, Wisconsin  53703-1482

This collection of information is required by 37 CFR 1.322, 1.323, and 1.324. The information is required to obtain or retain a benefit by the public
which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is
estimated to take 1.0 hour to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary
depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this
burden, should be sent to the Chief Information Officer,
U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR
COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Attention Certificate of Corrections Branch, Commissioner for Patents,
P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

QUESTMS-00003026

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 12946785 |
| **Filing Date:** | 15-Nov-2010 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Filer:** | Bruce Wu/Shana Haack |
| **Attorney Docket Number:** | 034827-9107 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Certificate of Correction | 1811 | 1 | 100 | 100 |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **100** |

QUESTMS-00003028

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 17032008 |
| **Application Number:** | 12946785 |
| **International Application Number:** | |
| **Confirmation Number:** | 1630 |
| **Title of Invention:** | DETERMINATION OF TESTOSTERONE BY MASS SPECTROMETRY |
| **First Named Inventor/Applicant Name:** | Michael P. Caulfield |
| **Customer Number:** | 23524 |
| **Filer:** | Bruce Wu/Shana Haack |
| **Filer Authorized By:** | Bruce Wu |
| **Attorney Docket Number:** | 034827-9107 |
| **Receipt Date:** | 03-OCT-2013 |
| **Filing Date:** | 15-NOV-2010 |
| **Time Stamp:** | 15:08:37 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 100 |
| RAM confirmation Number | 1671 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

QUESTMS-00003029

| 1 | Request for Certificate of Correction | 9107_CertofCorrTrans.pdf | 119145<br><br>05d21a218456450a939193625d74bf143e<br>d3ac9 | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Request for Certificate of Correction | 9107_COC.pdf | 122693<br><br>1fe19fb4661aeae9b4d8978e8802ef8b9849<br>bc8a | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30170<br><br>ee73bf924f9d0f2279e8a390ea860543168d<br>451c | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | | | 272008 | | |
|---|---|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

QUESTMS-00003030

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,409,862 B2                                              Page 1 of 1
APPLICATION NO.  : 12/946785
DATED                    : April 2, 2013
INVENTOR(S)        : Michael P. Caulfield et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

### IN THE CLAIMS

**Claim 12, Column 20, line 27**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 13, Column 20, line 38**

Delete "a" and insert -- said --, therefor.

**Claim 14, Column 20, line 40**

Delete "a" and insert -- said --, therefor.

**Claim 20, Column 21, line 2**

Delete "(c)" and insert -- (b) --, therefor.

**Claim 21, Column 22, line 2**

Delete "a" and insert -- said --, therefor.

**Claim 22, Column 22, line 4**

Delete "a" and insert -- said --, therefor.

Signed and Sealed this

Fifth Day of November, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Deputy Director of the United States Patent and Trademark Office*

QUESTMS-00003031

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | PATENT NUMBER | GROUP ART UNIT | FILE WRAPPER LOCATION |
| --- | --- | --- | --- |
| 12/946,785 | 8409862 | 1654 | 9200 |

OC0000000086124798

## Correspondence Address/Fee Address Change

**The following fields have been set to Customer Number 109855 on 01/15/2014**
- **Correspondence Address**
- **Maintenance Fee Address**

**The address of record for Customer Number 109855 is:**

109855
Quest Diagnostics
1311 Calle Batido
San Clemente, CA 92673

PART 1 - ATTORNEY/APPLICANT COPY
page 1 of 1

QUESTMS-00003032

AO 120 (Rev. 08/10)

| TO: | Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _____District of Delaware_____ on the following

☐ Trademarks or ☑ Patents. ( ☐ the patent action involves 35 U.S.C. § 292.):

| DOCKET NO. | DATE FILED<br>9/17/2018 | U.S. DISTRICT COURT<br>District of Delaware |
|---|---|---|
| PLAINTIFF<br><br>QUEST DIAGNOSTICS INVESTMENTS LLC | | DEFENDANT<br><br>LABORATORY CORPORATION OF AMERICA<br>HOLDINGS, ESOTERIX, INC. and ENDOCRINE<br>SCIENCES, INC. |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 8,409,862 B2 | 4/2/2013 | Quest Diagnostics Investments LLC |
| 2 | 8,101,427 B2 | 1/24/2012 | Quest Diagnostics Investments LLC |
| 3 | 7,972,867 B2 | 7/5/2011 | Quest Diagnostics Investments LLC |
| 4 | 7,972,868 B2 | 7/5/2011 | Quest Diagnsotics Investments LLC |
| 5 | | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading | | |
|---|---|---|---|
| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

Copy 1---Upon initiation of action, mail this copy to Director    Copy 3---Upon termination of action, mail this copy to Director
Copy 2---Upon filing document adding patent(s), mail this copy to Director    Copy 4---Case file copy

QUESTMS-00003033