01:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
QUEST DIAGNOSTICS INVESTMENTS, LLC,)
                                   )
                 Plaintiff,        )
                                   ) C.A. No. 18-1436(MN)
v.                                 )
                                   )
LABORATORY CORPORATION OF AMERICA  )
HOLDINGS, et al.,                  )
                                   )
                 Defendants.       )
```

Wednesday, September 18, 2019
2:00 p.m.
Motion Hearing


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge



APPEARANCES:


           MORRIS JAMES, LLP
           BY:  KENNETH LAURENCE DORSNEY, ESQ.

            -and-

           FENWICK & WEST, LLP
           BY:  ADAM GAHTAN, ESQ.
           BY:  KEVIN X. McGANN, ESQ.
           BY:  ERIC M. MAJCHRZAK, ESQ.


                 Counsel for the Plaintiff

1

APPEARANCES CONTINUED:

2

3

4              WILSON SONSINI GOODRICH & ROSATI, P.C.
               BY:  IAN ROBERT LISTON, ESQ.
5              BY:  OLIVIA M. KIM, ESQ.
               BY:  ERIK J. CARLSON, ESQ.
6
                         Counsel for the Defendants
7

8

9

10                           - oOo -

11                  P R O C E E D I N G S

12              (REPORTER'S NOTE:  The following hearing was

13      held in open court, beginning at 1:58 p.m.)

01:48:05 14

01:48:05 15              THE COURT:  Good afternoon.  Please be seated.

01:57:56 16      Let's start with some introductions.

01:58:01 17              MR. LISTON:  Good afternoon, Your Honor.  Ian

01:58:03 18      Liston of Wilson Sonsini Goodrich & Rosati for the

01:58:07 19      defendant, LabCorp, Esterix and Endocrine Sciences.  With me

01:58:09 20      are my colleagues from the LA office, Olivia Kim and Erik

01:58:14 21      Carlson.

01:58:15 22              MS. KIM:  Good afternoon.

01:58:16 23              THE COURT:  Good afternoon.  And welcome.

01:58:18 24      Mr. Dorsney.

01:58:19 25              MR. DORSNEY:  Good afternoon, Your Honor, on

01:58:20  1    behalf of plaintiff Quest, Ken Dorsney from Morris, James.

01:58:25  2    With me at counsel table I have Adam Gahtan, Kevin McGann

01:58:29  3    and Eric Majchrzak from Fenwick & West.

01:58:32  4              THE COURT:  Good afternoon to all of you.  So

01:58:33  5    we're here today on the defendants' motion for judgment on

01:58:39  6    the pleadings in the patents, the eligibility issues.  I

01:58:46  7    have read all of the papers submitted and I think before we

01:58:56  8    jump into the arguments, I wanted to hear from the

01:59:03  9    defendants on the assignor estoppel issue because I think it

01:59:07 10    was one of the cases that you cited that suggested to me

01:59:12 11    that assignor estoppel is a subject that can apply to the

01:59:18 12    issues here and if it is, I don't have a record sufficient

01:59:21 13    for me to make a determination on that one way or the other.

01:59:25 14    So I don't see how I can address those patents.  So tell me

01:59:31 15    what your best case is or your best argument that the

01:59:35 16    assignor estoppel does not apply.

01:59:38 17              MS. KIM:  Yes, Your Honor.  Thank you.  Olivia

01:59:40 18    Kim for LabCorp.  We have the slide deck that we provided to

01:59:45 19    Your Honor.  If we could start at slide number 10.

01:59:49 20              THE COURT:  This is yours?

01:59:51 21              MS. KIM:  The blue one, Your Honor.

01:59:53 22              THE COURT:  Okay.

01:59:54 23              MS. KIM:  Sorry about that, Your Honor.  So

02:00:21 24    section 101, Your Honor, first of all, whether the assignor

02:00:27 25    estoppel should apply to section 101, we could not find any

02:00:30 1    District Court cases and the Federal Circuit has not

02:00:33 2    actually looked at the specific issue.  However, looking at

02:00:36 3    the Supreme Court case in *Bilski* and the Federal Circuit

02:00:41 4    cases after that I think are very informative.  Section 101

02:00:47 5    is a threshold question as to whether the subject matter is

02:00:54 6    even patentable, whether there is even an invention that's

02:00:58 7    patentable.

02:00:59 8         Now that is different from other questions of

02:01:02 9    patentability, the substance of conditions of patentability

02:01:06 10   which goes to novelty, obviousness and written description,

02:01:10 11   namely 102, 103 and 112.

02:01:14 12        And, Your Honor, we submit that because section

02:01:18 13   101 is a threshold question that assignor estoppel should

02:01:26 14   not apply, if you go to slide level, let's start with how

02:01:30 15   the assignor estoppel started.  In 1988 the Federal Circuit

02:01:36 16   first applied the assignor estoppel in *Diamond Scientific* to

02:01:41 17   sections 102, 103 and 112.

02:01:44 18        THE COURT:  But it was in the *Diamond* case that

02:01:47 19   I think it's on the page before this one where the court

02:01:50 20   said that the estoppel historically was applied to

02:01:56 21   invalidity challenges based on novelty, utility, patentable

02:02:00 22   invention, which is what you just said, anticipatory matter

02:02:04 23   and the state of the art.  So what about that?

02:02:07 24        MS. KIM:  Right, Your Honor.  So when they're

02:02:09 25   quoting that, they're citing to an old First Circuit case,

02:02:15  1    *Babcock v. Clarkson*, that was a First Circuit case in 1894.

02:02:19  2    So *Diamond Scientific* was quoting directly from that First

02:02:24  3    Circuit case where the term "patentable invention" was used.

02:02:27  4    But if you look at the patent cases at that time in the late

02:02:31  5    1800's, the patentable invention term was used to refer to

02:02:35  6    what we now call obviousness, which was codified later in

02:02:39  7    section 103.

02:02:41  8            And we cited some cases in one of our letter

02:02:45  9    briefs that was submitted to Your Honor, if you look at the

02:02:49 10    Supreme Court decision in 1877 called *Smith v. Godia*, that's

02:02:57 11    94 U.S. 486, when he's talking about the term patentable

02:03:00 12    invention, it's looking at the question of obviousness.

02:03:04 13            THE COURT:  Right.  So when are you suggesting

02:03:07 14    that that term changed, when?

02:03:11 15            MS. KIM:  Your Honor, I don't think the term

02:03:13 16    changed meanings.  The patent when the Supreme Court early

02:03:18 17    on was talking about patentable invention, it was looking at

02:03:21 18    the substantive conditions of patentability which goes to

02:03:25 19    102, 103 and 112.

02:03:28 20            THE COURT:  But I'm looking at a Federal Circuit

02:03:30 21    case that says patentable invention and there is a footnote

02:03:33 22    there that says oops, that meant something very different,

02:03:37 23    that meant obviousness, we're not using it to mean 101.  I'm

02:03:42 24    just looking at the word, if you are telling me that

02:03:45 25    patentable invention meant something different, when it did

02:03:48  1    it change, because when you were talking about 101, you said

02:03:51  2    it was looking at whether something was a patentable

02:03:54  3    invention.

02:03:54  4          MS. KIM:   Whether it's a legible patent -- when

02:03:57  5    you look at the *Diamond Scientific* case, it's clear that

02:04:01  6    what they were relying on there was looking at the written

02:04:04  7    description, whether it lacked novelty or obviousness.   If

02:04:09  8    you could go to slide 12, and I think we looked at the

02:04:11  9    recent decisions by the Supreme Court and the Federal

02:04:15 10    Circuit, I think it's very informative.

02:04:17 11          In *Bilski* in 2010, the Supreme Court made very

02:04:22 12    clear that section 101 is a threshold test.   And it

02:04:28 13    distinguished that threshold test from other conditions and

02:04:33 14    requirements of the patent, namely the novelty under section

02:04:37 15    102, obviousness under section 103, and written description

02:04:42 16    under 112.

02:04:43 17          After that *Bilski* decision, the Federal Circuit

02:04:46 18    emphasized that distinction in, for example, *Classen*.   In

02:04:52 19    *Classen*, the Federal Circuit stated that in *Bilski*, it

02:04:56 20    encouraged preservation of the legal and practical

02:05:01 21    distinctions between the threshold inquiry of patent

02:05:04 22    eligibility and the substantive conditions of patentability.

02:05:11 23          And further on, next slide, in slide 13, in

02:05:13 24    *Ultramercial*, the Federal Circuit even compared the

02:05:18 25    threshold question of section 101 to jurisdictional inquiry.

02:05:23 1 The Federal Circuit stated that you need to first assess

02:05:27 2 whether claim subject matter is even eligible for patent

02:05:33 3 detection before addressing questions of invalidity or

02:05:37 4 infringement.

02:05:38 5   And this makes very good sense if you're looking

02:05:42 6 at whether this subject matter in the patents is even

02:05:46 7 eligible for patents.

02:05:47 8   THE COURT:  Right.  But why doesn't the sort of

02:05:52 9 the reason for assignor estoppel apply equally to what

02:05:56 10 you're saying as it would be to whether it's anticipated or

02:05:59 11 obvious?  If you have something and you take it to the

02:06:03 12 Patent Office and you say I think this is a patentable

02:06:06 13 invention and I should get a patent on it, how can you now

02:06:09 14 later go back and say, that wasn't really eligible for a

02:06:14 15 patent?

02:06:14 16   MS. KIM:  That's a great question, Your Honor.

02:06:16 17 I think you can look back at old Supreme Court case, I think

02:06:20 18 this is what we cited in our brief, the Scott paper, where

02:06:23 19 the Supreme Court held that assignor estoppel cannot apply

02:06:27 20 to expired patents.  That makes sense because you no longer

02:06:31 21 have a patent, so obviously a double negative cannot apply.

02:06:35 22 And I think a question of section 101 is very similar to

02:06:39 23 that.  You're looking at whether you can even patent

02:06:42 24 something here, and if that question, you cannot even patent

02:06:46 25 something here, there is no patent rights.

02:06:49  1          Now, that is very different from other questions

02:06:52  2     of patentability.  If we look at slide 10 again, looking at

02:06:59  3     the other subset of conditions of patentability, you already

02:07:04  4     have a patent.  You have an -- you have something that you

02:07:09  5     could patent and you have an invention.  What you're looking

02:07:11  6     at now is okay, was there prior art out there, is it

02:07:16  7     anticipated, is it obvious, or was there a technical issue

02:07:20  8     such as, you know, writing a patent wrong or there are some

02:07:24  9     technical issues with regards to written description.  This

02:07:27 10     is a very different scenario that we're looking at.

02:07:30 11          So we think, Your Honor, that the threshold

02:07:33 12     question whether if something could be even patented, the

02:07:38 13     assignor estoppel should not apply there.

02:07:49 14                    THE COURT:  Is that it?

02:07:50 15               MS. KIM:  That's it, Your Honor.

02:07:52 16               THE COURT:  Here is what I am going to do.  I

02:07:53 17     understand -- you can go back to your seat.

02:07:55 18               MS. KIM:  Okay.

02:07:56 19               THE COURT:  I understand the decision to argue

02:08:00 20     that assignor estoppel doesn't bar, and I take your points

02:08:04 21     on that, but when you say that it's clear that it doesn't

02:08:07 22     apply to 101 argument, I don't think it's quite that clear

02:08:11 23     and there are no cases from the District Court or the

02:08:14 24     Federal Circuit that explicitly say that.  Instead I'm left

02:08:19 25     with the Federal Circuit guidance in the *Diamond* case that

02:08:23  1   the estoppel historically has applied to invalidity

02:08:27  2   challenges based on novelty, utility, patentable invention,

02:08:33  3   anticipatory matter and the state of the art.

02:08:34  4          So I'm not prepared today to say that assignor

02:08:38  5   estoppel does not apply.  And the issue of assignor estoppel

02:08:44  6   from a substantive standpoint here, there is really no

02:08:47  7   record that I can decide that issue on.  And I can't figure

02:08:53  8   out if it actually would apply here to preclude the

02:08:57  9   defendants from challenging that Vitamin D under section

02:09:02 10   101(s).

02:09:04 11          What I'm going to do is I'm going to deny the

02:09:06 12   defendants' motion as to Vitamin D patents.  Defendants can

02:09:09 13   raise the 101 issue again at summary judgment with a more

02:09:13 14   developed record and the plaintiff can raise the assignor

02:09:17 15   estoppel issue as well with a fully developed record.

02:09:19 16          So with that, I think we're left with just the

02:09:23 17   testosterone, the '862 patent.  And I got to tell you, the

02:09:28 18   briefing on that was kind of skimpy.  So any argument you

02:09:33 19   want to give me to try and help me understand the issues on

02:09:38 20   that would be helpful.

02:09:42 21          So I have decided the Vitamin D.  I would like

02:09:46 22   now to hear about the remaining factors.

02:09:54 23          MS. KIM:  Thank you, Your Honor.  Moving on to

02:09:57 24   the testosterone patent, starting on slide 3.  Your Honor,

02:10:07 25   the testosterone patent is very straightforward patent where

02:10:10  1    the purpose of the claims are to determine the amount of

02:10:16  2    naturally occurring testosterone in a sample of a female

02:10:20  3    human.  So that is a natural, observing natural phenomenon.

02:10:25  4    That goes to step 1.

02:10:26  5              Now, step 2, how it goes about doing it just

02:10:31  6    merely using a well-known conventional and routine technique

02:10:37  7    called mass spec.  And they do not provide any new

02:10:40  8    laboratory technique in the claims.  And all of the claims

02:10:44  9    in the testosterone patent are substantially similar and

02:10:48 10    linked to the same patent-ineligible subject matter.

02:10:52 11              Slide 4.

02:10:58 12              So the specification tells us that first

02:11:00 13    testosterone is naturally occurring hormone in the body.

02:11:03 14    And more importantly, second, that the mass spec was a

02:11:09 15    well-known technique in the art at the time of the

02:11:14 16    invention.  So there is nothing new introduced in the

02:11:19 17    claims.

02:11:20 18              Slide 5.

02:11:22 19              So go forward, looking at example number one,

02:11:26 20    claim number 1, so testosterone patent is two independent

02:11:31 21    claims, Claim 1 and Claim 15, which are very similar.  And

02:11:35 22    I'll note one difference when we get to that, Your Honor.

02:11:38 23              The Claim 1 is very straightforward.  You have a

02:11:42 24    method for determining the amount of testosterone in a

02:11:46 25    sample, in a female human.  And the first step is purifying

02:11:51 1    testosterone from a sample from a female human wherein said

02:11:55 2    purifying comprises extracting testosterone from said

02:11:59 3    sample.

02:11:59 4              If you look at the specification, the patent

02:12:02 5    tells you that purifying testosterone was a well-known

02:12:06 6    technique in the art.  And that example is here, for

02:12:11 7    example, patent at column 3, lines 8 through 9.

02:12:17 8              Moving on to the second step, the second step

02:12:21 9    goes to ionizing the testosterone, the purified testosterone

02:12:26 10   to produce what they call ions detectable by a mass

02:12:33 11   spectrometer.  Again, the patent tells us in the

02:12:36 12   specification that ionizing is very well-known to a skilled

02:12:41 13   artisan at the time of the invention.  And again, example

02:12:46 14   citation is column 3, lines 59 through 61.

02:12:50 15             Next slide, slide 6.

02:12:53 16             The third step of Claim 1 for testosterone

02:12:57 17   patent is detecting the amount, and in particular, detecting

02:13:04 18   the amount and relating that amount of the ions to the

02:13:08 19   amount of the testosterone in the sample.  And again, this

02:13:12 20   detecting step is described in the patent in the

02:13:15 21   specification as well-known in the art, in particular where

02:13:20 22   you relate the amount of the ions to the amount of the

02:13:26 23   original molecule here, the testosterone, that is very

02:13:30 24   well-known in the art.  That's what the specification tells

02:13:33 25   us.

02:13:34  1              Now, there are two wherein clauses within Claim

02:13:38  2      1.  The wherein clause, the first wherein clause is that it

02:13:43  3      tells you not to derivatize prior to mass spec.  Now,

02:13:49  4      derivatize just merely means that you're reacting two

02:13:53  5      molecules to make a new molecule.  And not derivatizing or

02:13:58  6      derivatizing before mass spec has been well-known in the

02:14:04  7      art, and that's actually described in the '868 patent.

02:14:06  8              And of note is that the independent Claim 15

02:14:10  9      does not require not derivatizing.  So the patent claims are

02:14:16 10      merely describing, you could either derivatize or you do not

02:14:22 11      have to derivatize, and it's just telling you simply don't

02:14:24 12      do anything in this claim.

02:14:26 13              THE COURT:  Just because something was known in

02:14:27 14      the prior art doesn't mean that it was well-known or

02:14:31 15      conventional; right?

02:14:33 16              MS. KIM:  So, Your Honor, the specification

02:14:35 17      tells you that it was well-known in the art.  So if you look

02:14:38 18      at the Federal Circuit cases, for example, *Ariosa*, *Mayo*

02:14:45 19      *Clinic*, *Roche* and *Athena*, they all talk about the fact that

02:14:49 20      the specification tells you that it was well-known in art.

02:14:52 21              THE COURT:  Right.  And all I'm saying is when I

02:14:54 22      look at what you're citing there on the underivatized, it's

02:14:58 23      not saying if it was well-known to do it, it's just saying

02:15:03 24      there was this reference in the prior art that showed you

02:15:08 25      you could do it.  Right?  That was my question, there is two

02:15:10 1   different things, one is saying yes, somewhere you can find

02:15:13 2   a reference where someone did it, and the other is was it

02:15:16 3   well-known and conventional to do so?

02:15:20 4          MS. KIM:  Understood, Your Honor.  But the

02:15:21 5   specification specifically tells you that all these steps,

02:15:25 6   the mass spec steps especially were well-known in the art.

02:15:29 7   And these other steps that go with the mass spec they cite

02:15:32 8   to different references to show that this is all well known

02:15:36 9   and this was done in prior art.

02:15:40 10          And the last wherein clause, Your Honor, is just

02:15:44 11   stating a result.

02:15:45 12          THE COURT:  So can you tell me where in the

02:15:47 13   specification you're relying on to say that it was

02:15:51 14   well-known to derivatize or not to derivatize?

02:15:57 15          MS. KIM:  Yes, Your Honor.

02:15:59 16          THE COURT:  What is it that you're relying on?

02:16:00 17          MS. KIM:  Right, Your Honor, we're relying on

02:16:03 18   another patent, the '868 patent, which was filed after the

02:16:07 19   testosterone patent, but refers to the prior art that goes

02:16:11 20   way back before the testosterone patent was filed.

02:16:14 21          THE COURT:  So the quote that you have up there

02:16:17 22   under specification notes is not the patent at issue, that's

02:16:21 23   another patent?

02:16:21 24          MS. KIM:  That's right, Your Honor.  But part of

02:16:24 25   the reference because part of the complaint and the

02:16:26   1   pleadings and the '868 patent described both not

02:16:32   2   derivatizing, and also derivatizing before mass spec.  And

02:16:40   3   the derivatizing is cited in another slide, but I could --

02:16:47   4   for the record, Your Honor, that's '868 patent at column 4,

02:16:51   5   line 66 to column 5-24.  And we can quickly show that

02:16:57   6   reference which is on slide 17.  Here it is an exemplary

02:17:06   7   citation where again it explains what derivatization means,

02:17:15   8   and that it has been used and it has been disclosed in many

02:17:19   9   numerous prior art.

02:17:23  10           If we could go back to slide seven.

02:17:28  11           THE COURT:  So let me just ask you this because

02:17:31  12   you jumped pretty quick to step two of the *Alice/Mayo* test.

02:17:38  13   For step one, I understand you're saying all this natural

02:17:44  14   phenomenon because it's referring to that.  When I look at

02:17:47  15   the claim it seems more like the question would be is it an

02:17:51  16   abstract idea.  I'm trying to understand, what made you --

02:17:55  17   why did you choose to sort of follow the *Mayo* natural

02:17:58  18   phenomenon cases rather than mass spec?

02:18:02  19           MS. KIM:  Sure, that's a good question, Your

02:18:04  20   Honor.  If we could go back to the claim language which is

02:18:06  21   in slide five, now, this goes to the method of determining

02:18:11  22   the amount of testosterone in a sample when taken from a

02:18:15  23   female human.

02:18:16  24           THE COURT:  Right, but what if it just said a

02:18:20  25   method of determining and analyzing, and you didn't know it

02:18:24  1    was a naturally occurring question, I mean, would it still

02:18:28  2    be a *Mayo* question, then?

02:18:31  3            MS. KIM:  I think, Your Honor, that would have

02:18:33  4    to depend on what the rest of the claim states, but clearly

02:18:37  5    for this patent it's talking about testosterone, in

02:18:40  6    particular testosterone in a female human sample, so looking

02:18:44  7    at that, this is very similar to the claims found in the

02:18:48  8    Federal Circuit cases such as *Ariosa*, *Cleveland Clinic*,

02:18:53  9    *Athena*, and *Roche* cases where they are similarly, they were

02:18:58 10    trying to determine an amount of certain molecule or

02:19:03 11    compound found naturally in the body.  And in those cases,

02:19:07 12    actually they go further and they correlated that to another

02:19:11 13    disease.  Here it doesn't have any correlation to a disease,

02:19:14 14    but it's just simply trying to observe an amount or presence

02:19:18 15    of a naturally occurring compound, here specifically the

02:19:24 16    testosterone patent, it's specific to testosterone.

02:19:31 17            THE COURT:  Okay.

02:19:35 18            MS. KIM:  And if you could go to slide seven.

02:19:39 19    And the dependent claims do not add anything else, Your

02:19:42 20    Honor.  The dependent claims go to different types of

02:19:45 21    purification, and the purification step again the

02:19:51 22    specification tells you that this is well-known in the art.

02:19:54 23    So, for example, if you look at the testosterone patent at

02:19:57 24    column 3, line 7 through 5, it states that numerous methods

02:20:03 25    are known in the art to purify testosterone.  And it gives

02:20:08  1    many different examples including HPLC, which is high

02:20:15  2    performance liquid chromatography.

02:20:18  3             And also there is another chromatography which

02:20:22  4    they cite which is HTLC which is a high turbulence liquid

02:20:28  5    chromatography.  And again the specification in column 3,

02:20:30  6    line 16 through 29 tells you that persons of ordinary skill

02:20:34  7    in the art understand turbulent flow and HTLC has been known

02:20:42  8    and conventional before the time of the invention.

02:20:47  9             Slide eight.

02:20:52 10             And this, Your Honor, I think this case is very

02:20:55 11    similar to the Supreme Court decision in *Mayo* and the four

02:21:00 12    Federal Circuit decisions after that, *Athena*, *Ariosa,*

02:21:06 13    *Cleveland Clinic* and *Roche*, they all went to the subject

02:21:11 14    matter of trying to determine the amount of presence of

02:21:14 15    certain naturally occurring compound, and those cases then

02:21:18 16    correlating to a disease.  Here we just have the simple way

02:21:23 17    of determining amount of naturally occurring hormone in a

02:21:28 18    female human body using a conventional technique, mass spec.

02:21:35 19             Thank you, Your Honor.

02:21:36 20             THE COURT:  What about Claim 15, Claim 15 in

02:21:39 21    addition to the not having the not derivatized language, it

02:21:45 22    also refers specifically to the high turbulence HPLC.

02:21:50 23             MS. KIM:  Right, it first exposed HTLC and HPLC,

02:21:54 24    and if we could go back to slide seven.  Again, those two

02:21:59 25    types of column were very well-known in the art on the

02:22:05  1    specification face.  And again, the relevant excerpt from

02:22:09  2    the patent from column 3, lines 7 through 29 where it

02:22:14  3    discusses numerous methods that are known in the art to

02:22:18  4    purify testosterone which includes HPLC and also HTLC.

02:22:27  5              THE COURT:  And where are you referring to in

02:22:31  6    saying that you're saying that they were known and so that's

02:22:34  7    what you're saying it was well-known conventional

02:22:37  8    techniques.

02:22:38  9              MS. KIM:  Absolutely right, Your Honor.

02:22:39 10              THE COURT:  And what about the issue I think

02:22:41 11    that the plaintiffs have asserted, it's the ordered

02:22:47 12    combination of the steps?

02:22:48 13              MS. KIM:  Again, there is nothing new about this

02:22:52 14    ordering of the claims.  Again, if you go back to the claim

02:22:59 15    language, so in slide number 5, so if you look at the steps,

02:23:06 16    you first purify the testosterone, and then you ionize the

02:23:11 17    purified testosterone, and then you detect the amount after

02:23:16 18    applying the mass spec.  There is nothing special about this

02:23:19 19    order.  That's well conventional using mass spec.  And in

02:23:24 20    purifying the testosterone before ionizing, that is

02:23:31 21    described in the patent.  So, for example, Your Honor, if

02:23:33 22    you look at column 6, starting on line 28, it discusses what

02:23:42 23    the term mass spec means.  And it identifies several prior

02:23:48 24    art that describes what mass spec does.

02:23:51 25              And, for example, one of those patents describes

02:23:54  1    purifying the compound before applying mass spec.  And I

02:24:00  2    have a copy of that if Your Honor wants to see it.  For

02:24:04  3    example, it cites to patent number 6,268,144, which is on

02:24:11  4    line 38 of column 6, that describes purifying the compound

02:24:17  5    before applying mass spec.  And that was well-known in the

02:24:20  6    art.

02:24:21  7            THE COURT:  So in looking at your slide 7, if

02:24:25  8    you could put that up for me.  For HPLC, for both of them,

02:24:30  9    you have well-known, routine and conventional.  And I

02:24:33 10    understand the text that you have over there for HPLC,

02:24:37 11    numerous methods are known, et cetera.  It didn't use that

02:24:40 12    same language for HTLC though, does it?

02:24:43 13            MS. KIM:  It does, Your Honor.  So if you look

02:24:45 14    at the HTLC section, first it describes what HTLC is.  And

02:24:51 15    if you look down, it describes prior art, you know,

02:24:56 16    exemplary prior art that describes HTLC.  Now HTLC goes to

02:25:01 17    turbulent flow, using turbulent flow in chromatography.  If

02:25:06 18    you look at the last highlighted portion it states that

02:25:09 19    persons of ordinary skill in the art understand turbulent

02:25:13 20    flow.  So this was well-known in the art.  Persons of

02:25:16 21    ordinary skill in the art well know of HTLC.

02:25:19 22            THE COURT:  But it doesn't actually say that it

02:25:21 23    was well-known or conventional, it just says it's been used.

02:25:26 24    And isn't there a difference or at least perhaps a factual

02:25:29 25    matter there that goes to whether that was well-known and

02:25:32  1    conventional?

02:25:33  2           MS. KIM:  I would disagree with that, Your

02:25:35  3    Honor, because if you look at the other Federal Circuit

02:25:38  4    cases where it describes that the specification showed that

02:25:44  5    there was, you know, well-known in the art, that similar

02:25:49  6    language was used, that it was well-known in the art or that

02:25:52  7    it was used in the art.  And the Federal Circuit has used

02:25:55  8    those portions of the specification to know that this was

02:25:58  9    well-known, routine and conventional because persons of

02:26:02 10    ordinary skill in the art knew and understood those

02:26:05 11    techniques at the time of the invention.

02:26:09 12           THE COURT:  Okay.  Thank you.

02:26:11 13           MS. KIM:  Thank you, Your Honor.

02:26:19 14           MR. GAHTAN:  Good afternoon, Your Honor.

02:26:28 15           THE COURT:  Good afternoon.

02:26:30 16           MR. GAHTAN:  Adam Gahtan for Quest.  And we also

02:26:32 17    have a slide deck.

02:26:35 18           THE COURT:  I have it.

02:26:37 19           MR. GAHTAN:  Okay.  I would like to start with

02:26:48 20    step one and take you through the patent that way.  I think

02:26:53 21    it's helpful to understand the nature and character of the

02:26:57 22    invention that's claimed in step one.  You look first in the

02:27:02 23    specification to understand what problem the inventors were

02:27:05 24    trying to solve.

02:27:06 25           THE COURT:  Do you agree, though, that it should

be looked at as sort of a natural phenomenon rather than an abstract idea?

MR. GAHTAN:  I struggle, Your Honor, and still struggle now this afternoon to understand what the natural phenomenon that LabCorp. is trying to identify in these claims, is or are, if there are many of them.  They didn't argue abstract idea so it's hard for me to respond it to, but in fact I think what I have to say about the problem the inventors faced, how they solved it and how the solution is baked right in to the claim will get you -- will get us a win on step one under either regime.

All right.  These are all from the specification of the '862 explaining first that testosterone binds in plasma to all these other proteins, so when you have a sample, for example, from a female human, it' a -- there is going to be very little unbound testosterone for you to bind in the first place making it difficult to detect.

Now, there were attempts to detect it in the past including, and this is right in the spec as well, prior mass spec approaches, the mass spec approaches required as you can see from the excerpt derivatization which Your Honor probably knows much better than I do, it's a combination of two chemicals that react to some third derivative that might be more easy to find in the sample.

And finally the inventors explained that even on

02:28:43  1   top of those problems in females, testosterone is typically

02:28:48  2   present in much lower levels than --

02:28:51  3            THE COURT:  Do you agree that Claim 15 does

02:28:57  4   require that it be underivatized?

02:29:05  5            MR. GAHTAN:  It does not require that it be

02:29:07  6   underivatized.

02:29:09  7            So if I can go to the next slide, the slide

02:29:17  8   rather than being directed as they try to show comparison of

02:29:21  9   these earlier claims, *Mayo* and diagnostic progeny is a

02:29:28 10   technological solution to the problems of the specification

02:29:33 11   raises.  So first of all, defines these very low amounts,

02:29:37 12   less than ten nanograms per deciliter and the e-mail already

02:29:43 13   told us that testosterone exist in low levels in females, it

02:29:49 14   requires all of these other steps including particularly

02:29:53 15   extracting, then ionizing, then detecting.  It's got to be

02:29:59 16   nonderivatized and the result is this excellent low level of

02:30:02 17   detection extraction, particular in Claim 3 which is Claim 1

02:30:08 18   that you use high turbulent liquid chromatography as an

02:30:14 19   extraction method because the inventors figured out that if

02:30:17 20   you used that method in combination with all these other

02:30:21 21   steps you're going to get to this previously impossible

02:30:24 22   result.  But at step one, the point really is what kind of

02:30:28 23   claim is this?  What is the character of the claim in its

02:30:32 24   entirety?  That's the question, whether it's abstract idea

02:30:34 25   or natural law, the question is the same, and the answer is

02:30:37 1  this is the technique for more precise measurement, think of

02:30:42 2  it, you know, I'm always weary of an analogy, think of it as

02:30:47 3  a better ruler or a better scale, it's not the fact that

02:30:51 4  something has mass or link which might be a way for them to

02:30:56 5  characterize a natural phenomenon, this is just a claim,

02:30:58 6  this is not directed to a natural law in its entire, not

02:31:02 7  what I have heard what natural law might be directed to,

02:31:05 8  it's directed to a method of measurement, a more precise

02:31:09 9  method of measurement.

02:31:10 10         And to demonstrate that, I'm taking you through

02:31:12 11 these slides to demonstrate that's what it's directed by

02:31:16 12 showing that it contained a technological solution to a

02:31:19 13 stated problem of measurement, quantification.  So I think

02:31:24 14 in step one, I think they don't get past step one.

02:31:28 15         THE COURT:  What about Claim 15?

02:31:30 16         MR. GAHTAN:  Claim 15 as you say doesn't require

02:31:33 17 derivatization, but it does require high turbulence

02:31:40 18 chromatography, and it's no less a series of steps in its

02:31:45 19 character directed to -- directed to making finer and more

02:31:49 20 precise measurements than were possible, than were possible

02:31:53 21 in the past.  I can put it up on the Elmo if you would like.

02:31:59 22         THE COURT:  Doesn't, though, what you're talking

02:32:02 23 about here, functional claiming that's directed to achieving

02:32:07 24 a particular result, the measurements of less than ten

02:32:11 25 nanograms.

MR. GAHTAN:  I think for the eligibility

analysis, you're just -- the question really is, and it's

entirely their burden, is this claim, right, this improved

process for measuring levels of testosterone in female

humans, is it directed to -- does it really collapse into a

single natural law?  And I think it's enough to the claim to

understand the problem they were trying to solve that it

does not.

And what I would be happy to do next is to take

you through the cases that they rely on, five or six of them

and show you the difference between the claims in those

cases, and the court's analysis in those cases and the

claims we have here.

So I can start with --

THE COURT:  You don't need -- I would be

interested to see the cases that you think are the most

analogous, and in terms of if you want to distinguish

something, when you looked at it, *Ariosa* was the case that

sort of jumped out at me.  I don't need you to distinguish

all of them, but if you want to just tell me what you would

say vis-a-vis *Ariosa*.

MR. GAHTAN:  I'm happy to do that and I have a

slide of *Ariosa*, but I would like to give you a bigger

picture first before going through all of them if that's

okay.  In those cases the courts found the claim were

02:33:35  1   directed to a natural law in step one because there was some

02:33:38  2   discovery of a thing in nature, in correlation in *Mayo*

02:33:42  3   between the metabolite level and you know, proper dose, too

02:33:47  4   much, too little of the drug, they figured out what the

02:33:51  5   correlation was.  It doesn't matter how you get the data, we

02:33:54  6   have discovered this natural correlation between this amount

02:33:57  7   of metabolite.

02:33:58  8          THE COURT:  Or something else and the risk of

02:34:00  9   getting a disease kind of thing?

02:34:02 10          MR. GAHTAN:  Exactly, the *Cleveland Clinic* case,

02:34:04 11   very similar, we discussed that you have this much MTO in

02:34:09 12   your blood, you're going to have a heart attack in six

02:34:11 13   months or you're not, something like that, don't care how

02:34:13 14   you find out, in fact, I think they're saying mass spec

02:34:17 15   commercial kits, get information out.  Same thing in *Athena*,

02:34:22 16   our discovery is if you have antibodies to this particular

02:34:28 17   muscle, you got MG, right, that's a discovery.  And if you

02:34:33 18   look at the decisions in those cases and we'll do *Ariosa* as

02:34:36 19   well, of course, but if you look at the decisions in those

02:34:39 20   cases in every single one of them the court goes into the

02:34:43 21   spec and say well, what do the inventors say the invention

02:34:46 22   is.  And in every single one of those cases, I won't run

02:34:49 23   through it because you have asked me not to, in every one of

02:34:52 24   them, you look at the spec and the spec says public, we have

02:34:56 25   discovered this correlation, we have discover this natural

02:35:00 1   phenomenon that exist independently of any human action,

02:35:03 2   that's our invention.  As to the rest of it, you know,

02:35:05 3   that's all well understood per se at any step.

02:35:10 4            So *Ariosa* same thing, look at what the court

02:35:14 5   said in *Ariosa*, the written description supports conclusions

02:35:18 6   that the claims are directed to a naturally occurring

02:35:21 7   phenomenon.  And it goes specifically to the summary of the

02:35:25 8   invention.  It has now been discovered that foetal DNA is

02:35:30 9   detectable in a maternal serum.  What the patent is telling

02:35:35 10  the world is this foetal DNA that we had previously been

02:35:40 11  looking for in these intrusive, dangerous, complicated ways,

02:35:44 12  we just found it in this petri dish over here.  It's also in

02:35:48 13  maternal serum, the stuff we throw away, that's our big

02:35:52 14  discovery, the foetal DNA is in maternal serum.

02:35:57 15           If you look at our specifications, there is

02:35:59 16  nothing like that.  The entire specification of the '862

02:36:03 17  patent is just one long explanation of improved techniques

02:36:07 18  for detecting low levels of testosterone.  It's all about

02:36:13 19  the method, every example validates the method.  There is

02:36:18 20  no, we discovered some fact about testosterone, if you have

02:36:21 21  it at ten, you know, nanograms, then it means that, you

02:36:25 22  know, you have more or less than that, it means something

02:36:29 23  about that fact of nature that's independent of the human

02:36:33 24  intervention in our method --

02:36:35 25           THE COURT:  You're not saying that we discovered

02:36:37 1    that there is testosterone in a female human, you're saying

02:36:41 2    you discovered a better way to determine it even if it's at

02:36:45 3    a low amount?

02:36:46 4         MR. GAHTAN:  Better way to find it.  It might be

02:36:48 5    in there at such low amount, you have all these problems in

02:36:51 6    the prior art, you have to derivatize, it takes a long time,

02:36:54 7    it's at a low level, it gets bound to proteins that makes it

02:36:58 8    difficult to find even the small amount that's there, we

02:37:01 9    tell to you extract it, we further tell you to extract it in

02:37:04 10   a very specific way.  So again, step one, it's just simply

02:37:09 11   not to a correlation or a relationship or any of the other

02:37:13 12   kinds of natural laws that *Mayo* and the cases that come from

02:37:18 13   *Mayo* that LabCorp. cites, it's just sort of categorically

02:37:25 14   different.  Counsel for LabCorp. describes those cases of

02:37:35 15   having gone even further to state a correlation, but in fact

02:37:40 16   the problem in those cases for those claims was that the

02:37:43 17   entire invention was the correlation or the relationship,

02:37:45 18   and that's exactly what the inventors told them.  Here there

02:37:48 19   is just no, there is no analogy to that in these -- in these

02:37:54 20   patents.

02:37:58 21        THE COURT:  So show me how you think *CellzDirect*

02:38:04 22   support you, that is deliver cells that survive multiple

02:38:10 23   freeze sites, the people knew you could freeze them and thaw

02:38:14 24   them, but they didn't know you could do them multiple times

02:38:17 25   and get some benefit from them.

02:38:19 1          MR. GAHTAN:  I was thinking about this question.

02:38:21 2   We do talk about *CellzDirect* and *Diehr* and a lot of cases in

02:38:26 3   the brief.  I would say *CellzDirect* is primarily for our

02:38:30 4   purposes in that it's just further legal evidence that

02:38:35 5   claims to improve methods are eligible under 101 and indeed

02:38:41 6   101 specifically says improved processes as a category of

02:38:45 7   statutorily eligible invention.  The problem with trying to

02:38:51 8   analogize too closely with *CellzDirect* in our situation is

02:38:54 9   because in *CellzDirect* the inventor said look, we have

02:38:58 10  discovered that these hepatocyte liver cells can in fact

02:39:04 11  survive multiple freeze/thaw cycles, that's our invention,

02:39:08 12  but they got past that one because they applied that

02:39:12 13  invention to some new process that, you know, has to do with

02:39:15 14  preserving them.

02:39:18 15          Here I have the problem of not knowing what

02:39:20 16  natural law it is to which these claims are supposedly

02:39:24 17  directed in the first place so that I can tell you, oh, but

02:39:27 18  we do something better with them, we make a process around

02:39:31 19  them that gets us past that one.

02:39:35 20          THE COURT:  What caught my attention at least in

02:39:39 21  the *Ariosa* case was the language, it is undisputed that the

02:39:42 22  existence of a foetal DNA in maternal blood is a natural

02:39:48 23  phenomenon.  You start to think about this, and you say

02:39:50 24  okay, the existence of testosterone in female human is a

02:39:58 25  natural phenomenon.

1    MR. GAHTAN:  It is, but we don't claim to have

2    discovered that.  And in *Ariosa* as in all of those other

3    cases, the reason the courts went back into the spec, right,

4    is because it confirmed their impression of the claim that

5    that's what the whole claim is.  The fact that you got

6    foetal DNA in maternal serum, that's the ah-hah moment and

7    then there is nothing else.  We don't have the first part,

8    we don't have the ah-hah moment.  We all need to know it's

9    an important find, testosterone, especially in female

10   humans, it's at low levels.  Here is a problem with the way

11   it's been done.  Here is a better way to do it.

12          What you do with the information if you get it

13   at the end of the day, that's not what this claim is about,

14   the fact that testosterone exist, they're not claiming the

15   discovery of testosterone, right, and I don't think their

16   claim analogizes at all to the cases that they have relied

17   on.  And so frankly I think we just -- I don't think

18   LabCorp. gets past that point.

19          THE COURT:  Let's assume that they might.

20          MR. GAHTAN:  I had a feeling.

21          THE COURT:  What do you say for step 2?  And I

22   will note that in the brief I think that you all said oh,

23   there are factual issues, but you didn't really identify

24   any, so to the extent that there are factual issues, why

25   don't you tell me what you think are.

02:41:29  1          MR. GAHTAN:   I think there are factual issues

02:41:31  2   and obviously I don't want -- but we do get the benefit of

02:41:37  3   all reasonable inferences in the spec and in the pleading.

02:41:41  4   I think it's really sort of -- because I demonstrated that

02:41:45  5   we win at step 1 in the way I did, there is going to be a

02:41:48  6   lot of repetition.   Our claims are technological solutions

02:41:52  7   to a measurement problem.

02:41:56  8          In order for LabCorp. to win at step 2 assuming

02:42:00  9   they got past step 1, they would have to show that as an

02:42:04 10   ordered combination, all of the steps in the claim together

02:42:09 11   were well understood, routine and conventional.   And as Your

02:42:13 12   Honor pointed out and as *Berkheimer* makes very clear in the

02:42:18 13   very last slide that I showed you, the mere fact that

02:42:20 14   something is known in the prior art doesn't make it routine.

02:42:23 15          Now it may be that mass spec as a technique was

02:42:28 16   well understood, generally speaking I don't think there is

02:42:31 17   any question about that in the specification.   It doesn't

02:42:34 18   run from it.   But, for example, in Claim 1, if I could have

02:42:38 19   Claim 1, all of these steps, right, extracting and the

02:42:48 20   dependent claims, particularly by HTLC and ionizing and then

02:42:53 21   doing the mass spec and doing it with a sample that's not

02:42:56 22   derivatized and achieving this result, that's a whole order

02:43:01 23   combination and we didn't hear anything about the order

02:43:03 24   combination from LabCorp. this morning and frankly not in

02:43:07 25   their briefs either.

02:43:08  1          THE COURT:  I couldn't tell from your briefs, by

02:43:10  2     the way, were you arguing that you're detecting

02:43:14  3     non-naturally occurring ions because testosterone is ionized

02:43:18  4     or is that not an argument you're making?

02:43:21  5          MR. GAHTAN:  That's reality, right, the mass

02:43:23  6     spec machine will only detect positively or negatively

02:43:27  7     charged ions, and if it's tandem aspect, which is not in

02:43:33  8     this case, but applies to the other patents, there is a

02:43:36  9     second fragmentation of detecting ions even further down the

02:43:41 10     chain from the non-chart sample which I begin.

02:43:45 11          So counsel for LabCorp. took you through a

02:43:49 12     couple of excerpts in the patent to try to show that every

02:43:52 13     single one of -- every single one of the steps was known, at

02:43:58 14     least individually on its own, that's A, not the same thing

02:44:02 15     as A, as the order combination being well understood and

02:44:08 16     routine and that's a requirement.  Frankly, I think the

02:44:11 17     extracting step, maybe especially with respect to HTLC is

02:44:14 18     independently sufficiently unknown to get us past that,

02:44:19 19     there is some dispute as to whether that's the case.  Then

02:44:22 20     we have an issue of fact that we're going to have to

02:44:25 21     develop.

02:44:26 22          And I do notice that on their slide, I won't try

02:44:29 23     to put it up now, but on their slide pointing you to the

02:44:33 24     section about HTLC in our spec, it says HTLC has been, I

02:44:41 25     forgot the words, attempted or experimented on with respect

02:44:47  1    to two unnamed drugs.  That's it.  Right?  Certainly nothing

02:44:49  2    in there about using HTLC to extract testosterone or this

02:44:55  3    notion that everybody was using HTLC to extract everything

02:44:58  4    so extracting testosterone is no big deal, it's simply not

02:45:02  5    there.  So even on its own I think that's sufficient to get

02:45:05  6    us past 12(c) on the question of whether we get past that

02:45:10  7    step 2.

02:45:12  8              THE COURT:  Okay.  And you submitted a

02:45:17  9    declaration of Dr. Chiral.  I think you said it was solely

02:45:23 10    for background.  I just want to confirm, you weren't

02:45:25 11    submitting that to create or to, you know, say that there

02:45:28 12    were factual issues?

02:45:29 13              MR. GAHTAN:  No, we haven't heard anything from

02:45:33 14    me today of Dr. Chiral's declaration.  I think, so that gets

02:45:45 15    us past step 2.  I do want to put up this last slide from

02:45:52 16    *Berkheimer*, only because Your Honor, it engages counsel for

02:45:58 17    LabCorp. on this question.  In *Berkheimer*, of course it's in

02:46:02 18    many other cases as well, it may be something that was in

02:46:05 19    the art, but that doesn't make it well-known and routine.

02:46:09 20    And certainly the order combination of steps wasn't even in

02:46:14 21    the art, at least as far as we can tell on this record at

02:46:18 22    12(c).

02:46:19 23              And I will mention before I sit down that no one

02:46:21 24    was talked about preemption.  It is in our briefs I believe

02:46:26 25    pretty clearly these methods are so specific that they

02:46:30  1   hardly preempt measurement techniques for the testosterone

02:46:34  2   and indeed the specification goes through other measurement

02:46:37  3   techniques on which this one is a clear improvement.

02:46:41  4            Thank you, Your Honor.

02:46:45  5            THE COURT:  Reply.

02:46:51  6            MS. KIM:  Yes.  A couple of points, Your Honor.

02:47:00  7   So we went through the fact that the specification clearly

02:47:04  8   states that these were well-known techniques, in particular

02:47:09  9   using mass spec.

02:47:11 10            And the Supreme Court has made clear that using

02:47:18 11   conventional steps for the result of natural phenomenon,

02:47:28 12   natural ideas cannot make those laws patentable.  That's

02:47:31 13   pretty clear from the *Mayo.*  And from the four Third Circuit

02:47:36 14   cases again, *Ariosa*, *Cleveland Clinic*, *Roche* and *Athena* make

02:47:41 15   that very clear.

02:47:43 16            Now, with regards to the step 1 question, I

02:47:48 17   think the specification of the testosterone patent makes

02:47:51 18   pretty clear what the patent is about, especially in the

02:47:54 19   abstract of the patent.  It is the same language as the

02:47:59 20   claim where it states provided are methods for determining

02:48:03 21   the presence or amount of testosterone in a test sample.  So

02:48:08 22   it's pretty clear what the purpose of the patent is.

02:48:11 23            And the fact that this is a natural phenomenon

02:48:15 24   is because the patent relates to figuring out the amount of

02:48:18 25   testosterone in a female body.  And as Your Honor indicated,

02:48:24 1    very similar to *Ariosa* where we were trying to figure out

02:48:27 2    the presence or amount of naturally occurring compound in a

02:48:31 3    human body.

02:48:32 4             Slide nine.  Another point Your Honor made is

02:48:41 5    that since there are ions created by using -- to use the

02:48:45 6    mass spec, that's a man-made molecule.  But *Athena* made it

02:48:52 7    very clear that if you're applying a standard technique such

02:48:56 8    as a mass spec here, just because you're using a man-made

02:49:00 9    molecule using a standard technique does not change that

02:49:05 10   actual idea or natural law into something inventive.  So

02:49:09 11   *Athena* very recent decision made very clear that that does

02:49:13 12   not go over the threshold question of section 101.

02:49:18 13            Unless you have any other question, I have

02:49:21 14   nothing further.

02:49:22 15            THE COURT:  No, I don't.  How about we take a

02:49:27 16   quick recess while I think about a few issues, and then

02:49:31 17   we'll come back.

02:49:33 18            (A brief recess was taken.)

03:06:58 19            THE COURT:  Please be seated.  Thank you for the

03:07:01 20   arguments.  I am prepared to rule.  I have already decided

03:07:07 21   defendant's motion for judgment on the pleadings and I'm

03:07:12 22   also going to deny the motion as to the '862 patent.

03:07:16 23            I'm not going to read into the record my

03:07:19 24   understanding of section 101 law.  I have a legal standard

03:07:22 25   section that I have included in earlier opinions including

03:07:25  1    somewhat recently in *Olympus Corporation, et al. v.  Maxell,*

03:07:31  2    *Ltd.*, No. 2018cv00216, West Law 596-271 District of

03:07:37  3    Delaware, November 14th, 2018, and I incorporate that law

03:07:40  4    into my ruling today.

03:07:42  5          I recognize that that opinion involved an

03:07:44  6    abstract idea analysis under section 101.  For reasons that

03:07:50  7    will become apparent shortly, I will not read into the

03:07:52  8    record my understanding of section 101 law as applies to

03:07:56  9    laws of natural or natural phenomenon, but will state here

03:07:58 10    that the general two-step process applies to the analysis

03:08:02 11    for both abstract ideas and natural phenomenon types of 101

03:08:07 12    motions.  That is step 1 ask whether the claim as a whole is

03:08:11 13    directed to a patent ineligible subject matter and step 2

03:08:15 14    ask whether the claim elements or their ordered combination

03:08:19 15    supply an inventive concept.

03:08:22 16          First as to claims at issue in the motion,

03:08:24 17    plaintiffs singled out Claim 1 of the '862 patent is aimed

03:08:28 18    in a non-limited way and in their opening papers defendants

03:08:31 19    really only addressed Claim 1.  When plaintiff pointed that

03:08:35 20    out in its answering brief and argued that the Claim 1

03:08:38 21    attempted to address the eliminated claims in their reply

03:08:42 22    brief.  I'm not prepared to find defendants waived the

03:08:45 23    argument as to the other claims in its motion, but I will

03:08:47 24    note that plaintiff did not in its papers nor here today

03:08:50 25    make a strong challenge to representativeness.  And it is

not at all clear that the dependent claims had anything to bring claims outside of any natural phenomenon or abstract idea in Claim 1 or Claim 15.

As to step 1 of the Alice *Mayo* analysis, defendants argue that the '862 patent is directed to a method of observing a natural phenomenon, i.e., determining the amount of naturally occurring testosterone in female.

Defendants say Claim 1 of the '862 patent is like those held ineligible in *Ariosa*, *Cleveland Clinic*, *Roche* and *Mayo*.  That being said, defendants do not offer much analysis in their support of their assertion.

Basically they assert that Claim 1 of the '862 patent is directed to merely observing the amount of testosterone, a naturally occurring hormone in female humans, using well-known method, mass spec, and is, therefore, ineligible.

Plaintiff responds that the claims are directed to a better method of detecting testosterone that allows you to detect it at low levels of less than ten nanograms per deciliter.

The case law at least in the *Alice* line of cases, however, says that if you are claiming a result with functional limitations that you don't end the inquiry at step 1.  That being said, step 1 I cannot conclude at this stage that the claims as a whole are directed to the natural

1    phenomenon or law of nature articulated by defendants.  In

2    fact, I'm not entirely sure that the '862 patent should even

3    be analyzed under the *Mayo* type cases instead of as an

4    abstract idea analysis under *Alice* and its prodigy.  In any

5    event, there appear to be factual issues under step 2 of the

6    analysis that preclude granting of defendant's motion at the

7    pleading stage, so I will leave for another time and perhaps

8    more helpful briefing at the conclusion of step 1.

9            As to step 2 of the *Alice/Mayo* analysis

10   defendants argue that none of the claim elements in Claim 1

11   of the '862 patent applied an inventive concept.  Defendant

12   asserts that the steps A through C purifying, ionizing and

13   detecting in Claim 1 are all described in the specification

14   is well-known to a skilled artisan and they also argue that

15   the two wherein clauses do not supply an inventive concept.

16           Plaintiff responds that the '862 patent uses a

17   nonconventional arrangement of steps by doing purification,

18   ionizing, extracted testosterone and then detecting ions all

19   without derivatization.  Plaintiff argues that the

20   defendants are looking at each step in Claim 1 in isolation

21   and thereby ignoring whether their ordered combination

22   provides a sufficient inventive concept.

23           Plaintiff also argues that there are questions

24   of fact that preclude resolution of defendant's motion, for

25   example, whether or not the derivatization or whether the

03:11:49  1   nonderivatizing and the HTLC were well-known in conventional

03:11:54  2   techniques.

03:11:55  3          At step 2, I find that there are factual issues

03:11:57  4   that preclude the granting of defendant's motion.  For Claim

03:12:02  5   1 the specification is silent on whether it was well

03:12:05  6   understood, routine or conventional to derivatize or not to

03:12:09  7   derivatize testosterone prior to performing mass spec.

03:12:14  8   Indeed that term, derivatization, does not appear in the

03:12:16  9   specification.  Another patent-in-suit or another piece of

03:12:19 10   prior art may mention a sample being underivatized does not

03:12:24 11   demonstrate that this technique was conventional or well

03:12:27 12   understood in the art.  For that I'll cite *Berkheimer v.*

03:12:32 13   *HP*, 881 F.3d 1360 to 69 from the Federal Circuit in 2018.

03:12:37 14          Here there is an issue of fact as to whether the

03:12:41 15   nonderivatizing step in isolation or in the claimed

03:12:45 16   combination involves more than what was well understood,

03:12:48 17   routine and conventional and in the art.

03:12:50 18          For Claim 15, although the specification does

03:12:53 19   admit that numerous well-known purification methods can be

03:12:56 20   used to purify the testosterone prior to mass spec, Claim 15

03:13:00 21   requires more than simply purifying, as it is in Claim 1.

03:13:05 22          Claim 15 requires that high turbulence liquid

03:13:10 23   chromatography be used in the purifying step and the

03:13:13 24   specification does reference this technique as "recently"

03:13:17 25   being applied to samples containing two drugs and that's in

03:13:21  1    the '862 patent, column 9, lines 8 through 11.  The patent

03:13:25  2    does not admit that it was well understood, routine or

03:13:28  3    conventional to use HTLC in purifying biological samples.

03:13:33  4    It may very well be that it was well-known to use this

03:13:37  5    technique in this way, but the record before the court in

03:13:41  6    this pleading stage does not allow this conclusion.

03:13:43  7             Thus there are factual conclusions as to whether

03:13:46  8    the use of HTLC in the ordered combination as appears in

03:13:49  9    Claim 15 involved more than what was well understood,

03:13:52 10    routine and conventional in the art.

03:13:54 11             So in sum, defendants' motion as relates to the

03:13:57 12    '862 patent is also denied with leave to renew the 101

03:14:01 13    arguments at summary judgment after a more developed record

03:14:04 14    is established.

03:14:05 15             Any questions?

03:14:09 16             MS. KIM:  No, Your Honor.

03:14:10 17             MR. GAHTAN:  No, Your Honor.

03:14:11 18             THE COURT:  Okay.  So that being said, I think

03:14:13 19    we still have a little bit more time.  Did you want to

03:14:17 20    address the discovery issues that I have.

03:14:28 21             MR. CARSON:  Yes, Your Honor, we would like to.

03:14:30 22    How would you Your Honor like to proceed?

03:14:32 23             THE COURT:  Doesn't matter.  You stood up first,

03:14:34 24    so you can go.  I will say that I actually have made a

03:14:47 25    decision on some of them.  I do want to hear argument on I

think two, but with respect to your request on the

licensing.

                MR. CARLSON:  Yes.

                THE COURT:  I am going to deny that to the

extent that it is seeking, you know, just random offers of

licensing and limited to executed licenses for the patents

or patents that are related to the patents that are asserted

here.

                If the plaintiff at some point decides to rely

on other patents or damages or something else and it opens

it up, then I'll revisit it, but for now that's all I'm

going to allow.

                And similarly on the contentions regarding

conception and reduction to practice, I don't think that

this is fully fleshed out as a discovery issue.  It seems

that the plaintiffs have provided things and whatever they

need to rely on for conception and reduction to practice

they're going to have to make sure that they provide the

documents that are sufficient to show that.  So it seems

like they have provided some documents, they seem willing to

provide some additional documents, so I'm going to deny that

request at this time.

                MR. CARLSON:  Your Honor, may I just comment on

that?

                THE COURT:  Sure.

03:16:11  1          MR. CARLSON:  We asked when they're going to

03:16:13  2     provide those documents.  We think they should be produced

03:16:15  3     before inventor depositions which could start to occur

03:16:19  4     shortly after the deadline for substantial completion of

03:16:22  5     document production.  So we're looking for documents in this

03:16:25  6     critical period that relates to conception reduction to

03:16:29  7     practice, they said they would get back to us, and we have

03:16:32  8     heard nothing from them in two months.

03:16:34  9          THE COURT:  When is the substantial completion

03:16:35 10     of document production?

03:16:38 11          MR. CARLSON:  Next Friday.

03:16:39 12          THE COURT:  So I assume they're going to provide

03:16:41 13     them before next Friday.  Am I wrong about that?

03:16:44 14          MR. MAJCHRZAK:  Your Honor, we're not

03:16:45 15     withholding anything.  We have produced whatever we've

03:16:48 16     located as Your Honor is probably well aware, attempting to

03:16:51 17     find conception reduction to practice documents, we'll give

03:16:56 18     them whatever we find.

03:16:57 19          THE COURT:  Okay.  So with that representation,

03:17:00 20     and I assume you're going to do that before the end of the

03:17:05 21     substantial completion of documents next Friday, whatever

03:17:07 22     you find.

03:17:08 23          MR. MAJCHRZAK:  Whatever we have by next Friday,

03:17:12 24     if we find something after we will produce it immediately.

03:17:14 25          THE COURT:  All I will say with that, if you do

03:17:16  1    find something else after that and the depositions of the

03:17:18  2    inventors have taken place, you can come back to me and ask

03:17:21  3    for some relief from that and getting another deposition or

03:17:25  4    getting costs or something associated with that.

03:17:28  5                 MR. CARLSON:  Yes, Your Honor.

03:17:29  6                 THE COURT:  Okay.

03:17:30  7                 MR. CARLSON:  That does leave, though, the

03:17:32  8    request for the test related to Quest tests.

03:17:43  9                 THE COURT:  Say that again.

03:17:45 10                 MR. CARLSON:  The request for, the requests for

03:17:48 11    Quest tests boils down to information that Quest itself has

03:17:52 12    put at issue.  And if I may, Your Honor, can I hand up some

03:17:56 13    highlighted copies of Quest's interrogatory responses?

03:17:59 14                 THE COURT:  Sure.

03:18:00 15                 MR. CARLSON:  I would like to pause, because

03:18:01 16    they are marked highly confidential by Quest so I would

03:18:05 17    appreciate some guidance from the Court on how we should

03:18:09 18    proceed.

03:18:09 19                 THE COURT:  Why don't you give them to me and

03:18:11 20    then we'll try to -- you can point me to things and maybe we

03:18:16 21    don't have to actually say in open court what they are.  It

03:18:19 22    doesn't seem worthwhile to close court for a discovery

03:18:24 23    conference.

03:18:24 24                 MR. CARLSON:  Yes, Your Honor.

03:18:32 25                 THE COURT:  And may I ask with respect to the

03:18:34  1    conception reduction to practice, is the invention date an

03:18:38  2    issue here?  Have you put in prior art that makes it an

03:18:41  3    issue?

03:18:41  4            MR. CARLSON:  Yes, we have, Your Honor.

03:18:44  5            May I approach?

03:18:46  6            THE COURT:  Yes.

03:19:01  7            MR. CARLSON:  So if I could ask Your Honor to

03:19:03  8    turn to -- you have in front of you Exhibit A which is

03:19:08  9    plaintiff's responses to LabCorp.'s interrogatories, and if

03:19:12 10    I could ask you to turn to page 36 -- I'm sorry, turn to

03:19:17 11    page 30 which relates to commercial success.

03:19:19 12            THE COURT:  Okay.

03:19:20 13            MR. CARLSON:  As you'll see on that highlighted

03:19:23 14    page, here is an instance where Quest has already relied on

03:19:27 15    commercial success.  The argument in their briefing that

03:19:29 16    they are still deciding whether they're going to rely is

03:19:32 17    simply incorrect, they've already relied on, and have also

03:19:37 18    relied on successful licensing of the asserted patents.  So

03:19:41 19    the information about those tests, whether it's Quest tests

03:19:45 20    or its licensee's tests, whatever they have in their

03:19:48 21    possession, custody and control, it's our position that that

03:19:51 22    should be produced so that we can assess how those tests

03:19:56 23    operate and what financial information Quest has in relation

03:19:59 24    to those tests.

03:20:01 25            So then if you turn now to page 36 in Exhibit A,

03:20:10 1    you'll see that the highlighted portion shows that Quest's

03:20:15 2    contention as to irreparable harm for a permanent

03:20:20 3    injunction.  And just reading through this information

03:20:22 4    that's highlighted, injuries such as price erosion, loss of

03:20:28 5    market position, loss of reputation, goodwill and brand name

03:20:31 6    recognition, all things that have to do with their test and

03:20:34 7    their test in the marketplace that compete with LabCorp.

03:20:39 8         So we cited case law that information about a

03:20:44 9    patentee's products is relevant to commercial success when

03:20:48 10   the patentee chooses to rely on that and also relevant to a

03:20:54 11   permanent injunction when a plaintiff seeks that.  All we're

03:20:56 12   doing is asking for information that Quest itself has put at

03:21:00 13   issue here.

03:21:01 14        And just to address the one case that Quest

03:21:05 15   cited in response, the Emain Fills case, that case doesn't

03:21:09 16   apply here.  That was a situation where the court was

03:21:11 17   reviewing a magistrate judge's order for abuse of

03:21:15 18   discretion, and the court even suggested it might have

03:21:19 19   decided differently.  But what the magistrate found there

03:21:21 20   was that the accused infringer was seeking information for

03:21:25 21   an improper purpose.  And there is no improper purpose here.

03:21:28 22   We're seeking information that Quest itself put for

03:21:33 23   commercial success and its permanent injunction remedy.

03:21:36 24        Turning to the next part of this dispute, some

03:21:40 25   of our interrogatories regrettably have had typos in them.

03:21:44  1    We thought they were obvious typos.  Once Quest notified us

03:21:48  2    that they were going to refuse to respond to those

03:21:51  3    interrogatories, we corrected them.  And Quest still refuses

03:21:55  4    to respond.

03:21:55  5         So Your Honor, if I may, I can hand up a red

03:21:58  6    line that just shows what these typos are and how we fixed

03:22:03  7    them.

03:22:03  8         THE COURT:  When did you serve the fixed ones?

03:22:08  9         MR. CARLSON:  We served the fixed ones on August

03:22:15 10    16th, so more than thirty days ago.

03:22:18 11         May I approach?

03:22:37 12         THE COURT:  Yes.

03:22:38 13         MR. CARLSON:  Your Honor, what you have in front

03:22:39 14    of you is Exhibit F to your briefing, and this is a red line

03:22:43 15    with what we served with the corrected interrogatories to

03:22:45 16    show just the corrections that we made.  The first

03:22:48 17    correction is on page eight and you'll see just reading

03:22:51 18    interrogatory two for each test identified a response for

03:22:56 19    interrogatory, it used to say two, in other words, referring

03:23:00 20    to itself, and we had intended it to say one.

03:23:03 21         If I could ask Your Honor just to look back at

03:23:05 22    Exhibit A which is the -- which has the text of the

03:23:08 23    interrogatories as served, on page seven of Exhibit A,

03:23:16 24    you'll see that interrogatory number one ask for an

03:23:20 25    identification of test and that's the only identification of

03:23:25  1    interrogatory that ask for any identification of test.  So

03:23:28  2    we submit this is a regrettable typo that we should not have

03:23:31  3    done, but it was one that was obvious to realize and we

03:23:36  4    corrected it as soon as we could and we would just like an

03:23:39  5    answer that is more than we're not going to respond because

03:23:42  6    there is a typo.

03:23:51  7            And just finally I'll address the *Nevanta* case

03:23:54  8    that Quest cited in its brief.  That case didn't address a

03:23:59  9    typo like we have here.  In that case the interrogatory

03:24:04 10    assumed the premise that the receiving party disputed.  So,

03:24:09 11    in other words, it forced the receiving party to accept the

03:24:12 12    premise that it contested.  And the court held that that was

03:24:16 13    improper as drafted and the receiving party didn't need to

03:24:19 14    respond.  That's not the issue here.  We have an obvious

03:24:22 15    typo.  It's information that's relevant for the same reasons

03:24:25 16    that we addressed regarding the other information about

03:24:29 17    Quest tests and we think it should be responded to.

03:24:33 18            THE COURT:  Okay.

03:24:55 19            MR. MAJCHRZAK:  Good afternoon, Your Honor.  So

03:25:00 20    I would like to take these one at a time if that's the

03:25:05 21    request.  One of the issues is the requests are far broader

03:25:11 22    than they have been presented to Your Honor.  What they're

03:25:14 23    asking for, LabCorp. is asking for any test, whether

03:25:18 24    patented or not.  If you look at the request number one they

03:25:24 25    provided you, it's extraordinarily broad.

03:25:27  1          THE COURT:  Yes, I got it, there were ten

03:25:30  2   document requests and four interrogatories that were cited

03:25:33  3   that they're asking for a lot.  But I guess my question is,

03:25:39  4   are you relying on commercial success, because I was kind of

03:25:42  5   with you in the papers when you said we're not relying on

03:25:46  6   commercial success so it's not at issue right now, and then

03:25:51  7   I got the interrogatory where you do refer to commercial

03:25:54  8   success of your own products.

03:25:57  9          MR. MAJCHRZAK:  So, Your Honor, I think we were

03:25:59 10   in the process of making that decision, and we would

03:26:02 11   consider withdrawing the commercial success.  But that's

03:26:06 12   also incidentally related with the other issue we've asked

03:26:10 13   to address is LabCorp.'s designee under the protective

03:26:15 14   order, because the items LabCorp. was asking for are highly

03:26:20 15   sensitive.  These are SOP's, standard operating procedures,

03:26:24 16   they go from step one to the end.  These are for all these

03:26:28 17   tests, and it's not Quest's products that are at issue.

03:26:31 18          THE COURT:  Right.  But you're asking that

03:26:33 19   information of them and you have folks in your in-house who

03:26:37 20   are looking at that, right?

03:26:38 21          MR. MAJCHRZAK:  The person who is designated as

03:26:41 22   our in-house designee is not in IP counseling, Ms. Mack's

03:26:46 23   job is to oversee litigation, she doesn't have the type of

03:26:49 24   role we believe that LabCorp.'s representative has.  So it's

03:26:53 25   very different.  And balanced against the need for the

03:26:55 1    information, it's a patent infringement case, of course

03:26:58 2    their products are at issue.  It's not the same in the case

03:27:01 3    of Quest.

03:27:06 4              And Your Honor, the cases that they provided to

03:27:09 5    you support Quest, *Leader, Sonics*, the things they've also

03:27:16 6    asked for in the other interrogatories, even after

03:27:18 7    correcting their so-called typographical errors which appear

03:27:25 8    to be a lot of cut and pasting from says LabCorp, but it

03:27:29 9    appears to track one of our interrogatories.  It's not our

03:27:32 10   job to rewrite their interrogatory and the answer.

03:27:36 11             What they're asking for in some of those

03:27:39 12   requests are things like claim charts for our products.  The

03:27:41 13   cases they cited, Your Honor, denied that, *Leader, Sonics*,

03:27:46 14   that's exactly what they -- what the parties and the

03:27:49 15   defendant asked for in those cases and the court said no,

03:27:52 16   that's not -- you know, there is no reason you need claim

03:27:56 17   charts for a patentee's products.  The case isn't about the

03:28:00 18   patentee's products.

03:28:02 19             Another, Your Honor, another point they offered

03:28:07 20   to the Court is that they're entitled to all this

03:28:11 21   information about Quest's products and services that Quest

03:28:14 22   doesn't even allege are covered by the patents.  That's what

03:28:17 23   their requests cover.  And they're pushing that.  And their

03:28:20 24   argument is that's relevant for non-infringing alternatives,

03:28:25 25   which is a clear misunderstanding of the law.  Quest's

03:28:30 1    products and services are not non-infringing alternatives.

03:28:34 2    Non-infringing alternatives are things that have to be

03:28:38 3    available to the defendant.  Quest's proprietary processes

03:28:42 4    are not relevant to that inquiry.

03:28:48 5            If there are other things I could address for

03:28:51 6    Your Honor, I'm happy to do that, but at least as far as

03:28:55 7    their discovery goes, I think that addresses it.

03:28:59 8            THE COURT:  Okay.  So I think on this one what I

03:29:02 9    am going to do is to say you need to make a decision on

03:29:09 10   commercial success.  If you're going to go forward asserting

03:29:13 11   commercial success, you need to produce for them the tests

03:29:16 12   that you assert are covered by the claims so that you can,

03:29:21 13   you know -- because you're going to have to establish a

03:29:24 14   nexus anyway to the claims.  So if you go forward with

03:29:28 15   commercial success, you need to provide that information to

03:29:31 16   them.

03:29:32 17           I do think that these interrogatories, even

03:29:37 18   aside from that are somewhat overly broad with, you know,

03:29:41 19   all other expenses and all documents related to some of

03:29:48 20   these issues.  So why don't you figure out if you're going

03:29:52 21   to rely on commercial success.  If you are, then produce the

03:29:57 22   tests and then go back and discuss what of this other

03:30:00 23   financial information is required and should be produced,

03:30:04 24   see if you can work that out.

03:30:06 25           MR. MAJCHRZAK:  Understood, Your Honor.

03:30:10  1          MR. CARLSON:  Your Honor, if I may, is Your

03:30:13  2  Honor willing to discuss timing for when they will make that

03:30:17  3  decision?

03:30:17  4          THE COURT:  Yes.  When can you make that

03:30:19  5  decision?

03:30:21  6          MR. MAJCHRZAK:  Your Honor, it would depend on

03:30:26  7  your decision on Mr. Peterson, because Quest will have to

03:30:29  8  make a decision --

03:30:30  9          THE COURT:  I'm going to decide that today, so

03:30:33 10  assume I decide that today, when can you make that decision?

03:30:38 11          MR. MAJCHRZAK:  Can we have week, Your Honor?

03:30:42 12          MR. CARLSON:  I'm sorry?

03:30:43 13          MR. MAJCHRZAK:  A week.

03:30:44 14          MR. CARLSON:  Yes, sounds good.  Thank you.

03:30:46 15          THE COURT:  All right.  So now let's talk about

03:30:48 16  the protective order issue.  And I guess my thought in

03:30:57 17  reading these papers was after reading them, I don't really

03:31:03 18  have a good feel for what Mr. Peterson's responsibilities

03:31:07 19  are.  So maybe we could start with the defendants.  I'm not

03:31:12 20  going to find that there was a waiver because I do think

03:31:16 21  it's a protective order issue.  It was close, they did give

03:31:19 22  you an idea within the time period, so I would like to

03:31:23 23  address it on the merits.  I'm just not sure.  And you can

03:31:26 24  sit down because I want to hear from defendants first.  I

03:31:30 25  just want to understand, I know you say look, he's not

03:31:33  1    involved in the competitive decision making and it may very

03:31:37  2    well be that he's not, but I didn't get from anybody's

03:31:41  3    papers really an idea of what he does.

03:31:43  4          MR. CARLSON:  Yes, Your Honor.  Mr. Peterson is

03:31:45  5    an in-house lawyer for LabCorp.  His responsibilities

03:31:49  6    include managing litigation, managing prosecution, and a

03:31:53  7    more limited role in providing advice as to IP issues and

03:31:58  8    agreements.

03:31:58  9          He has been involved in this case including in

03:32:04 10    the pre-litigation communications that the parties

03:32:08 11    exchanged, so he's in a good position to manage this case.

03:32:11 12    There is a need for him to continue to be involved.  And

03:32:16 13    just to get into more about his position, he reports to the

03:32:20 14    general counsel.  He doesn't report to a business person.

03:32:24 15    He has a title from Sequenom, which is a LabCorp. subsidiary

03:32:30 16    that does -- I know I'm going to get this wrong --

03:32:38 17    noninvasive prenatal testing, so it's not the type of

03:32:42 18    technology that's at issue here.

03:32:45 19          And his title there reflects the fact that he

03:32:51 20    started his career at Sequenom and came to LabCorp. after

03:32:56 21    the acquisition at Sequenom.  Moving to his position at

03:32:59 22    LabCorp., it's the associate VP, and that reflects his level

03:33:04 23    of seniority within the legal department.  It's not an

03:33:07 24    indication of any substantive business roles and

03:33:11 25    responsibilities.

03:33:12  1         So you know, given all this, the fact that we

03:33:17  2  have a prosecution bar in the protective order, the fact

03:33:21  3  that the protective order contemplates one in-house counsel

03:33:27  4  from each side having access to information, the fact that

03:33:30  5  he's been involved in this case since the beginning, since

03:33:33  6  even before the complaint was filed, and the fact that he

03:33:36  7  doesn't report directly to any executives, he's not on the

03:33:40  8  management team and he's not involved in competitive

03:33:44  9  decision making, we submit that when you balance that

03:33:48 10  against the -- when you balance his need for access against

03:33:51 11  the small risk or nonexistent risk of inadvertent

03:33:56 12  disclosure, he should be given access to Quest's

03:34:01 13  information.

03:34:03 14         MR. MAJCHRZAK:  Your Honor, I'm still struggling

03:34:07 15  with what I think Your Honor was struggling with.  I really

03:34:11 16  don't have a good handle on what Mr. Peterson does other

03:34:15 17  than labels and conclusions.  He told you he wasn't involved

03:34:19 18  in decision making, competitive decision making, but the

03:34:22 19  facts necessary to establish that are things that we have

03:34:24 20  been asking LabCorp for and we haven't received.  Some of

03:34:29 21  what I heard today causes me concern, however, because it

03:34:34 22  manages prosecution.  There is a prosecution bar as counsel

03:34:39 23  acknowledges.  Involvement in prosecution of a -- as a

03:34:43 24  competitor involved in prosecution of patents, that is one

03:34:46 25  of the things that the cases have routinely identified as

03:34:50  1    competitive decision making.

03:34:52  2            Also, the cases in *Fisher* that we cited Your

03:34:57  3    Honor is a good example that goes through the types of

03:35:00  4    things that may be competitive decision making.  It doesn't

03:35:04  5    require that Mr. Peterson be the decision maker if he's

03:35:07  6    advising the decision makers.  There is no attack on

03:35:11  7    Mr. Peterson.  We're not trying to impune his integrity in

03:35:16  8    any way.  The problem is if he has access to things like

03:35:20  9    Quest SOP's, this is like the secret sauce, this is what

03:35:24 10    they do not tell the public.  And how is he supposed to

03:35:31 11    perform in his role once he has seen that information?

03:35:34 12            Now, what I haven't heard is an answer to the

03:35:37 13    question of is he involved in IP licensing, because that's

03:35:42 14    another factor for the Court to consider.  There is a list

03:35:46 15    of factors that *Fisher* case goes through and frankly we

03:35:51 16    haven't received an answer despite asking for it for almost

03:35:56 17    two months.

03:35:56 18            THE COURT:  Whose burden is it?

03:36:00 19            MR. MAJCHRZAK:  It's our burden, Your Honor.

03:36:03 20            THE COURT:  I don't think it matters.  So I am

03:36:06 21    going to allow Mr. Peterson to have the access afforded to

03:36:16 22    him.

03:36:17 23            MR. MAJCHRZAK:  Your Honor, if I may, I promise

03:36:20 24    to be brief.  In a number of the cases what the courts have

03:36:23 25    done is the person having access to the confidential

03:36:26  1    information may have submitted a declaration describing

03:36:30  2    their duties, things like that.  We don't have the benefit

03:36:33  3    of those facts.

03:36:34  4              THE COURT:  But you came to me knowing you had

03:36:36  5    the burden and you didn't try to meet it before coming to

03:36:41  6    me.  So --

03:36:44  7              MR. MAJCHRZAK:  We were required by certain

03:36:47  8    timing in the agreed protective order to ask the Court's

03:36:50  9    relief by ten days after the end of the meet and confer.

03:36:54 10              THE COURT:  Right.

03:36:55 11              MR. MAJCHRZAK:  We're essentially rewarding

03:36:58 12    LabCorp. for refusing to meet and confer and provide that

03:37:02 13    information.  They stonewalled us for two months and we got

03:37:05 14    to the end of the process, and we're facing either ask the

03:37:10 15    court for relief or waive.  So I'm sort of begging the

03:37:19 16    question, how is someone faced with stonewalling supposed to

03:37:24 17    proceed?

03:37:26 18              THE COURT:  Luckily that is not my problem at

03:37:29 19    the moment, but I will say that I just don't think that it's

03:37:33 20    been met.  Obviously Mr. Peterson is going to have to deal

03:37:37 21    with meeting the prosecution bar and not violating that if

03:37:43 22    he's going to get the information, so the prosecution aspect

03:37:49 23    doesn't bother me so much.  And I just haven't heard

03:37:53 24    anything else other than speculation about what he might do

03:37:56 25    that causes me to say that you have met your burden and that

03:38:00 1   he shouldn't have access to the information.  If it turns

03:38:03 2   out that something that they said was incorrect about his

03:38:05 3   responsibility, then you can bring that up.  That's my

03:38:09 4   ruling for now.

03:38:10 5           MR. MAJCHRZAK:  Can I ask for one clarification

03:38:13 6   or possibly some additional protection, maybe we could ask

03:38:16 7   now and if you need more information we'll be happy to

03:38:20 8   provide it.  In at least one of the cases, I will find the

03:38:24 9   case for you, there were restrictions placed upon the party

03:38:27 10  who was allowed to receive it, that they had to agree not to

03:38:31 11  be involved in, for example, deciding what patents might be

03:38:34 12  asserted against the party that had provided the

03:38:37 13  information.

03:38:37 14          So as a condition for -- because we don't know

03:38:40 15  that he's not making the decisions because we have been

03:38:43 16  stonewalled in terms of information, if he's willing to

03:38:47 17  represent that they won't -- he won't engage in that

03:38:51 18  function, then that would alleviate in part our concern.

03:38:58 19          MR. CARLSON:  Your Honor, we're certainly open

03:39:00 20  to considering some type of reciprocal arrangement like

03:39:04 21  that.  It appears that the risk is similar for both parties

03:39:07 22  about asserting patents, especially considering that we're

03:39:10 23  the defendants here and the patents are asserted against us.

03:39:13 24          MR. MAJCHRZAK:  I'm happy to take that up with

03:39:16 25  opposing counsel.

03:39:17  1                    THE COURT:  Why don't you guys -- it sounds like

03:39:19  2      it makes sense to me that this puts both parties on the same

03:39:24  3      footing.  So why don't you try to work something out along

03:39:28  4      that way, along those lines.

03:39:30  5                    MR. MAJCHRZAK:  Thank you, Your Honor.

03:39:31  6                    THE COURT:  Anything else?

03:39:33  7                    MR. CARLSON:  No, Your Honor.

03:39:36  8                    MR. GAHTAN:  No, Your Honor.

03:39:37  9                    THE COURT:  Thank you very much.

03:39:39 10                    (Court recessed at 3:39 p.m.)

         11

         12                    I hereby certify the foregoing is a true
             and accurate transcript from my stenographic notes in the
         13  proceeding.

         14
                                              /s/ Dale C. Hawkins
         15                             Official Court Reporter
                                          U.S. District Court
         16

         17

         18

         19

         20

         21

         22

         23

         24

         25