IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUEST DIAGNOSTICS INVESTMENTS LLC,<br><br>Plaintiff,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS, ESOTERIX, INC., and ENDOCRINE SCIENCES, INC.,<br><br>Defendants. | C.A. No. 1:18-cv-01436 (MN)<br><br>**DEMAND FOR JURY TRIAL**<br>**REDACTED PUBLIC VERSION** |

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: 320.880.6800
kdorsney@morrisjames.com

*Of Counsel:*
Adam R. Gahtan (agahtan@fenwick.com)
Kevin X. McGann (kmcgann@fenwick.com)
Eric M. Majchrzak (emajchrzak@fenwick.com)
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: 212.430.2600
emajchrzak@fenwick.com

Melanie L. Mayer (mmayer@fenwick.com)
Elizabeth B. Hagan (ehagan@fenwick.com)
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510

*Attorneys for Plaintiff*

December 4, 2019

WILSON SONSINI GOODRICH & ROSATI, P.C.
Ian R. Liston (#5507)
Johanna Peuscher-Funk (#6451)
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
Telephone: 302.304.7600
iliston@wsgr.com
jpeuscherfunk@wsgr.com

*Of Counsel:*
Edward G. Poplawski (epoplawski@wsgr.com)
Oliva M. Kim (okim@wsgr.com)
Erik Carlson (ecarlson@wsgr.com)
Wilson Sonsini Goodrich & Rosati, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: 323.210.2900

Matias Ferrario
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
Telephone: 336.607.7300
mferrario@kilpatricktownsend.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

I.     The Asserted Patents ...................................................................................................1

     A.     U.S. Patent No. 8,409,862 ................................................................................1

          1.     Quest's Overview ..................................................................................1

          2.     LabCorp's Overview .............................................................................1

     B.     U.S. Patent Nos. 7,972,867 and 8,101,427 ......................................................2

          1.     Quest's Overview ..................................................................................2

          2.     LabCorp's Overview .............................................................................3

II.     Person of Ordinary Skill in the Art .............................................................................3

     A.     Quest's Statement ............................................................................................3

     B.     LabCorp's Statement .......................................................................................4

III.     Agreed Constructions ..................................................................................................5

IV.     Disputed Constructions ...............................................................................................6

     A.     U.S. Patent No. 8,409,862 ................................................................................6

          1.     "capable of detecting testosterone at concentrations of less than 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the sample" ............................................6

               a)     Quest's Opening Position ........................................................6

               b)     LabCorp's Answering Position ...............................................7

               c)     Quest's Reply Position ...........................................................13

               d)     LabCorp's Sur-Reply Position ...............................................22

           2.     "ionizing" and "testosterone ions" ....................................................26

               a)     Quest's Opening Position ......................................................26

               b)     LabCorp's Answering Position .............................................29

               c)     Quest's Reply Position ...........................................................33

               d)     LabCorp's Sur-Reply Position ...............................................36

11406397/1

3.    "purifying testosterone" ...................................................................38

    a)    Quest's Opening Position ...............................................39

    b)    LabCorp's Answering Position......................................41

    c)    Quest's Reply Position...................................................45

    d)    LabCorp's Sur-Reply Position .....................................47

B.    U.S. Patent Nos. 7,972,867 and 8,101,427 ..................................................49

1.    "relating the detected ions to the presence or amount of said  25-hydroxyvitamin D$_2$ in said sample" .................................................49

    a)    Quest's Opening Position ...............................................49

    b)    LabCorp's Answering Position......................................53

    c)    Quest's Reply Position...................................................55

    d)    LabCorp's Sur-Reply Position .....................................57

2.    "relating the detected ions to the amount of said vitamin D metabolite in said sample"...............................................................58

    a)    Quest's Opening Position ...............................................58

    b)    LabCorp's Answering Position......................................59

    c)    Quest's Reply Position...................................................61

    d)    LabCorp's Sur-Reply Position .....................................62

11406397/1

# TABLE OF AUTHORITIES

CASES

*Allen Eng'g Corp. v. Bartell Indus.*,
   299 F.3d 1336 (Fed. Cir. 2002).................................................................................30, 36

*Am. Patent Dev. Corp., LLC v. MovieLink, LLC*,
   604 F. Supp. 2d 704 (D. Del. 2009).........................................................................52, 59

*Applera Corp. v. Micromass UK Ltd.*,
   186 F. Supp. 2d 487 (D. Del. 2002).........................................................................28, 37

*ArcelorMittal v. AK Steel Corp.*,
   No. 13-cv-00685, 2019 WL 3391814 (D. Del. Jul. 26, 2019) ..........................................52, 59

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
   No. 09-cv-347, 2010 WL 2219667 (D. Del. June 3, 2010) ....................................................56

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)..........................................................................7, 28, 35

*Bioverative Inc. v. CSL Behring LLC*,
   No. 17-cv-914, 2019 WL 1276030 (D. Del. Mar. 20, 2019)...................................................18

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008)..........................................................................41, 49

*Dow Chemical Co. v. Nova Chemicals Corp.*,
   803 F.3d 620 (Fed. Cir. 2015)................................................................................22

*eBay Inc. v. Glob. Equity Mgmt. (SA) Pty. Ltd.*,
   No. IPR2016-01829, Paper 66 (P.T.A.B. Oct. 16, 2018) ...................................................24

*Galderma Labs. Inc. v. Amneal Pharm., LLC*,
   No. 11-1106, 2013 WL 3942965 (D. Del. July 30, 2013) ...................................................53

*Game & Tech. Co., Ltd. v. Activision Blizzard Inc.*,
   926 F.3d 1370 (Fed. Cir. 2019)...............................................................................51

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
   940 F.3d 680 (Fed. Cir. 2019)............................................................................8, 21

*Immersion Corp. v. HTC Corp.*,
   No. 12-259, 2015 WL 581572 (D. Del. Feb. 11, 2015)......................................................52

*JobDiva, Inc v. Monster Worldwide, Inc.*,
   No. 13-CV-8229 KBF, 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014) ...................................8, 22

*McRO, Inc. v. Bethesda Softworks, LLC,*
No. 12-1509, 2017 WL 2483697 (D. Del. June 8, 2017) ......................................................28

*Mylan Pharm. Inc. v. Galderma Labs., Inc.,*
No. 10-892, 2011 WL 1113383 (D. Del. Mar. 24, 2011) ......................................................50

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014) ................................................................................................15, 28

*Omega Flex, Inc. v. Ward Mfg., LLC,*
No. 18-cv-01004, 2019 WL 3281270 (D. Del. Jul. 19, 2019) ........................................ *passim*

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc)......................................................................... *passim*

*PHT Corp. v. Invivodata, Inc.,*
No. 04-cv-60, 2005 WL 1189552 (D. Del. May 19, 2005) ...................................................46

*PODS, Inc. v. Porta Stor, Inc.,*
484 F.3d 1359 (Fed. Cir. 2007)........................................................................................57

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
422 F. Supp. 2d 446 (D. Del. 2006), *rev'd in part on other grounds by*, 711
F.3d 1348 (Fed. Cir. 2013)...............................................................................................7

*Purdue Pharma L.P. v. Amneal Pharm., LLC,*
No. 15-cv-1152, 2017 WL 634939 (D. Del. Feb. 16, 2017)..................................................34

*Renishaw PLC v. Marposs Societa' per Azioni,*
158 F.3d 1243 (Fed. Cir. 1998)................................................................................16, 45, 51

*Rexnord Corp. v. Laitram Corp.,*
274 F.3d 1336 (Fed. Cir. 2001)........................................................................................56

*Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.,*
844 F.3d 1370 (Fed. Cir. 2017)........................................................................................15

*Summit6, LLC v. Samsung Elecs., Co.,*
802 F.3d 1283 (Fed. Cir. 2015)........................................................................................50

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
789 F.3d 1335 (Fed. Cir. 2015)................................................................................8, 21, 22

*Trs. of Columbia Univ. v. Symantec Corp.,*
811 F.3d 1359 (Fed. Cir. 2016)...................................................................................... *passim*

*Unwired Planet, LLC v. Apple Inc.,*
829 F.3d 1353 (Fed. Cir. 2016)........................................................................................34

iv

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)........................................................................35

*Wasica Finance GmbH v. Continental Automotive Sys., Inc.*,
   853 F.3d 1272 (Fed. Cir. 2017)......................................................................56

STATUTES

35 U.S.C. § 311(b) .................................................................................................24

OTHER AUTHORITIES

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ........................................52

v

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Plaintiff Quest Diagnostics Investments LLC | Quest |
| Defendants Laboratory Corporation of America Holdings, Esoterix, Inc., and Endocrine Sciences, Inc. | LabCorp |
| U.S. Patent No. 8,409,862 | the '862 patent or the '862 testosterone patent |
| U.S. Patent No. 7,972,867 | the '867 patent |
| U.S. Patent No. 7,972,868 | the '868 patent |
| U.S. Patent No. 8,101,427 | the '427 patent |
| U.S. Patent Nos. 7,972,867 and 8,101,427, collectively | The Vitamin D Patents |
| Declaration of Deborah French, Ph.D., in Support of Defendant LabCorp's Answering Claim Construction Brief | French Decl. |
| Declaration of Leonard J. Chyall, Ph.D. | Chyall Decl. |

vi

# I.  THE ASSERTED PATENTS

## A.  U.S. Patent No. 8,409,862

### 1.  Quest's Overview

The '862 patent claims novel methods of determining the very low amounts of testosterone typically found in women.  For samples taken from a female human, the claimed methods include: purifying testosterone in the sample (which comprises extracting testosterone from the sample), ionizing the purified testosterone to produce one or more testosterone ions that can be detected by mass spectrometry, and detecting the amount of the one or more testosterone ions via mass spectrometry (the amount of detected ions being related to the amount of testosterone in the sample).  (*E.g.*, Ex. B, '862 patent, Claims.)[1]  The claims recite that the methods are capable of detecting testosterone below certain concentrations.  (*Id.*)

### 2.  LabCorp's Overview

The '862 patent is directed to methods for analyzing testosterone and for detecting testosterone in samples by mass spectrometry.  Testosterone is a steroid produced by the human body.  In males, testosterone is the major androgen, which stimulates maturation into an adult. Ex. B ('862 patent) at 1:34–48.  In females, testosterone is also present but at much lower levels. *Id.* at 1:49–59.  Around August 2002,[2] numerous assays for testosterone were known to those of skill in the art, *id.* at 1:66–2:4, including assays that use mass spectrometry.  French Decl. ¶ 27;

---

[1]  All references to Exhibits B through I refer to the exhibits filed with the Joint Claim Construction Chart (D.I. 72 & 73).

[2]  Quest has contended the '862 patent was conceived of and reduced to practice "by at least August 2002," a date which precedes September 8, 2003, which is the earliest filing date listed on the Facepage of the '862 patent.  LabCorp's arguments are based on what a person of ordinary skill in the art would have understood from the '862 patent around August 2002. LabCorp's arguments, however, do not change if September 2003 earliest filing date is used instead of August 2002.

1

Ex. B ('862 patent) at 2:2–3 citing Dorgan et al., Measurement of Steroid sex hormones in serum: a comparison of radioimmunoassay and mass spectrometry, Steroids, 67: 151-8 (2002).

Mass spectrometry is a technique for analyzing ions generated from an analyte of interest in a sample. A mass spectrometer separates those ions by their mass-to-charge ratio (m/z), and detects those ions qualitatively or quantitatively by their mass-to-charge ratio and abundance. The output of a mass spectrometer typically includes data about signal intensity for ions with various mass-to-charge ratios. Peaks of these intensities reflect the relative abundance of ions with specific mass-to-charge ratios. Analytical techniques can be applied to convert a peak or collection of peaks into useful information about the analyte in the sample. One such useful piece of information is a concentration of the analyte of interest. This analytical technique is called quantitation or quantification. Another useful piece of information is a ratio between two different ions which can indicate that the output of a mass spectrometer relates to the analyte of interest and not some interfering species. French Decl. ¶ 28.

### B.     U.S. Patent Nos. 7,972,867 and 8,101,427[3]

#### 1.     Quest's Overview

The '867 and '427 patents claim novel methods capable of determining the presence or amount of vitamin D metabolites in samples. (*See e.g.*, Ex. C, '867 patent, Claims; Ex. D, '427 patent, Claims.) Importantly, the claimed methods can also distinguish among structurally similar vitamin D metabolites by, for example, generating protonated and dehydrated precursor ions in an earlier step that, in a later step, fragment into metabolite-specific product ions. (Ex. C, '867 patent, 10:37-11:6; Ex. D, '427 patent, 10:40-11-9.) The steps in the claimed methods include: generating a protonated and dehydrated precursor ion, generating one or more fragment

---

[3]   The '867 and '427 patents are related and share a specification.

ions from the precursor ion, detecting the presence or amount of the ions, and relating the detected ions to the presence or amount of vitamin D metabolite in the sample.  (Ex. C, '867 patent, Claims, 21:1-22:59; Ex. D, '427 patent, Claims, 20:44-22:25.)

### 2. LabCorp's Overview

The Vitamin D Patents relate to detection of vitamin D metabolites by mass spectrometry.  Vitamin D is an essential nutrient with two forms: vitamin $D_2$ and vitamin $D_3$.  Ex. C ('867 patent) at 1:20–25.[4]  Measurement of vitamin D metabolites 25-hydroxyvitamin $D_2$ and 25-hydroxyvitamin $D_3$ are useful indexes of vitamin D nutritional status and were commonly measured around the 2005 timeframe.  Ex. C ('867 patent) at 1:39–67.  Known methods for detecting vitamin D metabolites included radioimmunoassays, liquid chromatography, and mass spectrometry.  '867 patent at 2:1–33.  Like the '862 testosterone patent, the Vitamin D Patents focus on detecting vitamin D metabolites using mass spectrometry.  The basics of mass spectrometry summarized above for the '862 testosterone patent also apply to the Vitamin D Patents.

## II. PERSON OF ORDINARY SKILL IN THE ART

### A. Quest's Statement

A person of ordinary skill in the art at the time of the testosterone and vitamin D inventions is someone having the knowledge of a person with a bachelor's degree in chemistry, medicinal chemistry, biochemistry, pharmaceutics, or a related discipline and at least three to four years of experience using chromatography to perform analytical assays to characterize organic and/or biological materials.  The skilled person would be familiar with the application of

---

[4]   The '427 patent is a continuation of the '867 patent that shares a common specification.  Citations are provided to the '867 patent and the same language is also present in the '427 patent.

3

mass spectrometry including tandem mass spectrometry in conjunction with High Performance Liquid Chromatography (HPLC) to perform those analytical assays.  Alternatively, a person of ordinary skill in the art might be a person with an advanced degree (master's or doctorate) in these same fields and a lesser amount of experience, such as one to two years with a master's degree or a few months to a year with a doctorate.

B.      LabCorp's Statement

The field of art of the '862 patent is analyzing testosterone and detecting testosterone in samples by mass spectrometry and a person of ordinary skill in the art would have an advanced degree (e.g., M.S. or Ph.D.) in chemistry or a related discipline, such as pharmacology or biochemistry, and at least 2-3 years of experience in a clinical or research laboratory.  In addition, a person of ordinary skill in the art would typically have experience with various extraction methods, mass spectrometry, and high performance liquid chromatography (HPLC), including the use of such methods for determining levels of analytes in biological samples.  A person of ordinary skill in the art also would have knowledge regarding what parameters would be suitable to adapt for the optimization of extraction, HPLC, and/or mass spectrometry to meet the requirements of a particular laboratory test.  French Decl. ¶ 23.

Quest has proposed the following definition of a person of ordinary skill in the art: "A person of ordinary skill in the art at the time of the testosterone and vitamin D inventions is someone having the knowledge of a person with a bachelor's degree in chemistry, medicinal chemistry, biochemistry, pharmaceutics, or a related discipline and at least three to four years of experience using chromatography to perform analytical assays to characterize organic and/or biological materials.  The skilled person would be familiar with the application of mass spectrometry including tandem mass spectrometry in conjunction with High Performance Liquid Chromatography (HPLC) to perform those analytical assays.  Alternatively, a person of ordinary

4

skill in the art might be a person with an advanced degree (master's or doctorate) in these same fields and a lesser amount of experience, such as one to two years with a master's degree or a few months to a year with a doctorate." Section II.A above. Quest's definition is substantially the same as LabCorp's definition of a person of ordinary skill in the art. In any event, LabCorp's analysis is the same under either party's definition of the level of ordinary skill in the art.

The field of art of the Vitamin D Patents is analyzing and detecting vitamin D in samples by mass spectrometry and a person of ordinary skill in the art would have an advanced degree (e.g., M.S. or Ph.D.) in chemistry or a related discipline, such as pharmacology or biochemistry, and at least 2-3 years of experience in a clinical or research laboratory. In addition, a person of ordinary skill in the art would typically have experience with various extraction methods, MS, and HPLC, including the use of such methods for determining levels of analytes in biological samples. A person of ordinary skill in the art also would have knowledge regarding what parameters would be suitable to adapt for the optimization of extraction, HPLC, and/or MS to meet the requirements of a particular laboratory test.

## III.   AGREED CONSTRUCTIONS

| Term<br>Patent/Claim | Agreed Construction |
|---|---|
| "generating a protonated and dehydrated precursor ion of said 25-hydroxyvitamin $D_2$ [said vitamin D metabolite]"<br><br>U.S. Patent No. 7,972,867, claim 21 | "adding a proton and removing a water molecule from said 25-hydroxyvitamin $D_2$ [said vitamin D metabolite] to generate a precursor ion." |
| "derivatizing"<br><br>U.S. Patent No. 7,972,868, claim 9 | "reacting two molecules to form a new molecule" |
| "derivatizing the dihydroxyvitamin D metabolites from said sample with 4'-carboxyphenyl-TAD"<br><br>U.S. Patent No. 7,972,868, claim 9 | "reacting the dihydroxyvitamin D metabolites from said sample with 4'-carboxyphenyl-TAD to form a new molecule" |

| Term<br>Patent/Claim | Agreed Construction |
|---|---|
| "detecting the amount"<br><br>U.S. Patent No. 8,101,427, claim 1<br><br>U.S. Patent No. 8,409,862,<br>claims 1, 15 | No construction necessary: "detecting the amount" |
| "detecting the presence or amount"<br><br>U.S. Patent No. 7,927,867, claim 21 | No construction necessary: "detecting the presence or amount" |
| "determining the presence or amount"<br><br>U.S. Patent No. 7,927,867, claims 21 and 31 | No construction necessary: "determining the presence or amount" |

## IV. DISPUTED CONSTRUCTIONS

### A. U.S. Patent No. 8,409,862

#### 1. "capable of detecting testosterone at concentrations of less than 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the sample"

| Term<br>Patent/Claim | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "capable of detecting testosterone at concentrations of less than 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the sample"<br><br>U.S. Patent No. 8,409,862, claims 1, 8, 9, 15, 23, 24 | Plain and ordinary meaning: "the method is able to detect testosterone at concentrations below 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the female human sample" | Indefinite |

#### a) Quest's Opening Position

The claim term "capable of detecting testosterone at concentrations of less than 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the sample" requires no construction.[5]  Where, as here, the ordinary meaning of the claim term to a POSA is readily apparent to a lay person, claim construction may

---

[5]  The disputed limitation appears in the listed claims, the only difference being the recited concentration.  (Ex. B, '862 patent, at Claims 1 & 15 (10 ng/dL), 8 & 23 (5 ng/dL), and 9 & 24 (1 ng/dL).)

11406397/1

"involve[] little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Omega Flex, Inc. v. Ward Mfg., LLC*, No. 18-cv-01004, 2019 WL 3281270, at *7 (D. Del. Jul. 19, 2019). The term means exactly what it says: that the claimed methods can detect testosterone at concentrations of less than 10, 5 or 1 ng/dL in a sample, which, based on the antecedent in the claim, must be a female human sample. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 452 (D. Del. 2006) (construing "said top layer of material" based on its antecedent "surface adjoining layer"), *rev'd in part on other grounds by*, 711 F.3d 1348 (Fed. Cir. 2013).

The intrinsic record confirms a plain and ordinary construction. For example, the '862 patent focuses on detecting the low levels of testosterone typically found in female humans, reciting detection levels below even 1 ng/dL. (Ex. B, '862 patent, Claims 9 & 24, 1:49–50 ("Testosterone levels are much lower in females compared to males."), 5:62-65, 16:11–17:9 (running test on female samples).)

As with the preceding two terms, Defendants did not previously identify this term as indefinite in their invalidity contentions, but do so now. Given the term's use of common English words in their plain and ordinary sense, Defendants cannot meet their clear and convincing evidentiary burden. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

### b)      LabCorp's Answering Position

The phrase "capable of detecting testosterone at concentrations of less than 10 [or 5 or 1]

ng/dL in the sample"[6] is indefinite.  The claim language merely states a function or result,[7] which requires one of ordinary skill in the art go to the specification of the patent to ascertain how to achieve this function or result.  French Decl. ¶ 31–40.  But the specification discloses at least four possible meanings for the "capable of detecting . . ." limitations: (1) Limit of Detection (LOD); (2) Lower Limit of Quantitation (LOQ); (3) specificity of testosterone determination; and (4) use of a sample taken from a female human that actually has testosterone at a concentration of less than 10 [or 5 or 1] ng/dL.  One of skill in the art would not know which meaning to apply and therefore the phrase is indefinite.  *See HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 698 (Fed. Cir. 2019) ("[A] claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions."); *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1342, 1345 (Fed. Cir. 2015) ("[M]olecular weight" held indefinite because a person of ordinary skill in the art would not know which of multiple ways to calculate the term); *see also JobDiva, Inc v. Monster Worldwide, Inc.,* No. 13-CV-8229 KBF, 2014 WL 5034674, at *19 (S.D.N.Y. Oct. 3, 2014) ("The law is clear that claim language that would lead those skilled in the art to perform different tests and get different results is indefinite.").

First, one of skill in the art would understand that the patent specification teaches that the Limit of Detection (LOD) is a potential meaning of the "capable of detecting testosterone. . ."

---

[6]  Claims 1 and 15 include the phrase "capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample."  Claims 8 and 23 substitute "5" in place of "10" for the concentration i.e. "capable of detecting testosterone at concentrations of less than 5 ng/dL in the sample."  Claims 9 and 24 substitute "1" in place of "10" for the concentration. LabCorp refers to these phrases collectively as the "capable of detecting . . ." phrases or limitations.

[7]  During prosecution, Quest argued the "capable of detecting …" limitations distinguished prior art, which makes these limitations the alleged point of novelty of the '862 testosterone patent.  French Decl. ¶ 41; Ex. F ('862 patent file history) at QUESTMS-00002858.

8

limitations.  LOD is one of the "[v]arious parameters of the assay [that] were investigated."
French Decl. ¶¶ 34–35; Ex. B ('862 patent) at 18:24–33.  One of skill in the art would understand
that LOD is a way to determine when a signal produced by a detector rises an arbitrary amount
above the uncertainty, e.g. noise, in the detector signal.  French Decl. ¶ 34.

Second, one of skill in the art would also understand that the patent specification teaches
that the Lower Limit of Quantitation (LOQ) is a potential meaning of the "capable of detecting
testosterone. . ." limitations. LOQ is another of the "various parameters" that the inventors
investigated.  French Decl. ¶¶ 36–37; Ex. B ('862 patent) at 18:34–40.  One of ordinary skill in
the art would understand that LOQ refers to a determination of at what point the measured
concentration of the method differs from the actual concentration in the sample with a CV of less
than 20%.  French Decl. ¶ 36.  LOQ would be a measure that would be relevant to determining
whether "the methods of the invention *accurately*[8] detect testosterone."  French Decl. ¶ 37; Ex. B
('862 patent) at 5:62–63.

Third, one of skill in the art would understand that the patent specification teaches
"specificity of testosterone determination" to be another potential meaning of the "capable of
detecting testosterone. . ." limitations.  One of skill in the art would understand specificity is a
measure of whether the method has detected testosterone and not an interfering substance, i.e.
the measurement is "specific" as to testosterone.  French Decl. ¶¶ 38–39.  Specificity would be a
way of assessing whether the method described by the present invention "unambiguously
detect[s] testosterone in a test sample."  French Decl. ¶ 39; Ex. B ('862 patent) at 5:50–51.

Fourth, one of skill in the art understand the patent specification as disclosing another
possible meaning of "capable of detecting testosterone . . ." limitations that requires the claimed

---

[8] All emphasis in quoted material is added unless stated otherwise.

method must use a sample taken from a female human that *actually* has testosterone at a concentration of less than 10 [or 5 or 1] ng/dL. French Decl. ¶ 40. This meaning is suggested by the preambles of claims 1 and 15, which recite "determining the amount of testosterone in a sample *when taken from a female human*." French Decl. ¶ 40. The "capable of detecting testosterone . . ." limitations refer back to this sample when claiming the recited function or result "capable of detecting testosterone" at levels below a recited concentration.

When Quest amended claims 1 and 15 to add the "capable of detecting testosterone . . ." limitation it did not identify any of the four possible meanings above. Instead it cited application paragraph [0030] which became the paragraph starting at column 5 line 50 and ending at column 6 line 3 of the '862 patent. Ex. F ('862 patent file history) at QUESTMS-00002855; French Decl. ¶ 42. That paragraph exacerbates the indefiniteness problem because one of skill in the art would understand it to refer to LOD ("detection limit"), LOQ ("*accurately* detect testosterone"), specificity ("*unambiguously* detecting testosterone" and "enhanced specificity"), and actual concentration in a sample ("accurately detect testosterone *in samples where it is present* in concentrations of less"). French Decl. ¶ 43. In other words, different language at various places in that paragraph suggests each of the four possible meanings for the "capable of detecting testosterone . . ." limitation.

In other places in the prosecution history the examiner and Quest inconsistently characterized the "capable of detecting testosterone . . ." limitations in various ways that one of skill in the art would understand to refer to each of the four possible meanings. French Decl. ¶ 44–52. In comparing the claims to prior art, the examiner appeared to use both the LOD and LOQ meanings when comparing the claims to a Zimmer et al. prior art reference. French Decl. ¶ 44; Ex. F ('862 patent file history) at QUESTMS-00002679–680. In rejecting the claims for

10

obviousness-type double patenting over another patent in the same family as the '862 patent, the examiner cited an example in that patent regarding LOD.  French Decl. ¶ 45; Ex. F ('862 patent file history) at QUESTMS-00002685; Ex. B ('862 patent) at 1:12; Ex. K ('137 patent).  In Quest's response, at various places, it used language that suggested each of the four possible meanings.  Quest suggested LOD would be a possible meaning in arguing against a reading of the Zimmer prior art reference that it disclosed "*detection* at levels down to 0.1 µg/dL."  French Decl. ¶ 47; Ex. F ('862 patent file history) at QUESTMS-00002750.  Quest suggested LOQ would be a possible meaning by arguing there was uncertainty associated with predicting quantitation levels and distinguishing prior art based on a limit of quantitation.  French Decl. ¶ 48; Ex. F ('862 patent file history) at QUESTMS-00002750, -2752–53.  Quest suggested "specificity of testosterone determination" would be a possible meaning by distinguishing the Ong reference on the basis that it did not disclose that *testosterone* was detected as opposed to some other analyte.  French Decl. ¶ 49; QUESTMS-00002752.  Quest suggested the fourth meaning would be possible when it distinguished Ong based on an argument that the levels of testosterone "*used by Ong*" were not below the concentrations recited in the claim.  French Decl. ¶ 50; Ex. F ('862 patent file history) at QUESTMS-00002751–53.  Additionally, Quest submitted two declarations from Michael P. Caulfield, one of the named inventors listed on the '862 patent regarding a purported reduction to practice before the earliest filing date of the '862 patent.  Ex. F ('862 patent file history) at QUESTMS-00002806–2813, -2861–65; French Decl. ¶ 52.  Those declarations did not identify any one of the at least four possible meanings for the "capable of detecting testosterone . . ." limitations.  French Decl. ¶ 52.

Quest's litigation positions also support a conclusion that the "capable of detecting testosterone . . ." limitations are indefinite.  Quest proposed a purported "plain and ordinary

11406397/1

████████████████████

meaning" construction that "the method is able to detect testosterone at concentrations below 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the female human sample."  This construction fails to identify any one of the at least four possible meanings the "capable of detecting testosterone . . ." limitations could have.  French Decl. ¶ 53.  In support of its construction Quest argues "The term means exactly what it says: that the claimed methods can detect testosterone at concentrations of less than 10, 5 or 1 ng/dL in a sample . . . ."  Section IV.A.1(a) above at 7.  As support for its argument, Quest cites the claims themselves (Claims 9 & 24), a statement in the Background of the Invention section that says "Testosterone levels are much lower in females compared to males" (1:49–50), and two other passages in the specification (5:62–65 and 16:11–17:9).  Quest does not cite to Example 4 LOD (Limit of Detection), Example 5 LOQ (Lower Limit of Quantitation), Example 8 Assay Specificity, or any of the other passages that would identify one of various possible meanings of the phrase in question.  French Decl. ¶¶ 54–56.  In other words, Quest's own construction does not help one of skill in the art to ascertain with reasonable certainty which meaning should apply to the phrase "capable of detecting …" limitations.

Similarly, Quest's infringement contentions also demonstrate the indefiniteness of the "capable of detecting testosterone . . ." limitations.  Quest contended one of LabCorp's methods "is capable of *detecting/quantifying* testosterone" at certain concentration and quoted various portions of LabCorp documents the refer to detection in some places and quantitation in others. French Decl. ¶ 57; Ex. L (Quest Infringement Contentions) at Ex. A pg. 4; *see also* Ex. A pg. 11 (addressing Claim 8 similarly).  Elsewhere, Quest's contentions suggest the third (specificity) and fourth (use) meanings should apply.  French Decl. ¶ 58; Ex. L (Quest Infringement Contentions) at Ex. A pg. 12; Ex. M ██████████████████████████████████ ████████████████████████.

For the above reasons, LabCorp respectfully requests that the Court determine the phrases "capable of detecting testosterone at concentrations of less than 10 [or 5 or 1] ng/dL in the sample" are indefinite because there are at least four possible meanings and one of ordinary skill in the art would not know which meaning would apply. Thus, a person of ordinary skill in the art would not know with reasonable certainty the scope of the claimed invention in light of the specification and prosecution history.

### c)      Quest's Reply Position

According to LabCorp, a POSA could not understand with reasonable certainty that "capable of detecting testosterone at concentrations of less than 10 [or 5 or 1] ng/dL in the sample" means just what it says—that the method can detect testosterone at the given concentrations. LabCorp and its expert posit four different "meanings" for the term, arguing that, because the meanings are all equally plausible, the term is indefinite. But even the most motivated reader cannot avoid the term's plain, literal language, and so Dr. French concedes that, to a POSA, the term's "first meaning" is "a method with a Limit of Detection (LOD) below 10 (or 5 or 1) ng/dL." (French Decl., ¶ 34.) That "first meaning" is consistent with Quest's proposed construction, and it is the only one that corresponds to the language of the claim ("detect") and for which Dr. French cites a relevant passage from the specification for support. (*Id*., citing Ex. B, '862 patent, 18:24–26, in which the inventors explain that a method is capable of detecting testosterone at the given concentrations when "the measured value is larger than the uncertainty associated with it.") Dr. French nonetheless declares that a POSA could find three other meanings for the term in the specification and file history, though she never explains why one would go looking for alternatives in the first place, having found a "first meaning" consistent with the claim language and the specification. The alternatives are inherently implausible and certainly not equally possible to a POSA:

- In her second meaning, LOD becomes limit of quantitation (LOQ), because, LabCorp argues, the specification describes the method as "accurately" detecting testosterone. For this "meaning," LabCorp focuses on the relationship of "quantify" and "accurate," which do not appear, in any form, in the claim.  In any event, "quantifying" is not the same as "detecting."  Dr. French also admits that her LOQ proposal would *not* meet claim 9's "less than 1 ng/dL" requirement (*see* French Decl., ¶¶ 34 & 36 (LOD is 0.6 ng/dL while LOQ is 1 ng/dL)).

- In her third meaning, "capable of detecting" connotes the method's "specificity" for testosterone rather than some other analyte.  (French Decl., ¶ 37.)  The claims' preamble already addresses specificity, reciting "a method for determining the amount of *testosterone*," and, indeed, that the method is concerned with that analyte rather than others is shot through the entire patent.  (*See* Ex. B, '862 patent, claim 1; Ex. O, Chyall Decl., ¶ 41.)  There is no reason to interpret "capable of detecting" as conveying that particular message, and, here again, LabCorp relies on words and concepts not found in the term itself.

- The fourth meaning that the term "could have," according to Dr. French, is hard to state because it is hard to understand.  LabCorp appears to be arguing that "capable of detecting" somehow modifies "the sample," rather than the method's sensitivity, such that the claims cover methods of detection only when the sample itself has testosterone concentrations lower than, *e.g.*, 10 ng/dL.  (French Decl., ¶ 40.)  According to this "meaning," although the claims literally state that the "*method*" be "*capable* of detecting" testosterone below the stated levels, they would not cover a method performed on a *sample* that had testosterone concentrations *above* those

14

levels.  This reading takes "capable of" out of the claim term, in addition to whatever other rearrangement of words it requires.

According to LabCorp, these alternative meanings render the term indefinite.  In fact, the term itself provides POSAs "reasonable certainty . . . about the scope of the invention" and "clear notice of what is claimed," and it is therefore not indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014).  Because none of LabCorp's alternatives are even remotely as plausible as Dr. French's "first" meaning, which is the only one that tracks the claim language, none provides a reason for holding the claims indefinite.  (Ex. O, Chyall Decl., ¶¶ 32-33.)  LabCorp has not come close to meeting the clear and convincing evidentiary burden for proving indefiniteness.  *See Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### (1)    The claim language is definite and requires no construction

The claim language plainly requires a method "capable of detecting testosterone" below certain specified concentrations, a concept that appears in Dr. French's "first meaning" only, presumably because, as she tacitly concedes, the language means something clear and definite to a POSA.  (French Decl., ¶ 34.)  Dr. Robert Fitzgerald, LabCorp's expert in a co-pending IPR filed against the same patent, certainly had no trouble understanding "capable of detecting" as correlating to Dr. French's "first meaning" (Ex. P, Fitzgerald Rough Tr. at 140:9-12), and, indeed, LabCorp sought no construction of the term in the IPR, relying instead on its obvious plain meaning.  Because it tracks the claim language, Quest's expert Dr. Chyall concurs with Dr. French's "first meaning," and with Dr. Fitzgerald, and, like Dr. Fitzgerald, he is not confused by any allegedly equally possible alternatives.  (Ex. O, Chyall Decl., ¶¶ 32-33.)  Dr. French also has no trouble finding directly relevant support for her first meaning in the specification.  (French

Decl., ¶ 34.)  A "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

LabCorp never argues that the claim language supports Dr. French's second, third, or fourth meanings, and it offers no claims-based reason at all to go beyond actual words in the term.  Indeed, when Dr. French declares that a POSA would "look to . . . additional possible meanings," it is not because she detects an ambiguity in the *claim*.  Rather, as shown below, it is because the *specification* uses certain words, that, she alleges, confuse the meaning of what she otherwise considers perfectly intelligible claim terms.  (French Decl., ¶ 35.)  All three experts— Drs. French and Fitzgerald for LabCorp, and Dr. Chyall—agree on the plain meaning of "capable of detecting."  (French Decl., ¶ 34; Ex. O, Chyall Decl., ¶¶ 32-33; Ex. P, Fitzgerald Rough Tr. at 140:9-12.)  That meaning should control the term's construction.  *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

### (2) The specification does not render the term indefinite

Unable to rely on the claim language, LabCorp skips to the specification, with equal futility.  LabCorp argues that the specification supports its purported second meaning, LOQ, for no other reason than that LOQ is one of the "various parameters" that the inventors investigated.  (*Supra* at 9.)  Patents certainly may, and perhaps almost always do, provide information about matters beyond what is reflected in a single claim or term.  But that does not provide any basis to conclude that "capable of detecting" means LOQ or is somehow indefinite.

16

As discussed above, there is no reason in the first place to look beyond the claims to understand the meaning of the disputed term.  But, in addition, the part of the specification that LabCorp cites as tying LOQ to "capable of detecting"—a single sentence fragment that reads, "determining whether 'the methods of the invention *accurately* detect testosterone'" (*supra* at 9 (quoting Ex. B, '862 patent, 5:62-63) (emphasis in original))—supports *Quest's* construction and makes no reference to LOQ.  (Ex. O, Chyall Decl., ¶ 38.)  If a POSA had any reason to consider this part of the specification to understand "capable of detecting," the POSA would understand it to refer to the method's ability to *detect* testosterone as described in the claim.  (Ex. O, Chyall Decl., ¶ 38.)

In support of its "specificity"-based alternative meaning, LabCorp cites part of the specification that addresses the method's ability to "unambiguously detect testosterone in a test sample."  (*Supra* at 9 (quoting Ex. B, '862 patent, 5:50–51.)  Here again, LabCorp and Dr. French start with the specification, not with any suggestion that, as used in the claims, "capable of detecting" relates to "specificity," let alone in some way that requires clarification.  LabCorp thus reads "specificity" (as word and concept) into the claim, and then equates that non-claim term with "unambiguously," another term that does not appear in the claim, all to create the impression that the actual claim term, "capable of detecting"—which LabCorp does not address—is indefinite.  As with LOQ, moreover, the language from the specification on which LabCorp relies addresses the method's ability to "detect" testosterone, exactly as the claims require.

Finally, LabCorp argues that the specification supports its inscrutable fourth alternative meaning, according to which, "the claimed function or result ("capable of detection") could only be achieved when the actual concentration in the sample taken from a female human is less than

17

of [sic] 10[or 5 or 1] ng/dL and the method detects the testosterone." (French Decl., ¶ 40.) In (LabCorp's) other words, "capable of detecting" means that "the method must be performed on a sample taken from a female human that actually has testosterone" at the given concentrations. (*Id.*) This is apparently because the "capable of detecting" refers not to the method's sensitivity, but to "*the* sample," which is in turn a reference to the preamble's "sample when taken from a female human" language. (*Id.*; *supra* at 10, emphasis in original.) To the extent Quest understands LabCorp's position, it is that the concentration limits in the "capable of detecting" terms do not refer to the method's sensitivity, but, rather, to the samples being tested. Accordingly, although the claim language literally says that the "method" is "capable of detecting" testosterone at concentrations "less than," *e.g.*, 10 ng/mL, in LabCorp's understanding this means that the *sample* cannot have a testosterone concentration *above* that limit.

LabCorp's fourth meaning, like its second and third, strays far from the language of the claim, and becomes possible as a matter of language—but still not plausible—only if "method is capable of" is read out of the term entirely, changing its meaning, and if the preamble becomes superfluous, violating a "guiding principle[ ] of claim construction" that "a court give every term independent meaning within the claim." *See Bioverative Inc. v. CSL Behring LLC*, No. 17-cv-914, 2019 WL 1276030, at *7 (D. Del. Mar. 20, 2019).

### (3)    The file history does not render the term indefinite

With respect to the file history, LabCorp offers two arguments. LabCorp argues first that the specific paragraph in the specification that Quest cited as support for adding the "capable of detecting" term supports multiple, alternative meanings. The paragraph in question is the one from which LabCorp draws the specification-based alternative definitions discussed immediately above. (*Supra* at 10 (citing Ex. F, '862 patent file history, at QUESTMS-00002855 (identifying '862 patent, 5:50-6:3 as an example for the specification that supports this term)).) Quest's

18

response is therefore the same: this is a game in which LabCorp equates adverbs that do not appear in the claim term (accurately, unambiguously) with concepts that do not appear in the claim term (LOQ, specificity), and concludes, somehow, that different words, which *do* appear in the term, are indefinite.  Oddly, LabCorp does not deal with the one word, "detect," that at least superficially connects the term to the cited portions of the specification, and that is the only word that the claim term and the cited portions share.  The method's ability to "detect" testosterone (accurately, unambiguously, otherwise), supports *Quest's* construction—"capable of detection" means capable of detection—which is also Dr. French's "*first* meaning," as well as the only meaning that LabCorp's IPR expert ascribes to the term, and that Dr. Chyall finds in it.  (Ex. O, Chyall Decl., ¶¶ 32-33, 39-40, 42.)

LabCorp next argues that Quest and the Examiner characterized the invention during prosecution in a manner that supports LabCorp's alternative meanings.  LabCorp gets the file history and the science wrong.  For example, LabCorp argues "the examiner appeared to use both the LOD and LOQ meanings when comparing the claims to Zimmer," a reference cited during prosecution (*Supra* at 10–11 (citing Ex. F, '862 patent file history, at QUESTMS-00002679-80), highlighting the Examiner's citation of Zimmer's "limit of quantitation," and her correlation of that information to Zimmer's ability to detect testosterone.  (*Id.*)  But Zimmer reports LOQ information *only* (*see generally* Ex. F, at QUESTMS-00002706-18), so that the Examiner had to discuss it in those terms.  In response, Quest argued that it was impossible to conclude from Zimmer's very high LOQ that Zimmer's method could even detect testosterone at levels as low as that of the '862 patented invention.  (Ex. F, at QUESTMS-00002706; Ex. O, Chyall Decl., ¶ 40.) Nothing in Quest's explanation equated capable of detection with LOQ.

LabCorp also argues that Quest suggested the "specificity" and "actual sample" meanings

during prosecution "by distinguishing the Ong reference on the basis that it did not disclose that testosterone was detected as opposed to some other analyte." (*Supra* at 11 (citing Ex. F, '862 patent file history, at QUESTMS-00002752).)  Setting aside the numerous other grounds on which Quest distinguished Ong (Ex. F, '862 patent file history, at QUESTMS-00002751-53), there is no indication that this particular statement had anything to do with the "capable of detecting" term. (*See* Ex. F, '862 patent file history, at QUESTMS-00002752.)

### (4)    Quest's litigation positions are consistent with a definite term

LabCorp next argues that two of Quest's litigation positions—(1) proposing a plain and ordinary meaning construction without "identify[ing]" any of LabCorp's alternative meanings, and (2) describing LabCorp's methods as "capable of detecting/quantifying testosterone" in its infringement contentions—suggest that the term is indefinite. (*Supra* at 11-13.)

There was no reason whatsoever for Quest, or anyone, to "identify" LabCorp's alternative meanings, none of which has a basis in, or uses, the actual claim language. (By LabCorp's reasoning, its own expert Dr. Fitzgerald also "fails to identify" Dr. French's alternatives.)

Nor do Quest's infringement contentions bear on the construction or definiteness of the disputed term.  Quest necessarily relied for its contentions on information in the documents LabCorp produced.  The documents contained LOQ data only.  Because LOD is always lower than LOQ (Ex. O, Chyall Decl., ¶ 36.), Quest could determine from the LOQ disclosed in the documents that LabCorp's tests infringe.  That is using LOQ to deduce that LabCorp's tests were capable of detecting testosterone at the claimed levels; it is not equating the two in any way, let alone so as to render the claim term indefinite.

### (5)    LabCorp's cases do not support its indefiniteness position

LabCorp cites three easily distinguishable cases in support of its argument that Dr. French's contrived alternative meanings render the "capable of detecting" term indefinite.

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 696 (Fed. Cir. 2019), concerned whether the phrase "better drying time" was indefinite.  The two tests for evaluating "drying time" provided in the patent were inconsistent with each other and internally inconsistent, and the patent provided no guidance as to which test to use, or the time at which to assess the amount of drying.  *Id.* at 698.  Thus, because a POSA could not tell how or when to determine whether a formulation met the "better drying time" limitation, the Federal Circuit found the term indefinite.  *Id.* at 698-99.  Here, in contrast, the '862 patent uses "capable of detecting" consistently and according to its common meaning that three different experts, including two for LabCorp, readily understand.

In *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343-45 (Fed. Cir. 2015), the Federal Circuit found the technical term "molecular weight" indefinite where the parties *agreed* that those skilled in the art recognized three different meanings for the term: peak average molecular weight ($M_p$), number average molecular weight ($M_n$) and weight average molecular weight ($M_w$).  *Id.* at 1338.  In related applications, moreover, the examiner had rejected as indefinite claims that used the same term, because "average molecular weight was meaningless without specifying whether $M_p$, $M_n$, or $M_w$ should be used," and, in those same applications, applicants had argued for two different meanings for "molecular weight," $M_w$ in one, and $M_p$ in another.  *Id.* at 1343-45.   Here, the claims use plain English words, "capable of detecting," not technical terms with multiple acknowledged meanings, the parties certainly do not agree, as they did in *Teva*, that multiple meanings could apply, and there is no evidence that Quest ever argued different meanings for the same claim term.

21

Finally, in *JobDiva, Inc. v. Monster Worldwide, Inc.*, No. 13-cv-8229, 2014 WL
5034674, at *14, 18-19 (S.D.N.Y. Oct. 3, 2014), a district court found the term "improve a
precision ratio when searching a resume database" indefinite because there was no test, in the
specification or the art, for testing improvement of a precision ratio.  Indeed, it appeared that the
ratios provided in the specification were "simply plucked out of thin air."  *Id.* at *18.  There is no
coined term like "precision ratio" at issue here, nor the need for a test to show that the thing to
which such a term refers has been improved.  A person of ordinary skill in the art would have no
difficulty determining whether a given method was capable of detecting testosterone at certain
concentrations.

### d)      LabCorp's Sur-Reply Position

Having sown the seeds of uncertainty as to the meaning of this term in its patent,
prosecution history, and infringement contentions, Quest plucks a meaning from one of the four
that have sprouted.  Quest's choice is incorrect because the intrinsic record provides at least four
distinct, but equally viable ways to meet the limitation: (1) Limit of Detection (LOD); (2) Lower
Limit of Quantitation (LOQ); (3) specificity of testosterone determination; and (4) use of a
sample taken from a female human that actually has testosterone at a concentration of less than
10 [or 5 or 1] ng/dL.  While paying token tribute to its original position that the "capable of
detection . . ." phrase "means just what it says," Quest quickly retreats to LOD as its preferred
meaning.  But the intrinsic record does not guide one to LOD—or any of the other four
methods—so the claim is indefinite.  *See Dow Chemical Co. v. Nova Chemicals Corp.,* 803 F.3d
620, 630 (Fed. Cir. 2015) ("the patent and prosecution history must disclose a single known
approach or establish that, where multiple known approaches exist, a person having ordinary
skill in the art would know which approach to select.").

Quest begins with an incorrect characterization of Dr. French's opinions: according to

Quest, because Dr. French referred to LOD as the "first meaning" it must be the most likely.  But Dr. French simply referred to LOD as the first meaning as a way to distinguish it from the other three meanings.  It was clearly not any value judgment that supports Quest's position.  Next, Quest incorrectly argues that the three other meanings "are inherently implausible and certainly not equally possible to a POSA."  Section IV.A.1(c) above at 14–15.  As demonstrated below, Quest is wrong.

**Claims**. The preamble of Claims 1 and 15 indicate the claims are drawn to a "method for determining the amount of testosterone in a sample."  Ex. B ('862 patent) at 19:50–51; French Decl. ¶¶ 31–32.  The last limitation of the claimed methods is functionally-drafted and contains no express clue as to ***how*** the method achieves the result or function of being "capable of detecting testosterone at concentrations of less than 10 ng/dL in the sample" or how to determine if the result or function is satisfied.  French Decl. ¶¶ 31–32.  The word "detecting" in the last element of the claim suggests LOD.  French Decl. ¶ 35.  The preamble's phrase "***determining the amount***" suggests the claimed capability is LOQ.  The portion of the preamble "determining the amount of ***testosterone***" and portion of the last element "capable of detecting ***testosterone***" suggests the claimed assay must be specific to testosterone.  And the portion of the preamble "amount of testosterone ***in a sample***" and portion of the last element "concentrations of less than 10 ng/dL ***in the sample***" suggests testosterone must actually be present in the sample at less than a certain concentration.  Thus, the claims themselves explicitly refer to four distinct and equally plausible ways to meet the limitation.  Quest ignores the ambiguous nature of its claims and incorrectly argues Dr. French "tacitly" conceded the claim language is clear.  Dr. French made no such concession.  French Decl. ¶¶ 33–40.

Quest's reliance on LabCorp's instituted IPR against the '862 patent similarly does not

support its position.  Neither LabCorp nor its IPR expert Dr. Fitzgerald could have raised

indefiniteness in those proceedings because IPRs are statutorily limited to prior art patentability

challenges under §§ 102 or 103.  *See* 35 U.S.C. § 311(b); *e.g.*, *eBay Inc. v. Glob. Equity Mgmt.*

*(SA) Pty. Ltd.*, No. IPR2016-01829, Paper 66 at 5 (P.T.A.B. Oct. 16, 2018).  The deposition

testimony Quest cited from Dr. Fitzgerald is a single question and answer where Dr. Fitzgerald

agreed that in one specific portion of his report (¶ 50) he used the phrase "capable of detecting"

to refer to LOD.  Ex. P (Fitzgerald Rough Tr.) at 140:9–12; *see also* 139:23–140:8 (asking Dr.

Fitzgerald to turn to paragraph 50 of his report).  Dr. Fitzgerald was not asked whether there

were any other potential meanings.

      **Specification**.  Quest incorrectly dismisses the key passage of the specification that

suggests each of the four possible meanings:

> The present invention describes methods and compositions for ***unambiguously***
> detecting testosterone in a test sample . . . the methods of the invention ***accurately***
> detect testosterone ***in samples where it is present*** in concentrations of less than 50
> ng/dL, less than 25 ng/dL, less than 10 ng/dL, less than 5 ng/dL, and even less
> than 1 ng/dL."

Exhibit B ('862 patent at 5:50-65).[9]  The passage contains good reasons to reject Quest's

arguments.  Section IV.A.1(c) above at 16–18.  First, the passage indicates that it is a description

of "[t]he present invention."  Second, one of skill in the art would understand that the statements

"***accurately*** detect testosterone" refers to LOQ, "***unambiguously*** detecting testosterone" refers to

specificity, and "accurately detect testosterone ***in samples where it is present*** in concentrations

of less than . . . " refers to the actual concentration in a sample.  French Decl. ¶ 33-40.  Third,

Quest itself adopted the paragraph containing this passage as written description support for the

"capable of detecting . . ." limitation during prosecution.  Ex. F ('862 patent file history) at

---

[9] All emphasis in quoted material is added unless stated otherwise.

QUESTMS-00002855 (citing application paragraph [0030]).

**File History**.  Quest generally argues that the prosecution history does not support LabCorp's construction (Section IV.A.1(c) above at 19–20), but a closer look at the prosecution history reveals otherwise.  When rejecting prosecution claims 22–23 that contained the "capable of detecting" limitation, the Examiner referred to both LOD and LOQ but concluded that "one of ordinary skill in the art would have been motivated to ***decrease the detection limit*** . . . and thus determining the lower ***limit of detection*** based on the teachings of Zimmer."  Ex. F ('862 patent file history) at QUESTMS-00002680.  Quest specifically relied on the LOQ meaning in responding to this rejection and distinguishing the prior art:

> The pending claims ***require quantitation of testosterone*** in samples when taken from a female human. At the time of Applicant's invention***, the ability to measure testosterone at levels present in female human samples*** was not simply a matter of routine optimization of prior art methods, but rather was unobtainable by prior art methods.

*See* Ex. F ('862 patent file history) at QUESTMS-00002750; *see also* QUESTMS-00002749–751 (responding to rejection of prosecution claims including 22–23).  As addressed in LabCorp's answering brief, there are similar statements where Quest adopted the third meaning (specificity) and fourth meaning (actual concentration in the sample) in overcoming the Examiner's rejections during prosecution.  Section IV.A.1(b) above at 10–11.

**Litigation Positions**.  Quest argues that its use of LOQ in determining that LabCorp's tests were capable of detecting testosterone at the claimed levels does not confuse LOQ and LOD.  Section IV.A.1(c) above at 20–21.  However, Quest's infringement contentions state that one of LabCorp's methods "is capable of ***detecting/quantifying*** testosterone" at certain concentrations and Quest quoted various portions of LabCorp documents that refer to detection in some places and quantitation in others, thus confusing LOQ and LOD.  French Decl. ¶ 57; Ex. L (Quest Infringement Contentions) at Ex. A pg. 4; *see also* Ex. A pg. 11 (addressing Claim 8

25

similarly).  As purported justification for mixing LOQ and LOD, Quest argues that "LOD is always lower than LOQ" citing the bare assertions of its expert that are not supported by any intrinsic evidence.  Section IV.A.1(c) above at 20 citing Chyall Decl. ¶ 36.  Quest completely ignores its contentions where it applied the third (specificity) and fourth (actual sample concentration) meanings.  French Decl. ¶ 58; Ex. L (Quest Infringement Contentions) at Ex. A pg. 12; Ex. M ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.

One of skill in the art would not know with reasonable certainty the scope of the '862 patent claims in light of the specification and prosecution history.  Thus, the Court should rule that the claims are indefinite.

## 2.      "ionizing" and "testosterone ions"

| Term<br>Patent/Claim | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "ionizing"<br><br>U.S. Patent No. 8,409,862, claims 1, 10–12, 15, 18–20 | Plain and ordinary meaning: "altering a molecule such that it has a net electric charge" | Indefinite |
| "testosterone ions"<br><br>U.S. Patent No. 8,409,862, claims 1, 12, 15, 20 | Plain and ordinary meaning: "one or more testosterone molecules that have been altered to have a net electric charge or one or more fragments thereof with a net electric charge" | Indefinite |

### a)      Quest's Opening Position

#### (1)      "ionizing"

"Ionizing" is used in the '862 patent in a way that a person of ordinary skill in the art ("POSA"),[10] or even anyone who has taken high school chemistry, would understand: "altering a molecule such that it has a net electric charge." Plaintiff's proposed construction is precisely this plain and ordinary meaning.

The patent defines the term in a way that confirms a plain and ordinary construction: "[t]he term 'ionization' and 'ionizing' as used herein refers to the process of generating an analyte ion having a net electrical charge equal to one or more electron units." (Ex. B, '862 patent, 8:45–47.) The specification goes on to explain that the net charge of these ions may be positive or negative. (*Id.*, 8:47–50.) The claims likewise use "ionizing" in its plain and ordinary sense. Independent claims 1 and 15 recite "ionizing said purified testosterone to produce one or more testosterone ions detectable by a mass spectrometer," and dependent claims 10–12 and 18–20 require the produced ions to have certain mass/charge ratios. (*Id.*, Claims.) The nature of the invention – methods of mass spectrometry – further supports a plain and ordinary construction of "ionizing" (*i.e.*, altering a molecule such that it has a net electric charge) because such methods require electrically charged molecules. (*Id.*, 6:28-35; D.I. 37, Declaration of Leonard J. Chyall, Ph.D., at ¶ 14 ("One requirement for analysis by mass spectrometry is that the atomic or molecular species contain either a positive or negative charge.").) Indeed, this Court previously recognized this general understanding of "ions" (and "ionize" or "ionizing") in the context of mass spectrometry: "[m]ass spectrometers operate by *applying an electrical charge to the molecules of the substance being analyzed*, *resulting in charged molecules known as ions*."

---

[10] Defendants' disclosure of disputed claim terms did not identify or define a POSA, but given the widely understood nature of "ions" and "ionizing," the construction or definiteness of this term does not turn on the definition of a POSA.

*Applera Corp. v. Micromass UK Ltd.*, 186 F. Supp. 2d 487, 493 (D. Del. 2002) (emphasis added).

Defendants did not previously identify this (or any other term) as indefinite in their invalidity contentions, but now, without specificity, they cite large portions of the patent, and its entire prosecution history, in support of their position that "ionizing" is somehow indefinite. (Ex. A, Amended Joint Claim Chart, at 2.) Defendants face a heavy burden—they would need to show by clear and convincing evidence that the claims fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910; *BASF*, 875 F.3d at 1365; *accord McRO, Inc. v. Bethesda Softworks, LLC*, No. 12-1509, 2017 WL 2483697, at *16 (D. Del. June 8, 2017). Given the term's common, established meaning, including as used in mass spectrometry, Defendants cannot make this showing. The Court should construe "ionizing" according to its plain and ordinary meaning as confirmed by the specification: "altering a molecule such that it has a net electric charge."

### (2) "testosterone ions"

This term is the combination of two well-known words: "testosterone" and "ions." As discussed in Section **Error! Reference source not found.** with respect to "ionizing," "ions" is a commonly understood term used in its usual way in the '862 patent, and "testosterone" obviously means "testosterone." Plaintiff's proposed construction of "testosterone ions" is therefore its plain, ordinary, commonly understood definition: "one or more testosterone molecules that have been altered to have a net electric charge or one or more fragments thereof with a net electric charge." *See Phillips*, 415 F.3d at 1314; *see also Omega Flex*, 2019 WL 3281270 at *7.

The '862 patent's "summary of the invention" explains that "testosterone ions" are created by "ionizing" testosterone. (Ex. B, '862 patent, 2:17–19.) "[I]onizing," as explained in Section **Error! Reference source not found.**, is altering a molecule such that it has a net electric

28

charge.  The summary further explains that "testosterone ions" include not only testosterone molecules that have been altered to have a net electric charge, but also testosterone fragments with a net electric charge. (Ex. B, '862 patent, 2:36-39 ("the testosterone ions … include ions with a mass/charge ratio (m/z) of 289.1±0.5, 109.2±0.5, and/or 96.9±0.5, the latter two being fragments of the larger ion").)  Maintaining consistency, the patent elsewhere elaborates that precursor ions generated from the molecule of interest (testosterone) may be subsequently fragmented to yield one or more fragment ions.  (*Id.*, 6:63–67, 12:61–13:4.)  The dependent claims, consistent in turn with the specification, recite "testosterone precursor ion" and "testosterone fragment ions."  *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent . . . can also be valuable sources of enlightenment as to the meaning of a claim term.").

The context of the term's use in the claims also supports Plaintiff's plain and ordinary meaning construction.  Claim 1 and 15 recite "ionizing said purified testosterone to produce one or more *testosterone ions* detectable by a mass spectrometer."  (Ex. B, '862 patent, Claims (emphasis added).)  Dependent claims 10–12 and 18–20 describe the mass/charge ratios of the testosterone ions, and further make clear that "testosterone ions" include both precursor ions and fragment ions.  (*See id.*, claims 11 & 19 ("testosterone fragment ions"), Claims 12 & 20 ("testosterone precursor ion").)  Because it is consistent with the claims and the specification, the Court should adopt Plaintiff's construction of "testosterone ions".

As with "ionizing," Defendants suddenly assert that "testosterone ions" is indefinite.  Given the use of the term in the claims and specification, as well as the commonly understood meanings of both words in the term, Defendants cannot meet their heavy burden here, either.

### b)     LabCorp's Answering Position

The claim terms "ionizing" and "testosterone ions" render the claims of the '862 patent indefinite.  The patent's use of the terms in the claims is internally contradictory and is

contradicted by the specification.  *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366-67 (Fed. Cir. 2016) (affirming a judgment that method claims were indefinite as internally contradictory because the claims recited "the step of extracting machine code instructions from something that does not have machine code instructions"); *Cf. Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (noting that it is not the court's "function to rewrite claims to preserve their validity").

The '862 patent specification defines "ionizing" to mean "the process of generating an analyte ion having a net electrical charge equal to one or more electron units."  Ex. B ('862 patent) at 8:45–47.  One of skill in the art would understand this to be the ordinary meaning of "ionizing" and that the definition means ionizing testosterone involves giving a testosterone molecule, i.e. the "analyte," a net electrical charge.  French Decl. ¶ 61.  Quest proposed a plain and ordinary meaning construction of "altering a molecule such that it has a net electric charge" and argues it is based on the definitional language in the patent.  Section IV.A.2(a) above at 27.

As to "testosterone ions," the '862 patent specification explains that "testosterone ions" include "ions with a mass/charge ratio (m/z) of 289.1±0.5, 109.2±0.5, and/or 96.9±0.5, the latter two being fragments of the larger ion."  Ex. B ('862 patent) at 2:36–41.  Quest proposed a construction that "testosterone ions" means "one or more testosterone molecules that have been altered to have a net electric charge *or one or more fragments thereof with a net electric charge*."  Section IV.A.2(a) above at 28.  In support Quest argues that "testosterone ions" include not only testosterone molecules that have been altered to have a net electric charge, but also testosterone fragments with a net electric charge.  *Id*.

In isolation, those two meanings could be correct. But the indefiniteness problem arises in the way the *claims* of the '862 patent use the terms "ionizing" and "testosterone ions."  Both

30

asserted independent claims (1 and 15) are method claims where the second step recites: "(b) *ionizing* said purified testosterone *to produce* one or more *testosterone ions* detectable by a mass spectrometer."  The problem, as will be discussed in the following paragraphs, is the patent specification makes clear that testosterone fragment ions are *not* produced by ionizing, instead they are produced in a separate fragmenting step.  Thus, the claimed ionizing step produces testosterone precursor ions, not testosterone fragment ions—a clear internal inconsistency in the claim supporting indefiniteness.  *See, e.g.*, *Trs. of Columbia Univ.*, 811 F.3d at 1366-67. Dependent claims 10–12 and 18–20 compound the problem as they explicitly recite creating fragments or even a fragmenting step (Claim 12 "effecting a collision . . .") that *comprises* the ionization step (b) of the independent claims.

The claims contradict the specification's definition of "mass spectrometry."  The definition is "methods of filtering, detecting, and measuring ions based on their mass-to-charge ratio, or 'm/z.'"  Ex. B ('862 patent) at 6:28–30.  The definition continues: "In general, one or more molecules of interest are ionized, and the ions are *subsequently introduced* into a mass spectrographic instrument . . . ."  Ex. B ('862 patent) at 6:30–35.  One of skill in the art would understand from this definition that ionization is a step that occurs *before* any testosterone ions are introduced into the mass spectrographic instrument, which is where fragmentation occurs. French Decl. ¶ 62.

The claims also contradict the specification's discussion of "tandem mass spectrometry." The patent explains: "In this technique, a precursor ion or group of ions generated from a molecule (or molecules) of interest may be filtered in an MS instrument, and these precursor ions [sic] subsequently fragmented to yield one or more fragment ions that are then analyzed in a second MS procedure."  Ex. B ('862 patent) at 6:63–67.  One of ordinary skill in the art would

31

understand this passage to reinforce the correct meaning of ionization as a step that occurs before precursor ions are introduced into the mass spectrographic instrument for filtration and fragmentation.  French Decl. ¶ 63.

The claims' usage of "ionizing" and "testosterone ion" is also inconsistent with all the examples of ionization and fragmenting given by the patent.  French Decl. ¶¶ 64–67.  The patent provided examples of ionization methods that refer to a process for giving a net electrical charge to testosterone molecules and do not include a fragmenting step that splits precursor ions into fragment ions.  *Id*.; Ex. B ('862 patent) at 7:19–24.  The patent discusses fragmenting testosterone precursor ions as a separate step from the ionization that occurs in the mass spectrographic instrument in a "fragmentation chamber, where collision with atoms of an inert gas occurs to produce the fragment ions."  French Decl. ¶ 65; Ex. B ('862 patent) at 6:67–7:4.  In Example 3, the patent provides more detail about what happens in the mass spectrographic instrument *after* the ionization step has occurred. In the mass spectrographic instrument, the first quadrupole (Q1) selects for "molecules with the mass to charge ratio of testosterone (289)."  Ex. B ('862 patent) at 14:1–2.  Then ions with that mass to charge ratio (289) are passed to a collision chamber Q2 where the ions are "collided with neutral gas molecules and fragment."

The passages above demonstrate that the specification consistently used "ionizing" in a specific way: to refer to a step that gives a net charge to a testosterone molecule *before* ions are introduced into the mass spectrographic instrument.  But the claims of the patent use "ionizing" to refer to both an ionizing step that occurs outside the mass spectrographic instrument and a separate fragmentation step that occurs inside the mass spectrographic instrument—a use leading to indefiniteness because it is contradicted by the specification.  In doing so, the claims are nonsensically directed to an ionization step that generates not just precursor ions but fragments

32

of them as well.  Producing fragments from an ionizing step is "nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite." *Trs. Of Columbia Univ.*, 811 F.3d at 1367.

For the above reasons, LabCorp respectfully requests that the Court determine the claims of the '862 patent are indefinite because the claims use of "ionizing" and "testosterone ions" is internally inconsistent and contradicted by the specification.  Thus, a person of ordinary skill in the art would not know with reasonable certainty the scope of the claimed invention in light of the specification and prosecution history.

c)      **Quest's Reply Position**

LabCorp argues that the terms "ionizing" and "testosterone ions" are indefinite because they are internally inconsistent: according to LabCorp, the claims require that the "ionizing" process produces "testosterone ions," but the specification "makes clear that testosterone fragment ions are *not* produced by ionizing," but by a "separate fragmenting step." (*Supra* at 31 (emphasis in original).)  In fact, the '862 patent explicitly defines "ionizing," and uses both terms in the usual, customary way.  As Quest's expert Dr. Leonard Chyall explains, a POSA would have no difficulty ascertaining their meaning and scope.  (Ex. O, Chyall Decl., ¶¶ 25-27.)  The court should thus construe "ionizing" as "altering a molecule such that it has a net electrical charge," and "testosterone ion" as "one or more testosterone molecules that have been altered to have a net electric charge or one or more fragments thereof with a net electric charge." (*Supra* at 26–29.)  LabCorp has not shown by clear and convincing evidence (or by any standard) that these terms are indefinite.

LabCorp admits that the '862 patent defines "ionizing," and it even recites the definition: "'the process of generating an analyte ion having a net electrical charge equal to one or more electron units.'" (*Supra* at 30 (quoting Ex. B, '862 patent, 8:45-47); Ex. O, Chyall Decl., ¶¶ 24,

33

28.)  Because an expressly defined term necessarily provides POSAs with reasonable certainty regarding the scope of the claim, this term cannot be indefinite.  *See Purdue Pharma L.P. v. Amneal Pharm., LLC*, No. 15-cv-1152, 2017 WL 634939, at *4-5 (D. Del. Feb. 16, 2017) ("polyethylene oxide" (PEO) term including molecular weight was definite due to a "statement in the specification [which] constitutes an express definition of what the inventor considered to be a PEO" with that molecular weight).  But LabCorp then ignores the definition, arguing that "ionizing" as used in the claims refers only to processes that occur "*before* any testosterone ions are introduced into the mass spectrographic instrument."  (*Supra* at 31 (emphasis in original).)

"Ionizing" certainly includes charging a molecule at that stage, but the controlling definition also permits other steps that generate an "analyte ion" with a net electrical charge. (Ex. B, '862 patent, 8:45–47; Ex. O, Chyall Decl., ¶¶ 25-27.)  As Dr. Chyall explains, the use of the term "analyte ion" in the definition of "ionizing" is informative: because a fragment ion is an analyte ion with a net electrical charge, "ionizing" may also include fragmentation steps.[11]  (Ex. O, Chyall Decl., ¶¶ 25-26.)  LabCorp's reference to "examples of ionization" in the specification (*see supra* at 32; French Decl., ¶ 64) does not support its conclusion that ionization and fragmentation must be separate concepts, because some of the methods included in those examples, *e.g.*, electron ionization, necessarily cause fragmentation.  (Ex. O, Chyall Decl., ¶ 28.) The specification thus contradicts the limiting construction LabCorp seeks.

Nor do the *claims* limit "ionizing" to a pre-spectrometry step or to precursor ions.  Claims 1 and 15, for example, require "ionizing said purified testosterone to produce one or more

---

[11]   LabCorp might argue that this express definition is contrary to the way a POSA would interpret the term, but, even if that were true, a term's ordinary meaning gives way when the patentee defines the term in the patent.  *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016); *Phillips*, 415 F.3d at 1316; *Omega Flex*, 2019 WL 3281270 at *7 (adopting a construction that reflected the specification's express definition).

34

testosterone ions detectable by a mass spectrometer[.]"  (Ex. B, '862 patent, claims 1 & 15.)

Fragment ions are no less "testosterone ions" and no less "detectable by a mass spectrometer"

than precursor ions are, and, given the non-limiting, express definition of "ionizing," a POSA

would have no difficulty understanding these terms or the scope of the claims with more than the

"reasonable certainty" required to defeat a claim of indefiniteness.  (Ex. O, Chyall Decl., ¶¶ 24-

27.)  *See BASF*, 875 F.3d at 1367-68 (reversing judgment of indefiniteness, finding relevant

skilled artisans would understand whether a material was "effective to catalyze" with reasonable

certainty).  For this same reason, dependent claims that expressly include a fragmentation step

(*e.g.*, claims 10-12 and 18-20) do not alter, and indeed support, this conclusion, as they are

consistent with the specification, including the express definition.

     LabCorp relies entirely on the extrinsic evidence of an expert declaration.  (*See generally*

*supra* at 29-33.)  Such evidence cannot contradict the plain language of the claims or an express

definition, and so cannot provide a basis for indefiniteness.  *See Vitronics Corp. v. Conceptronic,*

*Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("extrinsic evidence in general, and expert testimony in

particular . . . may not be used to vary or contradict the claim language . . . [n]or may it

contradict the import of other parts of the specification") (citations omitted).  Finally, LabCorp's

cases are not analogous.  In *Trs. of Columbia Univ. v. Symatex Corp.*, 811 F.3d 1359, 1366-67

(Fed. Cir. 2016), the parties stipulated to indefiniteness where the "claims [we]re nonsensical in

the way a claim to extracting orange juice from apples would be," because they required

"extracting machine code instructions from something that does not have machine code

instructions."  *Id.* at 1367.  Here, contrary to LabCorp's position, there is no similar "internal

inconsistency" (*supra* at 31), and the claims are not "nonsensically directed" (*supra* at 32),

because, by express definition, "ionizing" can include creating a fragment ion.  That definition

guides a POSA to a definite (standard) meaning of the terms, and the claims use the terms consistently with that definition.  In *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002), the claim was indefinite where the inventors meant to write "parallel," but wrote "perpendicular" instead, a set of facts that LabCorp does not even try to analogize to the facts here.

"Ionizing" and "testosterone ions" are not indefinite, and Quest's proposed constructions are correct.

### d)    LabCorp's Sur-Reply Position[12]

Quest attempts a subtle—but no less incorrect—rewrite of the '862 patent's express definition of "ionizing" in an attempt to preserve the validity of the '862 patent.  This Court should reject Quest's rewrite.

The '862 patent specification defines "ionizing" to mean "the process of generating an analyte ion having a net electrical charge equal to one or more electron units."  Ex. B ('862 patent) at 8:45–47.  Quest admits this express definition confirms the plan and ordinary meaning. Instead of adopting that express definition, however, Quest proposes: "***altering*** a molecule ***such that*** it has a net electric charge."  Section IV.A.2(c) above at 33.  As Quest's reply brief makes clear, the reason for Quest's subtle rewrite is so that "ionizing" could include not just ionizing, but also fragmenting.  Section IV.A.2(c) above at 34.  Quest attempts this rewrite to avoid indefiniteness that results from inconsistent use of the term "ionizing" in the claims.  In some instances, the term is used to mean generating an analyte having a net electrical charge of one or more electron units (claims 1 and 15).  And at times the term is used to include functionality,

---

[12]   Quest's Reply brief mentions its proposed construction for "testosterone ions," but Quest's arguments under its "ionizing" and "testosterone ions" section is directed toward "ionizing."

such as fragmenting (claims 12 and 20), that does not fall within either the plain and ordinary meaning of the term, or the definition Quest provided in the specification.

In seeking to rewrite the claims, Quest contradicts its Opening brief, where it quoted a case from this Court: "[m]ass spectrometers operate by *applying an electrical charge to the molecules of the substance being analyzed, resulting in charged molecules known as ions."* *Applera*, 186 F. Supp. 2d at 493 (emphasis added by Quest); Section IV.A.2(a) above at 27–28. *Applera* reflects the ordinary meaning of ionizing, which is confirmed by the express definition in the '862 patent.

Quest relies on an expert declaration in an attempt to rewrite the definition of "ionizing" so that it could include other steps, such as filtering and fragmenting. Section IV.A.2(c) above at 34. But Quest's expert opinions are not grounded in the actual language of the intrinsic evidence. Dr. Chyall's analysis of "ionizing" does not cite to any passage of the patent specification besides the patent's express definition of "ionizing." Chyall Decl., ¶¶ 24–28. Dr. Chyall's opinions rest solely on his incorrect interpretation of "analyte ions" without any support in the intrinsic record. What Dr. Chyall ignores is that the patent consistently uses "analyte" to refer to the testosterone molecule and "analyte ions" to refer to ions generated by adding or removing a charge to a testosterone molecule. Ex. B ('862 patent) 7:28–30 ("Impact of the electrons with the analyte(s) produces ***analyte ions***, which may then be subjected to a mass spectroscopy technique."); 13:2–3 ("Specific fragments produced only by the ***analyte ion*** are isolated by the final MS (Q3)"). Dr. Chyall also ignores the patent's definitions of "mass spectrometry" and "tandem mass spectrometry" that specify ionization occurs outside a mass spectrographic instrument while fragmentation occurs within. Ex. B ('862 patent) 6:28–30, 6:63–7:4; French Decl. ¶¶ 62–63.

37

The specification's examples of ionization and fragmentation further elucidate the inconsistency.  The patent provides examples of ionization techniques that add a net electrical charge to testosterone molecules.  *See* Ex. B ('862 patent) at 6:67–7:4, 7:19–24; French Decl. ¶¶ 64–67.  Example 3 indicates that fragmentation happens in the mass spectrographic instrument ***after*** ionization has occurred.  *See* Ex. B ('862 patent) at 14:1–2; 14:5–6.  Quest does not substantively address the issues presented with the ionization examples described above.  Quest's expert unpersuasively dismisses all of the examples that indicate that fragmentation must occur ***after*** ionization based on his ipse dixit that "***some*** of those methods—*e.g.,* 'electron ionization' – will cause fragmentation per se."  Chyall Decl. ¶ 28.  Even if that were true, Dr. Chyall fails to identify any example of "ionizing" that performs the "isolating the precursor ion . . ." and "effecting a collision . . ." steps of Claims 12 and 20.

The specification consistently refers to "ionizing" as a step that gives a net charge to a testosterone molecule ***before*** ions are introduced into the mass spectrographic instrument.  But the claims of the patent refer to "ionizing" as a process that includes both an ionizing step that occurs ***outside*** the mass spectrographic instrument and a separate fragmentation step that occurs ***inside*** the mass spectrographic instrument.  The internal inconsistency between the specification and the claims renders the claim indefinite.  *See Trs. of Columbia Univ.*, 811 F.3d at 1367.

For the above reasons, LabCorp respectfully requests that the Court determine the claims of the '862 patent are indefinite because the claims use of "ionizing" and "testosterone ions" is internally inconsistent and contradicted by the specification.

### 3.  "purifying testosterone"

| Term Patent/Claim | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "purifying testosterone" | Plain and ordinary meaning: "enriching the amount of | "enriching the amount of testosterone relative to one or |

| U.S. Patent No. 8,409,862, claims 1, 15 | testosterone relative to one or more other components of the sample" | more other components of the sample by removing materials other than the analyte of interest" |
|---|---|---|

### a)     Quest's Opening Position

Plaintiff's construction tracks an express definition in the specification, which states:

> Purification in this context does not refer to removing all materials from the sample other than the analyte(s) of interest.   Instead, *purification* refers to a procedure that *enriches the amount of one or more analytes of interest relative to one or more other components of the sample*.

(Ex. B, '862 patent, 3:50–54 (emphasis added).)  Nothing in the specification or prosecution history diverges from this express and straightforward definition; Plaintiff's construction—"enriching the amount of testosterone relative to one or more other components of the sample"—simply adopts it.  Because a patentee's lexicography typically governs, the Court should adopt Plaintiff's construction.  *Phillips*, 415 F.3d at 1316; *see also Omega Flex*, 2019 WL 3281270 at *7 (adopting a construction that reflected the specification's express definition).

The dispute about this term arises from Defendants' addition of "by removing materials other than the analyte of interest" to the patent's express definition of purification.  This unnecessary extra language appears to come from the sentence *preceding* the specification's definition of purification:

> Purification in this context *does not* refer to *removing all materials from the sample other than the analyte(s) of interest*.

(Ex. B, '862 patent, 3:50–51 (emphasis added).)  Not only is this sentence *not* part of the express definition, but it describes what *is not* purification.  For at least those two reasons, Defendants' construction makes no sense.

The Defendants' construction also improperly excludes "extraction" of testosterone, which

39

both the claims and the specification describe expressly as an example of purification.  For example, claim 1 of the '862 patent recites: "purifying testosterone from a sample from a female human, wherein said purifying comprises extracting testosterone from said sample."  Similarly, claim 15 recites "purifying testosterone from a sample from a female human by extracting testosterone."  The specification likewise describes extraction as a form of purification.  (*See e.g.,* Ex. B, '862 patent, 3:8–15 ("Numerous methods are known in the art to purify testosterone, including . . . extraction methods[.]").)  As the specification explains, in extraction, testosterone can be removed or captured by, for example, an extraction column.  (*See e.g.*, *id.*, 12:55–58 ("As unbound and unwanted debris is swept through the extraction column at high velocity, the testosterone is captured and concentrated on the column.").)  Defendants' added language requires removing *other materials* from the sample, leaving testosterone, but excludes removing *testosterone* from the sample (extraction), a result in conflict with the claims and the specification.  Because "purifying" *must* be broad enough to include at least "extracting testosterone," Defendants' construction should be rejected for this additional reason.  *See, e.g., Phillips*, 415 F.3d at 1314 (where "steel baffles" appears in claim, "baffles" must include, but is not limited to, objects made of steel).  Further, to the extent Defendants' proposal implies that all unwanted material is removed from the sample, it conflicts with the specification's teaching that "[p]urification in this context *does not refer* to removing all materials from the sample other than the analyte(s) of interest." (Ex. B, '862 patent, 3:50-51 (emphasis added).)

Plaintiff's proposed construction of purifying testosterone as "enriching the amount of testosterone relative to one or more other components of the sample" is the only construction that comports with the claim language and the specification, including the specification's express definition of "purifying."  The Court should adopt Plaintiff's construction.

40

### b)      LabCorp's Answering Position

The proper construction for the term "purifying testosterone" in claims 1 and 15 of the

'862 patent is "enriching the amount of testosterone relative to one or more other components of

the sample by removing materials other than the analyte of interest."  The Court should reject

Quest's purported plain and ordinary meaning construction because it is incomplete for omitting

a portion of the '862 patent's definitional language and is inconsistent with the claims and the

other intrinsic evidence.  The portion of the construction that Quest improperly omits is "by

removing materials other than the analyte of interest."

The '862 patent includes definitional language in the passage below:

> Purification in this context does not refer to removing all materials from the
> sample other than the analyte(s) of interest. Instead, purification refers to a
> procedure that enriches the amount of one or more analytes of interest relative
> to one or more other components of the sample.

Ex. B, '862 patent at 3:50–54.  The parties agree that the second sentence above is definitional

(or defining) language.  The issue is whether purification requires "removing materials other than

the analyte of interest."

The first sentence in the passage above is one of many repeated and definitive remarks

that restricts the meaning of purification.  *Computer Docking Station Corp. v. Dell, Inc.,* 519

F.3d 1366, 1374 (Fed. Cir. 2008) ("Occasionally specification explanations may lead one of

ordinary skill to interpret a claim more narrowly than its plain meaning suggests . . . For

example, repeated and definitive remarks in the written description could restrict a claim

limitation to a particular structure.").  The sentence appears in the SUMMARY OF THE

INVENTION section of the specification and says: "Purification in this context does not refer to

removing all materials from the sample other than the analyte(s) of interest."  Ex. B ('862 patent)

at 3:50–51.  Here, patent distinguishes their claimed purifying step from one that remove *all*

materials from the sample other than the analyte(s) of interest. In the next sentence, the inventors

explain: "Instead, purification refers to a procedure that enriches the amount of one or more

analytes of interest relative to one or more other components of the sample."  Ex. B ('862 patent)

at 3:52–54.  Thus, the inventors explain that purifying testosterone means removing some—but

not all—materials from the sample other than the analyte(s) of interest.  The combination of

these two sentences shows the inventors' intent to define "purifying testosterone" to require

removing materials from the sample other than the analyte(s) of interest.  *Tr. of Columbia Univ.*,

811 F.3d at 1366 (limiting "byte sequence feature" to "machine code instructions" based on

"overwhelming evidence" in the specification "demonstrating the intended definition of this term

does not include information other than machine code instructions.").

     The very next sentence following the passage addressed above, contains additional

evidence supporting LabCorp's construction.  The specification states: "In preferred

embodiments, purification can be used to *remove one or more interfering substances*, e.g., one or

more substances that would interfere with detection of an analyte ion by mass spectrometry."

Ex. B ('862 patent) at 3:54–58.

     A bit earlier in the SUMMARY OF THE INVENTION section of the patent is more

evidence.  The patents states: "Preferred embodiments utilize high turbulence liquid

chromatography (HTLC), alone or in combination with one or more purification methods, to

purify testosterone in samples."  Ex. B ('862 patent) at 3:16–18.  The patent explains that HTLC

procedures have benefits in that they "can be linked in an automated fashion" so "the

requirement for operator involvement during the purification of testosterone can be minimized."

Ex. B ('862 patent) at 3:45–48.

     In describing the preferred embodiment using HTLC, the patent says: "the purifying step

involves (i) applying the sample to an HTLC extraction column, (ii) washing the HTLC extraction column under conditions whereby testosterone is retained by the column, (iii) eluting retained testosterone from the HTLC extraction column (iv) applying the retained material to an analytical column, and (v) eluting purified testosterone from the analytical column." Ex. B ('862 patent) at 4:36–43.  Here, the patent explains that the purifying step uses an HTLC *extraction* column and that the testosterone is *retained* by the HTLC extraction column. The patent distinguishes "extraction columns" like the preferred HTLC column from "analytical columns" because extraction columns "have the general purpose of *separating or extracting retained material from non-retained materials in* order to obtain a purified sample for further analysis." Ex. B ('862 patent) at 4:57–61.  As indicated by the patent, an HTLC extraction column retains testosterone meaning that the non-retained materials are the interfering substances that are removed from the sample in the purifying step.

Next, in the DETAILED DESCRIPTION OF THE INVENTION section, the patent indicates that the "*present invention* describes methods and compositions for unambiguously detecting testosterone in a test sample." Ex. B ('862 patent) at 5:50–51.  The patent goes on to state that the "methods utilize liquid chromatography (LC), most preferably HTLC, to perform an initial purification of selected analytes." Ex. B ('862 patent) at 5:52–54.  Later in that section, the patent further discusses purification as referring to "where the analyte of interest is reversibly retained by the column packing material, while one or more other materials are not retained." Ex. B ('862 patent) at 9:38–42.  The patent includes in Example 2, "a general description of a preferred embodiment of the methods for determining total testosterone in a sample."  Ex. B ('862 patent) at 12:47–13:50.  The Example says "sample contaminants are eliminated" during the HTLC procedure because "[a]s unbound and unwanted debris is swept through the extraction

column at high velocity, the *testosterone is captured and concentrated* on the column." Ex. B ('862 patent) at 12:54–58. The patent continues by noting "[t]he HTLC system is logically divided into two functions: 1) Solid phase extraction . . . and 2) HPLC." Ex. B ('862 patent) at 13:20–24. The solid phase extraction function uses high flow rate, which creates turbulence that "ensures optimized binding of testosterone to the large particles in the column and the passage of residual protein and debris to waste." Ex. B ('862 patent) at 13:31–34.

The claims also support LabCorp's construction. Claim 1 recites "purifying testosterone from a sample from a female human, wherein said purifying comprises *extracting* testosterone from said sample." Here the inventors explicitly require extraction by referring to "extracting testosterone" in the claim. Dependent claims 2–4 recite specific types of extraction in the purification step. Claim 15 is similar in that it also expressly requires extraction, although it recites a specific extraction method, HTLC, in the claim. Dependent claims 5–7 indicate that the purification "further comprises" other techniques in addition to the claimed extraction, including chromatography, liquid chromatography and high performance liquid chromatography (HPLC). As explained above, the patent distinguished "extraction columns" from other liquid chromatography techniques based on the extraction column's general purpose of separating or extracting retained material, i.e. testosterone, from non-retained materials. And everywhere that an extraction column was discussed, the extraction column retained testosterone in the column while other materials were flushed through the column.

The prosecution history also supports LabCorp's construction. During prosecution, Quest submitted two declarations by named inventor Michael P. Caulfield. In both declarations, Dr. Caulfield addressed the "method described in [the application that led to the '862 patent]." Ex. F ('862 patent file history) at QUESTMS-00002807 ¶ 5. Dr. Caulfield declared that the "method

44

includes purifying testosterone from a sample *by subjecting the sample to an extraction column and an analytical column to generate an eluent.*"  Ex. F ('862 patent file history) at QUESTMS-00002807 ¶ 5.  Dr. Caulfield attached excerpts of a Validation Summary Report and explained that the report showed that "the inventors performed the method by first purifying testosterone from human plasma and serum with a high turbulence liquid chromatography (HTLC) extraction column, followed by further purification with a high performance liquid chromatography (HPLC)."  Ex. F ('862 patent file history) at QUESTMS-00002808 ¶ 7.  Here, Dr. Caulfield confirmed that the method in his patent includes purifying using an extraction column, which retains testosterone and removes materials from the sample other than the analyte of interest—testosterone.  For all the reasons above, the Court should reject Quest's construction and adopt LabCorp's.

### c) Quest's Reply Position

The parties agree that the following passage from the specification is definitional: "purification refers to a procedure that enriches the amount of one or more analytes of interest relative to one or more other components of the sample."  (Ex. B, '862 patent, 3:52-54; *see also supra* at 41.)  Quest's lexicography controls for construing "purifying testosterone."  *Renishaw*, 158 F.3d at 1249 (when "a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term . . . the definition selected by the patent applicant controls"); *PHT Corp. v. Invivodata, Inc.*, No. 04-cv-60, 2005 WL 1189552, at *3 (D. Del. May 19, 2005) (rejecting proposed construction that added limitations to patentee's explicit definition).  Despite the definition's non-limiting language and clarity—"purification" is the enrichment of the amount of the analyte of interest relative to other components, without regard to how it is achieved—LabCorp's construction limits "purifying" to procedures that remove *non-analyte materials only, and excludes procedures that enrich instead by removing the analyte.

45

(*Supra* at 40-41.)  But as a matter of plain language, both approaches are consistent with the patent's definition, which Quest's construction faithfully tracks, as both enrich the relative amount of testosterone.

The passages that LabCorp cites in support of its construction are, in the first place, not about whether "purifying" means removing the desired or undesired material; rather, they explain that "purifying" does not require *total* separation of analyte and other components.  (*See*, Ex. B, '862 patent, 3:50-54; 3:54-58.)  LabCorp's construction is wrong also because the language it adds to the definition of "purifying"—"removing materials other than the analyte of interest"—comes not from the definition of that term, but from a description in the next sentence of a preferred embodiment:

> [P]urification refers to a procedure that enriches the amount of one or more analytes of interest relative to one or more other components of the sample.  In *preferred embodiments*, purification can be used to *remove one or more interfering substances*, e.g., one or more substances that would interfere with detection of an analyte ion by mass spectrometry.

(Ex. B, '862 patent, 3:52–58 (emphasis added); *see also supra* at 42.)  Importing limitations into the claims, including from preferred embodiments, is "one of the cardinal sins of patent law[.]"  *Phillips*, 415 F.3d at 1320 (quotation omitted).

LabCorp also never addresses Quest's argument that the one-way construction of "purifying" cannot be right because it excludes embodiments of the claims in which purification includes "extracting" the analyte of interest.  (*See*, *e.g.,* Ex. B, '862 patent, 3:8-15, 12:55-58, claims 1 and 15.)  This omission is especially odd given that LabCorp acknowledges that "purifying" includes extraction, for example by explaining that HTLC columns are "extraction columns" that represent a "preferred embodiment" of the invention (*supra* at 42-43), and, more directly, by stating that the claims include "extracting" and "extraction" (*supra* at 44).  In HTLC,

46

the column retains/captures testosterone and flushes the rest of the sample.  Determining whether

a process separates the analyte from unwanted material, or unwanted material from the analyte,

is a matter of metaphysics, possibly interesting but ultimately unimportant: either way, the

process enriches the analyte of interest relative to other materials, which is consistent with the

express definition of "purification," and with Quest's construction.  HTLC achieves the

enrichment, and it is a preferred embodiment.  LabCorp's construction would improperly

exclude it.

**d)**      **LabCorp's Sur-Reply Position**

LabCorp's construction is based on the definitional language Quest chose to use for

purification. Quest is simply incorrect that any portion of LabCorp's construction comes from "a

description in the next sentence of a preferred embodiment."  Section IV.A.3(c) above at 46.

Rather, LabCorp's construction is based on the definitional language below.

The SUMMARY OF THE INVENTION states:

> Purification in this context does not refer to ***removing*** all ***materials from the***
> ***sample other than the analyte(s) of interest***. Instead, purification refers to a
> procedure that enriches the amount of one or more analytes of interest relative to
> one or more other components of the sample.

Ex. B ('862 patent) at 3:50–54.  LabCorp's construction "enriching the amount of testosterone

relative to one or more other components of the sample by ***removing materials other than the***

***analyte of interest***" adopts the definitional language from the first sentence quoted above, not

any description of the preferred embodiment.

Quest incorrectly argues LabCorp's construction pulls from a sentence ***after*** the quoted

passage above.  In that sentence, the patent explains that in preferred embodiments purification

can be used to remove a ***specific type*** of material from the sample other than the analyte(s) of

interest: "one or more interfering substances e.g., one or more substances that would interfere

47

with detection of an analyte ion by mass spectrometry."  Ex. B ('862 patent) at 3:55–58.

LabCorp's construction does not import this limitation of the preferred embodiment that requires

removal of some **subset** of materials other than the analyte of interest.  Thus, Quest's citation to

*Phillips* is misplaced.

 LabCorp's construction of "purifying testosterone" is correct because it is not only based

on Quest's definitional language but is consistent with the claim language and all embodiments

of the claims discussed in the patent.  Claims 1 recites "purifying testosterone from a sample

from a female human, **wherein said purifying comprises** extracting testosterone from said

sample."  In other words, purifying is not extracting testosterone from said sample it simply

further comprises extracting testosterone from said sample **as recited in this claim**.  Claim 15

similarly provides "purifying testosterone from a sample from a female human by extracting

testosterone from said sample **by high turbulence liquid chromatography (HTLC)**."  As

explained in LabCorp's answering brief, the specification explains that HTLC involves applying

**the sample** to an HTLC column, **washing away** sample contaminants, and then backflushing the

column to elute testosterone from the column, i.e. **extracting testosterone from the sample** that

was applied to the column.  Section IV.A.3(b) above at 43; Ex. B ('862 patent) at 4:36–43; 4:57–

61.

 Thus, in both Claim 1 and Claim 15, purifying involves removing materials from the

sample other than the analyte of interest and also includes extracting testosterone from the

sample.  This is consistent with the other embodiments discussed that involve removing

materials other than the analyte of interest from the sample and then extracting testosterone from

the sample.  Ex. B, '862 patent, 3:8-15, 12:55-58, claims 1 and 15.  Quest's argument that

LabCorp's construction excludes HTLC or other forms of extraction is incorrect.  The correct

48

construction of "purifying testosterone" is far from an unimportant "matter of metaphysics" (Section IV.A.3(c) above at 47), it is compelled by the express language Quest chose to use in its patent.

Quest does not address LabCorp's argument that the specification includes repeated remarks that indicate purification requires "removing materials other than the analyte of interest." *See Computer Docking Station Corp.,* 519 F.3d at 1374 ("repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure"). Quest also does not address LabCorp's argument based on prosecution history. Dr. Caulfield's declarations support LabCorp's proposed construction because they confirm the inventors understood their invention to include purifying using an extraction column, which retains testosterone and removes materials from the sample other than the analyte of interest. For the foregoing reasons, the Court should adopt LabCorp's construction.

## B.    U.S. Patent Nos. 7,972,867 and 8,101,427

### 1.    "relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ in said sample"

| Term Patent/Claim | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ in said sample"<br><br>U.S. Patent No. 7,972,867, claim 21 | No construction necessary: "relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ or vitamin D metabolite in said sample" | "quantifying the presence or concentration of said 25-hydroxyvitamin $D_2$ in said sample based on the detected ions" |

### a)    Quest's Opening Position

A POSA would readily understand this term, which consists primarily of everyday English words like "relating," "presence," and "amount," which the specification and claims use in their ordinary senses. Defendants do not propose to construe "detected ions," the only

49

remotely technical term.  Moreover, for no apparent linguistic or intrinsic-evidence-based reason,

Defendants substitute "quantifying" for an otherwise clear term—"relating."  Defendants

construction then results in the perplexing term "quantifying the presence."  Defendants also

improperly re-write the claim, changing "amount" to "concentration" even though these are two

separate concepts and are not interchangeable.

     The first dispute arises from Defendants' redefining "relating" to mean "quantifying."

Defendants' construction unjustifiably changes the meaning of a plain English word, and it is

inconsistent with the claim language and the specification. In fact, no construction is necessary,

because the term means what it says: relating the detected ions to the presence (not a quantity) or

amount (a quantity).  When a term is readily understandable to POSAs, judges, and lay juries, it

needs no construction.  *See Phillips*, 415 F.3d at 1314 (expressing reluctance to construe

"commonly understood words"); *Summit6, LLC v. Samsung Elecs., Co.*, 802 F.3d 1283, 1291

(Fed. Cir. 2015) ("Because the plain and ordinary meaning of the disputed claim language is

clear, the district court did not err by declining to construe the claim term."); *Mylan Pharm. Inc.*

*v. Galderma Labs., Inc.*, No. 10-892, 2011 WL 1113383, at *5 (D. Del. Mar. 24, 2011)

(declining to construe terms that "would be readily understandable to a lay judge and jury").

     "Relating the detected ions to the presence or amount" plainly encompasses two separate

concepts, as highlighted by the disjunctive conjunction "or."  *See Game & Tech. Co., Ltd. v.*

*Activision Blizzard Inc.*, 926 F.3d 1370, 1377-79 (Fed. Cir. 2019).  The first ("relating the

detected ions to the presence") is qualitative, *i.e.*, 25-hydroxyvitamin D2 is either present or it is

not. The second ("relating the detected ions to the . . . amount") is quantitative; it describes

measuring the *amount* of 25-hydroxyvitamin D2.  The specification supports not construing the

term.  It describes how the term fits within the overall claimed method and how "detected ions"

50

may be related to the presence (non-quantitative) or amount (quantitative) of 25-hydroxyvitamin $D_2$ in a sample.  (*See, e.g.*, Ex. C, '867 patent, 2:43-49, 3:1-28, 5:51-60.)  These passages confirm the plain distinction between "presence" and "amount," repeatedly using the very phrase at issue, "relating the detected ions to the presence or amount," to describe the claimed methods as assessments of presence *or* quantity.  Further, Example 1 describes a process in detail, including the specific ions monitored (*id.*, 13:20-29), and a method for relating the detected ions to the presence or amount of 25-hydroxyvitamin $D_2$.  (*Id.*, 13:30-41.)  No intrinsic evidence suggests that "relating" is used in the claim other than in its ordinary way, and certainly not so as to cause a POSA to understand it as "quantify."

Despite the phrase's clear meaning, which the specification supports, Defendants urge the Court to construe "*relating . . . the presence or amount*" to mean "*quantifying* the presence or concentration."  Replacing "relating" with "quantifying" not only changes the term's overall sense—the words mean different things—but it eliminates the distinction between the analyte's *presence* (non-quantitative), and its *amount* (quantitative).  Courts disfavor constructions, like Defendants' proposed construction, that are inconsistent with the claim language and description of the invention.  *See Renishaw*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

Beyond improperly narrowing the claim and changing its meaning, Defendants' proposed construction makes little sense.  It is unclear how a POSA could "quantify[ ] the presence" of 25-hydroxyvitamin D2 in a sample.  "Quantify" means "to determine, express, or measure the *quantity* of" a substance.  *See* Quantify Definition, *Merriam-Webster's Collegiate Dictionary*, at 1017 (11th ed. 2003) (Ex. J) (emphasis added).  "*Relating* the detected ions to the presence" of

51

25-hydroxyvitamin D2, as in the claim as written, is a binary assessment: the analyte is present or it is not; quantity is irrelevant.  Defendants' proposed construction thus not only contradicts the intrinsic record of the '867 patent, but it would confuse a jury.  *Immersion Corp. v. HTC Corp.*, No. 12-259, 2015 WL 581572, at *8 (D. Del. Feb. 11, 2015) (refusing to construe a term that was "well understood by laypeople, and [where] a jury would be more likely to be confused by Defendants' proposed construction than by the term itself").

The Court should further reject Defendants' proposed construction because it muddies otherwise clear language.  Although it is impossible to tell, Defendants' proposed construction— substituting "quantifying" for "relating"—appears to require something of the claimed method other than what the term plainly describes.  If Defendants do not intend to change the meaning, then the Court should reject their construction as unnecessary.  *See Am. Patent Dev. Corp., LLC v. MovieLink, LLC*, 604 F. Supp. 2d 704, 708 (D. Del. 2009) (holding that no construction was necessary where a party's proposed construction did not "illuminate the meaning" of the term); *ArcelorMittal v. AK Steel Corp.*, No. 13-cv-00685, 2019 WL 3391814, at *6 (D. Del. Jul. 26, 2019) (construing the term according to its plain and ordinary meaning, noting that "Defendant's proposal adds a lot of words without really explaining why, and thus does not seem to add anything to the plain meaning of the words").  If Defendants do intend to suggest a different meaning – one in which "relating" transforms into "quantifying" and "*based on* the detected ions" is unclear—then the Court should reject it as contrary to the plain language of the claims and the intrinsic record of the '867 and '427 patents.

As this term is clear on its face, no construction is necessary.  Defendants' construction is both inconsistent with the words of the claim and serves only to create confusion and ambiguity. The Court should adopt Plaintiff's position and decline to construe this term.  *See Galderma*

*Labs. Inc. v. Amneal Pharm., LLC*, No. 11-1106, 2013 WL 3942965, at *4-5 (D. Del. July 30, 2013) (declining to construe "coated with at least one enteric polymer" where Plaintiff asserted no construction, and Defendants' construction excluded "indirect" enteric coating although "[n]othing in the claims or specification" supported such an exclusion).

**b)**     **LabCorp's Answering Position**

The phrase "relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ in said sample" appears in the last limitation of claim 21 of the '867 patent. LabCorp proposes that this phrase means "quantifying the presence or concentration of said 25-hydroxyvitamin $D_2$ in said sample based on the detected ions."

Starting with the claim language, Claim 21's preamble recites: "A method for determining the presence or amount of 25-hydroxyvitamin $D_2$ in a sample by tandem mass spectrometry." Ex. C ('867 patent) at 22:20–22.  Generally, the three elements of the claim include (1) generating a precursor ion; (2) generating fragments; and (3) detecting and relating. As discussed below, the specification indicates that the "relating" of this last step involves quantifying the presence or concentration of the vitamin D metabolite.

The specification explains the process of quantifying the presence or concentration that is claimed in the "relating" step.  The specification of the '867 patent indicates that a "mass spectrometer typically provides the user with an ion scan; that is, the relative abundance of each ion with a particular m/z over a given range." Ex. C ('867 patent) at 9:20–22.  This results in a mass spectrum that "can be related to the amount of the analyte in the original sample by numerous methods known in the art." *Id.* at 9:22–25.  Examples given are comparing the relative abundance of each ion "to a table that converts that relative abundance to an absolute amount of the original molecule." *Id.* at 9:27–29.  Another example is using a standard curve to convert the relative abundance "into an absolute amount of the original molecule." *Id.* at 9:33–

53

34.  As to the additional language "presence" in this claim term, the specification clearly links

that concept to the same above described methods known in the art for quantifying—the

specification indicates that these methods are some of "[n]umerous other methods for relating the

*presence* or amount of an ion to the presence or amount of the original molecule will be well

known to those of ordinary skill in the art."  *Id.* at 9:42–45.

> The passages Quest cites do not suggest any meaning other than LabCorp's construction.
The first two (2:43-67 and 3:3-18) simply parrot the claim language without explaining what
such language means.  *Id*. at 2:48–49 ("relating presence or amount of the detected ion to the
presence or amount of the vitamin D metabolite in the sample."); 3:25–27 ("relating the presence
or amount of the ions to the presence or amount of the vitamin D metabolites in the sample.").
Example 1, which Quest cites, supports LabCorp's construction. Quest admits that Example 1
describes the process of relating detected ions to the presence or amount of 25-hydroxyvitamin
$D_2$ in a sample.  Section IV.B.1(a) above at 51.  Example 1 is clear that the final element of the
claim involves "detection and quantitation" (Ex. C ('867 patent) at 13:18–20) i.e. "detecting" and
"relating."

> Example 1 supports LabCorp's construction as it illustrates quantification of the presence
or concentration of a Vitamin D metabolite.  The example tracks the three elements of claim 1 of
the '867 patent indicating that the analyte is ionized and the mass spectrometer selects the
generated protonated and dehydrated ions of vitamin D metabolites, i.e. protonated and
dehydrated precursor ions.  *Id.* at 12:32–13:7.  The precursor ions are allowed to pass into a
collision chamber where fragment ions are generated.  *Id.* at 13:8–30.  The ions are detected and
related to the presence or amount of analyte in the sample using calibration curves.  The patent
indicates that such curves were "used to calculate analyte *concentrations*."  *Id.* at 13:36–39.

54

Example 1 concludes with: "[u]sing the calibration curves, the *concentrations* of [vitamin D metabolites] were *quantitated* in the patient samples." *Id.* at 13:39–41. Thus, the passages Quest cites do not support Quest's position that no construction is necessary, and the Court should adopt LabCorp's proposed construction.

### c)      Quest's Reply Position

Without addressing the threshold issue of whether this term needs to be construed –it does not, as the term is clear—LabCorp proposes rewriting it as "quantifying the concentration of said vitamin D metabolite in said sample based on the detected ions." (*Supra* at 53.) Among other problems with LabCorp's position, it never responds to Quest's opening argument that LabCorp's attempt to apply "quantifying" to a term about "*presence*" makes no sense. Moreover, construing "presence or amount" for this term conflicts with LabCorp's agreement to not construe "presence or amount" elsewhere in the claim.

The claim language and the specification both contemplate that the detected ions can be related to the *presence* (qualitative) or *amount* (quantitative) of 25-hydroxyvitamin D₂. *See*, *e.g.*, Ex. C, '867 patent, 5:39-41 ("detecting the presence or amount of the ion, wherein the presence or amount of the ion is related to the presence or amount of the vitamin D metabolite in the sample"), 8:1-24 (describing "methods of detecting the presence, absence, and/or amount"). As explained in Quest's opening brief, LabCorp's substitution of "quantifying" for "relating" results in the perplexing term "quantifying the presence" and excludes any qualitative assessments. In other words, not only would LabCorp's construction puzzle a jury (how do we quantitate the presence and how is this different from quantitating the amount?), it is also inconsistent with Federal Circuit case law instructing that constructions be consistent with the language of the claims and the specification. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341–42 (Fed. Cir. 2001) (claim construction begins "with the language of the claims," that terms "should

55

be construed consistently with [their] appearance . . . in the same claim or in other claims of the same patent," and that the construction must be consistent with the patentee's use in the specification).

LabCorp suggests that, because the '867 patent allows that a relating step *can* be used to quantify an analyte, the relating step in the claims *must* quantify the analyte. That is incorrect construction practice. First, the Federal Circuit has "repeatedly warned against confining . . . claims" to specific embodiments of the invention described in the specification. *Phillips*, 415 F.3d at 1323; *B. Braun Melsungen AG v. Terumo Med. Corp.*, No. 09-cv-347, 2010 WL 2219667, at *6-7 (D. Del. June 3, 2010) (declining to construe "proximal wall" as referring to the rear wall based on a preferred embodiment). Second, as shown above, because the claim language (relating the *presence or* amount) allows for reliance on a qualitative assessment (a peak at a certain location indicates the analyte's *presence* even if its amount is yet undetermined), the court should not construe the term as limited to *quantitative* assessments. *See Wasica Finance GmbH v. Continental Automotive Sys., Inc.*, 853 F.3d 1272, 1280 (Fed. Cir. 2017) (rejecting limiting "numbers or symbols" to numeric values because the disjunctive "or" designates alternatives).

LabCorp's proposed construction is particularly puzzling given their late concession with respect to the "determining" and "detecting" terms (*see supra* at 6), and that the phrase "presence or amount" appears three times in claim 21 of the '867 patent:

> A method for determining the *presence or amount* of 25-hydroxyvitamin $D_2$ in a sample by tandem mass spectrometry, comprising…

> (c) detecting the *presence or amount* of one or more of said ions generated in step (a) or (b) or both and relating the detected ions to the *presence or amount* of said 25-hydroxyvitamin $D_2$ in said sample.

56

(Ex. C, '867 patent, claim 21, 22:21-32 (emphases added).)  Defendants now argue that the last instance of "presence or amount," preceded by "relating," should be construed to mean "presence or concentration," but that the earlier two instances need not be construed at all.  This makes no sense and is inconsistent with the "presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."  *See, e.g., PODS, Inc. v. Porta Stor, Inc*., 484 F.3d 1359, 1366 (Fed. Cir. 2007) (quoting *Fin Control Sys. Pty., Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001)).

LabCorp's construction would also confuse the jury: if the claimed method is for determining the "presence or amount," why are the detected ions related to the "presence or concentration"?  LabCorp walks through an example in the patent that discusses calculating concentrations (*infra* at 59-61), but it does not explain why that example, or anything else, supports substituting "concentration" for "amount" in the claim.  The words mean different things, and Defendants cite no portion of the specification suggesting that they are equivalent in the context of these patents.

The claim term "relating the detected ions to the presence or amount of said 25-hydroxyvitamin $D_2$ in said sample" is clear and needs no construction.

### d)    LabCorp's Sur-Reply Position

In Quest's opposition to LabCorp's motion for judgment on the pleadings, Quest argued that both the '867 patent and '427 patent "claim patentable methods to detect and ***quantitate*** vitamin D metabolites."  D.I. 35 at 2.  Having won the battle at the pleadings stage, Quest now takes the opposite position during claim construction: that the '867 patent does not require quantitating vitamin D metabolites.  That position should be rejected.

Quest argues that this term includes not just a quantitative relation but a qualitative one.

But as discussed in LabCorp's Answering Brief, the passages Quest relies on simply parrot back the claim language "relating the detected ions to the presence" without providing a meaning separate from quantitating.  Section IV.B.1(b) above at 54.  The only meaning provided for "relating the detected ions to the presence or amount" is quantifying the presence or concentration.  Ex. C ('867 Patent) 9:42–45.  Thus, the Court should adopt LabCorp's proposed construction.

### 2.    "relating the detected ions to the amount of said vitamin D metabolite in said sample"

| Term Patent/Claim | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "relating the detected ions to the amount of said vitamin D metabolite in said sample"<br><br>U.S. Patent No. 8,101,427, claim 1 | No construction necessary: "relating the detected ions to the amount of said vitamin D metabolite in said sample" | "quantifying the concentration of said vitamin D metabolite in said sample based on the detected ions" |

#### a)    Quest's Opening Position

As in Section IV.B.1, no construction is warranted and Defendants' attempt to rewrite simple, understandable words with something that is no clearer should be rejected.

As explained in Section IV.B.1, relating is both clear and supported by the patent's description of how a POSA may *relate* "detected ions" to the *amount* of vitamin D metabolite in a sample.  (*See, e.g.*, Ex. D, '427 patent, 2:39-3:2, 3:5-21, 13:30-39 (Table 1), 13:40-52.)  Thus, even though this term recites that the relating is of detected ions to the "amount" of vitamin D metabolite, not "presence or amount" as in the '867 claim 21, this does not change that there is no reason to substitute "quantifying" for "relating."  Likewise, there is no principled reason to replace "amount" with "concentration."  Defendants' proposed departures from the clear words of the claim should be rejected because none illuminate or enhance the understanding of the claim language.  *See e.g., Am. Patent*, 604 F. Supp. 2d at 708; *ArcelorMittal*, 2019 WL 3391814,

at *6.  Finally, as noted in Section IV.B.1, "relating" cannot be "quantifying" in the context of the related '867 patent claim.  It would be odd and likely only confuse the jury to give "relating" some different meaning here.

The Court should therefore reject Defendants' proposed construction and decline to construe this term.

### b)       LabCorp's Answering Position

The phrase "relating the detected ions to the amount of said vitamin D metabolite in said sample" appears in the last limitation of claim 1 of the '427 patent.  LabCorp proposes that this phrase means "quantifying the concentration of said vitamin D metabolite in said sample based on the detected ions."

The claim language supports LabCorp's construction.  The preamble indicates that the method is "for determining the amount of a vitamin D metabolite in a sample by tandem mass spectrometry."  Ex. D ('427 patent) at 20:44–45.  In its brief, Quest admitted that determining an analyte's amount "*is* quantitative."  Section IV.B.a(a) above at 51.  The claim goes on to list three elements.  The first addresses generating a precursor ion from which fragments are generated in the second element. In the third and final element ions are detected and related "to the amount of said vitamin D metabolite in said sample."  As discussed below, the specification indicates that it is in this last step that the amount of vitamin D metabolite is quantified to produce a concentration.

The specification of the '427 patent indicates that the "mass spectrometer typically provides the user with an ion scan; that is, the relative abundance of each ion with a particular m/z over a given range."  Ex. D ('427 patent) at 9:23–25.  This results in a mass spectrum that "can be related to the amount of the analyte in the original sample by numerous methods known in the art."  *Id.* at 9:26–28.  Examples given are comparing the relative abundance of each ion "to

59

a table that converts that relative abundance to an absolute amount of the original molecule." *Id.* at 9:30–32.  Another example is using a standard curve to convert the relative abundance "into an absolute amount of the original molecule." *Id.* at 9:35–37.  Here, the specification clearly uses language that indicates the detected ions are used to quantify the absolute amount of the original molecule, i.e. the vitamin D metabolite, in the sample.  The specification indicates that these methods are some of "[n]umerous other methods for relating the presence or amount of an ion to the presence or amount of the original molecule will be well known to those of ordinary skill in the art." *Id.* at 9:45–48.

The specification then goes on to discuss "particularly preferred embodiments" where "vitamin D metabolites are detected and/or *quantified* using LC-MS/MS . . . ." *Id.* at 9:54–55.  The specification indicates that data is acquired about detected ions and the data is "correlated to the amount of the analyte (vitamin D metabolite) of interest." *Id.* at 11:17–18.

Quest cites Example 1 as part of the patent's description "of how a POSA may *relate* 'detected ions' to the *amount* of vitamin D metabolite in a sample."  Section IV.B.2(a) above at 58–59 (emphasis in original).  Example 1 supports LabCorp's construction as it illustrates the quantification of concentrations.  The example tracks the three elements of claim 1 of the '427 patent indicating that the analyte is ionized and the mass spectrometer selects the generated protonated and dehydrated ions of vitamin D metabolites, i.e. protonated and dehydrated precursor ions.  Ex. D ('427 patent) at 13:7–23.  The precursor ions are allowed to pass into a collision chamber where fragment ions are generated.  *Id.* at 13:20–27.  The ions are detected and related to the amount of analyte in the sample using calibration curves.  The patent indicates that such curves were "used to calculate analyte *concentrations*." *Id.* at 13:46–50.  Example 1 concludes with: "[u]sing the calibration curves, the *concentrations* of [vitamin D metabolites]

60

were *quantitated* in the patient samples." *Id.* at 13:50–52.

The other passages of the '427 patent Quest cited as support (2:39-3:2, 3:5-21) do not shed any light on what "relating the detected ions to the amount of said vitamin D metabolite in said sample" should mean. Instead those passages largely parrot the claim language: "relating presence or amount of the detected ion to the presence or amount of the vitamin D metabolite in the sample" (2:50–51) and "relating the detected ions to the presence or amount of the vitamin D metabolite" (3:11–12). Thus, the passages Quest cites do not support Quest's position that no construction is necessary, and the Court should adopt LabCorp's proposed construction.

### c)      Quest's Reply Position

The term "relating the detected ions to the amount of said vitamin D metabolite in said sample" also requires no construction. Defendants' construction, which improperly substitutes "concentration" for "amount" (again), and "quantifying" for "relating," is inconsistent with the claim language and confusing. The term "amount" appears three times in claim 1 of the '427 patent:

> A method for determining the *amount* of a vitamin D metabolite in a sample by tandem mass spectrometry, comprising . . .
>
> (c) detecting the *amount* of one or more of said ions generated in step (a) or (b) or both and relating the detected ions to the *amount* of said vitamin D metabolite in said sample.

(Ex. D, '427 patent, claim 1 (emphases added).) As with the prior term, Defendants assert that the last "amount" should be construed to mean "concentration," while the other two should not be construed at all. As before, this argument violates the requirement of consistent construction, and would confuse the jury (if the method is for determining the "amount," why are the detected ions related to the "concentration"?).

### d)      LabCorp's Sur-Reply Position

Quest has conceded "relating the detection ions to the . . . amount" is "quantitative; it describes measuring the amount of" a vitamin D metabolite.  Ex. Q at 1; D.I. 35 at 2.  Quest's only remaining dispute appears to be that "concentration" is not an appropriate construction for "amount" based on other limitations in the claim that use the term "amount."  Section IV.B.2(c) above at 61.  However, the context is different in those other limitations: "***determining the*** amount" and "***detecting*** the amount."  The specification of the '427 patent indicates that ***relating*** the amount means quantifying the concentration. Ex. D ('427 patent) at 13:46–50.  Thus, the Court should adopt LabCorp's proposed construction.

MORRIS JAMES LLP

/s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
Telephone: 302.888.6800
kdorsney@morrisjames.com

OF COUNSEL:

Adam R. Gahtan (admitted *Pro Hac Vice*)
Kevin X. McGann (admitted *Pro Hac Vice*)
Eric M. Majchrzak (admitted *Pro Hac Vice*)
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010-6035
Telephone: 212.921.2001
agahtan@fenwick.com
kmcgann@fenwick.com
emajchrzak@fenwick.com

Melanie L. Mayer (admitted *Pro Hac Vice*)
Elizabeth B. Hagan (admitted *Pro Hac Vice*)
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510
mmayer@fenwick.com
ehagan@fenwick.com

*Attorneys for Plaintiff Quest Diagnostics
Investments LLC*

Dated:  December 4, 2019

WILSON SONSINI GOODRICH & ROSATI, P.C.

/s/ Ian R. Liston
Ian R. Liston (#5507)
Johanna Peuscher-Funk (#6451)
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
Telephone: 302.304.7600
iliston@wsgr.com
jpeuscherfunk@wsgr.com

OF COUNSEL:

Edward G. Poplawski
Oliva M. Kim
Erik Carlson
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: 323.210.2900
epoplawski@wsgr.com
okim@wsgr.com
ecarlson@wsgr.com

Matias Ferrario
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
Telephone: 336.607.7300
mferrario@kilpatricktownsend.com

*Attorneys for Defendants Laboratory
Corporation of America Holdings, Esoterix,
Inc., and Endocrine Sciences, Inc.*

11406397/1

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on December 4, 2019, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further certify that on the same date the attached document was electronically mailed to the following person(s):

Ian R. Liston
Johanna Peuscher-Funk
WILSON SONSINI GOODRICH & ROSATI, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
iliston@wsgr.com
jpeuscherfunk@wsgr.com

*Attorneys for Defendants*

Edward G. Poplawski
Olivia M. Kim
Erik Carlson
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
epoplawski@wsgr.com
okim@wsgr.com
ecarlson@wsgr.com

*Attorneys for Defendants*

Matias Ferrario
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
mferrario@kilpatricktownsend.com

*Attorneys for Defendants*

Dated: December 4, 2019

*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

*Attorneys for Plaintiff*

**Other Documents**

1:18-cv-01436-MN Quest Diagnostics Investments LLC v. Laboratory Corporation of America Holdings et al

MEDIATION-MPT,PATENT

### U.S. District Court

### District of Delaware

**Notice of Electronic Filing**

The following transaction was entered by Dorsney, Kenneth on 12/4/2019 at 6:00 PM EST and filed on 12/4/2019

| | |
|---|---|
| **Case Name:** | Quest Diagnostics Investments LLC v. Laboratory Corporation of America Holdings et al |
| **Case Number:** | 1:18-cv-01436-MN |
| **Filer:** | Quest Diagnostics Investments LLC |
| **Document Number:** | 81 |

**Docket Text:**
**[SEALED] STATEMENT *JOINT CLAIM CONSTRUCTION BRIEF* by Quest Diagnostics Investments LLC. (Dorsney, Kenneth)**

**1:18-cv-01436-MN Notice has been electronically mailed to:**

Adam Gahtan     agahtan@fenwick.com

Edward G. Poplawski     epoplawski@wsgr.com, labrown@wsgr.com, twilliamsdavis@wsgr.com

Elizabeth B. Hagan     ehagan@fenwick.com, smcphee@fenwick.com

Eric M. Majchrzak     emajchrzak@fenwick.com, mcampion@fenwick.com

Erik J. Carlson     ecarlson@wsgr.com, anavarro@wsgr.com

Ian Robert Liston     IListon@wsgr.com, kkharris@wsgr.com, kramos@wsgr.com, rdean@wsgr.com, twilliamsdavis@wsgr.com

Kenneth Laurence Dorsney     kdorsney@morrisjames.com, ippara@morrisjames.com

Kevin X. McGann     kmcgann@fenwick.com, paola.guerrero@fenwick.com

Matias Ferrario     mferrario@kilpatricktownsend.com

Melanie M. Mayer     mmayer@fenwick.com

Olivia M. Kim     okim@wsgr.com, ctong@wsgr.com

**1:18-cv-01436-MN Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=12/4/2019] [FileNumber=4037332-0
] [89b0a5048e9181a47f305c481072e2e20c7a5d615963a1a6176db4d482b32e97869
c6eb33b79f819f747e29d36bbfdd8a2585b25da2fcd7ca69236362e78004b]]