1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                 - - -


4
      QUEST DIAGNOSTICS                  :    CIVIL ACTION
5     INVESTMENTS LLC,                   :
                                         :
6                    Plaintiff,          :
                                         :
7          vs.                           :
                                         :
8     LABORATORY CORPORATION OF          :
      AMERICA HOLDINGS, ESOTERIX,        :
9     INC., and ENDOCRINE                :
      SCIENCES, INC.,                    :
10                                       :
                     Defendants.   :    NO. 18-01436 (MN)

11

12                                - - -


13                              Wilmington, Delaware
                                Tuesday, January 7, 2019
14                              1:00 o'clock, p.m.

15                                - - -

16    BEFORE:   HONORABLE MARYELLEN NOREIKA, U.S.D.C.J.

17                                - - -

18    APPEARANCES:

19              MORRIS JAMES
                BY:  KENNETH L. DORSNEY, ESQ.
20

21                        -and-

22

23
                                          Valerie J. Gunning
24                                        Official Court Reporter

25

```
 1    APPEARANCES (Continued):

 2
                 FENWICK & WEST LLP
 3               BY:  ADAM R. GAHTAN, ESQ.
                      KEVIN X. McGANN, ESQ. and
 4                    ERIC M. MAJCHRZAK, ESQ.
                      (New York, New York)
 5

 6                        -and-

 7
                 FENWICK & WEST LLP
 8               BY:  MELANIE L. MAYER, ESQ. and
                      ELIZABETH B. HAGAN, ESQ.
 9                    (Seattle, Washington)

10
                      Counsel for Plaintiff
11

12
                 WILSON SONSINI GOODRICH & ROSATI, P.C.
13               BY:  IAN R. LISTON, ESQ.

14                        -and-

15
                 WILSON SONSINI GOODRICH & ROSATI, P.C.
16               BY:  EDWARD G. POPLAWSKI, ESQ.,
                      OLIVIA M. KIM, ESQ. and
17                    ERIK CARLSON, ESQ.
                      (Winston-Salem, North Carolina)
18

19                    Counsel for Defendants

20                        -   -   -

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3                 (Proceedings commenced in the courtroom,

 4    beginning at 1:00 p.m.)

 5

 6                 THE COURT:  Good afternoon.  Please be seated.

 7    Okay.  Let's start with introductions.  Mr. Dorsney?

 8                 MR. DORSNEY:  Good afternoon, your Honor.  For

 9    Quest Diagnostics, Ken Dorsney from Morris James, and with

10    me at counsel table that will be presenting the argument

11    from Fenwick & West, I have Melanie Mayer and Eric

12    Majchrzak.  Also assisting from Fenwick & West, I have Kevin

13    McGann, Adam Gahtan and Elizabeth Hagan.  A pleasure to be

14    here.

15                 THE COURT:  Okay.

16                 MR. LISTON:  Good afternoon, Your Honor.  Ian

17    Liston from Wilson Sonsini.

18                 With me at counsel table from our Los Angeles

19    office are Ed Poplawski, Olivia Kim, and Erik Carlson.

20                 THE COURT:  Good afternoon.

21                 MR. LISTON:  Thank you, Your Honor.

22                 THE COURT:  Thank you.  Okay.  So we have

23    reviewed all of the papers.  We've reviewed the tutorials

24    and I think we've set aside three hours today, but I don't

25    think we're really going to need three hours.
```

```
 1              So have you discussed how you want to present
 2    the argument?
 3              MS. MAYER:  We've not discussed it, Your Honor,
 4    but Quest as the patentee would like the opportunity to go
 5    first, and we appreciate that Quest or LabCorp's arguments
 6    involve indefiniteness, so we would be reserving quite a bit
 7    of time for rebuttal in that case, but present a first
 8    argument would be our preference.
 9              THE COURT:  Okay.  Any objections?
10              MS. KIM:  No objection, Your Honor.
11              THE COURT:  Okay.  But I would like to go term
12    by term so that we can keep it in context except for a
13    couple of places where I think it makes sense to combine
14    them, like ionizing.  Okay.
15              MS. MAYER:  Your Honor, do you have a preference
16    for which patent we start with?
17              THE COURT:  No.  I'm happy to go in the order
18    that they were in the briefs, but if you have something
19    different, that's fine, too.
20              MS. MAYER:  That would be fine.
21              THE COURT:  Let me just pull up my notes.  Okay.
22              MS. MAYER:  Good afternoon, Your Honor.  Melanie
23    Mayer from Fenwick & West on behalf of Quest.
24              We mentioned earlier that we would like to
25    reserve time for rebuttal, and do you prefer that we reserve
```

1    a certain amount of time or will you just reserve our

2    remaining time?

3                    THE COURT:  No.  Whatever is left.

4                    MS. MAYER:  Thank you.  So we'll start with the

5    claim terms in the '862 patent, which is sometimes called

6    the testosterone patent, and we'll take those terms in order

7    starting with the capable of detection term.

8                    So the first term in dispute in the testosterone

9    patent is the term capable of detecting testosterone at

10   concentrations less than 10 or 5 or 1, depending on the

11   claim, nanograms per deciliter in the sample.

12                   Quest offers a construction that uses the plain

13   and ordinary meaning of the term, and Quest or LabCorp's

14   position is that the term is indefinite, so it does not

15   offer a construction.

16                   This term uses plain and ordinary English words,

17   such as capable of and detecting, and the parties don't

18   dispute what testosterone means, and they also don't dispute

19   what a concentration is.

20                   Quest's construction is the first and only

21   sensible meaning for this term, and LabCorp's expert agrees

22   that a limit of detection, which conceptually is the plain

23   and ordinary meaning that Quest proposes, is the first

24   meaning.  It's also the only sensible meaning.  LabCorp does

25   provide three alternative meanings and I will talk about

```
 1    each of those, but they're based on a manufactured

 2    ambiguity, and in many cases, LabCorp is plucking words out

 3    of the specification such as accurately or unambiguously and

 4    then trying to tie them to some other concept later in the

 5    patent with really no logical reasoning, and then they try

 6    to circle that concept back to the words of the claim.

 7              But these alternative meanings are not even

 8    close to being equally plausible and they have no basis in

 9    the claim language.  In fact, as we described in our

10    briefing, in many cases they refute the language of the

11    claims.

12              As this Court knows, LabCorp would have to prove

13    indefiniteness by clear and convincing evidence, and I'm

14    sure the Court is familiar with the cases that LabCorp cites

15    in its brief, but it's worth taking a minute to remind

16    ourselves of the facts of those cases, because they're truly

17    different from the facts here.

18              In Teva, the term at issue was average molecular

19    weight, and those of skill in the art appreciated that there

20    were three possible meanings for that term, a peak average,

21    a weight average and a number average.  The specification

22    didn't define which of those three possible meanings it

23    meant, and, in fact, it didn't even acknowledge that there

24    were three possible meanings.

25              And Teva used two of those meanings during
```

1    prosecution.   In one instance it said that molecular weight

2    was peak average and in another instance it said molecular

3    weight was weight average.   So that's the situation where

4    the Court found indefiniteness.

5              In HZNP there were two tests for drying times

6    and they provided inconsistent results and the specification

7    didn't even say when you should assess drying time.   And in

8    Job Diva, the claim term was a precision ratio, which there

9    was no test for determining a precision ratio, and there was

10   no explanation for how the ratios in the specifications were

11   determined.   The Court thought that they were essentially

12   plucked out of thin air.

13             And when we compare those cases to the facts

14   here, we really don't have any similarity.  People of skill

15   in the art don't recognize capable of detecting as having

16   multiple meanings.   There's no competing or inconsistent

17   uses of the term in the specification.   The specification

18   doesn't say capable of detecting means X and then later say

19   it means Y.

20             There's no competing or inconsistent uses in the

21   prosecution history.   There's no inconsistent tests that

22   result in different results.   And there's no coined term

23   such as precision ratio.

24             THE COURT:   There's no evidence of any

25   differences in the results if you apply the different tests

1    that are proposed by defendants.   Right?

2              MS. MAYER:   Correct.   And I would hint, I mean,

3    in my view, they're not alternatives for a test to detect

4    testosterone.   They're completely different concepts.   Like

5    one of their alternate meanings is specificity.   That's not

6    a test for detecting testosterone.   It's a completely

7    different concept, like which molecule am I interested in.

8              So the claims use the words of the capable of

9    detecting term in their plain and ordinary meaning.   The

10   specification uses those words similarly.   The test, the

11   method, capable of detecting testosterone at a recited

12   concentration.

13             There are at least three experts who have

14   weighed in on the meaning of capable of detecting and they

15   all agree that the first meaning a person of skill in the

16   art would give to the capable of detecting term is the

17   meaning provided in Quest's construction.

18             Dr. Chyall, who presented a declaration in this

19   case on behalf of Quest, is a Ph.D. analytical chemist.   He

20   has over 30 years of experience with mass spectrometry, and

21   he explained that a person of skill in the art would

22   understand the capable of detecting term to have its plain

23   and ordinary meaning.   Detecting means you can demonstrate

24   the presence of testosterone, and in an experiment, that

25   means that the signal is above the noise.   It's the first,

1        he explained that this is the first and only logical meaning

2        that a person of skill in the art would arrive at by reading

3        the patent.

4                    Similarly, Dr. French, who presented a

5        declaration on behalf of LabCorp, agreed that limit, a limit

6        of detection, which is conceptually the same as Quest's

7        construction, is the first meaning a person of skill in the

8        art would give this term.

9                    THE COURT:  You can move on from that one.  I

10       don't find that one all too compelling.

11                   MS. MAYER:  Okay.

12                   THE COURT:  She did note there were second,

13       third and fourth ones.  I don't think she meant to give it

14       the emphasis that you have up there.

15                   MS. MAYER:  So that may be the emphasis point

16       may not be true, but it is at least she acknowledges that

17       the limit of detection is a meaning that a person of skill

18       in the art would recognize the capable of detecting term.

19       And LabCorp also has an expert in the '862 patent IPR and he

20       didn't need to construe the capable of detecting term.

21                   THE COURT:  But indefiniteness isn't an issue

22       that they could have raised in the IPR.  Right?

23                   MS. MAYER:  It's true, but he also didn't even

24       attempt to construe it.  You absolutely can construe terms

25       in an IPR.  He didn't think it was necessary because he

1    viewed it as having plain and ordinary meaning.

2              THE COURT:  Maybe he didn't want to construe it

3    because then they couldn't make the argument about

4    indefiniteness here.

5              MS. MAYER:  That's very possible.  And Dr.

6    Fitzgerald, when asked what he meant by capable of

7    detecting, he confirmed that it's a limit of detection, very

8    similar to the first meaning that Dr. French acknowledged

9    the term would have and very similar to the results that, or

10   the conclusion that Dr. Chyall reached.

11             So three experts, including two for LabCorp,

12   have said that they would understand that capable of

13   detecting term to be a limit of detection, conceptually the

14   same as Quest's construction.  The method can detect

15   testosterone so as distinguish it from the background.

16             Despite there being, despite the term being

17   readily understandable, LabCorp does offer three

18   alternatives and I will talk about these.

19             So the first -- the second meaning that LabCorp

20   proposes is limit of quantitation, and I think it's helpful

21   to look at how they arrive at this possible alternate

22   meaning.  They don't really address the claim language.

23   Instead they start with a paragraph that Quest cited in

24   support when it added capable of detecting in the claims.

25   It cited a paragraph as providing support for that and they

1          go to that paragraph, and this, this paragraph does have the

2          sentence towards the bottom in various embodiments, the

3          methods of the invention.  That's a sentence we've looked at

4          before.  It describes a limit of detection, capable of

5          detecting testosterone.

6                    And --

7                    THE COURT:  Even if you assume it accurately

8          refers to the limit or quantitation or the lower limit of

9          quantitation, there it's saying accurately and someplace

10         else I think it says unambiguously or something like that.

11                   What is the effect of the fact that those

12         modifiers are not included in the claim?

13                   MS. MAYER:  So I think that's a great point and

14         we think that LabCorp has simply plucked accurately and

15         unambiguously out of the specification.  So these terms are

16         not in the claim and, in fact, when they appear in the

17         paragraph, they're modifying detect.  So they pull out the

18         word accurately.  They don't explain why a person of skill

19         in the art would even focus on accurately.  Dr. French

20         doesn't explain why you focus on accurately and she's not

21         here today to give us an explanation.

22                   When it appears in the paragraph, it says

23         accurately detects, and they don't explain why one of skill

24         in the art wouldn't understand that to be a limit of

25         detection, the first meaning that Dr. French identified.

1          And then they try to take that word accurately

2     and link it to a concept, limit of quantification, or limit

3     of quantitation that's nowhere to be found in this

4     paragraph.  It appears elsewhere in the specification, but

5     the only link that LabCorp identified is that limit of

6     quantitation is one of the various parameters the inventor

7     investigated, but there's no logical link between accurately

8     and limit of quantitation, and, in fact, in this paragraph,

9     accurately is modifying detect.

10          And then they take it one step further and they

11    present limit of quantitation as an alternate meaning for

12    capable of detecting.  Again, unclear why one of skill in

13    the art would take limit of quantitation and impose it on a

14    capable of detecting.

15          So each of these steps that they go through to

16    try to make an indefiniteness argument doesn't have a

17    logical underpinning and they make it worse by combining

18    them.

19          In the next slide, under, you know, just

20    plucking the word accurately out of one paragraph of the

21    specification and trying to read in using that to try to

22    read limit of quantitation into the claims, it conflicts

23    with the claim language.  The claims say the method is

24    capable of detecting.  They could have said capable of

25    quantifying, but they didn't.  So this proposal is not even

1    consistent with the language of the claim, and LabCorp's

2    expert, Dr. French, acknowledges this.

3            So the patent gives an example of a method with

4    a, that's capable of detecting testosterone below one

5    nanogram per deciliter, and she acknowledges that if you

6    consider LOQ, the limit of quantitation, the specification

7    doesn't even provide an example of a method with a limit of

8    quantitation below one nanogram per deciliter, which is

9    required in several of the dependent claims.  So she

10   acknowledges that a person of skill in the art would look at

11   this and not think that LOQ was really the right meaning,

12   and that's why she says, well, let's go look for some other

13   meaning.

14           LabCorp's third meaning is specificity, and,

15   again, they arrive at this alternative meaning in a logical

16   way that is similar to what we just looked at for the second

17   meaning.  So they skip over the claim language.  They go to

18   the same paragraph and now they pluck out a different word,

19   unambiguously.  They don't explain why would a person of

20   skill in the art focus on unambiguously as opposed -- I

21   didn't even reproduce all of these paragraphs because it's

22   long, but why would a person of skill in the art focus on

23   unambiguously?  Dr. French doesn't tell us.  She's not here

24   to explain it.

25           Then they equate unambiguously with specificity,

1      and they don't explain why would one of skill in the art

2      read that term together with the next term.  You

3      unambiguously detect, which is what the claims talk about,

4      capable of detecting testosterone.  Instead, they equate

5      unambiguously with specificity and we don't know why.  Dr.

6      French doesn't explain why we're going to be using just

7      specificity, not something else, like a limit of detection.

8                  They only say, while specificity is one of the

9      various parameters the inventors investigated, but that

10     doesn't link unambiguously to specificity, and then they

11     kind of compound the problem by presenting specificity as an

12     alternate meaning for capable of detecting, but they never

13     mean specificity with capable of detecting.

14                 And, again, this third alternative, specificity,

15     doesn't make sense with the claim language.  The claims

16     already address specificity.  It mentions numerous times

17     that the analyte is testosterone.  It's not any other

18     molecule.  There's no question about specificity here.  And

19     so why were we trying to load up the capable of detecting

20     term with a specificity requirement that's already addressed

21     in other language?

22                 And just like with the second meaning --

23                 THE COURT:  Why don't you move to the fourth

24     meaning.

25                 MS. MAYER:  Okay.

1          THE COURT:  I think you did all of this quite

2     well in your briefs, so I understand the argument.  I don't

3     need you to state it again.

4          MS. MAYER:  Okay.  The fourth meaning is, they

5     say the fourth meaning is that the actual sample has the

6     recited concentration, and, again, they rely on a phrase in

7     the paragraph, samples where it is present.

8          Again, they don't say why a person of skill in

9     the art would focus on this language.  They don't -- samples

10    where it is present is not in the claims.  This is not what

11    the claim says.

12         THE COURT:  But it says, in the sample in the

13    claim.  Right?

14         MS. MAYER:  It says the method is capable.  Why

15    don't we just move on.

16         THE COURT:  It says, where the method is capable

17    of detecting testosterone at concentrations of less than ten

18    nanograms per deciliter in the sample, in the sample.

19         MS. MAYER:  Correct, but it's the method that's

20    capable of detecting it.

21         THE COURT:  But it must detect it in the sample.

22    Right?

23         MS. MAYER:  So the method is used to analyze a

24    sample, but it doesn't have to detect the concentration of

25    less than ten nanograms per deciliter in the sample.  That's

1    not what the claim says.  It's the method is capable of

2    detecting a low level of testosterone, but you can certainly

3    use the method of higher concentrations, a sample with

4    higher concentrations.

5              And, in fact --

6              THE COURT:  Then how would you prove that it met

7    that limitation?

8              MS. MAYER:  Because you would validate just like

9    both parties in this case do, you validate the patent.  So

10   you understand the limitations of your test by validating

11   it.  What are the boundaries of where the test can measure?

12   And then once you know that, you can apply it to the sample,

13   and that's just what happened in the specification.  They

14   validate their method and then they use it on samples.  And,

15   in fact, if you look in column 18 of the specification, it

16   validates the method, and then when it looks at the low

17   concentration sample, those have levels of testosterone that

18   vary from about 10 to 25, if I remember right.

19             So those samples have higher concentrations than

20   the method is capable of detecting, but the important point

21   is you need to validate your method.  You need to say, can

22   my method detect low levels of testosterone?  Where is that

23   boundary?  And then once you know that, you can use samples,

24   and you'll know that if you get a higher concentration

25   reading from those samples, you have confidence in that, and

1       if the sample is reading out at one, then you know your

2       method may be, needs to be revisited.

3                   But the claim says the method is capable.  It

4       doesn't require the sample to have that concentration.  And,

5       in fact, it doesn't even make sense, because as I said, the

6       low concentration samples in the spec are often higher than

7       ten nanograms per deciliter.  So the patentee wouldn't

8       develop a method when it can only be used in some very minor

9       percent examples in the universe.

10                  LabCorp also relies on the prosecution history,

11      and I'm happy to address those on rebuttal.  I'm not sure

12      which it will focus on, but I think some overarching

13      concept.  The cited statements in the prosecution history

14      don't equate the capable of detecting term to the alternate

15      meanings.  In some cases they focus on statements where we

16      use the word quantitating and they say, well, that supports

17      the limit of quantitation.  But other elements of the claim

18      is a method for determining the amount of testosterone,

19      where you as say the ions and you relate them.  So the whole

20      method is determining the amount of quantity.  Just because

21      we discuss quantitate doesn't mean we're talking about

22      capable of detecting.  That's a separate concept in the

23      claim.

24                  So I don't know if you wanted to go claim by

25      claim and you want LabCorp to address capable of detecting

```
 1    or should I go onto the other terms?
 2                THE COURT:  No.  I would like to hear from
 3    LabCorp.
 4                MS. MAYER:  Okay.
 5                MS. KIM:  Thank you, Your Honor.  Olivia Kim for
 6    defendant LabCorp.
 7                I will be handling the terms from the
 8    testosterone patent today and Mr. Carlson will handle the
 9    terms found in the patents.
10                THE COURT:  Thank you.
11                MS. KIM:  The capable of detecting term.  If you
12    go to slide 4, please.
13                There is no dispute that one of the possible
14    meanings for the capable term is limit of detection, and
15    that is a definition that Quest is saying that applies.  But
16    Quest ignores three other possible meanings described in the
17    intrinsic record, and we'll go through the claim language,
18    the specification and prosecution history.
19                THE COURT:  I'd like to understand why you think
20    you have met your burden hereby clear and convincing
21    evidence.
22                MS. KIM:  Absolutely, Your Honor.  So we'll go
23    through the intrinsic evidence, and intrinsic evidence is
24    pretty clear.  There is no indication which of these
25    possible meanings to apply to the claim terms of capable of
```

1    detecting.  And before we get there, we need to understand

2    the definitions of these, these approaches that are

3    described in the spec and intrinsic record.  And if you look

4    at what they mean, it's pretty common sense that the spec

5    and the prosecution history are talking about four different

6    meanings and they don't make any clear indication as to

7    which one of these should apply to the plain capable of

8    detecting term.

9            And if the Federal Circuit has made clear that

10   there are multiple meanings without any confidence as to

11   which one should apply to the invention, then the claims are

12   indefinite.

13           Let's look at the claim language first, and we

14   agree with Quest that you need to look at the term in

15   context of the claim.  As you look at the claim language, it

16   is not very clear that it is only referring to limit of

17   detection.  For example, if you look at the preamble of the

18   claim, it states that it's determining the amount of

19   testosterone in a sample.  This has multiple different

20   indications to the different methods of determine the

21   testosterone.  And if you look at the limitation that is at

22   issue, which is the last limitation, it says, wherein the

23   method is capable of detecting testosterone at

24   concentrations of less than ten nanograms per deciliter in

25   the sample.  It is not very clear whether if it's talking

1    about LOD or whether it's talking about specificity which

2    goes to determining whether it's testosterone.  And, lastly,

3    it's very unclear as to whether it's talking about the

4    concentrations that are actually in the sample.  And the

5    same problem arises again in the specification and also

6    during the prosecution history.

7              So if we look at the specification, in the

8    examples, the inventors discuss use of LOD and LOQ, and I

9    think Your Honor asked Quest as to whether the results are

10   different from different approaches and the results are

11   indeed different.

12             THE COURT:  Where do you have evidence of that?

13             MS. KIM:  So, for example, here, if you look at

14   the first paragraph where it details LOD, very last

15   paragraph, it shows the results of LOD was assayed to be

16   determined .6-nanograms per deciliter.  For the lower limit

17   of quantitation, which is the second paragraph here, in

18   column 18, the result is in the last sentence where it says

19   the LOQ for the assay was determined to be one nanogram per

20   deciliter.  So the results are different.  It depends on

21   which approaches you are using to determine the analyte at

22   issue, which here is testosterone.

23             And these examples do not tell us which of these

24   approaches should be used for the invention.  And we've

25   looked at column 5, and this is what the opposing counsel

1   discussed extensively.  The important point here is that

2   when you look at the first sentence of this, this is

3   discussing the present invention.  It's talking about the

4   invention as a whole, and it talks about the invention

5   having methods and compositions for unambiguously detecting

6   testosterone in a testosterone sample.  The work, of course,

7   it's important because it describes invention as a whole.

8   It also discusses accurately detecting testosterone and,

9   again, we have very confusing statements here about samples,

10  in samples where it is present in concentration of less than

11  50-nanograms per deciliter and so forth.

12              THE COURT:  I will ask you the same questions

13  that I asked earlier, which is, what is the effect of, in

14  the specification it's saying unambiguously detecting or

15  accurately detecting, but in the claims they did not include

16  those words.  Why should I say that those words could be in

17  there?

18              MS. KIM:  Because, Your Honor, again, this

19  discusses the present invention, and if you look at the

20  claim language --

21              THE COURT:  Well, the first one discussed the

22  present invention.  When you got down to accurately, you

23  were pretty far away from the present invention.  Right?

24              MS. KIM:  But if you look at it, it's consistent

25  with the claim language here, Your Honor.  If you look at

1     the context of the claim, it's still not clear as to which

2     method should be used, or which approach should be used for

3     the last limitation, but it's talking about determining the

4     amount of testosterone, which is the preamble of the whole

5     method.  And then in the last limitation it talks about

6     detecting testosterone at concentrations in the sample.

7     Again, it's not very clear as to which of the approaches

8     should be used, and that's consistent throughout the

9     intrinsic record.

10            And column 5, it is important because during the

11    prosecution of the patent, the patentee included the capable

12    of detecting term in independent claims and described it as

13    detection limit, which means LOD, then cited to this very

14    specification to support adding that limitation.

15            Again, if you look at the support, it's all over

16    the place.  It's discussing not only LOD, but LOQ

17    specificity and whether if the concentration is actually in

18    the sample.

19            Now, opposing counsel indicated that we are

20    referring to the prosecution history in particular when

21    we're referring to the prosecution history where the

22    inventors distinguish prior art, that it did not relate to

23    the capable of detecting term.  That's not true.

24            Here, when they are distinguishing Zimmer and

25    Ong, they specifically refer to the dependent claims that

1    claim the capable of detecting term.  Now, it's true at this

2    time they did not have the capable of detecting term in the

3    independent claims.  But it had the dependent claims which

4    had those capable of detecting terms.  And if you look at

5    the prosecution history, when they are distinguishing the

6    prior art, they are specifically referring to those

7    dependent claims which had the capable of detecting terms.

8              And, again, in the prosecution history, when

9    they are trying to distinguish prior art, they are all over

10   the place again.  They refer to LOD, detection of levels.

11   They refer to LOQ when they talk about the quantitation.

12   They also refer to specificity, where they are talking about

13   detecting testosterone.  And, again, it's not clear if

14   they're talking about a concentration in the sample or not.

15             So, for example --

16             THE COURT:  What do you say to the point that

17   was raised by Ms. Mayer that, you know, you have up there

18   color coordination, but how is it that I'm supposed to

19   understand that certain language in there refers to LOD, LOQ

20   specificity, or use in the sample?

21             MS. KIM:  That's a very good question, Your

22   Honor.  I think that goes to what do these mean?  And these

23   are well-known approaches in the art.  And if you look at

24   the definition, it's accurately pretty common sense.

25             So let's look at the definition.  So I'm on

slide 4.  We have the definitions of these.  Limit of

detection means a way to determine when a signal produced by

a detector rises an arbitrary amount above the uncertainty,

e.g., noise, in the detector signal.  So it's not really

specific quantitation.  It just arises to a level above.

Now, limit of quantitation, on the other hand,

is a determination of at what point the measured

concentration of the method differs from the actual

concentration in the sample with a coefficient of variation

of less than 20 percent.  They are using some sort of, more

math to quantify the analyte.

Specificity, on the other hand, of the

definition is a measure of whether the method has detected

testosterone and not an interfering substance, i.e., the

measurement is specific as to testosterone.  So if you were

talking about, okay.  Are we measuring testosterone?

And finally, in sample, this means method must

use a sample taken from a female human that actually has

testosterone at the concentration of less than 10 or 5 or

1 nanograms per deciliter as claimed in the claims.

So as to understanding what these mean, and if

you look at the specification and the prosecution history,

you could tell that they're all over the place describing

each one of these four possible meanings.  The same thing

with the claim language.  And there was no clear indication

1    as to which one of these approaches should be used with a

2    claim capable of detecting term.

3              Now, they have made very clear that the

4    important purpose of having indefiniteness is giving public

5    notice and that is important because that would make the

6    others in the public understand what the scope of the claim

7    is and what constitutes infringement.

8              And I am on slide 10, and Quest's own

9    infringement contentions show us the lack of public notice.

10   Similar to the intrinsic record, Quest is all over the place

11   when they are having infringement contentions against

12   LabCorp's methods.  They talk about detecting, which is LOD

13   and quantifying, which is LOQ.  They also refer to

14   specificity portions of the accused methods, and also they

15   talk about whether it is capable of detecting samples in

16   different concentrations.

17             So similar to the intrinsic record, there's lack

18   of public notice, and Quest, when they are providing

19   infringement contentions, they're all over the place.

20             Very quickly on the case law, Your Honor, I

21   think the three Federal Circuit cases that we cited to are

22   right on point.  HZNP is a recent Federal Circuit case that

23   involves a term better drying, time and the Federal Circuit

24   found that that had at least two possible meanings and the

25   intrinsic record did not make clear indication as to which

1    one should apply.

2              Dow Chemical.  That looked at the indefiniteness

3    issue right after the Supreme Court's decision in Nautilus,

4    and that made clear that the patent and prosecution history

5    must disclose a single known approach or establish that

6    where multiple known approaches exist, a person having

7    ordinary skill in the art would know which approach to

8    select.  And in that case, there was a term concerning how

9    to measure a scope and there were multiple ways to do that,

10   and the Federal Circuit found that because there was no

11   clear indication as to which measuring should take place,

12   the claim was indefinite.

13             Teva is very similar.  Teva involved the term

14   molecular weight, and there were at least three ways to look

15   at the molecular weight and the intrinsic record did not

16   make clear as to which one should apply.

17             So those three cases, Your Honor, are very on

18   point and very similar to the case we have here.

19             Unless Your Honor has any questions, I'm done

20   with this term.

21             THE COURT:  Okay.  Ms. Mayer?

22             MS. MAYER:  I just have a couple of points, Your

23   Honor.

24             LabCorp is trying hard to make this seem like

25   four possible tests for the same concept, but it's not

1    what's going on here.  It's like if you are trying to

2    describe a human and you describe them by their weight,

3    their height, their hair color and their gender.  Those are

4    four separate characteristics of a human.  And in this case,

5    Quest used different characteristics of the assay and they

6    do describe them in the specification.

7              And LabCorp's argument is how do I know which

8    characteristics you're talking about?  In this case, it's

9    because Quest said, look at the height.  In our fact pattern

10   they said, look at the limit of detection.  They didn't say,

11   look at the limit of quantitation or look at the specificity

12   or let's look at how much is in the samples.  Those may end

13   up being the inventors investigated in the patent, which is

14   how LabCorp presents it, but they're not to be confused with

15   what the claim language said.  Of those characteristics,

16   Quest wrote in the claim, the method is capable of

17   detecting.  So it told the person of skill in the art

18   exactly which characteristic to focus on.  And no one

19   disputes the meaning of limit of detection.

20             There aren't four possible meanings.  This is

21   nothing like Teva.  They also assume the four possible

22   meanings and then try to find support for them.  But as we

23   discuss, they simply pluck words like accurately or

24   unambiguously out of the specification, and then in a very,

25   with no logical connection, link them to some concept in

1    the specification and then they try to link that back to

2    the claim language.  That is not clear and convincing

3    evidence.  And the three alternatives are not even remotely

4    plausible.  The claim tells you exactly what the inventors

5    were focusing on in the claim, capable of detecting.

6          Even two of the words they point to, accurately

7    and unambiguously, modify detect, the limit of detection.

8    They're not separate concepts.

9          In terms of --

10         THE COURT:  I think you can move onto the next

11   term.

12         MS. MAYER:  Okay.  So as you note, LabCorp takes

13   the two terms, ionizing and testosterone ions together, and

14   so we'll take them together as well today.

15         What Quest proposes is the plain and ordinary

16   meaning of these terms.  Both meanings are consistent with

17   the specification, and again here LabCorp proposes that

18   these terms are indefiniteness and therefore have their same

19   clear and convincing evidence standard.

20         Interestingly, LabCorp agrees that Quest's

21   constructions are the plain and ordinary meaning, and in

22   their brief they say in isolation, those two meanings could

23   be correct.  Their indefiniteness argument is based on their

24   position that the specification and claims use the terms

25   inconsistently with one another, and we explain in our brief

1    and I will show you today that that is not true.  In the

2    claims, ionizing includes generating in the analyte ion.

3    That includes a precursor ion.  That includes fragment ions.

4    And that's exactly how it's discussed and defined even in

5    the specification.

6              And, by the way, there's no argument here that

7    LabCorp makes that these terms fail to give reasonable

8    certainty to the indefiniteness standard.  They don't argue

9    that the claims are clear.  They're just -- they argue

10   there's some inconsistency with the specification, which

11   there's not.

12             So let's start with the ionizing term.  Quest's

13   construction follows the broad definition in the

14   specification and defines the term as a process of

15   generating an analyte ion having a net charge equal to one

16   or more electron units, and LabCorp agrees this definition

17   is the plain and ordinary meaning.  And in the quote we've

18   reproduced here, it refers to the definition above and says

19   that can be the ordinary meaning of ionizing.  The same with

20   testosterone ions.  Quest's construction is that their

21   testosterone molecule has been altered to have a net

22   electrical charge or a fragment with a net electrical

23   charge, and those follow the definitions in the

24   specification.

25             So in the first excerpt, the specification

1    explains that testosterone ion is created by ionizing

2    testosterone.  And in the second excerpt, it's very clear

3    that testosterone ions include not only a precursor ion, but

4    testosterone with a charge, but also fragment ions that you

5    can bake from the larger testosterone ions.

6              Again, LabCorp agrees, those could be the plain

7    and ordinary meaning.  Its argument is that the claims in

8    the specification use them inconsistently.  So let's look at

9    the claims.

10             Claim 1, a method for determining the amount of

11   testosterone in a sample.  It involves purifying

12   testosterone, ionizing said purified testosterone to produce

13   one or more testosterone ions detectable by a mass

14   spectrometer.  So, and then detecting.

15             The specification makes clear that there are

16   many mass spectrometry procedures you can use.  You can use

17   a single mass spectrometer in which case you ionize

18   testosterone and you detect that charged molecule, or you

19   can use a tandem mass spectrometer, two mass spectrometers

20   in tandem, one after the other, and as we explained in the

21   tutorial, you charge testosterone.  You fragment it and then

22   you analyze, you detect the fragment ions.  So you can

23   detect what's called, you know, a precursor ion.  You can

24   detect an analyte ion, precursor being charged testosterone.

25             And in claim 12, the ionizing step comprises

1    reducing the precursor ion, to isolate the precursor ion,

2    and then you collide the precursor ion gas to form

3    fragments, and the fragments are what's detected.

4              The specification uses ionizing exactly the same

5    way.  It's defined as a process of generating an analyte ion

6    having a net electrical charge to one or more electron

7    units.  The specification, as I will show you, uses analyte

8    ions to talk about a precursor ion or a fragment ion.  And

9    Dr. Chyall explained that a precursor ion, the fragment ions

10   are both analyte ions.  There's no contrary testimony in the

11   record from Dr. French on this point.

12             And LabCorp also makes the argument that it

13   matters whether the analyte ions, that it also argues that

14   ionizing only refers to charging a molecule before it enters

15   the mass spec.  That is nowhere to be found in the

16   definition.

17             LabCorp also argues that somehow the use of the

18   term ionizing the testosterone ions conflict with the

19   definitions of mass spectrometry and tandem mass

20   spectrometry in the patent, and that's not correct.

21             So this is a definition of mass spectrometry.

22   It only requires filtering, detecting and measuring ions

23   based on their mass-to-charge ratio.  It's a broad term that

24   can be a single mass spectrometer or a tandem mass

25   spectrometer.  And as a single, we show this in our

1    tutorial.  You ionize a molecule and then they're detected.

2    So LabCorp agrees, I think, that this is included in

3    ionizing.  But they say in tandem mass spectrometry, you

4    can't include the fragment ion.  Well, that doesn't -- that

5    doesn't line up with the specification.

6              So this is a picture of tandem mass

7    spectrometry, so you start the same way as in mass

8    spectrometry.  You charge the molecule.  That forms a

9    precursor ion.  Then you collide the precursor ion with gas

10   in most cases and you fragment it, and then those fragment

11   ions are detected.

12             So you can have one mass spectrometer in which

13   case you're detecting charged testosterone at around the

14   full molecular weight, or you can put two mass spectrometers

15   together, and in the second that you're analyzing, the only

16   thing you're detecting is the fragment ion.

17             So all of those are analyte ions.  The whole

18   purpose of tandem mass spectrometry, the thing that you

19   measure as a fragment ion, that's what LabCorp is trying to

20   exclude in saying, well, ionizing can't include those.  Of

21   course, it is.  Ionizing defined as generating an analyte

22   ion.  The whole point of tandem mass spec is to get the

23   fragment ion.

24             And then let's look at the patents use of the

25   term analyte ion.  LabCorp addresses it a little bit --

1           THE COURT:  If fragments weren't included, then

2    some of those dependent claims wouldn't work, right, because

3    they're specific to them?

4           MS. KIM:  Right.

5           THE COURT:  You don't have to keep --

6           MS. KIM:  Okay.

7           THE COURT:  I've got it.

8           MS. KIM:  Okay.  So all I have on this point is

9    the analyte ion point, so I already made my point.  Analyte

10   ion is using the spec to include both precursor and

11   fragment.  That's all I have on that point.

12          THE COURT:  I've got it.  I've got it.

13          MS. MAYER:  Thank you.

14          MS. KIM:  Thank you, Your Honor.

15          So the fundamental problem with the ionizing

16   step found in the claims of the patent --

17          THE COURT:  Let me understand.  Are you guys

18   really contesting the aspect of whether fragments are

19   included?

20          MS. KIM:  So we're contesting the fact that the

21   specification, the --

22          THE COURT:  Are you contesting whether fragments

23   are included in testosterone ions in those claims?

24          MS. KIM:  So we agree that the testosterone ions

25   include fragment ions and that's the fundamental problem

1    because the specification describes two distinct separate

2    steps.  One is ionizing, which has nothing to do with

3    fragmentation, and the fragmentation step which is separate

4    and distinct from the ionizing step.  And that is where the

5    problem lies, Your Honor, because the claim does exactly the

6    opposite.  There is a fundamental problem with the claim

7    language where when you look at the ionizing step, it tells

8    you that the ionizing step has to produce the testosterone

9    ions.  Okay.  That's a requirement.  Ionizing testosterones

10   to produce one or more testosterone ions detectable by a

11   mass spec.  And then after that you go to the detecting step

12   where that testosterone ion, which is produced by the

13   ionizing step, is then used by the mass spec.

14             Now, that's what the claim language says.  Now,

15   the problem is nowhere in the spec, the spec is the total

16   opposite from this.

17             Can we go to the next slide?

18             The spec tells you that the testosterone ions,

19   which are the fragment ions, are not produced in the

20   ionizing step.  It's actually produced in the fragmentation

21   step.  So let's look at this in steps.

22             The spec tells you that the ionizing process, so

23   of the ionizing step generates analyte ions.  Your Honor,

24   analyte ions are not fragment ions.  Analyte ions are used

25   to put into the mass spec.  Then it's fragmented, and the

1    fragmented ions are then analyzed to determine the amount.

2            And this is shown further consistent with the

3    definition of ionizing.  It gives examples of how ionization

4    can be produced.  It gives examples of electron ionization,

5    chemical ionization, nothing to do with fragmentation in the

6    mass spec.

7            Go to slide 16.

8            Further, the specification tells us that the

9    ionizing step occurs before the fragmentation step, and

10   that's found in the definitions of the mass spec.

11           And --

12           THE COURT:  Tell me how what you are arguing

13   makes sense with respect to claim number 11.

14           MS. KIM:  The same problem with claim number 11,

15   Your Honor.  They are completing the ionizing step with the

16   presentation step.

17           The spec tells us --

18           THE COURT:  It actually says that in the claim.

19   Right?  You're saying, oh, but it's inconsistent with the

20   specification, but the claim is pretty clear what it's

21   talking about, isn't it?

22           MS. KIM:  The claim -- if I remember correctly,

23   Your Honor, claim 11 discusses the same problem with the

24   second step.  It discusses the ionization step comprising or

25   producing testosterone ions.

```
 1              THE COURT:  That's fragment ions?

 2              MS. KIM:  Correct.  The ionization step again

 3    does not produce fragment ions.  It has the same problem

 4    because the spec --

 5              THE COURT:  I'm sorry.  I don't understand your

 6    argument.  Tell me again.  I am not sure I understand what

 7    you are saying.

 8              MS. KIM:  The ionizing step is separate and

 9    distinct from the fragmentation step.

10              THE COURT:  But the claim language does not

11    suggest that, right, because it says, the ionizing step

12    produces one or more testosterone fragment ions.  So I'm

13    not sure what is indefinite about the language of that

14    claim.

15              MS. KIM:  Maybe we should go to -- we'll come

16    back to this.  If we could go to slide 19.

17              So when a claim is nonsensical, we're arguing

18    that it's nonsensical here.  So the example that the Federal

19    Circuit used is they are trying to make orange juice out of

20    apples when that cannot happen, and that's exactly what

21    we're arguing here.

22              The spec tells us that the ionization step is

23    different from fragmentation step.  The ionizing step does

24    not produce fragment ions, but when they claim the

25    limitations in the patent, they're trying to make orange
```

1    juice out of apples.  They are saying now the ionization

2    step is producing fragment ions and that's not supported by

3    the specification.

4              THE COURT:  So what are the claims in this

5    Columbia case so I understand the nonsensical aspect?

6              MS. KIM:  Sure.  It discusses it here, actually.

7    It says, specifically, the claims describe the step of

8    extracting machine code instructions from something that

9    does not have machine code instructions.  The same thing

10   here.  They are trying to claim a step of creating fragment

11   ions by using the ionization step where ionization step does

12   not produce fragment ions as described in the specification.

13   That is a totally separate and different step in the mass

14   spec.

15             And if we could go back to slide 14.  I'm sorry.

16   I think we're at slide 15 now.  So we know that the

17   ionization step occurs before the presentation step.  And if

18   you could go to slide 18 -- I'm sorry, slide 17.  I skipped

19   a slide.

20             Now, this one is very important, Your Honor.

21             THE COURT:  Does the specification say that the

22   ionization step cannot produce fragments?

23             MS. KIM:  It never equates the two, Your Honor.

24             THE COURT:  But it doesn't say it can't.  I

25   mean, it seems different to me than the Columbia case where

1    they were saying there's no machine code.  It doesn't have

2    machine code.  Here, I have you telling me that it doesn't

3    have, that the ionization step doesn't produce fragments,

4    though the claim says that it does.

5            You have the burden on this one, clear and

6    convincing evidence.  Where is it that I'm supposed to say,

7    that claim is nonsensical?

8            MS. KIM:  Your Honor, that is very important.

9    If you look at column 7, lines 1 through 4, it discusses the

10   step, again.  The spec is very clear as to the steps of how

11   this happens.

12           Ionization, which is ionization -- it's

13   producing the analyte ions, and then later you have a

14   fragmentation step which uses what they call fragmentation

15   chamber to produce fragmentation ions.

16           So here it says, only ions produced by certain

17   analytes of interest, that's the analyte ions, are passed to

18   the fragmentation chamber.  So, again, the analyte ions we

19   know from the spec are done in the ionization step, where

20   the fragmentation chamber, where collision with atoms of an

21   inert gas occurs to produce the fragment ions.

22           So this tells us that the ionization for the

23   analyte ions are distinct and separate from producing the

24   fragment ions in the fragmentation step.

25           THE COURT:  And you think that's clear and

1    convincing evidence?  Do you have an expert to tell me

2    that?

3              MS. KIM:   I can have an expert explain in her

4    declaration, her understanding, and this is well-known in

5    the art, the steps of the mass spec.  If you have analyte

6    ions and then you go to the mass spec where fragmentation

7    happens, which is separate and distinct from ionization, and

8    the definition of ionization in the patent is very clear on

9    that as well.

10             And, again, when they are talking about the

11   fragmentation step, they make clear that the specific

12   fragment produced only by the analyte ions are analyte ions.

13   That means you have a starting point with the analyte ions

14   which is then fragmented in a fragmentation step in the mass

15   spec and which is then used to analyze the amount.

16             The spec is very clear that these are two

17   distinct and individual steps, ionizing and fragmentation.

18             Slide 18.

19             And the spec also makes clear what testosterone

20   ions are.  The testosterone ions include fragmented ions,

21   and we know from the claim language that the testosterone

22   ions are the ones that are analyte in the mass spec, and

23   therefore the testosterone ions must include fragmented

24   ions, which is a use of three analyzing mass spec.  So the

25   testosterone ions cannot be produced by the ionizing step as

1    claimed in the patent because it's inconsistent with what is

2    described in the spec.

3              And, again, slide 19.  This is exactly like the

4    Trustees of the Columbia University where, again, you're

5    trying to make orange juice out of apples where the spec is

6    very clear to the different step of producing analyte ions

7    versus the fragmentation step that produces the fragmented

8    ions.

9              THE COURT:  Okay.

10             MS. MAYER:  Your Honor, unless you have

11   questions, I don't have rebuttal.

12             THE COURT:  I would like to understand your

13   position on where, how the specification supports the

14   ionizing step including producing fragmented ions.  As I

15   understand it, they are saying the claims ionize it to

16   produce testosterone ions.  If you are saying testosterone

17   ions include fragments, where is there any support for

18   that?

19             MS. MAYER:  Sure.  So the first place to start

20   in the specification is the definition, and the definition

21   of ionizing and ionization is the process of generating an

22   analyte ion having an electric charge.

23             An analyte ion, we looked at the figures of mass

24   spectrometry and tandem mass spectrometry.  It includes

25   testosterone with a charge, a precursor ion, and it includes

1    fragment ions.  Both are analyte ions.

2              Dr. Chyall in his declaration confirmed how the

3    specification uses those, that both precursor and fragment

4    ions are analyte ions.  This is the only testimony on this

5    point that analyte ions include both.

6              I mean, counsel pointed to this section as

7    representing LabCorp's position, and I love this section

8    because it says testosterone ions include precursor ions

9    and fragment ions.  And there's no dispute, Dr. French says

10   testosterone --

11             THE COURT:  They are not disputing that.  What

12   they are disputing is that the claim says ionizing to

13   produce testosterone ions.  And if that means, what they are

14   saying is, there's no way to ionize to produce a fragment.

15   So what is your response to that?

16             MS. MAYER:  So there's also expert testimony on

17   this point.  They pointed to electron ionization and said,

18   well, this is just ionization, and it does say it produces

19   analyte ions.  And Dr. Chyall explained that ionization

20   techniques in the specification, including electron

21   ionization, generate fragment ions as well as precursor

22   ions.

23             THE COURT:  And is that disputed?

24             MS. MAYER:  That's not disputed.  To my

25   knowledge, there's no contrary expert testimony on this

1    point.

2              THE COURT:  Okay.  You can move on.

3              MS. MAYER:  Okay.

4              MS. KIM:  May I make one simple point?

5              THE COURT:  Yes, you may.

6              MS. KIM:  Thank you.

7              THE COURT:  Tell me, was that testimony of Dr.

8    Chyall disputed?

9              MS. KIM:  Your Honor, all their expert is saying

10   that --

11             THE COURT:  Was it disputed in the papers?

12             MS. KIM:  It does not -- we contested his

13   opinion.  Merely, what his opinion from what we understand

14   is that by ionizing the testosterone, by happenstance, you

15   may get some fragmented ions, but that's not relevant to

16   this inquiry because you're only using the analyte ion to

17   then put into the mass spec for the fragmentation step.

18             So there is no evidence in the intrinsic record,

19   especially the specification, that equates analyte ions to

20   fragment ions.  On the contrary, as we see on slide 17, the

21   spec makes it very clear that the analyte ions are passed

22   through the fragmentation chamber to then produce the

23   fragment ions.  So they're very different ions.

24             Thank you, Your Honor.

25             THE COURT:  Okay.

1          MS. MAYER:  And, Your Honor, I plan on moving

2     onto the last term.

3          THE COURT:  Yes, please.

4          MS. MAYER:  So the last term in dispute in the

5     testosterone patent is purifying testosterone.  In this

6     case, LabCorp proposes the construction.  The first part of

7     the parties' constructions are exactly the same and follow

8     the definition in the specification.

9          LabCorp's construction Quest disputes because it

10    address the words by removing materials other than the

11    analyte of interest.  So even though the definition just is

12    enriching the amount of testosterone and it doesn't care how

13    you enrich, but you want to enrich before you put it on the

14    mass spectrometer.

15         LabCorp's construction artificially excludes

16    some methods of enriching in which you remove the analyte as

17    opposed to the contaminants.  So to enrich, you can take out

18    A or you can take out B.  It doesn't matter.  It's enriched

19    both ways, and LabCorp's construction improperly excludes

20    some of those options.

21         So both parties agree, there's a definition in

22    the specification for purification.  Purification refers to

23    a procedure that enriches the amount of one or more analytes

24    of interest, or testosterone, relative to one or more other

25    components of the sample.

1          That is the first -- that is Quest's

2     construction.  It adopts that definition.  LabCorp adds by

3     removing materials other than the analytes of interest, and

4     according to the briefing, it's focusing on the sentence

5     before the definition.  That sentence says what purification

6     is not.  That sentence says, purification does not refer to

7     removing all materials from the sample other than the

8     analytes of interest.

9          LabCorp tries to argue that -- I mean, the

10    purpose of that sentence is all.  The specification is

11    making the point, you don't have to have a hundred percent

12    purity of testosterone.  I'm not even sure that's possible.

13    You just have to enrich.  That's what this, these two

14    sentences together mean.

15         LabCorp's misreading the first sentence and

16    saying that that first sentence means that the only way you

17    can purify is to remove material other than the analyte of

18    interest.  That's not right.  If the patentee wanted to

19    define it that way, it could have simply said, instead

20    purification refers to removing some materials from the

21    sample other than the analyte of interest, but it didn't.

22    It chose different words because purification is enriching.

23         There are several ways to enrich the amount of

24    analyte, which is the definition of purification.  On the

25    left you can remove contaminants from the sample and lead to

1    analyte.   On the right, you could remove the analyte from

2    the contaminant.   And on the left there's an orange sample.

3    You can separate it.   The contaminants, which are yellow,

4    can bind to the stationary phase and you're left with an

5    enriched analyte.   That's a way to purify or you remove

6    contaminants.

7              On the right you start with the same sample, but

8    at this time it's the contaminants in red that bind with the

9    stationary state.

10             THE COURT:   Analyte.

11             MS. MAYER:   I'm sorry.   The analyte in red that

12   bind.   You're left with the contaminant.   Either one of

13   those purifies, enrich the amount of analyte.   You can do

14   both.

15             LabCorp is trying to exclude removing analytes

16   from the contaminant, and they may get up here and say,

17   actually, we're excluding the one on the left, but that just

18   highlights this metaphysical point we make in our brief.

19   It's very hard sometimes to say what you are removing, the

20   contaminant or the analyte, but we know that LabCorp is

21   trying to artificially exclude certain procedures from the

22   definition.

23             The specification talks about you can remove

24   analyte or you can remove contaminant, and these are just

25   some examples.   On the left, a blood serum sample is

1    collected of a human patient and you deprotonate.  You take

2    out some contaminants.

3                On the right, the parties talked a lot about

4    HTLC in the briefing, and that's described in the

5    specification as an unbound and unwanted debris is swept

6    through the column to get rid of the contaminant.  The

7    testosterone, the analyte is captured and concentrated on

8    the column.  So you're absorbing all of the analyte onto the

9    column.

10               And down below the specification talks about

11   other methods.  Immunoaffinity separations is one.  Of

12   course, you're not going to have antibody to all the

13   contaminants.  The antibody is going to be to the

14   contaminant.  The specification talks about both ways to

15   enrich.  You can remove contaminants.  You can remove

16   analytes.  It doesn't matter.  The definition is you enrich

17   the analyte.

18               And, finally, LabCorp's construction also

19   excludes preferred embodiments.  We agree, the parties agree

20   that HTLC is described as the preferred embodiment.  There's

21   a cite there.  HTLC is described in the specification as

22   removing analyte from the sample, it says during the HTLC

23   procedure.  The testosterone is captured and concentrated

24   on the column.  It's removed from the samples onto the

25   column.

1            And LabCorp's construction of purifying

2    testosterone excludes removing analyte.  So it doesn't

3    include HTLC, which is the preferred embodiment.

4            So, in sum, LabCorp's construction artificially

5    narrows the definition of purification in the specification.

6            THE COURT:  Thank you.

7            MS. MAYER:  Thank you.

8            MS. KIM:  Your Honor --

9            THE COURT:  So are you excluding extraction of

10   the testosterone?

11           MS. KIM:  Not for the claim language, Your

12   Honor.  So I think --

13           THE COURT:  What does that mean?

14           MS. KIM:  Yes.  I'm going to get there.

15           THE COURT:  I want to get there now.

16           MS. KIM:  Okay.  Let's get there now.  I need to

17   set this up a little bit.  It's slide 22.

18           So we agree that the purifying testosterone

19   claim term is defined in the spec, and we believe that Quest

20   is ignoring the first part of the definition that's found in

21   the specification, and this definition that we're proposing

22   is consistent notably with the claim language.

23           So let's look at the claim, and we have to look

24   at the context of the claim when we're construing the claim

25   terms.  So the next slide, slide 23.  But let's look at the

```
 1    claim language.

 2               Now, when we're talking about purifying

 3    testosterone here, claim 1, that's one of the three

 4    independent claims, says you're purifying comprises

 5    extracting.  Extracting.  The same thing with independent

 6    claim 15.  Purifying.  They talk about extracting

 7    testosterone.  Here they make it more detailed by using

 8    HTLC.

 9               So let's look at what the spec tells us.

10               THE COURT:  Well, wait a second.  What we're

11    talking about here is I'm construing the term purifying

12    testosterone as found in claims 1 and 15.

13               MS. KIM:  That's correct, Your Honor.

14               THE COURT:  So when you say you're not disputing

15    that it -- so in your construction of that term in that

16    claim, is extract included in what you propose the

17    construction to be?

18               MS. KIM:  Right.  Let's look at our proposal.

19    Slide 22.

20               THE COURT:  I don't understand what you are

21    telling me when you say it's not excluded in the claims.  I

22    get it, it's not excluded in the claims.  It says it in the

23    claim.  But what does your proposal -- does it exclude it?

24               MS. KIM:  I see what you mean, Your Honor.  I

25    think maybe there was a dispute as to what the patent tells
```

1    us about extraction, and what our position is, is that

2    extraction includes both.  Removing other materials -- not

3    all, but removing some of the other materials plus in the

4    amount, which is consistent with the definition they gave in

5    the specification.

6              THE COURT:  But your construction, which is by

7    removing materials other than the analyte of interest.  If

8    all you do is extract testosterone from a sample, does that

9    fall within your construction?

10             MS. KIM:  So our construction has two parts,

11   Your Honor.

12             THE COURT:  I'm asking about the one part that I

13   care about right now.  If all you do is you remove

14   testosterone from the sample, does that fall within your

15   construction?

16             MS. KIM:  I don't think, Your Honor, because the

17   spec tells us that extraction includes removing, also

18   removing material other than the analyte.

19             And let's look at the spec.  And if we could go

20   to slide 24.  So we leak at the claim language where it

21   identifies extraction, so we want to understand what

22   extraction means in the context of the claims.

23             In the spec, so extraction includes HTLC.  So

24   when the spec talks about HTLC, it tells us the steps of

25   washing away other materials when you are using HTLC.  And

1    when they are identifying the extraction columns, for

2    example, HTLC that's described, it tells us such columns are

3    often distinguished from extraction columns.  They're

4    distinguishing from the column here.  It says, which has a

5    general purpose of separating or extracting retained

6    material from non-retained materials in order to obtain a

7    purified sample for further analysis.  So it tells us that

8    you're separating or removing other materials compared to

9    the analyte that you want.

10            The next slide.

11            Further, when it's talking about extraction

12   again, it tells you that analyte of interest is reversibly

13   retained by the column packing material, while one or more

14   other materials are not retained.  And, again, the same

15   thing.  The HTLC procedure, when they're describing it, it

16   tells us that an unbound and unwanted debris is swept

17   through, meaning it's removed, and the testosterone is

18   captured and concentrate on the column.

19            So when you look at the spec, we know that the

20   purified testosterone in the context of the claim language

21   is talking about extraction, and claim 15 further nails that

22   down to HTLC.  And when you look at the description in the

23   spec, it's talking about both, and consistent with the

24   definition of the spec, where you'll be moving some of the

25   material that's not the analyte of interest and you're

1    enriching the analyte here with the testosterone.

2                And this is consistent --

3                THE COURT:  So hold on.  Let's look at the

4    patent itself.

5                MS. KIM:  Sure.

6                THE COURT:  Column 9, 38.

7                MS. KIM:  Column 9.

8                THE COURT:  What you cited up there.

9                MS. KIM:  Yes.

10               THE COURT:  I just want to see it in context.

11               MS. KIM:  Sure.

12               THE COURT:  So you are citing to me column 9,

13   lines 38 to 42, and that goes down and the explanation of

14   that continues down to at about line 44, and then it says,

15   alternatively, an analyte may be purified by applying a

16   sample to a column under mobile phase conditions where the

17   analyte of interest elutes at a different rate in comparison

18   to one or more of the other material and as discussed above,

19   such procedures may enrich the amount of them.

20               Doesn't that suggest that you can have

21   purification where the analyte comes out first?

22               MS. KIM:  Yes, Your Honor, but, again, we have

23   to go back to the context of the claim.  The claim makes

24   it clear -- let's look at the claim again.  This is slide

25   23.

```
 1                    It's not where you -- the claim does not say

 2      just purify, period.  It says, you purify.  Claim 1, it

 3      comprises extraction.  The extraction is included in the

 4      purification process.

 5                    THE COURT:  And your position is if it's solely

 6      extraction, it doesn't constitute purifying.  Right?

 7                    MS. KIM:  It is part of purification, which is

 8      described in the clam language.  The claim requires

 9      inclusion of extraction.

10                    THE COURT:  Right.  My question was:  If it's

11      just extraction, then your position is that is not

12      purifying?

13                    MS. KIM:  We believe that extraction is

14      purifying as defined in the specification, because the

15      spec describes extraction as having those both components.

16      Look at the specification definition again, which is on

17      slide 22.

18                    We believe that the specification describes

19      purification as removing material that is not analyte of

20      interest, plus enriching the amount of analyte relative to

21      other components in the sample, which is consistent --

22                    THE COURT:  What is the next sentence after

23      that?

24                    MS. KIM:  It talks about preferred embodiment, I

25      believe, Your Honor.
```

```
 1              THE COURT:  Okay.  But what does it say?
 2              MS. KIM:  Let's pull it out.  It says, in
 3    preferred embodiments, purification can be used to remove
 4    one or more interfering substances, e.g., one or more
 5    substances that would interfere with detection of an analyte
 6    ion by mass spec.
 7              THE COURT:  Isn't that what you are asking me to
 8    include?  That it has to remove one or more things?
 9              MS. KIM:  That's correct, Your Honor, because of
10    the claim language again.  Because of the claimed contact,
11    talking about where purification has to include at least
12    extraction and it has to include extraction by HTLC, and
13    that's I think the gist of our argument, is that the spec
14    gives this definition, and that is consistent with the claim
15    language where the purification limitation is claimed.
16              THE COURT:  All right.  Can you tell me why this
17    matters in the context of this case?
18              MS. KIM:  Oh, this matters because LabCorp does
19    not use HTLC, and we believe that claim 1 also has
20    limitation extraction which LabCorp does not do.
21              THE COURT:  But if claim 1 includes extraction,
22    that's in the claim.  They can't get away from extraction.
23    Isn't that right?
24              MS. KIM:  And we want to make sure that the
25    purifying testosterone, and that's a very good point, Your
```

1    Honor, that purifying testosterone has to include

2    extraction, which is also described in the patent, and

3    maybe -- I think there may be a dispute as to what

4    extraction includes.

5              THE COURT:  Okay.  Well, that wasn't raised for

6    me.  Right?  You keep telling me claim 1 says HTLC and I'm

7    missing that in the claim.

8              MS. KIM:  Oh, no, claim 1 does not have HTLC.

9    Claim 1 just talks about extraction.  And it further limits

10   the method of extraction to -- using HTLC.

11             And our position is that we do not think

12   extraction is described in the spec, and therefore we do not

13   purify the testosterone as claimed in the patent.

14             THE COURT:  Okay.

15             MS. KIM:  Thank you, Your Honor.

16             MS. MAYER:  Your Honor, I really have no

17   rebuttal.  The term before you is purifying testosterone,

18   and I'm not even sure if -- how we still disagree.

19             THE COURT:  That's fine.  Let's move to the next

20   patent.

21             MS. MAYER:  Okay.

22             MR. MAJCHRZAK:  Good afternoon, Your Honor.

23             With respect to the '867 patent, the parties

24   dispute the construction of a single term, which reads,

25   relating the detected ions to the presence or amount of said

1   25 hydroxyvitamin D2 in said sample.  That term uses only

2   plain English words in their normal way.  The words of that

3   term have no special meaning in this art, and LabCorp

4   certainly is not suggesting special means for those plain

5   words within the art.

6           Under basic claim construction principles, Your

7   Honor, we believe therefore no construction of this term is

8   necessary.  It's plain English words.  Everyone understands

9   what they mean and they should just be given the plain

10  meaning.  Despite the plain English nature of this term,

11  LabCorp offers a construction that rewrites and alters the

12  claim.  In particular, LabCorp rewrites relating as

13  quantifying and amount as concentration.

14          Turning first to the rewrite of relating to

15  quantifying.  As written, the claim makes perfect sense.

16  Skilled artisans can relate detected ions to the present of

17  qualitative terms or the amount of quantitative term of 25

18  hydroxyvitamin D2 in said sample.

19          Despite the dual nature of this claim term,

20  qualitative and quantitative, LabCorp intends to introduce a

21  quantitative only verb, quantifying.  In so doing, this will

22  either make the term entirely quantitative, which in effect

23  removes present from the scope of the claim, the qualitative

24  aspect of this claim, or it needlessly confuses the claim

25  language itself.  In particular, it's very confusing to

1    determine you who one can quantify the presence of something

2    as LabCorp's supposed construction would have you do.

3           Under such a construction, it would only serve

4    to construe the skilled artisans and juries about the

5    meaning and scope of this claim.

6           Due to the importance of the qualitative and

7    quantitative distinction here, LabCorp's attempted rewriting

8    of this claim, we provided a very simple example.  They are

9    here on the screen.  There's a beaker with a couple of red

10   circles here.

11          THE COURT:  I've got the difference here.  I

12   don't need this.  Go ahead.

13          MR. MAJCHRZAK:  Certainly.  So the specification

14   supports the notion that the term requires no construction

15   and that possesses its dual qualitative and quantitative

16   nature.

17          Looking at the first cut out in the upper

18   left-hand corner, directly uses the word relating in

19   conjunction with the phrase presence.  "Relating presence or

20   amount of the detected ion to the Vitamin D in the sample."

21   This is the same concept expressed in the plain English

22   words in the claim.

23          The second cutout on the screen in the middle,

24   again quoting, "The presence or amount of the ions is

25   related to the presence or amount of the Vitamin D

1      metabolite in the sample."  The inventors, Your Honor,

2      clearly understood that relating, the verb relating should

3      be used exactly as it is in the claims and they used it

4      consistently throughout the specification.

5              The third cutout on the screen merely emphasizes

6      this point.  "The presence or absence or amount of two or

7      more Vitamin D metabolites in a sample are detected in a

8      single assay using the above described MS/MS methods."

9              Relating, presence or absence as described in

10     this cutout is clearly qualitative, and it's exactly the

11     type of investment that LabCorp is seemingly trying to

12     remove with its proposed construction.  But the

13     specification goes even further and explicitly teaches

14     skilled artisans how to relate detective ions to the

15     cite of the present or the amount of metabolite D in the

16     sample, including 25 hydroxyvitamin D2.

17             Example 1 in Table 1 shown here on the left show

18     a number of ions that skilled artisans can use to relate

19     either the presence or the amount of 25 hydroxyvitamin D2 in

20     a patient sample.

21             A skilled artisan would understand that they

22     could look at, look for one, some or all of these ions to

23     determine whether hydroxy, 25 hydroxyvitamin D2 is present

24     in the patient sample.

25             Turning to LabCorp's attempt to rewrite amount

1    as concentration this is particularly confusing as the

2    phrase present or amount appears three times in claim 21,

3    but LabCorp seeks only to construe the last of the phase.

4    In fact, with respect to the first few appearances, LabCorp

5    agreed that no construction was necessary.  In those two

6    instances, presence or amount means presence or amount, yet

7    in the third instance, presence or amount somehow becomes

8    presence or concentration.  This would simply be confusing

9    to a skilled artisan or a jury.

10             As a whole, Your Honor, because plain English

11   words are used in a normal way for this term and because

12   LabCorp is attempting to rewrite the claim and make it, if

13   anything, more confusing, Quest respectfully suggests that

14   the Court decline to construe this term.

15             Your Honor, I could move on to the next related

16   term or we'll wait.

17             THE COURT:  I mean, the argument is really the

18   same for that one.  Right?

19             MR. MAJCHRZAK:  Yes.

20             THE COURT:  All right.  You don't need to do

21   that.

22             MR. MAJCHRZAK:  Thank you, Your Honor.

23             THE COURT:  So what do you say about this?

24             MR. CARLSON:  Good afternoon, Your Honor.  Sure.

25   This is a great place to start.  Here, you have three

1    appearances of presence or amount and the context is

2    different for each.

3              So in the first one you're looking at the

4    preamble.  It says, a method for determining the presence or

5    amount.  The second one deals with detecting the presence or

6    amount.  And what the claim is directed to there is

7    detecting the presence or amount of ions.  It's not, it's

8    not doing anything with the presence or amount of the

9    Vitamin D metabolite, 25 hydroxyvitamin D2 in the sample.

10             The last appearance of presence or amount in the

11   relating step is the term that we've identified for

12   construction.  Understanding that Your Honor doesn't want to

13   hear claim construction disputes that don't mean anything,

14   this is the crux of our argument, because it's a

15   noninfringement defense.

16             So we didn't think it was necessary to construe

17   the other language.  We thought at least the preamble where

18   it says determining the presence or amount of Vitamin D

19   metabolite is helpful because it gives context to what the

20   relating limitation means.  But detecting the presence or

21   amount of ions is not a claim construction that we see that

22   we have to have because it doesn't have any effect on issues

23   in the case.

24             THE COURT:  Thank you.

25             MR. CARLSON:  So, Your Honor, just jumping into

1    what the primary disputes seem to be, and there's some

2    overlap here between the '867 and '427, as Your Honor

3    mentioned.

4           The first is whether a construction is needed in

5    the first place, and the second one is does relating the

6    detected ions to the amount being formed in the

7    concentration.

8           Now, there's also an '867 specific dispute that

9    deals with how you, relating the ions to the present.  Your

10   Honor, that's a difficult question given what is in the

11   specification.  There's a dearth of an explanation of what

12   that means.

13          Our construction we believe is the best meaning

14   for that term, but there certainly could be other ways to

15   construe that language.

16          So turning to the first, turning to the first

17   issue of whether construction is needed in the first place.

18   I'm going to go through this quickly, but generally, there

19   are three elements here, A, B and C.  The first one is

20   ionizing, generating a protonated or precursor ion.  And

21   over here on the right, we have an image from LabCorp's

22   tutorial that depicts ionizing.  Then in limitation B you

23   have fragmentation, the generation of fragmented ion.  And

24   element C actually includes two limitations, because first

25   you're detecting, and over here on the right you see the ion

1    hitting the detector and a mass spec is formed based on that

2    protection.  But there's also the relating element.

3              So there's two separate elements here and the

4    relating element based on the language of the claims we

5    would submit is where the determination of the presence or

6    the amount of the Vitamin D metabolite occurs, and that's a

7    separate step from detection.

8              Now, and that is summarized here, but there are

9    two separate limitations in element three.

10             LabCorp's position is that merely detecting the

11   presence or the amount of said ions is not enough to meet

12   the relating step, and our construction was chosen to assure

13   that there is an actual second requirement maintained.

14             So let me explain what I mean by that.  You saw

15   some aspects in Quest's presentation and you also, Your

16   Honor, probably saw these in Quest's tutorial.  And when

17   Quest was describing detecting in their tutorial, they

18   showed ions hitting the detector and a mass spectrum is

19   produced.

20             When Quest was depicting relating ions to the

21   presence of an analyte, you also saw a mass spectrum with

22   several peaks.  So it's our position if what Quest is

23   attempting to do here is collapse the detecting and relating

24   requirement of element C into just one requirement.  So if

25   you are merely detecting ions and you produce a mass

1    spectra, some scientists may be able to relate them, and

2    that's not the appropriate reading of this claim, and here's

3    why.

4              Let me see here.  The patent in the detailed

5    description of the invention section, it uses the same

6    language that was used in the claim.  For example, on the

7    left here we have relating the detected ions to the presence

8    or amount and the same in the bottom on the left here.  But

9    if you look over on the right, there are other preferred

10   embodiments where you simply detect an ion, and that ion

11   is related to the presence or amount.  In other words,

12   there's not an affirmative relating step.  There's detection

13   and there's just some relation that exists in the

14   background.

15             And the two passages on the right here explain

16   how there are those preferred embodiments where that may be

17   the case.  But what the claim says, it says you have to

18   detect and then you have to affirmatively relate the

19   detected ion to the presence or amount of the Vitamin D

20   metabolite.  That's what LabCorp's construction is directed

21   to in saying that that distinction, that relating is an

22   actual requirement of this method claim.

23             So if you look at Quest's openings position for

24   why no construction is needed, you'll see that Quest cites

25   some portions of the specification that simply parrot back

1          the claim language without providing the meaning, but the

2          one thing that they do make clear is relating is an

3          affirmative requirement of this method.

4                    Here, you have another one that's similar.  The

5          specification makes clear that relating is an affirmative

6          requirement in the claim.

7                    And then on this next slide, slide 44, just to

8          note a correction.  We had a typo in the citation on the

9          right.  It should be column 9, lines 20 to 45.  What we gave

10         to Your Honor, I believe column 5, line 51 to 60, which is

11         on the right there.  I would invite Your Honor to make that

12         correction, that the correct cite on slide 44 is column 9,

13         lines 20 to 45, and this was a portion of the specification

14         that LabCorp cited in its brief.

15                   Here's the only portion of the specification

16         that LabCorp was aware of that attempts to provide any

17         explanation as to what it means to relate the presence or

18         amount of an ion to the presence or amount of the original

19         molecule, and you'll see that right in the bottom of this

20         passage.  It looks like line 42, column 9.  Numerous other

21         methods for relating the presence or amount of an ion to the

22         presence of the noninfringing molecule will be well-known to

23         those of ordinary skill in the art.

24                   But if you look at the examples that are

25         provided, all involve some type of quantification.

1    And I have this listed better here on the next slide, slide

2    45.

3            The first example given is the abundance of a

4    given ion, so this is after the ions have been detected, the

5    ions are compared to a table that converts the relative

6    abundance to an absolute amount of the original molecule,

7    and we would submit that that is a quantification.

8            THE COURT:  And it says can be related to the

9    amount, which is one of the options in the relating part of

10   the claim.  Right?

11           MR. CARLSON:  That's right, Your Honor.

12           THE COURT:  Does it talk about relating it to

13   presence and also being quantified?

14           MR. CARLSON:  Your Honor, no.  This passage

15   merely goes through two examples that I think are most

16   fairly characterized as quantifying the amount, but then at

17   the end of the passage it says, numerous other methods for

18   relating the presence or amount of an ion to the presence or

19   amount of the original molecule will be well-known.  So we

20   would submit that the statement at the end of this passage,

21   linked relating to the presence of these methods of

22   quantification that are explained here in this patent.

23           And there's another passage in the specification

24   that became relevant after we saw Quest's claim construction

25   tutorial, so I will go there now.

1              So what Quest just presented and what Your Honor

2    probably saw in their tutorial is that some comparison of

3    two peaks in a mass spectrum could be used to relate the

4    detected ions to the present, and if you look through the

5    patent, there's a description of something like that and

6    it's called a daughter ion ratio monitoring.  And what that

7    refers to is, the two peaks that you see over on the left of

8    Quest's tutorial are two fragments that were detected.  And

9    by calculating the ratio of the abundance of those two ions,

10   scientists can determine that the substance that produced

11   that mass spectrum was actually the substance that was, that

12   the scientists thought they were measuring.  In this case,

13   it would be Vitamin D.

14              So if you look at how the patent describes this,

15   you have the quantity of various ions you have determined.

16   I have it summarized here on slide 22, the quantity of

17   various ions determined.  The ratio of the quantities are

18   calculated and monitored.  The ratio compared to the

19   molecular standard, and if there's a substantial difference,

20   you have an interfering molecule present.  If there's not a

21   substantial difference, if they're similar, you have

22   increased confidence there is no interference.  In other

23   words, the analyte ion is present.

24              So based on what the patent says about this

25   daughter ion ratio monitoring, even determining the presence

1    of an analyte ion is something that involves quantification,

2    and it's not a binary simplistic yes or no or red dot is

3    present.  It requires all of these steps of quantifying

4    ions, calculating ratios, monitoring them and then comparing

5    them to something else.

6              So for that reason, we would submit that

7    quantifying the presence makes sense in the context of this

8    patent along with quantifying the ion.

9              So getting back to the slide that I skipped over

10   here, it seems to be that Quest in other places will admit

11   that this patent and this claim in particular involves

12   quantification.  LabCorp's construction simply reflects the

13   fact that there is a quantification involved and it respects

14   the fact that it could be present or an amount.

15             So for that reason, Your Honor, we submit that

16   LabCorp's construction should be adopted and Quest's

17   position that no construction is necessary should be

18   rejected.

19             THE COURT:  All right.  So what's your response

20   to this?

21             MR. MAJCHRZAK:  Well, Your Honor --

22             THE COURT:  No.  Leave that up there.

23             MR. MAJCHRZAK:  So as I understood Mr. Carlson

24   say is that there may, even if there is some quantification

25   involved, it would be quantification of ion, which that

1    changing relating in the claim language wouldn't make too

2    much sense with respect to that because the claim says,

3    relating the detected ions to the present or amount of said

4    25 hydroxyvitamin D2 in the sample.

5              I don't believe Mr. Carlson's argument ever said

6    he would quantify the amount of, necessarily quantify the

7    amount of the analyte, the Vitamin D metabolite.  It's

8    quantifying the ions above the noise.

9              THE COURT:  Well, their construction is

10   quantifying the presence or concentration of the 25

11   hydroxyvitamin D2 in said sample.  Isn't that what you were

12   saying that the claims were directed to?

13             MR. MAJCHRZAK:  No, Your Honor.  What the claim

14   is directed to -- so as you might have seen in both

15   tutorials, one of the ending steps of mass spectrometry is

16   detecting ions.

17             THE COURT:  Well, you agree that the claims were

18   put up there, that they require two things -- a detecting

19   step and a relating step.  Right?

20             MR. MAJCHRZAK:  Correct.  Yes, Your Honor.

21             THE COURT:  All right.  And what you said in the

22   motion in response to the motion for judgment on the

23   pleadings was that -- I don't know what three is.  I guess

24   it's the claimed patentable method to detect and quantitate

25   Vitamin D metabolites.

1              MR. MAJCHRZAK:  Certainly, that's one aspect of

2    the claim, Your Honor.  We do not dispute that one aspect of

3    the claim is quantitating metabolite, Vitamin D metabolites.

4    The clear claim language though is relating detected ions to

5    the present, present is qualitative, or amount of the

6    Vitamin D, Vitamin D-2 analyte to itself.

7              THE COURT:  Just one other question.  I noticed

8    that the language that you proposed, you dropped the

9    language about Vitamin D, metabolite D, was included in your

10   claim.  Is that no longer part of your construction?

11             MR. MAJCHRZAK:  That, Your Honor, was a typo.

12   We believe the claim should be just exactly as it appears in

13   the claim itself.

14             THE COURT:  Okay.  And, lastly, let me ask:

15   You, nobody has mentioned who the person of ordinary skill

16   in the art is.  Is it correct that whether I were to go with

17   your proposed construction or defendant's, that it wouldn't

18   make any difference for the issue before me on the

19   construction?

20             MR. MAJCHRZAK:  We agree with that, Your Honor.

21             THE COURT:  All right.  Anything else?

22             MR. MAJCHRZAK:  Thank you.

23             THE COURT:  And, defendants, do you agree as

24   well on the person of ordinary skill in the art?

25             MR. CARLSON:  Yes, we do, Your Honor.

1          THE COURT:  All right.  Did you want to say

2   anything else in connection with these last terms or not?

3          MR. CARLSON:  Just one thing just to clarify.

4          There are similar terms in the -- there's a

5   similar term in the '427 patent, and we would submit that

6   the argument that we just presented addressing quantitation

7   of the amount are the same arguments that we would make for

8   the '427 patent.

9          I'm happy to go through those if Your Honor

10  would like.  It's the same specification.  We're going to

11  see the same things.  But if Your Honor is satisfied in

12  using the argument you presented for quantifying the amount,

13  I'm happy to sit down.

14         THE COURT:  I assumed both sides, really, the

15  arguments were similar, so thank you for clarifying that.

16         MR. CARLSON:  Thank you, Your Honor.

17         THE COURT:  Okay.  I want to take a few minutes

18  to think about some issues and then I will come back and

19  rule on at least a few things here, so let's take 15 or

20  20 minutes.

21         (Short recess taken.)

22              -  -  -

23         (Proceedings resumed after the short recess.)

24         THE COURT:  All right.  Please be seated.  Thank

25  you for your patience and thank you for your arguments

1    today.  They were helpful.  At issue we have three patents

2    in two families, and six disputed claim terms.

3             I am prepared to rule on each of those disputes.

4    I will not be issuing a written opinion, but I will issue an

5    order stating my ruling.  I want to emphasize before I

6    announce my decisions that while I'm not issuing a written

7    decision, we have followed a full and thorough process for

8    making the decisions I'm about to state.

9             I have reviewed each of the patents in dispute.

10   I have also reviewed the portions of the prosecution

11   histories submitted.  There was full briefing on each of the

12   disputed terms.  There was an appendix, which included

13   declarations of experts.  There were tutorials on the

14   technology submitted by each side and there has been

15   argument here today.  All of that has been carefully

16   considered.

17            Now as to my rulings, as an initial matter, I am

18   not going to read into the record my understanding of claim

19   construction law generally and indefiniteness.  I have a

20   legal standard section that I have included in earlier

21   opinions, including recently in *Waters Corporation v.*

22   *Agilent Technologies, Inc.,* C.A. No. 18-1450.  I incorporate

23   that law and adopt it into my rulings today and will also

24   set it out in the order that I issue.

25            As to the person of skill in the art, the

1    parties' definitions are substantially similar and the

2    parties have agreed that the analysis is the same under both

3    parties' definitions of the level of ordinary skill in the

4    art.

5                    Now, the disputed terms.

6                    The first term is "capable of detecting

7    testosterone at concentrations of less than 10 ng/dL [or 5

8    ng/dL or 1 ng/dL] in the sample," which is found in claims

9    1, 8, 9, 15, 23 and 24 of the '862 patent.  Plaintiff

10   asserts that the term has its plain and ordinary meaning,

11   which is "the method is able to detect testosterone at

12   concentrations below 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the

13   female human sample."  Defendants argue that the term is

14   indefinite.

15                   I will give this term its plain and ordinary

16   meaning, i.e., the method is able to detect testosterone at

17   concentrations below 10 ng/dL [or 5 ng/dL or 1 ng/dL] in the

18   sample.  This is consistent with the words used in the

19   claim.  And this construction is also supported by the

20   intrinsic record.  For example, the '862 patent discusses

21   detecting low levels of testosterone, notes the lower level

22   in females and refers to detection at the levels recited in

23   the claims and even below 1 ng/dL.

24                   Defendants, citing the declaration of their

25   expert, Dr. French, argue that there are four different

1    "meanings" for the term, and that because each of these

2    meanings is equally plausible, the term is indefinite.  I

3    disagree.

4         The four meanings asserted by Defendants are:

5    One, the limit of detection ("LOD"); two, the lower limit of

6    quantitation ("LOQ"); three, the specificity of testosterone

7    determination; and, four, the use of a sample taken from a

8    female human that actually has testosterone at a

9    concentration of less than 10 (or 5 or 1) ng/dL.

10        Defendants note that when Quest added the

11   disputed language to the claims, it pointed to the text that

12   became the first paragraph of the detailed description of

13   the invention.  That paragraph refers to "accurately

14   detecting" and "unambiguously detecting."  Defendants say

15   that "accurately detecting" refers to the LOQ, or the lower

16   limit of quantitation, and "unambiguously detecting" refers

17   to specificity and thus the "capable of detecting" language

18   refers to multiple things.  Defendants though don't clearly

19   explain how those words or the terms are linked.

20        I am not persuaded that statements made during

21   the prosecution history or in the specification change the

22   analysis.  None of that is inconsistent with the ordinary

23   meaning of the words used in the claims.  Indeed, the claims

24   did not use the words "accurately" or "unambiguously" - only

25   "detecting."  I find that only one of the four proposed

1    "meanings" offered by Defendants - the limit of detection -

2    corresponds to the language of the claim, i.e., "detecting"

3    testosterone.

4              The language of the claim itself provides

5    persons of ordinary skill with "reasonable certainty ...

6    about the scope of the invention" and "clear notice of what

7    is claimed."  And Defendants have not met their burden to

8    show indefiniteness by clear and convincing evidence.

9              The next terms are "ionizing" and "testosterone

10   ions."  "Ionizing" is found in claims 1 through 12, 15 and

11   18 through 20 of the '862 patent.  "Testosterone ions" is

12   found in a subset of those, i.e., claims 1, 12, 15 and 20 of

13   the '862 patent.  The parties have briefed and argued these

14   terms together.

15             As with the prior term, Plaintiff argues that

16   these terms should be given their plain and ordinary

17   meaning.  For "ionizing," Plaintiff states that that is

18   "altering a molecule such that it has a net electric

19   charge."  For "testosterone ions," Plaintiff states that the

20   plain and ordinary meaning is "one or more testosterone

21   molecules that have been altered to have a net electric

22   charge or one or more fragments thereof with a net electric

23   charge."  Defendants again assert that those terms are

24   indefinite.

25             Ionizing and ions are common words with common

meaning.  The intrinsic evidence uses those terms consistent
with their ordinary meanings.  The '862 patent defines
ionizing at column 8, lines 45 to 47, stating that "[t]he
term 'ionization' and 'ionizing' as used as herein refers to
the process of generating an analyte ion having a net
electrical charge equal to one or more electron units."  The
patent in the lines following that definition explains that
the net charge of these ions may be positive or negative.
The claims likewise use "ionizing" in its plain and ordinary
sense.  Independent claims 1 and 15 recite "ionizing said
purified testosterone to produce one or more testosterone
ions detectable by a mass spectrometer," and dependent
claims 10 through 12 and 18 through 20 require the produced
ions to have certain mass/charge ratios.

I also credit the opinions of Dr. Chyall,
Plaintiff's expert, that the nature of the invention -
methods of mass spectrometry - further supports a plain and
ordinary meaning of "ionizing," because such methods require
electrically charged molecules.

Similarly, as to testosterone ions, in the
"summary of the invention," the '862 patent explains that
"testosterone ions" are created by "ionizing" testosterone.
There is no dispute as to what "testosterone" means, and as
I've already noted, "ionizing" is defined in the
specification.

1            I understand Defendants' argument that the

2     specification doesn't clearly refer to ionizing to produce

3     fragments.  But as Defendants' counsel acknowledged today,

4     the specification does not preclude that either.

5            The specification does, however, explain that

6     "testosterone ions" include not only testosterone molecules

7     that have been altered to have a net electric charge, but

8     also testosterone fragments with a net electric charge.  And

9     there are also dependent claims - such as claims 11 and 19

10    that claim that the ionizing of step (b) comprises producing

11    one or more testosterone fragment ions having a mass/charge

12    ratio selected from the group consisting of 109.2 ± 0.05 and

13    96.9 ± 0.5.

14           I also here credit Dr. Chyall's unrebutted

15    opinion that ionization techniques disclosed in the

16    specification can generate fragment ions as well as

17    precursor ions.

18           In sum, Defendants have not met their burden of

19    showing by clear and convincing evidence that these terms

20    are indefinite, and I will construe them to have their plain

21    and ordinary meanings as articulated by Plaintiff.

22           The fourth term is "purifying testosterone,"

23    which is found in claims 1 and 15 of the '862 patent.

24    Plaintiff again offers the plain and ordinary meaning, which

25    it states is "enriching the amount of testosterone relative

to one or more other components of the sample."  Defendants

counter with "enriching the amount of testosterone relative

to one or more other components of the sample by removing

materials other than the analyte of interest."  The crux of

dispute is whether the additional language proposed by

Defendants, i.e., "by removing materials other than the

analyte of interest" belongs in the construction.  I

conclude that it does not.

In column 3, lines 50 to 54, the '862 patent

states that "purification refers to a procedure that

enriches the amount of one or more analytes of interest

relative to one or more other components of the sample."

That is a definition and the parties do not dispute that.

Defendants' proposed additional language comes

from the sentences preceding and following the definition

that I just read.  The preceding sentence states that "For

[p]urification in this context does not refer to removing

all materials from the sample other than the analyte(s) of

interest."  That refers to what purification is not in the

context of the '862 patent rather than what it is, and I

find that it is not part of the express definition of the

term.  Moreover, that sentence seems to suggest that

purification does not require removing all other materials

from the sample other than the analyte of interest.  It does

not suggest that purification requires removal of

1    non-analyte materials from the sample as opposed to vice

2    versa.

3           Defendants also rely on the sentence following

4    the definition, which states:  "In preferred embodiments,

5    purification can be used to remove one or more interfering

6    substances, e.g., one or more substances that would

7    interfere with detection of an analyte ion by mass

8    spectrometry."  That language is clearly referring to

9    embodiments of the invention and is not definitional.

10          Finally, Defendants' construction improperly

11   excludes "extraction" of testosterone without removing other

12   non-analyte materials, which both the claims and the

13   specification describe as purifying.  For example, claim 1

14   of the '862 patent recites:  "purifying testosterone from a

15   sample from a female human, wherein said purifying comprises

16   extracting testosterone from said sample."  Other sections

17   of the specification cited here today, for example, column

18   9, lines 54 through 60, similarly refer to "purifying" the

19   analyte of interest without reference to removal of

20   non-analyte material from the sample.  I will thus not

21   include the additional language proposed by Defendants in

22   the construction.

23          The fifth term is "relating the detected ions to

24   the presence or amount of said 25-hydroxyvitamin D2 in said

25   sample."  It is found in claim 21 of the '867 patent.

1   Plaintiff asserts that no construction is necessary and

2   simply refers to the words themselves.  Defendants argue

3   that the term means "quantifying the presence or

4   concentration of said 25-hydroxyvitamin D2 in said sample

5   based on the detected ions."

6          Defendants' construction substitutes the word

7   "quantifying" for the language "relating the detected ions

8   to" and substitutes the word "concentration" for amount.

9          Here, I agree with Plaintiff that the words

10  "relating the detected ions to the presence or amount"

11  encompasses two concepts.  The first concept is "relating

12  the detected ions to the presence" and it is qualitative,

13  i.e., 25-hydroxyvitamin D2 is either present or it is not.

14  The second concept is "relating the detected ions to

15  the ... amount" and it is quantitative, i.e., describing

16  measuring the amount of 25-hydroxyvitamin D2.

17         The specification of the '867 patent similarly

18  describes how "detected ions" may be related to the

19  presence, which is non-quantitative, or amount, which is

20  quantitative, of 25-hydroxyvitamin D2 in a sample.  These

21  passages distinguish between the "presence" and the

22  "amount."

23         Although Defendants cite to a number of places

24  in the patent where the amount of analyte is measured, those

25  appear to be embodiments.  The Federal Circuit has cautioned

1    against reading embodiments into the claims in *CCS Fitness,*

2    *Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366, (Fed. Cir.

3    2002), and *Superguide Corp. v. DirectTV Enterprises, Inc.,*

4    358 F.3d 870, 875 (Fed. Cir. 2004).  I will heed that

5    caution and refrain from reading the limitations from

6    embodiments in the specification that Defendants propose I

7    add.

8              The sixth and final term is "relating the

9    detected ions to the amount of said vitamin D metabolite in

10   said sample," which is found in claim 1 of the '427 patent.

11   The dispute regarding this term is similar to the "relating"

12   term that I just construed.  Plaintiff again argues that no

13   construction is necessary and refers to the words

14   themselves.  Defendants argue that the term means

15   "quantifying the concentration of said vitamin D metabolite

16   in said sample based on the detected ions."

17             For the reasons previously stated with respect

18   to the fifth term, I agree that no construction is

19   necessary.

20             So I think that's all of the terms.  Is there

21   anything else that we need to address today?

22             MS. MAYER:  No, Your Honor.

23             MS. KIM:  Not from Defendants, Your Honor.

24             THE COURT:  Okay.  Thank you very much.

25             (Hearing concluded at 3:49 p.m.)